1  POMERANTZ LLP
2  Jennifer Pafiti (SBN 282790)
   1100 Glendon Avenue, 15th Floor
3  Los Angeles, California 90024
   Telephone: (310) 405-7190
4  jpafiti@pomlaw.com

5  *Attorney for Plaintiff*

6  *[Additional Counsel on Signature Page]*

7

8                UNITED STATES DISTRICT COURT
9               NORTHERN DISTRICT OF CALIFORNIA

10 | SCOTT PETERSEN, Individually and on Behalf | Case No.
11 | of All Others Similarly Situated,

12 |                          Plaintiff,         | CLASS ACTION

13 |              v.                             | COMPLAINT FOR VIOLATIONS OF THE
14 |                                             | FEDERAL SECURITIES LAWS
   | STEM, INC. f/k/a STAR PEAK ENERGY
15 | TRANSITION CORP., JOHN CARRINGTON,          | DEMAND FOR JURY TRIAL
   | ERIC SCHEYER, WILLIAM BUSH,
16 | MICHAEL D. WILDS, MICHAEL C.
   | MORGAN, ADAM E. DALEY, ALEC
17 | LITOWITZ, DESIRÉE ROGERS, and C. PARK
   | SHAPER,
18 |
19 |                          Defendants.
20

21         Plaintiff Scott Petersen ("Plaintiff"), individually and on behalf of all others similarly

22 situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges

23 the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and

24 information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

25 by and through Plaintiff's attorneys, which included, among other things, a review of the

26 Defendants' public documents, conference calls and announcements made by Defendants, United

27 States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases

28

                                    1

published by and regarding Stem, Inc. ("Stem" or the "Company") f/k/a Star Peak Energy Transition Corp. ("STPK"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Stem securities: (a) pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the merger ("Merger") consummated on April 28, 2021 by and among the Company, STPK Merger Sub Corp. ("Merger Sub"), and Stem, Inc., a private Delaware corporation ("Legacy Stem"); and/or (b) between March 4, 2021 and February 16, 2023, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Stem purports to operate as a digitally connected and intelligent energy storage network provider in the U.S. and internationally. The Company offers energy storage systems sourced from original equipment manufacturers ("OEMs") and provides an artificial intelligence ("AI") platform called Athena, which offers battery hardware and software-enabled services to operate the energy storage systems. The Company's management has asserted that Stem's services revenue line is purportedly comprised entirely of software revenue. Prior to the Merger, the Company operated as a publicly traded special purpose acquisition company ("SPAC").[1]

---

[1]      A SPAC, also called a blank-check company, is a development stage company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

3.     On December 4, 2020, the Company announced that it had entered into a definitive agreement for the Merger with Legacy Stem, a purported global leader in AI-driven clean energy storage systems, that would result in a combined company with an estimated equity value of approximately $1.35 billion.

4.     On December 17, 2020, the Company filed a registration statement ("Registration Statement") on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on March 29, 2021.

5.     On March 30, 2021, the Company filed a joint prospectus and proxy statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents") on Form 424B3 with the SEC in connection with the Merger, which incorporated and formed part of the Registration Statement.

6.     On April 28, 2021, the Company consummated the Merger whereby, among other things, Merger Sub merged with and into Legacy Stem, with Legacy Stem surviving the transaction as a wholly owned subsidiary of the Company; the Company renamed itself "Stem, Inc."; and the Company began operating Legacy Stem's business.

7.     On April 29, 2021, the combined Company's common stock and warrants began publicly trading on the New York Stock Exchange ("NYSE") under the ticker symbols "STEM" and "STEM.WS", respectively.

8.     Leading up to and following the Merger, Stem repeatedly represented that its unique AI-driven approach to energy storage management and related software products and offerings, which it offered alongside its hardware products and offerings, afforded the Company significant competitive advantages in attracting and retaining business partners and customers, and that these advantages differentiated Stem's business from its competitors.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9.      On February 24, 2022, Stem issued a press release announcing that it had entered into a strategic partnership with Available Power ("AP"), a purported developer of distributed energy resources and microgrid systems for commercial and industrial real estate, with a "*[v]alue of award expected to exceed $500 million across the project portfolio*" and that "*provide[d] Stem exclusive rights to 100 standalone energy storage projects in Texas*" (emphases in original).  Stem attributed the partnership win to its Athena software, thereby apparently validating Stem's narrative that its unique AI-driven approach to energy storage management differentiated the Company from competitors and would lead to significant growth and earnings.

10.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Legacy Stem suffered from material weaknesses in internal control over financial reporting related to accounting for deferred cost of goods sold and inventory, certain revenue recognition calculations, and internal-use capitalized software calculations; (ii) the Company had overstated Legacy Stem's and its own post-Merger business and financial prospects; (iii) Stem's software revenue did not make up 100% of the Company's services revenue; (iv) Stem had overstated the benefits expected to flow from its AP partnership; and (v) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

11.     On March 15, 2021, in an SEC filing, the Company revealed that Legacy Stem suffered from various previously undisclosed material weaknesses in its internal control over financial reporting related to, *inter alia*, "accounting for . . . deferred cost of goods sold and inventory," "the review of certain revenue recognition calculations," and "the review of internal-use capitalized software calculations."

12.     On this news, Stem's stock price fell $1.19 per share, or 3.36%, to close at $34.24 per share on March 15, 2021.

13.     On February 24, 2022, Stem reported its fourth quarter ("4Q") and full year ("FY") 2021 financial results.  Among other items, Stem reported FY 2021 earnings per share ("EPS") of -$0.96, missing consensus estimates by $0.05, as well as FY 2021 revenue of $127.37 million, missing consensus estimates by $19.58 million.

14.     On this news, Stem's stock price fell $2.43 per share, or 21.62%, to close at $8.81 per share on February 25, 2022.

15.     On January 5, 2023, Stem released an investor presentation deck that it had prepared in connection with its attendance at the Goldman Sachs Global Energy and Clean Technology Conference, wherein the Company revealed that its 2022 bookings backlog was "partially offset by [a] Stem-initiated contract cancellation (~$130M) due to partner non-performance on [an] agreed timeline".

16.     Following release of the investor presentation deck, Stem's stock price fell $0.75 per share, or 8.78%, to close at $7.79 per share on January 5, 2023.

17.     On January 11, 2023, Blue Orca Capital ("Blue Orca") issued a report alleging various additional undisclosed issues with Stem's business and financial prospects, including, among other things, that the Company had overstated its software revenues by falsely claiming that 100% of its services revenue line was attributable to software revenues.

18.     On January 12, 2023, Stem issued a response to the Blue Orca report, purporting to refute Blue Orca's claims regarding, *inter alia*, the Company's software revenues.  In doing so, however, the Company never expressly refuted Blue Orca's claims that software revenue did not make up 100% of the Company's services revenue.  Separately, Stem's response to the Blue Orca report clarified that the Company's "canceled . . . booking of approximately $135 million in the fourth quarter of 2022"—as first disclosed in Stem's January 5, 2023 investor presentation deck—was "attributable solely to DevCo projects with [AP]" and that "[w]e have not recorded any revenue from any [AP] projects and there are no additional projects in the backlog with this former partner."

19.     Then, on February 16, 2023, Stem reported its 4Q 2022 results and 2023 guidance. Among other items, the Company reported 4Q revenue of $156 million, versus consensus estimates of $166 million, and issued disappointing FY 2023 revenue guidance of $550 million to $650 million, which was mostly below consensus estimates of $647 million.

20.     On this news, Stem's stock price fell $1.44 per share, or 14.78%, to close at $8.30 per share on February 17, 2023—a ***69.32% decline*** from the Company's first post-Merger closing stock price of $27.05 per share on April 29, 2021 (the "Initial Closing Price").

21.     As of the time this Complaint was filed, Stem's common stock was trading significantly below its Initial Closing Price and continues to trade below its initial value from the Merger, damaging investors.

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Stem is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

27.     Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired Stem securities pursuant and/or traceable to the Offering Documents issued in connection with the Merger, and/or during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Defendant Stem is a Delaware corporation with principal executive offices located at 100 California Street, 14th Floor, San Francisco, California 94111.  Stem's common stock and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

warrants trade in an efficient market on NYSE under the ticker symbols "STEM" and "STEM.WS", respectively. Prior to the Merger, the Company was a Delaware corporation with principal executive offices located at 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201, and the Company's Class A common stock, warrants, and units traded in an efficient market on the NYSE under the ticker symbols "STPK", "STPK.WS", and "STPK.U", respectively.

29.     Defendant John Carrington ("Carrington") has served as the Company's Chief Executive Officer ("CEO") at all relevant times following consummation of the Merger. Carrington also currently serves as a Director of the Company. During the Class Period, Defendant Carrington sold 538,097 Stem shares for total proceeds of approximately $8.08 million.

30.     Defendant Eric Scheyer ("Scheyer") served as the Company's CEO at all relevant times prior to consummation of the Merger. Scheyer signed or authorized the signing of the Registration Statement filed with the SEC.

31.     Defendant William Bush ("Bush") has served as the Company's Chief Financial Officer ("CFO") at all relevant times following consummation of the Merger. During the Class Period, Defendant Bush sold 189,421 Stem shares for total proceeds of approximately $2.99 million.

32.     Defendant Michael D. Wilds ("Wilds") served as the Company's CFO at all relevant times prior to consummation of the Merger. Wilds signed or authorized the signing of the Registration Statement filed with the SEC.

33.     Defendants Carrington, Scheyer, Bush, and Wilds are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

34.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

35.     Stem and the Exchange Act Individual Defendants are sometimes collectively referred to herein as the "Exchange Act Defendants."

36.     Defendant Michael C. Morgan ("Morgan") served as the Company's Chairman of the Board at all relevant times prior to consummation of the Merger.   Morgan has served as a Director of the Company at all relevant times following consummation of the Merger.  Morgan signed or authorized the signing of the Registration Statement filed with the SEC.

37.     Defendant Adam E. Daley ("Daley") has served as a Director of the Company at all relevant times.  Daley signed or authorized the signing of the Registration Statement filed with the SEC.  During the Class Period, Defendant Daley sold 500,000 Stem shares for total proceeds of approximately $8.37 million.

38.     Defendant Alec Litowitz ("Litowitz") served as a Director of the Company at all relevant times prior to consummation of the Merger.  Litowitz signed or authorized the signing of the Registration Statement filed with the SEC.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39.     Defendant Desirée Rogers ("Rogers") served as a Director of the Company at all relevant times prior to consummation of the Merger.  Rogers signed or authorized the signing of the Registration Statement filed with the SEC.

40.     Defendant C. Park Shaper ("Shaper") served as a Director of the Company at all relevant times prior to consummation of the Merger.  Shaper signed or authorized the signing of the Registration Statement filed with the SEC.

41.     Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper are sometimes collectively referred to herein as the "Securities Act Individual Defendants."

42.     As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation of the Company's securities in the Merger for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the Merger working group and executives of the Company who pitched investors to approve the Merger and the shares acquired in the Merger.

43.     Stem and the Securities Act Individual Defendants are sometimes collectively referred to herein as the "Securities Act Defendants."

44.     The Exchange Act Defendants and the Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

45.     Stem purports to operate as a digitally connected and intelligent energy storage network provider in the U.S. and internationally.  The Company offers energy storage systems sourced from OEMs and provides an AI platform called Athena, which offers battery hardware and software-enabled services to operate the energy storage systems.  The Company also offers various other services to commercial and industrial enterprises, independent power producers,

renewable project developers, and utilities and grid operators.  Prior to the Merger, the Company operated as a publicly traded SPAC.

46.     On December 4, 2020, the Company announced that it had entered into a definitive agreement for the Merger with Legacy Stem, a purported global leader in AI-driven clean energy storage systems, that would result in a combined company with an estimated equity value of approximately $1.35 billion.

47.     On December 17, 2020, the Company filed the Registration Statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on March 29, 2021.

48.     On March 30, 2021, the Company filed the Prospectus on Form 424B3 with the SEC in connection with the Merger, which incorporated and formed part of the Registration Statement.

49.     On April 28, 2021, the Company consummated the Merger whereby, among other things, Merger Sub merged with and into Legacy Stem, with Legacy Stem surviving the transaction as a wholly owned subsidiary of the Company; the Company renamed itself "Stem, Inc."; and the Company began operating Legacy Stem's business.

50.     On April 29, 2021, the combined Company's common stock and warrants began publicly trading on the NYSE under the ticker symbols "STEM" and "STEM.WS", respectively.

51.     Leading up to and following the Merger, Stem repeatedly represented that its unique AI-driven approach to energy storage management and related software products and offerings, which it offered alongside its hardware products and offerings, afforded the Company significant competitive advantages in attracting and retaining business partners and customers, and that these advantages differentiated Stem's business from its competitors.

**Materially False and Misleading Statements Issued in the Offering Documents**

52.     The Offering Documents contained various statements that purported to support the attractiveness of Legacy Stem as a merger target.  For example, the Offering Documents stated, *inter alia*, that Legacy Stem "ha[s] numerous partnerships with a diverse set of industry leaders to reduce execution risk and increase speed to market in certain geographies"; and that Legacy Stem, "[i]nternationally, . . . ha[s] partnered with leading regional industrial equipment and energy firms . . . each focused on leveraging the partner's local market knowledge and reputation with leading corporates, utilities and grid operators."

53.     The Offering Documents also stated that "[w]e intend to leverage our competitive strengths, technology leadership and market share position to build out the largest, digitally connected, AI-powered energy storage network, through" several strategies, including a "Continued Focus on Software Innovations", "Front-of-the-Meter Expansion", "International Market Growth", "More Favorable Supply Chain and Financing Terms", and "Additional Service Offerings".  For example, the Offering Documents stated that "[w]e have significant in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM [Front-of-the-Meter] opportunities"; that "[w]e have a history of innovation in the energy storage market through our development of an AI-powered storage technology and zero-money down financing"; that Legacy Stem "ha[s] built a sizeable leadership position"; and that "[w]e have additional end-market opportunities in other applications for storage such as electric vehicle charging ('EV') integration and power solutions."

54.     With respect to competition, the Offering Documents asserted, *inter alia*, that "industry transformation has created an opportunity for an increased role for energy storage solutions like ours" and "[w]e believe as one of the largest in this industry we have a significant head start against our competition in this rapidly evolving environment."

55. Likewise, the Offering Documents asserted that Legacy Stem's "industry peers are typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, while our AI-powered platform is capable of delivering a multitude of software-enabled services operating an extensive and diverse network of energy storage systems across multiple geographies, utility and grid operator service areas."

56. With further regard to Legacy Stem's and, accordingly, the Company's post-Merger competitive advantages, the Offering Documents stated, in relevant part:

> We believe that one of the key advantages driving sustainable differentiation for our company includes the focus and capabilities built in our pioneering history in the BTM [Behind-the-Meter] segment of the energy storage industry. This experience required an emphasis on AI-driven co-optimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single-purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems.
>
> We believe we are well-positioned to compete successfully in the market for energy storage hardware and software-enabled services. Despite our limited operating history, we are among the leaders in global distributed energy storage under management, supported by our Athena platform, compelling customer services, strategic partnerships and seasoned leadership team with a proven track record of success.

57. The statements referenced in ¶¶ 52-56 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated Legacy Stem's and its own post-Merger business and financial prospects; and (ii) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

**Materially False and Misleading Statements Issued During the Class Period**

58.    The Class Period begins on March 4, 2021, when the Company, then still operating as a SPAC, filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K"). With respect to the proposed Merger, the 2020 10-K largely discussed the general terms and process of the anticipated transaction, while repeatedly referring investors "to the preliminary proxy statement/consent solicitation statement/prospectus, as filed in Form S-4 with the [SEC] on January 22, 2021 for additional information."  The referenced filing stated the following, in relevant part, regarding material weaknesses that existed in Legacy Stem's internal control over financial reporting:

> Based on its assessment as of December 31, 2019, management has identified material weaknesses in its internal controls over financial reporting that we are currently working to remediate, which relate to (i) ineffective internal controls over accounting for complex and significant transactions, (ii) accounting for energy storage systems, (iii) ineffective internal controls over review of the Company's consolidated financial statements and related disclosures and (iv) a lack of formality in our internal control activities, especially related to management review-type controls. With respect to accounting for complex and significant transactions, deficiencies exist in our process for ensuring the completeness of information utilized in various technical accounting analyses and in certain instances, the proper application of the relevant accounting literature, including the determination of the appropriate valuation methodology. These deficiencies could result in material adjustments for certain transactions, including interest capitalization and accounting for convertible notes, accounting and valuation of embedded derivatives and warrant liabilities. With respect to energy storage systems, we did not properly track inflows and outflows, including the valuation of energy storage systems, due in part to the systems that the Company used to track and value energy storage systems. With respect to a lack of formality in our control activities, we did not sufficiently establish formal policies and procedures to design effective controls,

14

establish responsibilities to execute these policies and procedures and hold individuals accountable for performance of these responsibilities. We had multiple control deficiencies aggregating to a material weakness over ineffective control activities.

59.     Appended as exhibits to the 2020 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Scheyer and Wilds certified that the 2020 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "the information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

60.     The statements referenced in ¶¶ 58-59 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) Legacy Stem suffered from additional material weaknesses in internal control over financial reporting related to accounting for deferred cost of goods sold and inventory, certain revenue recognition calculations, and internal-use capitalized software calculations; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

61.     On March 15, 2021, during pre-market hours, Stem filed a third amendment to the Registration Statement on Form S-4/A with the SEC (the "Third Registration Statement Amendment"), revealing previously undisclosed material weaknesses in Legacy Stem's internal control over financial reporting, stating, in relevant part:

Based on its assessment as of December 31, 2020, management has identified material weaknesses in its internal controls over financial reporting that we are currently working to remediate, which relate to [*inter alia*] . . . (ii) accounting for . . . deferred cost of goods sold and inventory . . . (v) ineffective internal controls

over the review of certain revenue recognition calculations, and (vi) ineffective internal controls over the review of internal-use capitalized software calculations . . . . With respect to . . . inventory and deferred cost of goods sold, we did not properly track inflows and outflows, including the valuation of energy storage systems, due in part to the systems that the Company used to track and value energy storage systems and inventory . . . . [W]e did not sufficiently establish formal policies and procedures to design effective controls, . . . including over review over revenue recognition and internal-use capitalized software calculations.

62.  Following the filing of the Third Amended Registration Statement, Stem's stock price fell $1.19 per share, or 3.36%, to close at $34.24 per share on March 15, 2021.  Despite this decline in the Company's stock price, Stem securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding Stem's post-Merger business and financial prospects, software revenues, and the benefits expected to flow from its AP partnership.

63.  For example, on November 9, 2021, Stem hosted a conference call with investors and analysts to discuss the Company's third quarter 2021 financial results (the "3Q21 Earnings Call").  On the 3Q21 Earnings Call, Defendant Bush represented that the Company's services revenue line was comprised entirely of software revenue:

**[Analyst]**

First, a little bookkeeping question. But on the service revenue line, is that 100% software-related revenue? Or is there another component to that?

**[Defendant Bush]**

That is 100% software revenue.

64.  On February 24, 2022, Stem issued a press release entitled "Stem's Athena® Software Selected by [AP] to Optimize Up to 2GWh Energy Storage Portfolio in ERCOT" (the "February 2022 Press Release"), announcing that the Company "has been selected to provide smart energy storage solutions in Texas to [AP], a developer that designs, develops, and deploys distributed energy resources and microgrid systems for commercial and industrial real estate."

The February 2022 Press Release touted the AP partnership as a major win for the Company's business, stating, in relevant part:

> This strategic partnership gives Stem exclusive rights to provide its proprietary Athena® smart energy storage software to energy storage systems at 100 front-of-the-meter (FTM) sites throughout the state of Texas. The project portfolio is expected to have a value of more than $500 million and will be completed in phases, beginning with deployment of the first 20 systems by early 2023. Together, Stem and AP will be providing the state grid, operating under the Electric Reliability Council of Texas (ERCOT), with an additional one gigawatt (GW), or two gigawatt-hours (GWh), of flexible electric power for 20 years.
>
> ERCOT is responsible for delivering 90 percent of the state's electric power to more than 25 million people throughout Texas. The market for energy storage in ERCOT is expected to grow more than 10 GWh over the next five years as renewable energy adoption increases and the state prioritizes grid resilience.
>
> AP will be facilitating the entire scope of work on the projects, from development of the energy storage sites, to marketing and selling the assets as they reach operation. Stem will provide the battery storage hardware at each site, incorporate Athena Bidder™ to optimize the bidding and dispatch of the systems (based on real-time market dynamics), and organize the portfolio of energy storage sites into a single, integrated energy intelligence platform. The full scope of Stem's software and services also includes revenue modeling, battery hardware consulting, and development support to successfully complete these projects.

65.    The February 2022 Press Release also quoted Defendant Carrington, who stated that "[t]his partnership with [AP] showcases Stem's ability to support developers across the project lifecycle and enable best-in-class management of large portfolios of energy storage projects"; and that "[o]ur market-leading Athena® software, advanced Bidder™ application, system operating knowledge, and ability to rapidly deploy projects will help [AP] quickly go to market and generate exceptional value."

66.    The statements referenced in ¶¶ 63-65 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, the Exchange Act Defendants made false and/or misleading statements

and/or failed to disclose that: (i) the Company had overstated Legacy Stem's and its own post-Merger business and financial prospects; (ii) Stem's software revenue did not make up 100% of the Company's services revenue; (iii) Stem had overstated the benefits expected to flow from its AP partnership; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

67.     On February 24, 2022, during post-market hours, Stem issued a press release announcing its 4Q and FY 2021 financial results (the "4Q/FY21 Press Release").  Among other items, Stem reported FY 2021 EPS of -$0.96, missing consensus estimates by $0.05, as well as FY 2021 revenue of $127.37 million, missing consensus estimates by $19.58 million.  As reported by *Seeking Alpha* the following day:

> Stem Inc. (STEM -19%) sinks to a new 52-week low after reporting a larger than forecast Q4 loss and record-high quarterly revenues that tripled from a year ago but missed analyst expectations.
>
> Stem's Q4 net loss narrowed to $34.1M from last year's $100.9M loss but was still wider than the analyst consensus for an $11.6M loss.
>
> * * *
>
> "Supply chain, permitting and interconnection delays negatively impacted our fourth quarter revenues, but demand remains robust, and we expect these issues to resolve over time," [Defendant] Carrington said.
>
> * * *
>
> Stem shares have plunged 68% over the past year, including a 40% YTD decline.

68.     On this news, Stem's stock price fell $2.43 per share, or 21.62%, to close at $8.81 per share on February 25, 2022.  Despite this decline in the Company's stock price, Stem securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding Stem's post-

Merger business and financial prospects, software revenues, and the benefits expected to flow from its AP partnership.

69.     For example, in its "Business Highlights" section, the 4Q/FY21 Press Release reiterated the benefits Stem would realize through its AP partnership, stating, in relevant part:

> On February 24, 2022, the Company announced that it had been exclusively selected to provide storage solutions to [AP], a developer of distributed energy resources. The strategic partnership **will** develop up to 100 FTM sites in Texas with potential to provide one gigawatt (GW), or two GWh, of energy storage systems and Athena software. The portfolio **will** be completed in phases, with deployment of the first 20 systems by early 2023.

(Emphases added.)

70.     On February 28, 2022, Stem filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). That filing contained substantively the same statements as referenced in ¶¶ 52 and 54-56, *supra*, regarding the Company's business and financial prospects, including its purported competitive advantages and leadership in global distributed energy storage under management.

71.     With respect to Stem's service revenue line, including the sales comprising that revenue line, the 2021 10-K stated, in relevant part:

> We generate service revenue and hardware revenue. Service revenue is generated through arrangements with host customers to provide energy optimization services using our proprietary cloud-based software platform coupled with a dedicated energy storage system owned and controlled by us throughout the term of the contract. Fees charged to customers for energy optimization services generally consist of recurring fixed monthly payments throughout the term of the contract and in some arrangements, an installation and/or upfront fee component. We may also receive incentives from utility companies in relation to the sale of our services.
>
> . . . . We separately generate services revenue through partnership arrangements by providing energy optimization services after the developer completes the installation of the project.

72.     The 2021 10-K also reported that "[s]ervices revenue increased by $4.8 million primarily due to continued growth in host customers arrangements and partnership revenue related to services provided."  Taken in conjunction with Defendant Bush's representation on the 3Q21 Earnings Call that the services revenue line "is 100% software revenue", investors were led to believe that this increase in services revenue was entirely attributable to the Company's software products and offerings.

73.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 59, *supra*, signed by Defendants Carrington and Bush.

74.     The statements referenced in ¶¶ 69-73 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company had overstated Legacy Stem's and its own post-Merger business and financial prospects; (ii) Stem's software revenue did not make up 100% of the Company's services revenue; (iii) Stem had overstated the benefits expected to flow from its AP partnership; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

75.     On January 5, 2023, during pre-market hours, Stem released an investor presentation deck that it had prepared in connection with its attendance at the Goldman Sachs Global Energy and Clean Technology Conference, wherein the Company revealed that its 2022 bookings backlog was "partially offset by [a] Stem-initiated contract cancellation (~$130M) due to partner non-performance on [an] agreed timeline", notably, without disclosing which partner's non-performance had led to the contract cancellation.

76.     Following release of the investor presentation deck, Stem's stock price fell $0.75 per share, or 8.78%, to close at $7.79 per share on January 5, 2023.

77.     On January 11, 2023, Blue Orca issued a report alleging various additional undisclosed issues with Stem's business and financial prospects, including, among other things, that the Company had overstated its software revenues by falsely claiming that 100% of its services revenue line was attributable to software revenue, stating, in relevant part:

> STEM's stock trades at a premium on its claim that its low-margin hardware sales are accompanied by high-margin software revenues from its Athena AI platform, which STEM claims has a growing pipeline of recurring future revenues . . . . STEM's management stated unequivocally that "100%" of this services revenue line was from "software revenue." **In our view, this is a lie.** Rather, almost all of this services revenue is not from software, but from a legacy business under which STEM leases hardware to customers in what it calls "host customer arrangements." These arrangements, which STEM are winding down, are akin to hardware leases with a small software and services component, yet STEM tries to claim that 100% of the revenues from these contracts are software . . . . By disguising these low-margin, no-growth contract leases as software revenues, we think STEM fools investors into believing that STEM has a meaningful software business in order to garner a substantially higher valuation multiple.
>
> * * *
>
> For example, on an earnings call, STEM's CFO confirmed that "100%" of the service revenue line was "software revenue."
>
> * * *
>
> Likewise in its investor presentations, STEM labels these revenues as "software revenue."
>
> * * *
>
> Without hardware-leasing revenues masquerading as software revenues, STEM would be viewed as a low margin battery storage integrator whose primary business is charging developers a small markup on batteries purchased from OEMs. We think that STEM misleads investors about the true nature of its software revenues to inflate its stock price.
>
> • **This Explains STEM's Shifting and Disappearing Disclosures**

We think STEM knows that this is terminal to its valuation, which is why STEM has stopped disclosing both partnership services and host customer revenues in recent periods.

Up until and including its Q3 2021 filing, STEM specifically broke out the portion of its "partnership service" revenue derived from services. We think that this is the best proxy for the revenue reasonably attributed to the supposedly unique and coveted "Athena AI" platform which STEM pitches to investors as the cornerstone of its burgeoning and coveted software business.

*Disaggregation of Revenue*

The following table provides information on the disaggregation of revenue as recorded in the consolidated statements of operations (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Partnership hardware revenue | $ 34,886 | $ 5,523 | $ 59,609 | $ 6,950 |
| Partnership service revenue | 33 | — | 112 | — |
| Host customer service revenue | 4,914 | 3,649 | 14,870 | 10,711 |
| Total revenue | $ 39,833 | $ 9,172 | $ 74,591 | $ 17,661 |

*Source: STEM 10-Q Q3-2021*

\* \* \*

Then, in Q3 2022, STEM changed the labelling of its software segment from "service revenue" to **"services and *other* revenue."**

*Disaggregation of Revenue*

The following table provides information on the disaggregation of revenue as recorded in the consolidated statements of operations (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Hardware revenue | $ 85,809 | $ 34,886 | $ 171,358 | $ 59,609 |
| Services and other revenue | 13,692 | 4,947 | 36,178 | 14,982 |
| Total revenue | $ 99,501 | $ 39,833 | $ 207,536 | $ 74,591 |

*Source: STEM 10-Q Q3-2022*

What counts as "other" in this segment? STEM does not say. Yet the timing of the label change is notable. In Q3-2022, STEM's purported organic "software" segment grew 24% QoQ [quarter-over-quarter] to $6.6 million, the first time this segment had shown meaningful growth in 18 months. We suspect that the growth was driven not by organic software sales, but by the inclusion of other non-software service revenue in the segment, hence the label change.

(Emphases in original.)

78.    On January 12, 2023, Stem issued a response to the Blue Orca report, purporting to refute Blue Orca's claims regarding, *inter alia*, the Company's software revenues. In doing

so, however, the Company never expressly refuted Blue Orca's claims that software revenue did

not make up 100% of the Company's services revenue, merely stating, in relevant part:

> **Software Revenues.** Our Host Customer agreements represented approximately
> $20 million of our total Services revenue in full-year 2021. These agreements
> represent ongoing software services where we optimize energy storage systems on
> behalf of our customers. These contracts are financed by third parties and are not
> classified as leases. Rather, these contracts are classified as services revenue in
> accordance with FASB ASU 2014-09 Topic 606, *Revenue from Contracts with
> Customers ("ASC 606")*.
>
> We generated $36 million of services revenue through third quarter 2022, a 141%
> increase versus the nine months ended September 30, 2021, and our services
> revenue in third quarter 2022 grew 9% sequentially versus the second quarter of
> 2022.
>
> We believe Contracted Annual Recurring Revenue (CARR) is a good proxy for the
> long-term value of the differentiated technology that we provide our customers. All
> additions to CARR represent contracted, high-margin software services. As
> previously disclosed, CARR was $61 million at the end of the third quarter 2022.

(Emphases in original.)

79.     Separately, Stem's response to the Blue Orca report clarified that the Company's

"canceled . . . booking of approximately $135 million in the fourth quarter of 2022"—as first

disclosed in Stem's January 5, 2023 investor presentation deck—was "attributable solely to

DevCo projects with [AP]" and that "[w]e have not recorded any revenue from any [AP] projects

and there are no additional projects in the backlog with this former partner."

80.     Then, on February 16, 2023, during post-market hours, Stem reported its 4Q 2022

results and 2023 guidance.  Among other items, the Company reported 4Q revenue of $156

million, versus consensus estimates of $166 million, and issued disappointing FY 2023 revenue

guidance of $550 million to $650 million, which was mostly below consensus estimates of $647

million.  For example, as *Seeking Alpha* reported the following day:

> Stem Inc. (NYSE:STEM) -9.1% pre-market Friday after reporting Q4 revenues that
> missed estimates and FY 2023 guidance that disappointed investors.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Q4 revenues hit a company record $156M that tripled year-ago results and surged 56% Q/Q, but the analyst consensus had forecast $166M; full-year revenues totaled a record $363M.

Q4 net loss was $35.3M, compared to a net loss of $34.1M in the prior-year period; adjusted EBITDA was negative $10M vs. negative $12M in the year-ago quarter.

Q4 bookings more than doubled from a year earlier to $458M, which exceeded the company's entire bookings for FY 2021, and the year-end backlog totaled nearly $1B.

Cowen analysts said earnings were hurt by demand and logistical issues caused by China's COVID resurgence and the U.S. regulatory crackdown on solar, Bloomberg reported.

For FY 2023, Stem (STEM) guided for revenues of $550M-$650M, mostly below analyst consensus of $647M, and an adjusted EBITDA of $5M-$35M.

The company said it is "actively driving towards achieving positive adjusted EBITDA, which we continue to expect to occur in the second half of 2023."

Stem (STEM) shares have gained 15% so far this year but fell 14.5% during the past year.

81.     On this news, Stem's stock price fell $1.44 per share, or 14.78%, to close at $8.30 per share on February 17, 2023—a ***69.32% decline*** from the $27.05 per share Initial Closing Price.

82.     As of the time this Complaint was filed, Stem's common stock was trading significantly below the Initial Closing Price and continues to trade below its initial value from the Merger, damaging investors.

83.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than

Defendants that purchased or otherwise acquired Stem securities pursuant and/or traceable to the Offering Documents issued in connection with the Merger, and/or Stem securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

85.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stem securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Stem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

86.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

87.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

88.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the Merger, or during the Class Period, misrepresented material facts about the business, operations and management of Stem;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the Merger and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Stem to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Stem securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

90.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Stem securities are traded in an efficient market;

26

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

91. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

92. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

93. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

94. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

95. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon

Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Stem securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Stem securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

96.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Stem securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Stem's finances and business prospects.

97.     By virtue of their positions at Stem, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were

committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

98.     Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Stem, the Exchange Act Individual Defendants had knowledge of the details of Stem's internal affairs.

99.     The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Stem.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Stem's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Stem securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Stem's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Stem securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

100.    During the Class Period, Stem securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or

caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Stem securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Stem securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Stem securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

101.    By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

103.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Stem, and conducted and participated, directly and indirectly, in the conduct of Stem's business affairs. Because of their senior positions, they knew the adverse

non-public information about Stem's misstatement of income and expenses and false financial statements.

105.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Stem's financial condition and results of operations, and to correct promptly any public statements issued by Stem which had become materially false or misleading.

106.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Stem disseminated in the marketplace during the Class Period concerning Stem's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Stem to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of Stem within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Stem securities.

107.    Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Stem.  By reason of their senior management positions and/or being directors of Stem, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Stem to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Stem and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

108.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Stem.

## COUNT III

### (Violations of Section 11 of the Securities Act Against the Securities Act Defendants)

109.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

110.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

111.    The Offering Documents for the Merger were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

112.    Stem is the registrant for the shares issued pursuant to the Offering Documents. Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

113.    As issuer of the shares, Stem is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

114.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

115.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

116.    Plaintiff acquired Stem shares pursuant and/or traceable to the Offering Documents for the Merger.

117.    Plaintiff and the Class have sustained damages.  The value of Stem securities has declined substantially subsequent to and because of Defendants' violations.

## COUNT IV

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

118.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

119.    This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

120.    The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Stem within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Stem to engage in the acts described herein.

121.    The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

122.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

D.       Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  May 12, 2023                                 Respectfully submitted,

                                                              POMERANTZ LLP

                                                              */s/ Jennifer Pafiti*
                                                              Jennifer Pafiti (SBN 282790)
                                                              1100 Glendon Avenue, 15th Floor
                                                              Los Angeles, California 90024
                                                              Telephone: (310) 405-7190
                                                              jpafiti@pomlaw.com

                                                              POMERANTZ LLP
                                                              Jeremy A. Lieberman
                                                              (*pro hac vice* application forthcoming)
                                                              J. Alexander Hood II
                                                              (*pro hac vice* application forthcoming)
                                                              600 Third Avenue, 20th Floor
                                                              New York, New York 10016
                                                              Telephone: (212) 661-1100
                                                              Facsimile: (917) 463-1044
                                                              jalieberman@pomlaw.com
                                                              ahood@pomlaw.com

                                                              PORTNOY LAW FIRM
                                                              Leslie F. Portnoy
                                                              1800 Century Park East Suite 600
                                                              Los Angeles, California 90067
                                                              Telephone: (310) 692-8883
                                                              lesley@portnoylaw.com

                                                              *Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS