1    ROBBINS GELLER RUDMAN
        & DOWD LLP
2    SHAWN A. WILLIAMS (SBN 213113)
     WILLOW E. RADCLIFFE (SBN 200087)
3    Post Montgomery Center
     One Montgomery Street, Suite 1800
4    San Francisco, CA 94104
     Telephone: 415/288-4545
5    415/288-4534 (fax)
     shawnw@rgrdlaw.com
6    willowr@rgrdlaw.com

7    LEVI & KORSINSKY, LLP
     ADAM M. APTON (SBN 316506)
8    ADAM C. MCCALL (SBN 302130)
     445 South Figueroa Street, 31st Floor
9    Los Angeles, CA 90071
     Telephone: 213/985-7290
10   aapton@zlk.com
     amccall@zlk.com
11
     Lead Counsel for Lead Plaintiffs
12
     [Additional counsel appear on signature page.]
13
                    UNITED STATES DISTRICT COURT
14
                 NORTHERN DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| 16  VISHAL LAWALE and VISHAL P. ) | Master File No. 3:23-cv-02329-MMC |
| THAKKAR, Individually and on Behalf of All ) | |
| 17  Others Similarly Situated, ) | CLASS ACTION |
| ) | |
| 18  Lead Plaintiffs, ) | CONSOLIDATED COMPLAINT FOR |
| ) | VIOLATIONS OF THE FEDERAL |
| 19  v. ) | SECURITIES LAWS |
| ) | |
| 20  STEM, INC., JOHN CARRINGTON, ) | DEMAND FOR JURY TRIAL |
| WILLIAM BUSH, LARSH JOHNSON, ) | |
| 21  PRAKESH PATEL, ALAN RUSSO, BRYAN ) | |
| HO, STAR PEAK ENERGY TRANSITION ) | |
| 22  CORP., ERIC SCHEYER, MICHAEL D. ) | |
| WILDS, MICHAEL C. MORGAN, ADAM E. ) | |
| 23  DALEY, ALEC LITOWITZ, DESIRÉE ) | |
| ROGERS, AND C. PARK SHAPER, ) | |
| ) | |
| 24  Defendants. ) | |
| _____ ) | |
| 25  ) | |
| This Document Relates To: ) | |
| 26  ) | |
| ALL ACTIONS. ) | |
| 27  _____ ) | |

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 1 -

**TABLE OF CONTENTS**

**Page**

GLOSSARY OF DEFINED TERMS ......................................................................................... i

I.    JURISDICTION AND VENUE ................................................................................... 3

II.   PARTIES ..................................................................................................................... 4

      A.    Plaintiffs ......................................................................................................... 4

      B.    Defendants ...................................................................................................... 4

III.  NON-PARTIES AND PERCIPIENT WITNESSES ................................................. 10

      A.    Non-Parties ................................................................................................... 10

      B.    Percipient Witnesses .................................................................................... 11

IV.   BACKGROUND FACTS ......................................................................................... 12

      A.    Star Peak Forms a SPAC to Acquire a Company Purportedly to Improve Energy Ecosystems and Reduce Emissions ................................... 12

      B.    Stem's Software Story .................................................................................. 14

      C.    STEM's BTM Market Sales Had Stalled Prior to the IPO ........................... 17

      D.    Stem's Athena "AI" Software Was Not Viable for FTM Projects ................ 17

      E.    Stem Was Unable to Provide Training Materials for FTM Projects Because Athena Did Not Work for FTM .................................................... 19

      F.    Stem's Pipeline Was Inflated ...................................................................... 21

      G.    Stem's IPO and the Associated Infusion of Capital Was Critical for the Company's Survival and Growth .......................................................... 24

            1.    Stem Needed the Infusion of Capital from the IPO to Continue Operating and to Secure Deals ............................................. 24

            2.    Stem Needed the Infusion of Capital from the IPO to Develop Athena ............................................................................. 26

            3.    Stem Goes Public Through a Merger with Star Peak Based on a Defective Prospectus and Defective Investor Materials ......................... 26

      H.    Stem Acquired AlsoEnergy in an Effort to Remedy Athena's Deficient FTM Software and Boost Software Margins Revenue ................... 29

      I.    After the IPO Closes, Stem Books Phantom FTM Deals, Including the Available Power Project ........................................................................ 32

      J.    Stem Is Forced to Raise Capital ................................................................... 34

V.    THE 14(a) DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT ................... 37

    A.    The 14(a) Defendants' Materially False and Misleading Statements ................. 37

        1.    Contrary to the 14(a) Defendants' Misstatements, Stem's Athena Software Was Not Automated for FTM Customers ................................. 37

        2.    Because Athena Was Not Viable for FTM Projects, the 14(a) Defendants Had No Basis to Tout the FTM Segment ............................. 39

        3.    Defendants' Risk Disclosures Omitted Critical Facts and Warned of Risks that Had Already Materialized ................................................. 42

    B.    Causation ................................................................................................. 44

VI.    THE FRAUD DEFENDANTS' VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT ................................................................................................ 45

    A.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Business Model ................................................................. 45

    B.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Automated Software Athena ........................................... 54

    C.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's FTM Success with Athena ........................................... 58

    D.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Purported Pipeline and Available Power FTM Deal ............. 61

    E.    The Fraud Defendants' Materially False and Misleading Risk Disclosures ........ 66

    F.    The Fraud Defendants' Scheme ................................................................. 69

VII.    ADDITIONAL ALLEGATIONS OF LOSS CAUSATION ............................................. 77

    A.    Loss Causation (All Claims) ..................................................................... 77

        1.    Partial Disclosures on February 24, 2022 ................................. 79

        2.    Partial Disclosures on January 5, 2023 ..................................... 82

        3.    Partial Disclosures on February 16, 2023 ................................. 84

        4.    Partial Disclosures on March 29, 2023 ..................................... 89

        5.    Partial Disclosures on April 4, 2023 .......................................... 91

    B.    Loss Causation (§10(b) Claims Only) ....................................................... 95

VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER (§10(b) CLAIMS ONLY) ................. 96

    A.    Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo's Massive Insider Trading Supports a Strong Inference of Scienter ................................. 96

B. That Defendants Carrington, Bush, and Johnson Monitored Stem's Key Metrics as Part of Their Annual Performance Compensation Supports a Strong Inference of Scienter ................................................. 101

C. Stem's Liquidity Issues and Capital Requirements Add to the Strong Inference of Scienter ................................................. 104

D. Extensive Due Diligence as Part of the IPO Process Adds to the Inference of Scienter ................................................. 106

E. The Individual Fraud Defendants' Participation in Meetings, Focus on Margins, and Access to the Salesforce Pipeline Adds to the Inference of Scienter ................................................. 108

F. The Core Operation Inference Adds to the Inference of Scienter ................................................. 110

G. That the Individual Fraud Defendants Spoke Knowingly on Topics Adds to the Inference of Scienter ................................................. 111

H. The Individual Fraud Defendants Knew Stem's Internal Controls Were Ineffective ................................................. 114

I. The Individual Fraud Defendants' Violations of Stem's Own Internal Policies Support a Strong Inference of Scienter ................................................. 115

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR DOCTRINE AND BESPEAKS CAUTION DOCTRINE ................................................. 118

X. PRESUMPTION OF RELIANCE ................................................. 122

XI. CLASS ACTION ALLEGATIONS ................................................. 124

COUNT I ................................................. 125

Violation of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9 Against the 14(a) Defendants ................................................. 125

COUNT II ................................................. 128

For Violation of §20(a) of the Exchange Act Against the 14(a) Individual Defendants ................................................. 128

COUNT III ................................................. 129

For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against the Fraud Defendants ................................................. 129

COUNT IV ................................................. 130

For Violation of §20(a) Of The Exchange Act Against the Individual Fraud Defendants ................................................. 130

COUNT V ................................................. 131

1

For Violation of §20A of the Exchange Act Against Defendants Bush,
Carrington, Daley, Johnson, and Russo for Insider Selling ......................................... 131

PRAYER FOR RELIEF ................................................................. 134

JURY DEMAND ......................................................................... 134

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# GLOSSARY OF DEFINED TERMS

The following short forms and citations are used herein:

| TERM | DEFINITION |
|---|---|
| "14(a) Defendants" | Defendants Stem, Star Peak, Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper. |
| "14(a) Individual Defendants" | Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper. |
| "2022 AIP" | 2022 Annual Incentive Plan |
| "AI" | Artificial intelligence |
| "AlsoEnergy" | AlsoEnergy Holdings, Inc. |
| "Available Power" | Available Power, LLC |
| "Blue Orca" | Blue Orca Capital |
| "BTM" | Behind-the-meter |
| "Bush" | William Bush |
| "C&I" | Commercial and industrial |
| "CAO" | Chief Accounting Officer |
| "CARR" | Contracted Annual Recurring Revenue |
| "Carrington" | John Carrington |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "Class" | The Section 14(a) Class and the Section 10(b) Class. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. |
| "Class Period" | The time period between and including 12/04/20 and 04/03/23. |
| "CRO" | Chief Revenue Officer |
| "CSO" | Chief Strategy Officer |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                      - i -

| TERM | DEFINITION |
|------|------------|
| "CTO" | Chief Technology Officer |
| "CW" | Confidential witness |
| "D&T" | Deloitte & Touche LLP |
| "Daley" | Adam E. Daley |
| "Defective Investor Materials" | Numerous investor materials that were incorporated by reference into the Defective Prospectus, including press releases, PowerPoint slide decks, and presentation transcripts, that were filed with the SEC on 12/04/20, 01/05/21, 01/13/21, 01/25/21, 02/11/21, 02/18/21, 03/02/21, 03/18/21, 03/22/21, 03/30/21, 04/06/21, 04/12/21, 04/14/21, and 04/21/21. |
| "Defective Prospectus" | The defective prospectus includes the defective registration statement and preliminary proxy statement/consent solicitation statement/prospectus on Form S-4 in connection with the merger and that was thereafter amended on Forms S-4/A on 01/22/21, 02/12/21, 03/15/21, 03/25/21, and 03/26/21, and the body of which was incorporated into the final proxy statement/consent solicitation statement/prospectus on Form 424(b)(3) filed on 03/30/2021. |
| "ERCOT" | Electric Reliability Council of Texas |
| "Exchange Act" | Securities Exchange Act of 1934 |
| "FLNC" | Fluence Energy |
| "Fraud Defendants" | Defendants Stem, Star Peak, Bush, Carrington, Daley, Johnson, Morgan, Patel, Russo, Scheyer, and Ho |
| "FTM" | Front-of-the-meter |
| "GAAP" | Generally accepted accounting principles |
| "Ho" | Bryan Ho |
| "Individual Defendants" | Defendants Bush, Carrington, Daley, Ho, Johnson, Litowitz, Morgan, Patel, Russo, Rogers, Shaper, Scheyer, and Wilds. |
| "Individual Fraud Defendants" | Defendants Bush, Carrington, Daley, Johnson, Morgan, Patel, Russo, Scheyer, and Ho. |
| "IPO" | Initial public offering |

| TERM | DEFINITION |
|---|---|
| "Johnson" | Larsh Johnson |
| "K&E" | Kirkland & Ellis LLP |
| "Legacy Stem" | Stem, Inc. prior to the Merger. |
| "Litowitz" | Alec Litowitz |
| "Merger" | Merger of Stem, Inc. and Star Peak Energy Corp. |
| "MNPI" | Material nonpublic information |
| "Morgan" | Michael C. Morgan |
| "NYSE" | New York Stock Exchange |
| "OEMs" | Original equipment manufacturers |
| "Patel" | Prakesh Patel |
| "PSLRA" | Private Securities Litigation Reform Act |
| "Rogers" | Desiree Rogers |
| "Russo" | Alan Russo |
| "Scheyer" | Eric Scheyer |
| "SEC" | U.S. Securities and Exchange Commission |
| "Section 10(b) Class" | All purchasers of Stem securities during the Class Period. |
| "Section 14(a) Class" | All persons who were solicited to approve the merger of Stem and Star Peak and who exchanged publicly listed Star Peak shares for Stem Class A common stock rather than redeeming the same pursuant to the Defective Prospectus. |
| "SEDG" | SolarEdge Technologies |
| "Selling Defendants" | Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo. |
| "SGIP" | Self-Generation Incentive Program |
| "Shaper" | C. Park Shaper |
| "SPAC" | Special Purpose Acquisition Company |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - iii -
4884-3219-7509.v2

| TERM | DEFINITION |
|---|---|
| "Star Peak" or "STPK" | Star Peak Energy Transition Corp. |
| "Stem" or the "Company" | Stem, Inc. f/k/a Star Peak Energy Transition Corp. |
| "STPK Merger Sub" | STPK Merger Sub Corp. |
| "SVP" | Senior Vice President |
| "Wilds" | Michael D. Wilds |

1.      Stem, Inc. f/k/a Star Peak Energy Transition Corp. ("Stem" or the "Company") is an energy storage company which purportedly allows its customers to "automatically" maximize storage assets with its Athena artificial intelligence ("AI") software.   On 12/04/20, Stem announced its intent to go public by merging with Star Peak Energy Transition Corp. ("Star Peak" or "STPK"), a blank-check acquisition company or SPAC ("Special Purpose Acquisition Company"), at a valuation of roughly $1.35 billion.  The business combination between Stem and Star Peak closed on 04/28/21 and, the following day, Stem went public with a closing price of $27.05.  Notably, Stem raised over $600 million in its initial public offering ("IPO") by promising rapid growth and a quick road to profitability with the Company's new found focus of selling its high-margin software, which purportedly required little capital and an expansion of its business to front-of-the-meter ("FTM") customers.  That story, however, would fall apart less than two years after Stem's IPO.  The stock now trades at approximately $4 per share, an ~85% drop since Stem's initial closing price on 04/29/01.

2.      This is a class action brought pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of all persons who purchased Stem securities between 12/04/20 and 04/03/23 (the "Class Period"), against Stem and certain of its senior executives and directors (the "Section 10(b) Class").[1]  The §§10(b) and 20(a) claims arise out of a scheme to defraud investors by taking Stem public with a defective business model and engaging in a host of activities that reaffirmed the purported viability of that model as well as by making false and misleading statements concerning, *inter alia*: (i) Stem's business model – purportedly a software company with high margins and profit requiring little capital – when its key software Athena, which was crucial to the success of the Company's business model, was neither automated nor viable for FTM projects; (ii) Stem's FTM success with its Athena software in Massachusetts when the "automated" software was not viable for FTM projects; (iii) Stem's pipeline when the prospective deals in that pipeline were unrealistic; and (iv) the risks to Stem's business when those risks were already occurring.

---

[1]    The Fraud Defendants are identified in ¶36, *infra*.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 1 -

3.    Defendants' materially misleading statements allowed and facilitated Stem's IPO and caused Stem's securities to trade at artificially inflated prices throughout the Class Period. Through a series of partial truths, the true nature of Stem's business and the risks that had materialized thereby were trickled into the market.

4.    On 02/24/22, the price of Stem stock dropped by nearly 22% when the Company was forced to reveal, among other things, that Stem's margins and profitability had begun to be negatively impacted by its inability to derive high-margin revenue from its software in the FTM markets.  Thereafter, on 01/05/23, Stem was forced to disclose disappointing margins and the loss of a ~$130 million contract (later identified as its flagship FTM customer Available Power, LLC ("Available Power")) causing its stock to drop 8.78%.

5.    A short time later, on 02/16/23, Stem was forced to announce negative news regarding the Company's FY 2022 results and future outlook reporting that, instead of the growth and profitability in its FTM business segment that Defendants had promised would flow from Stem's high-margin software business model, the Company had not achieved gross margins of 15%-20%, it had difficulty converting FTM projects into software revenue, and Stem's outlook for 2023 was disappointing.  As a result of not being able to deliver on Stem's software story, on 03/29/23 before the market opened, Stem announced it would be forced to raise additional capital through a note offering to fund its capital intensive low-margin software business, causing its common stock price to tank another 10.42%, from a close of $6.24 on 03/28/23 to a close of $5.59 on 03/29/23.   Days later, on 04/03/23, analysts downgraded the Company, coming to the realization that, contrary to Defendants' representations, Stem was dependent on its lower-margin hardware and service business, and would not see the margins or profits that Defendants had repeatedly promised from a high-margin automated software business.  This caused Stem's stock to drop another 7.45%, from a close of $5.91 on 04/03/23 to a close of $5.47 on 04/04/23.  The following day, the stock fell another 10.42% to a close of $4.89 on 04/05/23, as the market continued to absorb the news.

6.    While investors suffered losses as a result of the Fraud Defendants' scheme and materially false and misleading statements, Defendants Bush, Carrington, Daley, Johnson, Patel,

1  and Russo reaped insider trading proceeds of over $27 million in violation of §20A of the

2  Exchange Act.

3       7.    Separately, and without incorporating any of the fraud allegations herein, Plaintiffs

4  bring claims pursuant to §14(a) of the Exchange Act.  The claims against the 14(a) Defendants

5  (defined *infra*, ¶35) are brought on behalf of all persons who were solicited to approve the merger

6  of Stem and Star Peak (the "Merger") and who exchanged publicly listed Star Peak shares for Stem

7  Class A common stock rather than redeeming the shares pursuant to the Defective Prospectus.[2]

8  The §14(a) claim arises from the 14(a) Defendants' negligence in issuing the Defective Prospectus

9  and Defective Investor Materials (defined *infra*, ¶143), which contained materially misleading

10 statements and omissions concerning the viability of Stem's purportedly "automated" software for

11 FTM projects and Stem's business prospects with respect to its key FTM business segment,

12 including Stem's ability to expand in the FTM market, and, in turn, profit from the high-margin

13 software sales in that market.

### I.  JURISDICTION AND VENUE

15      8.    The claims asserted herein arise under §§10(b), 20(a), 14(a), and 20A of the

16 Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78n(a), and 78t-1, and the SEC rules promulgated

17 thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5, and Rule 14a-9, 17 C.F.R. § 240.14a-9.

18      9.    This Court has jurisdiction over the subject matter of this action pursuant to 28

19 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

20      10.   Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the

21 Exchange Act, 15 U.S.C. §78aa.  Substantial acts in furtherance of the alleged fraud or the effects

22 of the fraud and negligence have occurred in this district.

---

[2]  "Defective Prospectus" includes the defective registration statement and preliminary proxy statement/consent solicitation statement/prospectus on Form S-4 in connection with the merger and that was thereafter amended on Forms S-4/A on 01/22/21, 02/12/21, 03/15/21, 03/25/21, and 03/26/21, and the body of which was incorporated into the final proxy statement/consent solicitation statement/prospectus on Form 424(b)(3) filed on 03/30/21.

11.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## II.     PARTIES

### A.     Plaintiffs

12.     Lead Plaintiff Vishal Lawale purchased or otherwise (i) acquired Stem common stock during the Class Period and (ii) held Stem common stock as of the 03/04/21 record date and was entitled to vote on the Merger at the 04/27/21 special meeting of shareholders as set forth in the certification filed with his Lead Plaintiff application (ECF 30-2), incorporated by reference herein, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

13.     Lead Plaintiff Vishal P. Thakkar purchased or otherwise (i) acquired Stem common stock during the Class Period and (ii) held Stem common stock as of the 03/04/21 record date and was entitled to vote on the Merger at the 04/27/21 special meeting of shareholders, as set forth in the certification filed with his motion to consolidate and Lead Plaintiff application (ECF 43-3), incorporated by reference herein, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.[3]

### B.     Defendants

14.     Defendant Stem, Inc. f/k/a/ Star Peak Energy Transition Corp. is a Delaware corporation with its principal executive offices located in San Francisco, California.  On 04/28/21, Legacy Stem[4] completed a merger with Star Peak Energy Transition Corp. and STPK Merger Sub Corp., a Delaware corporation and wholly owned subsidiary of STPK ("STPK Merger Sub") wherein STPK Merger Sub merged with and into Legacy Stem with Legacy Stem surviving the

---

[3]     Lead Plaintiffs Vishal Lawale and Vishal P. Thakkar are referred to collectively herein as "Plaintiffs."

[4]     "Legacy Stem" refers to Stem, Inc. prior to the Merger.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                      - 4 -
4884-3219-7509.v2

1  transaction as a wholly owned subsidiary of Star Peak.  At this time, Star Peak renamed itself
2  "Stem, Inc." and began operating Legacy Stem's business.

3       15.    Stem is engaged in the business of energy storage, providing customers with energy
4  storage systems, primarily in the form of batteries and related hardware, and software-enabled
5  services to operate those energy storage systems.  The Company's common stock and warrants to
6  purchase common stock commenced trading on the New York Stock Exchange ("NYSE") on
7  04/28/21 under the symbols STEM and STEM.WS, respectively.

8       16.    Defendant John Carrington ("Carrington") has been the Company's Chief
9  Executive Officer ("CEO") and director since December 2013.   During the Class Period,
10  Defendant Carrington had the ultimate authority over the disclosures made in the Company's
11  Forms 10-Q and 10-K.  Defendant Carrington signed Certifications pursuant to 18 U.S.C. §1350,
12  as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, and pursuant to Rules 13a-14(a)
13  and 15d-14(a) under the Exchange Act, as adopted pursuant to §302 of the Sarbanes-Oxley Act of
14  2002 for the Company's Forms 10-Q and 10-K from 05/17/21 to 08/04/23.  Defendant Carrington
15  also participated in the Company's Class Period earnings conference calls as well as other investor
16  conferences on: 06/09/21, 08/11/21, 11/09/21, 08/04/22, 02/24/22, 01/06/22, 05/05/22, 11/03/22,
17  09/28/22, 01/05/23, and 02/16/23.

18       17.    As a member of Legacy Stem's Board of Directors prior to the Merger, Defendant
19  Carrington recommended approval of the Merger and solicited shareholders' votes pursuant to the
20  Defective Prospectus and Defective Investor Materials.  Defendant Carrington sold 556,511 shares
21  of Stem common stock during the Class Period while in possession of material nonpublic
22  information for total proceeds of approximately $8.08 million.

23       18.    Defendant William Bush ("Bush") has been the Company's Chief Financial Officer
24  ("CFO") since November 2016.  Defendant Bush signed Certifications pursuant to 18 U.S.C.
25  §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, and pursuant to Rules 13a-
26  14(a) and 15d-14(a) under the Exchange Act, as adopted pursuant to §302 of the Sarbanes-Oxley
27  Act of 2002 for the Company's Forms 10-Q and 10-K from 05/17/21 to 08/04/23.  Defendant Bush
28  also participated in the Company's Class Period earnings conference calls as well as other investor

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                        - 5 -
4884-3219-7509.v2

conferences on: 08/11/21, 11/09/21, 02/24/22, 05/05/22, 08/04/22, 09/28/22, 11/03/22, and 02/16/23.

19. Defendant Bush sold 200,753 shares of Stem common stock during the Class Period, while in possession of material nonpublic information for total proceeds of approximately $3.03 million.

20. Defendant Larsh Johnson ("Johnson") has been the Company's Chief Technology Officer ("CTO") since January 2016. As CTO, Defendant Johnson leads software and engineering at Stem. Defendant Johnson participated in the Company's Class Period earnings conference calls as well as other investor conferences on: 08/11/2021, 11/09/21, 02/24/22, 05/05/22, 08/04/22, and 09/28/22.

21. During the Class Period, Defendant Johnson sold 108,146 shares of Stem common stock while in possession of material nonpublic information for total proceeds of approximately $1.73 million.

22. Defendant Prakesh Patel ("Patel") has been the Company's Chief Strategy Officer ("CSO") since 2020. Upon information and belief, as CSO, Defendant Patel is charged with Stem's strategy formulation and management, including developing and overseeing Stem's corporate vision and strategy. Defendant Patel participated in the Company's Class Period earnings conference calls and other investor conferences on: 11/09/21, 02/16/2023, and 09/28/22.

23. During the Class Period, Defendant Patel sold 128,157 shares of Stem common stock while in possession of material nonpublic information for total proceeds of approximately $3.1 million.

24. Defendant Alan Russo ("Russo") has been the Company's Chief Revenue Officer ("CRO") since 2019. Upon information and belief, Defendant Russo oversaw numerous Stem departments, including, but not limited to, sales for behind-the-meter ("BTM") and FTM, business development, and marketing.

25. During the Class Period, Defendant Russo sold 176,296 shares of Stem common stock while in possession of material nonpublic information for total proceeds of approximately $2.6 million.

26.     Defendant Bryan Ho ("Ho") has been the Company's Senior Director of Product Management since March 2022.  Defendant Ho participated in the Company's investor and analyst day on 09/28/22.  Plaintiffs only allege that Ho violated the Exchange Act for the period after Ho took his position in March 2022.

27.     Defendant Star Peak Energy Transition Corp. was a blank check company with no business operations of its own that was incorporated in Delaware on 10/29/18.  On 04/28/21, Star Peak and STPK Merger Sub completed a Merger with Legacy Stem wherein STPK Merger Sub merged with and into Legacy Stem with Legacy Stem surviving the transaction as a wholly owned subsidiary of Star Peak.  At this time, Star Peak renamed itself "Stem, Inc." and began operating Legacy Stem's business.

28.     Defendant Eric Scheyer ("Scheyer") served as Star Peak's CEO and served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem. Defendant Scheyer signed the Defective Prospectus and participated in the 12/04/20 Investor Conference prior to the Merger.  As a member of Star Peak's Board of Directors prior to the Merger, Defendant Scheyer recommended approval of the Merger and solicited shareholders' votes pursuant to the Defective Prospectus and Defective Investor Materials.  Plaintiffs allege violations of the Exchange Act against Defendant Scheyer up until the time the business combination between Stem and Star Peak closed on 04/28/21.

29.     Defendant Michael D. Wilds ("Wilds") served as Star Peak's CFO and Chief Accounting Officer ("CAO") from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem.  Defendant Wilds authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact.

30.     Defendant Michael C. Morgan ("Morgan") served as Star Peak's Chairman from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem.  Since 04/27/21, Defendant Morgan has served as a director of Stem.  Defendant Morgan authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact and participated in the 12/04/20 Investor Conference, 12/06/20 UBS Energy Transition Call with Stem to Discuss Intelligent Energy Storage, and 05/31/21 FGain YouTube Presentation prior to

the Merger.  As a member of Star Peak's Board of Directors prior to the Merger, Defendant Morgan recommended approval of the Merger and solicited shareholders' votes to approve the Merger pursuant to the Defective Prospectus and Defective Investor Materials.

31.     Defendant Adam E. Daley ("Daley") served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem. Since 04/27/21, Defendant Daley has served as a Director of Stem.  Defendant Daley authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact. As a member of Star Peak's Board of Directors prior to the Merger, Defendant Daley recommended approval of the Merger and solicited shareholders' votes to approve the Merger pursuant to the Defective Prospectus and Defective Investor Materials. During the Class Period, Defendant Daley sold 500,000 Stem shares for total proceeds of approximately $8.37 million.

32.     Defendant Alec Litowitz ("Litowitz ") served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem. Defendant Litowitz authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact.  As a member of Star Peak's Board of Directors prior to the Merger, Defendant Litowitz recommended approval of the Merger and solicited shareholders' votes to approve the Merger pursuant to the Defective Prospectus and Defective Investor Materials.

33.     Defendant Desirée Rogers ("Rogers ") served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem. Defendant Rogers authorized Defendant Scheyer to sign the Defective Prospectus on her behalf as attorney-in-fact.  As a member of Star Peak's Board of Directors prior to the Merger, Defendant Rogers recommended approval of the Merger and solicited shareholders' votes to approve the Merger pursuant to the Defective Prospectus and Defective Investor Materials.

34.     Defendant C. Park Shaper ("Shaper") served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem. Defendant Shaper authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact.  As a member of Star Peak's Board of Directors prior to the Merger, Defendant

1  Shaper recommended approval of the Merger and solicited shareholders' votes to approve the

2  Merger pursuant to the Defective Prospectus and Defective Investor Materials.

3      35.    The "14(a) Defendants" referred to herein are Defendants Stem, Star Peak,

4  Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper.

5      36.    The "Fraud Defendants" referred to herein are Stem, Star Peak, Bush, Carrington,

6  Daley, Johnson, Morgan, Patel, Russo, Scheyer, and Ho.  Defendants Carrington, Bush, Scheyer,

7  Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper are collectively referred to as the "14(a)

8  Individual Defendants."

9      37.    The "Individual Fraud Defendants" referred to herein are Bush, Carrington, Daley,

10  Johnson, Morgan, Patel, Russo, Scheyer, and Ho.

11      38.    The 14(a) Defendants and Fraud Defendants are referred to collectively herein as

12  "Defendants."  Defendants Bush, Carrington, Daley, Ho, Johnson, Litowitz, Morgan, Patel, Russo,

13  Rogers, Shaper, Scheyer, and Wilds are referred to collectively as the "Individual Defendants."

14      39.    The Individual Fraud Defendants were directly involved in the management and

15  day-to-day operations of the Company at the highest levels and/or were privy to confidential

16  proprietary information concerning the Company and its business, operations, software and

17  services, and present and future business prospects, as alleged herein.

18      40.    The Individual Fraud Defendants were involved in drafting, producing, reviewing

19  and/or disseminating the false and misleading statements and information alleged herein, and were

20  aware of and/or acted with deliberate recklessness regarding the false and misleading statements

21  being issued regarding the Company, and approved or ratified these statements, in violation of the

22  federal securities laws.  They also were all privy to confidential proprietary information concerning

23  the Company and its business, operations, software and services, and present and future business

24  prospects, as alleged herein.

25      41.    As officers and controlling persons of a publicly held company whose securities

26  are registered with the U.S. Securities and Exchange Commission ("SEC") pursuant to the

27  Securities Act of 1933 and the Exchange Act and trade on the NYSE, which is governed by the

28  provisions of the federal securities laws, the Individual Fraud Defendants each had a duty to

promptly disseminate accurate and truthful information with respect to the Company's business, operations, software and services, and present and future business prospects. In addition, all Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

42. The Individual Fraud Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, presentations and other public statements pertaining to the Company; the Individual Fraud Defendants also had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Fraud Defendants are responsible for the accuracy of the materially false and misleading public statements detailed herein.

43. Defendants were provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### III. NON-PARTIES AND PERCIPIENT WITNESSES

#### A. Non-Parties

44. AlsoEnergy Holdings, Inc. ("AlsoEnergy") is a Delaware corporation with its headquarters located in Colorado. AlsoEnergy purportedly provides customers with solar asset performance monitoring and control software. On 12/16/21, Stem announced its acquisition of AlsoEnergy for $695 million.

45. Available Power, LLC is a Colorado corporation with its principal place of business located in North Carolina. Available Power purportedly designs, develops, and deploys distributed

1  energy resources and microgrid systems for commercial and industrial real estate.  On 02/24/22,

2  Stem announced that it was selected by Available Power for a partnership giving Stem exclusive

3  rights to provide Athena to energy storage systems at 100 FTM sites throughout Texas, with a

4  project portfolio valued over $500 million.

5              **B.    Percipient Witnesses**

6          46.    CW1[5] was employed at Stem from prior to the Class Period until February 2022.

7  They worked on front-of-the-meter deals and answering client questions.  They reported to Mary

8  Adam, the Director of Sales with responsibilities for FTM.

9          47.    Mary Adam's LinkedIn page confirms that she was employed at Stem as "Director

10  of Partner Sales for the Front of the Meter Team responsible for leading Account Executives to hit

11  assigned quota targets" from May 2020 to March 2022.  Adam's LinkedIn page further specifies

12  that her "[c]ore strengths include generating, qualifying and closing complex sales transactions

13  with multilevel decision making teams and C-level executives."  Mary Adam reported to

14  Defendant Russo.  In turn, Russo reported to Defendant Carrington.

15          48.    CW2 held several positions at Stem from early 2020 until August 2023, including

16  as a Stem analyst.  As part of their position, CW2 indicated that they worked with sales involving,

17  among other things, FTM projects, including for the Electric Reliability Council of Texas

18  ("ERCOT") and New England.  CW2 reported ultimately to Chief Revenue Officer Alan Russo.

19          49.    CW3 was Stem's Director, Technical Sales Training from March 2021 to June

20  2023.  In their position, they were involved in overseeing all training and enablement for Stem's

21  sales and marketing teams, as well at Stem's external partners.  CW3 worked closely with the

22  product teams, including the developers and engineers for Athena.  CW3's role fell under the

23  marketing umbrella and they worked with the product marketing team, which worked on the

24  Company's website and materials for trade shows.  They reported to Vice President of Marketing

25  Garrett Colburn who, in turn, reported to Chief Revenue Officer Alan Russo.

26

27

28  [5]    "CW" refers to confidential witness.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                    - 11 -
4884-3219-7509.v2

50.    CW4 worked at Stem from prior to the Class Period until August 2021.  CW4 oversaw legislation and regulatory affairs at Stem.  CW4's team tracked U.S. and Canadian laws related to relevant incentive programs and advocated for Stem's interests in the writing of new laws.  This included interacting with industry trade associations and directing lobbying at Congress and state legislatures.  During the Class Period, CW4 reported to Ryan O'Keefe, the Senior Vice President of Business Development ("SVP").  The SVP reported to Stem's Chief Revenue Officer Alan Russo.

## IV.    BACKGROUND FACTS

### A.    Star Peak Forms a SPAC to Acquire a Company Purportedly to Improve Energy Ecosystems and Reduce Emissions

51.    Star Peak is a blank check company with no business operations of its own.  Star Peak is a SPAC that was formed for the sole purpose of listing on a public exchange and subsequently effecting a business combination with one or more businesses seeking to be a market leader in, and/or benefit from, the increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions.[6]

52.    John Coates, speaking in 2021 as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:[7]

> The basics of a typical SPAC are complex, but can be simplified as follows.  A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company.  Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk.  If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates.  About ten percent of SPACs have liquidated between 2009 and now.
>
> But most SPACs since 2009 have gone on to identify acquisition candidates.  In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (*i.e.*, the private company to be acquired), or a new shell

---

[6]    *See* Star Peak's Registration Statement on Form S-1 filed with the SEC on 07/31/20.

[7]    John Coates, "SPACS, IPOs and Liability Risk Under the Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws    (April    8,    2021) (footnotes omitted).

"holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

53. The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interests, and to avoid disclosures that may dissuade investors from exchanging shares in the merger. If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to the public offering and enjoy considerable control such as the ability to nominate board members to the new company.

54. Companies seeking to go public, like Stem, have increasingly turned to SPAC structures in recent years because they are faster than traditional IPOs, the price is determined in advance instead of by the market determining the price, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. However, SPAC mergers also have the potential to be rife with inaccurate disclosures, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. Here, Star Peak targeted Stem to take public and avoid the rigors of a normal IPO process.

55. On 08/20/20, Star Peak completed its IPO of 35,000,000 units generating gross proceeds of $350,000,000. On 08/26/20, the underwriters partially exercised the over-allotment option and purchased an additional 3,358,504 units, at a price of $10.00 per unit, generating gross proceeds of $33,585,040.

56. On 09/28/20, Star Peak entered into exclusivity with Stem and chose Stem for its target. As part of the Merger process, Stem provided multiple rounds of due diligence information to Star Peak. This due diligence information would have included information on Stem's business model, operations, products, customers, and the Company's growth prospects.

### B.     Stem's Software Story

57.     Stem describes itself as a "global leader in artificial intelligence (AI)-driven clean energy solutions and services."  To that end, it traditionally bundled hardware (largely batteries) together with its Athena software offering as part of the solution it sold to BTM customers.  Stem, however, was not profitable with this traditional business model and remained in the red leading up to the IPO.

58.     Stem does not, itself, manufacture batteries but, rather, procures batteries from leading, global battery original equipment manufacturers ("OEMs"), including, among others, Tesla, Samsung, LG Chem, and Panasonic.  Stem then re-sells the batteries to its customers, which include commercial and industrial ("C&I") enterprises as well as independent power producers, renewable project developers, and grid operators with energy storage systems.

59.     Stem coupled its hardware sales with its Athena software as part of its energy solution to customers.  Athena was purportedly a "fully automated" AI software that provides "energy forecasts" and "real-time optimization and automated controls" for customers.[8]  Stem posited that Athena is constantly "learning" and gaining "deep insights to better inform the improvement of [its] algorithms in predicting economically optimal charge and discharge intervals of energy storage systems."  Stem also claimed that Athena operates autonomously to deliver value to grid operators and other customers: "*[W]hat Athena does is it's analyzing these large data sets and making real-time decisions that automatically respond to changing conditions in the energy market*."[9]  In this way, Athena's purported ability to function autonomously is crucial to its stated capabilities.

60.     The intent of Athena's automated operation was to allow grid operators to decrease their reliance on conventional energy generation sources, thereby improving the resiliency of the electrical grid and enabling lower carbon emissions through the increased adoption of renewable generation sources.  Moreover, Athena was intended to automate system discharges across

---

[8]     Star Peak Energy Transition Corp., Registration Statement (Form S-1) (12/16/20).

[9]     IPO Fireside Chat with Star Peak and Stem, Event Transcript (04/12/21).

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                                    - 14 -
4884-3219-7509.v2

1  multiple different utility territories, collaborating with the utilities to provide instant grid support

2  when and where it is needed.

3      61.    Historically, Stem focused its business operations on BTM projects for C&I

4  customers.  As part of its IPO story, Stem pitched its transformation to a high-margin low-capital

5  software company that, with its Athena software, could capture market share from the lucrative

6  FTM market – a market that was ten times that of the BTM market.  The Company's focus on

7  expanding software sales was critical because Stem's hardware sales can only nominally mark-up

8  the batteries that it sells to customers (*i.e.* a reported 10%-30% gross margins at the time of the

9  IPO).  In contrast, Defendants indicated that Stem's Athena software carries gross margins in

10  excess of 80%.

11      62.    To that end, at the beginning of the Class Period, on 12/04/20, Stem touted in a

12  release that the Company was "a global leader in artificial intelligence (AI)-driven clean energy

13  storage systems" and announced its Merger and intent to become a publicly listed business

14  combination with Star Peak.  In the release, investors were told that the transaction would provide

15  up to $608 million in gross proceeds and "position[] Stem to capitalize on significant growth

16  opportunities, expand globally and continue to advance its Athena™ software platform."

17      63.    The Company's Merger and IPO would also supposedly position Stem for

18  profitability and growth because it allowed Stem to have the funds to "fully fund" its business

19  model.  Indeed, the Merger and IPO was described in the 12/04/20 release as a "***transaction [that]***

20  ***is transformative for us and we expect it to significantly accelerate our growth***."  Further,

21  Defendants emphasized that the ~$600 million in gross proceeds from Stem's Merger and IPO

22  "***positions Stem to capitalize on significant growth opportunities***, expand globally and continue

23  to advance its Athena™ software platform."  Defendants similarly represented that the combined

24  "***[b]alance sheet supports significant market expansion – strong balance sheet with***

25  ***approximately $525 million of cash to fully finance all U.S. and international forecasted***

26  ***growth***."  That forecasted growth included a projected profit by the end of FY 2022, and gross

27  margins of 12% for FY 2020 that would more than double by the end of FY 2022 to 28% driven

28  by software sales:



**stem** Financial Forecast                                                                Confidential   31

## Stem delivers consistent growth and improving margins

| ($MM) | FY20E | FY21E | FY22E | FY23E | FY24E | FY25E | FY26E |
|---|---|---|---|---|---|---|---|
| Cumulative AUM (MWh) | 714 | 1,046 | 1,754 | 3,785 | 7,257 | 11,834 | 17,799 |
| *YoY Growth* | 153% | 46% | 68% | 116% | 92% | 63% | 50% |
| **Bookings** | $145 | $198 | $342 | $721 | $848 | $974 | $1,159 |
| *YoY Growth* | 65% | 37% | 72% | 111% | 18% | 15% | 19% |
| **Revenue** | $33 | $147 | $315 | $526 | $748 | $944 | $1,167 |
| *YoY Growth* | 94% | 348% | 115% | 67% | 42% | 26% | 24% |
| **Pro Forma Gross Profit** | $4 | $24 | $82 | $169 | $264 | $360 | $483 |
| *Gross Margin*[1] | 12% | 16% | 26% | 32% | 35% | 38% | 41% |
| Total Operating Expenses | 39 | 49 | 54 | 55 | 60 | 65 | 66 |
| **Adjusted EBITDA** | ($35) | ($25) | $28 | $113 | $204 | $295 | $417 |
| *EBITDA Margin %* | NM | NM | 9% | 22% | 27% | 31% | 36% |
| CapEx | NM | ($17) | ($34) | ($39) | ($37) | ($35) | ($25) |
| **Free Cash Flow** | NM | ($49) | ($7) | $70 | $162 | $253 | $381 |

**~88% of Forecasted 2021 Revenues From Executed Contracts**

Source: Stem.
Note: Stem's fiscal year is 31-Dec. (1) Pro Forma Gross Profit adjusted for non-recurring, non-system related items and amortization related with product development (IOS) costs.

**stem** Revenue Diversity                                                                Confidential   29

## Robust revenue growth by customer type and segment

**By Customer Type ($MM)**        **By Segment ($MM)**        **By Software Type ($MM)**

Source: Stem.
Note: Stem total revenue calculation assumes recognition of all contracted backlog at system delivery and ratable recognition of software services over the contractual period; Hardware revenue assumes all contracted backlog recognized at system delivery; Software revenue includes SaaS Fees, revenue within the period from systems on balance sheet and O&M.

64.     To drive home the Company's growth story, the 12/04/20 Stem release highlighted that the merged entity had a "***Capital light business model***" and that "***Athena™ AI-driven software leads to strong operating leverage with low expected capital intensity***."

65.     Based on Stem's business model and software story, Stem forecasted astronomical growth and improving gross margins with the Company turning profitable in two years:

| 12/04/20 Forecast Affirmed 01/25/21 | | | | |
|---|---|---|---|---|
| ($mm) | **FY20E** | **FY21E** | **FY22E** | **FY23E** |
| Revenue | $33 | $147 | $315 | $526 |
| Non-GAAP Gross Margin % | 12% | 16% | 26% | 32% |
| Adjusted EBITDA | $(35) | $(25) | $28 | $113 |

**C.      STEM's BTM Market Sales Had Stalled Prior to the IPO**

66.     Stem's IPO story that the Company would find success in the lucrative FTM market was necessary because the Company's BTM business had not and would not drive growth or profits.  Indeed, CW2 explained that Stem's BTM line of business began to flatline in growth which led Stem to decide to build-out a FTM line of business.

67.     Similarly, CW4 explained that Stem had been able to sell batteries at a profit in California because of the state's Self-Generation Incentive Program ("SGIP") which provided rebates to BTM customers who installed qualified distributed energy systems.  CW4 indicated the SGIP ran out of money around 2020.

68.     In order to drive growth and profits, Stem sought to expand its sales to the FTM market.  To that end, on 07/09/19, Stem announced its *first* FTM project purportedly providing AI-driven storage solutions through Athena at five grid-scale sites across Massachusetts.[10]

69.     69.     As explained below, Stem's Athena software was not automated and was not viable for the FTM projects, which are larger and more complex FTM projects than their BTM counterparts.  As to the large Massachusetts project, a Stem employee used an Excel spreadsheet to manually perform functions Athena was supposed to offer.  Thus, Stem's software story was fatally flawed as Athena did not operate autonomously.

**D.      Stem's Athena "AI" Software Was Not Viable for FTM Projects**

70.     When Stem entered the FTM market in 2019, its Athena software product did not work for FTM projects.

---

[10]   "Stem enters the front of the meter energy storage market with a solar energy storage partnership in Massachusetts" July 9, 2019, https://www.stem.com/stem-enters-the-front-of-meter-energy-storage-market-with-a-solar-energy-storage-partnership-in-massachusetts/    (last accessed Oct. 6, 2023).

71.     CW1, who worked on FTM projects, explained that Stem was selling a product for FTM projects that was not viable.  In fact, according to CW1, Stem did not have a working product for FTM projects since Stem's inception.  CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had.  CW1 explained that Athena was functional for BTM deals but not well made for large FTM deals.  CW1 indicated that Athena was not fully automated for FTM projects. CW1 also explained that, for FTM to work, Athena was really only a very rough prototype and basically just an Excel sheet.  According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.

72.     CW1 elaborated that Stem had determined that large FTM deals were lucrative and thus Stem wanted to sell Athena for FTM wholesale markets.  FTM projects are significantly more complex than BTM because, *inter alia*, these systems use technology and data analysis to balance supply and demand, manage outages, and maintain the stability and reliability of the grid rather than merely focusing on reducing energy costs and enhancing energy resiliency for an individual business as with BTM.  Athena, however, was inadequate to address the more complex demands of FTM projects.

73.     CW3, who worked with sales and the product marketing team as well as the Athena product team, corroborated reports that Athena lacked functionality with respect to FTM projects. CW3 also reported that CW3 could not recall ever seeing an example of a case study for FTM that was fully installed, and that CW3 and the FTM sales team would frequently request examples of Athena's successful implementation into a FTM project and other demonstrations of Athena's success in FTM projects but, despite those numerous requests, no such information was provided to CW3.  Corroborating these accounts, CW2, who worked in sales on, among other things, FTM projects, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time.

74.     CW1 disclosed that Athena was not a working FTM product and that Stem's approach was to sign up enough FTM projects to eventually be able to build out its software team and from there build the software for FTM projects.  CW2 corroborated that Stem's plan was to

1    eventually get enough FTM projects to then hire personnel to develop Athena. CW2 considered

2    this a very short-sighted strategy. As CW1 stated, in representing Athena as viable for FTM

3    projects, Stem misled investors with respect to Athena's FTM capabilities. CW2 corroborated

4    CW1's reports that Stem hoped to develop Athena later.

5         75.    Moreover, Stem's Athena software was not automated but, rather, involved a Stem

6    employee manipulating purportedly automated functions. CW1 indicated that clients referred to

7    Stem as an empty suit when it came to the software for FTM projects. In other words, according

8    to CW1, if Athena could be likened to a vending machine, customers were being asked to put a

9    coin into the machine under the presumption there was, in fact, a machine inside. But in the case

10   of Athena, the software was not self-sufficient but, rather, functioned through a Stem employee

11   using an Excel spreadsheet to give answers that Athena was supposed to generate automatically.

12   CW1 indicated that representing Athena as viable for FTM projects was misleading.

13        76.    For the Massachusetts FTM project, which was Stem's largest and most touted

14   FTM program, CW1 explained that during their tenure through early 2022, Stem had not yet

15   finished the Massachusetts FTM project. CW1 reported that because Athena did not work as

16   marketed, Stem had an employee managing an Excel spreadsheet in which various minute changes

17   were input to reflect changing conditions and performing the functions that Athena could not do

18   automatically. CW2 corroborated CW1's account, indicating that they had heard Stem had an

19   employee who worked on an Excel spreadsheet to handle functions on the Massachusetts FTM

20   project that were supposed to be handled by Athena, and confirmed that the employee had been

21   doing some manual processes. CW2 also reported hearing that the Stem employee complained to

22   a Stem salesperson that he was annoyed at having to do so many manual tasks.

23        **E.    Stem Was Unable to Provide Training Materials for FTM Projects
            Because Athena Did Not Work for FTM**

24

25        77.    Because Stem lacked a viable FTM product, the Company was unable to provide

26   details about how the software functioned to its employees and customers.

27        78.    CW1 reported that they asked a product marketing manager in Stem's marketing

28   department for a video demonstrating Athena software working in an FTM setting, but they were

1  unable to provide one because the software for FTM projects was not viable.  Similar to CW1's

2  account, CW3, who worked with the product marketing team, explained that they found it difficult

3  to provide enough useful content to Stem's partners for training and it was always a struggle to get

4  enough information from the product team, particularly for FTM projects.  Based upon CW3's

5  experience at other companies, the information should have been provided by multiple

6  stakeholders, including the product, marketing, training, and operations teams.  Accordingly, CW3

7  felt that they were on their own to get things done and were unable to get enough information to

8  provide to Stem's partners for their FTM sales purposes.

9       79.    CW3 elaborated that sometime in late 2021 or early 2022, there was a lot of

10  confusion around Athena.  There were some people who had been highly involved with Athena

11  who left, including the Senior Product Manager who oversaw product development for Athena;

12  these departures seemed sudden.  CW3 indicated that the new product team provided the marketing

13  development team with content for training materials.  However, when members of the product

14  team reviewed the training materials created by CW3's team based upon the provided content,

15  they were told that some of the content on Athena's FTM software could not be used because the

16  products were still in development and were not functional.  CW3 indicated that Athena Bidder

17  and Athena Supervisor were two such products that were designed for FTM projects and had been

18  featured in materials but were supposed to be removed.[11]  CW3 explained that the products in

19  development could also not be included in the official training materials for the partners.  They

20  were told products in development could be used in materials for trade shows for marketing to

21  potential customers and partners, but not in training materials for the sales team and partners.  CW2

22  confirmed that it was always a big request from the salesforce to get a video or some demonstration

23  of the Athena platform in an operational setting to show customers and that this kind of material

24  was never offered, further corroborating CW1 and CW3's statements regarding lack of FTM

25  demonstration materials.

26

27  [11]  Athena Bidder was cited by John Carrington as a "market-leading" software in the

28  announcement of the Available Power deal in February 2022.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                    - 20 -
4884-3219-7509.v2

1

**F.    Stem's Pipeline Was Inflated**

2       80.    Leading into the IPO and during the Class Period, as alleged herein, Stem tracked

3   and regularly reported on its pipeline and bookings.   Stem described its pipeline metric in

4   presentations prepared in connection with the Company's earnings calls and filed with the SEC

5   leading up to the IPO as the total value of uncontracted, potential hardware and software revenue

6   from ***opportunities currently in process*** by Stem direct salesforce and channel partners, ***which***

7   ***have a reasonable likelihood*** of contract execution within 12 months.  Defendants also referred to

8   Stem's pipeline as "12-Month Pipeline"[12] and would refer to pipeline and 12-month pipeline

9   interchangeably throughout the Class Period.[13]

10      81.    Stem defines bookings as the total value of executed customer agreements, as

11  measured during a given period.[14]   The booking amount includes hardware revenue (typically

12  recognized at delivery of system to customer) and software revenue (total nominal software

13  contract value recognized ratably over the contract period).[15]

14      82.    Leading up to Stem's IPO, Defendants repeatedly touted the Company's pipeline.

15  For instance, during a 04/12/21 Fireside Chat with IPO Edge, Defendant Carrington emphasized

16  that 12-month pipeline was a key metric that the Company would report quarterly and represented

17  it was currently valued at over $1 billion.  And within weeks of completing the IPO, in Stem's 1Q

18  2021 earnings release on 05/17/21, Stem announced a 12-month pipeline of $1.43 billion.

19      83.    Several former employees confirmed that Stem's pipeline was inflated.  CW1, who

20  was, among other duties, involved in developing pipeline, indicated that engagements listed in the

21

22  [12]  *See* Stem's 01/25/21 analyst day presentation, filed with the SEC on Form 425.

23  [13]  *Compare* 08/11/21 Stem's Q2 2021 earnings call (Carrington: "Our pipeline which stood at
    $1.7 billion at the end of June is significant and growing."), *with* 08/25/21 "Interview with John
24  Carrington, CEO of $STEM" (Carrington: "I think the key metric to think about is our 12 month
    pipeline and, and that continues to grow, you know, that's $1.7 billion at the end of June, and that's
25  21% up from the end of the first quarter of 2021.").

26  [14]  *See* Stem's 01/25/21 analyst day presentation, filed with the SEC on Form 425.

27  [15]  Stem refers to the total value of bookings in dollars as reflected on a specific date as backlog.
    Backlog would therefore increase as new contracts are executed (bookings) and decrease as
28  integrated storage systems are delivered and recognized as revenue.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                     - 21 -
4884-3219-7509.v2

1  pipeline were not actual deals or even commitments on the part of the developer but, rather, they

2  represented just a chance with no guarantee of getting a platform deal signed. CW1 explained that

3  the pipeline included phantom deals. CW1 explained that while Stem was hoping for repeat

4  business with its development partners, most of the prospective business in the pipeline was pie-

5  in-the-sky because the pipeline was just a chance to send a proposal.

6      84.    CW1 explained that several very large projects that were included in the pipeline

7  were only requests for proposals, and that Stem included them in the pipeline simply because it

8  was technically possible that Stem's proposal may be selected for the project. CW1 reported that

9  Stem included these requests for proposals in Salesforce and in the pipeline even if there was no

10  practical chance of winning, even if Stem was not the cheapest bidder, or even if Stem lacked the

11  experience that some requests for proposals required. Moreover, CW1 reported that Alan Russo,

12  and Stem's Director of Sales, Mary Adams, would not count these kinds of deals in sales in their

13  head because they knew the deals were untenable for Stem to win.

14      85.    Further, as to repeat business Stem did get, Stem's pricing would go down as more

15  deals were entered into, almost like a pyramid scheme. Similarly, CW2, who worked to develop

16  business opportunities for Stem, explained that Stem's pipeline was inflated. According to CW2,

17  there was a huge emphasis to build pipeline and that prospective deals were built in Salesforce.

18  CW2 indicated that some employees built everything into the pipeline even though the

19  opportunities were not meaningful pipeline and were numbers without facts. At the end of the

20  quarter, some of these deals would be shown as having a high potential of closing even though the

21  salespeople knew that was not the case. CW2 further reported that some managers had their

22  employees add deals into the pipeline without any support.

23      86.    CW3 explained that the sales team was under a lot of pressure to sell FTM products.

24  CW2 explained that prospective deals were always kept in the pipeline even when those deals had

25  no results after a couple of quarters. According to CW2, this was apparent because of the low

26  close rate of these deals. CW1 corroborated that deals which were no longer viable would remain

27  in Salesforce and would be used for Stem's projections and reports to investors. According to

28  CW1, Stem's reporting dashboards in Salesforce reflected aspirational deals rather than realistic

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                 - 22 -

1    ones. CW2 further noted that Stem's bonus incentives to the sales force were "built on pipeline,"

2    even though the subsequent downstream credentialing of the deals was challenging.

3        87.    Stem not only inflated their pipeline, but touted bookings metrics that were not

4    actual deals. CW2 indicated that bookings were letters of intent that had no teeth actually requiring

5    customers to make a purchase order. According to CW2, Stem would chase bookings at the ends

6    of quarters to report prospective deals even without an actual purchase order.

7        88.    Notably, Stem's flagship $500 million Available Power FTM project was a

8    phantom deal. According to CW2, Stem originally reported a booking from Available Power,

9    which was essentially a non-binding letter of intent in which Available Power was supposed to

10   issue actual purchase orders to Stem within two months of the letter of intent date. However,

11   Available Power never issued the purchase orders, which, according to CW2, is what constituted

12   a sale. CW2 indicated that it was Stem's policy that a purchase order was necessary (*i.e.*, the

13   trigger) for Stem to actually purchase hardware in relation to a particular project.

14       89.    According to CW2, in violation of company policy, Stem ordered hardware

15   intended for the Available Power project based on just the booking (*i.e.*, the letter of intent). CW2

16   indicated it was Stem's standard procedure to not procure hardware without a customer purchase

17   order but that exceptions to this procedure were not uncommon. CW2 recalled that Defendant

18   Bush would have signed for Stem's purchase of the hardware meant for Available Power, which

19   would have also been cross-executed by Defendant Carrington. CW2 indicated they personally

20   became aware that the Available Power deal was no longer viable in approximately early 3Q 2022

21   when they learned from their manager Randy Parole that there was hardware that needed to be

22   sold.

23       90.    CW2 further indicated that because Stem wanted to recognize revenue on the basis

24   of the hardware Stem had purchased for the Available Power project before the end of 2022, Stem

25   sought to find other buyers for the hardware. CW2 explained that Stem managed to find additional

26

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 23 -
4884-3219-7509.v2

1   buyers for the hardware before the end of 2022.[16]  CW2 noted that these transactions had a parent

2   guarantee which ultimately would allow both companies to return the equipment to Stem if the

3   two companies were unable to sell the equipment.  CW2 said that if the two customers did not sell

4   the equipment, they could hold onto the hardware until October 2023 and return it, after which it

5   would be up to Stem to sell it.

6          91.    Despite these facts, Defendants reported Stem's inflated pipeline to investors to

7   support a higher IPO price.

### G.   Stem's IPO and the Associated Infusion of Capital Was Critical for the Company's Survival and Growth

#### 1.   Stem Needed the Infusion of Capital from the IPO to Continue Operating and to Secure Deals

11          92.    Prior to Stem's IPO, the Company was facing a severe liquidity crisis that seriously

12   jeopardized Stem's ability to continue operating unless the Company received a significant influx

13   of funding.  Indeed, as of 12/31/20, Stem had cash and cash equivalents of $6.9 million, an

14   accumulated deficit of $407.8 million, and net current liabilities of $141.2 million, with

15   $116.2 million of debt financing coming due in 2021.  The Company, for FY 2020, had also

16   incurred a net loss of $156.1 million and had negative cash flows from operating activities of

17   $33.7 million.

18          93.    Given Stem's dismal financial position, the Company's auditor, Deloitte &

19   Touche LLP ("D&T"), expressed that the Company was a going concern – aka on the verge of

20   financial collapse – in Stem's Defective Prospectus.  D&T indicated that Stem's ability to continue

21   operations was a concern because of the Company's "recurring losses from operations and cash

22   outflows from operating activities and . . . debt coming due."

23          94.    Stem also included a note in the Defective Prospectus expounding on the

24   Company's dire financial condition, stating in relevant part:  As a result of these conditions, ***there***

---

[16]   In fact, Stem announced on 12/08/22 a separate transaction with REX Storage Holdings, LLC, a joint venture of Regis Energy Partners LP, and Excelsior Energy Capital.

1    *is substantial doubt about the Company's ability to continue as a going concern within one year*

2    *after the date that the financial statements are available to be issued.*

3    95.    Stem had gotten to its abysmal financial condition pre-IPO based on selling low-

4    margin hardware (largely batteries) from other companies such as Tesla and Sungrow to its BTM

5    users, mainly C&I customers, and its inability to sell to FTM customers.

6    96.    Two former employees of Stem disclosed that Stem was not getting significant

7    margins for its hardware sales.  According to CW1, Stem's markup on hardware was typically as

8    low as 5% and sometimes lower, but Stem wanted as many customers as it could get and was

9    chasing revenue even if it meant selling hardware at its own cost.  CW2 corroborated that Stem's

10    hardware mark-up was usually 5% to 10%.

11    97.    Stem knew that most of its business came from hardware sales rather than software.

12    According to CW1, Stem was essentially a hardware company masquerading as a software

13    company.  If a Stem customer wanted to enter into a development agreement with Stem to get

14    hardware at attractive prices, the requirement was that the customer also had to enter into a

15    software agreement because Stem was acting as if it was a SaaS company.  Defendants touted the

16    strong potential margins from software because, theoretically, software was far more lucrative long

17    term than hardware.  However, Stem was unable to sell its software, because it wasn't fully

18    developed or viable for FTM projects.

19    98.    Defendants were therefore desperate to complete Stem's IPO and secure much

20    needed cash to continue as a Company.  Without an influx of cash, the Company's ability to

21    survive, and in turn the ability of the Individual Fraud Defendants to get paid and/or even keep

22    their positions at Stem, was in serious jeopardy.

23    99.    Indeed, Defendants' efforts to secure funding in connection with the merger would

24    ultimately pay off, as the merger infused the Company with over $600 million of gross cash

25    proceeds and zero debt , purportedly enabling Stem to execute on much larger projects and expand

26    its addressable market.

27

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 25 -

**2.      Stem Needed the Infusion of Capital from the IPO to Develop Athena**

100.    Stem also needed the funds from its IPO to fund the build out of Athena's capabilities for FTM projects.  For instance, during a 04/12/21 Fireside Chat with IPO Edge, Defendant Carrington explained that Stem intended to use the IPO funds to focus on Athena and expand their software offerings through acquisitions, stating in relevant part: "[W]e intend to invest in our Athena software development team, including more software developers and data scientists, and opportunistically evaluate technology acquisitions that would either accelerate our software roadmap or help us open new markets."

101.    Defendants, however, did not disclose that such an investment was necessary because the Company did not have a viable FTM software product.  As described in §IV.D, *supra*, numerous former employees confirmed that Athena was not fully developed for FTM projects. According to CW1, Stem did not have a working product for FTM projects since Stem's inception. CW1 elaborated that FTM deals were a lot more complex than the BTM deals and Athena was inadequate to fulfill those needs.  Corroborating these accounts, CW2 confirmed that, with respect to Athena, Stem was taking off and building the ship at the same time, and that Stem cannot say a product was ready when it was not, which was the case with Athena.  CW2 explained that Stem's plan was to eventually get enough FTM projects and then hire more personnel to develop Athena.

102.    Despite this reality, Defendants touted Athena's FTM prowess leading up to and during the Company's IPO.  For instance, in the Defective Prospectus, Defendants emphasized Stem's ability to optimize the operations in the FTM market using Athena's software-enabled services to capture revenue from energy market participation, including the sale of capacity, energy and ancillary services into regional electricity markets.  Stem claimed that this benefited FTM customers by enhancing renewable project returns while improving grid resiliency and reliability for utilities and grid operators.

**3.      Stem Goes Public Through a Merger with Star Peak Based on a Defective Prospectus and Defective Investor Materials**

103.    On 12/03/20, Stem entered into a Merger agreement with Star Peak and the STPK Merger Sub Corp., a Delaware corporation and wholly owned subsidiary of STPK.  Pursuant to

the terms of the Merger agreement, and subject to shareholder approval, Stem would merge with STPK Merger Sub Corp. with Stem surviving as a wholly owned subsidiary of Star Peak.

104.    The following day, 12/04/20, Star Peak and Stem issued a release that was filed with the SEC as an Exhibit to a Form 8-K touting the proposed business combination and heralding that Stem was "a global leader in artificial intelligence (AI)-driven clean energy storage systems."

105.    In the 12/04/20 release, Defendant Carrington emphasized the IPO's import to Stem's purported growth prospects and the strength the IPO would bring to Company's balance sheet, stating in relevant part:

> *This transaction is transformative for us and we expect it to significantly accelerate our growth.  Stem is a market leader and our Athena™ software platform is proven in the U.S., Japan and Canadian markets, and this merger will enable expansion to several additional global markets.*  Our systems deliver value to our customers by lowering energy costs, enhancing renewable returns, and meeting ESG and sustainability goals, while increasing grid reliability.  We are excited to partner with the Star Peak team and share a collective vision.  *The balance sheet strength of the combined company will empower Stem to expand its technological leadership and geographic reach.*  We look forward to creating long-term value for our customers, employees and shareholders as a public company.

106.    The 12/04/20 release further claimed that the combined "*[b]alance sheet supports significant market expansion – strong balance sheet with approximately $525 million of cash to fully finance all U.S. and international forecasted growth.*"

107.    Analysts and the market fully embraced Stem's expansion into software and the FTM market.  For instance, in a report issued on 12/14/20, Imperial Capital analysts emphasized that Athena "empowers its customers and partners to optimize energy usage by *automatically* switching between battery power, onsite generation and grid power."  The report also echoed the significance of the business combination and Stem's IPO for funding the Company's "growth initiatives," stating in relevant part:

> The company expects to have about $525mn in cash and no debt upon the closing of the business combination and committed equity PIPE.  *This level of cash is expected to fully fund the company's growth initiatives in the coming years as its revenues increase, EBITDA becomes positive and cash flows begin to contribute to the financials as well.*

108.    On 12/17/20, Star Peak filed the Defective Prospectus which included two identical statements from the Star Peak Board of Directors (endorsed by Defendants Scheyer and Morgan,

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                      - 27 -
4884-3219-7509.v2

1   respectively), recommending that Star Peak's stockholders approve the business combination,

2   stating in relevant part:

3       The STPK board of directors has unanimously approved the merger agreement and
        the transactions contemplated thereby and recommends that STPK stockholders
4       vote "**FOR**" the approval of the merger agreement, "FOR" the issuance of New
        Stem Common Stock to be issued as the merger consideration and "**FOR**" the other
5       matters to be considered at the STPK Special Meeting.

6       109.    The Defective Prospectus contained a similar recommendation from the Stem

7   Board of Directors, stating in relevant part:

8       This proxy statement/consent solicitation statement/prospectus is being delivered
        to you on behalf of the Stem board of directors to request that holders of Stem
9       common stock and preferred stock (with respect to the common stock such holders
        will hold upon conversion of their preferred stock) execute and return written
10      consents to adopt and approve the merger agreement and the merger.

11                          *        *        *

12      The Stem board of directors has considered the merger and the terms of the merger
        agreement and has unanimously determined that the merger and the merger
13      agreement are advisable, fair to and in the best interests of Stem and its stockholders
        and recommends that Stem stockholders adopt the merger agreement by submitting
14      a written consent.

15      110.    In the months between the Merger's announcement on 12/04/20 and the 04/27/21

16  vote, Defendants emphasized, *inter alia*, Stem's purportedly bright financial and FTM prospects,

17  including emphasizing that "Athena™ AI-driven software leads to strong operating leverage with

18  low expected capital intensity" and the growth that would come with 80% software margins,

19  including a projected profit by the end of FY 2022, projected gross margins of 12% for FY 2020

20  that would more than double by the end of FY 2022 to 28% driven by software sales.

21      111.    On 04/12/21, Defendant Carrington participated in a Fireside Chat with IPO Edge

22  to encourage investors to approve the business combination by emphasizing the purported value

23  of Stem's software and its associated long-tern recurring revenue in the days immediately

24  preceding Stem's IPO, stating in relevant part:

25      So what we do is we attach our software to all of our customers. It's a hundred
        percent attach rate for our software services. We have a subscription model that
26      ranges from 10 to 20 years. And that provides us with significant and predictable
        contracted revenue. And there's a final piece to this that you see on the slide around
27      this market participation. And that's when we aggregate customer installations and
        monetize that capacity in the energy market. ***And what's compelling as you can
28      see very strong, gross margins across each of these values as we go through the***

*process.  And the software revenue, the recurring piece of that, continues to grow in the out years.  And you can see this movement to much more of a software led company.*

112.    On 04/28/21, STPK Merger Sub Corp. merged with and into Legacy Stem, with Legacy Stem surviving the transaction as a wholly owned subsidiary of Star Peak.  At this time, Star Peak renamed itself "Stem, Inc." and began operating Legacy Stem's business.

113.    The combined public Company began trading under the ticker "STEM" on the NYSE on 04/29/21.  The IPO had raised more than $600 million in proceeds with the understanding that those proceeds would fully fund the Company's expected growth and path to profitability.

### H.    Stem Acquired AlsoEnergy in an Effort to Remedy Athena's Deficient FTM Software and Boost Software Margins Revenue

114.    Approximately seven months after Stem's IPO closed, on 12/16/21, Stem announced its acquisition of AlsoEnergy, a company that purportedly provides customers with solar asset performance monitoring and control software, for $695 million.  Stem's 12/16/21 4Q/FY 2021 release filed with the SEC on a Form 8-K, described AlsoEnergy as "a global leader in solar asset management software" with "60% gross margin across its software" and other services businesses.  The deal was completed on 02/01/22.

115.    In a 12/17/21 interview with MadMoney's Jim Cramer to discuss Stem's acquisition of AlsoEnergy, Defendant Carrington explained that the acquisition accomplished the Company's goals of having "strong recurring revenues," "a strong gross margin accretive to our gross margin," and "accelerat[ing] our software roadmap."

116.    Following the AlsoEnergy announcement, Wolfe Research analysts issued a report on 12/19/21 indicating that "[t]he deal announcement was not a surprise as STEM has been upfront in saying that it was looking to pursue software-oriented M&A to further enhance its revenue mix and help drive Athena adoption."  Further, that the "deal also explains the timing of the $400M convert offering last month."

117.    The next day, on 12/20/21, analysts at Credit Suisse wrote that the "AlsoEnergy acquisition wasn't surprising" but that the size was "above our expectations ($100-200m)" and the

1    "timing was sooner than we hoped (1 month after convertible note issuance)."  Credit Suisse's

2    outperform rating was "based on a growing market and Stem's capital-light business model."

3        118.    Thereafter, Stem issued a 02/01/22 release, in which it emphasized that the

4    AlsoEnergy acquisition was supposed "to be immediately accretive and . . . boost [Stem's] growth,

5    enhance our margins, and accelerate our expansion as a global provider of clean energy intelligent

6    software solutions."

7        119.    Three weeks later, on 02/24/22, during Stem's 4Q/FY 2021 earnings call,

8    Defendant Carrington explained that AlsoEnergy had "the industry-leading SaaS platform with

9    their PowerTrack software that monitors and controls 33 gigawatts of solar assets in over 50

10   countries." Defendant Carrington also asserted that most of AlsoEnergy's customers were "front-

11   of-meter customers," which are "core markets for Stem smart energy storage solutions."

12   Defendant Carrington further highlighted that AlsoEnergy generates 60% gross margins overall,

13   and "80%-plus gross margins on software, with very low churn.  In addition to this strong margin

14   profile, they generate a significant amount of recurring revenue from their SaaS contracts."

15       120.    Analysts attending the 4Q/FY 2021 earnings call understood Stem's acquisition of

16   AlsoEnergy's software was an effort to boost Stem's software margins.  For example:

17   [Analyst:]  Kudos on the nice bookings and revenue outlook here.  I wanted to ask
     a first question, I guess, on the margins here.  Maybe if you could give us a bit more
18   bridge.  I think you said AlsoEnergy is doing 60% gross margin, overall.  So at the
     midpoint of guidance, it implies they're about half your gross profit dollars for
19   2022, *and that means core Stem is doing maybe about a 10% gross margin*.  *I
     think you guys originally had a target to do, like, mid-20s in 2022, and you were
20   also 10% to 20% throughout all of '21, before 4Q. Just I'm trying to reconcile
     the sharp drop-off here*, and I know you mentioned a number of different moving
21   parts, but can you maybe help bridge a bit and maybe quantify, if you can, kind of
     where we were targeting before for core Stem and kind of where we're ending up
22   here with, *if the math is right, an implied kind of 10% margin*?

23   [Bush:]  Thanks, John. Brian, appreciate the question.  So I think, as John said, I think in
     the future we won't be breaking out the 2 divisions of the company that way.  *But I
24   mean, I think the basic math is pretty very correct.*

25   *I think the issue that we're focused on is the continued bookings of the company,
     and the focus there is making sure that the software is what's driving the long-
26   term value of the company.  So it's possible that we'll see lower margins in the
     near term, but ultimately – and that's why we rolled out the CARR metric*.  I mean,
27   that's the – I think we've said pretty consistently in the past that we think backlog
     is a great short- to medium-term reflection of what the revenues will be.  Well,
28   CARR is going to be a great reflection of what software is going to be as we mature.

121.    As such, Defendant Bush confirmed that Stem's core margins for FY 2022, absent impact from AlsoEnergy, was only 10%, a far cry from previously reported hardware gross margins of 10%-30% and software gross margins of 80%.

122.    Not satisfied with Defendants' response, analyst Brian K. Lee at Goldman questioned Stem's lower hardware gross margins of 10% relative to the expectations that Defendants had set for investors of 10% to 30%.  Defendants responded that it was not a structural issue and told investors that the more important thing was the super high gross margin software contract:

> [Analyst:]  Okay.  I mean, that's fair enough.  I know you guys have a mix shift story here medium to longer term.  As more software Athena gets embedded at these higher margins, you're obviously going to see some margin expansion.  But just in the near term, there's still going to be a relatively high hardware mix.  *And I think you guys had talked about a 10% to 30% hardware gross margin.  I mean, if you're doing 10%, is there something here to suggest that maybe we should structurally be thinking about a lower hardware gross margin and, eventually, you see the mix shift help you get consolidated margins up, but you're not going to see the sort of 10% to 30% gross margins on hardware anymore?*  Just trying to figure it out if this is a temporary supply chain logistics issue or if this is maybe more structural on the hardware side.

> [Bush:]  *I guess I'm not sure I would use the word "structural".  But I mean, I think we have consistently said that the larger FTM projects carry a lower gross margin*.  When you think about those larger developers versus, say, the "smaller ones", the primary difference is integration; and the integration being, does that company have a supply chain relationship or a procurement department?  To the sense that they have that and you're doing deals that kind of come into the multi-hundred millions of dollars gigawatt size range, they tend to have relationships, which means that some of the value-added services that we would normally bring to, say, maybe a BTM project just isn't required.  And so as a result of that, you're going to see lower gross margins on the hardware.  That's just what it is.

> However, *the more important thing is you're still signing a software contract, which is that super high gross margin contract* which is going to layer in over a long period of time.

> And so I think irrespective of what the hardware margin is, I think one of the things that we really thought about and which, frankly, drove the decision to acquire AlsoEnergy was the gross margin profile on the software and services.  And so that's really where we're focused long term.  I mean, to the extent that the hardware suffers in the near term, well, then that's – we think that's a great trade-off for a 10- to 20-year contract with super low churn.  So it even goes beyond that.

> And so that's really kind of what (inaudible) always thought that way.  We're starting to do more software-only deals as well, which is kind of along that same path.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                      - 31 -
4884-3219-7509.v2

*And so we think that the software continues to differentiate itself from other competitors* in the *marketplace*.  And I think that's really in the end where we're going to be.

## I.    After the IPO Closes, Stem Books Phantom FTM Deals, Including the Available Power Project

123.    Following the IPO, Stem's pipeline of phantom deals ballooned with large FTM projects when Stem did not have a viable product for those bookings.  For example, prior to its consummation of the IPO, during a 04/12/21 Fireside Chat with IPO Edge, Defendant Carrington confirmed that Stem's 12-month pipeline was currently valued at over $1 billion.  And within weeks of completing the IPO, in the 1Q 2021 earnings Release on 05/17/21, Stem announced a 12-month pipeline of $1.43 billion.  Just thirteen months later, Defendant Carrington reported during Stem's Q1 2022 earnings call on 05/05/22 that its pipeline was valued *around $5.2 billion*, an increase of over eight times, with the backlog consisting of "a little over 80% front of the meter" projects.

124.    Following the IPO, Stem's bookings also became bloated with FTM "projects."  For example, Defendant Carrington confirmed, during Stem's Q1 2022 earnings call on 05/05/22 that Stem's bookings for the quarter of $151 million nearly *tripled* from the first quarter of 2021 with those bookings consisting of 90% FTM projects and 10% BTM projects.

125.    As with pipeline, Stem's growth in bookings consisted primarily of FTM projects even though these bookings were not enforceable contracts, and the Company did not have a viable FTM Athena software product.

126.    As described in detail above in §IV.D, Stem's software was not viable for complicated FTM projects, and thus Defendants had no reasonable basis to include FTM deals in Stem's pipeline or bookings.  According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.  CW3 also reported that CW3 could not recall ever seeing an example of a case study for FTM that was fully installed.  Further, as CW2 explained, bookings were letters of intent that did not actually require customers to make a purchase order.

127.    During Stem's Q4/FY 2022 earnings call on 02/24/22, Defendant Carrington introduced the Available Power deal to investors and emphasized the enormity of the deal, underscoring that "this could become a 1-gigawatt, 2-gigawatt hour portfolio, which more than doubles our assets under management from current levels on the storage side."   Defendant Carrington went on to report that, with the Available Power deal, ERCOT "now represents the largest market in our pipeline."

128.    Also, during the Q4/FY 2022 earnings call, Defendant Carrington touted the Available Power deal as "another example of our continued momentum in large-scale, front-of-meter, or FTM, market."   Defendant Carrigan also emphasized that "[t]he Available Power win further demonstrates our commercial diversity, as our customers span multiple geographies, customer types and use cases, continuing to underscore the reach of our Athena platform."

129.    During the 02/24/22 earnings call, Defendant Carrington also assured that the Company would update investors as to the Available Power deal, stating in relevant part "*as we proceed and start to get more clarity on the planned tranches we'll obviously update you and everyone on how that's coming together*."

130.    Following the release and earnings call, analysts reported on 02/25/22 strong bookings and the Available Power deal:

> [Credit Suisse] – "*Positives" included "Strong backlog*: STEM recognized $217m in new bookings in 4Q, up vs ~$104m in 3Q, and ~$100-150m needed to meet 2022 hardware revenues.   Bookings included ~60% hardware and ~40% software revenues."

> [Wolfe] – "Bookings and backlog growth the bright spot" with "*Available Power deal the largest in Stem's history.*"

131.    As explained in detail in §IV.F, *supra*, the Available Power deal was in fact a phantom deal.   According to CW2, the booking from Available Power was essentially a non-binding letter of intent in which Available Power was supposed to issue actual purchase orders to Stem within two months of the letter of intent date.   However, Available Power never issued the purchase orders, which, according to CW2, was necessary to constitute a sale.

132.    On 01/05/23, before the market open, Stem disclosed in an investor presentation deck for Goldman Sachs Global Energy and Clean Technology Conference that it had initiated the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 33 -

cancellation of a ~$130 million contract (later on 01/12/23 confirmed to be Available Power) stating in relevant part:

> Backlog: Expect approximately $1 billion in backlog as of Q4'22; ***strong bookings partially offset by Stem-initiated contract cancellation (~$130M) due to partner non-performance on agreed timeline***.

133.   Following the Company's release of the presentation deck, Stem's stock price fell $0.75 per share, or 8.78%, to close at $7.79 per share on 01/05/23.

### J.    Stem Is Forced to Raise Capital

134.   The Company's non-existent profits, consistently low margins, on top of the Available Power cancellation, culminated in the Company's need to raise additional capital through a private debt offering in March 2023.[17]

135.   About a month before the March 2023 debt offering, Stem released disappointing results and FY 2023 guidance.  On 02/16/23, Stem filed on a Form 8-K with the SEC a release announcing Stem's results for both 4Q 2022 and FY 2022 for the period ending 12/31/22.  Stem reported for FY 2022 a net loss of $124 million and an adjusted EBITDA of $(46) million.  Likewise, for 4Q 2022, Stem reported a net loss of $35 million and an adjusted EBITDA of $(10) million.  Stem also announced FY 2023 guidance, including revenues of $550-$650 million, 15%-20% non-GAAP gross margins, and a predicted loss for 2023 with adjusted EBITDA of $(35)-$(5) million.

136.   A month later, on 03/29/23, Stem filed a release with the SEC on a Form 8-K announcing a proposed $175 million Green Convertible Senior Notes Offering (which it would later upsize to $200 million) in a private offering to institutional buyers, which would be due in 2030.  In the 03/29/23 release, Defendants explained that Stem intended to use the proceeds from the notes to purchase and surrender for cancellation a portion of Stem's 2028 Convertible Senior

---

[17]   Previously, on 11/16/21, Stem announced a note offering for $350 million of senior notes in a private debt offering.  On 11/17/21, Stem announced that it had upsized the offering to $400 million.  Days later, on 11/21/21, Stem sold $460 million in Green Convertible Senior Notes to Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC and Barclays Capital Inc.

Notes, to fund the cost of entering into the capped call transactions, and for general corporate purposes.

> Stem intends to use (i) approximately $99.8 million of the net proceeds from the Offering to purchase and surrender for cancellation approximately $163.0 million aggregate principal amount of Stem's 0.50% Green Convertible Senior Notes due 2028 (the "2028 Notes") in privately negotiated transactions concurrently with the pricing of the Offering; (ii) approximately $23.2 million of the net proceeds of the Offering to fund the cost of entering into the capped call transactions described above; and (iii) the remainder of the net proceeds of the Offering for general corporate purposes. If the initial purchasers exercise their option to purchase additional Notes, then Stem intends to use a portion of the additional net proceeds to fund the cost of entering into additional capped call transactions as described above.

137. In response to this news, Stem's stock plummeted nearly 12% from a close of $6.24 on 03/28/23 to a close of $5.50 on 03/30/23.

138. Stem's need to raise capital was unexpected and the market began to understand that Stem's inability to derive high-margin revenue from its FTM-deficient software had negatively impacted the Company's capital position. Indeed, a Credit Suisse analyst noted on 03/29/23 that "Stem's convert was not expected," and "[t]iming is also surprising given higher interest rates and spreads since their previous 2028 convert issued in mid-November 2021."

139. Similarly, analysts at Guggenheim issued a report on 03/30/23 questioning the timing and management's prior promises that no additional funding was needed:

> STEM's announcement yesterday that the company intends to offer a $175 million convertible green bond was moderately negative, in our view, although not sufficient to alter our current Buy rating. We are, however, lowering our price target to $14 from $11 based on a higher risk premium applied in our valuation model. We spoke to the company following the announcement, and we believe that STEM has a reasonable basis for doing the deal. At the same time, *the financing comes on the heels of management having assured investors repeatedly that no additional funding was needed, and it also comes following a 64% decline in the stock price since September, not including the decline yesterday after the deal was announced*. This compares to an 1% increase for the S&P 500 over the same time period. *The timing of the transaction is less than optimal, in our view, as was the decision to proceed despite having been vocal about not needing additional funding*. As such, we think the STEM team may need to spend some time rebuilding credibility.

140. More bad news, however, was to come. On 04/04/23 analysts reported on Stem's inability to deliver on the Company's software story. Specifically, analysts reached the indisputable conclusion that Stem would not see the margins or profits that Defendants had

1    repeatedly promised from Stem's purported high-margin automated Athena software product or

2    its purportedly robust FTM pipeline but, rather, its revenues were driven by low-margin hardware

3    sales.

4        141.    For example, on 04/04/03 analysts at BofA Global Research downgraded the stock

5    to underperform writing that:

> We rate STEM at Underperform. ***While we acknowledge that STEM pitches itself
> as a software focused way to play energy storage, slow realization of revenues
> from this business means the company is ultimately dependent on lower margin
> hardware and services businesses to drive an EBITDA inflection.*** We are
> cautious to underwrite STEM growing into new businesses while cutting
> overhead. . . .

*        *        *

> ***We downgrade Stem to Underperform as our confidence in the story is
> increasingly strained. The notion of what Stem "is" at its core is now more
> confusing than it used to be given the shifting business mix contemplated within
> its dramatic top-line ramp from '22 into '25. While our recent launch
> contemplated a Neutral rating, a disappointing 4Q outlook call since and now
> uncertainty reflected from convertible issuance last week push us to be less
> generous on estimates*** – particularly given the risks reflected in standing up two
> new services businesses (Dev-serv to 'setup' the battery install initially and Pro-
> Serv to operate batteries on an ongoing basis) and implicitly keeping opex relatively
> stable. Historically, Stem has been the leader in effective software optimization for
> battery applications with a key end market in C&I customers focused on "clipping"
> otherwise punitive demand charges via load shifting and rapid dispatch of onsite
> behind the meter batteries. But after years of building to an increasingly saturated
> point of market share – Stem currently holds about a third of all projects in this
> segment – the business has been forced to expand into larger grid scale applications
> where the competition is more pronounced.

> Capacity to drive confidence from a burgeoning services offering is now a
> requirement for the story to work and while not a new piece of the narrative, we
> increasingly see too many things needing to go right in an increasingly more
> challenging macro. While we do see merits of an opportunistic convert refinancing
> last week – note Stem is not the first to execute this strategy, nor will it likely be
> the last – implicit messaging on cash is still less than ideal given at least some
> portion of proceeds will help bolster working capital needs. In the end, we still see
> Stem reaching positive EBITDA in 4Q22, albeit briefly, and purely as a function
> of back half loaded revenue recognition over ratable overhead spend. But it's not
> about simply realizing cash inflection – how much cash and how quickly it's
> growing matters, where even consensus suggests a hockey-stick-like cadence
> biasing realization to 2025. With a deeper review of what could go wrong in
> consensus numbers as well as true ups for latest macro concerns, we downgrade to
> Underperform.

*        *        *

> ***For some time, this company has been pitched as a high margin, software-
> focused way to play energy storage given its Athena platform focus and vs peers***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                          - 36 -

*in the space that reap a "typical" hardware margin in the 5-15% range. However,*
*out of $550-650mm in revenue guided for FY23, ~$520mm is implied as*
*hardware and we estimate just $45-50mm comes from Stem's recurring software*
*business with the balance in a burgeoning services business.* Note while Stem
talks to a "Contracted Annual Recurring Revenue" metric to describe the software
opportunity, the $45-50mm listed aligns to performance obligations in its 10-K that
are expected to be realized in the next 12 months. The irony here is that while the
company's pitch has been predicated for some time on front loaded hardware
installs as an enabler of the long-term recurring software business, the latter cannot
on its own drive the story to positive EBTIDA today and at a corporate level, the
2H23 inflection will rely on a business that Stem intends to divorce longer term.

## V.    THE 14(a) DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

142.    The Section 14(a) Class was harmed by the 14(a) Defendants' materially false and

misleading statements in the Defective Prospectus and Defective Investor Materials (as defined

below).

### A.    The 14(a) Defendants' Materially False and Misleading Statements

143.    On 03/30/21, Star Peak filed its Defective Prospectus. The Defective Prospectus

incorporated by reference numerous investor materials, including releases, PowerPoint slide

decks, and presentation transcripts, that were filed with the SEC on 12/04/20, 01/05/21, 01/13/21,

01/25/21, 02/11/21, 02/18/21, 03/02/21, 03/18/21, 03/22/21, 03/30/21, 04/06/21, 04/12/21,

04/14/21, and 04/21/21 (collectively, the "Defective Investor Materials"). Each of the materially

false and misleading statements alleged for Plaintiffs' §14(a) claims is set forth in Exhibit A

(Section 14(a) Defendants' Materially False and Misleading Statements chart), attached hereto,

and incorporated by reference as if fully set forth herein.

#### 1.    Contrary to the 14(a) Defendants' Misstatements, Stem's
#### Athena Software Was Not Automated for FTM Customers

144.    Throughout the course of Stem's IPO, the 14(a) Defendants repeatedly published

materially false and misleading statements, and/or omitted material adverse facts in the Defective

Prospectus and Defective Investor Materials that Athena was automated for FTM customers. The

statements include, but are not limited to:,

- (12/04/20 Investor Conference) "***Athena automates system discharges***
***across multiple different utility territories***";

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                                - 37 -
4884-3219-7509.v2

- (01/05/21 Release) "***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power***";

- (01/25/21 Slide Deck) "Our market leading Athena software uses advanced artificial intelligence and machine learning to optimize the operation of these batteries ***by automatically switching between battery power, onsite generation and grid power. . . . And Athena and smart battery storage maximize wholesale market revenues with automated market participation across the project's entire lifecycle***"; and

- (03/30/21 Defective Prospectus) "***Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers. . . .***"

145.    The above statements were materially false and misleading when made because, unbeknownst to investors, with respect to FTM projects, Stem's purported "automated" software was not viable for FTM projects and required human intervention.  As described in detail in §§IV.D-F and §VIII, Stem's Athena software was not automated for FTM projects, requiring Stem employees to ***manually*** operate the software behind the scenes, as detailed by the following:

- As described by three former Stem employees, Athena was not in fact automated for the FTM market but really only a very rough prototype and basically just an Excel sheet.  In fact, according to CW1, Stem did not have a working product for FTM projects since Stem's inception.  CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had.  According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.  CW2, who worked in sales on, among other things, FTM projects, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time. CW3 corroborated reports that Athena lacked functionality with respect to FTM projects.

- Athena was not capable of autonomously handling large FTM projects such as the Massachusetts FTM deal.  CW1 explained that for the large Massachusetts FTM project, instead of a machine, there was an employee for Stem manually performing the functions that Athena could not do automatically.  Because Athena did not work for FTM projects, this employee managed an Excel spreadsheet in which various minute changes were input to reflect changing conditions.  Corroborating CW1's account, CW2 indicated that they had heard that Stem had an employee who worked on an Excel Spreadsheet to handle functions on the Massachusetts FTM project that were supposed to be handled by Athena, and confirmed that the employee had been doing some manual processes.  CW2 also reported hearing that the Stem employee complained to a Stem salesperson that he was annoyed at having to do so many manual tasks.

- Stem was unable to produce any case studies or live demonstration materials for Athena's purportedly automated FTM software because the products were still in development and were not functional.  CW3, who worked with sales in the product

marketing team and regularly interfaced with the product team, corroborated reports that Athena lacked functionality with respect to FTM projects. CW3 also reported that CW3 could not recall ever seeing an example of a case study for FTM that was fully installed, and that CW3 and the FTM sales team would frequently request examples of Athena's successful implementation into a FTM project and other demonstrations of Athena's success in FTM projects but, despite those numerous requests, no such information was provided to CW3.

146. Additional materially false and misleading misrepresentations regarding Athena's automation alleged for Plaintiffs' §14(a) claims are set forth in Exhibit A (Section 14(a) Defendants' Materially False and Misleading Statements chart, at Nos. 1-19), attached hereto, and incorporated by reference as if fully set forth herein. These statements were materially false and misleading when made for the same reasons described in ¶145, *supra*.

**2.    Because Athena Was Not Viable for FTM Projects, the 14(a) Defendants Had No Basis to Tout the FTM Segment**

147. Throughout the course of Stem's IPO, the 14(a) Defendants repeatedly published materially false and misleading statements and/or omitted materially adverse facts in the Defective Prospectus and Defective Investor Materials, claiming that Stem was capable of completing FTM projects, that Stem was driving hardware gross margins of 10%-30%, and that Stem's software was driving strong margins when, in fact, Stem's Athena software was not viable for FTM projects, Stem's hardware margins for FTM projects were lower than 10%, and Stem's software was unable to drive margins in FTM projects because it was not viable for those projects. The Section 14(a) Defendants' false misrepresentations include, but are not limited to:

- (12/4/20) STEM describes hardware gross margins as "*~10-30%.*"

- (3/30/21) "[*We*] *developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services. We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage*."

- (3/30/21) "*We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry*."

148. The above statements were materially false and misleading when made because, unbeknownst to investors, Stem's hardware margins for FTM projects were less than 10%, Stem's

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                                                      - 39 -
4884-3219-7509.v2

Athena software was not automated as to FTM projects and, as a result, Stem did not have a FTM software product that could drive margins and profitability as detailed in §IV.D-F and, *inter alia*, by the following:

- Stem did not have a viable software product for FTM projects as described by three former Stem employees and, therefore, the underlying premise of Stem's business model was defective. Indeed, CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had. CW2, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time. CW3 corroborated reports that Athena lacked functionality with respect to FTM projects.

- Stem's Athena software was not viable for the FTM market. CW1 indicated that Athena was functional for BTM deals but not well made for large FTM deals. CW1 explained that, for FTM projects, Athena was really only a very rough prototype and basically just an Excel sheet. According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.

- Athena was not capable of autonomously handling large FTM projects such as the Massachusetts FTM deal. CW1 explained that for the large Massachusetts FTM project, there was an employee for Stem manually performing the functions that Athena could not do automatically. Because Athena did not work for FTM projects, this employee managed an Excel spreadsheet in which various minute changes were input to reflect changing conditions. Corroborating CW1's account, CW2 indicated that they had heard that Stem had an employee who worked on an Excel Spreadsheet to handle functions on the Massachusetts FTM project that were supposed to be handled by Athena, and confirmed that the employee had been doing some manual processes. CW2 also reported hearing that the Stem employee complained to a Stem salesperson that he was annoyed at having to do so many manual tasks.

- CW1 elaborated that Stem had determined that large FTM deals were lucrative and, thus, Stem wanted to sell Athena for FTM wholesale markets. The FTM deals, however, were a lot more complex than the BTM deals and Athena was inadequate to fulfill large FTM deals. CW1 explained that Athena was not a working FTM product.

- Athena was undeveloped for FTM projects. Indeed, Stem only hoped to sign enough deals in order to build it up to be operable for FTM deals. CW1 disclosed that Stem's approach was to sign up enough FTM projects in order to eventually be able to build out their software team and from there build the software for FTM projects. CW2, who worked in sales on, among other things, FTM projects, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                        - 40 -

CW2 corroborated that Stem's plan was to eventually get enough FTM projects so as to then hire on personnel to develop Athena. CW2 considered this a very short-sighted strategy. As CW1 stated, in representing Athena as viable for FTM projects, Stem misled investors with respect to Athena's FTM capabilities. CW2 corroborated CW1's reports that Stem hoped to develop Athena later.

- Stem was unable to produce any case studies or live demonstration materials for Athena's purportedly automated FTM software because the products were still in development and were not functional. CW3, who worked with sales in the product marketing team and regularly interfaced with the product team, corroborated reports that Athena lacked functionality with respect to FTM projects. CW3 also reported that CW3 could not recall ever seeing an example of a case study for FTM that was fully installed, and that CW3 and the FTM sales team would frequently request examples of Athena's successful implementation into a FTM project and other demonstrations of Athena's success in FTM projects but, despite those numerous requests, no such information was provided to CW3.

- CW3, who worked with the product marketing team, explained that they found it difficult to provide enough useful content to Stem's partners for training and it was always a struggle to get enough information from the product team, particularly for FTM projects.

- Stem's business was suffering because its hardware sales did not produce 10%-30% gross margins as stated to investors, but typically garnered as low as 5% and sometimes lower. According to CW1, Stem's markup on hardware was typically as low as 5% and sometimes lower, but Stem wanted as many customers as it could get and was chasing revenue even if it meant selling hardware at its own cost. CW2 corroborated that Stem's hardware mark-up was usually 5% to 10%. Moreover, according to CW1, Stem was essentially a hardware company masquerading as a software company. If a Stem customer wanted to enter into a development agreement with Stem to get hardware at attractive prices, the requirement was that the customer also had to enter into a software agreement because Stem was acting as if it was a SaaS company.

149. Each of the materially false and misleading statements alleged for Plaintiffs' §14(a) claims concerning Stem's FTM projects is set forth in Exhibit A (Section 14(a) Defendants' Materially False and Misleading Statements chart, Nos. 20-29), attached hereto, and incorporated by reference as if fully set forth herein. These statements were materially false and misleading when made for the same reasons described in ¶148, *supra*.

### 3. Defendants' Risk Disclosures Omitted Critical Facts and Warned of Risks that Had Already Materialized

150.    In the course of Stem's IPO, the 14(a) Defendants published materially false and misleading statements and/or omitted materially adverse facts in the Defective Prospectus when they warned of risks that, unbeknownst to investors, had already materialized.  These materially false and misleading statements include, but are not limited to:

- (3/20/21) "***Stem's technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption***."

- (3/20/21) "Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, ***including the perception that our technology is unproven***. . . ."

- (3/30/21) "[***T***]*he occurrence of any defects, errors, disruptions in service, or other performance problems*, interruptions, or delays ***with our energy storage systems or the Athena platform, whether in connection with day-to-day operations or otherwise, could result in*** . . . ***delayed market acceptance and sales of our hardware and software-enabled services***."

151.    The 14(a) Defendants' materially false and misleading warnings regarding the state of Athena's functionality and market adoption omitted facts regarding the state of Athena's technology and facts known internally regarding the lack of viability of Stem's Athena offering with respect to Stem's critical FTM market.  Further, the risk factors were misleading and inadequate because Athena was not adequate for FTM projects and Stem was unable to gain FTM market share with an undeveloped product.  Thus, these risks had already materialized.  As explained in detail in §IV.D-F, former employees confirmed, *inter alia*, the following:

- The risk that enterprises may be unwilling to adopt Stem's offerings because of a "***perception***" that Stem's technology was "***unproven***" had already materialized because Athena was not viable for the FTM market.  Further, the risk of the loss or delayed market acceptance of Athena had already occurred for the same reasons.  In addition, the risk of being unsuccessful in developing Athena had already occurred for the same reasons.  Likewise, the risk of not achieving gross margins or profitability had already materialized because Stem did not have a viable automated software product for the FTM market.  FTM expansion was required for Stem to achieve anticipated gross margins and profitability.

- Athena was not viable for the FTM market. CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had. CW1 also indicated that Athena was functional for BTM deals but not well made for large FTM deals. CW1 explained that, for FTM work, Athena was really only a very rough prototype and basically just an Excel sheet. According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.

- In addition, Athena's technology was not proven, and in fact was undeveloped for FTM projects and Stem only hoped to sign enough deals in order to build it up to be operable for FTM deals. CW1 explained that Stem's approach was to sign up enough FTM projects in order to eventually be able to build out their software team and from there build the software for FTM projects. CW2, who worked in sales on, among other things, FTM projects, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time. CW2 corroborated that Stem's plan was to eventually get enough FTM projects so as to then hire on personnel to develop Athena. As CW1 stated, in representing Athena as viable for FTM projects, Stem misled investors with respect to Athena's FTM capabilities. CW2 corroborated CW1's reports that Stem hoped to develop Athena later.

- Similar to CW1's account, CW3, who worked with the product marketing team, explained that they found it difficult to provide enough useful content to Stem's partners for training and it was always a struggle to get enough information from the product team, particularly for FTM projects. CW3 indicated that the Athena product team provided the marketing development team with content for training materials. However, when members of the product team reviewed the training materials created by CW3's team based upon the provided content, they were told that some of the content on Athena's FTM software could not be used because the products were still in development and were not functional.

- Stem's margins on hardware were already lower than those reported by the Company, Stem's pipeline was inflated, and Stem's bookings were not deals. According to CW1, Stem was essentially a hardware company masquerading as a software company. If a Stem customer wanted to enter into a development agreement with Stem to get hardware at attractive prices, the requirement was that the customer also had to enter into a software agreement, because Stem was acting as if it was a SaaS company. According to CW1, Stem's markup on hardware was typically as low as 5% and sometimes lower, but Stem wanted as many customers as it could get and was chasing revenue even if it meant selling hardware at its own cost.

- Stem's Athena software was not viable for the FTM market. CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                         - 43 -
4884-3219-7509.v2

software it said it had. CW1 indicated that Athena was functional for BTM deals but not well made for large FTM deals. CW1 explained that for FTM to work, Athena was really only a very rough prototype and basically just an Excel sheet. Accor ding to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.

152. Leading up to Stem's IPO, the Section 14(a) Defendants repeatedly made materially false and misleading risk disclosures. Each of the materially false and misleading statements alleged for Plaintiffs' §14(a) claims concerning Stem's risk disclosures is set forth in Exhibit A (Section 14(a) Defendants' Materially False and Misleading Statements chart, Nos. 30-33), attached hereto, and incorporated by reference as if fully set forth herein. Each of the risk disclosures is materially false and misleading for the same reasons as those set forth in §IV.D-F, *supra*.

## B. Causation

153. Every public shareholder of Star Peak prior to the effective date of the Merger on 04/27/21 was negatively impacted by the Defective Prospectus and Defective Investor Materials in the following three ways:

(a) **Redemption**: public shareholders were provided the right to redeem Star Peak shares for a pro rata portion of the cash held in the Trust Account, which holds the proceeds of Star Peak's IPO if they preferred to receive their money back rather than obtain Stem shares in the Merger.

(b) **Merger Vote**: whether or not they redeemed shares, the Defective Prospectus called for Star Peak public shareholders to vote to approve or reject the Merger between Star Peak and Stem.

(c) **Replacement Share Issuance**: Star Peak shareholders who did not redeem shares had their Star Peak shares automatically converted into shares of Stem common stock.

154. As a result of the materially false misstatements and omissions made in the Defective Prospectus and Defective Investor Materials, §14(a) Class members were harmed. To avoid unnecessary duplication, Plaintiffs incorporate here the loss causation allegations from §VII, *infra*.

## VI. THE FRAUD DEFENDANTS' VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT

155.    The Fraud Defendants engaged in a fraudulent scheme to mislead investors through their conduct and by issuing materially false statements and/or omitting adverse material facts, either knowingly or with deliberate recklessness, regarding: (i) Stem's business model and software story; (ii) Stem's success with its "automated" Athena software as a differentiating point that would drive growth, particularly in the lucrative FTM market; and (iii) Stem's growing pipeline, including the Massachusetts FTM project that Stem touted as a shining of example of its success with FTM projects while concealing from investors that Athena was not a viable FTM product and required a Stem employee to manually perform its functions.

156.    The Fraud Defendants' misrepresentations and fraudulent conduct misled investors regarding Stem's business, operations and ability to grow a profitable company as described herein.

### A.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Business Model

157.    Leading up to Stem's IPO, the Fraud Defendants primed the market as to the nature of Stem's business.  In a 12/04/20 release Fraud Defendants claimed that Stem was "a global leader in artificial intelligence (AI)-driven clean energy storage systems."  The Fraud Defendants further represented that "Stem is a market leader and our Athena™ software platform is proven in the U.S., Japan and Canadian markets."  Stem's Athena software product and its purported success is a message that would be hammered by the Fraud Defendants in one form or another throughout the Class Period.

158.    As described in §IV.B-F, Stem's business model and its transformation to a high-margin low-capital software company was dependent on the Company's Athena software and expanding its market share in the lucrative FTM market with Athena.  To that end, Stem was dependent on substantial and accelerated growth in the FTM market, a market ten times that of the BTM market.

159.    The Company's merger and IPO was supposed to position Stem for profitability and growth because it allowed Stem to have the funds to "fully fund" its purported business model.

Indeed, the message to investors by the Fraud Defendants in the 12/04/20 release was that the merger and IPO, was a "transaction [that] is transformative for us and we expect it to significantly accelerate our growth." Further, the Fraud Defendants highlighted that the ~$600 million in gross proceeds from Stem's merger and IPO "positions Stem to capitalize on significant growth opportunities, expand globally and continue to advance its Athena™ software platform." The Fraud Defendants further represented that Stem and Star Peak's combined "[b]alance sheet supports significant market expansion – strong balance sheet with approximately $525 million of cash to fully finance all U.S. and international forecasted growth." The Fraud Defendants also, in the 12/04/20 release, "urged" investors to read Stem's proxy statement/prospectus and other documents filed with the SEC for more information.

160.    Based on Stem's business model and software story, Stem forecasted astronomical growth and improving gross margins with the Company turning profitable in two years:

| 12/04/20 Forecast Affirmed 01/25/21 | | | | |
|---|---|---|---|---|
| ($mm) | FY20E | FY21E | FY22E | FY23E |
| Revenue | $33 | $147 | $315 | $526 |
| Non-GAAP Gross Margin % | 12% | 16% | 26% | 32% |
| Adjusted EBITDA | $(35) | $(25) | $28 | $113 |

161.    The Fraud Defendants did not waver from Stem's software story. Indeed, they doubled down and continued to reinforce it leading up to the IPO and throughout the Class Period. However, contrary to the Fraud Defendants' messaging, Athena was not viable for FTM projects. As such, the Fraud Defendants had no basis to claim that Athena, coupled with the expansion into the FTM market, could serve as the foundation for Stem's transformation into a profitable software company.

162.    For example, on 04/12/21, Defendant Carrington participated in an IPO Edge Fireside Chat wherein he falsely claimed that Stem's gross margins or profits came from software sales and that Stem was a "***software led company***": and what was "***compelling***" was that "***you can see very strong, gross margins across each of these values as we go through the process. And the software revenue, the recurring piece of that, continues to grow in the out years***."

163.    And, even when Stem announced disappointing FY 2021 results on 02/24/22, the Fraud Defendants continued to double-down on Stem's software story during the 02/24/22 earnings call:

[Analyst:] I wanted to ask a first question, I guess, on the margins here. Maybe if you could give us a bit more bridge. I think you said AlsoEnergy is doing 60% gross margin, overall. So at the midpoint of guidance, it implies they're about half your gross profit dollars for 2022, and that means core Stem is doing maybe about a 10% gross margin. I think you guys originally had a target to do, like, mid-20s in 2022, and you were also 10% to 20% throughout all of '21, before 4Q. Just I'm trying to reconcile the sharp drop-off here, and I know you mentioned a number of different moving parts, but can you maybe help bridge a bit and maybe quantify, if you can, kind of where we were targeting before for core Stem and kind of where we're ending up here with, if the math is right, an implied kind of 10% margin?

[Carrington:] Thanks, Brian. Good to have you on the call. Appreciate the question. I'd say, first, then I'll turn it over to Bill, we're really not providing separated guidance. It's all consolidated. And we don't want to break it out for each company's performance.

But Bill, if you want to address some of those points, we can maybe tackle a few of those items that Brian asked.

[Bush:] Thanks, John. Brian, appreciate the question. So I think, as John said, I think in the future we won't be breaking out the 2 divisions of the company that way. But I mean, I think the basic math is pretty very correct.

***I think the issue that we're focused on is the continued bookings of the company, and the focus there is making sure that the software is what's driving the long-term value of the company.*** So it's possible that we'll see lower margins in the near term, but ultimately – and that's why we rolled out the CARR metric. I mean, that's the – I think we've said pretty consistently in the past that we think backlog is a great short- to medium-term reflection of what the revenues will be. Well, CARR is going to be a great reflection of what software is going to be as we mature.

164.    Not satisfied with Defendants' response, analyst Brian K. Lee at Goldman questioned Stem's lower hardware gross margins of 10% relative to the expectations that Defendants had set for investors of 10% to 30% with Defendants, in response, denying the reduced margins were the result of a structural issue and telling investors that the more important thing is Stem's software:

[Analyst:] Okay. I mean, that's fair enough. I know you guys have a mix shift story here medium to longer term. As more software Athena gets embedded at these higher margins, you're obviously going to see some margin expansion. But just in the near term, there's still going to be a relatively high hardware mix. And I think you guys had talked about a 10% to 30% hardware gross margin. I mean, if you're doing 10%, is there something here to suggest that maybe we should structurally be thinking about a lower hardware gross margin and, eventually, you

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC
4884-3219-7509.v2

see the mix shift help you get consolidated margins up, but you're not going to see the sort of 10% to 30% gross margins on hardware anymore? Just trying to figure out if this is a temporary supply chain logistics issue or if this is maybe more structural on the hardware side.

[Bush:] I guess I'm not sure I would use the word "structural." But I mean, I think we have consistently said that the larger FTM projects carry a lower gross margin. When you think about those larger developers versus, say, the "smaller ones," the primary difference is integration; and the integration being, does that company have a supply chain relationship or a procurement department? To the sense that they have that and you're doing deals that kind of come into the multi-hundred millions of dollars gigawatt size range, they tend to have relationships, which means that some of the value-added services that we would normally bring to, say, maybe a BTM project just isn't required. And so as a result of that, you're going to see lower gross margins on the hardware. That's just what it is.

However, the more important thing is you're still signing a software contract, which is that super high gross margin contract which is going to layer in over a long period of time.

And so I think irrespective of what the hardware margin is, I think one of the things that we really thought about and which, frankly, drove the decision to acquire AlsoEnergy was the gross margin profile on the software and services. And so that's really where we're focused long term. I mean, to the extent that the hardware suffers in the near term, well, then that's – we think that's a great trade-off for a 10- to 20-year contract with super low churn. So it even goes beyond that.

And so that's really kind of what (inaudible) always thought that way. We're starting to do more software-only deals as well, which is kind of along that same path.

***And so we think that the software continues to differentiate itself from other competitors in the marketplace***. And I think that's really in the end where we're going to be.

165.    The Goldman analyst understood Defendants to be signaling that Stem was getting high-margins for software in the FTM market, which Defendant Bush affirmed while continuing to sell Stem's "software story" with its Athena platform:

[Analyst:] Got it. I suppose the good news is (inaudible) the increase in FTM mix, you're still getting the software business that has the same margins, whether it's FTM or BTM.

[Bush:] Exactly. I mean, ultimately, I think as we've always said and I think most have agreed, ***this is a software story***. It's not a sale of somebody else's hardware story. It's really what – ***the differentiating component of Stem is the Athena platform. That's always been true, and I think that's going to continue to be true in the future***.

166.    In addition to the above materially false and misleading statements and omissions, throughout the Class Period, the Fraud Defendants made other materially misleading statements

and omissions to investors regarding Stem's defective business model in Stem's Investor Presentation (12/04/20); Investor call (12/04/20); Analyst Day Presentation (01/25/21); Simmons Energy Conference Presentation (03/22/21); Defective Prospectus (03/30/21); IPO Edge Fireside Chat (04/12/21); Cowen Sustainability & Energy Transition Summit (06/09/21); Stem's 2Q 2021 earnings call (08/11/21); Leader in AI-Driven Solutions presentation (09/09/21); Stem's 3Q 2021 earnings call (11/09/21); Leader in AI-Driven Solutions presentation (12/01/21); Leader in AI-Driven Solutions presentation (01/06/22); Goldman Sachs Global Energy and Clean Technology Conference (01/06/22); Stem's 4Q/FY 2021 earnings call (02/24/22); Leader in AI-Driven Energy Solutions presentation (03/15/22); Stem's release (05/05/22); Stem's 1Q 2022 earnings call (05/05/22); Stem's 2Q 2022 earnings call (08/04/22); Stem's Investor and Analyst Day (09/28/22); Goldman Sachs Energy Conference (01/05/23); and Stem's 4Q/FY 2022 earnings call (02/16/23). Plaintiffs attach as Exhibit B (Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Business Model, Statement Nos. 34-68) the precise language of each such materially false and misleading statement regarding Stem's business model and incorporate those statements by reference herein.

167.    At the time when the misleading statements were issued, the Fraud Defendants acted with deliberate recklessness and/or knowingly misled investors regarding Stem's business model, including *inter alia*, that it could expand into the FTM market with its Athena software. Stem's model, however, was dependent on the high-margin FTM software sales that were unobtainable given Athena's deficient FTM capabilities.  Accordingly, the Fraud Defendants' statements and omissions concerning Stem's business model in Exhibit B were materially false and misleading for the reasons detailed in §§IV.B-F and §VIII as well as, *inter alia*, because:

- Contrary to the Fraud Defendants' statements that Stem's Athena software was "is what is driving the long term value of the company" and that Athena is what differentiates Stem from its competitors positioning it to compete in the FTM market, Stem's Athena software was not viable for the FTM market.  Accordingly, the underlying premise of Stem's business model was defective.  CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had.  CW1 indicated that Athena was functional for BTM deals but not well made for large FTM deals.  CW1 explained that, for FTM projects, Athena was really only a

very rough prototype and basically just an Excel sheet. According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.

- CW1 elaborated that Stem had determined that large FTM deals were lucrative and, thus, Stem wanted to sell Athena for FTM wholesale markets. The FTM deals, however, were a lot more complex than the BTM deals and Athena was inadequate to fulfill large FTM deals. They explained that Athena was not a working FTM product.

- Athena was not actually the "robust artificial intelligence platform" Stem claimed it was for the FTM market. In fact, it was undeveloped and Stem only hoped to sign enough deals in order to build it up to be operable for FTM deals. CW1 disclosed that Stem's approach was to sign up enough FTM projects in order to eventually be able to build out their software team and from there build the software for FTM projects. CW2, who worked in sales on, among other things, FTM projects, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time. CW2 corroborated that Stem's plan was to eventually get enough FTM projects so as to then hire on personnel to develop Athena. CW2 considered this a very short-sighted strategy. As CW1 stated, in representing Athena as viable for FTM projects, Stem misled investors with respect to Athena's FTM capabilities. CW2 corroborated CW1's reports that Stem hoped to develop Athena later.

- Similar to CW1's account, CW3, who worked with the product marketing team, explained that they found it difficult to provide enough useful content to Stem's partners for training and it was always a struggle to get enough information from the product team, particularly for FTM projects. CW3 indicated that the Athena product team provided the marketing development team with content for training materials. However, when members of the product team reviewed the training materials created by CW3's team based upon the provided content, they were told that some of the content on Athena's FTM software could not be used because the products were still in development and were not functional.

- Contrary to the Fraud Defendants' statements regarding Stem's growing software revenue and bookings momentum, these statements were belied by the fact that Athena was not viable for the FTM market. In addition these statements were belied by the fact that the Company was inflating its pipeline with phantom deals and its bookings were not actually deals. CW1, who was, among other duties, involved in developing pipeline, indicated that engagements listed in the pipeline were not actual deals or even commitments on the part of the developer, but, rather, they represented just a chance with no guarantee of getting a platform deal signed. CW1 explained that the pipeline included phantom deals. CW1 explained that while Stem was hoping for repeat business with its development partners, most of the prospective business in the pipeline was pie-in-the-sky because the pipeline was just a chance to send a proposal. For example, CW1 reported that several very large projects that were included in the pipeline were only requests for proposals, and that Stem included them in the pipeline simply because it was technically possibly

that Stem's proposal may be selected for the project. CW1 reported that Stem included these requests for proposals in Salesforce and in the pipeline even if there was no practical chance of winning, even if Stem was not the cheapest bidder, or even if Stem lacked the experience that some requests for proposals required.

- CW2 explained that prospective deals were always kept in the pipeline even when those deals had no results after a couple of quarters. According to CW2, this was apparent because of the low close rate of these deals. CW1 corroborated that deals which were no longer viable would remain in Salesforce and would be used for Stem's projections and reports to investors.

- In addition to the above, contrary to the Fraud Defendants' statements regarding hardware gross margins that would drive cash flows, Stem's business was suffering because it's hardware sales did not produce 10%-30% gross margins as stated to investors, but typically garnered as low as 5% and sometimes lower. According to CW1, Stem was essentially a hardware company masquerading as a software company. If a Stem customer wanted to enter into a development agreement with Stem to get hardware at attractive prices, the requirement was that the customer also had to enter into a software agreement because Stem was acting as if it was a SaaS company. According to CW1, Stem's markup on hardware was typically as low as 5% and sometimes lower, but Stem wanted as many customers as it could get and was chasing revenue even if it meant selling hardware at its own cost. CW2 corroborated that Stem's hardware mark-up was usually 5% to 10%.

168. The market, however, was unaware that Stem's business model suffered from fatal flaws and believed that the Company would expand in the FTM market, generate high-margin software sales and turn a profit. Analysts wrote, for example, as follows:

(a)    On 06/29/21 Credit Suisse analysts initiated coverage of Stem reiterating that: "*We expect the strongest growth in the US utility-scale, or front-of-the-meter (FTM)*, market (54% CAGR) and the US commercial and industrial storage market (41% CAGR)." Further, that: "[b]attery software and market participation revenues are spread out over 10-20 years, with an 80% gross margin. *Stem's focus on software as a service for its batteries is further bolstered by a capital-light business model*. We estimate a revenue CAGR of 70% per year, driven by US utility-scale and international projects."

(b)    On 07/19/21 Susquehanna Financial Group LLP analysts initiated coverage of Stem noting that: "Main concerns/risks to our thesis include competition *to increase market share within the FTM segment (which is needed to meet the company's growth objectives)*." The Susquehanna analysts added that, "*[m]eeting growth targets will require increased market*

1    *share in the FTM market*."  Further, that Stem's "Software platform adds recurring revenue with

2    expanding margins" with the "exciting part of Stem's product offering is its AI-enabled software

3    platform, Athena."  The Susquehanna analysts indicated that "Athena adds a key competitive

4    advantage for the company."

5          (c)    On 05/05/22 Wolfe rated Stem as "Outperform", noting that: "Stem recently

6    entered the front-of-the-meter space, which was part of the reason for its go-public transaction,

7    and the company is already showing signs of success.  The cornerstone of the company is its

8    Athena software platform."

9          (d)    On 08/04/22 Wolfe similarly wrote: the "FTM market continues to grow

10   rapidly for STEM" and giving the Company an "Outperform" rating.  Further, "*Stem recently*

11   *entered the front-of-the-meter space, which was part of the reason for its go-public transaction,*

12   *and the company is already showing signs of success*.  The cornerstone of the company is its

13   Athena software platform."

14         (e)    On 08/05/22 Guggenheim analysts noted that "*FTM remains the key*

15   *driver*."

16         (f)    On 09/22/22 Cowen initiated coverage of Stem with an Outperform rating

17   and embracing that "*Stem is well positioned to capture demand both in front of* and behind *the*

18   *meter applications*."

19         (g)    On 09/29/22 Cowen wrote: "*Focus on Software & Services to Drive*

20   *Profitability*"; and "*Management highlighted the strong position of its Athena platform*."

21         (h)    On 09/29/22 analysts at Northland reported that: "We came back from

22   STEM's analyst day feeling more confident about its software prowess and *technological*

23   *differentiation that is driving its profitable and predictable growth*"; and "STEM expects to be

24   EBITDA positive in 2H 2023; with them having *a capex-light business model*."

25         (i)    On 11/03/22 Wolfe continued to emphasize Stem's business model: "Q3

26   revenue and bookings both beat expectations and Stem's pipeline was up 29% sequentially"; and

27   "*Stem recently entered the front-of-the-meter space, which was part of the reason for its go-*

28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                      - 52 -
4884-3219-7509.v2

1 | *public transaction, and the company is already showing signs of success.  The cornerstone of*

2 | *the company is its Athena software platform*."

3 |     169.    Despite the Fraud Defendants' reinforcement of Stem's business model, following

4 | Stem's 4Q/FY 2022 earnings call and release on 02/16/23 with disappointing results and FY 2023

5 | guidance below expectations, the market began to question Stem's software story.  For example,

6 | analysts at Morningstar issued a report on 02/17/23 focusing on Stem's ability to execute on its

7 | business model:

> With Stem previously indicating 2022 results were going to be weaker than expected, our focus was on the company's 2023 guidance. . . . [N]on-GAAP gross margin guidance of 15%-20% for the full year is in line with original 2022 guidance, showing limited improvement year on year.

> ***Stem's long-term strategy remains around its Athena software, but we think its transition from a hardware-dominated business to one with sizable software revenue is going to be more gradual than our prior expectations***.  As such, we now incorporate a more subdued gross margin improvement into our forecast.  We now assume the company does not meet its 15% adjusted EBITDA target until 2026, a year later than its analyst day projections.  We would like to see management execute against its 2023 guidance and further scale its software revenue prior to becoming more constructive on shares.

> In addition to margin improvements, ***we are watching Stem's ability to turn cash flow positive given its somewhat constrained balance shee***t.  Stem ended the quarter with $250 million in cash and approximately $450 million in debt.  The resulting net leverage position has us agreeing with management's laser focus on achieving adjusted EBITDA breakeven (even if it comes at the expense of revenue growth).

> *        *        *

> Stem has recently expanded its market focus to include larger projects in the front-of-the-meter market.  The company's history has centered on behind-the-meter installations, but the FTM market is approximately 10 times larger than BTM.  ***We view the company's decision in late 2020 to go public as aiding its FTM sales activities via a larger balance sheet.  While we recognize the large size of the FTM market, we think the company enjoys the strongest relative position in smaller, average-size projects with less sophisticated customers***.  Thus, we expect Stem to achieve lower long-term market share in FTM than it enjoys in BTM.

> Stem completed its largest acquisition to date with its 2022 purchase of AlsoEnergy, a provider of solar asset management software.  Given limited financial flexibility, we do not anticipate further sizable acquisitions going forward.

170.    Later, fed up with Stem's repeated misses and deterioration of Stem's software story, on 04/04/23 analysts at BofA Global Research downgraded the stock to underperform writing, *inter alia*, that:

> ***We downgrade Stem to Underperform as our confidence in the story is increasingly strained.  The notion of what Stem "is" at its core is now more confusing than it used to be given the shifting business mix contemplated within its dramatic top-line ramp from '22 into '25.  While our recent launch contemplated a Neutral rating, a disappointing 4Q outlook call since and now uncertainty reflected from convertible issuance last week push us to be less generous on estimates*** – particularly given the risks reflected in standing up two new services businesses (Dev-serv to 'setup' the battery install initially and Pro-Serv to operate batteries on an ongoing basis) and implicitly keeping opex relatively stable.  Historically, Stem has been the leader in effective software optimization for battery applications with a key end market in C&I customers focused on "clipping" otherwise punitive demand charges via load shifting and rapid dispatch of onsite behind the meter batteries.  But after years of building to an increasingly saturated point of market share – Stem currently holds about a third of all projects in this segment – the business has been forced to expand into larger grid scale applications where the competition is more pronounced.

171.    In other words, the Fraud Defendants software story had reached the point where the market no longer believed that they could execute on it.

**B.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Automated Software Athena**

172.    Throughout the Class Period, the Fraud Defendants materially misled investors by falsely touting Athena as automated when, with respect to Stem's critical FTM business, which Stem needed to fuel growth, margins, and profitability, Athena was not.

173.    For example, at the beginning of the Class Period, the Fraud Defendants misled investors by claiming in Stem's 12/04/20 release filed with the SEC on a Form 8-K that the "Company generates revenue by providing customers with integrated energy storage systems, long-term recurring software services and energy market participation through its ***proprietary software platform, called Athena™, which enables AI-automated system operations***."  A claim that the Fraud Defendants would repeat in one form or another throughout the Class Period.

174.    On 05/31/21 Defendant Carrington participated in an interview an FGain YouTube video to further get the message to investors that Stem's Athena software product, that was intended to drive the Company's growth, margins and profitability, was automatic:

[Carrington:] (12:53) Sure, yeah. So our artificial, you know, intelligence or AI software, which I mentioned is called Athena, is really built to optimize energy storage assets for different value streams. And each market has different value streams. The good news is we see 13 that could be identified with energy storage. So you've got this massive land and expand opportunity that I alluded to earlier that's just not out there with a solar or wind technology. ***And what Athena does is it's analyzing these large data sets and making real time decisions that automatically respond to changing conditions in the energy market.*** It's not immaterial. We've been at this for a long time and our dataset is very important. So to kind of give you a little bit more color around that, Athena's ingesting over 700,000 data points per second from customer site and energy storage systems.

It requires very specific and localized information. As I mentioned, it changes in different markets, but typically we're looking at weather, energy prices, grid dynamics, and obviously the customer usage pattern and then their energy usage. And then what we do is we pair all of that with real-time data in our machine learning algorithm, which predicts future conditions. And that allows, and that runs over 24 million scenarios to optimize battery value for our customers. The grid, whether it's the grid, the customer, the utility. So it's a, it's a pretty intense amount of AI that's going on. ***It is true AI***, it does get better with more use cases, and we believe it creates a significant competitive moat with all that ingested data. We have over 20 million runtime hours, John, that's the equivalent of 2000 years of experience actually, which is remarkable. We've had many battery suppliers come to us and try to acquire or want to acquire our data set because it is super compelling and very insightful on a variety of different segments. So, you know, bottom line is battery storage needs smart software to make it work and optimize all these use cases. And by far we believe Athena is the best in class around that objective.

175. The Fraud Defendants continued during the 09/28/22 Investor and Analyst Day to hammer in the misleading message to investors that Athena was automated, including for FTM projects, using the Massachusetts project as an example:

[Johnson:] ***So the question is, well, what does winning look like***? With this extensive suite of capabilities, there's a lot of different characteristics that I think are important here. The interesting thing that's going on with the passage of IRA is how to think about solar plus storage combination. So we're going to focus a little bit on winning with the hybrid systems where you have both solar and storage, in particular, potentially retrofitting storage to that 40,000 installed base that you heard about with AlsoEnergy PowerTrack system.

***So we'll start with one of the sites that has solar and storage in Massachusetts. We've been operating this site, delivering a full suite of capabilities that automatically continuously co-optimize 7 different value streams***. We're bidding hybrid solar and storage into the ISO-New England market. PowerTrack is at the site providing a complete view of the asset, the solar asset and on-site weather conditions. And this combination of economic optimization and asset management has resulted in revenues exceeding the project pro forma by over 46%.

***This demonstrates the differentiated capability to operate and monetize these different value streams in grid services and wholesale market opportunities in front-of-the-meter site, operating with the combined services of the Athena platform*** and the AlsoEnergy PowerTrack application.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                                              - 55 -

1                               *      *      *

2       So one of the other dynamics that's going to come in here is the merger and
the co-optimization across what we're already doing today in multiple markets with
3   front-of-the-meter projects moving into the behind-the-meter applications as well.
So again, ***bringing back the differentiation of Athena with this broader suite of***
4   ***capabilities across a broad market segments and being able to tie that back under***
***a single platform into a unique value proposition***.

5                               *      *      *

6
        And then full circle, of course, owners will have a trusted enterprise
7   platform.  ***We offer a single pane of glass that covers both behind-the-meter and***
***front-of-the-meter facilities***, with a mix of clean energy assets across multiple
8   markets, use cases and OEMs and provides integrated economic optimization and
asset performance management.   And that's a mouthful, but that's what the
9   platform promises, is to be able to provide that kind of capability with one stop with
one company who can support that over time.   And when compared to multiple
10  point solutions, our unified platform and Athena offerings are differentiated in the
industry, and the ability to sell solutions into this entire ecosystem will make smart
11  energy simpler for all.

12      176.    In addition to the above materially false and misleading statements, throughout the

13  Class Period, the Fraud Defendants made other materially misleading statements to investors

14  regarding Stem's purportedly "automated" Athena software including in Stem's release

15  (12/04/20); Stem's Investor call (12/04/20); Stem's release (01/05/21); Stem's release (01/13/21);

16  Stem's Analyst Day Presentation (01/25/21); Stem's release (02/11/21); Stem's release (02/18/21);

17  Stem's release (03/02/21); Stem's release (03/18/21); Stem's Communication to investors

18  (03/30/21); Stem's release (03/30/21); the Defective Prospectus (03/30/21); Stem's release

19  (04/06/21); Stem's release (04/12/21); IPO Edge Fireside Chat (04/12/21); Stem's release

20  (04/14/21); Star Peak's Announcement to shareholders (04/21/21); Stem's 1Q 2021 earnings

21  release (05/17/21); John Carrington's interview on FGain YouTube video (05/31/21); Stem's 2Q

22  2021 earnings call (08/11/21); Stem's 2Q 2021 earnings release (08/11/21); Stem's 3Q 2021

23  earnings release (11/09/21); Stem's 4Q/FY 2021 earnings release (02/24/22); Stem's 4Q FY 2021

24  earnings call (02/24/22); Stem's Form 10-K for FY 2021 (02/28/22); Stem's 1Q 2022 earnings

25  release (05/05/22); Stem's 2Q 2022 earnings release (08/04/22); Stem's Investor and Analyst Day

26  (09/28/22); and Stem's Form 10-K for FY 2022 (02/17/23).  Plaintiffs attach as Exhibit C (False

27  Statements Regarding Athena's Automated Software, Statement Nos. 69-111) the precise

28

1    language of each such materially false and misleading statement and incorporate those statements

2    by reference herein.

3         177.    The Fraud Defendants knowingly and/or with deliberate recklessness misled

4    investors by misleadingly claiming that Stem's Athena software was automated and capable of

5    handling large FTM projects when, in reality, the software lacked sufficient capabilities to perform

6    or complete tasks automatically.  Given the importance of Stem expanding into the FTM market

7    and its inability to implement Athena with those automatic functions in its Massachusetts FTM

8    project, the Fraud Defendants knew that Athena was insufficient for FTM projects.  The Fraud

9    Defendants' statements and omissions in ¶¶173-176 and Exhibit C were materially false and

10   misleading for the reasons detailed in §§IV.D-F and §VIII as well as *inter alia,* because:

- Contrary to the Fraud Defendants' statements that Athena was automated, as described by three former Stem employees, Athena was not in fact automated for the FTM market but really only a very rough prototype and basically just an Excel sheet.  In fact, according to CW1, Stem did not have a working product for FTM projects since Stem's inception.  CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had.  According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.  CW2, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time.  CW3 corroborated that Athena lacked functionality with respect to FTM projects.

- Athena was not capable of autonomously handling large FTM projects such as the Massachusetts FTM deal.  CW1 explained that for the large Massachusetts FTM project, instead of a machine, an employee for Stem manually performing the functions that Athena could not do automatically.  Because Athena did not work for FTM projects, this employee managed an Excel spreadsheet in which various minute changes were input to reflect changing conditions.  Corroborating CW1's account, CW2 indicated that they had heard that Stem had an employee who worked on an Excel spreadsheet to handle functions on the Massachusetts FTM project that were supposed to be handled by Athena, and confirmed that the employee had been doing some manual processes.  CW2 also reported hearing that the Stem employee complained to a Stem salesperson that he was annoyed at having to do so many manual tasks.

- Stem was unable to produce any case studies or live demonstration materials for Athena's purportedly automated FTM software because the products were still in development and were not functional.  CW3, who worked with

sales and the product marketing team as well as the Athena product team, corroborated reports that Athena lacked functionality with respect to FTM projects. CW3 also reported that CW3 could not recall ever seeing an example of a case study for FTM that was fully installed, and that CW3 and the FTM sales team would frequently request examples of Athena's successful implementation into a FTM project and other demonstrations of Athena's success in FTM projects but, despite those numerous requests, no such information was provided to CW3.

- Despite the Fraud Defendants statement on 08/11/21 that Stem was rolling out new automated Athena products, these products were not fully developed or functional. For instance, as reported by CW3, when members of the product team reviewed the training materials created by CW3's team based upon the provided content, they were told in late 2021/early 2022 that some of the content on Athena's FTM software could not be used because the products were still in development and were not functional, such as Athena Bidder and Athena Supervisor.

## C. The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's FTM Success with Athena

178. Leading up to Stem's IPO and throughout the Class Period, the Fraud Defendants misled investors that Stem was positioned for and had success in the FTM market as a result of its automated Athena software. Contrary to these representations, Stem's Athena software was not viable for the FTM market.

179. Following Stem's IPO, the Fraud Defendants misled investors by pointing to Stem's large FTM project in Massachusetts (and within New England) as a success in the FTM market when Athena was not fully automated but, rather, relied on a human to perform purportedly automated functions in Massachusetts. For example, the Fraud Defendants in Stem's 08/11/21 earnings call for 2Q 2021 touted the Company's success in ISO-New England (which includes Massachusetts) for its FTM offering:

> I'd say that, one of the really exciting parts of what we're doing on the front of the meter side is if you look at Massachusetts, particularly it's a market we weren't even in 18 months ago. And as mentioned in the prepared remarks, we have 52% of the energy storage assets, active in the wholesale markets that Athena's managing. **So we feel very good about our advanced, our efforts in the Front of the Meter side**.

180.    Again, during the AI Driven Energy Storage Conference on 10/12/21, Defendant Carrington relied on Stem's Massachusetts FTM project in order to convince investors that it had a "very compelling product" for the FTM market:

[Interviewer:]   (29:10) What would you say to a skeptical investor or a potential investor looking at the competition?  What did they get wrong about your company?

[Carrington:]   (29:22) You know, look, I mean, I think we've got a tremendous shareholder base.  You can see who those names are.  Obviously, the stock performance has been very good.  I don't think people don't understand the company.  *I think it's a question of can, can the company execute?  Can they make this shift to front of the meter from behind the meter?  Yes, you are the leader, yes, you have this huge market share.  And I would say to that highlight, Massachusetts, which is one of the biggest front of the meter markets, we have 52% share.  I would also highlight the fact that we weren't there 18 months ago. So we have a very compelling product that is winning in a variety of markets*.  So, I don't, there's not been a silver bullet of, hey, here's a concern we see.  And when your customers continue to buy from you, you grow at 4x, year over year, you continue to meet your financial metrics that you've committed to the street. That's pretty powerful and I intend to continue to do that.

181.    Similarly, on Stem's 09/28/22 Investor and Analyst Day, the Fraud Defendants pointed to Stem's purported success with its FTM business in New England with it being a "big milestone":

[Carrington:]  And people said, do you think you can really execute in front of the meter because you've done such a great job behind the meter.  *While we went from 0 to over 50% market share in 18 months in the New England ISO.*

*So a real accomplishment that is very much attributable to our software platform because we could translate our behind-the-meter. software deck to that front-of-the-meter need*.   And I think that – that was a big milestone for the business to make that transition.

182.    The Fraud Defendants, having nothing else to point to for the success of Stem's Athena platform in the FTM market, misled investors with similarly false and misleading statements during the Class Period, including in the Defective Prospectus (03/30/21); Stem's 2Q 2021 earnings call (08/11/21); AI Driven Energy Storage Conference (10/12/21); Stem's 3Q 2021 earnings call (11/09/21); Stem's Form 10-K for FY 2021 (02/28/22); Stem's 2Q 2022 earnings call (08/04/22); Stem's Investor and Analyst Day (09/28/22); Goldman Sachs Energy Conference (01/05/23); and Stem's 10-K for FY 2021 (02/16/23).  Plaintiffs attach as Exhibit D (The Fraud Defendants' Materially False and Misleading Statements and Omissions Regarding Stem's FTM

Projects, Statement Nos. 112-126) the precise language of each such materially false and misleading statement and incorporate those statements by reference as if fully set forth herein.

183. The Fraud Defendants knew and/or acted with deliberate recklessness in that their statements and omissions regarding Stem's FTM projects were false and/or misleading in each of the materially false and/or misleading statements set forth in ¶¶179-182 and Exhibit D for the reasons detailed in §§IV.C-F and §VIII as well as *inter alia*, for the following reasons:

- Contrary to the Fraud Defendants' statements that Stem was positioned for growth in the FTM market as a result of Athena and their use of Massachusetts as an example of the Company's success in the FTM market, Stem did not have a viable software product for FTM projects as described by three former Stem employees. For example, CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had. CW2, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time. CW3 corroborated reports that Athena lacked functionality with respect to FTM projects.

- Contrary to the Fraud Defendants' statements highlighting Massachusetts as an example of Stem's success in the FTM market, Athena did not perform as advertised in Massachusetts. Rather, CW1 explained that for the large Massachusetts FTM project, there was an employee for Stem manually performing the functions that Athena could not do automatically. Because Athena did not work for FTM projects, this employee managed an Excel spreadsheet in which various minute changes were input to reflect changing conditions. Corroborating CW1's account, CW2 indicated that they had heard that Stem had an employee who worked on an Excel Spreadsheet to handle functions on the Massachusetts FTM project that were supposed to be handled by Athena, and confirmed that the employee had been doing some manual processes. CW2 also reported hearing that the Stem employee complained to a Stem salesperson that he was annoyed at having to do so many manual tasks.

- Stem's statements regarding the Company's expansion and growth in to the FTM market were also misleading because underpinning those statements were misleading pipeline and booking figures that implied FTM business. For example, CW1 indicated that engagements listed in the pipeline were not actual deals or even commitments on the part of the developer but, rather, they represented just a chance with no guarantee of getting a platform deal signed. CW1 explained that the pipeline included phantom deals. CW1 elaborated that while Stem was hoping for repeat business with its development partners, most of the prospective business in the pipeline was pie-in-the-sky. Similarly, CW2 indicated that there were deals in the pipeline without any support and that prospective deals were always kept in

the pipeline even when those deals had no results after a couple of quarters. As to bookings, CW2 explained that bookings were letters of intent that had no teeth actually requiring customers to make a purchase order. CW2 also indicated that Stem would chase bookings at the end of quarters to report prospective deals even without an actual purchase order.

- Contrary to the Fraud Defendants Stem's statements that they were rolling out new automated Athena products, these products were not fully developed or functional. For instance, as reported by CW3, when members of the product team reviewed the training materials created by CW3's team based upon the provided content, they were told in late 2021/early 2022 that some of the content on Athena's FTM software could not be used because the products were still in development and were not functional, such as Athena Bidder and Athena Supervisor.

184. The market, however, was unaware that Athena was, in fact, not viable for the FTM market and that a human performed automated functions for the Massachusetts project. Analysts had bought Defendants' message that Stem's Massachusetts project exemplified a successful use of Athena in the FTM market. For example, on 06/29/21, Credit Suisse analysts initiated coverage of Stem tying expected growth in FTM market share to Stem's purportedly successful FTM implementation of Athena for the Massachusetts' project:

**Growth from Utility, or Front-of-the-Meter (FTM), Projects**

Stem has a 30% share of the US BTM market and a <2% share of the US FTM market. ***Management expects to grow US FTM market share to >10-15% by 2026, which is a steep slope***; however, we believe it will be driven by smaller utility-scale projects. ***Since Stem announced its first project in Massachusetts in 2017, it has captured a 20% market share of the non-residential projects in the state under its SMART program***. Internationally, the company expects to gain up to 5% of the storage market share, driven by cross-country selling efforts to existing US customers.

**D.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Purported Pipeline and Available Power FTM Deal**

185. Prior to Stem's IPO and throughout the Class Period, the Fraud Defendants issued materially false and misleading statements regarding Stem's purported pipeline, its growth, as well as the FTM opportunities in that purported pipeline. The Fraud Defendants ultimately abandoned what they once claimed was a key metric, announcing on 02/16/23 in its 4Q/FY 2022 earnings Release that Stem would "no longer report [the] 12-month pipeline [as a key metric in] 2023."

186.    The Fraud Defendants' materially false and misleading pipeline statements included, for example, their misrepresentation in Stem's 08/11/21 2Q 2021 earnings release, filed on a Form 8-K, that:

> **The Company's 12-month forward Pipeline was $1.7 billion as of June 30, 2021 representing significant year-over-year growth.  The 21% increase in the 12-month pipeline from $1.4 billion at March 31 2021 is a result of increased FTM project opportunities** and the seasonal nature of the pipeline.

187.    Likewise, on the same day, 08/11/21, Stem held a 2Q 2021 earnings call, in which defendant Bush emphasized the focus on the FTM market and growth in Stem's pipeline:

> **Turning to our operating metrics, our 12-month pipeline grew to $1.7 billion as of the end of June that's up 21% from the end of the first quarter 2021. We are seeing a lot of new opportunities in the FTM space, which contributed to two-thirds of the growth in the pipeline as our salesforce focuses on that market.** We booked $45 million in projects in the quarter and have booked $96 million in the first half 2021 versus $58 million in the first half of 2020.

188.    Later, in a 02/24/22 release, the Fraud Defendants announced Stem's partnership with Available Power in Texas that included Athena software:

> **On February 24, 2022, the Company announced that it had been exclusively selected to provide storage solutions to Available Power**, a developer of distributed energy resources.  **The strategic partnership will develop up to 100 FTM sites in Texas** with potential to provide one gigawatt (GW), or two GWh, of energy storage systems and Athena software.  **The portfolio will be completed in phases, with deployment of the first 20 systems by early 2023.**

189.    The Fraud Defendants further misled investors during the 02/24/22 earnings call by pointing to the Available Power deal in Texas and Stem's success with FTM business in response to a question from an analyst as follows:

> [Analyst:]  Anything you can say about the margin threshold you have on the hardware side for new business?
>
> *        *        *
>
> [Bush:]  **I think one of the things that's important to note is we are ever more leaning towards the FTM side of the house. I mean, we've talked about 80/20. That number is getting higher on the FTM side.  And as you go back to the guidance of, gosh, almost 2 years ago now, we talked about margins in the 10% to 30% range, more closer to 10% on the FTM side, and that's kind of what we're seeing.**
>
> So I think that though it's a long-dated plan, we're still kind of operating somewhat close to it, other than kind of the mix percentages that we talked about, that we're leaning more heavily towards FTM.  I don't think we could have

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 62 -
4884-3219-7509.v2

predicted way back then that Texas would become the market that it has. But the good news is that we're there in force, and we're happy to be.

So I think on the BTM side, still growing, good margins, but definitely maybe more impacted by the pandemic because that tends to be more on the Fortune 500 side of the house.

190.    Again on 05/05/22 during Stem's 1Q 2022 earnings call, the Fraud Defendants, despite knowing that Available Power had not executed purchase orders for hardware, touted the strength of Stem's pipeline, indicating that it was fueled by FTM deals, with Defendant Carrington telling investors that the Available Power deal was accelerating the strength of the Texas market:

On the bookings front, we did $151 million, and again, that's nearly triple the same quarter of 2021.  The mix is 90% FTM and 10% BTM. As you might recall, the fourth quarter was 95%, 5%.  You know, *from a pipeline standpoint, we're running about a little over 80% front of the meter with a 12-month pipeline of around $5.2 billion.  And that's a record, so we feel very strong about that.  It's really indicative of a couple of markets like Texas and California that have continued to see acceleration.*

191.    Throughout the Class Period, the Fraud Defendants materially misled investors in a similar manner regarding Stem's pipeline, and later the Available Power deal in: Stem's Leader in AI-Driven Storage Solutions presentation (01/25/21); IPO Edge Fireside Chat (04/12/21); Stem's 2Q 2021 earnings release (08/11/21); Stem's 2Q 2021 earnings call (08/11/21); interview with Defendant Carrington at the AI-Driven Storage Conference (10/12/21), Stem's 3Q 2021 earnings release (11/09/21), Stem's 3Q 2021 earnings call (11/09/21); Stem's Form 10-Q for 3Q 2021 (11/09/21); Goldman Sachs Global Energy and Clean Technology Conference (01/06/22); Leader in AI-Driven Energy Solutions (01/06/2022); Stem's release (02/24/22); Stem's 4Q/FY 2021 earnings call (02/24/22); Stem's Form 10-K for FY 2021 (02/28/22); Leader in AI-Driven Energy Solutions presentation (03/15/22); Stem's 1Q 2022 release (05/05/22), Stem's 1Q 2022 earnings call (05/05/22); Stem's Form 10-Q for 1Q 2022 (05/06/22); Stem's 2Q 2022 earnings release (8/04/22); Stem's 2Q 2022 Financial Results presentation (08/04/22); Stem's Form 10-Q for 2Q 2022 (08/05/22); Stem's release (11/03/22); Stem's 3Q 2022 earnings presentation (11/03/22); Stem's Form 10-Q for 3Q 2022 (11/04/22); Stem's 4Q/FY 2022 earnings release (02/16/23); Stem's 4Q 2022 Financial Results and 2023 Guidance presentation (02/16/23); and Stem's Form 10-K for FY 2022 (02/17/23).  Plaintiffs attach as Exhibit E (The Fraud Defendants'

Materially False and Misleading Pipeline Statements, Nos. 127-159) the precise language of each such materially false and misleading statement and incorporate those statements by reference as if fully set forth herein.

192.    The Fraud Defendants knew and/or acted with deliberate recklessness that their statements and omissions regarding Stem's pipeline and the Available Power deal were materially false and/or misleading in each of the statements set forth in ¶¶186-191 and Exhibit E for the reasons set forth in §§IV.D-F, §IV.I, and §VIII as well as, *inter alia*, for the following reasons:

- Contrary to the Fraud Defendants' statements regarding Stem's pipeline consisting of reasonable opportunities, the Available Power deal and the increase of Stem's pipeline as a result of the Company gaining market share in the FTM market, Stem's pipeline was inflated, the Available Power deal was no deal at all and any expansion into the FTM market was entirely unrealistic as set forth in §§IV.D-F and §IV.I. CW1, who was involved in developing pipeline, among other duties, indicated that engagements listed in the pipeline were not actual deals or even commitments on the part of the developer but, rather, they represented just a chance with no guarantee of getting a platform deal signed. CW1 elaborated that while Stem was hoping for repeat business with its development partners, most of the prospective business in the pipeline was pie-in-the-sky because the pipeline was just a chance to send a proposal. For example, CW1 reported that several very large projects that were included in the pipeline were only requests for proposals, and that Stem included them in the pipeline simply because it was technically possible that Stem's proposal may be selected for the project.

- Similarly, CW2, who worked to develop business opportunities for Stem, confirmed that Stem's pipeline was inflated. According to CW2, there was a huge emphasis to build pipeline and that prospective deals were built in Salesforce. CW2 indicated that some employees built everything into the pipeline even though the opportunities were not meaningful pipeline and were numbers without facts. At the end of the quarter, some of these deals would be shown as having a high potential of closing even though the salespeople knew that was not the case. CW2 further reported that some managers had their employees add deals into the pipeline without any support.

- CW1 further indicated that Stem included requests for proposals in Salesforce and in the pipeline even if there was no practical chance of winning, even if Stem was not the cheapest bidder, or even if Stem lacked the experience that some requests for proposals required. CW1 stated that deals which were no longer viable would remain in Salesforce and would be used for Stem's projections and reports to investors. According to CW1, Stem's reporting dashboards in Salesforce reflected aspirational deals rather

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                                    - 64 -
4884-3219-7509.v2

than realistic ones and this is a reason why Stem's actual results ended up being different than the pipeline.

- CW2 corroborated that prospective deals were always kept in the pipeline even when those deals had no results after a couple of quarters. According to CW2, this was apparent because of the low close rate of these deals. CW2 said that senior leadership, such as Defendants Russo, Carrington, and Bush would have been aware that the pipeline was inflated based on the close rates of the deals in the pipeline.

- CW2 further noted that Stem's bonus incentives to the sales force were "built on pipeline," even though the subsequent downstream credentialing of the deals was challenging. CW2 indicated that Stem's senior leadership and management, such as Defendants Russo, Carrington, and Bush would have been aware that the pipeline was inflated, because of the poor close rate of deals in the pipeline. CW1 confirmed that Stem senior executives had access to Salesforce and the pipeline. CW1 noted that Defendant Russo would participate in sales meetings and ask questions about every deal. CW3 corroborated that there were weekly sales meetings with Defendant Russo. CW3 noted that Defendant Bush would sometimes join these calls as well. CW1 believed Mary Adam, the Director of Sales, would regularly meet with Defendant Russo and update him on the status of deals. CW3 stated that Defendant Russo was very involved in a lot of sales, especially for larger deals.

- Stem's Available Power FTM project was not an actual deal. According to CW2, Stem originally reported a booking from Available Power, which was essentially a non-binding letter of intent in which Available Power was supposed to issue actual Purchase Orders to Stem within two months of the letter of intent date. However, Available Power never issued the Purchase Orders, which, according to CW2, is what constituted a sale. CW2 indicated that it was Stem's policy that a purchase order was necessary (*i.e.*, the trigger) for Stem to actually purchase hardware in relation to a particular project. According to CW2, in violation of company policy, Stem ordered hardware intended for the Available Power project based on just the booking (*i.e.*, the letter of intent). CW2 indicated it was Stem's standard procedure to not procure hardware without a customer purchase order but that exceptions to this procedure were not uncommon. CW2 recalled that Defendant Bush would have signed for Stem's purchase of the hardware meant for Available Power, which would have also been cross-executed by Defendant Carrington.

- CW2 indicated they personally became aware that the Available Power deal was no longer viable in approximately early 3Q 2022 when they learned from their manager Randy Parole that there was hardware that needed to be sold. CW2 further indicated that because Stem wanted to recognize revenue on the basis of the hardware Stem had purchased for the Available Power project before the end of 2022, Stem sought to find other buyers for the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 65 -
4884-3219-7509.v2

hardware. CW2 explained that Stem managed to find additional buyers for the hardware before the end of 2022. CW2 noted that these transactions had a parent guarantee which ultimately would allow both companies to return the equipment to Stem if the two companies were unable to sell the equipment. CW2 said that if the two customers did not sell the equipment, they could hold onto the hardware until October 2023 and return it, after which it would be up to Stem to sell it.

**E.    The Fraud Defendants' Materially False and Misleading Risk Disclosures**

193.    In addition to the Fraud Defendants' false and misleading statements above, Stem's Forms 10-K and 10-Q issued false and/or misleading warnings regarding the importance of Athena to the Company's business model, omitting material adverse facts regarding the state of Athena's technology, and omitting material facts known internally regarding the lack of viability of Stem's Athena offering with respect to the critical FTM market of Stem's business. Further, the risk factors identified were materially misleading because the Fraud Defendants knew that these risks had already materialized.

194.    For example, in the discussion of risk factors in Stem's Form 10-K for the period ending 12/31/21, filed on 02/28/22, and in Stem's Form 10-K for the period ending 12/31/22, filed on 2/16/23, the Fraud Defendants falsely claimed that "[o]ur future growth depends on our ability to continue to develop and maintain our proprietary technology that supports our hardware and software-enabled services, including our Athena platform. ***In the event that our current or future products and services require features that we have not developed or licensed***, or we lose the benefit of an existing license, we will be required to develop or obtain such technology through purchase, license or other arrangements." The 10-K further falsely stated: "***If we are unsuccessful in developing and maintaining our proprietary technology, including our Athena platform, our ability to attract and retain partners could be impaired, our competitive position could be adversely affected and our revenue could be reduced***."

195.    In both Forms 10-K for the periods ending 12/31/21 and 12/31/22, the Fraud Defendants made statements regarding risks of issues with Athena, when, in reality, the Fraud Defendants knew Athena was not fully automated for FTM projects. Specifically, Stem's Forms 10-K falsely stated, "***[o]ur technology, including the Athena platform, could have undetected***

*defects, errors or bugs in hardware or software which could reduce market adoption, damage our reputation with current or prospective customers and/or expose us to product liability and other claims that could materially and adversely affect our business.*"

196.    In Stem's Forms 10-Q during this same period, filed with the SEC on 05/05/22, 08/04/22, and 11/03/22, Stem reiterated these materially false and misleading statements by stating quarter after quarter that there were "*no material changes*" to the relevant risk factors previously reported in the Forms 10-K for FY 2021 and FY 2022, respectively.

197.    Similarly, the Fraud Defendants also warned of risks to Stem's business in Stem's 05/17/21 release despite the fact that those risks had already come to fruition:

> Our business prospects are subject to risks, expenses and uncertainties frequently encountered by companies in the early stages of commercial operations. To date, we have financed our operations primarily through equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including obtaining adequate financing to complete our development activities, obtaining adequate supplier relationships, building our customer base, successfully executing our business and marketing strategy and hiring appropriate personnel. *Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require us to modify, delay, or abandon some of our planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on our business, operating results, financial condition and ability to achieve our intended business objectives*.

198.    Throughout the Class Period, the Fraud Defendants repeatedly made materially false and misleading statements and/or omissions about Athena's capabilities and Stem's operations in the Company's Forms 10-K filed on 02/28/22 and 02/16/23, and in Stem's Forms 10-Q filed on 08/11/21, 11/10/21, 05/05/22, 08/04/22, and 11/03/22. Plaintiffs attach as Exhibit F (The Fraud Defendants Knowingly Made False Risk Disclosures, Nos. 160-179) the precise language of each such materially false and misleading statement and incorporate those statements by reference as if fully set forth herein.

199.    The Fraud Defendants issued materially false and misleading statements and/or omitted materially adverse facts when they warned of risks that, unbeknownst to investors, had already materialized. The Fraud Defendants knew Stem's risk warnings were false and misleading and/or omitted materially adverse facts, and/or acted with deliberate recklessness with respect to

each of Stem's purported risk disclosures set forth in ¶¶194-198 and Exhibit F for the reasons described, in §§IV.C-IV.J and §VIII as well as, *inter alia*, for the following reasons:

- Contrary to the Fraud Defendants' representations, the risk that enterprises may be unwilling to adopt Stem's offerings because of a "***perception***" that Stem's technology was "***unproven***" had already materialized because Athena was not viable for the FTM market. Further, the risk of the loss or delayed market acceptance of Athena had already occurred for the same reasons. In addition, the risk of being unsuccessful in developing Athena had already occurred for the same reasons. Likewise, the risk of not achieving gross margins or profitability had already materialized because Stem did not have a viable automated software product for the FTM market. FTM expansion was required for Stem to achieve anticipated gross margins and profitability.

- Athena was not viable for the FTM market. CW1 reported that FTM clients described Stem as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had. CW1 also indicated that Athena was functional for BTM deals but not well made for large FTM deals. CW1 explained that for FTM projects, Athena was really only a very rough prototype and basically just an Excel sheet. According to CW1, Athena was not really used for FTM because Stem was unable to provide core functionalities.

- In addition, Athena's technology was not proven, and in fact was undeveloped for FTM projects and Stem only hoped to sign enough deals in order to build it up to be operable for FTM deals. CW1 explained that Stem's approach was to sign up enough FTM projects in order to eventually be able to build out their software team and from there build the software for FTM projects. CW2, who worked in sales on, among other things, FTM projects, confirmed that Athena was not fully developed, indicating that the ship was taking off and being built at the same time. CW2 corroborated that Stem's plan was to eventually get enough FTM projects so as to then hire on personnel to develop Athena. As CW1 stated, in representing Athena as viable for FTM projects, Stem misled investors with respect to Athena's FTM capabilities. CW2 corroborated CW1's reports that Stem hoped to develop Athena later.

- Similar to CW1's account, CW3, who worked with the product marketing team, explained that they found it difficult to provide enough useful content to Stem's partners for training and it was always a struggle to get enough information from the product team, particularly for FTM projects. CW3 indicated that the Athena product team provided the marketing development team with content for training materials. However, when members of the product team reviewed the training materials created by CW3's team based upon the provided content, they were told that some of the content on

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 68 -

Athena's FTM software could not be used because the products were still in development and were not functional.

- Contrary to the Fraud Defendants' representation that there was a risk that not achieving gross margins or profitability may have an adverse effect on the Company, Stem was already experiencing those adverse effects at the time of those disclosures: Stem's margins on hardware were already lower than those reported by the Company, Stem's pipeline was inflated, and Stem's bookings were not deals. According to CW1, Stem was essentially a hardware company masquerading as a software company. If a Stem customer wanted to enter into a development agreement with Stem to get hardware at attractive prices, the requirement was that the customer also had to enter into a software agreement, because Stem was acting as if it was a SaaS company. According to CW1, Stem's markup on hardware was typically as low as 5% and sometimes lower, but Stem wanted as many customers as it could get and was chasing revenue even if it meant selling hardware at its own cost.

- Stem's pipeline was inflated and it was unable to secure enough deals to make its projected revenue goals. CW1, who was involved in developing pipeline, among other duties, indicated that engagements listed in the pipeline were not actual deals or even commitments on the part of the developer but, rather, they represented just a chance with no guarantee of getting a platform deal signed. CW1 explained that the pipeline included phantom deals. CW1 explained that while Stem was hoping for repeat business with its development partners, most of the prospective business in the pipeline was pie-in-the-sky because the pipeline was just a chance to send a proposal. For example, CW1 reported that several very large projects that were included in the pipeline were only requests for proposals, and that Stem included them in the pipeline simply because it was technically possibly that Stem's proposal may be selected for the project. CW1 reported that Stem included these requests for proposals in Salesforce and in the pipeline even if there was no practical chance of winning, even if Stem was not the cheapest bidder, or even if Stem lacked the experience that some requests for proposals required.

- CW2 explained that prospective deals were always kept in the pipeline even when those deals had no results after a couple of quarters. According to CW2, this was apparent because of the low close rate of these deals. CW1 corroborated that deals which were no longer viable would remain in Salesforce and would be used for Stem's projections and reports to investors. CW2 also indicated that bookings were letters of intent that had no teeth actually requiring customers to make a purchase order.

## F.  The Fraud Defendants' Scheme

200.  The Fraud Defendants sold investors on a business model wherein Stem would transform from an unprofitable Company that was considered a "going concern" – aka on the verge

1  of collapse – to achieving profitability and growth in FY 2022 based on its AI software product

2  Athena.  Fraud Defendants claimed that Stem's sale of its superior automated software would

3  result in high gross margins (*i.e.*, from 12% in FY 2020 to 26% in FY 2022) and require little

4  capital (*i.e.*, capital light).

5       201.  The principal problem with Stem's software story and the Company's path to

6  profitability was that, contrary to the business model that was pitched to investors in connection

7  with Stem's IPO and throughout the Class Period, Athena did not operate as advertised when it

8  came to the lucrative FTM deals that Stem needed in order for Stem to transform into the high-

9  margin software company it promised.  Indeed, at Stem's largest and most touted FTM project in

10  Massachusetts, optimization was done by an employee (*i.e.* a human) using an Excel spreadsheet

11  and not Stem's automated Athena software.  To that end, in furtherance of their scheme, the Fraud

12  Defendants touted Stem's pipeline and other metrics to make it appear there was strong demand

13  for Stem's Athena software when, in fact, the pipeline was entirely unrealistic.  Similarly, in

14  furtherance of their scheme, the Fraud Defendants also touted a FTM deal with Available Power

15  that was non-existent.

16       202.  The Fraud Defendants scheme to defraud included not only the materially false and

17  misleading statements alleged herein in §§§, *supra*, and the statements included in Exhibits B-F,

18  which are incorporated herein by reference, but also, *inter alia*: (i) Defendants' acts of creating

19  and endorsing Stem's deceptive and unsound business model to attract investors, take the

20  Company public, and inflate the Company's value; (ii) their attempts to influence analysts and

21  others to positively portray the Company in order to artificially inflate the value of Stem's

22  securities; (iii) their attempts to discredit or mitigate negative information regarding Stem in order

23  to artificially inflate the value of Stem's securities; (iv) their purchase of AlsoEnergy and

24  comingling of financials which obscured Stem's poor results and prospects; (v) their violations of

25  Company policy in purchasing hardware without a valid purchase order; (vi) their creation and use

26  of financial metrics that masked Stem's lack of a viable FTM Athena software product and sales;

27  and (vii) their preparation of presentation materials used in presentations leading up to the IPO,

28  during earnings calls, and for analyst days to prop up the value of Stem.  The Fraud Defendants'

1  deceptive acts and course of business were disseminated to the market and artificially inflated

2  Stem's securities.

3      203.   ***The Plan to Take Stem Public and its Business Model***: A scheme includes a plan.

4  Here, the Fraud Defendants formed and/or participated in a plan to take Stem public *vis-à-vis* a

5  SPAC with an unrealistic and unsustainable business model, as described in §IV.A-G and §VI.A,

6  *supra*.  Working together, the Fraud Defendants exploited that the SPAC process, circumvents the

7  rigors of a normal IPO process, by, *inter alia*, promising rapid growth and profits as a result of

8  Stem's pipeline, expansion into the FTM market, and resulting high-margin software sales.

9  Indeed, during a 04/12/21 Fireside chat, Defendant Carrington explained "how we built the model"

10  regarding Stem's growth forecast explaining that "it was a very collaborative effort by Star Peak."

11      204.   To that end, as described in §VIII.D, *infra*, Defendants Carrington and Bush

12  provided extensive due diligence regarding Stem's operations in connection with the IPO in

13  meetings with representatives from Star Peak, including Defendants Scheyer, Morgan, and Daley.

14      205.   ***AlsoEnergy***: On 12/16/21, Defendants announced in a release that Stem had

15  entered into an agreement to purchase AlsoEnergy for $695 million, with 75% in cash and 25% in

16  common stock.  By purchasing AlsoEnergy, which had its own high-margin software product(s),

17  Defendants acted in furtherance of their scheme to defraud by masking Stem's issues with Athena

18  in the FTM market.  In other words, by combining the two companies, going forward Stem was

19  able to attribute part of Stem's "actual" success to Athena as opposed to AlsoEnergy's software

20  by muddling the financial results by reporting only combined results.  Indeed, as described in ¶163,

21  Stem intended to combine the financial results of the two companies and not report them

22  separately.

23      206.   ***Available Power deal***: On 02/24/22, the Fraud Defendants filed with the SEC a

24  Stem release on a Form 8-K announcing Stem's 4Q 2021 and FY 2021 results in which they

25  reported disappointing non-GAAP gross margin of 11% for the year (compared to previous

26  guidance of 16%).  The release further reported full-year 2021 revenues of $127.4 million

27  (compared to previous guidance of $147 million).

28

207.    To distract from the negative news, on the same day, 02/24/22, and in furtherance of their scheme the Fraud Defendants deliberately issued a release regarding a partnership with Available Power in Texas that included Athena software.  The value of the award was "expected to exceed $500 million across the project portfolio" pointing to Stem's exclusive rights to energy storage systems at 100 FTM sites throughout Texas.  Later, during the earnings call on the same day, Defendant Carrington clarified that the $500 million plus of the Available Power deal was for Stem with bookings of ~$100 million assumed in 2022.

208.    To that end, during the 02/24/22 earnings call, the Fraud Defendants touted Stem's "bookings" and "Athena expansion" as signals of strong growth while reinforcing Stem's business model messaging.  Defendant Bush sought to focus investors on record bookings and Stem's leading software: "[o]ur sales team again set a *new quarterly bookings record*, which is 58% more than was reported in all of 2020, *a testament to our leading software* and hardware solution." Stem's bookings were not actual contracts and included a phantom Available Power deal.

209.    During the 02/24/22 earnings call, Carrington also assured investors that, regarding the Available Power deal, "*as we proceed and start to get more clarity on the planned tranches we'll obviously update you and everyone on how that's coming together*."  In furtherance of their scheme, however, the Fraud Defendants would not tell investors, *inter alia*, that: (i) Stem bought more than $100 million of hardware for the Available Power deal in violation of Company policy; or (ii) that Available Power never issued purchase orders despite its agreement to do so two months after the initial letter of intent was signed.  Moreover, Available Power's deal with Stem required Stem to invest in the deal by providing cash to support it.

210.    The Fraud Defendants' deceptive efforts paid off as analysts continued to believe Stem's "software story" reporting on 02/25/22 strong bookings and the Available Power deal as follows:

> [Credit Suisse] – "*Positives*" *included* "*Strong backlog*: STEM recognized $217m in new bookings in 4Q, up vs ~$104m in 3Q, and ~$100-150m needed to meet 2022 hardware revenues.  Bookings included ~60% hardware and ~40% software revenues."
>
> [Wolfe] – "Bookings and backlog growth the bright spot" with "*Available Power deal the largest in STEM's history*."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                                    - 72 -

211.    Later, on 11/03/22, Defendants held a 3Q 2022 earnings call wherein the Fraud Defendants, in furtherance of their scheme, attempted to explain Stem's increased use of cash (without disclosing it included the purchase of hardware for the Available Power deal in violation of Company Policy):

> [Bush:]  In the last few quarters, ***we have strategically deployed some cash to secure storage hardware for our customers*** and ***drive greater adoption of high-margin recurring revenue***.  This cash flow recycled back to the balance sheet when the systems are delivered, but the net effect has been the use of cash.

212.    Thereafter, on 12/08/22, Stem announced a project in Texas with REX Storage Holdings, LLC, a joint "venture between Regis Energy Partners LP, an independent developer, owner, and operator of energy storage systems, and Excelsior Energy Capital (EEC)."  The project represented the first of a $400M equity commitment by REX.  This announcement was in furtherance of the Fraud Defendants' scheme because it made Stem look like it had another plum deal when, in fact, it was trying to unload the hardware from its failed Available Power deal as described in §§IV.F-I, *supra*.

213.    Not until 01/05/23 did the Fraud Defendants reveal in a Stem slide deck that the Company had lost a ~$130 million booking "due to a partner non-performance on agreed timeline" (which would later be disclosed as Available Power).

214.    ***Meetings with Analysts and Others***: The Fraud Defendants, in furtherance of their fraudulent scheme, met with analysts to try to influence their reports to investors.  For example, Stem's management met with analysts at Wolfe the week of 03/14/22, after Stem had issued disappointing results on 02/24/22 for FY 2021.  Following the meeting, Wolfe issued a report on 03/16/22 indicating that "[o]verall, we thought STEM was effective in addressing some of the key concerns following the Q4 update last month" and giving the Company an Outperform rating.

215.    According to the report, the Fraud Defendants also conveyed to Wolfe analysts the false impression that Stem's software story was on track:

> ***Shift toward FTM driving more software revenue***.  While the outlook reset for margins and pushed out timing for EBITDA profitability was a disappointment last month, ***we think mgmt was effective in highlighting the big picture.  The dramatic shift toward FTM has compressed margins in the interim, but it also is driving much larger absolute dollars of software revenue that will be recognized***

*over time.  And in markets like ERCOT, continued success w/ large FTM storage-only deals* can lead to upside from market participation revenue immediately.

216.    Wolfe continued to report what they learned from the Fraud Defendants, including their reinforcement of Stem's business model, using the Available Power deal as tangible evidence of the Company's success:

> Purposeful investments in OpEx; building a competitive moat. **Management spent a lot of time talking through the 2022 OpEx guidance** and even included a new slide in its deck to better illustrate the rationale for the increase vs 2021.  A chunk of that is absorbing AlsoEnergy, **but STEM also went into detail on three different buckets, two of which will help build the company's competitive moat going forward.  First is to access large FTM opportunities to accelerate booking/revenue momentum, particularly for the software piece.  The Available Power deal is tangible evidence of this, which features $200M in total software value to STEM**.

217.    In furtherance of the Fraud Defendants scheme, Stem's management team also met with analysts at Guggenheim in May 2022 regarding Stem's business model and future. Guggenheim analysts reported on 05/24/22 that: "*[w]e hosted the management team from Stem for a series of meetings with investors last week*, and had an opportunity to drill down on the company's current operations, business model and plans for the future. *Stem is booking new business more rapidly than we had expected, and our revised financial model reflects a higher outlook for bookings and revenue*."  Guggenheim analysts further reported that "Stem reports that it continues to lead the market, as measured by the number of front-of-meter (FTM) systems that it operates."

218.    **Use of Confusing Metrics**: As indicated in ¶120 and ¶160, *supra*, in furtherance of their scheme, the Fraud Defendants used confusing "key" metrics to make it appear that Stem was on track to meet its performance objectives and turn a profit when, in fact those metrics obfuscated Stem's failures in the FTM market.

219.    As discussed above, in §IV.F, the Fraud Defendants used the misleading pipeline metric to make it appear that there was a huge demand from FTM customers for Athena and that it was reasonably likely that those projects in the pipeline would convert to bookings when, in fact, according to CW1 and CW2 the pipeline contained unrealistic deals.

220.    Likewise, the Fraud Defendants used the term "booking" – its plain meaning implying an actual deal when there was no actual deal.  Stem's FY 2021 Form 10-K filed on 02/28/22 reinforced that meaning: "[w]e characterize **contracts that have been signed but not yet installed as a booking** that becomes part of our backlog."  The Fraud Defendants further stated that:

> **[B]ookings are a key metric** that allows us to understand and evaluate the growth of our Company and our estimated future revenue related to customer contracts for our energy optimization services and transfer of energy storage systems.  Bookings represents the accumulated value at a point in time of **contracts that have been executed** under both our host customer and partnership sales models.

221.    But then, for partnership sales like Available Power, Stem indicates that (i) "[a] signed customer contract is considered a booking as this indicates the customer has agreed to place a purchase order in the foreseeable future," and (ii) for accounting purposes (*i.e.* ASC 606) they do not consider a booking as a contract until "once a purchase order has been executed."

222.    This confusing terminology was part of the Fraud Defendants' scheme.  Stem's bookings were nothing more than letters of intent, not contracts.  And according to CW2, Stem's "bookings," particularly in the FTM sector, routinely did not convert to actual deals.  Yet, when the Fraud Defendants issued the announcement of the Available Power partnership in Stem's 02/24/22 release, there was no mention of Stem's unique interpretation of the meaning of "booking."  Likewise, during Stem's earnings call held on the same day, Defendant Bush referred to the project as the "Available Power deal" and referred to "sign[ing] other large deals like the one [Available Power deal] we announced today."

223.    Stem's introduction of the CARR metric in 1Q 2022 as a substitute for Pipeline also masked Stem's defective business model.  The CARR metric, like bookings, was not based on actual binding contracts.  Further, while the metric purportedly reflected growth in software, because it didn't require a binding contract, the metric told investors very little about actual growth in software sales.

224.    **Efforts to Discredit Negative News**: The Fraud Defendants also took steps to negate potentially adverse news in order to keep Stem's stock artificially inflated.  For example, on 01/11/23 short-seller Blue Orca Capital ("Blue Orca") issued a report on Stem reporting on a host

of issues with Stem's business and business model, including that: "STEM continues to trade at a high valuation on its claim that its special AI enabled software platform has a growing pipeline of high-margin, long duration, and recurring software revenues. *This is nonsense*." The report further provided that: "Ultimately, STEM is valued on the misconception that it provides AI enabled software with high margins, long-term contracts and recurring revenues. The Company claims that as it sells new battery systems, software revenues will continue to be meaningful, will grow, and will remain sticky. Yet this is false." To that end, Blue Orca quoted industry experts regarding the fact that Stem was a non-player in the FTM space and described, *inter alia*, Stem's "key" pipeline metric as misleading.

225. Immediately after Blue Orca issued its report, the Fraud Defendants, in furtherance of their scheme, engaged in damage control by issuing adamant denials of the truth of the contents of the Blue Orca report. For example, Seeking Alpha wrote in an article on the same day, 01/11/23 that:

> *Stem (STEM) responded to the short report in an email to Seeking Alpha*.
>
> "*The report contains numerous errors and unsupported speculation, and draws misleading and flawed conclusions*," Stem said in a statement. "Stem was not contacted during the development of the report nor given the opportunity to provide factual information that would have easily refuted the incorrect claims made throughout the report. Stem is preparing a response to the report, which it will release in the near future."

226. On 01/12/23, the Fraud Defendants took the additional step of responding to the Blue Orca report in a published statement. They did so in furtherance of their scheme to continue to mislead investors that Stem's software story and business model were, in fact, sound and that they should disregard the Blue Orca report. Specifically, the Fraud Defendants told investors that "[t]he report, issued on January 11, 2023 which *Blue Orca itself describes as a 'short-biased opinion piece . . . not statements of fact,' contains factual inaccuracies, mischaracterizations and faulty assumptions. While Stem will not rebut every inaccuracy in the report, we stand by our disclosures*" and then went on to respond to certain Blue Orca attacks.

227.    The Fraud Defendants also engaged in damage control by speaking with analysts to convince them that Stem's software story was on track.  Indeed, analysts at Guggenheim wrote on 01/01/23 that:

> We reiterate our Buy rating and $17 price target following some recent conversations with STEM's management team.

> - Reiterating Buy rating, and $17 price target.  **We spent some time catching up with the STEM management team following the company's updated outlook for 2022, and did some additional analysis following the release of a short seller report earlier this week. STEM needs to demonstrate that it can begin to show growth in the value-added segment of its business, which means services and software revenue for the energy storage and solar assets that STEM has under management.  The company has reasonable answers to our questions on this topic**, and based on our recent conversations and our own industry checks we think that STEM should in fact be able to show meaningful progress on software and services revenue during 2023.

228.    Analysts at Credit Suisse, however, noted on 01/13/23 that Stem's "[s]tock underperformed on 1/11/23 likely due to resurfaced concerns around mix of pure service+software revenues and legacy host customer arrangements in the reported service revenues."

## VII. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION

### A.    Loss Causation (All Claims)

229.    Leading up to Stem's IPO and throughout the remainder of the Class Period, the Defendants made materially false and misleading statements and omissions that caused the price of Stem's securities to be artificially inflated and/or maintained the artificial inflation in the price of Stem's securities.  Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth that, *inter alia*, Athena was not viable for FTM projects and that Stem's business model of profiting from high-margin software sales while maintaining a capital light company was not feasible as a result.

230.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiffs and the other members of the Class.  As described herein, during the Class Period, the Defendants made or caused to be made, or failed to correct, a series of

materially false or misleading statements concerning Stem's business model, products, operations and prospects. Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of Stem's business model and its purported success in executing on that model, the Company's ability to achieve growth and profits, and the success and viability of its Athena software for the FTM market, thus causing Stem's securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made and/or endorsed by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing Stem's securities at artificially inflated prices, thus causing the damages complained of herein.

231. As a result of their purchases of Stem's securities during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price declines in Stem's securities, the corrective events, and the market's reaction negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to Stem that were unrelated to the alleged misstatements. This is supported by the stock charts in ¶¶238, 245, 259, 266, and 275 below, which demonstrate the clear divergence in the performance of Stem's (STEM) common stock prices from the S&P 500 index and its peers, Fluence Energy ("FLNC") and SolarEdge Technologies ("SEDG").

232. Defendants' Class Period misstatements were corrected through a series of partial disclosures.[18] Though each of the disclosures was incomplete, each corrected at least part of Defendants' prior misstatements concerning Stem's business, leading to price declines that partially corrected Stem's stock price by reducing the extent to which it had been inflated by

---

[18] The list of corrective events identified herein is necessarily preliminary, and based upon Plaintiffs' analysis and investigation to date. Upon further investigation and discovery and additional analysis Plaintiffs may alter or amend its theory of damages, including by identifying additional corrective events that caused or contributed to the damages claimed in this action.

Defendants' misrepresentations, thereby injuring Plaintiffs and other members of the Class who had purchased Stem securities during the Class Period at prices that had been artificially inflated by the alleged false and misleading statements and omissions alleged herein.

**1.    Partial Disclosures on February 24, 2022**

233.    On 02/24/22, Defendants announced Stem's 4Q/FY 2021 financial results in a release issued after the market closed. The 4Q/FY 2021 release was concurrently filed with the SEC on a Form 8-K. Stem held an earnings call the same day after the market closed and issued a slide presentation titled "Q4 and FY2021 Financial Results," which was posted to Stem's website. Stem's release, earnings call, and presentation conveyed disappointing FY 2021 results to the market. Indeed, the Company revealed misses including, *inter alia*, gross margins and adjusted EBITDA:

| ($$MM) | Guidance[19] | FY 2021A | Delta |
|---|---|---|---|
| Non-GAAP Gross Margins | 16% | 11% | (5)% |
| Adj. EBITDA | $(25) | $(30.3) | ~$(5.3) |

234.    Stem also reported disappointing FY 2022 guidance including, *inter alia*, gross margins of 15-20% and adjusted EBITDA of ($60)-($20) million. By comparison, on 01/25/21, just over one year earlier, Stem led the market to believe that FY 2022 would result in gross margins of 26% and that the Company would be profitable with adjusted EBITDA of $28 million.

235.    Stem's 02/24/22 4Q/FY 2021 release, earnings call and presentation reporting Stem's disappointing FY 2021 results and FY 2022 guidance began to reveal to investors that Stem had not been generating revenues through high-margin FTM software sales, as Defendants previously claimed. Leading into the IPO and during the Class Period, Stem maintained that its path to success and profits was being executed through expansion into the FTM market with high-margin FTM software sales. Because Stem's Athena software was in fact not viable for the FTM

---

[19]    Stem issued FY 2021 guidance in an investor presentations on 01/25/21 and reaffirmed that guidance on 03/22/21. It also reaffirmed revenue and adjusted EBITDA guidance on 11/09/21.

market, however, the Company was unable to deliver on this business model it had been touting since the announcement of the Merger.  As a result, Stem's gross margins and profits suffered in FY 2021 and would continue to suffer in FY 2022.

236.    The disappointing FY 2021 financial results and FY 2022 guidance also began to reveal to investors the materialization of the risks posed by Stem's deficient business model – the risks of relying on FTM sales and market expansion without a viable high-margin software product for that market.

237.    Indeed, during Stem's 02/24/22 earnings call, an analyst at Goldman questioned the sharp drop in gross margins:

> [Analyst:] Kudos on the nice bookings and revenue outlook here.  I wanted to ask a first question, I guess, on the margins here.  Maybe if you could give us a bit more bridge.  I think you said AlsoEnergy is doing 60% gross margin, overall.  So at the midpoint of guidance, it implies they're about half your gross profit dollars for 2022, **and that means core Stem is doing maybe about a 10% gross margin**.  **I think you guys originally had a target to do, like, mid-20s in 2022, and you were also 10% to 20% throughout all of '21, before 4Q.  Just I'm trying to reconcile the sharp drop-off here**, and I know you mentioned a number of different moving parts, but can you maybe help bridge a bit and maybe quantify, if you can, kind of where we were targeting before for core Stem and kind of where we're ending up here with, **if the math is right, an implied kind of 10% margin**?

> *        *        *

> [Bush:] Thanks, John.  Brian, appreciate the question.  So I think, as John said, I think in the future we won't be breaking out the 2 divisions of the company that way.  **But I mean, I think the basic math is pretty very correct**.

>> **I think the issue that we're focused on is the continued bookings of the company, and the focus there is making sure that the software is what's driving the long-term value of the company.  So it's possible that we'll see lower margins in the near term, but ultimately – and that's why we rolled out the CARR metric**.  I mean, that's the – I think we've said pretty consistently in the past that we think backlog is a great short- to medium-term reflection of what the revenues will be.  Well, CARR is going to be a great reflection of what software is going to be as we mature.

238.    Upon Stem's disappointing news on 02/24/22, Stem's stock price plummeted from $11.24 on 02/24/22 to $8.81 per share on 02/25/22 on unusually heavy trading volume, a decline of $2.43 per share, or -21.62% as reflected in the following:



239.    The market's reaction to the news indicated that it understood Stem's wide miss of its gross-margin and earnings targets in FY 2021 and discouraging outlook for FY 2022 meant that Stem was not generating the high-margin FTM software sales that Defendants had promised to investors.  For example, on 02/25/22, analysts reported:

[Morningstar] – lowered Stem's price target $8, from $18 to $10 per share as a "result of an increase in our discount rate *and a reduction in our long-term profitability outlook*."; "***The miss is largely driven by weaker-than-expected gross profit as the company appears to be selling hardware at near breakeven gross margins, below its prior guidance of 10%-30% margins***"; and "[w]e would like to see the company execute well against its 2022 targets ***and demonstrate further ability to generate software-only sales*** prior to becoming more constructive on its valuation upside."

[Credit Suisse] – "We reduce our TP by $8 to $28, due to ***lower hardware gross margins due to higher mix of low-margin FTM products*** and higher opex for expansion in new markets and products."

[SIG] – "margin below expectations" with "***non-GAAP gross margins came in meaningfully below our forecast*.*"  Further, that "we are ***assuming a slower gross margin progression*.*"

[Wolfe] – "Stem's update was a disappointment" Noting "2021 misses; ***margin outlook much weaker***" and that "***[d]riving the negative surprise was a materially weaker outlook for gross margins – guidance of 15-20% for 2022 vs our prior expectation of ~25%*.*"  The price target was cut "largely on the lower margin outlook."

240.    Wolfe Research similarly noted that, while Stem's acquisition of AlsoEnergy was supposed to enhance Stem's margins, Stem's gross margin FY 2022 guidance was still far below expectations:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                              - 81 -
4884-3219-7509.v2

***Wasn't the AE deal supposed to be margin accretive***? That was our expectation heading into the print, but ***AE's contribution is being masked by lower margins in STEM's battery segment. STEM previously pointed to a 10-30% GM, but given the backlog's heavy tilt toward FTM projects, the blended margin looks to be at the 10% level. With battery hardware still driving the majority of revenue in the coming years, this is driving materially lower margins/EBITDA in our forecast*** (details on pg 3).

*        *        *

***Gross margins inflect lower for now***. STEM's 15-20% guide for gross margins in 2022 was well below our expectation of ~25%. And our expectation was just for legacy STEM - ***AlsoEnergy was supposed to be accretive to that given that it is a ~60% gross margin business. However, AlsoEnergy's contribution is being masked by lower margins in STEM's battery segment. STEM previously pointed to a 10-30% gross margin, but given the backlog's heavy tilt toward FTM projects (90%+), the blended margin looks to be at the 10% level at least over the near term***.

### 2.    Partial Disclosures on January 5, 2023

241.    On 01/05/23, before the market opened, Stem posted an Investor Presentation Deck for the Goldman Sachs Global Energy and Clean Technology Conference. The presentation deck revealed that Stem's Q4 2022 revenue and FY 2022 gross margins were tracking at and below the low end of prior guidance, respectively, despite the Company reaffirming full-year and Q4 guidance not even two months prior as part of its 3Q 2022 results reported on 11/03/22.

242.    Specifically, the 01/05/23 presentation reported that Stem's FTM hardware gross margins were expected to be "~10%", compared to 10-30% for FY 2021. Stem's presentation reported that Stem's FY 2022 non-GAAP gross margins were also expected to be below the low end of prior guidance. Finally, Defendants' disclosures revealed for the first time that Stem had "lost" one of its larger FTM projects, which would later be revealed to be Available Power.

243.    Indeed, the presentation further revealed that Stem's 2022 bookings backlog was lower due to "[a] ***Stem-initiated contract cancellation*** (~$130M) due to partner non-performance on [an] agreed timeline."[20] Stem later admitted in a 01/12/23 publication that, "[a]s publicly disclosed in our January 5, 2023 investor webcast and presentation, we canceled a booking of

---

[20]    Notably, Stem did not disclose that the cancellation was that of the Available Power deal or that all of the Available Power's remaining $400 million in bookings had also been cancelled.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                      - 82 -
4884-3219-7509.v2

1    approximately $135 million in the fourth quarter of 2022.  This cancellation was attributable solely

2    to DevCo projects with Available Power."

3    244.    This news partially revealed to investors the continued materialization of the risks

4    posed by Stem's deficient business model and its failure to have a viable automated Athena product

5    for the FTM market, resulting in Stem now "losing" FTM customers.

6    245.    Following the Company's 01/05/23 partial disclosures, Stem's stock price declined

7    from $8.54 per share on 01/04/23, to $7.79 per share on 01/05/23, a decline of $0.75 per share, or

8    -8.78% on unusually heavy trading volume, as depicted in the following:



246.    The decline in the Company's stock price was the direct result of a correction of

the Defendants' prior false statements and omissions being revealed to investors and the market.

247.    The market's reaction to the news indicated that it understood Stem's downward

guidance to mean that Stem was not generating the high-margin FTM software sales, including

software only sales, that Defendants had promised to investors.  For example, on 01/09/23,

Morningstar lowered its fair value estimate for Stem to $10 per share from $12 "after reviewing

an updated slide deck the company released last week" based, in part, on Stem's lowered FY 2022

forecasts and inexperience with FTM projects.  Morningstar's lower estimate reflected Stem's

inability to generate software sales, reflecting a materialization of the risk that Athena could not

work for FTM deals.  As Morningstar reported, it was lowering its rating, in part, because:

***Stem's software sales are largely derived from hardware sales today, and the company may be unsuccessful in generating stand-alone software sales.***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                                                       - 83 -

Competition from well-financed battery manufacturers that can integrate software directly into hardware may prove difficult for Stem to compete with.

**Stem is relatively inexperienced in the front-of-the-meter market**, which is a material contributor to long-term financial targets.

\*       \*       \*

Given the company does not undertake material value-added activities or manufacture proprietary hardware components, it is difficult to justify a moat for its hardware sales.  Further, given margin stacking (Stem sells hardware at a 10%-30% gross margin), we think its hardware is at a relatively disadvantaged cost structure versus competitors.

Stem's long-term strategic focus is around its Athena artificial intelligence software.  To date, the company's software has been sold attached to hardware sales for a bundled solution.  We see this dynamic as favoring well capitalized battery hardware manufacturers that have increasingly looked to build out software management systems (*i.e.*: Tesla's Autobidder).  **We view the company's need to be involved in hardware as indicative that its software does not possess a competitive moat on its own**.

### 3.    Partial Disclosures on February 16, 2023

248.    On 02/16/23, Stem announced 4Q/FY 2022 financial results in a release, issued after market close.  The 4Q/FY 2022 release was concurrently filed with the SEC on a Form 8-K.  Also on 02/16/23, Stem published a slide presentation on its Investor Relations Webpage to inform discussion during the 4Q/FY 2022 earnings call, which took place after market close on 02/16/23.

249.    On 02/16/23, Stem disclosed disappointing earnings and non-GAAP gross margins of 13%.[21]  During the 4Q/FY 2022 earnings call, Defendant Bush revealed that Stem's gross margins miss was "**driven by a higher mix of hardware than we expected**."

250.    In discussing Stem's disappointing results for FY 2022, Defendants acknowledged that Stem was having difficulty converting backlog to sales and, thus, only 10% of Stem's revenue came from higher margin software sales.[22]  Stem further attributed the Company's disappointing FY 2022 non-GAAP gross margins of 13% to, among other things, "Storage Hardware Revenue mix weighted to FTM driving down consolidated Non-GAAP Gross Margin."

---

[21]  *See* 01/05/23, Stem's Leader in AI-Driven Energy Solutions presentation, https://s27.q4cdn.com/138752898/files/doc_presentation/2023/Stem_InvestorPresentation_2023-Jan-_-vF.pdf

[22]  These hardware sales likely consisted of sales to the Excelsior group and one other as a result of the collapse of the Available Power deal.

251.    Stem also disclosed that it ended FY 2022 with $250 million in cash, cash equivalents and short-term investments explaining that "the primary uses of cash during the fourth quarter of 2022 related to purchases of hardware for customer projects, which are expected to convert to revenue in coming quarters."

252.    Notably, Stem's 02/16/23 release also issued discouraging FY 2023 guidance, including anticipated FY 2023 revenues of $550 - $650 million, non-GAAP gross margins of 15 – 20%, and adjusted EBITDA of ($35) to ($5) million.

253.    When presented during the call with Stem's disappointing forecasts for FY 2023, analysts continued to become skeptical of Stem's ability to convert its $969 million FTM-heavy backlog into revenue and earnings.    In response to that skepticism, Defendant Carrington confirmed that the backlog, which consisted heavily of FTM projects, was converting more slowly than expected:

> [Analyst:]  I just – first one on the guidance for revenue. I mean, given the backlog position here, I'm just kind of curious.  What's your assumption around backlog conversion? *I would have thought you'd be in position to do higher than kind of the revenue guidance here of $600 million at the midpoint.  So are you seeing backlog converting more slowly?  Or is there something with respect to mix that's maybe not turning over as quickly as you would have thought* just given the overall headline number seem to be bigger and gave you more coverage than sort of the revenue guidance you're providing here?  And then I had a follow-up on the margins.

> [Carrington:]  Perfect. So yes.  And I think we – *in terms of the backlog, it is converting slower. I think we've talked about this in the past, as we're taking on larger and larger projects, those tend to be – they tend to be FTM first*.  And then second, they tend to be multiyear installations.  And so we saw much quick – when the projects were slow – we're smaller, we saw a much quicker conversion, much like – say, at the end of '21, we had $400-plus million – $450 million in backlog.  We did $363 million in revenue this year. So pretty quick conversion in general.

> But this year and into – I think going into the future years, we're just going to – we're going to need to build more pipeline because the projects are longer.  And so from that standpoint, I would say extension, but still pretty significant growth on a year-over-year basis for revenue.

254.    During the 4Q/FY 2022 earnings call, a Guggenheim analyst was similarly surprised by Stem's low service revenues despite Stem's increasing amount of software bookings:

> [Analyst:] Okay.  So – but just to follow on that then, if your operating AUM is doubling and you're bringing additional projects – you're executing on additional projects and it's, I think, reasonable if you look at your CARR and what

the annualized run rate of your revenue – your service revenue is right now. ***I guess I'll ask the question the way a lot of other people have asked it. Why is this service revenue number not going up a lot more? Why is it not doubling***?

[Bush:] Well, it is growing at 75% rate. So I think that's pretty significant growth and then when you look at…

[Analyst:] Not to belabor it, but you put a CARR – an end of year 2023 CARR metric of whatever is 80% to 90% and you're at 65% currently. ***So I guess I'm trying to understand why that CARR number, which is a reasonable bogey for the de-annualized software and services run rate, why that's not going up more given what you're saying about adding to the operating base***?

[Bush:] Well, so CARR wouldn't increase as a result of operating assets first. So, I think that's an important distinction. CARR is the contracted amount. So that CARR is going to increase based on the amount of software, let's say, that is attached on an annual basis to a particular contract. The software number that we recognize as revenue in the business is tied to the operating assets. And so that's where I'd say like when you look at the growth rates that we've had so far about 9% in the third quarter, 17% in the fourth quarter, that's where you're seeing the actual operating assets being able to generate actual revenue and then gross margin. So CARR is an indicator of what will happen not what has happened. And so when we think – when I say, hey, operating assets are going to double, that means that we're going to have a faster conversion of CARR into ARR than what we've had. So that's a distinction that I would make.

255. An analyst from SIG also questioned Stem's lower than expected software revenues despite a consistent amount of projects, which Defendant Carrington attributed, in part, to an increasing mix of FTM projects.

[Analyst:] So I guess my question was also related to CARR and sort of, when I sort of looked at – compare your CARR to asset under management, it's been pretty stable through last year. ***Because when I look at the guidance, it seems like there's a step down and that how much of AUM is translating into CARR. I guess, is that related to project size or is there a thing going on in the software attach ratio***?

[Carrington:] It's not that everything we sell has – all hardware has 100 software attachment. Really, the dynamic that's happening, and Bill mentioned this in his discussion is we're selling and winning much larger front of the meter deals and some of those are expanding beyond 20 years in term. And so when you see the average length of the software terms expand, that's bringing down the per year CARR conversion.

[Analyst:] Got it. That's helpful. And then I think on the last call, you sort of mentioned the – you're starting to see the BTM mix come up with data, I think, in your pipeline. So can you give us sort of an update where you stand now, what are the recent bookings? Are you still sort of setup for the bookings in the 90:10 ratio or has that moved?

[Carrington:] We really have, Biju, and thanks for the questions. So one of the – ***certainly, one of the things that we've seen is that larger FTM or our ability to win larger FTM deals. So what that tends to do in terms of the bookings and***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 86 -

*then, of course, the backlog is it weights it heavily towards FTM projects.* So we are absolutely increasing both the percentage and absolute values of the BTM side of our business, but it's a smaller part. It's just – those are just smaller projects by their very nature, they're not going to grow in size nearly as fast as the FTM projects.

\*        \*        \*

And so that, we've talked pretty consistently about the ability because we're delivering customers more value that we'll be able to drive higher software attach rates and actual dollars. So we're really excited about the BTM or behind the meter side. I think it's going to be a nice growth area for us. But it's always going to – just because of the absolute size of the projects, *it's always going to get a bit swamped by what we're doing on FTM*.

256.    Also, in response to analyst questioning during the 4Q/FY 2023 earnings call, Defendant Carrington acknowledged that, like in FY 2022, Stem's 60% gross margins revenues may not materialize in 2023, having an additional negative impact on forecasted margins:

[Analyst:] Okay. Fair enough. Yes, just on the margins. *I know '22, it sounded like you obviously had some issue that impacted you on the gross margins. You're effectively starting '23 here with the same adjusted gross margin guidance is what you had going into '22. But it seems like some of the headwinds from last year have started to dissipate.*

So is there some conservatism baked in here? Or is there some level of margin leverage that you're not seeing that you would have expected? Because my understanding is you've got maybe a little bit more BTM coming back into the mix, supply chain is better. And I know – kudos on the operating leverage side of things. So just wondering what are some of the levers around gross margin leverage that we could look to here in '23? Because just based on the headline guidance, it doesn't seem like you're baking in a ton.

[Carrington:] Well, I think – so in terms of the margins, I think, one, is – I think we need to be somewhat conservative, because the solar part of our business has a lot of margin leverage into it. And though we are seeing some green shoots come out – I mean, you can see that in terms of we had 8% service growth in the fourth quarter sequentially. We've got really nice increase in backlog, 42% year-over-year. We want to make sure those numbers are actually there. And because of the – that's a 60% gross margin business in general. *If that doesn't materialize, though we expect – much like in '22, that will have a negative impact on us for 2023.*

So probably is some conservatism. I think to some extent you can always increase the numbers, hard to take them down. And so I think what we'll be doing as we roll into 2023 is continue to monitor the solar part of our business very carefully. But I think the other thing to consider as well is that the hardware side of the storage part of the business continues to be under pressure. *I mean that is definitely going to – as we move up in terms of project size, the margins on those hardware sales, which unfortunately comes before the software, is going to impact the overall gross margin.*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                            - 87 -

1  So we kind of went through and tried to appropriately forecast what the mix
   of those 2 things would be. And I think the ultimate answer is going to depend a
2  lot on what the mix turns out to actually be.

3  257. Stem's 02/16/23 partial disclosures, including the Company's misses with gross-

4  margins and earnings as well as the discouraging FY 2023 guidance, partially revealed the negative

5  impact of Defendants' materially false and misleading statements alleged herein.

6  258. Similarly, this news partially revealed to investors that the materialization of the

7  risks posed by Stem's failure to have a viable automated software for the FTM market, and the

8  fact that its pipeline was filled with phantom FTM deals such as Available Power. Stem's 02/16/23

9  disclosures of poor results, including the lack of the high software margins that underpinned its

10 IPO story, difficulty converting FTM projects into software revenue, and expected losses for FY

11 2023 all reflected the risks that were already materializing.

12 259. On 02/16/23, in response to Defendants' corrective disclosures, the price of Stem's

13 securities fell sharply, declining from $9.74 per share on 02/16/23 to $8.30 per share on 02/17/23,

14 a decline of $1.44 per share, or 14.78%, on unusually heavy trading volume as follows:



26 260. The extent of Stem's disclosures with respect to the Company's financial results

27 and outlook for 2023 surprised investors. On 02/17/23, Morningstar analysts lowered Stem's

target price $2, from $10 to $8 as "a result of reducing our long-term gross margin forecast as we expect gross margin improvement to be more gradual than our prior forecast" and noting that Stem's transition from a hardware to a software company was going to take a lot longer than Defendants previously represented:

> With Stem previously indicating 2022 results were going to be weaker than expected, our focus was on the company's 2023 guidance. Positives include expected booking growth of 40% year on year and reiteration of achieving breakeven adjusted EBITDA in the second half of 2023. **However, non-GAAP gross margin guidance of 15%-20% for the full year is in line with original 2022 guidance, showing limited improvement year on year**.

> **Stem's long-term strategy remains around its Athena software, but we think its transition from a hardware-dominated business to one with sizable software revenue is going to be more gradual than our prior expectations. As such, we now incorporate a more subdued gross margin improvement into our forecast. We now assume the company does not meet its 15% adjusted EBITDA target until 2026, a year later than its analyst day projections. We would like to see management execute against its 2023 guidance and further scale its software revenue prior to becoming more constructive on shares**.

261. Similarly, other analysts expressed skepticism about Stem's ability to generate high-margin sales and turn a profit:

> [UBS 02/16/23] – "continued **skepticism in the market about profit potential**"; and "STEM is not currently a profitable company and achieving our estimates profit levels will require commercial execution."

> [Morgan Stanley 02/17/23] – "**Weaker than expected 4Q revenue and gross margin**, offset by opex discipline."

> [BofA 02/17/23] – "**2023 guidance unfortunately comes with yet another negative reset vs expectations** with revs guided to $550-650mm vs consensus at $680mm, gross margins again pointed to a 15-20% range on a non-GAAP basis (same as 2022 which missed this range at 13%) and relatively deep EBITDA drag of ($5)-($35mm)."

### 4.    Partial Disclosures on March 29, 2023

262. On 03/29/23, Stem announced it would be offering $175 million Convertible Senior Notes, due in 2030, in a private offering to institutional buyers. Stem intended to use the proceeds of the notes to purchase and surrender for cancellation a portion of Stem's 2028 Convertible Senior Notes, to fund the cost of entering into the privately negotiated capped call transactions with the purchasers, and for general corporate purposes.

263.    On 03/30/23, Stem upped the amount of offering from the day before, from $175 million to $200 million.  Stem intended to use: (i) approximately $99.8 million of the net proceeds from the offering to purchase approximately $163.0 million in Stem's 0.50% Green Convertible Senior Notes due 2028; (ii) approximately $23.2 million of the net proceeds of the offering to fund the cost of entering into capped call transactions; and (iii) the remainder of the net proceeds of the offering or ~$75 million for general corporate purposes.

264.    This news revealed to the market that Stem was not executing on its business model of a high-margin FTM software company that would alleviate the need for Stem to be a capital heavy company.  Thus, Stem's 03/29/23 disclosure of the need to raise capital, partially revealed the negative impact of Defendants' materially false and misleading statements alleged herein.

265.    Similarly, this news partially revealed to investors the materialization of the risks posed by Stem's deficient business model and its failure to have a viable automated Athena product for the FTM market.  Stem's 03/29/23 disclosure that the Company would raise capital, reflected that the risks were already materializing.

266.    Upon the news, Stem's stock price declined from $6.24 per share on 03/28/23 to $5.59 per share on 03/29/23, a decline of $0.65 per share, or -10.42%, on unusually heavy trading volume.  The stock fell another -1.6%, or $0.09 the following day, to a close of $5.50 on 03/30/23 as Stem issued its second offering announcement and the market continued to absorb the news.  These movements are reflected in the following chart:



267.    Analysts were puzzled and surprised by the news.  On 03/29/23, a Credit Suisse analyst noted that "Stem's convert was not expected," and "[t]iming is also surprising given higher interest rates and spreads since their previous 2028 convert issued in mid-November 2021."

268.    A Guggenheim report issued on 03/30/23 reduced Stem's price target from $14 to $11 following the announcement of $175 million convertible debt financing, stating that "we think that STEM could have handled its recent communications more effectively.  The transaction is also poorly timed, in our view."  Moreover, "***the financing comes on the heels of management having assured investors repeatedly that no additional funding was needed***, and it also comes following a 64% decline in the stock price since September, not including the decline yesterday after the deal was announced."  Guggenheim found that Stem's strategy for revenue is "***clearly proving more difficult than STEM expected to generate gross margin on its hardware resale business, especially as the business remains geared mostly to front-of-the-meter business, and that is pushing out overall profitability***."

### 5.    Partial Disclosures on April 4, 2023

269.    By 04/04/23, analysts arrived at the inescapable conclusion that Stem's business was dependent on its lower margin hardware sales, and that the Company would not see the gross

1    margins or profits that Defendants had repeatedly promised would result from Stem's high-margin

2    automated software product and its expansion into the FTM market.  In other words, the market

3    had little confidence in Stem management's ability to execute on the business model it sold

4    investors on two years earlier when the Company went public.

5        270.    On 04/04/23, analysts at Bank of America issued a report titled, "Waning

6    Confidence on Sharp Ramp: Downgrade to Underperform," stating their "confidence in estimates

7    is increasingly strained."  ***The analysts explained that they were diverting from the street***

8    ***consensus*** on hardware margins of 15% to 9-10% hardware margins, and explained their contrary

9    rationale about Stem:

10        How do we look vs consensus?

11            The primary differences between our updated estimates and consensus
12        hinge on (1) ***lower attribution to a hardware business gross margin which we***
        ***frankly think aligns more closely to reality*** and (2) a ***more reasonable take on***
13        ***opex trends against Stem's scaling plans. We emphasize that while we are lower***
        ***than consensus on each, we are actually not dissimilar from Stem's long-term***
14        ***guidance on either, which leaves us confident in the prospect of further negative***
        ***revisions. We lack confidence in Stem's ability to drive margin improvements in***
15        ***the increasingly supply constrained and competitive business of buying and***
        ***selling batteries.*** In 2022, still with the benefits of more BTM hardware delivery
16        mix than what Stem expects long term, its hardware margin hovered in the high
        single digit range throughout the year.  By contrast, consensus estimates provided
17        via Visible Alpha imply that Stem drives its margin mix towards 15% by 2024 and
        off a 10% level in 2023 despite increasingly unfavorable mix trends and still limited
18        available ESS focused cell supply that should continue to pressure "middle-man"
        margins.  For our part, we assume that hardware margins trend in the high single
19        digits (9-10%) over time. which is arguably still generous vs what we have already
        seen in 2022.  Again, underling the peculiarities in consensus, ***Stem readily admits***
20        ***that the "Front of the Meter" (FTM) hardware margin it expects longer term is***
        ***~10% which more closely aligns to our view***.  It flags increasing FTM exposure
21        specifically as dragging its margin lower in 2022.

22        271.    The Bank of America analysts called out that what Stem's business model was even

23    more confusing than it previously had been, especially given the convertible note offering:

24        ***The notion of what Stem "is" at its core is now more confusing than it used to be***
        ***given the shifting business mix contemplated within its dramatic top-line ramp***
25        ***from '22 into '25***.  While our recent launch contemplated a Neutral rating, ***a***
        ***disappointing 4Q outlook call since and now uncertainty reflected from***
26        ***convertible issuance last week push us to be less generous on estimates*** –
        particularly given the risks reflected in standing up two new services businesses
27        (Dev-serv to 'setup' the battery install initially and Pro-Serv to operate batteries on
        an ongoing basis) and implicitly keeping opex relatively stable.

28                                    *        *        *

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                      - 92 -

While we do see merits of an opportunistic convert refinancing last week – note Stem is not the first to execute this strategy, nor will it likely be the last – implicit messaging on cash is still less than ideal given at least some portion of proceeds will help bolster working capital needs. In the end, we still see Stem reaching positive EBITDA in 4Q22, albeit briefly, and purely as a function of back half loaded revenue recognition over ratable overhead spend. But it's not about simply realizing cash inflection – how much cash and how quickly it's growing matters, where even consensus suggests a hockey-stick-like cadence biasing realization to 2025. With a deeper review of what could go wrong in consensus numbers as well as true ups for latest macro concerns, we downgrade to Underperform.

272.    Bank of America analysts also revealed to the market that, despite all the hype, Stem's software business is inherently dependent on its success as a low-margin hardware business, but the "middle-man margins" were not panning out. Stem's future plan to divorce it and ultimately rely on software simply did not add up:

For some time, this company has been pitched as a high margin, software-focused way to play energy storage given its Athena platform focus and vs peers in the space that reap a "typical" hardware margin in the 5-15% range. **However, out of $550-650mm in revenue guided for FY23, ~$520mm is implied as hardware and we estimate just $45-50mm comes from Stem's recurring software business with the balance in a burgeoning services business**. Note while Stem talks to a "Contracted Annual Recurring Revenue" metric to describe the software opportunity, the $45-50mm listed aligns to performance obligations in its 10-K that are expected to be realized in the next 12 months. **The irony here is that while the company's pitch has been predicated for some time on front loaded hardware installs as an enabler of the long-term recurring software business, the latter cannot on its own drive the story to positive EBTIDA today and at a corporate level, the 2H23 inflection will rely on a business that Stem intends to divorce longer term**.

273.    The 04/04/23 disclosures, including: (i) the downgrade of Stem to underperform; (ii) the lowering of estimates based on Stem's gross margins aligned with a hardware company, not a software company; (iii) the Company's confusing business mix shift; and (iv) the uncertainty reflected in Stem's $200 million convertible issuance – all revealed the negative impact of Defendants' materially false and misleading statements alleged herein.

274.    Similarly, this news revealed to investors the materialization of the risks posed by Stem's deficient business model and its failure to have a viable automated Athena product for the FTM market. The downgrade of Stem to underperform and Bank of America's assessment that the Company's gross margins were aligned with that of a hardware company, not a high-margin software company, among other disclosures, was a materialization of these risks.

275.    Upon this news, Stem's stock price declined from $5.91 per share on 04/03/23, to $5.47 per share on 04/04/23, a decline of $0.44 or -7.45%.  The stock fell another -10.60%, or $0.58 the following day, to a close of $4.89 on 04/05/23, as the market continued to absorb the news as reflected in the following:



276.    On 04/04/23, Seeking Alpha summarized Bank of America's report:

> *Stem pitches itself as a software focused way to play energy storage, but "slow realization of revenues from this business means the company is ultimately dependent on lower margin hardware and service businesses to drive an EBITDA inflection*," BofA's [analyst] wrote.

> While company management suggests a rapid scale up in services would bridge the drop in hardware sales, "the pivot towards standing up a novel services business to hit contemplated guide accentuates the uncertainty from the latest capital raise," according to [Bank of America's analyst].

> Stem is trading near all-time lows despite rising revenues and margins.

277.    In a 04/06/23 Wolfe report titled, "STEM: Our view's been de-stemmed; downgrade to PP," analysts reported that "the investment case has not played out as hoped."  After taking a "*fundamental review*" of Stem's outlook, the report concluded that, "*[t]he thesis for STEM has drifted from targets established during the company's 2021 SPAC listing which were premised on 1) growing share in the front-of-the-meter (FTM) market and 2) Improving*

*margins via increased deployments of Athena, STEM's software platform. Neither have played out as hoped.*" The report also pointed out that while bookings are strong, the "backlog conversion remain[s] elongated," and that management may need to reconsider expectations again and the "sentiment [will likely stay] depressed until execution becomes apparent."

278. Wolfe was also surprised by the note offering, it had not anticipated Stem's "funding needs in 2023 which raises questions about STEM's anticipated cash generation outlook."

279. The Wolfe report also highlighted that Athena was not contributing meaningfully to gross margins:

> *Disaggregating the Services segment shows Athena not yet a meaningful contributor.* We estimate that in 2022, Athena contributed $5.9mn of gross margin relative to the company's $47.3mn consolidated GM. While Athena did grow by ~2x last year, *it would have to grow by more than 4x in FY23 in order to move the needle for consolidated margins* in our new model. Given the company's underwhelming 4Q results and FY23 outlook, *we don't view this as a probable outcome* in the NT.

> *Hard to justify premium multiples given recent disappointments.*

**B.    Loss Causation (§10(b) Claims Only)**

280. In addition to the allegations above in §VII.A, Plaintiffs allege that the Fraud Defendants' scheme and materially false and misleading statements caused the price of Stem's securities to be artificially inflated and/or maintained the artificial inflation in the price of Stem's securities. They did so as part of the Fraud Defendants' scheme and by publicly issuing and endorsing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading.

281. The business conditions and risks concealed from investors by the Fraud Defendants' scheme and misrepresentations were corrected through the partial disclosures on 02/24/22, 01/05/23, 02/16/23, 03/29/23 and 04/04/23. Though each of the disclosures was incomplete, each partially revealed the negative impact of the Fraud Defendants' scheme and their materially false and misleading statements.

# VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER (§10(b) CLAIMS ONLY)

## A.   Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo's Massive Insider Trading Supports a Strong Inference of Scienter

282.   Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo (the "Selling Defendants") were motivated to engage in their fraudulent course of conduct to complete Stem's IPO and sell shares of their STEM common stock at inflated prices (depicted in the chart below), from which they and other Stem insiders collectively and personally profited by approximately $41 million during the Class Period.

| Defendant | Date of Sale(s) | Number of Shares | Price | Proceeds |
|---|---|---|---|---|
| Bush | 11/16/21 | 12,456 | $24.55 | $305,794.80 |
| | 11/17/21 | 11,056 | $22.01 | $243,342.56 |
| | 11/17/21 | 1,400 | $22.69 | $31,766.56 |
| | 12/1/21 | 4,973 | $20.77 | $103,283.24 |
| | 12/1/21 | 5,027 | $21.49 | $108,054.36 |
| | 12/2/21 | 3,000 | $20.34 | $61,032.00 |
| | 5/10/22 | 2,080 | $7.32 | $15,225.60 |
| | 5/17/22 | 37,284 | $7.62 | $284,104.08 |
| | 8/15/22 | 60,220 | $16.24 | $977,972.80 |
| | 8/15/22 | 422 | $16.70 | $7,045.97 |
| | 8/16/22 | 21,200 | $15.93 | $337,800.80 |
| | 8/16/22 | 2,383 | $16.62 | $39,605.46 |
| | 11/15/22 | 30,000 | $14.67 | $440,100.00 |
| | 3/1/23 | 9,252 | $8.10 | $74,968.03 |
| | | 200,753 | | $3,030,096.26 |
| | | | | |
| Carrington | 11/16/21 | 44,750 | $24.55 | $1,098,612.50 |
| | 11/17/21 | 39,750 | $22.01 | $874,980.98 |
| | 11/17/21 | 5,000 | $22.75 | $113,774.00 |
| | 12/1/21 | 11,163 | $20.77 | $231,907.98 |
| | 12/1/21 | 11,212 | $21.50 | $241,026.61 |
| | 12/2/21 | 6,401 | $20.36 | $130,309.64 |
| | 12/8/21 | 200 | $20.00 | $4,000.00 |
| | 12/9/21 | 19,621 | $20.11 | $394,578.31 |
| | 5/10/22 | 5,198 | $7.32 | $38,049.36 |
| | 5/19/22 | 28,580 | $7.73 | $220,923.40 |
| | 5/20/22 | 28,580 | $7.48 | $213,778.40 |
| | 6/8/22 | 28,570 | $9.34 | $266,843.80 |
| | 6/9/22 | 28,570 | $8.99 | $256,844.30 |
| | 7/20/22 | 28,570 | $8.92 | $254,844.40 |
| | 7/21/22 | 28,570 | $9.17 | $261,986.90 |
| | 8/16/22 | 26,560 | $15.94 | $423,292.03 |
| | 8/16/22 | 2,010 | $16.56 | $33,287.81 |
| | 8/17/22 | 27,870 | $15.09 | $420,477.48 |
| | 8/17/22 | 700 | $15.56 | $10,892.56 |

| Defendant | Date of Sale(s) | Number of Shares | Price | Proceeds |
|---|---|---|---|---|
| | 9/13/22 | 7,899 | $15.81 | $124,867.39 |
| | 9/13/22 | 20,671 | $16.44 | $339,746.49 |
| | 9/14/22 | 10,231 | $16.38 | $167,628.80 |
| | 9/14/22 | 18,339 | $17.25 | $316,259.72 |
| | 10/5/22 | 26,670 | $13.46 | $359,031.54 |
| | 10/5/22 | 1,900 | $13.96 | $26,523.05 |
| | 10/6/22 | 25,913 | $13.67 | $354,114.10 |
| | 10/6/22 | 2,657 | $14.59 | $38,754.74 |
| | 11/16/22 | 28,570 | $13.82 | $394,837.40 |
| | 11/17/22 | 28,570 | $13.60 | $388,552.00 |
| | 3/20/23 | 13,216 | $6.33 | $83,657.28 |
| | | **556,511** | | **$8,084,382.95** |
| | | | | |
| Daley | 12/1/21 | 100,000 | $21.13 | $2,113,480.00 |
| | 12/2/21 | 100,000 | $19.82 | $1,981,790.00 |
| | 8/10/22 | 75,000 | $14.79 | $1,109,250.00 |
| | 8/11/22 | 75,000 | $15.05 | $1,128,750.00 |
| | 11/17/22 | 75,000 | $13.63 | $1,022,220.00 |
| | 11/18/22 | 75,000 | $13.57 | $1,017,990.00 |
| | | **500,000** | | **$8,373,480.00** |
| | | | | |
| Johnson | 11/16/21 | 15,000 | $24.55 | $368,305.50 |
| | 5/10/22 | 1,269 | $7.32 | $9,289.08 |
| | 8/12/22 | 30,000 | $15.44 | $463,290.00 |
| | 8/15/22 | 20,000 | $16.38 | $327,640.00 |
| | 8/16/22 | 10,000 | $16.09 | $160,851.00 |
| | 11/14/22 | 12,500 | $13.46 | $168,250.00 |
| | 11/15/22 | 12,500 | $14.42 | $180,228.75 |
| | 3/1/23 | 6,877 | $8.10 | $55,723.64 |
| | | **108,146** | | **$1,733,577.97** |
| | | | | |
| Patel | 11/10/21 | 90,000 | $25.25 | $2,272,185.00 |
| | 11/11/21 | 25,000 | $25.26 | $631,522.50 |
| | 11/11/21 | 5,000 | $27.02 | $135,075.00 |
| | 5/10/22 | 1,269 | $7.32 | $9,289.08 |
| | 3/1/23 | 6,888 | $8.10 | $55,812.78 |
| | | **128,157** | | **$3,103,884.36** |
| | | | | |
| Russo | 11/2/21 | 8,500 | $25.01 | $212,570.55 |
| | 5/10/22 | 1,564 | $7.32 | $11,448.48 |
| | 8/9/22 | 46,641 | $14.70 | $685,622.70 |
| | 8/9/22 | 113,5569 | $14.70 | $1,669,464.30 |
| | 8/10/22 | 13,427 | $6.50 | $87,275.50 |
| | 3/1/23 | 6,022 | $8.10 | $48,795.66 |
| | | **189,723** | | **$2,715,177.19** |
| | | | | |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC

- 97 -

| Defendant | Date of Sale(s) | Number of Shares | Price | Proceeds |
|---|---|---|---|---|
| Combined Total | | **1,683,290** | | **$27,040,598.73** |

283. The Selling Defendants' sales of Stem common stock also culminated in the sale of significant portions of their total holdings during the Class Period:

| Defendant | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|
| | Shares Sold | Shares Retained | % Sold | Shares Sold | Shares Retained | % Sold |
| Carrington | 138,097 | 428,127 | 24.4% | 405,198 | 97,843 | 80.5% |
| Bush | 37,912 | 294,791 | 1.3% | 195,409 | 231,851 | 45.7% |
| Daley | 200,000 | 489,027 | 29% | 300,000 | 275,800 | 52.1% |
| Johnson | 15,000 | 192,456 | 7.2% | 86,269 | 107,456 | 44.5% |
| Patel | 120,000 | 53,231 | 69.3% | - | - | |
| Russo | 8,500 | 139,594 | 6.1% | 175,201 | 139,594 | 55.65% |

284. The highly suspicious amounts and timing of the Selling Defendants' insider trading also supports a strong inference that they timed their respective trading with knowledge of the alleged fraud and intended to benefit from Stem's artificially inflated trading price before the market understood the truth about Stem's business model, including the negative impact of Athena's deficient software on the Company's growth and profits.

285. Here, Stem's IPO included a lock-up agreement that prevented Stem's directors, officers, and substantial stockholders from selling stock until six months after the date upon which the Merger between Star Peak and Stem closed. That lock-up agreement expired on or about 10/28/21.

286. Shortly after the lock-up's expiration, the Selling Defendants began unloading their Stem stock for their own personal gain. For instance, on 11/02/21, only five days after the lock-up's expiration, Defendant Russo made his first sale. Defendant Patel's first sale followed, occurring on 11/10/21, a mere 13 days after the lock-up's expiration. Defendants Bush, Carrington, and Johnson made their respective first sales on 11/16/21, only 19 days after the lock-up's expiration and days after Stem had reaffirmed FY 2021 guidance on 11/09/21. Defendant Daley's first sale would occur shortly thereafter on 12/01/21, 34 days after the lock-up's expiration.

287.    The Selling Defendants' 2021 sales also occurred weeks before the close of FY 2021 on 12/31/21 giving them considerable insight into the actual results for FY 2021. Results that Stem would be forced to report were far below expectations on 02/24/22 causing a nearly 22% drop in Stem's stock price as described in §VII.A.1, *supra*.

288.    The Selling Defendants' 2022 sales were also suspicious and made at a time when they knew of material adverse facts or recklessly disregarded those facts. As described in §VIII.E, *infra*, despite Stem's announcement of the $500 million Available Power flagship FTM deal on 02/24/22, when each of the Selling Defendants sold shares beginning in 05/22/22 they knew that this deal was lost and that they were stuck with the hardware that Stem had purchased in violation of Company policy for that deal. Indeed, CW2 explained that Available Power had committed to issuing purchase orders within two months of the letter of intent but that it never issued the purchase orders. Similarly, when Defendants Bush, Carrington, Daley, Johnson, and Russo sold Stem stock in 3Q 2022 (July through September), Stem was actively shopping the hardware that they had purchased for the Available Power deal in violation of Company policy.

289.    Given the importance of the Available Power deal, it is reasonable to infer that senior management and senior executives knew that it had been lost. Further, CW2 confirmed that by the time CW2 learned that the Available Power deal was not going through in early 3Q 2022, Stem's senior management and executives would have also known because the information came down from senior leadership to their manager, who told CW2 the hardware purchased for Available Power needed to be sold.

290.    Similarly, Defendants Bush's, Carrington's, Daley's, and Johnson's sales in late 2022 occurred on the heels of more bad news for the Company issued on 01/05/23 – namely, the announcement of the loss of a $130 million contract (later revealed to be with Available Power), lowered 4Q 2022 revenue and gross margin guidance, and preannounced disappointing FY 2023 earnings guidance as explained in §VII.A.2, *supra*. While these defendants took advantage of Stem's artificially inflated stock prices (at above $13 per share), Stem's stock would tank to below $8 per share following Stem's 01/05/03 disclosures.

291.    Likewise, Defendants Bush, Carrington, Johnson, Patel, and Russo all sold stock in March 2023, which was highly suspicious because they sold immediately before 03/29/23 when Stem was forced to renege on its story that it had sufficient capital to fund its business model as described in §VII.A.4, *supra*.  Defendants Johnson, Patel, and Russo all took advantage of the artificially inflated value of Stem's stock selling their shares on 03/01/23 for over $8 per share, while Carrington unloaded his stock at $6.33 per share on 03/20/23.  Following Stem's disclosures on 03/29/30, and the downgrade of Stem's stock by analysts on 04/04/23, Stem's stock traded below $5 per share.

292.    At the time of their aforementioned sales, the Selling Defendants knew adverse information regarding Athena's capabilities, Stem's ability to provide a viable automated software product for FTM projects and Stem's business model, which, when ultimately revealed, caused the price of Stem's stock to decline.  Accordingly, the Selling Defendants' well-timed stock sales, capitalizing on Stem's inflated stock price, strongly support scienter.

293.    Ultimately, the Selling Defendants collectively sold almost 1.7 million shares of their Stem common stock at artificially inflated prices for proceeds of approximately over $27 million dollars during the Class Period.  In total, Stem insiders dumped over 2.7 million shares of Stem common stock during the Class Period for combined proceeds of over $41 million.

| Stem Insider | Total (Tax) | |
|---|---|---|
| | Shares | Proceeds |
| Defendant Bush | 200,753 | $3,030,096.26 |
| Director David Buzby | 203,121 | $2,625,620.21 |
| Defendant Carrington | 556,511 | $8,084,382.95 |
| Defendant Daley | 500,000 | $8,373,480.00 |
| Chief People Officer Kim Homenock | 54,690 | $651,939.76 |
| Defendant Johnson | 108,146 | $1,733,577.97 |
| Chief Legal Officer Saul Laureles | 25,181 | $296,962.90 |
| Defendant Patel | 128,157 | $3,103,884.36 |
| Defendant Russo | 189,723 | $2,715,177.19 |
| Chief Accounting Officer Shukla | 4,193 | $34,508.39 |
| Director Anil Tammineedi | 750,000 | $9,984,000.00 |
| Chief Operating Officer Mark Triplett | 40,000 | $767,464.16 |
| | | |
| Combined Total | 2,760,475 | $41,401,094.15 |

**B.    That Defendants Carrington, Bush, and Johnson Monitored Stem's Key Metrics as Part of Their Annual Performance Compensation Supports a Strong Inference of Scienter**

294.    Defendants Carrington's, Bush's and Johnson's executive compensation plans, as detailed in Stem's 04/29/22 Proxy Statement for FY 2021, consist of three primary elements: base salary, annual short-term cash incentive awards, and long-term awards such as restricted stock units and stock options. The performance-based, short-term cash incentive awards are based on achievement of quantitative financial objectives detailed in the 2021 Annual Incentive Plan (the "2021 AIP"), as adopted by the Stem Compensation Committee, which Defendant Morgan chaired, on 05/25/21. The 2021 AIP explains that in addition to their base salaries, the named executives were eligible to receive an annual cash incentive target bonus determined as a percentage of their annual base salary depending on whether they achieved certain approved weighted performance goals. The initial annual target bonus percentages for Defendants Carrington, Bush, and Johnson were 110%, 75% and 65% of base salary, respectively. The 2021 performance metrics were weighted as: (a) 15% for achieving 12-month pipeline, (b) 35% for achieving contracted backlog; (c) 30% for achieving revenue, and (d) 20% for achieving adjusted EBITDA. Therefore, Defendants Carrington, Bush and Johnson were keenly aware of these

1 | performance metrics and were highly motivated to meet them because their bonuses were
2 | dependent upon meeting these goals.

3 | 295. Based on Stem's FY 2021 results, Defendants Carrington, Bush, and Johnson made
4 | the full percentage of their bonuses under the 2021 AIP. In 2021, Defendant Carrington met his
5 | performance goal and received over $1,000,000 in base salary and incentive awards. Adding in
6 | his other incentive awards, such stocks, options, and other awards, Defendant Carrington received
7 | over $40,000,000 in total compensation for 2021. Compared with a base salary of $395,521,
8 | $4,210,065 in option awards, and $350,625 non-equity incentive plan compensation, for a total
9 | compensation of $4,956,211 in 2020, Defendant Carrington profited substantially from the SPAC
10 | merger and IPO. Defendant Bush likewise profited from the SPAC merger and IPO. In 2020,
11 | Defendant Bush received $350,000 in base salary, $1,878,363 in option awards, and $150,000
12 | non-equity incentive plan compensation, for a total of $2,378,363. Reaching the performance
13 | goals in 2021 increased his base salary and incentive awards to $600,000, and combined with his
14 | stock and option awards, Defendant Bush received over $4,000,000 in total compensation in 2021.
15 | Similarly, in reaching his performance goals, Defendant Johnson received $4,048,018 in 2021
16 | compared with $925,626 in 2020.

17 | 296. Like in FY 2021, Defendants Carrington and Bush were similarly compensated
18 | with base salary, annual short-term cash incentive awards, and long-term awards in FY 2022.[23]
19 | However, the 2022 Annual Incentive Plan ("2022 AIP") changed the performance metrics from
20 | rewarding 12-month pipeline goals to instead incentivizing Contracted Annual Recurring Revenue
21 | ("CARR"). Metrics such as backlog, revenue, and EBITDA were still incentivized, but weights
22 | were adjusted. For example, with the April 2022 adoption of the 2022 AIP, the weight for revenue

---

[23] Stem did not include information regarding Defendant Johnson's FY 2022 compensation in its 2023 Proxy Statement.

suspiciously went from 30% in 2021 to 25% in 2022 after Stem failed to meet its revenue targets for 2021 as depicted below.[24][25]

The following table summarizes the 2021 performance metrics, weighting per metric, the threshold and target goals per metric, actual performance per metric and actual performance as a percentage of the target, all as approved by our Compensation Committee:

| Metric | Weighting | Threshold* | Target* | Actual | Payout(1) |
|---|---|---|---|---|---|
| 12-month pipeline | 15% | $ 1.75B | $ 2.5B | $ 4.0B | 125% |
| Contracted backlog | 35% | $ 181M | $ 258.0M | $ 449.0M | 125% |
| Revenue | 30% | $ 103M | $ 147.0M | $ 127.4M | 87% |
| Adjusted EBITDA(2) | 20% | ($ 36M) | ($ 25.0M) | ($ 30.2M) | 80% |
| Payout | | 70% | 100% | | 105% |

The following table summarizes the 2022 performance metrics, weighting per metric, the threshold and target goals per metric, actual performance per metric and actual performance as a percentage of the target, all as approved by our Compensation Committee:

| Metric | Weighting | Threshold * | Target * | Actual | Payout (1) |
|---|---|---|---|---|---|
| Contracted backlog | 35% | $519.5M | $742.2M | $969.0M | 120% |
| CARR | 20% | $49.0M | $70.0M | $65.3M | 93% |
| Revenue | 25% | $271.2M | $387.5M | $363.0M | 94% |
| Adjusted EBITDA (2) | 20% | ($57.1M) | ($40.0M) | ($46.0M) | 87% |
| Payout | | 70% | 100 % | | 101% |

297.    The 2022 performance metrics were weighted as follows: (a) 20% for achieving CARR; (b) 35% for achieving contracted backlog; (c) 25% for achieving revenue; and (d) 20% for achieving adjusted EBITDA.  In 2022, Defendant Carrington was awarded 111.15% of his 110% performance goal and received over $550,000 in base salary and incentive awards. Including his other stock and option awards, Defendant Carrington received over $3,000,000 in total compensation in 2022.  Defendant Bush made 75.79% of his 75% performance goal earning over $700,000 in base salary and incentive awards, and combined with his stock and option awards, received over $2,000,000 in total compensation in 2022.

298.    As explained in the Proxy Statement filed with SEC on 04/21/23, the Compensation Committee decided to replace the 12-month pipeline metric in the 2022 AIP with CARR, because, purportedly, "CARR provides better visibility into our anticipated growth in services revenue,"

---

[24]    Stem's Proxy Statement for its 2022 Annual Meeting, https://www.sec.gov/Archives/edgar/data/1758766/000119312522128178/d304504ddef14a.htm.

[25]    Stem's Proxy Statement for its 2023 Annual Meeting, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001758766/000175876623000056/stem-20230403.htm.

1  and CARR, "reflects the Company's increased focus on software revenue because it includes

2  accumulated higher margin software contracts on an annualized basis."

3      299.    Thus, because Defendants Carrington's, Bush's and Johnson's performance goals

4  were tied directly to certain weighted performance metrics, they were acutely aware of these

5  financial objectives and motivated to meet them. Specifically, throughout FY 2021, Defendants

6  Carrington, Bush, and Johnson would have closely monitored the 12-month pipeline, whereas in

7  fiscal year 2022, they would have closely monitored CARR. Moreover, Defendants Carrington,

8  Bush, and Johnson would have closely monitored contracted backlog, revenue, and EBITDA

9  because they were consistently incentivized to meet these goals over the entire Class Period.

10  Defendants Carrington and Bush also presented and discussed the pipeline, CARR, contracted

11  backlog, revenue, and EBITDA metrics in detail during each quarterly earnings call during the

12  Class Period.

13      300.    Because Defendants Carrington, Bush and Johnson were focused on these metrics,

14  they acted with deliberate recklessness and/or knew that, *inter alia*: (a) Stem's pipeline was

15  unrealistic and inflated; (b) that prospective FTM deals were not converting to bookings; (c) that

16  bookings, including the Available Power deal, were not turning into actual deals; and (d) that the

17  software deals in CARR were also not converting to actual contracts.

    **C.**    **Stem's Liquidity Issues and Capital Requirements Add to the Strong Inference of Scienter**

18

19

20      301.    As explained in §IV.G.1, *supra*, leading into Stem's IPO, the Company was facing

21  a severe liquidity crisis that seriously jeopardized Stem's ability to continue operating unless the

22  Company received a significant influx of funding. Stem's auditors had issued a going concern

23  letter and the Company itself acknowledged in its registration statement that "***there is substantial***

24  ***doubt about the Company's ability to continue as a going concern within one year after the date***

25  ***that the financial statements are available to be issued***."

26      302.    The Fraud Defendants were therefore desperate to complete Stem's IPO and secure

27  cash to keep Stem afloat and to grow Stem's business. In turn, they would personally benefit by

28  not only keeping their positions but by their compensation packages.

303.    To that end, Defendant Carrington acknowledged, during a 04/12/21 Fireside Chat with IPO Edge, that the Company's dismal balance sheet hampered Stem's ability to secure new contracts, stating in relevant part:

> We have in fact seen instances where large renewable owners, asset owners, many private equity companies, where they say, "We want to use your solution. We want to put Athena and your storage solution on our solar facilities." ***They'll spend time on our balance sheet pre this announcement, and we'll actually get cut back. On multiple occasions where we had 100% win turn into 50, 40 or 30% because of that issue***. So that's tabled. We're seeing more and more large opportunities coming our way since the announcement. So we feel like that bigger balance sheet will definitely open up the ability to participate in larger projects, and certainly the geographic expansion is big.

304.    During a 04/30/21 interview with TD Ameritrade Network, Defendant Carrington again repeated that the Company's balance sheet without the IPO cash was hampering Stem's ability to secure contracts because customers wanted to ensure they'd be around for 20 years, stating in relevant part:

> In this industry, anything in energy, ***a bigger balance sheet is viewed more positively***. Um, a lot of these customers that we have are large renewable portfolio developers of solar or wind as an example, and those are 20, 25 year deals. So they want to make sure their counterparty that is in is providing them the software to orchestrate and operate these facilities, in addition to the lithium ion batteries that we provide, ***will be there for the duration of their project. So we certainly inoculate that concern with this deal***. And so it, it allows us to, to, I think just extend that lead allows us to expand much broader geographically as well.[26]

305.    Even after the IPO closed, Defendant Carrington continued to emphasize how Stem's dismal financial condition prior to the IPO constrained the Company's operations. For instance, on 06/21/21, Defendant Carrington participated in Cowen's Sustainability and Energy Transition Summit, wherein he emphasized that the funds received in Stem's IPO now alleviated customers' concerns about the Company's balance sheet, stating in relevant part:

> [T]his transaction is transformational for the company. ***We'll be able to go after larger customers. We would win projects. And our balance sheet did not give comfort previous to this, to have a 20-, 25-year PPA in place and making sure that this company would be here when we had 12 to 18 months of cash as a venture-backed company***. Now we have $500 million on the balance sheet with 0 debt.

---

[26]    Schwab Network, *Stem CEO John Carrington on Company Growth & SPAC Deal*, April 20, 2021, https://schwabnetwork.com/video/ceo-of-stem-john-carrington-on-company-growth-spac-deal?redirect=true (last accessed Oct. 4, 2023).

306.    Similarly, on 08/21/21, Carrington participated in C3 Solution's Tech Voices Series wherein he explained that Stem's balance sheet hindered the Company's ability to secure contracts and further noted that the IPO funds alleviated that concern and provided the funding necessary to build out Athena's capabilities, stating in relevant part:

> So early days, as we began to get more and more successful, ***it became clear our balance sheet was a constraint***. So we, and that was constrained in a couple areas. When you look at large project owners, and there are a lot of those when you think about the Goldman Sachses, Blackstone, BlackRocks, you know, they have a big solar portfolio that they want to put storage on. ***And when we have a, you know, 12 to 18 months runway as a venture backed company, it didn't exactly, uh, exude confidence for them.*** So that was one of the big drivers. And also we wanted to do more geographic expansion. We knew our terms were asymmetrical because of our balance sheet with suppliers. That's all changing. ***So yeah, I mean, you've hit on it. And again, look, you know, this now gives us a chance to look at some tuck-in acquisitions to accelerate our software roadmap as well***.

307.    As such, Stem's dire financial condition prior to the merger and IPO motivated the Fraud Defendants to pitch an unrealistic business model based on the sale of a software product (*i.e.* Athena) to the lucrative FTM market, when, in fact, Athena was not viable for FTM projects. All the while the Fraud Defendants claimed that Stem's software, with its 80% margins, would drive gross margins and profits, and that Stem's business model was capital light.

308.    Indeed, the Fraud Defendants' efforts to secure needed funding in connection with the merger paid off, as the merger infused the Company with over $600 million of gross cash proceeds and zero debt, purportedly enabling Stem to execute on much larger projects and expand its addressable market.

**D.    Extensive Due Diligence as Part of the IPO Process Adds to the Inference of Scienter**

309.    Defendants Scheyer, Morgan, and Daley participated in an extensive due diligence in connection with the merger and Stem's IPO. The due diligence process involved numerous meetings between Star Peak and Stem's respective management and a thorough review of Stem's operations with documents supplied by Stem's management.

310.    For instance, according to the Defective Prospectus, Defendants Scheyer, Morgan, and Daley attended presentations and participated in meetings with Stem management, including

1   Defendant Carrington, to obtain information regarding Stem's operations.  Those presentations

2   and meetings included, *inter alia*, the following:

3          (a)      On 08/28/20, Stem provided a management presentation to

4   representatives of STPK, including Defendants Scheyer, Morgan, and Daley;

5          (b)      On 08/31/20, Defendant Morgan spoke with Defendant Carrington and

6   expressed STPK's initial interest in exploring a transaction with Stem and beginning due

7   diligence;

8          (c)      On 09/11/20, Defendant Morgan spoke with Defendant Carrington to

9   outline STPK's intention to present a term sheet after completing initial due diligence; and

10         (d)      Then, on 09/29/20, STPK commenced its confirmatory business due

11  diligence concerning the following, *inter alia*, legal, financial, accounting, tax, information

12  technology, insurance, benefits and industry trends. STPK management also participated in

13  various discussions with representatives of Stem.

14         311.    Moreover, throughout October and November 2020, Stem, STPK, and their

15  respective advisors participated in a number of due diligence telephone calls and exchanged due

16  diligence materials, including those relating to legal, financial, market, information technology,

17  software, tax, insurance, employee benefits, and industry trends.  This exchange of material

18  included Stem's contracted backlog through 2021, which Defendants Scheyer, Morgan, and

19  Daley, and the remaining members of Star Peak's board of directors expressly relied on in

20  enter into the Merger.

21         312.    Indeed, in the Defective Prospectus, Defendants Scheyer, Morgan, and Daley, and

22  the remaining members of Star Peak's board of directors represented to investors that they

23  considered, *inter alia*, Stem's purportedly strong growth prospects within the energy storage

24  industry, Stem's contracted backlog through 2021, Stem's robust long-term forecast, and Stem's

25  long-term market participation, historical financial results, outlook, financial plan, and debt

26  structure.

27         313.    Defendants Scheyer, Morgan, and Daley, and the remaining members of Star

28  Peak's board of directors also reviewed Stem's growth in certain key financial metrics, including

1  but not limited to certain customer and revenue metrics, Stem's prospects for growth if Stem

2  achieved its business plans, and Stem's various historical and current balance sheet items.

3      314.    Defendant Morgan also met with Defendant Carrington for dinner on 10/12/20 to

4  discuss Stem's business and operations.

5      315.    Accordingly, given their extensive due diligence, Defendants Scheyer, Morgan,

6  and Daley knew or were reckless in not knowing that Athena was not viable for the FTM market

7  and Stem's pipeline was inflated.

8          E.    **The Individual Fraud Defendants' Participation in Meetings, Focus
           on Margins, and Access to the Salesforce Pipeline Adds to the**

9          **Inference of Scienter**

10     316.    Defendant Carrington and other members of Stem's C-suite and executive

11  leadership team, including, *inter alia*, Defendants Bush, Johnson, Patel, and Russo knew that

12  Stem's pipeline was overinflated with phantom deals that could not be converted to meaningful

13  revenue given Athena's lacking FTM capabilities because they participated in regular meetings

14  related to sales and marketing, and operations and had access to the pipeline deals reported in

15  Stem's internal Salesforce system.

16     317.    As described in detail in §IV.F and §IV.D, CW2 indicated that Stem's senior

17  leadership and management, such as Defendants Russo, Carrington, and Bush, would have been

18  aware that the pipeline was inflated because of the poor close rate of deals in the pipeline.  CW1

19  confirmed that Stem senior executives had access to Salesforce and the pipeline.  Moreover, as with

20  Defendants Carrington, Bush, and Johnson (*see* §VIII.B, *supra*), CW2 noted that Stem's bonus

21  incentives to the sales force were built on pipeline, even though the subsequent downstream

22  credentialing of the deals was challenging.

23     318.    As to Defendant Russo, CW1 noted that he participated in sales meetings and asked

24  questions about every deal.  CW1 further believed Mary Adam, the Director of Sales, would

25  regularly meet with Defendant Russo and updated him on the status of deals.  CW3 corroborated

26  that there were weekly sales meetings with Defendant Russo.  CW3 explained that Defendant Russo

27  was very involved in a lot of sales, especially for larger deals.

28

319.    As to Defendant Carrington, CW2 indicated that he would have been briefed on the matters concerning the Available Power deal because of Carrington's participation in sales and marketing meetings that were held on a weekly or bi-weekly basis, which were predominantly to inform the C-suite of what the sales and marketing organizations were doing.

320.    As to Defendant Bush, CW3 noted that Defendant Bush would sometimes join the weekly sales calls.  It is also reasonable to infer that as the CFO, Defendant Bush was well informed of large deals and particularly those where Stem had purchased tens of millions in hardware such as the Available Power deal.

321.    Given the importance of the Available Power deal, it is reasonable to infer that senior management and senior executives knew that it had been lost.  Further, CW2 confirmed that by the time CW2 learned that the Available Power deal was not going through in early 3Q 2022, Stem's senior management and executives would have also known because the information came down from senior leadership to their manager, who told CW2 the hardware purchased for Available Power needed to be sold.

322.    Defendant Carrington also participated in weekly operations calls wherein the Company's supply chain and delivery of project equipment was discussed in depth given its express link to revenue recognition.  For instance, during the 06/21/21 Cowen Sustainability and Energy Transition Summit, Defendant Carrington stated: "*we are looking at our supply chain weekly in our operations call.  And It's obviously very important because we are going to only recognize revenue when the hardware is delivered to our customer*."

323.    Similarly, during Stem's 11/09/21 Q3 2021 earnings call, Defendant Carrington asserted that the Company was closely monitoring its FTM projects and discussing their status in depth during the weekly calls, stating in relevant part:

> [W]e've run a *very rigorous process of weekly discussions*, looking at each project aligned with each hardware supplier in that specific geography.  So it's a rigorous literally weekly call with the operations team and e-staff members. So we're all over this.  I'd say, on the longer-term projects*, those front of the meter that tend to be a little further out, we're also monitoring those on a regular basis.*

324.    Defendant Carrington, during Stem's Q4 2021 earnings call on 02/24/22 also admitted that with respect to margins on hardware: "*we have a pretty thorough process*…that we

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC
4884-3219-7509.v2

- 109 -

1  go through on any large deals.  Our sales team has a threshold, *If it goes below, that they've got*
2  *to come to me and Bill [Bush], and then we decide what we want to do*."  Further, Defendant
3  Carrington added that the margin review and approval process was not only "a very tight process"
4  but that it "goes on, on a weekly basis and as needed if its more than weekly.  So we're all over
5  it . . . ."

6     325.    As such, it is reasonable to infer that Defendants Carrington, Bush, Johnson, Patel,
7  Russo, and Ho were informed through Salesforce, sales meetings, Stem's supply chain, as well as
8  their weekly monitoring of FTM projects and approval process on hardware margins, of the non-
9  public adverse information alleged herein.

10     **F.     The Core Operation Inference Adds to the Inference of Scienter**

11     326.    The Fraud Defendants knew of the material adverse information alleged herein
12  because Stem's business model was key to the Company's path to grow and profitability.

13     327.    Stem, a small company comprised of approximately 143 employees at the beginning
14  of the Class Period, did not manufacture its own batteries.  Rather, it resold them.  As such, the key
15  to Stem's success as purportedly a software company was its Athena product.  Indeed, 37 of the
16  Company's 143 employees at the time of the IPO were devoted to designing, developing,
17  integrating, and testing Athena.

18     328.    The Fraud Defendants consistently touted that *"the key to our growth and success*
19  *is really this Athena software platform*."[27]  The Fraud Defendants similarly emphasized that
20  Athena was *driving Stem's "continued momentum in growing share of the FTM market"* and
21  "compelling margins and long-term recurring software revenue."[28]

22     329.    For example, in Stem's 12/04/20 presentation, Defendant Carrington described
23  Athena as powering everything that Stem does:

24     **Nicole Petallides**

25     So, those are the logistics of how this is going to take place, right?  It goes into the
       first quarter of 2021.  So, you are creating what would be the first public pure play
26     smart energy storage company.  What does that mean?

27

28  ─────────────
   [27] 06/09/21, Stem Cowen's Sustainability and Energy Transition Summit Investor Call
   [28] 08/11/21 Stem's Q2 2021 Earnings Call.
   CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
   SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 110 -
   4884-3219-7509.v2

1    **John Carrington**

2    Yeah.  So, we provide clean energy battery solutions that allow our customers to
3    reduce energy costs, reduce carbon emissions, and provide greater reliability for the
     grid.  *All of that is operated by our proprietary AI-driven software platform we*
4    *call Athena.  So, it's really about the software, and we like to think of it as, the*
     *Athena software creates the superintelligence that drives these large lithium-ion*
5    *batteries.*

6    **Nicole Petallides**

7    So, when you talk about what's going on here, this is a cleaner environment, you're
     telling me about solar.  This is to close in the first quarter of next year, *Athena*
8    *seems to be main, you know, project here*.  This goes forward, how do you expand?
     What are some of the projects on the horizon and goals going forward?[29]

9    330.    The Fraud Defendants also repeatedly represented that Athena had a "100% attach

10   rate," meaning that it was a service included in each prospective FTM project in the Company's

11   pipeline and in each booking.  For instance, during Stem's 02/24/22 Q4 2022 earnings call,

12   Defendant Bush emphasized that "long-term software revenue is the backbone of the backlog and

13   represents approximately 40% of the total booking. . . ."   Defendant Bush reiterated this point

14   throughout the Class Period, for instance on Stem's 02/16/23 Q4 2023 earnings call, Bush stated

15   that "40% of the total economic value of the system" related to software and that Stem though

16   "software and services is definitely going to be a bigger part of the business."

17   331.    Given the importance of Athena to Stem, a self-proclaimed "global leader in *AI-*

18   *driven* clean energy solutions and services," it is reasonable to infer that the Fraud Defendants knew

19   of adverse facts related to Athena's lack of automation for FTM projects.

20          **G.      That the Individual Fraud Defendants Spoke Knowingly on Topics
                      Adds to the Inference of Scienter**
21

22   332.    Throughout the Class Period, during Stem's earnings calls, analysts also regularly

23   asked questions concerning Stem's FTM business, including Stem's pipeline, bookings, and

     backlog.  The Individual Defendants did not demur or claim ignorance of these matters.  Rather,
24
     Defendants Bush and Carrington repeatedly provided detailed answers to these questions,
25

26

27
     _____
28   [29] 12/04/20, Investor Presentation.

1    indicating their personal knowledge on the subjects, and frequently discussed their own knowledge

2    and understanding of these issues.

3    333.    For example, during the 11/09/21 Q3 2021 earnings call, Defendant Carrington

4    provided the specific amount of FTM projects that were purportedly in Stem's pipeline:

**Maheep Mandloi**
*Crédit Suisse AG, Research Division - Associate*

Got it.  No, that makes sense.  And just one last one for me and then I'll just hop back in the queue here.  ***If you could just talk about the split of, in the bookings, the share of behind the meter and front of the meter and how much is hardware versus software?***

**John E. Carrington**
*Stem, Inc. - CEO & Director*

Yes.  ***From a booking standpoint, 80% of our bookings in the third quarter were front of the meter***.  And Texas was a large part of our pipeline expansion, particularly around front of the meter.  ***The pipeline as we go forward looks to be about 75% front of meter***.  And so we feel like we're making great progress on that front and getting into new geographies.  The second part of the question you had on that was software.

14    334.    Likewise, during the 02/24/22 Q4/FY 2021, 05/05/22 Q1 2022, and 08/04/22 Q2

15    2022 earnings calls, Defendant Carrington quantified, in detail, Stem's purported total bookings,

16    the portion of that related to software sales, and the portion of Stem's sales that were purportedly

17    FTM:

### February 24, 2022 Q4/FY 2021 Earnings Call

**John E. Carrington**
*Stem, Inc.  – CEO & Director*

I think in the opening remarks Bill mentioned -- as Bill mentioned, Brian, I think ***it's important to underscript that the $1 billion of bookings does represent $400 million of software total contracted value***.  So there's just exciting leverage around the hardware piece, even if that gross margin is somewhat minimal.  And as Bill mentioned, we've focused or we've actually modeled the decline in margins around the hardware piece and much more of a software lift, which we continue to see.

### May 5, 2022 Q1 2022 Earnings Call

**David Christian Peters**
*Wolfe Research, LLC  – Research Analyst*

The other question I had was just related to that.  Last I heard from you guys the bookings target for '22 sounded like it could be on the conservative side.  And Q1 booking certainly looks strong as well, ahead of your 20% target.  This was obviously before the DOC's investigation.  So maybe you could just talk to any

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                      - 112 -

updated thoughts there.  And has there been a shift at all in FTM versus BTM as a result of all this?

**John E. Carrington**
*Stem, Inc. – CEO & Director*

Yes.  David, John Carrington here.  ***On the bookings front, we did $151 million, and again, that's nearly triple the same quarter of 2021.  The mix is 90% FTM and 10% BTM.***  As you might recall, the fourth quarter was 95%, 5%.  ***You know, from a pipeline standpoint, we're running about a little over 80% front of the meter with a 12-month pipeline of around $5.2 billion.  And that's a record, so we feel very strong about that.***  It's really indicative of a couple of markets like Texas and California that have continued to see acceleration.

**August 4, 2022 Q2 2022 Earnings Call**

**Biju Z. Perincheril**
*Susquehanna Financial Group, LLLP, Research Division  – Analyst*

And then maybe can you add a little bit more color on the bookings this quarter was a nice, pleasant surprise with all the headwinds the sector has been facing.  But the bookings, are they mostly stand-alone storage?  Or is it because behind the meter projects were not as impacted by the supply chain constraints?

**John E. Carrington**
*Stem, Inc. – CEO & Director*

Yes.  I mean I appreciate the comment on the bookings.  ***We're really excited about it as well, as we mentioned, $226 million.  That's 50% quarter-over-quarter growth and 400% year-over-year.  So the demand on the ground continues to be extremely strong.  From a mix standpoint, 91% FTM, 9% BTM.***  We do believe that BTM will increase.

335.    In addition, Defendants Carrington, Bush, Johnson, and Ho all specifically spoke to investors regarding the automated nature of Athena.  *See* Exhibit C, Statement Nos. 70, 85, 89, 95, and 105-108.  Moreover Defendants Carrington and Bush repeatedly represented to investors that Athena was the key to Stem's success.  *See* Exhibit B, Statement Nos. 35, 45, 46, 48, 51, 57, 61, and 64.  Defendants Bush and Carrington also repeatedly spoke on the topic of Stem's "gross margins."  *See* Exhibit B, Statement Nos. 34-37, 42-44, 48-49, 52-54, 60 and 62.  By speaking on these topics, each of these Defendants is presumed to have been knowledgeable on the topic they spoke, including the adverse information alleged herein.  Further, if the aforementioned Defendants did not possess such knowledge, then they were deliberately reckless in speaking on those topics without first informing themselves about the true nature of Stem's business model and Athena.

336.    As alleged herein, the Fraud Defendants made similar detailed statements concerning Stem's pipeline, bookings, software, and FTM sales during the 01/06/22 and 01/05/23 Goldman Sachs' conferences and in Stem's 11/03/22 Q3 2022 and 02/16/23 earnings calls. Defendants Carrington's and Bush's numerous, detailed discussions with analysts and investors regarding Stem's FTM pipeline, bookings, margins, and Athena's ability to thrive with complex FTM projects are probative of their knowledge of those subjects and support a strong inference of scienter.

### H.    The Individual Fraud Defendants Knew Stem's Internal Controls Were Ineffective

337.    The Individual Fraud Defendants' own admission that Stem's internal controls over financial reporting were inadequate further supports a strong inference of scienter. From as early as December 2019 and continuing through December 2022, Defendants repeatedly admitted that Stem lacked effective internal controls over its financial reporting.

338.    Starting on 08/31/20, Star Peak conducted thorough due diligence on Stem. Star Peak sent Stem a detailed due diligence request list, including financial items, competitive dynamics, business operations, and end markets. Stem exchanged due diligence materials, including in the areas of legal, financial, market, information technology, software, tax, insurance, employee benefits and industry trends throughout the months of October and November 2020. By December 2020, Star Peak was preparing to finalize the business combination with Stem.

339.    On 12/16/20, Star Peak issued a Registration Statement disclosing certain risk factors, one of which was that Stem had "multiple control deficiencies aggregating to a material weakness over ineffective control activities," relating to: "(i) ineffective internal controls over accounting for complex and significant transactions, (ii) accounting for energy storage systems, deferred cost of goods sold and inventory, (iii) review of the Company's unaudited condensed consolidated financial statements and related disclosures and (iv) a lack of formality in our internal control activities, especially related to management review-type controls."[30]    Stem further

---

[30]    Stem further explained that the "lack of formality" meant that Stem "did not sufficiently establish formal policies and procedures to design effective controls, establish responsibilities to

admitted that it did not properly track inflows and outflows of the energy storage systems, including the valuation of energy storage systems.

340.    Then, in Star Peak's 03/15/21 third amendment to its registration statement, issued just three months later, the Fraud Defendants disclosed two additional material weaknesses: "(v) ineffective internal controls over the review of certain revenue recognition calculations, and (vi) ineffective internal controls over the review of internal-use capitalized software calculations." Defendants continued to report through the third quarter-ended 09/30/22 that Stem's internal controls were deficient.

341.    The Fraud Defendants' own admissions create a strong inference that they either knew, and/or recklessly disregarded, and/or acted with deliberate recklessness that their statements concerning Stem's business model pipeline, bookings and financial strength throughout the Class Period were false when made due to Stem's lack of effective internal controls over its financial reporting.

**I.    The Individual Fraud Defendants' Violations of Stem's Own Internal Policies Support a Strong Inference of Scienter**

342.    Throughout the Class Period, the Individual Fraud Defendants violated Stem's own internal corporate policies and guidelines by making the material misstatements and omissions alleged herein concerning Stem's business model, the capabilities of Stem's Athena software and Stem's ability to drive gross margins.  The Individual Fraud Defendants' violations of Stem's internal Company policies support a strong inference of scienter.

343.    First, according to Stem's "Code of Conduct," which applies to "each director, officer and employee" of the Company, all individuals are expected to "conduct themselves with the highest degree of honesty and integrity at all times."  The "Company Disclosure Obligations" section of the Code of Conduct required the Individual Fraud Defendants to provide complete and accurate public disclosures to investors:

> As a public company, we are committed to abiding by our disclosure obligations in a full, fair, accurate, timely, and understandable manner.  Only with reliable records

execute these policies and procedures and hold individuals accountable for performance of these responsibilities."

and clear disclosure procedures can we make informed and responsible business decisions.  When disclosing information to the public, it is our policy to provide consistent and accurate information.

344.    Thus, the Individual Fraud Defendants violated Stem's internal policies by issuing materially false and misleading statements, as detailed herein, that were both inaccurate and incomplete.

345.    Second, the "Inside Information" section of the Code of Conduct strictly prohibits insider trading based on material non-public information, providing that:

> While at the Company, you may also come into contact with another form of information that requires special handling and discretion.  Inside information is material, nonpublic information about the Company or another company that, if made public, would be reasonably expected to affect the price of a company's securities or investment decisions regarding the purchase or sale of such securities. Employees must never use inside information to obtain any type of personal advantage, and should not disclose inside information to any third parties without the prior approval of senior management.  For further discussion on our policy with respect to inside information, please review our Insider Trading Policy and Guidelines for Public Disclosures and Communications with the Investment Community, which are incorporated herein by reference.

*        *        *

> Directors, officers, and employees should avoid activities that create or give the appearance of a conflict of interest between their personal interests and the Company's interests.  A conflict of interest exists when a personal interest or activity of a director officer or employee could influence or interfere with that person's performance of duties, responsibilities, or commitments to the Company. A conflict of interest also exists when a director, officer or employee (or member of his or her family) receives an improper personal benefit as a result of his or her position at the Company.

346.    Yet in violation of this policy, Defendants Bush, Carrington, Daley, Johnson, Patel, Russo, and other Stem insiders engaged in extensive insider trading while in possession of material non-public information in which they collectively, personally profited to the tune of over $41 million.  *See* Count V, *infra*.

347.    The Individual Fraud Defendants' violations of the above financial reporting and insider trading policies also constitute violations of Stem's policy for "Compliance with Laws, Rules and Regulations," which provides:

> Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success.  All employees, officers and directors must respect and obey the laws of

the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.

348.     Moreover, "[a]ny director, officer or employee who obtains information about a Code violation or illegal act has the responsibility to report the matter immediately" in the manner specified in the Code of Conduct.[31]  By perpetuating and allowing the alleged misconduct to occur throughout the Class Period and failing to report it, the Individual Fraud Defendants also violated Stem's policies concerning reporting requirements for known misconduct.

349.     Third, the Individual Fraud Defendants also violated their own Audit Committee Charter, which lays out the policies and procedures relating to oversight of Stem's financial statements and related disclosures.  Defendant Morgan served on the Audit Committee in 2021. Defendant Daley served on the Audit Committee in 2022 and 2023. The Audit Committee Charter provides, in pertinent part:

The purpose of the Audit Committee, as stated in the charter, is to, "at minimum":

- represent and act on behalf of the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with ethical, legal and regulatory requirements; (c) the outside auditor's qualifications and independence and (d) the performance of the Company's internal audit function and outside auditor; and

- oversee the preparation of the report of the Committee required by SEC Rules to be included in the Company's annual proxy statement.

350.     According to the Audit Committee Charter, management was required to report to members of the Committee, and the Committee must "review and discuss with management the adequacy of the Company's controls and procedures," as well as "earnings, press releases, financial information, and earnings guidance provided to analysts and ratings agencies."  The Audit Committee was required to meet at least quarterly, and annually "obtain and review a report by the outside auditor describing (1) the outside auditor's internal quality control procedures and

---

[31]  Stem's          Employee          Code          of          Conduct,          §II, https://s27.q4cdn.com/138752898/files/doc_downloads/gov/Employee-Code-of-Conduct.pdf (May 26, 2021).

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC
4884-3219-7509.v2

- 117 -

1    (2) any material issues raised by the most recent internal quality control review . . . and any steps

2    taken to deal with any such issues."

3         351.    The Individual Fraud Defendants violated the policies in the Audit Committee

4    Charter by knowingly or recklessly failing to report Stem's material misstatements to the Audit

5    Committee, and/or the Audit Committee members were complacent or ignored such violations in

6    allowing Stem to issue the material misstatements alleged herein.

7         352.    Fourth, in violation of the Code of Conduct, Audit Committee Charter, and Stem's

8    Governance Guidelines, the Individual Fraud Defendants conducted little, if any, oversight of the

9    alleged scheme to issue materially false and misleading statements to the public and to facilitate

10   and disguise the Fraud Defendants' violations of law, including but not limited to violations of

11   §§10(b) and 14(a) of the Exchange Act.

12        353.    Finally, CW2 indicated that it was Stem's policy that a purchase order was

13   necessary (*i.e.*, the trigger) for Stem to actually purchase hardware in relation to a particular

14   project.  Thus, the Fraud Defendants violated Stem's internal policies when the Company

15   purchased hardware for the Available Power deal without a purchase order. A practice that was

16   not uncommon according to CW2.

17        354.    Defendants' systemic departures from Stem's internal policies throughout the Class

18   Period support a strong inference of scienter.

19   **IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR DOCTRINE AND**
     **BESPEAKS CAUTION DOCTRINE**

20

21        355.    The statements alleged herein to be false and misleading are not subject to the

     protections of the Private Securities Litigation Reform Act's ("PSLRA") statutory safe harbor for
22

     forward-looking statements nor the bespeaks caution doctrine, because they are either: (a) not
23

     forward looking; (b) subject to exclusion; or (c) not identified as forward looking or accompanied
24

     by meaningful cautionary language.
25

26        356.    Under the PSLRA's statutory safe harbor for written statements, a forward-looking

27   statement is protected if it is: (a) identified as such; ***and*** (b) accompanied by ***meaningful***

     cautionary language.  15 U.S.C. §78u-5(c)(1)(A)(i).
28

357.    For oral statements, an oral forward-looking statement must be: (a) accompanied by a cautionary statement that it is forward looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document; (b) the oral statement must identify the written document, or portion thereof that contains such facto; and (c) the referenced written documents must contain meaningful cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

358.    The safe harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 USC §78u-5(b)(2)(A).

359.    The bespeaks doctrine requires a "stringent showing" that sufficient cautionary or risk disclosure is included in any forward-looking statement such "that reasonable minds could not disagree that the challenged statements were not misleading."  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (alteration and internal quotation marks omitted).

360.    Statements of historical fact, current condition, or a mixture thereof are not "forward looking" and thus not protected by the safe harbor.  Nor are Defendants' omissions of historical fact protected by the safe harbor.  The false statements alleged herein are actionable and the safe harbor does not apply because they are statements of current or historical fact or omitted historical facts including, *inter alia*:

- (12/4/20 release) "Athena™ AI-driven software leads to strong operating leverage with low expected capital intensity."

- (3/20/21)  "Stem's technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption . . . ."

- (3/20/21)  "Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, including the perception that our technology is unproven . . . ."

- (3/30/21)  "[T]he occurrence of any defects, errors, disruptions in service, or other performance problems, interruptions, or delays with our energy storage systems or the Athena platform, whether in connection with day-to-day operations or

otherwise, could result in . . . delayed market acceptance and sales of our hardware and software-enabled services."

361.    Neither the safe harbor nor the bespeaks caution doctrine apply to Defendants' statements or omissions of current or historical fact.  For instance, Defendants' omissions regarding the loss of the Available Power deal are not subject to the safe harbor at any time starting no later than May 2022, because at that time, the Defendants were aware that Available Power had failed to execute any purchase orders pursuant to the letter of intent.  For the same reasons, the false statements alleged herein regarding Stem's success in the FTM segment and growing pipeline are actionable because they omitted the loss of the Available Power deal starting no later than May 2022, including, *inter alia*, Defendant Carrington's statements on 09/28/22 at the Investor and Analyst Day: "And then finally, on the front-of-the-meter side, this is a market, as I mentioned, that we really continue to have great success . . . ."

362.    To the extent that the misrepresentations alleged are forward looking, they are still actionable.  Defendants knew at the time they spoke or failed to speak fully that each of their forward-looking false and misleading statements was materially false and misleading.  Defendants' false and misleading forward-looking statements were authorized or approved by a controlling person, who knew that the forward-looking statements were false when made.  The forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  And the safe harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.  *See* 15 U.S.C. §78u-5(c)(1)(A)(i).

363.    For example, no safe harbor applies to Defendants' statements contained in the Company's quarterly and annual filings, because those statements omitted then-existing facts and were knowingly false when issued.  Legislative history on the safe harbor clearly specifies that "[a] cautionary statement that misstates historical facts[, however] is not covered by the Safe harbor" (H.R. Conf. Rep. No. 104-369, at 44 (1995), as reprinted in 1995 U.S.C.C.A.N. 730, 743).

364.    Close examination of other purportedly cautionary language contained in the quarterly and annual filings (summarized below) shows that this language was inadequate because Defendants knew the these risks they warned of had already materialized, *e.g.*:

- (08/11/21 Form 10-Q; 11/10/21 Form 10-Q; 02/28/22 Form 10-K; 05/05/22 Form 10-Q; 08/04/22 Form 10-Q; 11/03/22 Form 10-Q; 02/16/23 Form 10-K) "Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition."

- (02/28/22 Form 10-K; 02/16/23 Form 10-K) "The distributed generation industry is emerging and our distributed generation offerings may not receive widespread market acceptance."

- (02/28/22 Form 10-K; 02/16/23 Form 10-K) "If we are unsuccessful in developing and maintaining our proprietary technology, including our Athena platform, our ability to attract and retain partners could be impaired, our competitive position could be adversely affected and our revenue could be reduced."

365.    Stem's purported cautionary language was inadequate to insulate Defendants' false statements under the statutory safe harbor because each of the disclosures was also vague and included boilerplate language that remained unchanged throughout the Class Period.  For example, warning that the Company's "business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations" which could affect the Company's results could apply to nearly any company.  Similarly, warning that the market may "develop[] more slowly than we anticipate, our business may be adversely affected" also applies to virtually any company.  The language is so vague as to be meaningless, particularly in light of Defendants' knowledge of adverse historical facts regarding Stem's software offering and their ability to sell the undeveloped Athena software in the FTM sector.  Likewise, the boilerplate warnings that Stem's technology "could have undetected defects, errors or bugs in hardware or software" could have applied to any of Stem's competitors.  Rather than meaningful, the risk warnings were misleading because the Company was already experiencing the failure to

1    create real growth in the FTM market as a result of its nonviable Athena software. None of Stem's

2    purported risk disclosures were meaningful because they failed to warn investors of the known

3    risks that materialized during the Class Period, including, *inter alia*, that its high margin Athena

4    software was not viable for FTM deals, its low conversion rate of pipeline into meaningful revenue,

5    and its loss of the Available Power deal.

6    366.    Further, no safe harbor applies to the oral statements made by Defendants that did

7    not include any cautionary statements that identified the statements as forward looking nor that

8    actual results may differ materially and that additional information concerning risk factors is

9    contained in a readily available written document, such as, for example, Defendant Carrington's

10    statements in the FGain YouTube video on 05/31/21 state that what "Athena does is it's analyzing

11    these large data sets and making real time decisions that ***automatically respond to changing***

12    ***conditions in the energy market***."

13    ## X.  PRESUMPTION OF RELIANCE

14    367.    The market for Stem securities was open, well-developed, and efficient at all

15    relevant times. As a result of the Defendants' materially false or misleading statements and

16    material omissions, the Company's common stock traded at artificially inflated prices during the

17    Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the

18    Company's securities relying on the integrity of the market price of such securities and on publicly

19    available market information relating to Stem. Plaintiffs and Class members have been damaged

20    thereby.

21    368.    During the Class Period, the artificial inflation of the value of Stem securities was

22    caused by the material misrepresentations and omissions alleged in this Complaint,[32] thereby

23    causing the damages sustained by Plaintiffs and other Class members. As alleged herein, during

24    the Class Period, Defendants made or caused to be made a series of materially false or misleading

25    statements about the Company's business, prospects, and operations, causing the price of the

26    Company's common stock to be artificially inflated at all relevant times. When the truth was

27    

28    [32] And as to Count III, Defendants scheme.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                          - 122 -
4884-3219-7509.v2

1  disclosed, it drove down the value of the Company's securities, causing Plaintiffs and other Class

2  members that had purchased the securities at artificially inflated prices to be damaged as a result.

3      369.    At all relevant times, the market for Stem common stock was an efficient market

4  for the following reasons, among others:

5      (a)    Stem common stock met the requirements for listing, and was listed and

6             actively traded on the NYSE, a highly efficient, electronic stock market;

7      (b)    as a regulated issuer, Stem filed periodic public reports with the SEC and

8             the NYSE;

9      (c)    Stem regularly communicated with public investors via established market

10            communication mechanisms, including regular disseminations of press

11            releases on the national circuits of major newswire services and other wide-

12            ranging public disclosures, such as communications with the financial press

13            and other similar reporting services; and

14      (d)    Stem was followed by securities analysts employed by major brokerage

15            firms who wrote reports that were distributed to the sales force and certain

16            customers of their respective brokerage firms.  Each of these reports was

17            publicly available and entered the public marketplace.

18      370.    Based on the foregoing, during the Class Period, the market for Stem securities

19  promptly digested information regarding the Company from all publicly available sources and

20  impounded such information into the price of Stem securities.  Under these circumstances, the

21  market for Stem securities was efficient during the Class Period and, therefore, investors'

22  purchases of Stem securities at artificially inflated market prices give rise to a class-wide

23  presumption of reliance under the fraud-on-the-market doctrine.

24      371.    In the alternative, the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

25  (1972) presumption of reliance applies to the extent that Defendants' statements during the Class

26  Period involved omissions of material facts.  These omissions concealed, among other things, and

27  as alleged more fully above, that Stem's business model was deficient, Athena software was not

28

1  viable for the FTM market, and that Stem's pipeline was inflated because it included unrealistic

2  potential "deals."

3  **XI.    CLASS ACTION ALLEGATIONS**

4  372.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

5  Procedure 23(a) and (b)(3) on behalf of:

6          (a)    the Section 10(b) Class: all purchasers of Stem securities during the Class

7                  Period (the "Section 10(b) Class"); and

8          (b)    the Section 14(a) Class: all persons who were solicited to approve the

9                  merger of Stem and Star Peak and who exchanged publicly listed Star Peak

10                  shares for Stem Class A common stock rather than redeeming the same

11                  pursuant to the Defective Prospectus (the "Section 14(a) Class" and

12                  collectively with the Section 10(b) Class, "the Class").

13  Excluded from the Class are Defendants and their families, the officers and directors of the

14  Company, at all relevant times, members of their immediate families and their legal

15  representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a

16  controlling interest.

17  373.    The members of the Class are so numerous that joinder of all members is

18  impracticable.  Throughout the Class Period, Stem common stock was actively traded on the

19  NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, and can

20  only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of

21  thousands of members in the proposed Class.  Record owners and other members of the Class may

22  be identified from records maintained by Stem and/or its transfer agent and may be notified of the

23  pendency of this action by mail, using the form of notice similar to that customarily used in

24  securities class actions.

25  374.    Plaintiffs' claims are typical of the claims of the members of the Class as all

26  members of the Class are similarly affected by Defendants' wrongful conduct in violation of

27  federal law that is complained of herein.

28

375. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel who are competent and experienced in class action securities litigation.

376. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether the Exchange Act was violated by Defendants, as alleged herein;

      (b)    whether the statements made were materially false and misleading, or omitted material facts;

      (c)    as to the Section 10(b) Class, whether the Fraud Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

      (d)    whether the prices of Stem's securities during the Class Period were artificially inflated because of Defendants' conducted complained of herein; and

      (e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

377. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a Class action.

## COUNT I

### Violation of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9
### Against the 14(a) Defendants

378. Plaintiffs restate and reallege ¶¶7-154, ¶¶229-279, and ¶¶355-377 as though fully set forth herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any

allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is solely based on negligence.

379.    This Count is asserted pursuant to §14(a) of the Exchange Act, 15 U.S.C. §78n, and SEC Rule 14a-9 promulgated thereunder, against the 14(a) Defendants.

380.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

381.    Defendant Scheyer signed the cover letter for the Defective Prospectus.

382.    The Defective Prospectus was issued "By Order of the [Star Peak] Board of Directors" and signed by Defendant Morgan.  Star Peak also issued the Defective Prospectus "to its stockholders as part of the solicitation of proxies by the board of directors."  Moreover, the 14(a) Defendants permitted the use of their names by, among other things, allowing the Defective Prospectus to represent they recommended business combination (*see* ¶¶17, 28, and 30-34).

383.    The 14(a) Defendants also prepared, reviewed, and disseminated the Defective Prospectus and Defective Investor Materials, which as specified above, made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

384.    By virtue of their positions within the pre-Merger Company and their due diligence regarding Stem and the Merger, the 14(a) Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Prospectus and Defective Investor Materials.  The Defective Prospectus and Defective Investor Materials were prepared, reviewed, and/or disseminated by the 14(a) Defendants named herein

1  and misrepresented and/or omitted material facts, as detailed above. The 14(a) Defendants were

2  at least negligent in filing the Defective Prospectus and Defective Investor Materials with these

3  materially false and misleading statements.

4  385.  As a direct result of the 14(a) Defendants' negligent preparation, review, and

5  dissemination of the Defective Prospectus and Defective Investor Materials, members of the

6  Section 14(a) Class were induced to vote their shares and accept inadequate consideration in

7  connection with the Merger. The Defective Prospectus and Defective Investor Materials used to

8  obtain shareholder approval of the Merger deprived Section 14(a) Class members of their right to

9  a fully informed shareholder vote in connection therewith, and deprived them of their right to the

10  information necessary to make an informed redemption decision. At all times relevant to the

11  dissemination of the Defective Prospectus and Defective Investor Materials, these Defendants

12  were aware of and/or had access to the true facts concerning Stem. Thus, as a direct and proximate

13  result of the dissemination of the Defective Prospectus and Defective Investor Materials that the

14  Section 14(a) Defendants used to obtain shareholder approval of and thereby consummate the

15  Merger, the Section 14(a) Class suffered damages and actual economic losses in an amount to be

16  determined at trial.

17  386.  The omissions and false and misleading statements in the Defective Prospectus and

18  Defective Investor Materials were material in that a reasonable stockholder would have considered

19  them important in deciding how to vote on the Merger. In addition, a reasonable investor would

20  view a full and accurate disclosure as significantly altering the "total mix" of information made

21  available in the Defective Prospectus and Defective Investor Materials and in other information

22  reasonably available to stockholders.

23  387.  As stated herein, the Defective Prospectus contained untrue statements of material

24  fact and omitted to state material facts necessary to make the statements made not misleading in

25  violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. It was an

26  essential link in the consummation of the Merger and described itself as the sole source of

27  information investors were to rely upon in making the Merger vote and redemption decisions. The

28  14(a) Defendants failed to correct the Defective Prospectus and Defective Investor Materials prior

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 127 -

1   to the merger vote or redemption deadline, and the failure to update and correct false statements is

2   also a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

3       388.    By reason of the foregoing, the 14(a) Defendants have violated §14(a) of the

4   Exchange Act and Rule 14a-9(a) promulgated thereunder.

5                                    **COUNT II**

6                     **For Violation of §20(a) of the Exchange Act**
                      **Against the 14(a) Individual Defendants**
7

8       389.    Plaintiffs restate and reallege ¶¶7-154, ¶¶229-279, and ¶¶355-377 as if fully set

9   forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation

    that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This
10
    claim is based solely in negligence.
11

12      390.    As alleged above, the 14(a) Defendants violated §14(a) of the Exchange Act by

13  their acts and omissions as alleged in this Complaint.

14      391.    The 14(a) Individual Defendants acted as controlling persons within the meaning

15  of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their high-level positions,

16  participation in and or awareness of the Company's operations, direct involvement in the day-to-

    day operations of the Company, and/or intimate knowledge of the Company's actual performance,
17
    and their power to control the Defective Prospectus and Defective Investor Materials, the 14(a)
18
    Individual Defendants had the power to control the information in the Defective Prospectus and
19
    Defective Investor Materials.  By reason of such conduct, the 14(a) Individual Defendants are each
20
    liable pursuant to Section 20(a) of the Exchange Act.
21

22      392.    Plaintiffs and Class members eligible to vote on the merger were denied the

23  opportunity to make an informed decision in voting on the merger and were damaged as a direct

    and proximate cause of the untrue statements and omissions in the Defective Prospectus, and other
24
    solicitations described herein.  Plaintiffs and the other members of the Section 14(a) Class suffered
25
    damages as described in ¶¶12-13, ¶¶153-154 and ¶¶229-279, a direct and proximate result of the
26
    14(a) Defendants' negligent conduct
27

28
    CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
    SECURITIES LAWS - 3:23-cv-02329-MMC                                      - 128 -

393.    By reason of such conduct, the 14(a) Defendants violated §20(a) of the Exchange Act.

## COUNT III

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
**Against the Fraud Defendants**

394.    Plaintiffs repeat and reallege each and every allegation detailed above as if fully set forth herein.

395.    This claim is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b) and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against the Fraud Defendants.[33]

396.    During the Class Period, the Fraud Defendants named herein employed a scheme to defraud investors and disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

397.    The Fraud Defendants knowingly and with deliberate recklessness made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, thereby inflating the price of Stem securities during the Class Period.

398.    In addition, the Fraud Defendants: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Stem securities during the Class Period.

399.    Plaintiffs and the Section 10(b) Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Stem securities.  Plaintiffs and the Section 10(b) Class would not have purchased Stem securities at the prices they paid, or at all,

---

[33]    With respect to Defendant Russo, for Count III, Plaintiffs only allege violations of Section 10(b) the Exchange Act and SEC Rules 10b-5 (a) and (c) promulgated thereunder.

if they had been aware that the market prices had been artificially and falsely inflated by the Fraud Defendants' misleading statements and fraudulent scheme.

400.    As a direct and proximate result of the aforementioned Defendants' wrongful conduct, Plaintiffs and the other members of the Section 10(b) Class suffered damages in connection with their purchases of Stem securities during the Class Period.

**COUNT IV**

**For Violation of §20(a) Of The Exchange Act**
**Against the Individual Fraud Defendants**

401.    Plaintiffs repeat and reallege each and every allegation detailed above as if fully set forth herein.

402.    The Individual Fraud Defendants acted as controlling persons of Stem within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78(t)(a).

403.    As alleged above, Defendants each violated §10(b) of the Exchange Act and SEC Rule 10(b)(5) by their acts or omissions as alleged in this Complaint.

404.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Stem during the Class Period, the Individual Fraud Defendants had the power and ability to control the actions of each other and the Company's employees.  By reason of such conduct the Individual Fraud Defendants are each liable pursuant to §20(a) of the Exchange Act.  The Individual Fraud Defendants had the power and authority to, and did, cause Stem to engage in the wrongful conduct alleged.

405.    As a direct and proximate result of the Individual Fraud Defendants' wrongful conduct, Plaintiffs and the other members of the Section 10(b) Class suffered damages in connection with their purchases of Stem common stock during the Class Period.

406.    By reason of such conduct, the Individual Fraud Defendants named herein are liable pursuant to §20(a) of the Exchange Act.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 130 -

1

**COUNT V**

2

**For Violation of §20A of the Exchange Act Against**
**Defendants Bush, Carrington, Daley, Johnson, and Russo for Insider Selling**

3

407.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully

4

set forth herein.

5

408.    This Count is brought pursuant to §20A of the Exchange Act against Defendants

6

Bush, Carrington, Daley, Johnson, and Russo.

7

409.    As set forth herein, Defendants Bush, Carrington, Daley, Johnson, and Russo

8

violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by selling shares

9

of Stem stock while in possession of material nonpublic information obtained by reason of their

10

positions as Stem insiders to sell over $27 million in Stem stock during the Class Period.

11

410.    Defendant Bush made the following relevant sales:

12

13

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Bush | 11/16/21 | 12,456 | $24.55 |
| Bush | 11/17/21 | 11,056 | $22.01 |
| Bush | 11/17/21 | 1,400 | $22.69 |
| Bush | 12/1/21 | 4,973 | $20.77 |
| Bush | 12/1/21 | 5,027 | $21.49 |
| Bush | 12/2/21 | 3,000 | $20.34 |
| Bush | 8/15/22 | 60,220 | $16.24 |
| Bush | 8/15/22 | 422 | $16.70 |
| Bush | 8/16/22 | 21,200 | $15.93 |
| Bush | 8/16/22 | 2,383 | $16.62 |

14
15
16
17
18
19
20

411.    Bush's sales were made contemporaneously with the following purchases by

21

Plaintiffs:

22
23

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 11/17/21 | 100 | $23.80 |
| Lawale | 11/17/21 | 900 | $22.56 |
| Lawale | 11/19/21 | 1,000 | $21.86 |
| Lawale | 11/24/21 | 456 | $21.16 |
| Lawale | 12/3/21 | 1000 | $18.35 |
| Lawale | 12/3/21 | 1000 | $17.78 |
| Lawale | 12/3/21 | 1000 | $17.73 |

24
25
26
27
28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                          - 131 -
4884-3219-7509.v2

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Thakkar | 8/19/22 | 4,445 | $14.11 |
| Thakkar | 8/22/22 | 3,911 | $13.77 |
| Thakkar | 8/23/22 | 4,445 | $14.11 |

412.    Defendant Carrington made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Carrington | 11/16/21 | 44,750 | $24.55 |
| Carrington | 11/17/21 | 39,750 | $22.01 |
| Carrington | 11/17/21 | 5,000 | $22.75 |
| Carrington | 12/1/21 | 11,163 | $20.77 |
| Carrington | 12/1/21 | 11,212 | $21.50 |
| Carrington | 12/2/21 | 6,401 | $20.36 |
| Carrington | 6/8/22 | 28,570 | $9.34 |
| Carrington | 6/9/22 | 28,570 | $8.99 |
| Carrington | 8/16/22 | 26,560 | $15.94 |
| Carrington | 8/16/22 | 2,010 | $16.56 |
| Carrington | 8/17/22 | 27,870 | $15.09 |
| Carrington | 8/17/22 | 700 | $15.56 |

413.    Carrington's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 11/17/21 | 100 | $23.80 |
| Lawale | 11/17/21 | 900 | $22.56 |
| Lawale | 11/19/21 | 1,000 | $21.86 |
| Lawale | 11/24/21 | 456 | $21.16 |
| Lawale | 12/3/21 | 1,000 | $18.35 |
| Lawale | 12/3/21 | 1,000 | $17.78 |
| Lawale | 12/3/21 | 1,000 | $17.73 |
| Lawale | 6/15/22 | 1,619 | $6.72 |
| Lawale | 6/15/22 | 1,623 | $6.72 |
| Lawale | 6/15/21 | 2,000 | $6.65 |
| Lawale | 6/15/21 | 2,000 | $6.59 |
| Thakkar | 8/19/22 | 4,445 | $14.11 |
| Thakkar | 8/22/22 | 3,911 | $13.77 |

414.    Defendant Daley made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Daley | 12/1/21 | 100,000 | $21.13 |
| Daley | 12/2/21 | 100,000 | $19.82 |

415.    Daley's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 12/3/21 | 1,000 | $18.35 |
| Lawale | 12/3/21 | 1,000 | $17.78 |
| Lawale | 12/3/21 | 1,000 | $17.73 |

416.    Defendant Johnson made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Johnson | 11/16/21 | 15,000 | $24.55 |
| Johnson | 8/15/22 | 20,000 | $16.38 |
| Johnson | 8/16/22 | 10,000 | $16.09 |

417.    Johnson's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 11/17/21 | 100 | $23.80 |
| Lawale | 11/17/21 | 900 | $22.56 |
| Lawale | 11/19/21 | 1,000 | $21.86 |
| Lawale | 11/24/21 | 456 | $21.16 |
| Thakkar | 8/19/22 | 4,445 | $14.11 |
| Thakkar | 8/22/22 | 3,911 | $13.77 |

418.    Defendant Russo made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Russo | 5/10/22 | 1,564 | $7.32 |

419.    Russo's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 5/11/22 | 1,100 | $6.80 |
| Lawale | 5/11/22 | 5,000 | $6.83 |
| Lawale | 5/11/22 | 5,000 | $6.70 |

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 5/11/22 | 5,000 | $6.73 |
| Lawale | 5/11/22 | 2,500 | $6.70 |
| Lawale | 5/11/22 | 3,000 | $6.65 |

420.    Plaintiffs and members of the class who purchased shares of Stem securities contemporaneously with sales by the foregoing Defendants suffered damages because: (a) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of the Exchange Act, as alleged herein; and (b) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the materially false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    determining that this action is a proper class action, having designated Plaintiffs as Lead Plaintiffs and Plaintiffs' counsel as Lead Counsel;

B.    awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    awarding such equitable/injunctive or other relief (including, but not limited to rescission), as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  October 17, 2023                    ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                                      SHAWN A. WILLIAMS
                                                      WILLOW E. RADCLIFFE
                                                      TAEVA C. SHEFLER

s/ Willow E. Radcliffe

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                                      - 134 -

WILLOW E. RADCLIFFE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
tshefler @rgrdlaw.com

DATED: October 17, 2023           LEVI & KORSINSKY, LLP
                                  SHANNON L. HOPKINS (admitted pro hac vice)


                                          s/ Shannon L. Hopkins
                                  SHANNON L. HOPKINS

                                  1111 Summer Street, Suite 403
                                  Stamford, CT 06905
                                  Telephone: 203/992-5423
                                  212/363-7171 (fax)
                                  shopkins@zlk.com

                                  LEVI & KORSINSKY, LLP
                                  ADAM M. APTON
                                  ADAM C. MCCALL
                                  1160 Battery Street East, Suite 100
                                  San Francisco, CA 94111
                                  Telephone: 415/373-1671
                                  415/484-1294 (fax)
                                  aapton@zlk.com
                                  amccall@zlk.com

                                  Lead Counsel for Lead Plaintiffs

## CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)

I, Willow E. Radcliffe, am the ECF User whose identification and password are being used to file this document. Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of the document has been obtained from each of the other signatories.

Dated: October 17, 2023

                                          s/ Willow E. Radcliffe
                                  WILLOW E. RADCLIFFE

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 135 -
4884-3219-7509.v2

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on October 17, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ WILLOW E. RADCLIFFE
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
Email: willowr@rgrdlaw.com

4884-3219-7509.v2

**Mailing Information for a Case 3:23-cv-02329-MMC In re Stem, Inc. Securities Litigation**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Stefan H Atkinson**
  stefan.atkinson@kirkland.com,kenymanagingclerk@kirkland.com

- **Ahson T. Azmat , I**
  ahson.azmat@kirkland.com

- **Jordan S. Elias**
  jelias@girardsharp.com,5261237420@filings.docketbird.com,avongoetz@girardsharp.com

- **Michael Phillip Esser**
  michael.esser@kirkland.com,adrienne-levin-5018@ecf.pacerpro.com

- **Boris Feldman**
  boris.feldman@freshfields.com,lauren.saffron@freshfields.com,filing_notice@freshfields.com,jonathan.sampson@freshfields.com,6188914420@filings.docketbird.co

- **Jon Bernhard Fougner**
  jon.fougner@freshfields.com,filing_notice@freshfields.com,bryan.soria@freshfields.com,dario.estrabao@freshfields.com,6188914420@filings.docketbird.com

- **Doru Gavril**
  doru.gavril@freshfields.com,filing_notice@freshfields.com,bryan.soria@freshfields.com,6188914420@filings.docketbird.com,anthony.denatale@freshfields.com,shea

- **Shannon L Hopkins**
  shopkins@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **Carl Patrick Hudson**
  carl.hudson@freshfields.com,filing_notice@freshfields.com,6188914420@filings.docketbird.com,vanessa.slater@freshfields

- **David R. Kaplan**
  dkaplan@saxenawhite.com,e-file@saxenawhite.com,lmix@saxenawhite.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kperez@pomlaw.com,ahood@pomlaw.com,tsayre@pomlaw.com,egoodman@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.com,ashr

- **Adam E. Polk**
  apolk@girardsharp.com,avongoetz@girardsharp.com,jelias@girardsharp.com,3768906420@filings.docketbird.com

- **Gregory M Potrepka**
  gpotrepka@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,racosta@rgrdlaw.com,WillowR@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,sbloyd@rgrdlaw.com

- **Pavithra Rajesh**
  prajesh@glancylaw.com,pavithra-rajesh-9402@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Olivia Rosen**
  olivia.rosen@freshfields.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Brian Jared Schall**
  brian@schallfirm.com

- **Taeva Cantor Shefler**
  TShefler@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)