United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT PETERSEN, et al.,<br>Plaintiffs,<br>v.<br>STEM, INC., et al.,<br>Defendants. | Case No. 23-cv-02329-MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT** |

Before the Court is defendants'[1] "Motion to Dismiss Plaintiffs' Consolidated Complaint" ("Defs.' Mot."), filed November 28, 2023, pursuant to Rules 12(b)(6), 8(a), and 9(b) of the Federal Rules of Civil Procedure. On January 16, 2024, plaintiffs filed opposition, to which defendants, on February 6, 2024, replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[2]

## BACKGROUND

For purposes of the instant motion, the Court assumes the following allegations, taken from plaintiffs' Consolidated Complaint ("CC"), are true.

---

[1] Defendants are, in the order listed in the caption, Stem, Inc. ("Stem"), John Carrington ("Carrington"), William Bush ("Bush"), Larsh Johnson ("Johnson"), Prakesh Patel ("Patel"), Alan Russo ("Russo"), Bryan Ho ("Ho"), Star Peak Energy Transition Corp. ("Star Peak"), Eric Scheyer ("Scheyer"), Michael D. Wilds ("Wilds"), Michael C. Morgan ("Morgan"), Adam E. Daley ("Daley"), Alec Litowitz ("Litowitz"), Desirée Rogers ("Rogers"), and C. Park Shaper ("Shaper"). (See Consolidated Complaint ("CC") at ¶¶ 14–34, Doc. No. 87.)

[2] By Order filed March 29, 2024, the Court took the matter under submission. (See Order, Doc. No. 116.)

Star Peak Energy Transition Corp. ("Star Peak") is a special purpose acquisition company ("SPAC"), i.e., a "blank check company with no business operations of its own" (see CC ¶¶ 1, 51), which went public through an IPO completed on August 20, 2020 (see id. ¶ 55).

A SPAC, after "listing [itself] on a public exchange," seeks to "acquire[ ]" a "private company" as a means to take it public. (See id. ¶¶ 51–52.) The SPAC's shareholders must approve the acquisition at a specified price per share in a vote called a "de-SPAC transaction," and, at that time, have the option to "sell [their shares] on the secondary market or have their shares redeemed" at the price specified. (See id. ¶ 52.) After the transaction, the target company "carries on its operations as a public company," and the SPAC dissolves. (See id.; see generally Frank Fagan and Saul Levmore, SPACs, PIPEs, and Common Investors, 25 U. PA. J. BUS. L. 102 (2023) (describing SPAC lifecycle).)

Stem, Inc. ("Stem") is a Delaware corporation that "provide[s] customers with energy storage systems, primarily . . . batteries and related hardware, and software-enabled services to operate those energy storage systems." (See id. ¶¶ 14–15.) Stem's software services include its "Athena" artificial intelligence software, which "purportedly allows its customers to 'automatically' maximize [energy] storage assets." (See id. ¶ 1.) Stem sells its products to two types of customers: "behind-the-meter" (BTM) and "front-of-the-meter" (FTM). (See id. ¶ 61.) BTM customers are typically "individual business[es]" seeking to "reduc[e] energy costs and enhanc[e] energy resiliency," whereas projects for FTM customers are "more complex," in that they "use technology and data analysis to balance supply and demand, manage outages, and maintain the stability and resiliency of the [electrical] grid." (See id. ¶ 72.)

On September 28, 2020, Star Peak chose Stem as its acquisition "target" (see id. ¶ 56), and, on December 3, 2020, the parties signed a merger agreement by which Star Peak agreed to acquire Stem (see id. ¶ 103), after which, on December 17, 2020, Star

United States District Court
Northern District of California

Peak filed a prospectus (hereinafter, the "Challenged Prospectus"). (See id. ¶ 108.)[3]

On April 27, 2021, after the Challenged Prospectus was filed, Star Peak's shareholders approved the merger, and, on April 28, 2021, the companies merged. (See id. ¶ 112). Stem survived "as a wholly owned subsidiary of Star Peak," and Star Peak "renamed itself 'Stem, Inc.' and began operating . . . Stem's business." (See id.) On April 29, 2021, Stem "went public with a closing price of $27.05" per share. (See id. ¶ 1.) As of the filing of the CC on October 17, 2023, the stock was "trad[ing] at approximately $4 per share." (See id.)

Lead plaintiffs Vishal Lawale and Vishale Thakkar held Star Peak shares[4] as of the March 4, 2021, record date, and were "entitled to vote on the [m]erger [between Stem and Star Peak] at the [April 27, 2021] special meeting of shareholders." (See id. ¶¶ 12–13.) They allege that "certain of [Stem's] senior executives and directors . . . engag[ed] in a host of activities that reaffirmed the purported viability" of Stem's "defective business model" and "ma[de] false and misleading statements" in several categories, including statements about said business model, statements about "Stem's success with its Athena software in Massachusetts," which they allege "was not viable for FTM projects," statements about prospective projects in Stem's "pipeline"[5] that "were unrealistic," and statements about "risks to Stem's business." (See id. ¶ 2.)

On behalf of themselves and a putative class "of all persons who purchased Stem securities between" December 4, 2020, and April 3, 2023 (see id.), plaintiffs assert five

---

[3] A prospectus is an "offering document describing the company, the IPO terms and other information that an investor may use when deciding whether to invest." See SEC. & EXCH. COMM'N., Pub. No. 133 (2/13), INVESTOR BULLETIN: INVESTING IN AN IPO.

[4] After the April 27 merger, Star Peak, as noted, re-named itself "Stem, Inc.," and, consequently, individuals who held "Star Peak" shares prior to the merger became "Stem" shareholders on that date. (See CC ¶ 14.)

[5] As alleged in the CC, Stem described its "pipeline metric" as "the total value of uncontracted, potential hardware and software revenue from opportunities currently in process by Stem direct salesforce and channel partners, which had a reasonable likelihood of contract execution within 12 months." (See CC ¶ 80 (emphasis omitted).)



United States District Court
Northern District of California

claims for relief, titled, respectively, (1) "Violation of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9 against the 14(a) Defendants,"[6] (2) "Violation of § 20(a) of the Exchange Act Against the 14(a) Individual Defendants," (3) "Violation of § 10(b) of the Exchange Act and SEC Rule 10b-5 Against the Fraud Defendants,"[7] (4) "Violation of § 20(a) of the Exchange Act Against the Individual Fraud Defendants," and (5) "Violation of the Exchange Act Against Defendants Bush, Carrington, Daley, Johnson, and Russo for Insider Selling." (See CC ¶¶ 378–420.)

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)); see also Fed. R. Civ. P. 8(d)(1) (providing "[e]ach allegation must be simple, concise, and direct"). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See Bell Atlantic Corp., 550 U.S. at 555. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss," however, "a complaint must contain sufficient factual

[6] The 14(a) Defendants are Stem, Star Peak, Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper. (See CC at i.)

[7] The Fraud Defendants are Stem, Star Peak, Bush, Carrington, Daley, Johnson, Morgan, Patel, Russo, Scheyer, and Ho. (See id. at ii.)

United States District Court
Northern District of California

material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," see Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud," see Fed. R. Civ. P. 9(b), specifically, the "who, what, when, where, and how of the misconduct charged," see Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation and citation omitted), and applies to claims based on "misrepresentations" as well as "omissions," see GlenFed Inc. Sec. Litig., 52 F.3d 1541, at 1543, 1548 (9th Cir. 1994).

**DISCUSSION**

By the instant motion, defendants seek dismissal of all claims alleged.

**I. Fraudulent Statements: Section 10(b) and Rule 10(b)-5 Claim**

Plaintiffs allege the Fraud Defendants violated section 10(b) of the Securities and Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 by "disseminat[ing] or approv[ing] materially false and misleading statements . . . which they knew, or were deliberately reckless in not knowing, were misleading." (See CC ¶ 396.)

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 603 (9th Cir. 2014).

Allegations of fraud must also "satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act of 1995 ('PSLRA')]." See Zucco Partners, LLC v. Digimarc Co., 552 F.3d 981, 990 (9th Cir. 2009). Plaintiffs must, under Rule 9(b), "state with particularity the circumstances constituting

fraud," see Fed. R. Civ. P. 9(b), and, must, under the PSLRA, "specify each statement alleged to have been misleading," specify "the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." See 15 U.S.C. §§ 78u-4(b)(1)–(2).

Here, defendants contend plaintiffs' claims for fraudulent statements under section 10(b) are subject to dismissal for failure to state a claim because, according to defendants, plaintiffs have "engaged in impermissible puzzle pleading," have "fail[ed] to plead any materially false or misleading statements," have "fail[ed] to show any statements were made with scienter," and did not "plead loss causation." (See Defs.' Mot. to Dismiss ("Defs.' Mot.") at 4:6–9, 15:10, 24:14–15, Doc. No. 104.)

**A. Puzzle Pleading**

The PSLRA "has exacting requirements for pleading falsity." See Metzler Inv. GMBH v. Corinthian Colleges, 540 F.3d 1049, 1070 (9th Cir. 2008). "A litany of alleged false statements, unaccompanied by pleadings of specific facts indicating why those statement[s] were false, does not meet [the PSLRA's] standard." See id. at 1070. A "puzzle pleading" is one that "recite[s] lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading." See Tarapara v. K12 Inc., No. 16-cv-4069-JPH, 2017 WL 3727112, at *9 (N.D. Cal. Aug. 30, 2017). In securities class actions, complaints that "place 'the burden [ ] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting [p]laintiffs' claims'" are subject to dismissal under the PSLRA. See Wenger v. Lumisys, Inc., 2 F.Supp.2d 1231, 1244 (N.D. Cal. 1998).

Here, defendants argue the CC is a puzzle pleading in violation of Rules 8(a)(2) and 8(d)(1), as well as the PSLRA (see Defs.' Mot. at 4:10–17), in that it "lists vague [confidential witness] allegations without any particular time frame, and then claims that those allegations falsify entire exhibits of block quotes . . . by various speakers across several years" (see id. at 5:1–4). The Court first addresses this argument.

The CC challenges 179 statements as contained in six exhibits totaling 71 pages (see CC Ex. A–F, Doc. Nos. 87-1–87-6), each exhibit representing a "category" of allegedly false statements addressed in Parts VI.A–E of the CC, respectively (see CC ¶¶ 155–199).[8] Rather than "follow[ing] each allegedly false statement with factors showing it was false," see Wenger, 2 F.Supp.2d at 1243, the CC gives, for each category, an amalgam of "reasons" why all statements in the corresponding exhibit are false. (See CC ¶¶ 167, 177, 183, 192, 199.) Additionally, the "reasons" are cross-references to multiple sections of factual allegations contained elsewhere in the CC, as well as a lengthy series of bullet points that are entirely devoid of citations to prior paragraphs in the CC, and constitute, once again, an amalgam of allegations made earlier therein. (See, e.g., id.; ¶ 167:25–26; ¶ 71.) Although plaintiffs purport to refute each "category" of challenged statements independently, the allegations on which plaintiffs rely to demonstrate the "falsity" of each category of statements substantially overlap. (See, e.g., id. ¶ 167:25–26; ¶¶ 177:13–15, 183:9–11, 199:10–12.) As a result, plaintiffs' "categories" do not aid the Court in determining which facts in the CC allegedly demonstrate the falsity of which challenged statements. See Brodsky v. Yahoo! Inc., 592 F.Supp.2d 1192, 1199 (N.D. Cal. Oct. 7, 2008) (dismissing as a puzzle pleading complaint that, for each challenged statement, "recite[d], almost verbatim, the same five-page description of [defendant's] problems").

Plaintiffs, citing In re Intuitive Surgical Sec. Litig., 65 F.Supp.3d 821, 831 (N.D. Cal. 2014), argue they have "'precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why.'" (See Pl.'s

---

[8] The six "categories" of alleged misstatements are as follows: (1) 14(a) Misstatements (see CC Ex. A, Doc. No. 87-1); (2) "Stem's business model" (see id. Ex. B, Doc. No. 87-2); (3) "Athena's automated software" (see id. Ex. C, Doc. No. 87-3); (4) "Stem's FTM projects" (see id. Ex. D, Doc No. 87-4); (5) "pipeline statements" (see id. Ex. E, Doc. No. 87-5); and (6) "false risk disclosures" (see id. Ex. F, Doc. No. 87-6). Defendants re-categorize the statements in their motion (see Defs.' Mot. at 4:6–8), and plaintiffs, in opposition, re-re-categorize the statements (see Pls.' Opp'n. to Defs.' Mot. to Dismiss ("Pls.' Opp'n.") at 7:2, 8:19, 11:14).

Opp'n. to Defs.' Mot. to Dismiss ("Pls.' Opp'n.") at 30:15–17, Doc. No. 109.) Although plaintiffs are correct that the exhibits to the CC "precisely detail" each challenged statement, the complaint here, unlike in Intuitive, does not follow each challenged statement with a list of "reasons as to why each statement was false," nor, unlike the complaint in Intuitive, does it provide citations to the factual allegations plaintiffs contend rendered the statement false. (See id.; Amended Class Action Complaint ¶¶ 182–249, In re Intuitive Surgical Sec. Litig., No. 5:13-cv-01929-EJD (N.D. Cal. Oct. 15, 2013), ECF No. 48.) Rather, the CC, like complaints found lacking in this district, "merely throws the statements and the alleged 'true facts' together in an undifferentiated clump," leading the Court to conclude plaintiffs "expect[ ] the reader to sort out and pair each statement with a supposedly relevant 'true fact.'" See Wenger, 2 F.Supp.2d at 1243.

Next, citing Homyk v. ChemoCentryx, No. 21-cv-03343-JST, 2023 WL 3579440, at *6–7 (N.D. Cal. Feb. 23, 2023), plaintiffs argue "'group[ing] [statements] according to the alleged omitted facts in each misstatement'" is acceptable. (See Pls.' Opp'n. at 30:15–20.) In Homyk, however, the statements "within each category [were] arrang[ed] . . . by source" and the complaint "follow[ed] each set of statements from a single source with a list of reasons why all of those statements were misleading when made." See id. Here, by contrast, the statements in each category are not arranged by source, and the alleged reasons why the statements were false apply to all statements in the category rather than to all statements from a particular source. (See CC Ex. B–F.)

The Court thus finds plaintiffs have failed to plead their fraud claims in compliance with Rule 8 and the PSLRA, and, accordingly, finds plaintiffs' such claims are subject to dismissal. Moreover, as discussed below, the claim fails for additional reasons.

**B. Confidential Witnesses**

In support of their claims, plaintiffs rely on information received from four confidential witnesses ("CWs"). To satisfy the PSLRA, a complaint "relying on statements from confidential witnesses" must describe the witnesses "with sufficient particularity to establish their reliability and personal knowledge," and the statements "must themselves

United States District Court
Northern District of California

be indicative of scienter." See Zucco Partners, 552 F.3d at 995 citing In re Daou Sys., Inc., 411 F.3d 1006, 1015–16, 1022 (9th Cir. 2005). To describe a witness with "sufficient particularity," plaintiffs must "provide sufficient detail about [the] witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge." See Zucco, 552 F.3d at 996 (finding complaint sufficient where it provided each CW's job title, e.g., "Director of the IT Department of [defendant's] ID Systems," and "financial analyst in [defendant's] ID Systems finance department," as well as a detailed description of each CW's responsibilities relevant to the information provided).

**1. CW1, CW2, and CW4**

The CC fails to provide the requisite specificity as to CW1, CW2, and CW4, in that it does not allege their job titles or responsibilities with sufficient particularity to satisfy the PSLRA. (See CC ¶¶ 46, 71 (alleging CW1 "worked on front-of-the meter deals and answering client questions" and "worked on FTM projects"), ¶ 48 (alleging CW2 "held several positions . . . including as a Stem analyst" and "worked with sales involving, among other things, FTM projects"), ¶ 50 (alleging CW4 "tracked U.S. and Canadian laws related to relevant incentive programs and advocated for Stem's interest in the writing of new laws").) These vague allegations are a far cry from the Ninth Circuit's requirement of "specificity," see Daou, 411 F.3d at 1016, which deficiency "renders the CWs unreliable," see McGovney v. Aerohive Networks, Inc., 367 F.Supp.3d 1038, 1053 (N.D. Cal. Feb. 5, 2019) (finding CWs "unreliable" where complaint "list[ed] the CWs' job titles" but omitted "job description and responsibilities"; noting complaint, without specific allegations as to CWs' job titles and duties, fails to "adequately allege that the CWs were in a position to have the knowledge they profess").[9]

---

[9] The cases to which plaintiffs cite are distinguishable, in that in each case, the complaint provided specific job titles and more robust descriptions of job responsibilities. See, e.g., In re Zillow Grp., Inc. Sec. Litig., No. C17-1387-JCC, 2019 WL 1755293, *5 (W.D. Wash. Apr. 19, 2019) (describing how CWs' responsibilities as "sales manager" and "sales operations trainer" provided foundation for personal knowledge of allegations);

Accordingly, plaintiffs have failed to describe CW1, CW2, and CW4 with sufficient specificity to establish their reliability.

**2. CW3**

Although, as to CW3, the CC provides a job title, namely, "Stem's Director, Technical Sales and Training," and responsibilities, described as "overseeing all training and enablement for Stem's marketing teams" and "work[ing] closely with the product teams, including the developers and engineers for Athena" (see CC ¶ 49), it nonetheless fails to make the requisite showing as to personal knowledge.

Plaintiffs allege CW3 was employed "from March 2021 to June 2023" and can "corroborate[ ] reports that Athena lacked functionality with respect to FTM projects." (See CC ¶ 49.) In support thereof, plaintiffs allege CW3 "could not recall ever seeing an example of a case study for FTM that was fully installed," and that "despite [ ] numerous requests" by "CW3 and the FTM sales team" for examples of Athena's implementation for "demonstrations of Athena's success in FTM projects[,] . . . no such information was provided." (See id. ¶ 73.) Additionally, plaintiffs allege, CW3 was told by "members of the product team" that "some of the content on Athena's FTM software could not be used because the products were still in development and were not functional," two such products being the "Athena Bidder and Athena Supervisor." (See id. ¶ 79.)

CW3 does not, however, specify which members of the product team conveyed the above-alleged information to CW3, or facts demonstrating their personal knowledge of the information conveyed. Such comments from an unspecified member of a team of unspecified size are precisely the type of "vague hearsay" the Ninth Circuit has held unreliable. See Zucco, 552 F.3d at 996 (rejecting allegations where CW was "not positioned to know the information alleged" and "report[ed] unreliable hearsay").

---

Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust v. RH, Inc., 302 F.Supp.3d 1028, 1040, 1045 n.10 (N.D. Cal. 2018) (describing how CWs' responsibilities as "Manager in Operations," "Director of Product Development", and "Manager of Financial Planning and Analysis" provided foundation for "working knowledge" of information provided).

Accordingly, plaintiffs have not shown the information provided by CW3 is based on personal knowledge.

**C. False Statements**

To plead falsity, a plaintiff must "identify[ ] the statements at issue and set[ ] forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." See In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 876 (9th Cir. 2012).

Here, as discussed above, the manner in which plaintiffs have pleaded their claims, namely, their failure to adequately match challenged statements to facts allegedly showing falsity, precludes a meaningful analysis. Nevertheless, to the extent plaintiffs, in their opposition, have endeavored to address such deficiency by matching alleged false statements to the alleged actuality, the Court, in the interest of judicial economy, has considered the parties' respective arguments pertaining thereto.

The Court first notes, however, that, to the extent plaintiffs have, in their opposition, not matched a particular false statement to a particular actuality, but, rather, to paragraphs constituting amalgamations found elsewhere in the CC covering a wide variety of topics, see generally Pl.'s Opp'n. at 9:18–17:22 citing ¶¶ 167, 177, 183, 192, and 199), the Court declines to engage in the exercise of trying to discern whether such amalgamations contradict any individual allegedly false statement. See, e.g. Brodsky, 592 F.Supp.2d at 1198 (noting "repetition" of "the same few pages" of alleged facts "does not help the Court align which [facts] prove the falsity of which [of] defendant's statements").

Second, as to any challenged statement for which the sole showing of falsity is information provided by a CW, the Court finds plaintiffs have failed to show falsity, the Court having found plaintiffs have not pleaded facts sufficient to show such individuals' reliability and personal knowledge.

The Court next turns to statements that plaintiffs, in their opposition, challenge on the basis of allegations as to asserted true facts other than those contained in the above-

described amalgamations (see CC ¶¶ 167, 177, 183, 192, and 199), or reported by a CW.

### 1. Misstatements Regarding Business Model, Athena, and Pipeline

Defendants argue certain of the challenged statements are not actionable because they are not contradicted by allegations in the CC. (See Defs.' Mot. at 6:19, 11:3–4.) Plaintiffs, in response, point to only two categories of statements that they argue are contradicted by facts other than those contained in amalgamations or reported by a CW, and, as set forth below, the remaining allegations on which they rely are insufficient to support a finding of falsity.

First, plaintiffs challenge as misleading defendants' representations that "Stem's hardware gross margins were 10-30%" (see Pls.' Opp'n. at 8:14–17, 14–18), and, in support thereof, cite to Bush's statement in an earnings call that "Stem is doing maybe about a 10% gross margin." (See CC ¶¶ 120–122.) Bush's statement that the hardware gross margins were in the stated range is not, however, false. See In re Petco Animal Supp. Inc. Sec. Litig., No. 05-CV-0823-H (RRB), 2006 WL 6829623, at *23 (S.D. Cal. Aug. 1, 2006) (noting results at low end of estimates "significantly weaken[ ] [p]laintiffs' allegations of falsity and scienter").[10]

Second, plaintiffs argue that defendants' assessment of deals in the "pipeline" was misleading, given Athena's allegedly limited FTM capabilities. (See Pls.' Opp'n. at 11:19–12:17.) Plaintiffs' sole citation to allegations in the CC other than puzzle-like amalgamations and information from CWs, however, does no more than define "pipeline." (See Pls.' Opp'n. at 12:2–6 citing CC ¶ 80.) Similarly unavailing is plaintiffs' argument that defendants' inclusion in the pipeline of a $500 million deal with Available Power was misleading (see Pls.' Opp'n. at 12:7–17 citing CC ¶ 131 (the booking "was essentially a non-binding letter of intent")), as the information on which plaintiffs rely comes exclusively

[10] Although CW1 and CW2 assert Stem's hardware margin was below 10% (see, e.g., CC ¶¶ 96, 148, 199), the Court has found neither witness is described with sufficient particularity to be deemed reliable. (See supra Part I.B.)



United States District Court
Northern District of California

United States District Court
Northern District of California

from CW2.

In sum, the Court finds plaintiffs have failed to adequately allege that any of the challenged statements are false, and, accordingly, their section 10(b) claim is subject to dismissal.

**2. Forward-Looking Statements**

"Even when a plaintiff has adequately pleaded all six elements of a Section 10(b) claim, the defendant may be protected under the PSLRA's 'safe harbor' provision for forward-looking statements." See Glazer Capital Mgmt. v. Forescouts Techs., Inc., 63 F.4th 747, 767 (9th Cir. 2023). Statements protected from liability under this safe harbor provision include, as relevant here, those related to "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." See 15 U.S.C. § 78u-5(i)(1)(B). To be protected under this safe harbor provision, a "forward-looking statement" must be "identified" as such and be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in" the statement. See id. § 78u-5(c)(1)(A)(ii).

Here, defendants argue that some of the alleged misrepresentations about Athena and "Stem's metrics" and are "protected" as forward looking. (See Defs.' Mot. at 9:16–21; 14:8, challenging Statement Nos. 20–25, 27–28,[11] 34–39, 41–42, 44, 47–54, 57–59, 60–63, 68, 94, 138, 160–61, 165, 168, 170, 172, 174, 177.)

At the outset, the Court finds unpersuasive defendants' characterization of Statement Nos. 20–23, 28, 34–37, 42, 44, 49, 52–54, 59, and 62 as "forward-looking." (See Defs.' Mot. at 14:20–22.) These statements refer to Stem's "Hardware Gross Margin" as "~10-30%," but do not include language suggesting such an estimate was the

[11] Although plaintiffs allege statements 20–23 and 27–28 were negligently, rather than fraudulently, made (see Doc. No. 87-1, identifying statements challenged under Section 14(a)), the Court, as set forth later herein, has found the Section 14(a) claims sound in fraud.

anticipated gross margin rather than the current gross margin. See, e.g. Statement No. 35 (stating Stem "provide[s] turnkey, integrated hardware solutions . . . which carry gross margins in the 10 to 30% range"); No. 54 (stating Stem "earn[s] anywhere from 10% to 30% gross margins on the hardware"). "[S]tatements describ[ing] past and current conditions, rather than plans or objectives for future operations, are not forward looking." See Glazer Cap. Mgmt., L.P. v. Forescout Techs., 63 F.4th 747, 774 (9th Cir. 2023). Although defendants argue the statements "appeared in presentations focused on future projections" (see Reply at 7:10–12), nothing in the language to which defendants cite indicates the presentations applied only to the future.

Of the remaining statements defendants argue are forward-looking, plaintiffs directly respond as to Statement Nos. 41 and 51.[12] (See Pl.'s Opp'n. at 16:17, 16:15–22 and n.23–24.) Statement 41 says, in relevant part, that Athena is "abl[e] to optimize the operations in both the BTM and FTM markets, which position[s] [Stem] to have multiple product offerings and services in the evolving market for FTM energy storage services." (See CC Ex. B, Doc. No. 87-2.) Plaintiffs argue such statement is "premised" on "Athena's [then] present 'ability to optimize the operations in both the BTM and FTM markets.'" (See Pls.' Opp'n. at 16:18.) The Court agrees the statement is in part premised on then-present conditions (discussing Athena's "ability to optimize the operations in both the BTM and FTM markets"), which part is not protected, but finds it also looks to the future (stating Stem is "positioned to have multiple product offerings and services in the evolving market for FTM energy storage services"), which part is protected. See In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1142 (9th Cir. 2017) (holding where "mixed statements contain[ ] non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of

---

[12] Plaintiffs additionally argue Statements 115, 120, 132, 139, and 156 are not protected forward-looking statements (see Pls.' Opp'n. at 15:17, 16:17), but defendants did not argue that they are. Accordingly, the Court does not address these statements herein.

the PSLRA"). Similarly, the Court finds No. 51, which states "[t]he Athena platform drove 8% GAAP [Generally Accepted Accounting Principles] gross margin and 15% non-GAAP gross margin this quarter, and Athena will continue to drive our margin expansion" (see CC Ex. B) is a "mixed statement," comprising a non-forward looking portion ("Athena platform drove . . . margin[s] this quarter") and a forward-looking portion ("Athena will continue to drive our margin expansion").[13]

### 3. Opinions

A statement of opinion constitutes an actionable falsehood under three circumstances: first, "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief [such speaker] professed and that the belief is objectively untrue"; second, "when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue"; and third, "when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615–616 (9th Cir. 2017) (internal quotations and citations omitted). Here, defendants, asserting opinion statements, to be actionable, must be both objectively and subjectively false, argue Statements 24, 26–27, 33, 38, 55, 127–141, 143–159 are opinion statements for which plaintiffs have not pled subjective falsity. (See Defs.' Mot. at 7:27–8:9, 12:15.)

Plaintiffs, in response, do not argue such asserted opinions were not "sincerely held," but, instead, relying on a theory of omission, contend they need only show such asserted opinions "did not 'fairly align with the information in [defendants'] possession" or that a "reasonable investor would find that the omitted information regarding Athena's

[13] As set forth above, however, plaintiffs have failed to identify any allegation in the CC that contradicts any non-forward-looking statement.

United States District Court
Northern District of California

lack of viability for the FTM market rendered the statements of opinion misleading." (See Pls.' Opp'n. at 14:6–5 citing City of Dearborn Heights, 856 F.3d at 616 and In re Intuitive Surgical Sec. Litig., No. 5:13-cv-01920-EJD, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017).)[14] Plaintiffs fail, however, to adequately identify the information they assert did not align with the defendants' representations, again failing to match the statements of opinion they allege were misleading with particular allegations in the CC, and instead relying on paragraphs of the CC that are an amalgamation of allegations found elsewhere in the complaint.

Plaintiffs' arguments as to Statements 127–141 and 143–159, which relate to Stem's "pipeline," i.e., "projects that had a reasonable likelihood of contract execution," likewise are unavailing (see Pl.'s Opp'n. at 14:19–20), in that plaintiffs' supporting allegations are in the form of amalgamations and information from CWs.

**D. Statements by Individual Defendants**

Defendants argue plaintiffs' section 10(b) claims against Daley, Morgan, Patel, Russo, and Scheyer additionally fail because "the maker of a statement" for purposes of liability under Rule 10b-5 "is the person or entity with ultimate authority over the statement, including its content and whether and how to make it" and Daley, Morgan, Patel, Russo, and Scheyer "made no challenged statements." (See Defs.' Mot. at 4 n.2 citing Janus Capital Grp., Inc. v. First Derviative Traders, 564 U.S. 135, 142 (2011).) Plaintiffs respond by arguing "each" of these defendants "signed or authorized the signing of the [Challenged] Prospectus," which contained Statement Nos. 38, 81, and 112. (See Pls.' Opp'n. at 7 n.5.)

A corporate official who "signs an SEC filing containing misrepresentations

[14] The substance of plaintiffs' challenges to these statements, along with much of the rest of their argument, is presented in single-spaced footnotes. Such presentation, apparently an attempt to evade Civil Local Rule 3-4(c)(2)'s requirement that all filings be double-spaced, renders plaintiffs' arguments disjointed and unreasonably difficult to parse. The Court advises plaintiffs that, in the future, filings containing an abuse of footnotes, particularly when the parties have been granted leave to file excess pages, will not be accepted.

make[s] a statement so as to be liable as a primary violator under § 10(b).” See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir. 2000); Thomas v. Magnachip Semiconductor Corp., 167 F.Supp.3d 1029, 1047–48 (N.D. Cal. Mar. 4, 2016) (finding claims sufficiently pleaded where plaintiffs alleged defendants “made the false statements” by “sign[ing]” the challenged SEC filings). Where, however, a plaintiff fails to allege a corporate officer has signed a challenged filing, such plaintiff must “plead specific facts to show the individual defendants’ ultimate authority over each of the alleged misstatements therein.” See Hefler v. Wells Fargo Co., No. 16-cv-05479-JST, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (finding plaintiffs had not sufficiently pleaded “ultimate authority” where defendants did not sign SEC filings although “provided with the documents . . . prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected”).

Here, plaintiffs allege that Daley (see CC ¶ 28), Morgan (see id. ¶ 30), and Scheyer (see id. ¶ 31) signed the Challenged Prospectus. Plaintiffs have not, however, alleged that either Patel (see id. ¶¶ 22–23) or Russo (see id. ¶¶ 24–25) signed the challenged Prospectus, nor do plaintiffs’ allegations against Patel and Russo provide any facts to support a finding that either had “ultimate authority” over the statements therein. (See id. ¶¶ 22–25.)

Accordingly, plaintiffs’ section 10(b) claims against Patel and Russo fail for this additional reason.

**E. Scienter**

Pursuant to the PSLRA, a plaintiff must “state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.” 15 U.S.C. § 78u–4(b)(2). To create a “strong inference” of scienter, the allegations must raise an inference that is “more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.” See Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 314 (2007). Although a plaintiff need not plead facts giving rise to an “irrefutable” inference of scienter and courts must “assess all

the allegations holistically," such plaintiff "must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." See id. at 324, 326, 328 (emphasis in original).

In the instant case, to the extent plaintiffs rely on information provided by CWs to establish scienter, such allegations are, for the reasons discussed above, unavailing. The Court thus turns to allegations of scienter based on other evidence.

**1. Stock Sales**

Plaintiffs allege the Fraud Defendants' stock sales during the class period "support[] a strong inference that they timed their respective trading with knowledge of the alleged fraud and intended to benefit from Stem's artificially inflated trading price." (See CC ¶ 284.) Specifically, plaintiffs allege, defendants' trades in late 2021, 2022, and early 2023 immediately preceded the public disclosure of, respectively, the financial year 2021 results, which were "below expectations," the collapse of the Available Power deal, and Stem's lack of "sufficient capital to fund its business model." (See id. ¶¶ 286–291.)

Insider stock sales can support an inference of scienter when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003). The "relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history"; additionally, courts "may consider an insider's ability to trade." See id. (internal quotation and citation omitted).

Defendants argue plaintiffs' allegations do not permit an inference of scienter because "all but a few . . . were nondiscretionary and pursuant to Rule 10b5-1 trading plans or to cover withholding tax obligations, negating the scienter inference," and because the discretionary trades were not suspicious in "size and timing." (See Mot. at 19:16–24, 20:6; Reply at 11:2–3.) Defendants fail, however, to identify any place in the

United States District Court
Northern District of California

record, either in the allegations of the CC or in their Request for Judicial Notice,[15] supporting their assertion that certain of the trades were nondiscretionary. Courts that have relied on the nondiscretionary nature of stock sales in finding such sales do not support an inference of scienter do not rely on assertions made in a party's briefing. See, e.g. In re Eargo, Inc. Sec. Litig., No. 21-cv-8597-CRB, 2023 WL 5663154, at *1 (N.D. Cal. Aug. 31, 2023) (finding trades were non-discretionary; citing to judicially-noticed exhibits); In re Nektar Therapeutics, No. 18-cv-06607-HSG, 2020 WL 3962004, at *15–16 (N.D. Cal. July 13, 2020) (relying on Form 4s filed during class period to demonstrate nature of stock sales). The Court thus considers the challenged stock sales as if they were discretionary.

As to the percentage of shares sold, plaintiffs report the percentage of total shares each defendant sold in 2021 and 2022. These percentages range from 1.3% to 69.3% in 2021, and 44.5% to 80.5% in 2022. (See CC ¶ 283.) As defendants note, to support an inference of scienter based on sales, courts generally require executives to have sold "all or almost all their holdings in the class period." See, e.g. In re Alteryx, Inc. Sec. Litig., No. 8:20-cv-05140 DOC, 2021 WL 4551201, at *4 (C.D. Cal. June 17, 2021) (noting Ninth Circuit "require[s]" an "eye-popping percentage" of shares). While some of the above-referenced percentages may appear "suspicious in amount," see In re Vantive Sec. Litig., 283 F.3d 1079, 1094 (9th Cir. 2002), any such finding is weakened by the class period of 121 weeks, which has the potential effect of "making [the] stock sales appear more suspicious than they would be with a shorter class period." See id. at 1092 (finding sixty-three-week class period "unusually long," thereby "allow[ing] the plaintiffs to sweep as many stock sales into their totals as possible").

As to trading history, plaintiffs make no argument that the Fraud Defendants'

---

[15] Plaintiffs object that such request seeks improper consideration of "extraneous documents." (See Pls.' Opp'n. to Defs.' Request for Judicial Notice at 1:16, Doc. No. 108.) As the Court, in making the findings set forth herein, has not relied on any such document, the request for judicial notice is hereby DENIED as moot.

trading during the class period differs from prior practice; rather, plaintiffs argue, "prior trading history is not relevant given that Stem did not exist prior to the IPO." (See Pls.' Opp'n. at 21 n.32.) The Ninth Circuit, however, has held a plaintiff is "not excused from pleading the relevant history," even where, a "defendant's trading history is simply not available, for reasons beyond a plaintiff's control." See Zucco, 552 F.3d at 1005; Am. W. Holding Corp., 320 F.3d at 938 (noting stock sales must be "dramatically out of line with prior trading practices" to raise an inference of scienter).

Lastly, although plaintiffs argue they have alleged the timing of defendants' trades was suspicious (see CC ¶¶ 284–90), such argument is primarily based on defendants' asserted knowledge of facts the Court has found have not been established by reliable evidence. (See, e.g. CC ¶¶ 288–92.)

The Court, having weighed the above-listed factors, finds plaintiffs' allegations of insider trading are not sufficient to support the requisite strong inference of scienter.

**2. Core Operations Inference**

Plaintiffs allege the Fraud Defendants "knew of material adverse information" because "Stem's business model was key to the [Stem's] path to growth and profitability." (See CC ¶ 326.) Although, generally, one may draw a "'reasonable inference' . . . that high-ranking corporate officers have knowledge of the core operations of their companies," see South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 782 (9th Cir. 2008), "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter," see Metzler Inv. GmbH v. Corinthian Colleges, Inc., 534 F.3d 1068, 1068 (9th Cir. 2008). Rather, allegations that a company's "core operations" are fraudulent suffice to establish scienter under the PSLRA only in the following three circumstances: (1) where the allegations, when read together with other allegations in the complaint, "raise an inference of scienter that is 'cogent and compelling, thus strong;'" (2) where the allegations "are particular and suggest that defendants had actual access to the disputed information;" and (3) in the "rare circumstance[ ]" where, even "without accompanying particularized allegations" the "nature of the relevant fact is

United States District Court
Northern District of California

of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." See S. Ferry LP, No. 2, 542 F.3d at 785–86.

Here, plaintiffs argue, "particularized allegations" in the CC suggest that "defendants had actual access to the disputed information." (See Pls.' Opp'n. at 19:1-2.) The allegations on which plaintiffs rely, however, which reflect defendants' general oversight of company business and projects, do not suffice to show defendants had access to information demonstrating Athena's alleged lack of functionality for FTM projects. (See CC ¶¶ 294, 299, 316-329.) Contrary to plaintiffs' argument, the Ninth Circuit has held "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and the receipt of unspecified weekly or monthly reports are insufficient" to demonstrate scienter. See In re Daou, at 411 F.3d at 1022 (emphasis omitted).[16]

Accordingly, the Court finds Stem's "core operations" do not support a strong inference of scienter under the PSLRA.[17]

**F. Loss Causation**

In support of loss causation, plaintiffs point to several instances in which Stem stock price dropped shortly after certain information about Stem became public. The parties disagree as to whether the relationship between those events was causative or coincidental. Although, as plaintiffs note, "the market need not learn from a disclosure of poor financial results that the defendants committed fraud" (see Pls.' Opp'n. at 26:7-8), an alleged corrective disclosure needs to match an alleged false statement, see Metzler, 540 F.3d at 1063 (citing with approval Seventh Circuit's holding that "to plead loss causation plaintiff had to allege that the defendant's material misrepresentation[ ] caused

[16] As discussed earlier herein, plaintiffs have failed to show any of the challenged statements was, in fact, false. Accordingly, the Court does not address herein plaintiffs' remaining arguments as to scienter.

[17] Given the Court's earlier-discussed finding that plaintiffs have failed to adequately plead the facts they allege to show falsity, the Court does not address herein the other theories of scienter on which plaintiffs rely.

[the plaintiff] to suffer a loss when that material misrepresentation became generally known") (internal quotations and citation omitted). As discussed above, plaintiffs here have failed to adequately allege a false statement, and accordingly, the Court does not further address at this juncture the question of loss causation.

**II. Scheme Liability**

Plaintiffs allege the Fraud Defendants participated in a "scheme" to "make it appear there was strong demand for Stem's Athena software, when, in fact, the pipeline was entirely unrealistic" and "touted a FTM deal with Available Power that was non-existent." (See CC ¶¶ 201.) Rules 10b-5(a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." See 17 C.F.R. § 240.10b-5(a), (c). A scheme liability claim can be based on misstatements that also violate section 10(b), see Lorenzo v. Securities and Exchange Comm'n., 587 U.S. 71, 80 (2019), but where the "alleged scheme consists entirely of" failed section 10(b) misstatements, plaintiffs likewise fail to adequately plead a scheme. See Kang v. PayPal Holdings, Inc., 620 F.Supp.3d 884, 902 (N.D. Cal. 2022).

Here, plaintiffs base their scheme liability claim on "the materially false and misleading statements alleged" elsewhere in the CC, as well as on other acts. (See CC ¶ 202.) Because the Court has found plaintiffs have failed to adequately allege facts giving rise to a strong inference of scienter for purposes of their section 10(b) claim, the Court finds plaintiffs have failed to plead scheme liability based on misleading statements. Further, as set forth below, the Court finds plaintiffs have failed to sufficiently plead scheme liability based on any other acts.

To state a claim for scheme liability, plaintiffs must allege "each defendant committed a manipulative or deceptive act in furtherance of the scheme." See Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997). Further, as the Ninth Circuit has held, "[c]onduct that is consistent with the defendants' normal course of business would not

United States District Court
Northern District of California

typically be considered to have the purpose and effect of creating a misrepresentation," and thus, standing alone, does not suffice to plead scheme liability. See Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1050 (9th Cir. 2006) (collecting cases) (noting creation of "[s]ham business transactions with no legitimate purpose" would suffice).

Here, as to the [nine] individual Fraud Defendants, the CC includes individualized allegations only as to Carrington, Bush, Scheyer, Morgan, and Daley. (See CC ¶¶ 200–228.) As to Scheyer, Morgan, and Daley, however, plaintiffs allege only that, during pre-merger meetings, said defendants were provided "extensive due diligence regarding Stem's operations," not that they undertook any allegedly deceptive course of conduct. (See id. ¶ 204.) As to Carrington and Bush, plaintiffs allege that (1) both said defendants "provided extensive due diligence . . . in connection with the IPO" (see CC ¶ 204); (2) Carrington, in a February 24, 2022, earnings call, clarified that the $500 million plus of the Available Power Deal was for Stem with bookings of ~$100 million assumed in 2022" (see id. ¶ 207); (3) Bush, in the same earnings call, "sought to focus investors on record bookings and Stem's leading software" (id. ¶ 208); (4) Carrington, in the same earnings call, would "update" investors "on how the [Available Power deal] was coming together" (id. ¶ 209); and (5) Bush, in a later earnings call, "attempted to explain Stem's increased use of cash" (id. ¶ 211).

There is nothing in the CC to demonstrate any of the above acts is outside the defendants' "normal course of business." See Simpson, 452 F.3d at 1050. Moreover, as discussed above, the Court finds plaintiffs have failed to adequately allege scienter for purposes of pleading their section 10(b) claim, and such deficiency likewise is fatal to their scheme claim. See Kang, 620 F.Supp.3d at 902 (dismissing claim for scheme liability where scienter allegations were inadequate).

Accordingly, plaintiffs' claim alleging scheme liability is subject to dismissal.

**III. Section 14(a) Claims**

Section 14(a) of the Securities and Exchange Act makes it unlawful for "any person" to "solicit or to permit the use of his name to solicit any proxy or consent or

United States District Court
Northern District of California

authorization" in "contravention of [the] rules and regulations" prescribed by the Securities and Exchange Commission. See 15 U.S.C. § 78n(a)(1). Rule 14a-9, in turn, provides that "[n]o solicitation . . . shall be made by means of any proxy statement" containing any "false or misleading [statement] with respect to any material fact." See 17 C.F.R. § 240.14a-9. Plaintiffs allege the 14(a) Defendants violated these provisions by "issu[ing]" the "[Challenged] Prospectus 'to [Star Peak] stockholders as part of the solicitation of proxies" and "permit[ing] the use of their names by . . . allowing the [Challenged] Prospectus to represent they recommended [the] business combination." (See CC ¶¶ 382–83.)

To state a claim under section 14(a) and Rule 14a-9, a plaintiff must allege: (1) "the defendant made a material misrepresentation or omission in a proxy statement," (2) "the misrepresentation or omission was made with the requisite level of culpability,"[18] and (3) "the misrepresentation or omission was an essential link in the accomplishment of a transaction proposed in the proxy solicitation." See Kelley v. Rambus, Inc., No. C 07–1238 JF (HRL), 2008 WL 5170598, at *3 (N.D. Cal. Dec. 9, 2008). Here, defendants argue, plaintiffs' section 14(a) claim "sounds in fraud," and, consequently, must meet the heightened pleading standards of Rule 9(b), which, defendants further argue, plaintiffs have failed to do.

**A. Application of Rule 9(b)**

Although section 14 does not necessarily require a plaintiff to plead fraud with particularity, "Rule 9(b) applies where a claim is 'grounded in fraud' or 'sound[s] in fraud,' even if fraud is not an essential element of the cause of action." See In re Finjan Holdings, Inc., 58 F.4th 1048, 1057 (9th Cir. 2023) (alteration in original). In that regard, the Ninth Circuit, in the context of claims under section 11 of the Securities and Exchange Act, has held that even where a negligence claim "does not adopt all the

[18] The requisite level of culpability for a Section 14(a) claim is negligence. See Knollenberg v. Harmonic, Inc., 152 Fed. App'x. 674, 682–83 (9th Cir. 2005).

United States District Court
Northern District of California

allegations contained in the rest of the complaint," if such claim "does not allege different misrepresentations [and] merely relies on the same alleged misrepresentations . . . that are central to [p]laintiffs' section 10(b) fraud claim," Rule 9(b) is applicable, see In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 886 (9th Cir. 2012), and district courts have applied that holding to claims under section 14, see, e.g. Mehedi v. View, No. 21-cv-06374-BLF, No. 2023 WL 3592098, at *14 (N.D. Cal. May 22, 2023) (quoting Rigel; finding "[t]he same reasoning applies to a Section 14 claim").

Although plaintiffs argue their "14(a) claims are demarcated from the fraud claims," and the "only" allegations regarding scienter are "in the [section] 10(b) portion of the [CC]" (see Pls.' Opp'n. at 5:20–26), their only allegation in the CC as to negligence is their statement that "[t]he 14(a) Defendants were at least negligent in filing the [challenged] prospectus and [challenged] investor materials with the[ ] materially false and misleading statements" (see CC ¶ 384). Such formalistic differentiation does not mean the 14(a) claims do not sound in fraud, see In re Rigel Pharms., 697 F.3d at 885 (holding "a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its [negligence] claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims"), and, as discussed above, plaintiffs have not adequately pleaded a false or misleading statement under Rule 9(b).

Accordingly, plaintiffs' section 14(a) claim is subject to dismissal.

**B. Solicitation**

The Ninth Circuit has held "the mere presence [of a defendant's] name in the [proxy] materials" is insufficient to state a claim under Section 14(a). See Yamamoto v. Omiya, 564 F.2d 1319, 1322–23 (9th Cir. 1977); see also Mehedi, 2023 WL 3592098, at *14 (characterizing as "conclusory" and "insufficient to survive a motion to dismiss" plaintiff's allegation that each defendant "solicited and/or permitted the use of its name to solicit consent or authorization" for the transaction). Where, however, plaintiffs "plead the nature of [the] [d]efendants' involvement in preparing or reviewing the Proxy," combined with the "[d]efendants' management roles in the company," such allegations suffice to

United States District Court
Northern District of California

plead negligence under the PSLRA." See Azar v. Blount Int'l., No. 3:16-cv-483-SI, 2017 WL 1055966, at *10 (D. Oregon Mar. 20, 2017). Here, defendants argue, plaintiffs have not pled solicitation by the individual defendants because they merely allege those defendants "signed" the prospectus. (See Defs.' Mot. at 30:17–23.)

As to defendants Daley, Litowitz, Rogers, and Shaper, plaintiffs allege said defendants "authorized Scheyer to sign the defective prospectus on [their] behalf" and that they "recommended approval of the merger and solicited shareholders' votes to approve the merger." (See CC ¶¶ 31–34.) As to defendant Wilds, plaintiffs allege only that he "authorized Scheyer to sign the defective prospectus on his behalf." (See id. ¶ 30.) Plaintiffs, citing Azar, argue they have "allege[d] negligent conduct by each of the 14(a) defendants"; they do not, however, sufficiently allege the role played by Daley, Litowitz, Rogers, Shaper, or Wilds in preparing the Challenged Prospectus. (See Pls.' Opp'n. at 6:3–15.)

Although plaintiffs do allege that the individual defendants "prepared, reviewed, and disseminated" the Challenged Prospectus (see CC ¶ 383), language the Azar court found sufficient to plead individual solicitation, courts in this district have required more than such "conclusory allegations." See Mehedi, 2023 WL 3592098, at *15; see also, e.g., Kelley, 2008 WL 5170598, at *5 (finding "mere appearance of a party's name in a proxy statement" insufficient "basis for that party's liability" under section 14(a)).

Plaintiffs provide more specific allegations as to the roles played by Bush, Carrington, Scheyer, and Morgan in the preparation of the Challenged Prospectus. Plaintiffs allege Scheyer and Morgan "participated in the 12/04/20 Investor Conference" (see CC ¶¶ 28, 30), materials from which are allegedly incorporated in the Prospectus (see id. ¶ 143), and that both Carrington and Bush made statements that plaintiffs characterize as misleading (see, e.g. Compl. Ex. A, Doc. No. 87-1, Nos. 1, 17, 21, 29). Such allegations, albeit more particularized than the allegations against the other Section 14(a) Defendants, nonetheless, are insufficient to state a claim, in that plaintiffs do not specify what role Scheyer and Morgan played in the Investor Conference, nor what

statements they allege were misleadingly made there.

Accordingly, plaintiffs having failed to plead solicitation sufficient to support a section 14(a) claim, plaintiffs' section 14(a) claim is subject to dismissal for such additional reason.

**CONCLUSION**

For the reasons stated above, defendants' motion to dismiss is hereby GRANTED, and, as plaintiffs may be able to cure the above-discussed deficiencies, they are hereby afforded leave to amend.

Plaintiffs' First Amended Consolidated Complaint shall be filed no later than November 1, 2024. Further, pursuant to the PSLRA and the Federal Rules of Civil Procedure, plaintiffs are hereby directed to set out in chart form their securities fraud allegations under the following headings on a numbered, statement-by-statement basis: (1) the speaker(s), date(s), and medium; (2) the false and misleading statements; (3) the reasons why the statements were false and misleading when made; and (4) the facts giving rise to a strong inference of scienter.

**IT IS SO ORDERED.**

Dated: August 30, 2024

MAXINE M. CHESNEY
United States District Judge