1   ROBBINS GELLER RUDMAN
        & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    WILLOW E. RADCLIFFE (200087)
3   TAEVA C. SHEFLER (291637)
    ALAINA L. GILCHRIST (335807)
4   Post Montgomery Center
    One Montgomery Street, Suite 1800
5   San Francisco, CA  94104
    Telephone:  415/288-4545
6   415/288-4534 (fax)
    shawnw@rgrdlaw.com
7   willowr@rgrdlaw.com
    tshefler@rgrdlaw.com
8   agilchrist@rgrdlaw.com

9   LEVI & KORSINSKY, LLP
    ADAM M. APTON (SBN 316506)
10  445 South Figueroa Street, 31st Floor
    Los Angeles, CA  90071
11  Telephone:  213/985-7290
    aapton@zlk.com
12
    Lead Counsel for Lead Plaintiffs
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15

| | |
|---|---|
| 16   In re STEM, INC. SECURITIES LITIGATION | )  Master File No. 3:23-cv-02329-MMC |
| 17   ———————————————————— | )  CLASS ACTION |
| 18   This Document Relates To: | )  FIRST AMENDED CONSOLIDATED )  COMPLAINT FOR VIOLATIONS OF THE |
| 19          ALL ACTIONS. | )  FEDERAL SECURITIES LAWS )  DEMAND FOR JURY TRIAL |

20

21

22

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS  - 3:23-cv-02329-MMC
4879-3770-3139.v1

**TABLE OF CONTENTS**

**Page**

GLOSSARY OF DEFINED TERMS ...................................................................... i

I.      JURISDICTION AND VENUE ...........................................................3

II.     PARTIES ...............................................................................................4

        A.      Plaintiffs .....................................................................................4

        B.      Defendants ..................................................................................4

III.    NON-PARTIES AND PERCIPIENT WITNESSES ........................11

        A.      Non-Parties ...............................................................................11

        B.      Percipient Witnesses ................................................................12

IV.     BACKGROUND FACTS ...................................................................13

        A.      Star Peak Forms a SPAC .........................................................13

        B.      Stem's Software Story ..............................................................15

        C.      As Stem's BTM Market Sales Had Stalled Prior to the IPO, Stem Pivoted to the More Lucrative FTM Market with a Non-Viable Product...........................18

        D.      Stem's Purportedly Automated Software – Athena – Was Not Viable for FTM Projects ...............................................................19

        E.      Stem Was Unable to Provide Training and Sales Materials for FTM Projects Because Athena Did Not Work for FTM................................21

        F.      Stem's FTM Bookings Were Not Viable Deals and Did Not Reflect that Athena Worked for the FTM Market .........................................22

        G.      Stem's IPO and the Associated Infusion of Capital Was Critical for the Company's Survival and Growth............................................25

        H.      Stem Goes Public Through a Merger with Star Peak Based on a Defective Prospectus and Defective Investor Materials............................28

        I.      Stem Acquires AlsoEnergy in an Effort to Remedy Athena's Deficient FTM Software and Boost Software Revenue ..............................31

        J.      The Market Understood Stem's Success Was Dependent on Athena's Expansion into the FTM Market.............................................33

        K.      Stem Is Forced to Raise Capital as the Market Questions the Viability and Success of Its FTM Product........................................34

V.      THE 14(a) DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT.....................37

A.    The 14(a) Defendants Solicited and Negligently Prepared the Defective Prospectus and Defective Investor Materials.........................................37

B.    The 14(a) Defendants' Materially False and Misleading Statements...................43

C.    Causation...........................................................................58

VI.    THE FRAUD DEFENDANTS' VIOLATIONS OF §10(b) OF THE EXCHANGE ACT..............................................................................59

A.    The Fraud Defendants' Materially False and Misleading Statements that Stem's Athena Software Was Automated for the FTM Market ...........................60

   1.    The Fraud Defendants Falsely Represented that Stem's Key Software Athena Is Automated Prior to the IPO .......................................60

   2.    The Fraud Defendants Continued to Falsely Represent that Athena Was Automated Throughout 2021.............................................65

   3.    The Fraud Defendants Continued to Falsely Represent that Athena Was Automated Throughout 2022.............................................67

   4.    The Fraud Defendants Continued to Falsely Represent that Athena Was Automated in 2023..................................................73

B.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Business Model ..................................................76

   1.    The Fraud Defendants Falsely Represented that Stem Had a Competitive Advantage in the FTM Market Leading Up to Stem's IPO ........................................................................76

   2.    The Fraud Defendants Continued to Falsely Represent that Stem Has a Competitive Advantage in 2021 and 2022.......................................79

C.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's FTM Success with Athena in 2021 and 2022 .........................83

D.    The Fraud Defendants' Materially False and Misleading Statements Warned of Purported Risks that Had Already Come to Fruition..........................89

   1.    The Fraud Defendants Issued Materially False and Misleading Statements that Warned of Purported Risks Leading Up to Stem's IPO in Early 2021 ....................................................90

   2.    The Fraud Defendants Continued to Issue Materially False and Misleading Statements Warning of Purported Risks After the IPO in 2021 and 2022................................................93

   3.    The Fraud Defendants Continued to Issue Materially False and Misleading Statements Warning of Purported Risks After the IPO in 2023 ..............................................................98

E.    The Fraud Defendants' Scheme.........................................................101

1    VII. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION ...............................112

2         A.      Loss Causation (All Claims)..................................................................112

3                 1.    Partial Disclosures on February 24, 2022 ................................114

4                 2.    Partial Disclosures on January 5, 2023 ....................................117

5                 3.    Partial Disclosures on February 16, 2023 ................................119

6                 4.    Partial Disclosures on March 29, 2023 .....................................123

7                 5.    Partial Disclosures on April 4, 2023 ........................................125

8                 6.    Post-Class Period Disclosures ..................................................129

9         B.      Loss Causation (§10(b) Claims Only) .................................................130

10   VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER (§10(b) CLAIMS ONLY) .............130

11        A.      Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo's Massive
                  Insider Trading Supports a Strong Inference of Scienter.....................130
12
          B.      Defendant Carrington's Own Post-Class Period Admission Creates a
13                Strong Inference of Scienter ................................................................135

14        C.      Stem's Liquidity Issues and Capital Requirements Add to the Strong
                  Inference of Scienter ............................................................................136
15
          D.      Extensive Due Diligence as Part of the IPO Process Adds to the Strong
16                Inference of Scienter ............................................................................138

17        E.      The Individual Fraud Defendants' Participation in Meetings, Focus on
                  Margins, and Access to Salesforce Adds to the Strong Inference of
18                Scienter ................................................................................................140

19        F.      The Core Operations Inference Adds to the Strong Inference of Scienter .........142

20        G.      That the Individual Fraud Defendants Spoke Knowingly on Topics Adds
                  to the Strong Inference of Scienter .....................................................144
21
          H.      The Suspicious Departures of Multiple Stem Executives Adds to the
22                Strong Inference of Scienter ................................................................145

23        I.      The Individual Fraud Defendants' Violations of Stem's Own Internal
                  Policies and Controls Adds to a Strong Inference of Scienter ...........146
24
     IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR DOCTRINE
25          AND BESPEAKS CAUTION DOCTRINE...............................................149

26   X.     APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE
            MARKET................................................................................................151
27
     XI.    CLASS ACTION ALLEGATIONS .........................................................153
28

COUNT I ...................................................................................................................154

COUNT II .................................................................................................................157

COUNT III ................................................................................................................157

COUNT IV ................................................................................................................159

COUNT V .................................................................................................................160

PRAYER FOR RELIEF ...........................................................................................163

JURY DEMAND ......................................................................................................163

1
2

### GLOSSARY OF DEFINED TERMS

The following short forms and citations are used herein:

| TERM | DEFINITION |
|---|---|
| "14(a) Defendants" | Defendants Stem, Star Peak, Bush, Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer. |
| "14(a) Individual Defendants" | Defendants Bush, Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer. |
| "AI" | Artificial intelligence |
| "AlsoEnergy" | AlsoEnergy Holdings, Inc. |
| "Available Power" | Available Power, LLC |
| "Blue Orca" | Blue Orca Capital |
| "BTM" | Behind-the-meter |
| "Bush" | William Bush |
| "C&I" | Commercial and industrial |
| "Carrington" | John Carrington |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "Class" | The Section 14(a) Class and the Section 10(b) Class. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. |
| "Class Period" | The time period between and including 12/04/20 and 04/03/23. |
| "CRO" | Chief Revenue Officer |
| "CSO" | Chief Strategy Officer |
| "CTO" | Chief Technology Officer |
| "CW" | Confidential witness |
| "D&T" | Deloitte & Touche LLP |
| "Daley" | Adam E. Daley |

| TERM | DEFINITION |
|---|---|
| "Defective Investor Materials" | Numerous investor materials that were incorporated by reference into the Defective Prospectus, including press releases, PowerPoint slide decks, and presentation transcripts, that were filed with the SEC on 12/04/20, 01/05/21, 01/13/21, 01/25/21, 02/11/21, 02/18/21, 03/02/21, 03/19/21, 03/30/21, 04/06/21, 04/12/21, 04/14/21, and 04/21/21. |
| "Defective Prospectus/ Proxy Statement" | The defective prospectus includes the defective registration statement and preliminary proxy statement/consent solicitation statement/prospectus on Form S-4 in connection with the merger and that was thereafter amended on Forms S-4/A on 01/22/21, 02/12/21, 03/15/21, 03/25/21, and 03/26/21, and the body of which was incorporated into the final proxy statement/consent solicitation statement/prospectus on Form 424(b)(3) filed on 03/30/2021. |
| "ERCOT" | Electric Reliability Council of Texas |
| "Exchange Act" | Securities Exchange Act of 1934 |
| "FLNC" | Fluence Energy |
| "Fraud Defendants" | Defendants Stem, Star Peak, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, Russo, and Scheyer. |
| "FTM" | Front-of-the-meter |
| "GAAP" | Generally accepted accounting principles |
| "Ho" | Bryan Ho |
| "Individual Fraud Defendants" | Defendants Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, Russo, and Scheyer. |
| "IPO" | Initial public offering |
| "Johnson" | Larsh Johnson |
| "Legacy Stem" | Stem, Inc. prior to the Merger. |
| "Litowitz" | Alec Litowitz |
| "Merger" | Merger of Stem, Inc. and Star Peak Energy Corp. |
| "Morgan" | Michael C. Morgan |
| "NYSE" | New York Stock Exchange |
| "OEMs" | Original equipment manufacturers |

| TERM | DEFINITION |
|---|---|
| "Patel" | Prakesh Patel |
| "PSLRA" | Private Securities Litigation Reform Act of 1995 |
| "Russo" | Alan Russo |
| "Scheyer" | Eric Scheyer |
| "SEC" | U.S. Securities and Exchange Commission |
| "Section 10(b) Class" | All purchasers of Stem securities during the Class Period. |
| "Section 14(a) Class" | All persons who were solicited to approve the merger of Stem and Star Peak and who exchanged publicly listed Star Peak shares for Stem Class A common stock rather than redeeming the same pursuant to the Defective Prospectus. |
| "Selling Defendants" | Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo. |
| "SPAC" | Special Purpose Acquisition Company |
| "Star Peak" or "STPK" | Star Peak Energy Transition Corp. |
| "Stem" or the "Company" | Stem, Inc. f/k/a Star Peak Energy Transition Corp. |
| "STPK Merger Sub" | STPK Merger Sub Corp. |

1.     Stem, Inc. f/k/a Star Peak Energy Transition Corp. ("Stem" or the "Company") is an energy storage company which purportedly allows its customers to "automatically" maximize storage assets with its Athena artificial intelligence ("AI") software.  On 12/04/20, Stem announced its intent to go public by merging with Star Peak Energy Transition Corp. ("Star Peak" or "STPK"), a blank-check acquisition company or SPAC ("Special Purpose Acquisition Company"), at a valuation of roughly $1.35 billion.  The business combination between Stem and Star Peak closed on 04/28/21 and, the following day, Stem went public with a closing price of $27.05 per share.  Notably, Defendants raised over $600 million in Stem's initial public offering ("IPO") by promising rapid growth and a quick road to profitability with the Company's newfound focus of selling its high-margin Athena software, which purportedly required little capital and an expansion of its business to front-of-the-meter ("FTM") customers.  That story, however, would fall apart less than two years after Stem's IPO with the stock plummeting to $4.89 on 04/05/23, an ~81.9% drop since Stem's initial closing price on 04/29/21.  Now the stock trades below one dollar per share with most of Stem's Class Period executives having departed the Company.

2.     This is a class action brought pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of all persons who purchased Stem securities between 12/04/20 and 04/03/23 (the "Class Period"), against Stem and Star Peak, as well as certain of their senior executives and directors (the "Section 10(b) Class").[1]  The §§10(b) and 20(a) claims arise out of a scheme to defraud investors by taking Stem public with a defective business model and engaging in a host of activities that reaffirmed the purported viability of that model as well as by making false and misleading statements that concealed from investors that, *inter alia*: (i) Stem's key software Athena was neither automated nor viable for FTM projects; (ii) Stem's business model was fundamentally flawed because the Company's Athena software was not automated for FTM projects; (iii) Stem's Massachusetts FTM project was not a successful implementation of Athena because the software was not "automated" for FTM projects; and (iv) the purported risks to Stem's business were not risks, they were already occurring.

---

[1]     The Fraud Defendants are identified in ¶34, *infra*.

3.    Defendants' materially false and misleading statements allowed and facilitated Stem's IPO and caused Stem's securities to trade at artificially inflated prices throughout the Class Period. Through a series of partial disclosures, the true nature of Stem's business and its negative impact on the Company was trickled into the market.

4.    On 02/24/22, the price of the merged-company's stock dropped by nearly 22% when Stem was forced to reveal, among other things, that the Company's margins and profitability had begun to be negatively impacted by its inability to derive high-margin revenue from its software in the FTM markets. Thereafter, on 01/05/23, Stem was forced to disclose disappointing margins and the loss of a ~$130 million contract (later identified as its flagship FTM customer Available Power, LLC ("Available Power")) causing its stock to drop 8.78%.

5.    A short time later, on 02/16/23, Stem was forced to announce negative news regarding the Company's FY 2022 results and future outlook, reporting that, instead of the growth and profitability in its FTM business segment that Defendants had promised would flow from Stem's high-margin software business model, the Company had not achieved gross margins of 15%-20%, it had difficulty converting FTM projects into software revenue and, as a result, Stem's outlook for 2023 was disappointing. As a result of not being able to deliver on Stem's software story, on 03/29/23 before the market opened, Stem announced it would be forced to raise additional capital through a note offering to fund its capital intensive low-margin business, causing its stock price to tank another 10.42%, from a close of $6.24 on 03/28/23 to a close of $5.59 on 03/29/23. Days later, on 04/03/23, analysts downgraded the Company, coming to the realization that, contrary to Defendants' representations, Stem was dependent on its lower-margin hardware and service business, and would not see the margins or profits that Defendants had repeatedly promised from a high-margin automated software business. This caused Stem's stock to drop another 7.45%, from a close of $5.91 on 04/03/23 to a close of $5.47 on 04/04/23. The following day, the stock fell another 10.42% to a close of $4.89 on 04/05/23, as the market continued to absorb the news.

6.    While investors suffered losses as a result of the Fraud Defendants' scheme and materially false and misleading statements, Stem insiders sold their personal holdings of Stem common stock at artificially inflated prices for collective proceeds of $41 million with Defendants

1  Bush, Carrington, Daley, Johnson, and Russo reaping insider trading proceeds of over $27 million in

2  violation of §20A of the Exchange Act.  The vast majority of the insider trading took place in just

3  ten months' time, between November 2021 and August 2022.

4          7.      Separately, and without incorporating any of the fraud allegations herein, Plaintiffs

5  bring claims pursuant to §14(a) of the Exchange Act.  The claims against the 14(a) Defendants[2] are

6  brought on behalf of all persons who were solicited to approve the merger of Stem and Star Peak

7  (the "Merger") and who exchanged publicly listed Star Peak shares for Stem Class A common stock

8  rather than redeeming the shares pursuant to the Defective Prospectus.[3]  The §14(a) claim arises

9  from the 14(a) Defendants' negligence in preparing and issuing the Defective Prospectus and

10  Defective Investor Materials[4], which contained materially false and misleading statements and

11  omissions concerning Stem's purportedly "automated" software for FTM projects.

12                 **I.      JURISDICTION AND VENUE**

13          8.      The claims asserted herein arise under §§10(b), 20(a), 14(a), and 20A of the

14  Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78n(a), and 78t-1, and the SEC rules promulgated

15  thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5, and Rule 14a-9, 17 C.F.R. §240.14a-9.

16          9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

17  §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

18          10.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the

19  Exchange Act, 15 U.S.C. §78aa.  Substantial acts in furtherance of the alleged fraud or the effects of

20  the fraud and negligence have occurred in this district.

---

[2]  The 14(a) Defendants are defined at ¶32, *infra.*

[3]  "Defective Prospectus" is defined as the defective registration statement and preliminary proxy statement/consent solicitation statement/prospectus on Form S-4 in connection with the Merger and that was thereafter amended on Forms S-4/A on 01/22/21, 02/12/21, 03/15/21, 03/25/21, and 03/26/21, and the body of which was incorporated into the final proxy statement/consent solicitation statement/prospectus on Form 424(b)(3) filed on 03/30/21.

[4]  The "Defective Investor Materials" is defined as the numerous investor materials that were incorporated by reference into the Defective Prospectus, including press releases, PowerPoint slide decks, and presentation transcripts, that were filed with the SEC on 12/04/20, 01/05/21, 01/13/21, 01/25/21, 02/11/21, 02/18/21, 03/02/21, 03/19/21, 03/30/21, 04/06/21, 04/12/21, 04/14/21, and 04/21/21.

1        11.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the

2  means and instrumentalities of interstate commerce, including, but not limited to, the mails,

3  interstate telephone communications, and the facilities of the national securities markets.

4                          **II.**     **PARTIES**

5       **A.**    **Plaintiffs**

6        12.     Lead Plaintiff Vishal Lawale purchased or otherwise (i) acquired Stem common stock

7  during the Class Period and (ii) held Star Peak common stock as of the 03/04/21 record date and was

8  entitled to vote on the Merger at the 04/27/21 special meeting of shareholders as set forth in the

9  certification filed with his Lead Plaintiff application (ECF 30-2), incorporated by reference herein,

10  and suffered damages as a result of Defendants' violations of the federal securities laws alleged

11  herein.

12        13.     Lead Plaintiff Vishal P. Thakkar purchased or otherwise (i) acquired Stem common

13  stock during the Class Period and (ii) held Star Peak common stock as of the 03/04/21 record date

14  and was entitled to vote on the Merger at the 04/27/21 special meeting of shareholders, as set forth in

15  the certification filed with his motion to consolidate and Lead Plaintiff application (ECF 43-3),

16  incorporated by reference herein, and suffered damages as a result of Defendants' violations of the

17  federal securities laws alleged herein.[5]

18       **B.**    **Defendants**

19        14.     Defendant Stem, Inc. f/k/a/ Star Peak Energy Transition Corp. is a Delaware

20  corporation with its principal executive offices located in San Francisco, California.  On 04/28/21,

21  Legacy Stem[6] completed a merger with Star Peak Energy Transition Corp. and STPK Merger Sub

22  Corp. ("STPK Merger Sub"), a Delaware corporation and wholly owned subsidiary of STPK

23  wherein STPK Merger Sub merged with and into Legacy Stem with Legacy Stem surviving the

24  transaction as a wholly owned subsidiary of Star Peak.  At this time, Star Peak renamed itself "Stem,

25  Inc." and began operating Legacy Stem's business.

---

[5]  Lead Plaintiffs Vishal Lawale and Vishal P. Thakkar are referred to collectively herein as "Plaintiffs."

[6]  "Legacy Stem" refers to Stem, Inc. prior to the Merger.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC          - 4 -
4879-3770-3139.v1

1       15.     Stem, at all relevant times, was engaged in the business of energy storage, providing

2  customers with energy storage systems, primarily in the form of batteries and related hardware, and

3  software-enabled services to operate those energy storage systems. The Company's common stock

4  and warrants to purchase common stock commenced trading on the New York Stock Exchange

5  ("NYSE") on 04/28/21 under the symbols STEM and STEM.WS, respectively.

6       16.     Defendant John Carrington ("Carrington") was the Company's Chief Executive

7  Officer ("CEO") and director from December 2013 until his abrupt departure on 09/16/24. During

8  the Class Period, Defendant Carrington had the ultimate authority over the disclosures made in the

9  Company's Forms 10-Q and 10-K. Defendant Carrington signed certifications pursuant to 18 U.S.C.

10  §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, and pursuant to Rules 13a-

11  14(a) and 15d-14(a) under the Exchange Act, as adopted pursuant to §302 of the Sarbanes-Oxley Act

12  of 2002 for the Company's Forms 10-Q and 10-K from 05/17/21 to 08/04/23. Defendant Carrington

13  also participated in the Company's Class Period earnings conference calls as well as other investor

14  conferences on: 12/04/20, 04/12/21, 08/11/21, 10/12/21, 11/09/21, 01/06/22, 02/24/22, and 09/28/22.

15  He is also quoted in Stem's releases filed on 12/04/20, 01/05/21, 01/13/21, 02/11/21, 02/18/21,

16  04/14/21, 05/17/21, 08/11/21, 11/09/21, 02/24/22, 05/05/22, and 08/04/22.

17       17.     As a member of Legacy Stem's Board of Directors prior to the Merger, Defendant

18  Carrington recommended approval of the Merger and solicited shareholders' votes pursuant to the

19  Defective Prospectus and Defective Investor Materials. Defendant Carrington sold 556,511 shares

20  of Stem common stock during the Class Period while in possession of material nonpublic

21  information for total proceeds of approximately $8.08 million.

22       18.     Defendant William Bush ("Bush") was the Company's Chief Financial Officer

23  ("CFO") from November 2016 to September 2, 2024 until he was replaced as CFO and took another

24  position at Stem. Defendant Bush signed certifications pursuant to 18 U.S.C. §1350, as adopted

25  pursuant to §906 of the Sarbanes-Oxley Act of 2002, and pursuant to Rules 13a-14(a) and 15d-14(a)

26  under the Exchange Act, as adopted pursuant to §302 of the Sarbanes-Oxley Act of 2002 for the

27  Company's Forms 10-Q and 10-K from 05/17/21 to 08/04/23. Defendant Bush also participated in

28

the Company's Class Period earnings conference calls as well as other investor conferences on: 12/04/20, 08/11/21, 02/24/22, and 09/28/22.

19.     Defendant Bush sold 200,753 shares of Stem common stock during the Class Period, while in possession of material nonpublic information for total proceeds of approximately $3.03 million.

20.     Defendant Larsh Johnson ("Johnson") has been the Company's Chief Technology Officer ("CTO") from January 2016 until he retired in or around May 2024.  As CTO, Defendant Johnson led software and engineering at Stem.  Defendant Johnson participated in the Company's Class Period earnings conference calls as well as other investor conferences on: 08/11/21, 11/09/21, 02/24/22, and 09/28/22.

21.     During the Class Period, Defendant Johnson sold 108,146 shares of Stem common stock while in possession of material nonpublic information for total proceeds of approximately $1.73 million.

22.     Defendant Prakesh Patel ("Patel") was the Company's Chief Strategy Officer ("CSO") from 2020 to 08/06/24, when Stem announced that he was "departing from the Company, effective immediately."  Upon information and belief, as CSO, Defendant Patel is charged with Stem's strategy formulation and management, including developing and overseeing Stem's corporate vision and strategy.  Defendant Patel participated in the Company's Class Period earnings conference calls on 8/11/21, 11/09/21, and 09/28/22.

23.     During the Class Period, Defendant Patel sold 128,157 shares of Stem common stock while in possession of material nonpublic information for total proceeds of approximately $3.1 million.

24.     Defendant Alan Russo ("Russo") was the Company's Chief Revenue Officer ("CRO") from 2019 until his departure on 07/12/24.  Upon information and belief, Defendant Russo oversaw numerous Stem departments, including, but not limited to, sales for behind-the-meter ("BTM") and FTM, business development, and marketing.  Defendant Russo participated in the Company's Investor and Analyst Day on 09/28/22.  He is also quoted in Stem's releases filed by Star Peak with the SEC pursuant to Rule 425 on 03/02/21 and 04/06/21.

25. During the Class Period, Defendant Russo sold 176,296 shares of Stem common stock while in possession of material nonpublic information for total proceeds of approximately $2.6 million.

26. Defendant Bryan Ho ("Ho") has been the Company's Senior Director of Product Management since March 2022. Defendant Ho participated in the Company's Investor and Analyst Day on 09/28/22. Plaintiffs only allege that Ho violated the Exchange Act for the period after Ho took his position in March 2022 through the end of the Class Period.

27. Defendant Star Peak Energy Transition Corp. ("Star Peak") was a blank check company with no business operations of its own that was incorporated in Delaware on 10/29/18. Star Peak completed its IPO on 08/26/20. On 12/04/20, Star Peak announced that it would be merging with Stem. On 04/28/21, Star Peak and STPK Merger Sub completed a Merger with Legacy Stem wherein STPK Merger Sub merged with and into Legacy Stem with Legacy Stem surviving the transaction as a wholly owned subsidiary of Star Peak. At this time, Star Peak renamed itself "Stem, Inc." and began operating Legacy Stem's business. Star Peak is controlled by Star Peak Sponsor, LLC who owned 99.2% of the outstanding common stock of Star Peak. Star Peak Sponsor LLC, in turn, is controlled by a board of managers, consisting of Defendant Eric Scheyer ("Scheyer"), Defendant Michael C. Morgan ("Morgan"), and Defendant Alec Litowitz ("Litowitz"). Thus, Defendants Scheyer, Morgan, and Litowitz each indirectly owned 99.2% of Star Peak, respectively, at the time of the Merger. In connection with the Merger, Star Peak received 9.5 million shares, and, thus, Star Peak, Scheyer, Morgan, and Litowitz profited handsomely from the Merger. Plaintiffs allege violations of the Exchange Act against Defendant Star Peak up until the time the business combination between Stem and Star Peak closed on 04/28/21.

28. Defendant Scheyer served as Star Peak's CEO and served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem. Defendant Scheyer signed the Defective Prospectus and participated in the 12/04/20 Investor Conference prior to the Merger. He is also quoted in Stem's release filed by Star Peak with the SEC on a Form 8-K on 12/04/20. As a member of Star Peak's Board of Directors prior to the Merger, and a controlling stockholder of Star Peak, Defendant Scheyer recommended approval of the Merger and

soliciting shareholders' votes pursuant to the Defective Prospectus and Defective Investor Materials. Plaintiffs allege violations of the Exchange Act against Defendant Scheyer up until the time the business combination between Stem and Star Peak closed on 04/28/21.  Defendant Scheyer participated in an investor conference on 12/04/20.  He is also quoted in a press release filed on 12/04/20.

29.    Defendant Morgan served as Star Peak's Chairman from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem.  From 04/28/21 until 10/07/24, Defendant Morgan served as a director of Stem.  Defendant Morgan authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact and participated in the 12/04/20 Investor Conference, and the 04/12/21 IPO Edge Fireside Chat prior to the Merger.  He is also quoted in Stem's release filed by Star Peak with the SEC on a Form 8-K on 12/04/20 and in press releases filed by Stem with the SEC pursuant to Rule 425 under the Securities Act and deemed filed pursuant to Rule 14a-12 under the Exchange Act on 04/12/21.  Morgan also signed the 02/16/23 Form 10-K that was filed by Stem with the SEC.  As a member of Star Peak's Board of Directors prior to the Merger and a controlling stockholder of Star Peak, Defendant Morgan recommended approval of the Merger and solicited shareholders' votes to approve the Merger pursuant to the Defective Prospectus and Defective Investor Materials.  Defendant Morgan participated in investor conference calls on 12/04/20 and 04/12/21.  He is also quoted in press releases filed on 12/04/20 and 04/12/21.

30.    Defendant Litowitz served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem.  Defendant Litowitz authorized Defendant Scheyer to sign the Defective Prospectus on his behalf as attorney-in-fact.  As a member of Star Peak's Board of Directors prior to the Merger and a controlling stockholder of Star Peak, Defendant Litowitz recommended approval of the Merger and solicited shareholders' votes to approve the Merger pursuant to the Defective Prospectus and Defective Investor Materials.

31.    Defendant Adam E. Daley ("Daley") served as a Director of Star Peak from Star Peak's IPO on 08/20/20 through 04/27/21, the effective date of Star Peak's Merger with Stem.  Since 04/28/21, Defendant Daley has served as a Director of Stem and currently serves on Stem's Board of

1   Directors.  Defendant Daley authorized Defendant Scheyer to sign the Defective Prospectus on his

2   behalf as attorney-in-fact.  As a member of Star Peak's Board of Directors prior to the Merger,

3   Defendant Daley recommended approval of the Merger and solicited shareholders' votes to approve

4   the Merger pursuant to the Defective Prospectus and Defective Investor Materials.  During the Class

5   Period, Defendant Daley sold 500,000 Stem shares for total proceeds of approximately $8.37 million

6   while in possession of material, nonpublic information.

7          32.    The "14(a) Defendants" referred to herein are Defendants Stem, Star Peak, Bush,

8   Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer.

9          33.    The "14(a) Individual Defendants" referred to herein are Bush, Carrington, Daley,

10  Litowitz, Morgan, Russo, and Scheyer.

11         34.    The "Fraud Defendants" referred to herein are Stem, Star Peak, Bush, Carrington,

12  Daley, Ho, Johnson, Morgan, Patel, Russo, and Scheyer.

13         35.    The "Individual Fraud Defendants" referred to herein are Bush, Carrington, Daley,

14  Ho, Johnson, Morgan, Patel, Russo, and Scheyer.

15         36.    The 14(a) Defendants and Fraud Defendants are referred to collectively herein as

16  "Defendants."

17         37.    The Individual Fraud Defendants were directly involved in the management and day-

18  to-day operations of the Company at the highest levels and/or were privy to confidential proprietary

19  information concerning the Company and its business, operations, software and services, and present

20  and future business prospects, as alleged herein.

21         38.    The Individual Fraud Defendants were involved in drafting, producing, reviewing

22  and/or disseminating the false and misleading statements and information alleged herein, and were

23  aware of and/or acted with deliberate recklessness regarding the false and misleading statements

24  being issued regarding the Company, and approved or ratified these statements, in violation of the

25  federal securities laws.  They also were all privy to confidential proprietary information concerning

26  the Company and its business, operations, software and services, and present and future business

27  prospects, as alleged herein.

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 9 -
4879-3770-3139.v1

39.     As officers and controlling persons of a publicly held company whose securities are registered with the U.S. Securities and Exchange Commission ("SEC") pursuant to the Securities Act of 1933 and the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Fraud Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's business, operations, software and services, and present and future business prospects.  In addition, all Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

40.     The Individual Fraud Defendants, because of their positions of control and authority as officers and/or directors of Stem and/or Star Peak, individually and collectively possessed the power and authority to control, and did control, the alleged fraudulent conduct as well as the contents of the various SEC filings, press releases, presentations and other public statements pertaining to the Company; the Individual Fraud Defendants also had the ability to correct the statements or prevent them from being released into the public sphere.  Accordingly, the Individual Fraud Defendants are responsible for the accuracy of the materially false and misleading public statements detailed herein.

41.     Defendants were provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, including the Defective Prospectus, quarterly and annual reports to the SEC, press releases, and presentations to investors, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Fraud Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made were thus materially false and/or misleading.  As alleged herein, certain of the Company's SEC filings, press releases, presentations to investors, and quarterly and annual reports, contained material misrepresentations and omissions when issued.  In addition, throughout the Class Period, the Individual Fraud Defendants participated in investor conferences as

1  well as the Company's quarterly and/or annual earnings conference calls wherein they made material

2  misrepresentations, omitted material information, or failed to correct the material misstatements or

3  omissions of others.

4             **III.    NON-PARTIES AND PERCIPIENT WITNESSES**

5        **A.    Non-Parties**

6        42.    AlsoEnergy Holdings, Inc. ("AlsoEnergy") is a Delaware corporation with its

7  headquarters located in Colorado.  AlsoEnergy purportedly provided customers with solar asset

8  performance monitoring and control software.  On 12/16/21, Stem announced its acquisition of

9  AlsoEnergy for $695 million.

10       43.    Available Power, LLC is a Colorado corporation with its principal place of business

11 located in North Carolina.  Available Power purportedly designs, develops, and deploys distributed

12 energy resources and microgrid systems for commercial and industrial real estate.  On 02/24/22,

13 Stem announced an Available Power booking in which Stem would have exclusive rights to provide

14 Athena to energy storage systems at 100 FTM sites throughout Texas, with a project portfolio valued

15 over $500 million.

16       44.    Lullwater Energy Projects Fund, L.P., a limited partnership doing business in Texas,

17 and Lullwater Bess I, LLC, a limited liability company doing business in Texas (collectively,

18 "Lullwater") was one of the companies that Stem at the end of 2022 sought to sell the batteries it had

19 purchased for the Available Power deal as explained in ¶¶86-88 below.

20       45.    REX Storage Holdings, LLC ("REX") is a joint venture between Regis Energy

21 Partners LP, an independent developer, owner, and operator of energy storage systems, and

22 Excelsior Energy Capital (EEC), a leading investment fund focused on renewable power generation.

23 It was one of the companies that Stem sought to sell the batteries it had purchased for the Available

24 Power deal as explained in ¶¶86-87 below.

25

26

27

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 11 -
4879-3770-3139.v1

1

**B.    Percipient Witnesses**

2        46.    CW1[7] was employed at Stem from prior to the Class Period until February 2022.

3    They worked on FTM deals and were responsible for, *inter alia*, answering client questions, assisting

4    the FTM sales team with drafting the initial proposals that were submitted in response to requests for

5    proposals ("RFPs"), sending proposals via emails to clients, managing deal flow across the entire

6    sales cycle, gathering pricing internally, as well as assisting with shipping logistics, payment terms,

7    and other backend logistics for sales.  CW1 explained that they served as an expert on the entire

8    sales cycle and had direct interactions with virtually every one of Stem's FTM clients.  They

9    reported to Mary Adam, the Director of Sales with responsibilities for FTM.

10       47.    Mary Adam's LinkedIn page confirms that she was employed at Stem as "Director of

11   Partner Sales for the Front of the Meter Team responsible for leading Account Executives to hit

12   assigned quota targets" from May 2020 to March 2022.  Adam's LinkedIn page further specifies that

13   her "[c]ore strengths include generating, qualifying and closing complex sales transactions with

14   multilevel decision making teams and C-level executives."  Mary Adam reported to Defendant

15   Russo.  In turn, Russo reported to Defendant Carrington.

16       48.    CW2 held several positions at Stem from early 2020 until August 2023, including as

17   a Stem analyst.    They also were part of Stem's Market Enablement Group that included

18   approximately 20 individuals from Stem's Business Development and Product Development

19   departments as well as individuals from the sales organization.  CW2 reported ultimately to CRO

20   Russo.  During CW2's tenure, they worked directly with sales on RFPs as well as analyzed new

21   markets and use cases for Stem's energy storage solutions, including for Mexico, residential, power

22   plants, and mini-co-ops (which were utilities and represented FTM opportunities).  CW2 also

23   worked with sales involving, among other things, FTM projects, including for the Electric Reliability

24   Council of Texas ("ERCOT") and New England, and that they used Salesforce which tracked

25   bookings and purchase orders as well as other information.

26

27

---

28  [7]    "CW" refers to confidential witness.

49.    CW3 was Stem's Director of Technical Sales Training from March 2021 to June 2023.  In their position, they were involved in overseeing all training and enablement for Stem's sales and marketing teams, as well as Stem's external partners.  CW3 worked closely with the product teams that oversaw development of Athena software for BTM and FTM, including the developers and engineers for Athena.  CW3's role fell under the marketing umbrella and they worked with the product marketing team, which worked on the Company's website and materials for trade shows.  They reported to Vice President of Marketing Garrett Colburn who, in turn, reported to CRO Russo.

## IV.    BACKGROUND FACTS

### A.    Star Peak Forms a SPAC

50.    Star Peak is a blank check company with no business operations of its own, formed for the sole purpose of listing on a public exchange and subsequently effecting a business combination with one or more businesses seeking to be a market leader in, and/or benefit from, the increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions.[8]

51.    John Coates, speaking in 2021 as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:[9]

> The basics of a typical SPAC are complex, but can be simplified as follows.  A SPAC is a shell company with no operations.  It proceeds in two stages.  In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company.  Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk.  If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates.  About ten percent of SPACs have liquidated between 2009 and now.

> But most SPACs since 2009 have gone on to identify acquisition candidates.  In their second stage, SPACs complete a business combination transaction, in which the

---

[8]    *See* Star Peak's Registration Statement on Form S-1 filed with the SEC on 07/31/20.

[9]    John Coates, "SPACS, IPOs and Liability Risk Under the Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021) (footnotes omitted).

SPAC, the target (*i.e.*, the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

52.     The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interests, and to avoid disclosures that may dissuade investors from exchanging shares in the merger. If a merger is completed within the allocated time frame, founders and managers of the SPAC, here, Litowitz, Morgan, and Scheyer, generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to the public offering and enjoy considerable control such as the ability to nominate board members to the new company.

53.     Companies seeking to go public, like Stem, have increasingly turned to SPAC structures in recent years because they are faster than traditional IPOs, the price is determined in advance instead of by the market determining the price, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. However, SPAC mergers also have the potential to be rife with inaccurate disclosures, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. Here, Star Peak targeted Stem to take public and avoid the rigors of a normal IPO process.

54.     On 08/20/20, Star Peak completed its IPO of 35,000,000 units generating gross proceeds of $350,000,000. On 08/26/20, the underwriters partially exercised the over-allotment option and purchased an additional 3,358,504 units, at a price of $10.00 per unit, generating gross proceeds of $33,585,040.

55.     On 09/28/20, Star Peak entered into exclusivity with Stem and chose Stem for its target. As part of the Merger process, Stem provided multiple rounds of due diligence information to Star Peak. This due diligence information would have included information on Stem's business model, operations, products, customers, and the Company's growth prospects.

1

**B.      Stem's Software Story**

2      56.      Stem describes itself as a "global leader in artificial intelligence (AI)-driven clean

3   energy solutions and services."  To that end, it traditionally bundled hardware (largely batteries)

4   together with its Athena software offering and then sold this solution to BTM customers.  Stem,

5   however, was not profitable with this traditional business model and remained in the red leading up

6   to the IPO.

7      57.      Stem does not, itself, manufacture batteries but, rather, procures batteries from

8   leading, global battery original equipment manufacturers ("OEMs"), including, among others, Tesla,

9   Samsung, LG Chem, and Panasonic.  Stem then re-sells the batteries to its customers, which include

10   commercial and industrial ("C&I") enterprises as well as independent power producers, renewable

11   project developers, and grid operators with energy storage systems.

12      58.      Stem coupled its hardware sales with its Athena software as part of its energy solution

13   to customers.  Athena was purportedly a "fully automated" AI software that provides "energy

14   forecasts" and "real-time optimization and automated controls" for customers.[10]  Stem claimed that

15   Athena operates autonomously to deliver value to grid operators and other customers: "*[W]hat*

16   *Athena does is it's analyzing these large data sets and making real-time decisions that*

17   *automatically respond to changing conditions in the energy market*."[11]  In this way, Athena's

18   purported ability to function autonomously was crucial to its stated capabilities.

19      59.      The intent of Athena's automated operation was to allow grid operators to decrease

20   their reliance on conventional energy generation sources, thereby improving the reliance and

21   resiliency of the electrical grid and enabling lower carbon emissions through the increased adoption

22   of renewable generation sources.  Moreover, Athena was intended to automate system discharges

23   across multiple different utility territories, collaborating with the utilities to provide instant grid

24   support when and where it is needed.

25

26

----

27   [10]    Star Peak Energy Transition Corp., Registration Statement (Form S-1) (12/16/20).

28   [11]    IPO Fireside Chat with Star Peak and Stem, Event Transcript (04/12/21).

60.     Historically, Stem focused its business operations on BTM projects for C&I customers.  As part of its IPO story, Stem pitched its transformation to a profitable high-margin low-capital software company that, with its Athena software, could capture market share from the lucrative FTM market – a market that was ten times that of the BTM market.  The Company's focus on expanding software sales was critical because Stem's hardware sales can only nominally mark-up the batteries that it sells to customers (*i.e.* a reported 10%-30% gross margins at the time of the IPO). In contrast, Defendants indicated that Stem's Athena software carries gross margins in excess of 80%.

61.     To that end, at the beginning of the Class Period, on 12/04/20, Stem touted in a release that the Company was "a global leader in artificial intelligence (AI)-driven clean energy storage systems" and announced its Merger and intent to become a publicly listed business through a combination with Star Peak.[12]  In the release, investors were told that the transaction would provide up to $608 million in gross proceeds.

62.     The Company's Merger and IPO would also supposedly position Stem for profitability and growth because it allowed Stem to "fully fund" its business model.  Indeed, the Merger and IPO was described in the 12/04/20 release as a "***transaction [that] is transformative for us and we expect it to significantly accelerate our growth***."  Defendants also represented that the combined "***[b]alance sheet supports significant market expansion – strong balance sheet with approximately $525 million of cash to fully finance all U.S. and international forecasted growth***." That forecasted growth included a projected profit by the end of FY 2022, and gross margins of 12% for FY 2020 that would more than double by the end of FY 2022 to 28% driven by software sales:

---

[12]  Star Peak filed the release with the SEC on a Form 8-K signed by Defendant Scheyer on 12/04/20.



**stem** Financial Forecast                                                              Confidential   31

## Stem delivers consistent growth and improving margins

| ($MM) | FY20E | FY21E | FY22E | FY23E | FY24E | FY25E | FY26E |
|---|---|---|---|---|---|---|---|
| Cumulative AUM (MWh) | 714 | 1,046 | 1,754 | 3,785 | 7,257 | 11,834 | 17,799 |
| *YoY Growth* | *153%* | *46%* | *68%* | *116%* | *92%* | *63%* | *50%* |
| Bookings | $145 | $198 | $342 | $721 | $848 | $974 | $1,159 |
| *YoY Growth* | *65%* | *37%* | *72%* | *111%* | *18%* | *15%* | *19%* |
| Revenue | $33 | $147 | $315 | $526 | $748 | $944 | $1,167 |
| *YoY Growth* | *94%* | *348%* | *115%* | *67%* | *42%* | *26%* | *24%* |
| Pro Forma Gross Profit | $4 | $24 | $82 | $169 | $264 | $360 | $483 |
| *Gross Margin(1)* | *12%* | *16%* | *26%* | *32%* | *35%* | *38%* | *41%* |
| Total Operating Expenses | 39 | 49 | 54 | 55 | 60 | 65 | 66 |
| Adjusted EBITDA | ($35) | ($25) | $28 | $113 | $204 | $295 | $417 |
| *EBITDA Margin %* | *NM* | *NM* | *9%* | *22%* | *27%* | *31%* | *36%* |
| CapEx | NM | ($17) | ($34) | ($39) | ($37) | ($35) | ($25) |
| Free Cash Flow | NM | ($49) | ($7) | $70 | $162 | $253 | $381 |

**~88% of Forecasted 2021 Revenues From Executed Contracts**

Source: Stem.
Note: Stem's fiscal year is 31-Dec. (1) Pro Forma Gross Profit  adjusted for non-recurring, non-system related items and amortization related with product development (IDS) costs.

**stem** Revenue Diversity                                                              Confidential   29

## Robust revenue growth by customer type and segment

Source: Stem.
Note: Stem total revenue calculation assumes recognition of all contracted backlog at system delivery and ratable recognition of software services over the contractual period; Hardware revenue assumes all contracted backlog recognized at system delivery; Software revenue includes SaaS Fees, revenue within the period from systems on balance sheet and O&M.

63.    To drive home the Company's growth story, the 12/04/20 Stem release highlighted that the merged entity had a "***Capital light business model***" and that "***Athena™ AI-driven software leads to strong operating leverage with low expected capital intensity.***"  This statement was adopted by Star Peak in a Form 8-K it filed with the SEC on 12/04/20 as a representation to investors that the Merger with Stem would add value to the combined company.

64.     Based on Stem's business model and software story, Star Peak and Stem forecasted for Stem astronomical growth and improving gross margins with the Company turning profitable in two years:

| 12/04/20 Forecast Affirmed 01/25/21 | | | | |
|---|---|---|---|---|
| ($mm) | **FY20E** | **FY21E** | **FY22E** | **FY23E** |
| Revenue | $33 | $147 | $315 | $526 |
| Non-GAAP Gross Margin % | 12% | 16% | 26% | 32% |
| Adjusted EBITDA | $(35) | $(25) | $28 | $113 |

**C.     As Stem's BTM Market Sales Had Stalled Prior to the IPO, Stem Pivoted to the More Lucrative FTM Market with a Non-Viable Product**

65.     Stem's IPO story that the combined company would find success in the lucrative FTM market was necessary because the Company's BTM business had not and would not drive growth or profits.  Indeed, CW2 explained that, prior to the IPO, growth in Stem's BTM line of business had flatlined, which led Stem to build-out an FTM line of business.

66.     CW1 confirmed that, in 2019, in order to drive growth and profits, Stem sought to expand its sales to the FTM market as FTM deals were much larger and more lucrative.  To that end, on 07/09/19, Stem announced its ***first*** FTM project purportedly providing AI-driven storage solutions through Athena at five grid-scale sites across Massachusetts.[13]

67.     CW1 explained, however, Athena did not work for the Massachusetts project because Stem's Athena software was not automated and, thus, required a Stem employee to use an Excel spreadsheet to manually perform functions Athena was supposed to offer.  CW2 corroborated CW1's account indicating that they also learned that manual processes were being used to perform Athena functions for the Massachusetts project.

68.     Indeed, as discussed below, Athena was not viable for FTM projects like the Massachusetts project because it was not automated for those projects.  Thus, Stem's software story was fatally flawed as Athena did not operate autonomously for ***any*** FTM projects.

---

[13]    "Stem enters the front of the meter energy storage market with a solar energy storage partnership in Massachusetts" July 9, 2019, https://www.stem.com/stem-enters-the-front-of-meter-energy-storage-market-with-a-solar-energy-storage-partnership-in-massachusetts/ (last accessed 11/08/24).

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                        - 18 -
4879-3770-3139.v1

D.    **Stem's Purportedly Automated Software – Athena – Was Not Viable for FTM Projects**

69.    CW1 explained that FTM projects are significantly more complex than BTM because, *inter alia*, these systems use technology and data analysis to balance supply and demand, manage outages, and maintain the stability and reliability of the grid rather than merely focusing on reducing energy costs and enhancing energy resiliency for an individual business as with BTM.  Athena, however, was inadequate to address the more complex demands of FTM projects.

70.    CW1, who worked on FTM projects from prior to the Class Period until they left in February 2022, explained that since Stem's inception, Stem did not have a working product for FTM projects because Athena was not fully automated for FTM.  CW1 explained that Athena was, thus, functional for BTM deals but not well made for large FTM deals.  CW1 indicated that representing Athena as viable for FTM projects was misleading.

71.    According to CW1, even though Athena was not a working FTM product, Stem's approach was to sign up enough FTM projects to eventually be able to build out its software team and from there build the software for FTM projects.  CW2 corroborated that Stem's plan was to eventually get enough FTM projects to then hire personnel to develop Athena.  CW1 reported that all of Stem's FTM clients CW1 worked with described Athena as an empty suit when it came to the software for the FTM projects because Stem simply did not have the software it said it had.  They explained that Athena was not really used for FTM because Stem was unable to provide core functionalities.  Indeed, according to CW1, Athena only existed in a Beta version that would repeatedly crash.  CW1 said that whenever an error was fixed, a new error would arise within five minutes.  The team would put a sample project into Athena to try to break it, but Athena would crash before the initial inputs were even entered.

72.    Further, CW1 elaborated that, for FTM, Athena was really only a very rough prototype and basically just an Excel sheet.  CW1 stated if Athena could be likened to a vending machine, customers were being asked to put a coin into the machine under the presumption there was, in fact, a machine inside.  But in the case of Athena, the software was not self-sufficient but,

1  rather, functioned through a Stem employee using an Excel spreadsheet to give answers that Athena
2  was supposed to generate automatically.

3        73.    For the Massachusetts FTM project, which was Stem's largest and most touted FTM
4  program, CW1 explained that during their tenure through early 2022, Stem had not yet finished (*i.e.*,
5  provided automated FTM software) the Massachusetts FTM project.  CW1 reported that because
6  Athena did not work as marketed, Stem had an employee managing an Excel spreadsheet in which
7  various minute changes were input to reflect changing conditions and performing the functions that
8  Athena could not do automatically.  CW1 referred to the Athena spreadsheet as a calculator that an
9  individual manipulated to get a specific output.

10        74.    CW2, who was employed at Stem and worked with sales, including on FTM projects,
11  from February 2020 until August 2023, corroborated CW1's accounts, indicating that they had heard
12  Stem had an employee who worked on an Excel spreadsheet to handle functions on the
13  Massachusetts FTM project that were supposed to be handled by Athena, and confirmed that the
14  employee had been doing some manual processes.  CW2 also reported hearing from a Stem senior
15  sales associate that a Stem operations manager had complained because the operations manager was
16  annoyed at having to do so many manual tasks.

17        75.    Notably, Defendant Carrington corroborated the accounts of CW1 and CW2 when he
18  admitted post-Class Period during Stem's 02/28/24 earnings call discussing the Company's Q4 2023
19  and FY 2023 results, Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's
20  operations.

21        76.    CW3, who worked with sales and the product marketing team as well as the Athena
22  product team from March 2021 until June 2023, also corroborated reports that Athena lacked
23  functionality with respect to FTM projects.

24        77.    Corroborating the accounts of CW1 and CW3, CW2 confirmed that Athena was not
25  fully developed, indicating that the ship was taking off and being built at the same time.

26

27

28

**E.    Stem Was Unable to Provide Training and Sales Materials for FTM Projects Because Athena Did Not Work for FTM**

78.    Because Stem lacked a viable FTM product, the Company was unable to provide details about how the software functioned to its employees and customers.

79.    Stem was unable to provide its sales team with a viable working version of Athena. CW1, who interacted with Stem's marketing group until February 2022, stated that Stem's sales team requested a working model of Athena to show customers but since one was not available, the marketing group fabricated screenshots of what Athena was supposed to look like, which were then shown to customers.  According to CW1, Mary Adam, Stem Sales Director, and Stem's marketing executives approved these fabricated screenshots. CW1 also requested a working Athena model in response to Adam's requests for updates on prospective deals.  In response, Adam told CW1 to ask the software team, which resulted in CW1 asking the software team for a working Athena model on a regular cadence.  They never received such a model.  To that end, CW1 explained that, at every sales meeting, someone would state that they had never seen a working version of Athena for FTM projects.  CW3 similarly reported that they could not recall ever seeing an example of a case study for FTM that was fully installed, and that CW3 and the FTM sales team would frequently request examples of Athena's successful implementation into an FTM project and other demonstrations of Athena's success in FTM projects but, despite those numerous requests, never received this information.

80.    CW1 reported that they asked a product marketing manager in Stem's marketing department for a video demonstrating Athena software working in an FTM setting, but they were unable to provide one because the software for FTM projects was not viable.  Similar to CW1's account, CW3, who worked with the product marketing team, explained that they found it difficult to provide enough useful content to Stem's partners for training and it was always a struggle to get enough information from the product team, particularly for FTM projects.  Based upon CW3's experience at other companies, the information should have been provided by multiple stakeholders, including the product, marketing, training, and operations teams.  Accordingly, CW3 felt that they

1   were on their own to get things done and were unable to get enough information to provide to Stem's

2   partners for their FTM sales purposes.

3          81.    CW3 elaborated that sometime in late 2021 or early 2022, there was a lot of

4   confusion around Athena.  There were some people who had been highly involved with Athena who

5   left, including the Senior Product Manager who oversaw product development for Athena.  CW3

6   said these departures seemed sudden.  CW3 indicated that the new product team provided the

7   marketing development team with content for training materials.  However, when members of the

8   product team reviewed the training materials created by CW3's team based upon the provided

9   content, they were told that some of the content on Athena's FTM software could not be used

10  because the products were still in development and were not functional.  CW3 indicated that Athena

11  Bidder and Athena Supervisor were two such products that were designed for FTM projects and had

12  been featured in materials but were supposed to be removed.[14]  CW3 explained that the products in

13  development could also not be included in the official training materials for the partners.  They were

14  told products in development could be used in materials for trade shows for marketing to potential

15  customers and partners, but not in training materials for the sales team and partners.  CW2 confirmed

16  that it was always a big request from the sales force to get a video or some demonstration of the

17  Athena platform in an operational setting to show customers and that this kind of material was never

18  offered, further corroborating CW1 and CW3's statements regarding lack of FTM demonstration

19  materials.

20        **F.**    **Stem's FTM Bookings Were Not Viable Deals and Did Not Reflect**
                **that Athena Worked for the FTM Market**

21

22        82.    Stem touted FTM bookings that were not actual viable deals.  As part of Stem's

23  scramble to grow market share post-IPO, Stem guaranteed to its customers that the value of

24  purchased hardware would not decline for a certain period of time.  Under this guaranty, if these

25  customers were unable to install or designate the hardware to a specified project within such period

26  of time, the Company would be required to assist the customer in re-marketing the hardware for

27  ───────────────

    [14]  Athena Bidder was cited by John Carrington as a "market-leading" software in the
28  announcement of the Available Power deal in February 2022.

    FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
    FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 22 -
    4879-3770-3139.v1

resale by the customer.  The guaranty provided that, in such cases, if the customer resold the hardware for less than the amount initially sold to the customer, the Company would be required to compensate the customer for any shortfall in fair value for the hardware from the initial contract price.  CW2, who worked on deals with the parent guarantees, described them as a give-you-back agreement which reduced the risk for clients if they subsequently had issues so that the client was not on the hook for the products.

83.    CW1 asserted that Stem had difficulty closing deals and that large FTM deals fell apart because Athena did not work for the FTM market.  CW1 noted that Russo participated in weekly sales meetings throughout the Class Period, wherein updates were provided on the status of new deals.  CW1 stated that, during the weekly sales meetings, Defendant Russo asked questions about every deal and that Russo was a self-proclaimed Salesforce data czar.  CW1 also believed Mary Adam, the Director of Sales, would regularly meet with Defendant Russo and updated him on the status of deals following weekly meetings that CW1 participated in with Mary Adam.  As to bookings, CW2, who was employed at Stem throughout the Class Period, and worked on securing deals, indicated that bookings were letters of intent that did not require customers to issue a purchase order.  According to CW2, Stem would chase bookings at the end of the quarter to report prospective deals even without an actual purchase order.

84.    Stem's flagship $500 million Available Power FTM project is an example of a phantom deal.  According to CW2, Stem originally reported a booking from Available Power, which was essentially a non-binding letter of intent in which Available Power was supposed to issue actual purchase orders to Stem within two months of the letter of intent date.  However, Available Power never issued the purchase orders, which, according to CW2, is what constituted a sale.  CW2 indicated that it was Stem's policy that a purchase order was necessary (*i.e.*, the trigger) for Stem to actually purchase hardware in relation to a particular project.

85.    According to CW2, in violation of Company policy, Stem ordered hardware intended for the Available Power project based on just the booking (*i.e.*, the letter of intent).  CW2 indicated it was Stem's standard procedure not to procure hardware without a customer purchase order but that exceptions to this procedure were not uncommon.  CW2 recalled that Defendant Bush would have

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                    - 23 -
4879-3770-3139.v1

signed for Stem's purchase of the hardware meant for Available Power, which would have also been cross-executed by Defendant Carrington. CW2 indicated they personally became aware that the Available Power deal was no longer viable in approximately early 3Q 2022 when they learned from their manager Randy Parole that there was hardware that needed to be off the books by 12/31/22 in order for Stem to hit its targets.

86. CW2 further indicated that because Stem wanted to recognize revenue on the basis of the hardware Stem had purchased for the Available Power project before the end of 2022, Stem was forced to find other buyers for the hardware. CW2, who worked on securing deals, explained that Stem managed to find additional buyers for the hardware – REX and Lullwater – before the end of 2022. CW2 noted that the contracts with REX and Lullwater had a parent guaranty, which Stem created out of a sense of urgency to in order to get the Available Power batteries off the books. These guarantees would allow both companies to return the equipment to Stem if the two companies were unable to sell the equipment. Nonetheless, according to CW2, Stem's agreements with REX and Lullwater were entered into to show a sale to Wall Street and to get the hardware off Stem's books by 12/31/22. As of August 2023 when CW2 left Stem, REX still had not found end users for Stem's battery system. CW2 learned this information from discussions with coworkers and described the information as general knowledge known to management and their coworkers.

87. CW2's account is corroborated by Stem's release filed on a Form 8-K on 02/16/23, Stem had announced on 12/08/22 that REX had made the first of a $400M equity commitment to acquire construction ready projects for which Stem would supply batteries. Further, CW2's account is confirmed by the complaints filed in *Lullwater Energy Projects Fund LP v. Stem, Inc.*, No. CIV 20234527 (Tex. Super. Ct. Harris Cnty. July 20, 2023). Lullwater's complaint described the deal with Stem as "a last minute end-of-the year negotiation." The complaints also reflect that (i) Lullwater and Stem had entered into a master purchase agreement (signed by Defendant Russo) on 09/30/22, as well as a master services agreement (signed by Defendant Carrington) on the same day; and (ii) on 12/30/22 Stem provided Lullwater with a parent guaranty (signed by Defendant Bush). Similar to CW2's account, according to the Lullwater complaints, "the last minute hard sell of

1  Batteries in late 2022 may have been an attempt to present year-end corporate disclosures in a more

2  positive light."

3      88.    Ultimately, the deal with Lullwater fell through, as it never took possession of the

4  batteries.  Instead, Lullwater filed suit, contending that the batteries sold by Stem were of subpar

5  quality and that Stem breached its contractual obligations in the sale.

6      89.    As detailed above, Stem's bookings/deals were not indicative that Athena was viable

7  for the FTM market.  In addition, to the phantom Available Power deal, according to CW1, many

8  deals did not close because customers (*i.e.* developers) realized Athena did not work for FTM

9  projects.  CW1 elaborated that Stem's FTM deal close rate for its eight account executives was only

10  15% to 20%, meaning that for every five FTM deals, only one deal closed, and the rest were lost.

11      90.    The hardware parent guarantees given by Stem negatively impacted the Company's

12  actual fiscal results for FY 2022 and the beginning of FY 2023.  Post-Class Period, Stem would

13  belatedly write down nearly $178 million in hardware revenue for this period, reporting $74 million

14  in revenue reductions beginning on 11/02/23 in its Q3 2023 Form 10-Q and a massive $104 million

15  accounts receivable write-offs on 10/30/24 in its Q3 2024 Form 10-Q.  Stem conceded in its Q3

16  2023 Form 10-Q that at least $16.9 million of its $37.4 million revenue reduction was directly

17  related to Q4 2022 revenue.  In addition, Stem reported additional revenue reductions related to its

18  parent guaranty contracts, including the following: Q2 2024 Form 10-Q filed with the SEC on

19  08/03/24 ($33.1 million) and Q3 2024 Form 10-Q filed with the SEC on 10/30/24 ($5.6 million).

20  These write-downs reflect that Stem was unable to sell its Athena software for FTM projects.

21      **G.    Stem's IPO and the Associated Infusion of Capital Was Critical for
         the Company's Survival and Growth**

22

23      91.    Prior to Stem's IPO, the Company was facing a severe liquidity crisis that seriously

24  jeopardized Stem's ability to continue operating unless the Company received a significant influx of

    funding.  Indeed, as of 12/31/20, Stem had cash and cash equivalents of $6.9 million, an

25  accumulated  deficit  of  $407.8 million,  and  net  current  liabilities  of  $141.2 million,  with

26  $116.2 million of debt financing coming due in 2021.  The Company, for FY 2020, also incurred

27

28

1    a net loss of $156.1 million and had negative cash flows from operating activities of

2    $33.7 million.

3        92.    Given Stem's dismal financial position, the Company's auditor, Deloitte & Touche

4    LLP ("D&T"), expressed in Stem's Defective Prospectus that the Company was a going concern –

5    *e.g.*, on the verge of financial collapse.  D&T indicated that Stem's ability to continue operations

6    was a concern because of the Company's "recurring losses from operations and cash outflows from

7    operating activities and . . . debt coming due."

8        93.    Stem also included a note in the Defective Prospectus expounding on the Company's

9    dire financial condition, stating in relevant part:  As a result of these conditions, ***there is substantial***

10   ***doubt about the Company's ability to continue as a going concern within one year after the date***

11   ***that the financial statements are available to be issued***.

12       94.    Stem had gotten to its abysmal financial condition pre-IPO based on selling low-

13   margin hardware (largely batteries) from other companies such as Tesla and Sungrow to its BTM

14   users, mainly C&I customers, and its inability to sell to FTM customers.

15       95.    Two former employees of Stem disclosed that Stem was not getting significant

16   margins for its hardware sales.  According to CW1, Stem's mark-up on hardware was typically as

17   low as 5% and sometimes lower, but Stem wanted as many customers as it could get and was

18   chasing revenue even if it meant selling hardware at its own cost.  CW2 corroborated that Stem's

19   hardware mark-up was usually 5% to 10%.  Because Stem was not receiving the 10%-30% hardware

20   mark-up that was presented as part of its business model, it had less cash available to operate.

21       96.    According to CW1, in order to sell Stem's software, Stem required a customer who

22   wanted to get hardware at attractive prices, to enter simultaneously into a software agreement.

23   Software was far more lucrative than hardware due to the higher margins.  However, Stem was

24   unable to sell its software as a standalone product because it was not fully developed or viable for

25   FTM projects.  Defendants, thus, needed to complete Stem's IPO to secure much needed cash to

26   continue as a Company and develop its software to work with FTM.

27       97.    Leading up to Stem's IPO, Defendants primed the market regarding the benefit to the

28   business combination including as to the nature of Stem's business.  In a 12/04/20 release,

Defendants claimed that Stem was "a global leader in artificial intelligence (AI)-driven clean energy storage systems." Defendants further represented that "Stem is a market leader and our Athena™ software platform is proven in the U.S., Japan and Canadian markets." Stem's business model and its transformation to a profitable high-margin low-capital software company was dependent on the Company's Athena software and expanding its market share in the lucrative FTM market with Athena. To that end, Stem was dependent on substantial and accelerated growth in the FTM market; a market ten times that of the BTM market.

98.    The Merger and IPO was supposed to position Stem for profitability and growth because it allowed Stem to fund fully its purported business model. Indeed, as Defendants disclosed in Stem's 12/04/20 release, the Merger and IPO, was a "transaction [that] is transformative for us and we expect it to significantly accelerate our growth." Further, Defendants highlighted that the ~$600 million in gross proceeds from Stem's Merger and IPO "positions Stem to capitalize on significant growth opportunities, expand globally and continue to advance its Athena™ software platform." Defendants further stated that Stem and Star Peak's combined "[b]alance sheet supports significant market expansion – strong balance sheet with approximately $525 million of cash to fully finance all U.S. and international forecasted growth." Defendants, in the 12/04/20 release, "urged" investors to read Stem's proxy statement/prospectus and other documents filed with the SEC for more information.

99.    Based on Stem's business model and software story, Stem forecasted astronomical growth and improving gross margins with the Company turning profitable in two years:

| 12/04/20 Forecast Affirmed 01/25/21 | | | | |
|---|---|---|---|---|
| ($mm) | **FY20E** | **FY21E** | **FY22E** | **FY23E** |
| Revenue | $33 | $147 | $315 | $526 |
| Non-GAAP Gross Margin % | 12% | 16% | 26% | 32% |
| Adjusted EBITDA | $(35) | $(25) | $28 | $113 |

100.    Defendants' efforts to secure funding in connection with the Merger would ultimately pay off, as the Merger infused the Company with over $600 million of gross cash proceeds and zero debt, purportedly enabling Stem to execute on much larger projects and expand its addressable market.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 27 -
4879-3770-3139.v1

101.    Stem, however, would not deliver as promised.  As detailed herein, because the Company did not have the automated software to drive higher gross margins and growth in the FTM market Stem's financial performance following the Merger was abysmal in comparison to what Defendants had promised the market in ¶¶62, 99 above:

| Actual Results | | | | |
|---|---|---|---|---|
| ($mm) | **FY20** | **FY21** | **FY22** | **FY23** |
| Revenue | $36 | $127 | $363 | $461 |
| Non-GAAP Gross Margin % | 10% | 11% | 13% | 15% |
| Adjusted EBITDA | $(25) | $(30) | $(46) | $(20) |

**H.    Stem Goes Public Through a Merger with Star Peak Based on a Defective Prospectus and Defective Investor Materials**

102.    On 12/03/20, Stem entered into a Merger agreement with Star Peak and the STPK Merger Sub., a Delaware corporation and wholly owned subsidiary of STPK.  Pursuant to the terms of the Merger agreement, and subject to shareholder approval, Stem would merge with STPK Merger Sub with Stem surviving as a wholly owned subsidiary of Star Peak.

103.    The following day, 12/04/20, Star Peak and Stem issued a release that was filed with the SEC as an Exhibit to a Form 8-K touting the proposed business combination and heralding that Stem was "a global leader in artificial intelligence (AI)-driven clean energy storage systems."

104.    In the 12/04/20 release, Defendant Carrington emphasized the IPO's import to Stem's purported growth prospects and the strength the combined company would bring to Company's balance sheet, stating in relevant part:

> ***This transaction is transformative for us and we expect it to significantly accelerate our growth.  Stem is a market leader and our Athena™ software platform is proven in the U.S., Japan and Canadian markets, and this merger will enable expansion to several additional global markets***.  Our systems deliver value to our customers by lowering energy costs, enhancing renewable returns, and meeting ESG and sustainability goals, while increasing grid reliability.  We are excited to partner with the Star Peak team and share a collective vision.  ***The balance sheet strength of the combined company will empower Stem to expand its technological leadership and geographic reach***.  We look forward to creating long-term value for our customers, employees and shareholders as a public company.

1    105.    The 12/04/20 release further claimed that the combined **"[b]alance sheet supports**

2 **significant market expansion – strong balance sheet with approximately $525 million of cash to**

3 **fully finance all U.S. and international forecasted growth**."

4    106.    Analysts and the market fully embraced the Merger and the combined company's

5 expansion into software and the FTM market.  For instance, in a report issued on 12/14/20, Imperial

6 Capital analysts emphasized that Athena "empowers its customers and partners to optimize energy

7 usage by ***automatically*** switching between battery power, onsite generation and grid power."  The

8 report also echoed the significance of the business combination and Stem's IPO for funding the

9 Company's "growth initiatives," stating in relevant part:

10       The company expects to have about $525mn in cash and no debt upon the closing of
         the business combination and committed equity PIPE. ***This level of cash is expected***
11       ***to fully fund the company's growth initiatives in the coming years as its revenues***
         ***increase, EBITDA becomes positive and cash flows begin to contribute to the***
12       ***financials as well***.

13    107.    On 12/17/20, Star Peak filed the Defective Prospectus which included two identical

14 statements from the Star Peak Board of Directors (endorsed by Defendants Scheyer and Morgan,

15 respectively), recommending that Star Peak's stockholders approve the business combination, stating

16 in relevant part:

17       The STPK board of directors has unanimously approved the merger
         agreement and the transactions contemplated thereby and recommends that STPK
18       stockholders vote "**FOR**" the approval of the merger agreement, "**FOR**" the issuance
         of New Stem Common Stock to be issued as the merger consideration and "**FOR**"
19       the other matters to be considered at the STPK Special Meeting.

20    108.    The Defective Prospectus contained a similar recommendation from the Stem board

21 of directors, stating in relevant part:

22       This proxy statement/consent solicitation statement/prospectus is being
         delivered to you on behalf of the Stem board of directors to request that holders of
23       Stem common stock and preferred stock (with respect to the common stock such
         holders will hold upon conversion of their preferred stock) execute and return written
24       consents to adopt and approve the merger agreement and the merger.

25                        *       *       *

26       The Stem board of directors has considered the merger and the terms of the
         merger agreement and has unanimously determined that the merger and the merger
27       agreement are advisable, fair to and in the best interests of Stem and its stockholders
         and recommends that Stem stockholders adopt the merger agreement by submitting a
28       written consent.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 29 -
4879-3770-3139.v1

109.     In the months between the announcement of the Merger on 12/04/20 and the 04/27/21 vote, Defendants emphasized, *inter alia*, the combined company's purportedly bright financial and FTM prospects, including emphasizing that "Athena™ AI-driven software leads to strong operating leverage with low expected capital intensity" and the growth that would come with 80% software margins, including a projected profit by the end of FY 2022, projected gross margins of 12% for FY 2020 that would more than double by the end of FY 2022 to 28% driven by software sales.

110.     On 04/28/21, STPK Merger Sub merged with and into Legacy Stem, with Legacy Stem surviving the transaction as a wholly owned subsidiary of Star Peak.  At this time, Star Peak renamed itself "Stem, Inc." and began operating Legacy Stem's business.

111.     The combined public Company began trading under the ticker "STEM" on the NYSE on 04/29/21.  The IPO had raised more than $600 million in proceeds with the understanding that those proceeds would fully fund the Company's expected growth and path to profitability.

112.     The market bought into Stem's "software story" and that the combined company would be profitable with its high-margin, low-capital business model.  On 06/29/21, Credit Suisse analysts stated: "***We expect the strongest growth in the US utility-scale, or front-of-the-meter (FTM)***, market (54% CAGR) and the US commercial and industrial storage market (41% CAGR)." Further, that: "[b]attery software and market participation revenues are spread out over 10-20 years, with an 80% gross margin.  ***Stem's focus on software as a service for its batteries is further bolstered by a capital-light business model***.  We estimate a revenue CAGR of 70% per year, driven by US utility-scale and international projects."

113.     On 07/19/21, Susquehanna Financial Group LLP analysts initiated coverage of Stem noting that: "Main concerns/risks to our thesis include competition ***to increase market share within the FTM segment (which is needed to meet the company's growth objectives)***." The Susquehanna analysts added that, "***[m]eeting growth targets will require increased market share in the FTM market***." Further, that Stem's "[s]oftware platform adds recurring revenue with expanding margins" with the "exciting part of Stem's product offering is its AI-enabled software platform, Athena." The Susquehanna analysts indicated that "Athena adds a key competitive advantage for the company."

**I.    Stem Acquires AlsoEnergy in an Effort to Remedy Athena's Deficient FTM Software and Boost Software Revenue**

114.    Approximately seven months after Stem's IPO closed, on 12/16/21, Stem announced its acquisition of AlsoEnergy, a company that purportedly provides customers with solar asset performance monitoring and control software, for $695 million.  Stem's 12/16/21 4Q/FY 2021 release filed with the SEC on a Form 8-K, described AlsoEnergy as "a global leader in solar asset management software" with "60% gross margin across its software" and other service businesses. The deal was completed on 02/01/22.  Following its purchase of AlsoEnergy, Stem recorded an increase in goodwill of $547 million in its Form 10-Q reporting Q1 2022 earnings filed with the SEC on 05/05/22.

115.    In a 12/17/21 interview with MadMoney's Jim Cramer to discuss Stem's acquisition of AlsoEnergy, Defendant Carrington explained that the acquisition accomplished the Company's goals of having "strong recurring revenues," "a strong gross margin accretive to our gross margin," and "accelerat[ing] our software roadmap."

116.    Following the AlsoEnergy announcement, Wolfe Research analysts issued a report on 12/19/21 indicating that "[t]he deal announcement was not a surprise as STEM has been upfront in saying that it was looking to pursue software-oriented M&A to further enhance its revenue mix and help drive Athena adoption."  Further, that the "deal also explains the timing of the $400M convert offering last month."

117.    The next day, on 12/20/21, analysts at Credit Suisse wrote that the "AlsoEnergy acquisition wasn't surprising" but that the size was "above our expectations ($100-200m)" and the "timing was sooner than we hoped (1 month after convertible note issuance)."  Credit Suisse's outperform rating was "based on a growing market and Stem's capital-light business model."

118.    Thereafter, Stem issued a 02/01/22 release, in which it emphasized that the AlsoEnergy acquisition was supposed "to be immediately accretive and . . . boost [Stem's] growth, enhance our margins, and accelerate our expansion as a global provider of clean energy intelligent software solutions."

119.    Three weeks later, on 02/24/22, during Stem's 4Q/FY 2021 earnings call, Defendant Carrington explained that AlsoEnergy had "the industry-leading SaaS platform with their PowerTrack software that monitors and controls 33 gigawatts of solar assets in over 50 countries." Defendant Carrington also asserted that most of AlsoEnergy's customers were "front-of-meter customers," which are "core markets for Stem smart energy storage solutions." Defendant Carrington further highlighted that AlsoEnergy generates 60% gross margins overall, and "80%-plus gross margins on software, with very low churn. In addition to this strong margin profile, they generate a significant amount of recurring revenue from their SaaS contracts."

120.    Analysts attending the 4Q/FY 2021 earnings call understood Stem's acquisition of AlsoEnergy's software was an effort to boost Stem's software margins. For example:

> [Analyst:] Kudos on the nice bookings and revenue outlook here. I wanted to ask a first question, I guess, on the margins here. Maybe if you could give us a bit more bridge. I think you said AlsoEnergy is doing 60% gross margin, overall. So at the midpoint of guidance, it implies they're about half your gross profit dollars for 2022, *and that means core Stem is doing maybe about a 10% gross margin. I think you guys originally had a target to do, like, mid-20s in 2022, and you were also 10% to 20% throughout all of '21, before 4Q. Just I'm trying to reconcile the sharp drop-off here*, and I know you mentioned a number of different moving parts, but can you maybe help bridge a bit and maybe quantify, if you can, kind of where we were targeting before for core Stem and kind of where we're ending up here with, *if the math is right, an implied kind of 10% margin*?

> *                *                *

> [Bush:] Thanks, John. Brian, appreciate the question. So I think, as John said, I think in the future we won't be breaking out the 2 divisions of the company that way. *But I mean, I think the basic math is pretty very correct.*

> *I think the issue that we're focused on is the continued bookings of the company, and the focus there is making sure that the software is what's driving the long-term value of the company. So it's possible that we'll see lower margins in the near term, but ultimately – and that's why we rolled out the CARR metric*. I mean, that's the – I think we've said pretty consistently in the past that we think backlog is a great short- to medium-term reflection of what the revenues will be. Well, CARR is going to be a great reflection of what software is going to be as we mature.

121.    The acquisition of AlsoEnergy did not alleviate Stem's fundamental flaw in its business model – the lack of a viable FTM software product. Further, post-Class Period, the value of Stem's investment in AlsoEnergy has been erased. On 08/07/24, Stem marked down the full $547

million in goodwill in its Q2 2024 Form 10-Q that had been associated with its purchase of AlsoEnergy announced on 02/01/22.

**J.    The Market Understood Stem's Success Was Dependent on Athena's Expansion into the FTM Market**

122.    Throughout 2022, the market bought into Stem's story about the success it was building in the FTM market due to Athena, with multiple analysts issuing favorable reports.  For example:

(a)    On 05/05/22, Wolfe rated Stem as "Outperform," noting that: "Stem recently entered the front-of-the-meter space, which was part of the reason for its go-public transaction, and the company is already showing signs of success.  ***The cornerstone of the company is its Athena software platform***."

(b)    On 08/04/22, Wolfe similarly wrote: the "FTM market continues to grow rapidly for STEM."  Wolfe gave the Company an "Outperform" rating.  They further stated that, "***Stem recently entered the front-of-the-meter space, which was part of the reason for its go-public transaction, and the company is already showing signs of success***.  The cornerstone of the company is its Athena software platform."

(c)    On 08/05/22, Guggenheim analysts noted that "***FTM remains the key driver***."

(d)    On 09/22/22, Cowen initiated coverage of Stem with an outperform rating and embraced the Company for being "***well positioned to capture demand both in front of*** and behind ***the meter applications***."

(e)    On 09/29/22, Cowen wrote: "Focus on Software & Services to Drive Profitability"; and "Management highlighted the ***strong position of its Athena platform***."

(f)    On 09/29/22, analysts at Northland reported that: "We came back from STEM's analyst day feeling more confident about its software prowess and ***technological differentiation that is driving its profitable and predictable growth***"; and "STEM expects to be EBITDA positive in 2H 2023; with them having *a capex-light business model*."

123.    On 11/03/22, Wolfe continued to emphasize Stem's business model: "Q3 revenue and bookings both beat expectations and Stem's pipeline was up 29% sequentially"; and "***Stem recently***

*entered the front-of-the-meter space, which was part of the reason for its go-public transaction,*
*and the company is already showing signs of success.  The cornerstone of the company is its*
*Athena software platform*."

### K.    Stem Is Forced to Raise Capital as the Market Questions the Viability and Success of Its FTM Product

124.    The Company's inability to sell and generate cash from FTM deals, expenditure of cash on the purchase of hardware for the phantom Available Power deal and inability to generate higher margins, culminated in the Company's need to raise additional capital through a private debt offering in March 2023.[15]

125.    About a month before the March 2023 debt offering, Stem released disappointing FY 2022 results and FY 2023 guidance.  On 02/16/23, Stem filed on a Form 8-K with the SEC a release announcing Stem's results for both 4Q 2022 and FY 2022 for the period ending 12/31/22.  Stem reported for FY 2022 a net loss of $124 million and an adjusted EBITDA of $(46) million.  Likewise, for 4Q 2022, Stem reported a net loss of $35 million and an adjusted EBITDA of $(10) million.  Stem also announced FY 2023 guidance, including revenues of $550-$650 million, 15%-20% non-GAAP gross margins, and a predicted loss for 2023 with adjusted EBITDA of $(35)-$(5) million.

126.    On an earnings call that same day in which Defendants Carrington, Patel, and Bush attended and announced the disappointing results and low FY 2023 guidance, the market reacted negatively to this news and began to question Stem's software story.  For example, analysts at Morningstar issued a report on 02/17/23 focusing on Stem's ability to execute on its business model:

> With Stem previously indicating 2022 results were going to be weaker than expected, our focus was on the company's 2023 guidance. . . .  [N]on-GAAP gross margin guidance of 15%-20% for the full year is in line with original 2022 guidance, showing limited improvement year on year.
>
> ***Stem's long-term strategy remains around its Athena software, but we think its transition from a hardware-dominated business to one with sizable software revenue is going to be more gradual than our prior expectations***.  As such, we now

---

[15]    Previously, on 11/16/21, Stem announced a note offering for $350 million of senior notes in a private debt offering.  On 11/17/21, Stem announced that it had upsized the offering to $400 million.  Days later, on 11/21/21, Stem sold $460 million in Green Convertible Senior Notes to Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC and Barclays Capital Inc.

incorporate a more subdued gross margin improvement into our forecast. We now assume the company does not meet its 15% adjusted EBITDA target until 2026, a year later than its analyst day projections. We would like to see management execute against its 2023 guidance and further scale its software revenue prior to becoming more constructive on shares.

In addition to margin improvements, ***we are watching Stem's ability to turn cash flow positive given its somewhat constrained balance sheet***. Stem ended the quarter with $250 million in cash and approximately $450 million in debt. The resulting net leverage position has us agreeing with management's laser focus on achieving adjusted EBITDA breakeven (even if it comes at the expense of revenue growth).

*        *        *

Stem has recently expanded its market focus to include larger projects in the front-of-the-meter market. The company's history has centered on behind-the-meter installations, but the FTM market is approximately 10 times larger than BTM. ***We view the company's decision in late 2020 to go public as aiding its FTM sales activities via a larger balance sheet. While we recognize the large size of the FTM market, we think the company enjoys the strongest relative position in smaller, average-size projects with less sophisticated customers***. Thus, we expect Stem to achieve lower long-term market share in FTM than it enjoys in BTM.

Stem completed its largest acquisition to date with its 2022 purchase of AlsoEnergy, a provider of solar asset management software. Given limited financial flexibility, we do not anticipate further sizable acquisitions going forward.

127.    A month later, on 03/29/23, Stem filed a release with the SEC on a Form 8-K announcing a proposed $175 million Green Convertible Senior Notes Offering (which it would later upsize to $200 million) in a private offering to institutional buyers, which would be due in 2030. In the 03/30/23 release, Defendants explained that Stem intended to use the proceeds from the notes to purchase and surrender for cancellation a portion of Stem's 2028 Convertible Senior Notes, to fund the cost of entering into the capped call transactions, and for general corporate purposes.

Stem intends to use (i) approximately $99.8 million of the net proceeds from the Offering to purchase and surrender for cancellation approximately $163.0 million aggregate principal amount of Stem's 0.50% Green Convertible Senior Notes due 2028 (the "2028 Notes") in privately negotiated transactions concurrently with the pricing of the Offering; (ii) approximately $23.2 million of the net proceeds of the Offering to fund the cost of entering into the capped call transactions described above; and (iii) the remainder of the net proceeds of the Offering for general corporate purposes. If the initial purchasers exercise their option to purchase additional Notes, then Stem intends to use a portion of the additional net proceeds to fund the cost of entering into additional capped call transactions as described above.

128.    In response to this news, Stem's stock plummeted nearly 12% from a close of $6.24 on 03/28/23 to a close of $5.50 on 03/30/23.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 35 -
4879-3770-3139.v1

129.     Stem's need to raise capital was unexpected and the market began to understand that Stem's inability to derive high-margin revenue from its FTM-deficient software had negatively impacted the Company's capital position.  Indeed, a Credit Suisse analyst noted on 03/29/23 that "Stem's convert was not expected," and "[t]iming is also surprising given higher interest rates and spreads since their previous 2028 convert issued in mid-November 2021."

130.     Similarly, analysts at Guggenheim issued a report on 03/30/23 questioning the timing and management's prior promises that no additional funding was needed:

> STEM's announcement yesterday that the company intends to offer a $175 million convertible green bond was moderately negative, in our view, although not sufficient to alter our current Buy rating.  We are, however, lowering our price target to $14 from $11 based on a higher risk premium applied in our valuation model.  We spoke to the company following the announcement, and we believe that STEM has a reasonable basis for doing the deal.  At the same time, *the financing comes on the heels of management having assured investors repeatedly that no additional funding was needed, and it also comes following a 64% decline in the stock price since September, not including the decline yesterday after the deal was announced.*  This compares to an 1% increase for the S&P 500 over the same time period.  *The timing of the transaction is less than optimal, in our view, as was the decision to proceed despite having been vocal about not needing additional funding*.  As such, we think the STEM team may need to spend some time rebuilding credibility.

131.     More bad news, however, was to come.  On 04/04/23 analysts reached the indisputable conclusion that Stem would not see the margins or profits that Defendants had repeatedly promised from Stem's purported high-margin automated Athena software product or its purportedly robust FTM pipeline but, rather, its revenues were driven by low-margin hardware sales.

132.     For example, on 04/04/23 analysts at BofA Global Research downgraded the stock to underperform writing that:

> We rate STEM at Underperform.  *While we acknowledge that STEM pitches itself as a software focused way to play energy storage, slow realization of revenues from this business means the company is ultimately dependent on lower margin hardware and services businesses to drive an EBITDA inflection.*  We are cautious to underwrite STEM growing into new businesses while cutting overhead. . . .
>
> *                 *                 *
>
> *We downgrade Stem to Underperform as our confidence in the story is increasingly strained.  The notion of what Stem "is" at its core is now more confusing than it used to be given the shifting business mix contemplated within its dramatic top-line ramp from '22 into '25.  While our recent launch contemplated a Neutral rating, a disappointing 4Q outlook call since and now uncertainty reflected from convertible issuance last week push us to be less generous on estimates* – particularly given the risks reflected in standing up two new services businesses

(Dev-serv to 'setup' the battery install initially and Pro-Serv to operate batteries on an ongoing basis) and implicitly keeping opex relatively stable.  Historically, Stem has been the leader in effective software optimization for battery applications with a key end market in C&I customers focused on "clipping" otherwise punitive demand charges via load shifting and rapid dispatch of onsite behind the meter batteries.  But after years of building to an increasingly saturated point of market share – Stem currently holds about a third of all projects in this segment – the business has been forced to expand into larger grid scale applications where the competition is more pronounced.

                            *        *        *

        *For some time, this company has been pitched as a high margin, software-focused way to play energy storage given its Athena platform focus and vs peers in the space that reap a "typical" hardware margin in the 5-15% range.  However, out of $550-650mm in revenue guided for FY23, ~$520mm is implied as hardware and we estimate just $45-50mm comes from Stem's recurring software business with the balance in a burgeoning services business*.  Note while Stem talks to a "Contracted Annual Recurring Revenue" metric to describe the software opportunity, the $45-50mm listed aligns to performance obligations in its 10-K that are expected to be realized in the next 12 months.  The irony here is that while the company's pitch has been predicated for some time on front loaded hardware installs as an enabler of the long-term recurring software business, the latter cannot on its own drive the story to positive EBTIDA today and at a corporate level, the 2H23 inflection will rely on a business that Stem intends to divorce longer term.

133.    The Company continued to deteriorate post-Class Period, with Stem reporting revenue below guidance, adjusted EBITDA of negative $20 million, and non-GAAP gross margins of only 15%, and a net loss of $140 million for FY 2023 in Stem's 10-K filed with the SEC on 02/28/24, thereby further confirming Stem was unable to execute on its business model.

## V.    THE 14(a) DEFENDANTS' VIOLATIONS OF THE EXCHANGE ACT

134.    The Section 14(a) Class was harmed by the 14(a) Defendants' materially false and misleading statements in the Defective Prospectus/Proxy Statement and Defective Investor Materials.  Each of the materially false and misleading statements alleged for Plaintiffs' Section 14(a) claims are also set forth in Exhibit A(1) (Section 14(a) Materially False and Misleading Statements), attached hereto.

### A.    The 14(a) Defendants Solicited and Negligently Prepared the Defective Prospectus and Defective Investor Materials

135.    At the time of the Merger, Star Peak was controlled by Star Peak Sponsor, LLC who owned 99.2% of the outstanding common stock of Star Peak.  Star Peak Sponsor LLC, in turn was controlled by a board of managers, consisting of Defendants Scheyer, Morgan, and Litowitz.  Thus,

1  Defendants Scheyer, Morgan, and Litowitz each indirectly owned 99.2% of Star Peak, respectively,
2  and exercised significant control over Star Peak.

3      136.    In connection with the Merger, the 14(a) Defendants solicited the participation of Star
4  Peak and Stem shareholders, as well as interest from prospective investors through road shows,
5  interviews, news reports, and their disclosures in the Defective Prospectus/Proxy Statement and
6  Investor Materials.

7      137.    Indeed, in the 03/30/21 press release entitled, "Star Peak Energy Transition Corp. and
8  Stem, Inc. Announce Registration Statement Effectiveness and April 27, 2021 Scheduled Special
9  Meeting to Approve Business Combination," the 14(a) Defendants alerted investors, that: "Star Peak
10 and Stem and their respective directors, executive officers, other members of management, and
11 employees, under SEC rules, may be deemed to be participants in the solicitation of proxies of Star
12 Peak's stockholders in connection with the proposed transaction."

13     138.    The claims against the 14(a) Defendants are premised upon their negligent failure to
14 conduct a reasonable due-diligence investigation into the accuracy and completeness of the
15 representations contained in the Defective Prospectus/Proxy Statement and Investor Materials and
16 their negligent preparation of these materials.  Had the 14(a) Defendants not acted negligently, and
17 had they conducted reasonable due-diligence investigations before the IPO, they would have
18 uncovered that the Defective Prospectus/Proxy Statement and Investor Materials contained untrue
19 statements of fact and omitted material facts.

20     139.    As disclosed in the Defective Prospectus/Proxy Statement, Defendants Carrington,
21 Daley, Morgan, and Scheyer were heavily involved in the Merger process:

22        •    "On August 21, 2020, Eric Scheyer, Mike Morgan and Dain DeGroff of STPK, had
              an introductory meeting in which they discussed Stem's business and the SPAC
23            business combination process."

24        •    "On August 28, 2020, Stem provided a management presentation to representatives
              of STPK, including Eric Scheyer, Mike Morgan, Adam Daley and Craig Rohr."
25

26        •    "On August 31, 2020, Mike Morgan spoke with John Carrington and indicated
              STPK's initial interest in exploring a transaction with Stem and beginning due
27            diligence."

28

140.    According to the Defective Prospectus/Proxy Statement, the Stem board of directors was kept informed of, and approved the actions of Stem management, including Defendants Carrington and Bush, throughout the Merger process:

- "Stem management also provided updates on its strategic process to the Stem board of directors through weekly or bimonthly meetings during the same period."

- "Between September 25, 2020 and December 2, 2020, Stem's board of directors met with the Company Advisors, GDC and Stem management to discuss the proposed business combination, the merger agreement and other transaction documents. In addition, John Carrington communicated with individual members of Stem's board of directors to update them on the status of the proposed business combination and discussions between Stem and STPK."

141.    Both the Stem and Star Peak boards of directors and executive management, including Defendants Bush, Carrington, Scheyer, and Morgan were intimately involved with the Merger negotiations, as disclosed in the Defective Prospectus/Proxy Statement as follows:

- "On September 11, 2020, Mike Morgan spoke with John Carrington and outlined STPK's intention to present a term sheet after completing initial due diligence."

- "On September 24, 2020, Mike Morgan, Adam Daley and Eric Scheyer had an update call with John Carrington and discussed potential terms of a transaction."

- "On September 25, 2020, the STPK board of directors met to discuss the transaction with Stem and authorized STPK to enter into the Preliminary Term Sheet."

- "On October 30, 2020, STPK held a board meeting, during which, among other things, the Preliminary Term Sheet was reviewed, a transaction status update was given, Stem's PIPE Investment investor presentation was reviewed, and the STPK board of directors (the '"STPK Board"') approved STPK to engage Goldman Sachs & Co. LLC ('"Goldman Sachs"') and Credit Suisse Securities (USA) LLC ('"Credit Suisse"') to act as placement agents for STPK in connection with the PIPE Investment. The STPK Board also authorized STPK to begin the PIPE Investment marketing process."

142.    Defendant Carrington also participated in roadshows leading up to the Merger. For instance, on the 08/03/23 earnings call, Defendant Carrington stated: "It's what we expected the assets to be used for all the way back when we did our roadshow. So it's good to see it's getting some traction."

143.    The Defective Prospectus/Proxy Statement stated that it was a consent/solicitation/prospectus from the Star Peak board of directions soliciting its shareholders

1    approval of the Merger and to new investors offering "New Stem Common Stock" and a consent

2    solicitation from the Stem board of directors to solicit approval of Stem's shareholders:

3         This document constitutes a proxy statement of STPK, a consent solicitation
     statement of Stem and a prospectus of STPK.  It is a proxy statement because the
4    board of directors of STPK is soliciting proxies using this proxy statement/consent
     solicitation statement/prospectus from its stockholders.  It is a consent solicitation
5    statement because the board of directors of Stem is soliciting written consent using
     this proxy statement/consent solicitation statement/prospectus from its stockholders.
6    It is a prospectus because STPK, in connection with the merger, is offering shares of
     New Stem Common Stock in exchange for the outstanding shares of Existing Stem
7    Common Stock.  See *The Merger Agreement — Merger Consideration*."

8        144.    The 14(a) Defendants oversaw and participated in the preparation of the Defective

9    Prospectus/ Proxy Statement, as stated therein:

10       *Preparation of Registration Statement / Proxy Statement*.  STPK has agreed
     to, as promptly as practicable after the date of the merger agreement, with the
11   assistance of Stem, to prepare and file with the SEC, the registration statement of
     which this proxy statement/consent solicitation statement/prospectus forms a part to
12   be used for the purpose of soliciting proxies from the stockholders of STPK at the
     STPK Special Meeting to adopt and approve the transactions contemplated by the
13   merger agreement. . . .

14       STPK has agreed to give Stem and its counsel reasonable opportunity to
     review, comment on and approve in writing each of the preliminary and final proxy
15   statement/consent solicitation statement/prospectus and any amendment or
     supplement thereto prior to its filing with the SEC.  STPK shall not file any such
16   documents with the SEC without the prior written consent of Stem. . . .

17       . . . Each of STPK and Stem have agreed to promptly furnish to the other all
     information concerning such party, its affiliates and its representatives that may be
18   required or reasonably requested in connection with any action for inclusion in any
     other statement, filing, notice or application made by or on behalf of STPK to the
19   SEC or NYSE in connection with the transactions contemplated by the merger
     agreement and ancillary documents thereto.

20
21       145.    The 14(a) Defendants also undertook to correct any information provided in the

22   Proxy Statement if found to be false and misleading:

23   Each of STPK and Stem have agreed to promptly correct any information provided
     by it for use in the proxy statement/consent solicitation statement/prospectus if such
     information is determined to have become false or misleading in any material
24   respect.  STPK shall amend or supplement the proxy statement/consent solicitation
     statement/prospectus and cause it to be filed with the SEC and disseminated to STPK
25   stockholders. . . .

26       . . . efforts to ensure that none of the information related to it or any of its
     representatives, supplied by or on its behalf for inclusion or incorporation by
27   reference in the proxy statement/consent solicitation statement/prospectus will, at the
     time it is filed with the SEC contain any untrue statement of a material fact or omit to
28   state any material fact required to be stated therein or necessary to make the

statements therein, in light of the circumstances under which they are made, not misleading.

146.    Moreover, Defendant Bush was the designated point person to answer all questions about the consent solicitation:

Q: WHOM SHOULD I CONTACT IF I HAVE ANY QUESTIONS ABOUT THE CONSENT SOLICITATION?

A: If you have any questions about the merger or how to return your written consent or letter of transmittal, or if you need additional copies of this proxy statement/consent solicitation statement/prospectus or a replacement written consent or letter of transmittal, **_please email Bill Bush, Stem's Chief Financial Officer, at CFO@stem.com_**.

147.    According to the Defective Prospectus/Proxy Statement, Defendants Bush and Carrington prepared the financial forecasts that were disclosed to investors in the Defective Prospectus/Proxy Statement as part of the 14(a) Defendants' solicitation of shareholder investment and votes that included FTM projects:

Stem's senior management prepared and provided to Stem's board of directors, Stem's financial advisors and STPK certain internal, unaudited prospective financial information in connection with the evaluation of the merger.

148.    According to the Defective Prospectus/Proxy Statement, the forecast "reflects the best currently available estimates and judgments, and presents, to the best of Stem senior management's knowledge and belief, the expected course of action and the expected future financial performance of Stem."

149.    The forecasts, however, were negligently prepared and included revenue and profits from FTM projects, which were not viable as Athena did not work for FTM.

150.    On 12/04/20, the day the 14(a) Defendants announced the Merger, Star Peak filed a Form 8-K with the SEC, signed by Defendant Scheyer, thereby attributing the statements therein to Star Peak, as well as to Scheyer.  The 12/04/20 Form 8-K announced the Merger and incorporated into the document, statements made in Exhibit 99.1, a press release, Exhibit 99.2, an investor presentation, and Exhibit 99.3, the transcript of the joint conference call held by Star Peak and Stem in connection with announcing the Merger Agreement.

151.    The 12/04/20 press release attached as Exhibit 99.1 to the Form 8-K included a quote from Defendant Scheyer encouraging the Merger:

"Stem is an exceptional investment opportunity. ***We completed an extensive due diligence process*** and view Stem as a market leader in one of the most exciting segments of the clean energy ecosystem. The Star Peak team has significant experience investing in the broader energy infrastructure, renewables and technology sectors, and we believe Stem represents a highly compelling opportunity to capitalize on the scarcity of high-quality, public clean energy companies with attractive ESG characteristics, significant scale and visible growth."

152. The 12/04/20 press release attached as Exhibit 99.1 to the Form 8-K also stated under the heading "Participants in the Solicitation" section, that: "STPK and Stem and their respective directors, executive officers, other members of management and employees, under SEC rules, may be deemed to be participants in the solicitation of proxies of STPK's stockholders in connection with the proposed transaction."

153. Defendants Carrington, Morgan, Scheyer, and Bush were speakers during the 12/04/20 Investor Call and, thus, participants in the negligent solicitation of the Merger. ¶¶159, 189, 388. Further, these Defendants were quoted in and authorized the issuance of press releases and thus solicited the Merger. ¶¶16, 18, 28, 29, 104, 151, 188.

154. Accordingly, the 14(a) Defendants played a significant role in the solicitation and negligent preparation of the Defective Prospectus/Proxy Statement through their drafting and/or review of the documents, answering of inquiries, the information they provided for inclusion in the Defective Prospectus/Proxy Statement used to solicit shareholder approval and interest, and their approvals of the documents.

155. The 14(a) Defendants had continual access to corporate information concerning the Company's business, financial condition, products, plans, assets, and growth prospects. A reasonable investigation would have revealed that the Defective Prospectus/Proxy Statement and Investor Materials contained false and/misleading statements and/or omissions. Thus the 14(a) Defendants failed to satisfy their duty to make a reasonable and diligent investigation to ensure that the Defective Prospectus/Proxy Statement and Investor Materials did not contain misstatements or omissions. Thus, the 14(a) Defendants were negligent in their preparation of the Defective Prospectus/Proxy Statement.

**B.    The 14(a) Defendants' Materially False and Misleading Statements[16]**

156.    Leading up to Stem's IPO, the 14(a) Defendants repeatedly published materially false and misleading statements, and/or omitted material adverse facts in the Defective Prospectus and Defective Investor Materials (as defined above) that Athena was automated for FTM customers.

157.    On 12/04/20 Star Peak filed a Form 8-K as a release with the SEC[17] that included the following materially false and misleading statement:

> "Company generates revenue by providing customers with integrated energy storage systems, long-term recurring software services and energy market participation through its ***proprietary software platform, called Athena™, which enables AI-automated system operations***." [Stmt. No. 1]

158.    The above statement was materially false and misleading when made because, unbeknownst to investors, with respect to FTM projects, Stem's purported "automated" software was not viable and required human intervention.  As described in detail in ¶¶66-83, Stem's Athena software was not automated for FTM projects, as detailed by the following:

(a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM.  ¶¶67, 70, 72, 74, 77.  CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects. ¶¶76, 81;

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76, 81;

(c)    CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities.  ¶71.  CW1 further reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused

---

[16]    The statements alleged to be false and misleading herein are bolded and italicized.  The other included statements are provided for context.

[17]    The release was filed pursuant to Rule 425 with the SEC on a Form 425 under the Securities Act and were deemed filed pursuant to Rule 14a-12 under the Exchange Act indicating that Star Peak adopted the statements made in the release and intended them to qualify as a Rule 425 prospectus.

the crash was resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71; and

(d)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

159.    On 12/04/20, Star Peak published the transcript of a Stem investor conference call held on 12/04/20 and filed it with the SEC attached as Exhibit 99.3 to a Form 8-K signed by Defendant Scheyer, thereby adopting the statements made in the conference call.  Star Peak and Scheyer, thus, intended Star Peak's 12/04/20 Form 8-K filing to qualify as a written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425).  In the conference call transcript, Defendant Carrington stated that Athena was automated when, in fact, it was not:

[Carrington:] I would now like to share a day in the life of Athena.

Throughout the day, Athena optimizes the value for individual customers as individual sites are consuming power based on their own business needs.  Later in the day, typically at about three o'clock in the case of California, Athena, in response to utility requests and market price signals, begins to orchestrate hundreds of sites coordinated as virtual power plants to deliver energy to the grid. ***Athena automates system discharges across multiple different utility territories, collaborating with the utilities to provide instant grid support when and where it is needed***.

In the early evening when grid demand has dropped, the systems resume normal operation.  And when power prices drop at night ***Athena automates their recharging***, using low cost power to restore energy so they can begin operation in a similar pattern for the following day.  [Stmt. No. 2]

160.    The above statement was materially false and misleading when made because, unbeknownst to investors, with respect to FTM projects, Stem's purported "automated" software was not viable and required human intervention.  As described in detail in ¶¶66-83, Stem's Athena software was not automated for FTM projects, as detailed by the following:

(a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM.  ¶¶67, 70, 72, 74, 77.  CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects. ¶¶76, 81;

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶76;

(c)    CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities.  ¶71.  CW1 further reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71; and

(d)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

161.    Prior to and following the IPO, Star Peak filed with the SEC several additional releases, conference call transcripts and presentations prepared by Stem containing identical false statements: (i) on 01/05/21, Star Peak filed a release entitled, "Stem, Inc. and Partners Awarded 68 MWh in New Smart Energy Storage Projects for Disadvantaged and Low-Income California Communities" with the SEC pursuant to Rule 425 [Stmt. No. 3]; (ii) on 01/13/21, Star Peak filed a release entitled, "Stem, Inc. Awarded Project to Deliver Smart Energy Storage to Massachusetts Water Resource Authority" with the SEC pursuant to Rule 425 [Stmt. No. 4]; (iii) on 02/11/21, Star Peak filed a release entitled "Stem, Inc. Brings Smart Energy Storage to Electric Cooperative Projects with Today's Power, Inc." with the SEC pursuant to Rule 425 [Stmt. No. 6]; (iv) on 02/18/21, Star Peak filed a release entitled, "Stem, Inc. Announces Board of Directors for Post-Merger Public Company" with the SEC pursuant to Rule 425 [Stmt. No. 7]; (v) on 03/02/21, Star Peak file a release entitled, "Stem, Inc. Announces New Front of the Meter, Wholesale Market Participation Services Project in Massachusetts" with the SEC pursuant to Rule 425 [Stmt. No. 8]; (vi) on 03/19/21, Star Peak filed a release entitled, "Stem, Inc. to Participate in Simmons Energy 21st Annual Energy Conference" with the SEC pursuant to Rule 425 [Stmt. No. 9]; (vii) on 03/30/21, Star Peak filed a release entitled, "Star Peak Energy Transition Corp. and Stem, Inc.

1  Announce Registration Statement Effectiveness and April 27, 2021 Scheduled Special Meeting to
2  Approve Business Combination" with the SEC pursuant to Rule 425 [Stmt. No. 10]; (viii) on
3  03/30/21, Star Peak filed a communication entitled "Your Vote Matters" with the SEC pursuant to
4  Rule 425 [Stmt. No. 11]; (ix) on 04/06/21, Star Peak filed a press release entitled, "Stem, Inc.
5  Announces Head of Government Relations to Lead Federal Initiatives" with the SEC pursuant to
6  Rule 425 [Stmt. No. 19]; (x) on 04/12/21, Star Peak filed a release entitled, "Star Peak Energy
7  Transition Corp. and Stem, Inc. to Host Fireside Chat Today with IPO Edge to Discuss Business
8  Combination" with the SEC pursuant to Rule 425 [Stmt. No. 20]; (xi) on 04/14/21, Star Peak filed a
9  release entitled, "Stem Successfully Transitions 345MWh Southern California Energy Storage
10 Portfolio to its Athena™ Software" with the SEC pursuant to Rule 425 [Stmt. No. 22]; (xii) and on
11 04/21/21, Star Peak filed a release entitled, "Star Peak Energy Transition Corp. Reminds
12 Stockholders to Vote in Favor of Business Combination with Stem, Inc." with the SEC pursuant to
13 Rule 425 [Stmt. No. 23].

14    162.    The above releases and communications were filed with the SEC pursuant to Rule
15 425 under the Securities Act and were deemed filed pursuant to Rule 14a-12 under the Exchange Act
16 indicating Star Peak adopted the statements made in the releases and intended them to qualify as a
17 Rule 425 prospectus.

18    163.    Each of the releases contained an identical false statement describing Stem as a
19 company with automated solutions, as follows:

20    About Stem, Inc.

21        Stem provides solutions that address the challenges of today's dynamic
22    energy market. By combining advanced energy storage solutions with Athena™, a
     world-class AI-powered analytics platform, **_Stem enables customers and partners to_**
23    **_optimize energy use by automatically switching between battery power, onsite_**
     **_generation and grid power_**. Stem's solutions help enterprise customers benefit from
24    a clean, adaptive energy infrastructure and achieve a wide variety of goals, including
     expense reduction, resilience, sustainability, environmental and corporate
25    responsibility and innovation.  Stem also offers full support for solar partners
     interested in adding storage to standalone, community or commercial solar projects –
26    both behind and in front of the meter.  [Stmt. Nos. 3, 4, 6, 7-11, 19, 20, 22, 23]

27    164.    The above statements were materially false and misleading when made because,
28 unbeknownst to investors, with respect to FTM projects, Stem's purported "automated" software

was not viable and required human intervention.  As described in detail in ¶¶66-83, Stem's Athena software was not automated for FTM projects, as detailed by the following:

(a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM.  ¶¶67, 70, 72, 74, 77.  CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects.  ¶¶76, 81;

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76, 81;

(c)    CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities.  ¶71.  CW1 further reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was resolved, a new issue would arise within five minutes, and Athena would crash again.  ¶71;

(d)    CW1 explained that Stem did not have a working model of Athena to show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that despite requests they never received an example of a successful implementation of Athena to show customers.  ¶¶79-80.  CW3 further confirmed that when they arrived in March 2021, despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM because it was still in development and was not functional.  ¶¶79-81; and

(e)    Defendant Carrington *admitted* during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

165.    On 01/25/21, Star Peak published the slide deck from an analyst day presentation and filed it with the SEC pursuant to Rule 425 under the Securities Act and deemed filed pursuant to Rule 14a-12 under the Exchange Act.  The presentation included the following language: "The

below updated presentation will be used by [Star Peak] in presentations . . . in connection with [Star Peak]'s previously disclosed proposed business combination with Stem, Inc." The presentation falsely represented that Athena was automated:

> Our market leading Athena software uses advanced artificial intelligence and machine learning to optimize the operation of these batteries *by automatically switching between battery power, onsite generation and grid power*.
>
> . . . *Athena absorbs massive volumes of real-time data to provide continuous monitoring, forecasting, optimization, and automated controls to deliver its many value-added services*.
>
> . . . *Athena then automatically evaluates each customer's exposure to dynamic energy and demand prices and adapts to store and release energy when the customer will achieve the most savings*.
>
> . . . It integrates in real time with energy market operators and utilities to provide essential system visibility to grid operators *while automating market transactions*.
>
> *And Athena and smart battery storage maximize wholesale market revenues with automated market participation across the project's entire lifecycle*. [Stmt. No. 5]

166.    The above statement was materially false and misleading when made because, unbeknownst to investors, with respect to FTM projects, Stem's purported "automated" software was not viable and required human intervention. As described in detail in ¶¶66-83, Stem's Athena software was not automated for FTM projects, as detailed by the following:

(a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM. ¶¶67, 70, 72, 74, 77. CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects. ¶¶76-81;

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed. ¶¶76, 81;

(c)    CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities. ¶71. CW1 further reported that Athena only existed in Beta mode and would repeatedly crash. ¶71. After the issue that caused

the crash was resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71; and

(d)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

167.    On 03/30/21, Star Peak filed its Defective Prospectus on Form 424B3 with the SEC in connection with the merger signed by Defendant Scheyer.  The Defective Prospectus falsely described Athena as automated:

*Our Athena Platform*

***Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers leveraging over 10 years of operational data and experience***.  By dispatching electricity to our C&I customers through our energy storage network during periods of peak power demand, we are able to decrease our customers' electricity expenses, improve the value of their energy usage and diminish their environmental impact.  Our Athena AI-powered platform supports customers by managing large-scale energy storage projects, addressing intermittency issues and safeguarding project value against fluctuating market conditions and on-going policy changes.  In addition, our energy storage network enables grid operators to decrease their reliance on conventional generation sources thereby improving the resiliency of the electrical grid and enabling lower carbon emissions through the increased adoption of renewable generation sources.

Athena utilizes highly localized weather, energy price and market data to understand the impact on customer electricity usage and formulate optimal economic strategies for charge and discharge of the energy storage systems.  Athena-operated systems are under real-time control and currently over 700,000 data points per second are streamed into the platform, informing the strategy developed for each individual asset and site.  As of October 2020, Athena's cloud infrastructure is performing automated data engineering, supporting our AI processes that currently model over 24 million scenarios per day, delivering optimal storage operating strategies for each individual customer site.  ***This autonomous operation delivers value to enterprise customers, renewable generation partners, utilities, grid operators and financing counterparties***.  The most difficult part of AI and machine learning is data collection and data integrity, and our automated data engineering platform enables our data science team to rapidly develop and deploy new algorithms.  These algorithms embed the physics of storage, renewable generation and the grid and include fit-to-purpose deep learning models that evolve so that Athena can react to changing conditions.  Our team has automated AI model selection and training, evaluating them against our extensive energy storage operations database encompassing over 20 million runtime hours, or the equivalent of 2,200 years of operations.  [Stmt. No. 12]

168.    The Defective Prospectus filed on 03/30/21 additionally falsely described Athena Gateway as automated:

1
2
3

Athena Gateway: Gateway services provide real-time integration endpoints that tie into utility and market control systems. ***This feature enables our customers to participate in markets and grid programs with automated dispatching leveraging the near-instantaneous response of the Athena platform***. [Stmt. No. 13]

4

169. The Defective Prospectus filed on 03/30/21 additionally falsely touted Athena's

5

"automated controls":

6
7
8
9
10

The transition to renewable energy and a distributed energy infrastructure has resulted in an increase in the complexity and variability of end-customer electricity demand influenced by onsite generation and flexible sources of load. Accordingly, it has become nearly impossible to efficiently manage and operate businesses and the grid using a schedule based, human operated approach. Instead, the utilization of intelligent, responsive energy storage throughout the grid is required to provide the real-time balance necessary to support more distributed renewable assets, and we believe that Athena fulfills this vital need of a modern energy infrastructure. ***Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers*** leveraging over 10 years of operational data and experience. [Stmt. No. 14]

11

170. The above statements in the 03/30/21 Defective Prospectus were materially false and

12

misleading when made because, unbeknownst to investors, with respect to FTM projects, Stem's

13

purported "automated" software was not viable and required human intervention. As described in

14

detail in ¶¶66-83, Stem's Athena software was not automated for FTM projects, as detailed by the

15
16

following:

17

(a)    CW1 and CW2 reported that the Company did not have a working product for

18

FTM projects because Athena was not automated for FTM. ¶¶67, 70, 72, 74, 77. CW3 confirmed

19

that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects.

20

¶¶76, 81;

21

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem

22

employee used an Excel spreadsheet to perform the "automated" functions of Athena for the

23

Massachusetts FTM project. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021,

24

Athena was still not fully developed. ¶¶76, 81;

25

(c)    CW1 stated that Stem did not have a working product for FTM projects since

26

inception because Athena was unable to provide core functionalities. ¶71. CW1 further reported

27

that Athena only existed in Beta mode and would repeatedly crash. ¶71. After the issue that caused

28

the crash was resolved, a new issue would arise within five minutes, and it would crash again. ¶71;

(d)    CW1 explained that Stem did not have a working model of Athena to show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that despite requests they never received an example of a successful implementation of Athena to show customers. ¶¶79-80. CW3 further confirmed that when they arrived in March 2021, despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM because it was still in development and was not functional. ¶¶79-81; and

(e)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM. ¶75.

171.    The Defective Prospectus, additionally falsely claimed that Stem was capable of completing FTM projects, when, in fact, Stem's Athena software was not viable for FTM projects:

> We operate in two key markets within the energy storage landscape: Behind-the-Meter ("BTM") and Front-of-the-Meter ("FTM"). BTM systems installed at C&I customer locations generate energy that can be used on-site without interacting with the electric grid and passing through an electric meter. Our BTM systems reduce C&I customer energy bills and help facilitate their corporate environmental, social and governance ("ESG") objectives. FTM, grid-connected systems deliver power into the grid which is often sold to off-site customers and transported by the grid prior to reaching an end-user. FTM systems decrease risk for solar and renewable project developers, asset owners, independent power producers and investors by adapting to dynamic energy market conditions and improving the combined value of the solar renewable resource and energy storage over the course of their FTM system's useful life. As an early participant in the BTM market, *we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services. We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage*. [Stmt. No. 15]

172.    The above statement was materially false and misleading when made because, unbeknownst to investors, Stem's Athena software was not automated for FTM projects and, as a result, did not provide a competitive advantage as detailed in ¶¶66-83, and, *inter alia*, by the following:

(a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM. ¶¶67, 70, 72, 74, 77. CW3 confirmed

1  that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects.

2  ¶¶76, 81;

3          (b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem

4  employee used an Excel spreadsheet to perform the "automated" functions of Athena for the

5  Massachusetts FTM project. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021,

6  Athena was still not fully developed. ¶¶76, 81;

7          (c)    CW1 stated that Stem did not have a working product for FTM projects since

8  inception because Athena was unable to provide core functionalities. ¶71. CW1 further reported

9  that Athena only existed in Beta mode and would repeatedly crash. ¶71. After the issue that caused

10  the crash was resolved, a new issue would arise within five minutes, and Athena would crash again.

11  ¶71;

12          (d)    CW1 explained that Stem did not have a working model of Athena to show to

13  FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that

14  despite requests they never received an example of a successful implementation of Athena to show

15  customers. ¶¶79-80. CW3 further confirmed that when they arrived in March 2021, despite

16  numerous requests to the product team, they could not recall ever seeing an example of a successful

17  implementation of Athena for FTM because it was still in development and was not functional.

18  ¶¶79-81; and

19          (e)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that

20  Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby

21  confirming Athena was never fully automated for FTM. ¶75.

22      173.    Also in the 03/30/21 Defective Prospectus, the 14(a) Defendants published materially

23  false and misleading statements and/or omitted materially adverse facts in the Defective Prospectus

24  when they warned of risks that, unbeknownst to investors, had already materialized.

25      174.    In a section entitled "Risks Relating to Stem's Business and Industry" the 14(a)

26  Defendants warned that *if* Athena was unsuccessful, Stem's competitive position ***could*** be adversely

27  affected, and revenue ***could*** be yet unbeknownst to investors, this risk had already materialized:

28        **Risks Relating to Stem's Business and Industry**

*     *     *

***If Stem is unsuccessful in developing and maintaining its proprietary technology, including the Athena platform, Stem's ability to attract and retain partners could be impaired, Stem's competitive position could be adversely affected and Stem's revenue could be reduced.*** [Stmt. No. 16]

175.     The 14(a) Defendants warnings were materially false and misleading because they warned of risks to Stem's business that, unbeknownst to investors, had already materialized. The risk that Stem may be unsuccessful in maintaining its proprietary technology had already materialized because Athena was not actually viable for FTM projects which was already adversely impacting Stem's ability to attract and retain customers. In addition, this statement was materially false and misleading for the reasons detailed in ¶¶66-90, and, *inter alia*, for the following reasons:

(a)     CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM. ¶¶67, 70, 72, 74, 77. CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects. ¶¶76, 81;

(b)     CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed. ¶¶76, 81;

(c)     CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities. ¶71. CW1 further reported that Athena only existed in Beta mode and would repeatedly crash. ¶71. After the issue that caused the crash was resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71;

(d)     CW1 explained that Stem did not have a working model of Athena to show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that despite requests they never received an example of a successful implementation of Athena to show customers. ¶¶79-80. CW3 further confirmed that when they arrived in March 2021, despite numerous requests to the product team, they could not recall ever seeing an example of a successful

1    implementation of Athena for FTM because it was still in development and was not functional.

2    ¶¶79-81;

3              (e)    CW1 and CW2 reported that Stem's approach was to sign up enough FTM

4    projects in order to be able eventually to build out their software team and from there build the

5    software for FTM projects.  ¶71; and

6              (f)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that

7    Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby

8    confirming Athena was never fully automated for FTM.  ¶75.

9          176.    Additionally in the "Risks Relating to Stem's Business and Industry" risk factor

10    section of the 03/30/21 Defective Prospectus, the 14(a) Defendants warned that Athena **could** have

11    defects which **could** reduce market adoption, yet unbeknownst to investors, this risk had already

12    materialized.

13          **Risks Relating to Stem's Business and Industry**

14                              *        *        *

15          ***Stem's technology, including the Athena platform, could have undetected defects,***
      ***errors or bugs in hardware or software which could reduce market adoption,***
16    ***damage Stem's reputation with current or prospective customers and/or expose***
      ***Stem to product liability and other claims that could materially and adversely affect***
17    ***Stem's business***.  [Stmt. No. 17]

18          177.    The 14(a) Defendants warnings were materially false and misleading because they

19    warned of risks to Stem's business that, unbeknownst to investors, had already materialized.  The

20    adverse risk to the Company that Stem's Athena platform could have defects in its software had

21    already materialized because Athena was not automated for FTM projects.  In addition, this

22    statement was materially false and misleading for the reasons detailed in ¶¶66-90, and, *inter alia*, for

23    the following reasons:

24              (a)    CW1 and CW2 reported that the Company did not have a working product for

25    FTM projects because Athena was not automated for FTM.  ¶¶67, 70, 72, 74, 77.  CW3 confirmed

26    that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects.

27    ¶¶76, 81;

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                        - 54 -
4879-3770-3139.v1

(b)      CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76, 81;

(c)      CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities.  ¶71.  CW1 further reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was resolved, a new issue would arise within five minutes, and it would crash again.  ¶71;

(d)      CW1 explained that Stem did not have a working model of Athena to show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that despite requests they never received an example of a successful implementation of Athena to show customers.  ¶¶79-80.  CW3 further confirmed that when they arrived in March 2021, despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM because it was still in development and was not functional. ¶¶79-81;

(e)      CW1 and CW2 reported that Stem's approach was to sign up enough FTM projects in order to be able eventually to build out their software team and from there build the software for FTM projects.  ¶71; and

(f)      Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

178.    Also in the 03/30/21 Defective Prospectus, in a section entitled "Market Opportunity Risks" the 14(a) Defendants warned that if enterprises may be unwilling to adopt Stem's offerings because of a "***perception***" that Stem's technology was "***unproven***" Stem's business may be adversely affected, yet unbeknownst to investors, this risk had already materialized:

**Market Opportunity Risks**

                                        *       *       *

***The distributed generation industry is an emerging market and our distributed generation offerings may not receive widespread market acceptance***.

The implementation and use of distributed generation at scale is still relatively nascent, and we cannot be sure that potential customers will accept such solutions broadly, or our hardware and software-enabled services more specifically. Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, ***including the perception that our technology is unproven***, lack of confidence in our business model, unavailability of back-up service providers to operate and maintain the energy storage systems, and lack of awareness of our related hardware and software-enabled services.  Because this is an emerging industry, ***broad acceptance of our hardware and software-enabled services is subject to a high level of uncertainty and risk***.  If the market develops more slowly than we anticipate, our business may be adversely affected. [Stmt. No. 18]

179.    The 14(a) Defendants warnings were materially false and misleading because they warned of risks to Stem's business that, unbeknownst to investors, had already materialized.  The risk that customers' perception that Stem's technology was unproven which would lead to a reduction in market adoption had already materialized because Stem was unable to close deals due to Athena's lack of viability for the FTM market.  In addition, this statement was materially false and misleading for the reasons detailed in ¶¶66-83, and, *inter alia*, for the following reasons:

(a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM.  ¶¶67, 70, 72, 74, 77.  CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects. ¶¶76, 81;

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76, 81;

(c)    CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities.  ¶71.  CW1 further reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was resolved, a new issue would arise within five minutes, and it would crash again.  ¶71;

(d)    CW1 explained that Stem did not have a working model of Athena to show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that

despite requests they never received an example of a successful implementation of Athena to show customers.  ¶¶79, 80.  CW3 further confirmed that when they arrived in March 2021, despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM because it was still in development and was not functional.  ¶¶79-81;

> (e)    CW1 and CW2 reported that Stem's approach was to sign up enough FTM projects in order to be able to eventually build out their software team and from there build the software for FTM projects.  ¶69; and

> (f)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

180.    On 04/12/21, Star Peak published the transcript of a Fireside Chat with IPO Edge and filed it with the SEC pursuant to Rule 425 under the Securities Act, and deemed it filed pursuant to Rule 14a-12 under the Exchange Act.  During the 04/12/21 Fireside Chat, Defendant Carrington made false representations about Athena:

> [Carrington:] ***And what Athena does is it's analyzing these large data sets and making real-time decisions that automatically respond to changing conditions in the energy market***.  It's not immaterial, we've been at this for a long time, and our data set is very important.  So to give you a little bit more color around that, Athena is ingesting over 700,000 data points per second from customer-sited energy storage systems.  [Stmt. No. 21]

181.    The above statements were materially false and misleading when made because, unbeknownst to investors, with respect to FTM projects, Stem's purported "automated" software was not viable and required human intervention.  As described in detail in ¶¶66-83, Stem's Athena software was not automated for FTM projects, as detailed by the following:

> (a)    CW1 and CW2 reported that the Company did not have a working product for FTM projects because Athena was not automated for FTM.  ¶¶67, 70, 72, 74, 77.  CW3 confirmed that when CW3 arrived in March 2021, Athena lacked functionality with respect to FTM projects.  ¶¶76, 81;

(b)    CW1 and CW2 stated that Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena for the Massachusetts FTM project.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76. 81;

(c)    CW1 stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities.  ¶71.  CW1 further reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was resolved, a new issue would arise within five minutes, and it would crash again.  ¶71;

(d)    CW1 explained that Stem did not have a working model of Athena to show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like, and that despite requests they never received an example of a successful implementation of Athena to show customers.  ¶¶79, 80.  CW3 further confirmed that when they arrived in March 2021, despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM because it was still in development and was not functional. ¶¶79-81; and

(e)    Defendant Carrington admitted during Stem's 02/28/24 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operations, thereby confirming Athena was never fully automated for FTM.  ¶75.

182.    The materially false and misleading misrepresentations regarding Athena's automation alleged for Plaintiffs' §14(a) claims are set forth in Exhibit A(1) (Section 14(a) Materially False and Misleading Statements chart, at Nos. 1-23), filed concurrently herewith.

**C.    Causation**

183.    Every public shareholder of Star Peak prior to the effective date of the Merger on 04/28/21 was negatively impacted by the Defective Prospectus and Defective Investor Materials in the following three ways:

(a)    **Redemption**: public shareholders were provided the right to redeem Star Peak shares for a pro rata portion of the cash held in the Trust Account, which holds the proceeds of Star

1   Peak's IPO if they preferred to receive their money back rather than obtain Stem shares in the
2   Merger.

3           (b)    **Merger Vote**: whether or not they redeemed shares, the Defective Prospectus
4   called for Star Peak public shareholders to vote to approve or reject the Merger between Star Peak
5   and Stem.

6           (c)    **Replacement Share Issuance**: Star Peak shareholders who did not redeem
7   shares had their Star Peak shares automatically converted into shares of Stem common stock.

8           184.   As a result of the materially false misstatements and omissions made in the Defective
9   Prospectus and Defective Investor Materials, §14(a) Class members were harmed.

10          185.   Moreover, as detailed in ¶¶292-338 below, Defendants' misstatements in the
11  Defective Proxy/Registration Statement were corrected through a series of partial disclosures on
12  02/24/22, 01/05/23, 02/16/23, 03/29/23, and 04/04/23, which caused Stem's stock price to decline to
13  values well below the inflated IPO price, thereby injuring Plaintiffs and other members of the Class
14  who had acquired Stem securities in the IPO at artificially inflated prices resulting from the alleged
15  false and misleading statements and omissions in the Defective Proxy/Registration Statement.

16                      **VI. THE FRAUD DEFENDANTS' VIOLATIONS OF §10(b)**
17                                  **OF THE EXCHANGE ACT**

18          186.   The Fraud Defendants engaged in a fraudulent scheme to mislead investors through
19  their conduct and by issuing materially false statements and/or omitting adverse material facts, either
20  knowingly or with deliberate recklessness, regarding: (i) Stem's key software Athena that was
21  neither automated nor viable for FTM projects; (ii) Stem's business model, which was
22  fundamentally flawed because its Athena software was not automated for FTM projects; (iii) Stem's
23  FTM success with its Athena software in Massachusetts when the "automated" software was not
24  viable for FTM projects; and (iv) the risks to Stem's business when those risks were already
25  occurring.  The Fraud Defendants' misrepresentations and fraudulent conduct misled investors
26  regarding the combined company's business, operations and ability to grow a profitable company as
27  described herein.

28

**A.    The Fraud Defendants' Materially False and Misleading Statements that Stem's Athena Software Was Automated for the FTM Market**

187.    Throughout the Class Period, the Fraud Defendants materially misled investors by falsely touting Athena as automated when the software was not automated with respect to Stem's critical FTM business – the very market on which Stem claimed its business model relied to fuel growth, margins, and profitability.

**1.    The Fraud Defendants Falsely Represented that Stem's Key Software Athena Is Automated Prior to the IPO**

188.    At the beginning of the Class Period, the Fraud Defendants misled investors by misrepresenting in Stem's 12/04/20 release attached to Form 8-K, signed by Defendant Scheyer, and filed by Star Peak with the SEC that the "***Company generates revenue by providing customers with integrated energy storage systems, long-term recurring software services and energy market participation through its proprietary software platform, called Athena™, which enables AI-automated system operations***." [Stmt. No. 24].[18] The Fraud Defendants reinforced this false claim in one form or another throughout the Class Period.

189.    Also on 12/04/20, Stem held an investor conference call in which Defendants Morgan, Scheyer, and Carrington participated.  On the call, Carrington misled investors by stating that Athena was an automated system:

> [Carrington:] I would now like to share a day in the life of Athena.

> Throughout the day, Athena optimizes the value for individual customers as individual sites are consuming power based on their own business needs.  Later in the day, typically at about three o'clock in the case of California, Athena, in response to utility requests and market price signals, begins to orchestrate hundreds of sites coordinated as virtual power plants to deliver energy to the grid.  ***Athena automates system discharges across multiple different utility territories, collaborating with the utilities to provide instant grid support when and where it is needed***.

> In the early evening when grid demand has dropped, the systems resume normal operation.  And when power prices drop at night ***Athena automates their recharging***, using low cost power to restore energy so they can begin operation in a similar pattern for the following day.  [Stmt. No. 25]

---

[18]    The Stem release filed by Star Peak contained quotes from Defendants Scheyer, Morgan, and Carrington.

190.    On 01/05/21, 01/13/21, 02/11/21, 02/18/21, 03/02/21, 03/19/21, 03/30/21, 03/30/21, 04/06/21, 04/12/21, 04/14/21, and 04/21/21 Star Peak filed releases with the SEC pursuant to Rule 425 listing both Star Peak and Stem contact information, all of which included the following identical statement that falsely represented Athena was automated:

About Stem, Inc.

Stem provides solutions that address the challenges of today's dynamic energy market.  By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, *Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power*.  Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation.  Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.  [Stmt. Nos. 26-27, 29, 30-34, 42-43, 45-46]

191.    In addition, on 01/25/21 the Fraud Defendants falsely stated in the slides for an Analyst Day Presentation that was filed by Star Peak with the SEC pursuant to Rule 425 entitled "Leader in AI-Driven Storage Solutions," that Athena "automatically switch[es] between battery power, onsite generation and grid power":

Our market leading Athena software uses advanced artificial intelligence and machine learning to optimize the operation of these batteries *by automatically switching between battery power, onsite generation and grid power*.

*Athena absorbs massive volumes of real-time data to provide continuous monitoring, forecasting, optimization, and automated controls to deliver its many value-added services*.

*Athena then automatically evaluates each customer's exposure to dynamic energy and demand prices and adapts to store and release energy when the customer will achieve the most savings*.

It integrates in real time with energy market operators and utilities to provide essential system visibility to grid operators *while automating market transactions*.

*And Athena and smart battery storage maximize wholesale market revenues with automated market participation across the project's entire lifecycle*. [Stmt. No. 28][19]

---

[19]    The presentation specifically provides that it will be used by Star Peak "in presentations to certain STPK stockholders and other persons, including at analyst day presentations commencing on 01/25/21, in connection with STPK's previously disclosed proposed business combination with Stem."

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                        - 61 -
4879-3770-3139.v1

192.     Two months later on 03/30/21, the Fraud Defendants filed the Defective Prospectus in which they again materially misled investors by claiming that Athena was automated:

Our Athena Platform

*Athena unlocks the value of battery storage by providing energy forecasting, real-time optimization and automated controls for our customers leveraging over 10 years of operational data and experience*.  By dispatching electricity to our C&I customers through our energy storage network during periods of peak power demand, we are able to decrease our customers' electricity expenses, improve the value of their energy usage and diminish their environmental impact. Our Athena AI-powered platform supports customers by managing large-scale energy storage projects, addressing intermittency issues and safeguarding project value against fluctuating market conditions and on-going policy changes.   In addition, our energy storage network enables grid operators to decrease their reliance on conventional generation sources thereby improving the resiliency of the electrical grid and enabling lower carbon emissions through the increased adoption of renewable generation sources.

Athena utilizes highly localized weather, energy price and market data to understand the impact on customer electricity usage and formulate optimal economic strategies for charge and discharge of the energy storage systems.  Athena-operated systems are under real-time control and currently over 700,000 data points per second are streamed into the platform, informing the strategy developed for each individual asset and site.   As of October 2020, Athena's cloud infrastructure is performing automated data engineering, supporting our AI processes that currently model over 24 million scenarios per day, delivering optimal storage operating strategies for each individual customer site.  *This autonomous operation delivers value to enterprise customers, renewable generation partners, utilities, grid operators and financing counterparties*.  The most difficult part of AI and machine learning is data collection and data integrity, and our automated data engineering platform enables our data science team to rapidly develop and deploy new algorithms.  These algorithms embed the physics of storage, renewable generation and the grid and include fit-to-purpose deep learning models that evolve so that Athena can react to changing conditions.   Our team has automated AI model selection and training, evaluating them against our extensive energy storage operations database encompassing over 20 million runtime hours, or the equivalent of 2,200 years of operations.  [Stmt. No. 35]

193.     In the same 03/30/21 Defective Prospectus, the Fraud Defendants went on to mislead investors by presenting Athena Gateway – one of Athena's features that they falsely claimed was "automated":

Athena Gateway: Gateway services provide real-time integration endpoints that tie into utility and market control systems.  *This feature enables our customers to participate in markets and grid programs with automated dispatching leveraging the near-instantaneous response of the Athena platform.*  [Stmt. No. 36]

194.    Six weeks later, on 04/12/21, Defendants Morgan, and Carrington participated in an IPO Edge Fireside Chat filed by Star Peak with the SEC pursuant to Rule 425 wherein Carrington falsely described Athena as automatically responding to changing conditions:

> [Carrington:] ***And what Athena does is it's analyzing these large data sets and making real-time decisions that automatically respond to changing conditions in the energy market***. It's not immaterial, we've been at this for a long time, and our data set is very important. So to give you a little bit more color around that, Athena is ingesting over 700,000 data points per second from customer-sited energy storage systems. [Stmt. No. 44]

195.    The Fraud Defendants, including Stem, Star Peak, Bush, Carrington, Daley, Johnson, Morgan, Patel, Russo, and Scheyer, knowingly and/or with deliberate recklessness made materially false and misleading statements that the Company's Athena software was automated when, in reality, it was not. Despite the fact that Stem's stated business model relied on it having a viable product for FTM projects, the Fraud Defendants failed to inform investors that Athena was not automated for FTM projects. Specifically, the Fraud Defendants' misstatements and omissions in ¶¶188-194 above, and in Exhibit A(2) (Stmt. Nos. 24-27, 29-36, 42-46) were materially false and misleading because:

(a)    ***Athena was not automated for FTM projects***: According to CW1 (who was employed at Stem from prior to the Class Period until February 2022), based upon their experience at Stem, the Company did not have a working product for FTM projects because Athena was not fully automated for FTM. ¶¶67, 70, 72. CW2 (who was employed at Stem from early 2020 until August 2023) confirmed that Athena was not fully developed for FTM projects, indicating that the ship was taking off and being built at the same time. ¶¶74, 77. CW3 also confirmed that when they arrived in March 2021, Athena was still in development for FTM projects. ¶¶76, 81;

(b)    ***Unbeknownst to investors, a Stem employee used an Excel spreadsheet to perform Athena's allegedly-automated functions***: The Fraud Defendants repeatedly touted the automated benefits of Athena for its customers, but, according to CW1 and CW2, Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of Athena. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed. ¶¶76, 81. These witness accounts are corroborated by Carrington's admission post-

1    Class Period on 02/28/24, that Stem's "program management team[] adds a 'human-in-the-loop'" to

2    Athena's operation.  ¶75;

3                (c)    ***Unbeknownst to investors, Athena was not viable for FTM projects but***

4    ***rather still a prototype***: CW1 and CW2 asserted that at the time of the Fraud Defendants'

5    misstatements Athena was still in development and unproven for FTM projects.  ¶¶67-68, 70-74, 79-

6    80.  CW1 further stated that Stem did not have a working product for FTM projects since inception

7    because Athena was unable to provide core functionalities.  ¶71.  For example, CW1 explained that

8    Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the

9    crash was resolved, a new issue would arise within five minutes, and Athena would crash again.

10   ¶71.  Because Stem's business model rested upon Athena being automated to be viable for FTM

11   projects, Stem's strategy was to close FTM deals and worry about developing Athena for FTM

12   projects later.  ¶¶65-66, 69, 71-72.  CW2 confirmed that Stem's strategy was to eventually get

13   enough FTM projects so that the Company would have enough money to hire more personnel to

14   develop Athena.  ¶71.  Indeed, CW1 explained that Stem did not have a working model of Athena to

15   show to FTM customers but rather fabricated screenshots of what Athena was supposed to look like,

16   and that despite requests they never received an example of a successful implementation of Athena

17   to show customers.  ¶¶79-80.  CW3 further confirmed that when they arrived in March 2021, despite

18   numerous requests to the product team, they could not recall ever seeing an example of a successful

19   implementation of Athena for FTM.  ¶¶79-81;

20               (d)    ***Stem's potential customers recognized that Athena was not automated for***

21   ***FTM projects and Stem was losing FTM deals as a result***: CW1 asserted that Stem's customers

22   described Athena as an empty suit because Athena was not automated.  ¶71.  CW1 further stated that

23   Stem was having difficulties closing FTM deals because Athena was not automated, resulting in

24   Stem's poor closing rate, which was tracked in Salesforce.  ¶¶70, 83, 89.  CW2 corroborated that

25   FTM deals were tracked in Salesforce and that Defendant Russo consistently reviewed Salesforce

26   data.  ¶83.  To that end, Carrington publicly reassured investors that he and other Stem executives

27   closely monitored the Company's performance, which necessarily would have required a review of

28   the Salesforce data reflecting lost deals.  ¶379.

### 2. The Fraud Defendants Continued to Falsely Represent that Athena Was Automated Throughout 2021

196.    On 05/17/21, 08/11/21, and 11/09/21 Stem issued releases attached to Forms 8-K filed with the SEC[20] that included the exact same false statements that the Fraud Defendants used prior to the IPO, falsely representing that Athena was automated:

About Stem, Inc.

Stem provides solutions that address the challenges of today's dynamic energy market.  By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, *Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power*.  Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation.  Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.  [Stmt. Nos. 47, 50, 58]

197.    The Fraud Defendants, including Stem, Bush, Carrington, Daley, Johnson, Morgan, Patel, and Russo, knowingly and/or with deliberate recklessness made materially false and misleading statements that the Company's Athena software was automated when, in reality, it was not.  Despite the fact that Stem's stated business model relied on it having a viable product for FTM projects, the Fraud Defendants failed to inform investors that Athena was not automated for FTM projects.  Specifically, the Fraud Defendants' misstatements and omissions in ¶196 above and in Exhibit A(2) (Stmt. Nos. 47, 50, 58) were materially false and misleading for the reasons detailed in ¶¶66-83 as well as, *inter alia*, because:

(a)    *Athena was not automated for FTM projects*: According to CW1 (who was employed at Stem from prior to the Class Period until February 2022), based upon their experience at Stem, the Company did not have a working product for FTM projects because Athena was not fully automated for FTM.  ¶¶67, 70, 72.  CW2 (who worked with in market enablement group and sales team and was employed at Stem from early 2020 until August 2023) confirmed that Athena was not fully developed for FTM projects, indicating that the ship was taking off and being built at

---

[20]    The 05/17/21 Form 8-K was signed by Defendant Bush and the attached release includes a quote from Defendant Carrington.  The 08/22/21 and 11/09/21 Forms 8-K were signed by Stem's Chief Legal Officer and Secretary Saul R. Lawless and include quotes from Defendant Carrington.

1 the same time.  ¶¶74, 77.  CW3 (who worked with sales and the product marketing team as well as

2 the Athena product team from March 2021 until June 2023) also corroborated reports that Athena

3 lacked functionality with respect to FTM projects.  ¶¶76, 81;

4         (b)     **_Unbeknownst to investors, Stem employees used an Excel spreadsheet to_**

5 **_perform Athena's allegedly automated functions_**: The Fraud Defendants repeatedly touted the

6 automated benefits of Athena for its customers, but, according to CW1 and CW2, Athena was not

7 automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions

8 of Athena.  ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not

9 fully developed.  ¶¶76, 81.  These witness account are corroborated by Carrington's admission post-

10 Class Period on 02/28/24 that Stem's "program management team[ ] adds a 'human-in-the-loop'" to

11 Athena's operation.  ¶75;

12         (c)     **_Unbeknownst to investors, Athena was not viable for FTM projects but_**

13 **_rather still a prototype_**: CW1 and CW2 asserted that, at the time of the Fraud Defendants'

14 misrepresentations, Athena was still in development and unproven for FTM projects.  ¶¶67-68, 70-

15 74, 79-80.  CW1 further stated that Stem did not have a working product for FTM projects since

16 inception because Athena was unable to provide core functionalities.  ¶71.  For example, CW1

17 explained that, throughout their entire tenure at Stem, Athena only existed in a Beta version, such

18 that as soon as one error was fixed, another error would arise within minutes, and that when a sample

19 project was attempted using Athena, it would crash before the initial inputs were even entered.  ¶71.

20 Because Stem's business model rested upon Athena being automated to be viable for FTM projects,

21 Stem's strategy was to close FTM deals and then worry about developing Athena for FTM projects

22 later.  ¶¶65-66, 69, 71-72.  CW2 confirmed that Stem's strategy was to eventually get enough FTM

23 projects so that the Company would have enough money to hire more personnel to develop Athena.

24 ¶71.  Indeed, CW1 explained that Stem did not have a working model of Athena to show to FTM

25 customers but rather fabricated screenshots of what Athena was supposed to look like, and that

26 despite requests they never received an example of a successful implementation of Athena to show

27 customers.  ¶¶79-80.  CW3 further confirmed that despite numerous requests to the product team,

28

they could not recall ever seeing an example of a successful implementation of Athena for FTM. ¶¶79-81;

(d)     ***Stem's potential customers recognized that Athena was not automated for FTM projects and Stem was losing FTM deals as a result***: CW1 asserted that Stem's customers described Athena as an empty suit because Athena was not automated. ¶71. CW1 further stated that Stem was having difficulties closing FTM deals because Athena was not automated, resulting in Stem's poor closing rate, which was tracked in Salesforce. ¶¶70, 83, 89. CW2 corroborated that FTM deals were tracked in Salesforce and that Defendant Russo consistently reviewed Salesforce data. ¶83. To that end, Carrington publicly reassured investors that he and other Stem executives closely monitored the Company's performance, which necessarily would have required a review of the Salesforce data reflecting lost deals. ¶379.

### 3.     The Fraud Defendants Continued to Falsely Represent that Athena Was Automated Throughout 2022

198.     On 02/24/22, Stem issued a release attached to a Form 8-K filed with the SEC which used the same misleading language that the Fraud Defendants had previously used that Athena was automated:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power***. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter. [Stmt. No. 63]

199.     On 02/24/22, Stem held its 4Q/FY 2021 earnings call in which Defendants Carrington, Johnson, and Bush participated. On the call, Johnson misled investors when he touted Athena as being "automated":

> [Johnson:] Our shared vision [with Also Energy] is to empower clean energy asset owners and operators to scale their businesses by leveraging ***AI-automated, data-driven operations enabled by Athena***. [Stmt. No. 64]

200. On the same 02/24/22 earnings call, Defendant Bush falsely reinforced that Athena was automated:

> Starting with the Stem energy storage business, our software drives exceptional economics for our customers. ***Athena automates everything***, including reducing costs, increasing revenues, complying with regulatory incentives and constraints and minimizing greenhouse gas emissions. Our broad market reach and scope allows us to co-optimize multiple value streams in real time and over time to maximize economic value for our customers. [Stmt. No. 65]

201. Days later, on 02/28/22, the Fraud Defendants filed Stem's Form 10-K for FY 2021 with the SEC, signed by Defendants Carrington, Bush, Daley, and Morgan in which the Fraud Defendants falsely touted Athena's "automated controls":

> The transition to renewable energy and a distributed energy infrastructure has resulted in an increase in the complexity and variability of end-customer electricity demand influenced by onsite generation and flexible sources of load. Accordingly, it has become nearly impossible to efficiently manage and operate businesses and the grid using a schedule based, human operated approach. Instead, the utilization of intelligent, responsive energy storage throughout the grid is required to provide the real-time balance necessary to support more distributed renewable assets, and we believe that Athena fulfills this vital need of a modern energy infrastructure. ***Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers*** leveraging over 10 years of operational data and experience. [Stmt. No. 67]

202. The Form 10-K also stated that Athena's "automated controls" were one of the Company's "competitive strengths":

> Our competitive strengths include the following:
>
> \*      \*      \*
>
> **Advanced Technology Platform**: We developed one of the first AI platforms for energy storage and virtual power plants, ***automating storage participation in electricity markets, performing monitoring and management of customer loads, solar generation and energy prices with real-time, complex decision-making algorithms***. The platform is able to co-optimize multiple energy market revenue streams across a diverse fleet of hardware throughout multiple geographies and energy markets. [Stmt. No. 68]

203. On 05/05/22 and 08/04/22, Stem issued releases attached to Forms 8-K filed with the SEC each of which used the same misleading language that Athena was automated:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite***

*generation and grid power*.  Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation.  Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.  [Stmt. Nos. 73, 77]

204.    During a 09/28/22 Investor and Analyst Day in which Defendants Bush, Carrington, Ho, Johnson, and Patel participated, the Fraud Defendants continued to hammer in the misleading message to investors that Athena was automated.  For instance, Defendant Johnson falsely described Athena as being fully automated "nonstop 24/7":

So first, *Athena automates dispatching with flexible energy systems,* right, to achieve that maximum economic value.  How does that happen?  The first step is we need to predict the future.  We need to predict what's going to happen.  You need to understand how much solar generation we're going to have available.  These are at every particular site that we're operating.  We need to predict that solar generation. We need to predict what the market prices will be.  We need to predict a customer load if we're going to be offsetting the customer load and optimizing for behind-the-meter facility.

And then we need to run that optimization which oftentimes takes millions of scenarios in order to achieve the best fit and look at the landscape of that particular site over a multi-day period, determining if the energy available is best to use today or best to save and use tomorrow when market prices may be higher or opportunities may be better.  We do that over a multiple day scenario.  And we're doing this continuously, literally running millions of scenarios every hour.

And then finally, we have to dispatch the asset.  So once we determine what the economic ideal operating plan is we need to actually create that – realize that economic plan, either through bidding into a wholesale market and clearing in prices that will affect the operation of the system in the way we want or by directly dispatching that aspect for a particular customer opportunity.  *This automated, very scalable prediction optimizing dispatch process run continuously, nonstop 24/7, supporting the economic dispatch of these flexible assets*.  [Stmt. No. 81]

205.    Johnson elaborated on Athena's capabilities at this analyst day by falsely stating that there are "no humans involved in this loop":

*This is a fully automated process lights out.  There's no humans involved in this loop.  Once we set it up, it just keeps running*.  And then second, we're at the point of asset performance management.  All the time we're doing this, we're continually getting streaming data from these sites.  Data that can range from every second to every few minutes.  It's coming in, in order to make sure that we have a complete situational awareness for all assets.  And then Athena can determine if there's anything that needs to be acted on.  Corrective actions such as remote automated solutions as well as corrective actions that may involve field work dispatch.

*So Athena automates this process, processing terabytes of data every day and determining where there are issues and then triggering the appropriate*

1    ***workflows to either automatically resolve an issue***, informing the proper people and
2    then in some cases, being able to initiate a workflow that results in a truck roll in
     order to do some work at the site.

3           Delivering both of these again on a unified platform, we think it's an entirely
4    differentiated offer that increases yield, reduces risk and improves the operating
     efficiency of these clean energy assets.  And this is just incredibly important to
     achieve our mission of accelerating the clean energy transition because the cost of
5    these operations, ***the economic value is what underwrites the ability to continue to
     grow this clean energy portfolio***.

6           I'm going to dig in one more level and ***talk a little bit about the automated***
7    ***AI operations***.  And it operates on several levels.  So you'll hear us talk about one
     second data.  We're also talking about one second and even sub-second control that
8    has to happen.  A lot of this is affected directly at the edge because of the latency that
     has to be low for some of these grid-related services.

9           And that's – ***these kinds of cadences are effectively what lead us into the***
10   ***performance that we've been citing. 96% of perfect foresight in terms of the ISO***
     ***New England market revenues*** and overperforming in the greenhouse gas goals at
11   C&I sites in California.  So again, every second, these solutions are operating at the
     edge, they're acquiring site-specific data, combining that real-time asset condition,
12   generation, local weather status and the making control decisions that can respond in
     milliseconds.

13                                        *        *        *

14          And then on a daily basis, we're evaluating the key performance indicators,
15   the KPIs that really determine how we're performing, either against greenhouse gas
     goal against an incentive goal against battery longevity and performance objectives
16   for the battery and warranty and so forth and then determining what that ongoing
     operating plan should be in relation to those maybe longer-horizon metrics that are
17   also part of the optimization process.

18          And then very interesting, quite important is on a monthly basis, ***our***
19   ***automated AI operations*** will evaluate the models that are used for each of these
     forecasts for each and every site.  So every site may have multiple forecast streams
     that are being run.  And every one of those may have a model that's selected
20   specifically based on ***model evaluation process that runs automatically every month***
     in order to adapt to longer changing conditions and that automated model selection,
21   you can look at deep neural net, gradient boosted network, gradient boosted forecast,
     random forest approach.  And all of those different approaches are evaluated in order
22   to say what's the best one for this particular site and then that's selected for the next
     operating period.

23          So Athena is automatically doing this in the background, evaluating the best
24   model approach, that set of hyper parameters that control that model and then being
     able to say this is how we should proceed and that ***AI automation for that process is***
25   ***something we think is also a unique and differentiated value in terms of scaling***
     ***and operating these systems, adapting to conditions without human intervention***.
26   [Stmt. No. 82]

27

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 70 -
4879-3770-3139.v1

206.    On 12/08/22 Stem hosted an Optimizing Your Large-Scale and Storage Portfolio Webinar in which Defendant Ho participated and built upon Stem's false message that Athena did not "need a human":

> Through all this variability, and again, the backdrop of variability in wholesale market pricing, uh, Athena's working 24/7 to generate, uh, solutions. And you'll see that, again, the general patterns and solutions are that system will charge during the day because of that ITC constraint and systems will discharge in the evening ramp because prices tend to be high there. But on top of that, there's the quantity and timing that which it charges and discharges is variable. ***And that's the power of automation, right? It's, it's there. You don't need a human operator to screen, you know, chained to the desk 24/7 to, uh, make this work. We've got Athena working on behalf of the asset owner every hour, every hour, every hour, um, optimizing this thing.*** So how does it, you know, this is, we're looking at meter data here and the kind of effects of the Athena optimization. How does it actually sort of affect, you know, um, get that done? We'll take kind of a look under the hood a bit here, uh, with some custom views that you can create in supervisor. Supervisor can essentially access all of our time series data and therefore allow users to layer on, uh, custom views. So we'll look at a view that was built to visualize real time, uh, energy bids and offers. [Stmt. No. 89].

207.    The Fraud Defendants including Stem, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, and Russo, knowingly and/or with deliberate recklessness made materially false and misleading statements that the Company's Athena software was automated when, in reality, it was not. Despite the fact that Stem's stated business model relied on it having a viable product for FTM projects, the Fraud Defendants failed to inform investors that Athena was not automated for FTM projects. Specifically, the Fraud Defendants' misstatements and omissions in ¶¶198-206 above, and in Exhibit A(2) (Stmt. Nos. 63-65, 67-68, 73, 77, 81-82, 89) were materially false and misleading for the reasons detailed in ¶¶66-85, 99-101, 125-133 as well as, *inter alia*, because:

(a)    ***Athena was not automated for FTM projects***: As of the time CW1 left in February 2022, and as confirmed by CW2, who remained at Stem until after the Class Period, Stem did not have a working product for FTM projects because Athena was not fully automated. ¶¶67, 70, 72, 74, 77. CW3, who also remained at Stem until after the Class Period, corroborated this in stating that Athena was still in development for FTM projects. ¶¶76, 81;

(b)    ***Unbeknownst to investors, a Stem employee used an Excel spreadsheet to perform Athena's allegedly-automated functions***: The Fraud Defendants repeatedly touted the automated benefits of Athena for its customers, but, as of the time CW1 left in February 2022, and as

1    confirmed by CW2 who remained at Stem until after the Class Period, Athena was not automated;

2    rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of Athena.

3    ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully

4    developed.  ¶¶76, 81.  These witness accounts are corroborated by Carrington's admission post-Class

5    Period on 02/28/24 that Stem's "program management team[ ] adds a 'human-in-the-loop'" to

6    Athena's operation, which stands in marked contrast to the Fraud Defendants statements to investors,

7    including their 09/28/22 assertion that "[t]here's no humans involved in this loop." ¶¶75, 205;

8            (c)    ***Unbeknownst to investors, Athena was not viable for FTM projects but***

9    ***rather still a prototype***: As of the time CW1 left in February 2022 and as confirmed by CW2, at the

10   time of the Fraud Defendants' misstatement Athena was still in development and unproven for FTM

11   projects.  ¶¶67-68, 70-74, 79-80.  CW1 further stated that Stem did not have a working product for

12   FTM projects since inception because Athena was unable to provide core functionalities. ¶71. CW1

13   reported that Athena only existed in Beta mode and would repeatedly crash.  ¶71.  After the issue

14   that caused the crash was resolved, a new issue would arise within five minutes, and Athena would

15   crash again. ¶71.  Because Stem's business model rested upon Athena being automated to be viable

16   for FTM projects, Stem's strategy was to close FTM deals and then worry about developing Athena

17   for FTM projects later.  ¶¶65-66, 69, 71-72. CW2 confirmed that Stem's strategy was to eventually

18   get enough FTM projects so that the Company would have enough money to hire more personnel to

19   develop Athena. ¶71.  Indeed, CW1 explained that despite requests they never received an example

20   of a successful implementation of Athena to show customers.  ¶¶79-80.  CW3 further confirmed that

21   despite numerous requests to the product team, they could not recall ever seeing an example of a

22   successful implementation of Athena for FTM.  ¶¶79-81; and

23           (d)    ***Stem's potential customers recognized that Athena was not automated for***

24   ***FTM projects and Stem was losing FTM deals as a result***: Prior to CW1's departure in February

25   2022, CW1 asserted that Stem's customers described Athena as an empty suit because Athena was

26   not automated.  ¶71.  CW1 also stated that Stem was having difficulties closing FTM deals because

27   Athena was not automated, resulting in Stem's poor closing rate, which was tracked in Salesforce.

28   ¶¶70, 83, 89.  To that end, Carrington publicly reassured investors that he and other Stem executives

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 72 -

closely monitored the Company's performance, which necessarily would have required a review of the Salesforce data reflecting lost deals.  ¶379.  This inference is supported by CW2's account of the $500 million FTM Available Power "deal" that Stem announced on 02/24/22, which was touted to investors as an example of Athena's viability for the FTM market.  ¶¶84-85, 258.  Unbeknownst to investors until January 2023, this purported deal in fact never closed.  ¶84; and

(e)     ***Stem was unable to convert its business to a high-margin software Company, as reflected by its low gross margins and earnings***: Because Stem lacked an automated software product for the FTM market, it had no product that could drive the high software margins and profits that the Fraud Defendants promised would arise from Stem's software-based business model.  At the beginning of the Class Period, the Fraud Defendants promised Stem would be profitable in two years with gross margins more than doubling to 26% and earnings of $28 million for FY 2022 with the Company's sale of Athena to the FTM market.  ¶¶62, 64, 99.  Reflecting the lack of a viable FTM product, for FY 2022 Stem would report on 02/16/23 abysmal results – gross margins of only 13% and rather than a profit, a loss of $124 million for FY 2022.  ¶¶99, 125.  In addition, rather than the promised gross margins of 32% and earnings of $113 million for FY 2023 on 12/04/20, Stem would report gross margins of only 15% and a net loss of $140 million for FY 2023.  ¶¶101, 133.

### 4.     The Fraud Defendants Continued to Falsely Represent that Athena Was Automated in 2023

208.    On 02/17/23 the Fraud Defendants filed Stem's Form 10-K for FY 2022 with the SEC signed by Defendants Bush, Carrington, Daley, and Morgan wherein they falsely represented that its automated technology platform was one of its "competitive strengths":

Our competitive strengths include the following:

*          *          *

***Advanced Technology Platform***: We developed one of the first AI platforms for energy storage and virtual power plants ***automating storage participation in electricity markets and performs monitoring and management of customer loads, solar generation and energy prices with real-time, complex decision- making algorithms***.  The platform is able to co-optimize multiple energy market revenue streams across a diverse fleet of hardware throughout multiple geographies and energy markets.  [Stmt. No. 90]

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                                                      - 73 -
4879-3770-3139.v1

209.    Tellingly, after the Class Period ended and as of its release of Stem's 2Q 2023 financial results filed with the SEC on Form 8-K on 08/03/23, Stem no longer included the specific language describing Athena as "automatically switching between battery power, onsite generation and grid power" in its press releases.

210.    The Fraud Defendants, including Stem, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, and Russo, knowingly and/or with deliberate recklessness made materially false and misleading statements that the Company's Athena software was automated when, in reality, it was not. Despite that Stem's stated business model relied on it having a viable product for FTM projects, the Fraud Defendants failed to inform investors that Athena was not automated for FTM projects. Specifically, the Fraud Defendants' misstatements and omission in ¶208 above and in Exhibit A(2) (Stmt. No. 90) was materially false and misleading for the reasons detailed in ¶¶66-85, 99-101, 125-133, as well as, *inter alia*, because:

(a)    ***Athena was not automated for FTM projects***: As of the time CW1 left in February 2022, and as confirmed by CW2, who remained at Stem until after the Class Period, Stem did not have a working product for FTM projects because Athena was not fully automated.  ¶¶67, 70, 72, 74, 77.  CW3, who also remained at Stem until after the Class Period, corroborated this in stating that Athena was still in development.  ¶¶76, 81;

(b)    ***Unbeknownst to investors, a Stem employee used an Excel spreadsheet to perform Athena's allegedly-automated functions***: The Fraud Defendants repeatedly touted the automated benefits of Athena for its customers, but, as of the time CW1 left in February 2022, and as confirmed by CW2 who remained at Stem until after the Class Period, Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform the "automated" functions of Athena. ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76, 81.  These witness account are corroborated by Carrington's admission post-Class Period on 02/28/24 that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operation.  ¶75;

(c)    ***Unbeknownst to investors, Athena was not viable for FTM projects but rather still a prototype***: As of the time CW1 left in February 2022, and as confirmed by CW2, at the

time of the Fraud Defendants' misstatement Athena was still in development and unproven for FTM projects. ¶¶67-68, 70-74, 79-80. CW1 further stated that Stem did not have a working product for FTM projects since inception because Athena was unable to provide core functionalities. ¶71. CW1 reported that Athena only existed in Beta mode and would repeatedly crash. ¶71. After the issue that caused the crash was resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71. Because Stem's business model rested upon Athena being automated to be viable for FTM projects, Stem's strategy was to close FTM deals and then worry about developing Athena for FTM projects later. ¶¶65-66, 69, 71-72. CW2 confirmed that Stem's strategy was to eventually get enough FTM projects so that the Company would have enough money to hire more personnel to develop Athena. ¶71. Indeed, CW1 explained that despite requests, they never received an example of a successful implementation of Athena to show customers. ¶¶79-80. CW3 further confirmed that despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM. ¶¶79-81;

(d)     ***Stem's potential customers recognized that Athena was not automated for FTM projects and Stem was losing FTM deals as a result***: Prior to CW1's departure in February 2022, CW1 asserted that Stem's customers described Athena as an empty suit because Athena was not automated. ¶71. CW1 also stated that Stem was having difficulties closing FTM deals because Athena was not automated, resulting in Stem's poor closing rate, which was tracked in Salesforce. ¶¶70, 83, 89. To that end, Carrington publicly reassured investors that he and other Stem executives closely monitored the Company's performance, which necessarily would have required a review of the Salesforce data reflecting lost deals. ¶379. This inference is supported by CW2's account of the $500 million FTM Available Power "deal" that Stem announced on 02/24/22, which was touted to investors as an example of Athena's viability for the FTM market. ¶¶84-85, 258. Unbeknownst to investors until January 2023, this purported deal in fact never closed. ¶84; and

(e)     ***Stem was unable to convert its business to a high-margin software Company, as reflected by its low gross margins and earnings***: Because Stem lacked an automated software product for the FTM market, it had no product that could drive the high software margins and profits that the Fraud Defendants promised would arise from Stem's software-based business

model. At the beginning of the Class Period, the Fraud Defendants promised Stem would be profitable in two years with gross margins more than doubling to 26% and earnings of $28 million for FY 2022 with the Company's sale of Athena to the FTM market. ¶¶62, 64, 99. Reflecting the lack of a viable FTM product, for FY 2022 Stem would report on 02/16/23 abysmal results – gross margins of only 13%, and rather than a profit, a loss of $124 million for FY 2022. ¶¶99, 125. In addition, rather than the promised gross margins of 32% and earnings of $113 million for FY 2023, on 12/04/20, Stem would report gross margins of only 15% and a net loss of $140 million for FY 2023. ¶¶101, 133.

**B.    The Fraud Defendants' Materially False and Misleading Statements Regarding Stem's Business Model**

211.    Throughout the Class Period, the Fraud Defendants falsely represented that Stem had a viable business model that would drive growth. The business model was premised on the Company transforming into a profitable company as a result of its purported AI-automated software and expansion into the lucrative FTM market with its existing Athena software product. Unbeknownst to investors, Stem's business model was fatally flawed because a significant part of that model relied on software sales and expanding business into the FTM market when, in fact, Stem did not have a viable automated software product for the FTM market and thus it did not have a "competitive advantage" or "competitive moat." The Fraud Defendants concealed these material adverse facts from investors throughout the Class Period.

**1.    The Fraud Defendants Falsely Represented that Stem Had a Competitive Advantage in the FTM Market Leading Up to Stem's IPO**

212.    On 03/30/21, Star Peak filed the Defective Prospectus with the SEC in which the Fraud Defendants misled the market by stating that Athena was fully automated, which provided Stem with its competitive advantage:

> We operate in two key markets within the energy storage landscape: Behind-the-Meter ("BTM") and Front-of-the-Meter ("FTM"). BTM systems installed at C&I customer locations generate energy that can be used on-site without interacting with the electric grid and passing through an electric meter. Our BTM systems reduce C&I customer energy bills and help facilitate their corporate environmental, social and governance ("ESG") objectives. FTM, grid-connected systems deliver power into the grid which is often sold to off-site customers and transported by the grid prior to reaching an end-user. FTM systems decrease risk for solar and

1     renewable project developers, asset owners, independent power producers and
2     investors by adapting to dynamic energy market conditions and improving the
    combined value of the solar renewable resource and energy storage over the course
    of their FTM system's useful life. As an early participant in the BTM market, *we*
3     *developed operational focus and technical capabilities that position us to have*
    *multiple product offerings and services in the evolving market for FTM energy*
4     *storage services. We believe that Athena's ability to optimize operations in both the*
    *BTM and FTM markets is unique in the industry and provides us with a*
5     *competitive advantage.* [Stmt. No. 37]

6     213. The Defective Prospectus went on to falsely state that Athena fulfilled a vital need of

7 customers with its automated controls:

8     The transition to renewable energy and a distributed energy infrastructure has
    resulted in an increase in the complexity and variability of end-customer electricity
9     demand influenced by onsite generation and flexible sources of load. Accordingly, it
    has become nearly impossible to efficiently manage and operate businesses and the
10     grid using a schedule based, human operated approach. Instead, the utilization of
    intelligent, responsive energy storage throughout the grid is required to provide the
11     real-time be necessary to support more distributed renewable assets, and we believe
    that Athena fulfills this vital need of a modern energy infrastructure. *Athena*
12     *unlocks the value of battery storage by providing energy forecasting, real-time*
    *energy optimization and automated controls for our customers* leveraging over 10
13     years of operational data and experience. By dispatching electricity to our C&I
    customers through our energy storage network during periods of peak power
14     demand, we are able to reduce our customers' electricity expenses, improve the value
    of their energy usage and diminish their environmental impact. In addition, our
15     energy storage network enables grid operators to decrease their reliance on
    conventional generation sources, thereby improving the resiliency of the electrical
16     grid and enabling lower carbon emissions through the increased adoption of
    renewable generation sources. [Stmt. No. 41]

17
    214. The Fraud Defendants, including Stem, Star Peak, Bush, Carrington, Daley, Johnson,
18
19 Morgan, Patel, Russo, and Scheyer, knowingly and/or with deliberate recklessness made materially

20 false and misleading statements that the Company's Athena software provided it a competitive

21 advantage that would enable Stem to secure lucrative FTM deals and deliver profits as a high-margin

22 software company. Despite that Stem's business model relied on it having a viable product for FTM

23 projects, the Fraud Defendants failed to inform investors that Athena was not automated for FTM

24 projects. Specifically, the Fraud Defendants' misstatements and omissions in ¶¶212-213 above and

25 in Exhibit A(2) (Stmt. Nos. 37, 41) were materially false and misleading for the reasons detailed in

¶¶66-83 as well as, *inter alia*, because:
26
    (a)     *Stem's business model was not viable because Athena was not automated*
27
28 *for FTM projects*: Two former employees, CW1 and CW2, confirmed Stem did not have a working

1  product for FTM projects because Athena was not fully automated. ¶¶67, 70, 72, 74, 77. CW3 also

2  confirmed that when they arrived in March 2021, Athena was still in development for FTM projects.

3  ¶¶76, 81;

4        (b)    ***Unbeknownst to investors, a Stem employee used an Excel spreadsheet to***

5  ***perform Athena's allegedly-automated functions***: According to CW1 and CW2, Athena was not

6  automated; rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of

7  Athena. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021, Athena was still not

8  fully developed. ¶¶76, 81. These witness accounts are corroborated by Carrington's admission post-

9  Class Period on 02/28/24 that rather than automated, Stem's "program management team[ ] adds a

10 'human-in-the-loop'" to Athena's operation. ¶75;

11       (c)    ***Unbeknownst to investors, Athena was not viable for FTM projects but,***

12 ***rather still a prototype, and thus was unable to provide a competitive advantage***: CW1 and CW2

13 assert that at the time of the Fraud Defendants' misstatements Athena was still in development and

14 unproven for FTM projects. ¶¶67-68, 70-74, 79-80. CW1 further stated that Stem did not have a

15 working product for FTM projects since inception because Athena was unable to provide core

16 functionalities. ¶71. For example, CW1 explained that Athena only existed in Beta mode and would

17 repeatedly crash. ¶71. After the issue that caused the crash was resolved, a new issue would arise

18 within five minutes, and Athena would crash again. ¶71. Because Stem's business model rested

19 upon Athena being automated to be viable for FTM projects, Stem's strategy was to close FTM deals

20 and worry about developing Athena for FTM projects later. ¶¶65-66, 69, 71-72. CW2 confirmed

21 that Stem's strategy was to eventually get enough FTM projects so that the Company would have

22 enough money to hire more personnel to develop Athena. ¶71. Indeed, CW1 explained that despite

23 requests they never received an example of a successful implementation of Athena to show

24 customers. ¶¶79-80. CW3 further confirmed that when they arrived in March 2021, despite

25 numerous requests to the product team, they could not recall ever seeing an example of a successful

26 implementation of Athena for FTM. ¶¶79-81; and

27       (d)    ***Stem's business model was not viable because, despite the Fraud***

28 ***Defendants' representations to investors, Stem's potential customers recognized that Athena was***

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 78 -
4879-3770-3139.v1

*not automated for FTM projects and Stem was losing FTM deals as a result*: CW1 asserted that Stem's customers described Athena as an empty suit because Athena was not automated. ¶71. CW1 further stated that Stem was having difficulties closing FTM deals because Athena was not automated, resulting in Stem's poor closing rate, which was tracked in Salesforce. ¶70, 83. To that end, Carrington publicly reassured investors that he and other Stem executives closely monitored the Company's performance, which would have required a review of the Salesforce data reflecting lost deals. ¶379.

### 2. The Fraud Defendants Continued to Falsely Represent that Stem Has a Competitive Advantage in 2021 and 2022

215. On 06/09/21, Defendant Carrington participated in the Cowen Sustainability and Energy Transition Summit where he falsely misled investors by stating that Stem had an "AI machine" which was what gave Stem its "competitive moat" while omitting that its "AI machine" was not viable for FTM projects:

> [Carrington:] I mean I joined in 2013, we had 5 systems. We now have over 950. So the growth rate has been exceptional. But what's also important is all that data we've ingested is also – and that's 20 million runtime hours, by the way, *has really helped us refine our algorithms and created this AI machine* that we believe is best-in-class and *really creates a higher competitive moat for the company*. [Stmt. No. 48]

216. On 08/11/21 the Fraud Defendants held Stem's 2Q 2021 earnings call in which Defendants Carrington, Bush, Patel, and Johnson participated. On the call, Carrington falsely described Athena as Stem's "competitive mode":

> *Athena* benefits from years of experience operating a large install base with over 20 million run time hours across a diverse set of markets, battery technologies, and multiple use cases, culminating in *a significant competitive mode for the company*. [Stmt. No. 49]

217. Six months later, on 02/24/22, Defendants Carrington, Johnson, and Bush held Stem's 4Q 2021 earnings call wherein Bush falsely continued to sell Stem's "software story" with its Athena platform as "the differentiating component":

> [Analyst:] Got it. I suppose the good news is (inaudible) the increase in FTM mix, you're still getting the software business that has the same margins, whether it's FTM or BTM.
>
> [Bush:] Exactly. I mean, ultimately, I think as we've always said and I think most have agreed, *this is a software story*. It's not a sale of somebody else's hardware story. It's really what – *the differentiating component of Stem is the*

*Athena platform.  That's always been true, and I think that's going to continue to be true in the future*.  [Stmt. No. 66]

218.    On 02/28/22, in Stem's FY 2021 10-K, Stem continued to falsely represent its success in the FTM market:

We operate in two key areas within the energy storage landscape: Behind-the-Meter ("BTM") and Front-of-the-Meter ("FTM").  An energy system's position in relation to a customer's electric meter determines whether it is designated a BTM or FTM system. . . .  Our FTM systems are designed to decrease risk for project developers, asset owners, independent power producers and investors by adapting to dynamic energy market conditions in connection with the deployment of electricity and improving the combined value of the solar renewable resource and energy storage over the course of their FTM system's useful life.  We also help asset owners and operators monitor and manage the health and performance of their clean energy assets.  *As an early participant in the BTM market, we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services.  We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage*.  [Stmt. No. 69].

219.    Ten months later, on 02/16/23, Stem issued its Form 10-K for FY 2022 signed by Defendant Bush in which the Fraud Defendants continued to falsely represent that Athena provided Stem with a "competitive advantage" in the FTM market:

We operate in two key areas within the energy storage landscape: Behind-the-Meter ("BTM") and Front-of-the-Meter ("FTM").  An energy system's position in relation to a customer's electric meter determines whether it is designated a BTM or FTM system. . . .  Our FTM systems are designed to decrease risk for project developers, asset owners, independent power producers and investors by adapting to dynamic energy market conditions in connection with the deployment of electricity and improving the combined value of the solar renewable resource and energy storage over the course of their FTM system's useful life.  We also help asset owners and operators monitor and manage the health and performance of their clean energy assets.  *As an early participant in the BTM market, we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services.  We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage*.  [Stmt. No. 91]

220.    The Fraud Defendants, including Stem, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, and Russo, knowingly and/or with deliberate recklessness made materially false and misleading statements that the Company's Athena software provided it a competitive advantage that would enable Stem to secure lucrative FTM deals and deliver profits as a high-margin software company.  Despite that Stem's business model relied on having a viable product for FTM projects,

1    the Fraud Defendants failed to inform investors that Athena was not automated for FTM projects.

2    Specifically, the Fraud Defendants' misstatements and omissions in ¶¶215-219 above and in Exhibit

3    A(2) (Stmt. Nos. 46, 49, 66, 69, 91) were materially false and misleading for the reasons detailed in

4    ¶¶66-85, 99-101, 125-133 as well as, *inter alia*, because:

5            (a)    ***Stem's business model was not viable because Athena was not automated***

6    ***for FTM projects as the Fraud Defendants claimed***: Contrary to the Fraud Defendants' statements,

7    including that the "differentiating component of Stem is the Athena platform," as of the time CW1

8    left in February 2022, and as confirmed by CW2, who remained at Stem until August 2023, Stem did

9    not have a working product for FTM projects because Athena was not fully automated.  ¶¶67, 70, 72,

10   74, 77.  CW3 (who worked with sales and the product marketing team as well as the Athena product

11   team from March 2021 until June 2023), who also remained at Stem until following the end of the

12   Class Period, corroborated this, stating that Athena was still in development.  ¶¶76, 81;

13           (b)    ***Unbeknownst to investors, Stem employees used an Excel spreadsheet to***

14   ***perform Athena's allegedly-automated functions***: While the Fraud Defendants continued to tout,

15   among other things, "Athena's ability to optimize operations" as providing Stem "with a competitive

16   advantage," in reality, as of the time CW1 left in February 2022, and as confirmed by CW2 who

17   remained at Stem until after the Class Period, Athena was not automated; rather, a Stem employee

18   used an Excel spreadsheet to perform "automated" functions of Athena.  ¶¶67, 72-74.  CW3

19   confirmed that when they arrived in March 2021, Athena was still not fully developed.  ¶¶76-81.

20   These witness accounts are corroborated by Carrington's admission post-Class Period on 02/28/24

21   that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operation,

22   which stands in marked contrast to the Fraud Defendants' statements to investors, including their

23   09/28/22 assertion that "[t]here's no humans involved in this loop."  ¶¶75, 205;

24           (c)    ***Unbeknownst to investors, Athena was not viable for FTM projects but***

25   ***rather still a prototype, and thus was unable to provide Stem with a competitive advantage***: As of

26   the time CW1 left in February 2022, and as confirmed by CW2, at the time of the Fraud Defendants'

27   misstatements Athena was still in development and unproven for FTM projects. ¶¶67-68, 70-74, 79-

28   80.  CW1 further stated that Stem did not have a working product for FTM projects since inception

because Athena was unable to provide core functionalities. ¶71. CW1 reported that Athena only existed in Beta mode and would repeatedly crash. ¶71. After the issue that caused the crash was resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71. Because Stem's business model rested upon Athena being automated to be viable for FTM projects, Stem's strategy was to close FTM deals and worry about developing Athena for FTM projects later. ¶¶65-66, 69-71-72. CW2 confirmed that Stem's strategy was to eventually get enough FTM projects so that the Company would have enough money to hire more personnel to develop Athena. ¶71. Indeed, CW1 explained that despite requests they never received an example of a successful implementation of Athena to show customers. ¶¶79-80. CW3 further confirmed that despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM. ¶¶79-81;

(d)     ***Stem's business model was not viable because Athena was not automated for FTM projects and Stem was losing FTM deals as a result***: Prior to CW1's departure in February 2022, CW1 asserted that Stem's customers described Athena as an empty suit because Athena was not automated. ¶71. CW1 also stated that Stem was having difficulties closing FTM deals because Athena was not fully automated, resulting in Stem's poor closing rate, which was tracked in Salesforce. ¶¶70, 83, 89. To that end, Carrington publicly reassured investors that he and other Stem executives closely monitored the Company's performance, which necessarily would have required a review of the Salesforce data reflecting lost deals. ¶379. This inference is supported by CW2's account of the $500 million FTM Available Power "deal" that Stem announced on 02/24/22, which was touted to investors as an example of Athena's viability for the FTM market. ¶¶84-85, 258. Unbeknownst to investors until January 2023, this purported deal in fact never closed. ¶84; and

(e)     ***Stem was unable to convert its business to a profitable high-margin software Company, as reflected by the magnitude of its miss***: Because Stem lacked a viable software product for the FTM market, it had no product that could drive the high software margins and profits that the Fraud Defendants promised would arise from Stem's software-based business model. At the beginning of the Class Period, the Fraud Defendants promised Stem would be profitable in two years

1  with gross margins more than doubling to 26% and earnings of $28 million for FY 2022 with the

2  Company's sale of Athena to the FTM market.  ¶¶62, 64, 99.  Reflecting the lack of a viable FTM

3  product, for FY 2022 Stem would report on 02/16/23 abysmal results – gross margins of only 13%

4  and rather than a profit, a loss of $124 million for FY 2022.  ¶¶99, 125.  In addition, rather than the

5  promised gross margins of 32% and earnings of $113 million for FY 2023 on 12/04/20, Stem would

6  report gross margins of only 15% and a net loss of $140 million for FY 2023.  ¶¶101, 133.

7  **C.    The Fraud Defendants' Materially False and Misleading
          Statements Regarding Stem's FTM Success with Athena in 2021**

8  **and 2022**

9        221.    Throughout the Class Period, the Fraud Defendants misled investors that Stem was

10  positioned for and had success in the FTM market as a result of its automated Athena software.  The

11  Fraud Defendants misled investors by pointing to Stem's large FTM project in Massachusetts (and

12  within New England) as an example of Athena's success in the FTM market when that project was

13  not automated, but depended on a human to perform purportedly automated functions.  Contrary to

14  these representations, Stem's Athena software was not viable for the FTM market.

15        222.    On 08/11/21, the Fraud Defendants hosted Stem's 2Q 2021 earnings call, in which

16  Defendants Carrington, Bush, Patel, and Johnson participated.  The Fraud Defendants materially

17  misled investors by falsely representing that Athena was being successfully utilized in

18  Massachusetts:

19        [Carrington:] ***Athena is also executing in Massachusetts with its fully
          automated energy dispatch platform called Athena Bidder, where this past quarter***

20  ***Stem began AI automated bidding into the ISO New England energy and
    frequency regulation markets using real time price forecasting algorithms***.

21        At the same time, Athena is optimizing for capacity obligations, long-term

22  battery life, solar ITC compliance, and Massachusetts smart program compliance.
    Energy markets are only getting more complex, and Athena thrives on that

23  complexity.  [Stmt. No. 54]

24        223.    On the same call, the Fraud Defendants falsely touted the Company's success in

25  Massachusetts for its FTM offering:

26        [Carrington:] As we look to increase our sales in the fast growing Front of the
          Meter or FTM market, it is our partnered channel that will allow us to access those

27  larger projects in markets.  We have grown quickly in markets like Massachusetts.
    In fact, as of the end of June, Athena managed 52% of the energy storage assets

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                        - 83 -
4879-3770-3139.v1

active in the wholesale energy ancillary services and forward capacity settlement markets in Massachusetts.

This capacity represents almost 20% of the continuous storage facilities in the six states comprising the ISO New England market as reported by that system operator. *These strong results demonstrate our speed to market and effectiveness of our Athena platform, underscoring our confidence and continued momentum in growing share of the FTM market*. [Stmt. No. 55]

224. Two months later, during the AI Driven Energy Storage Conference on 10/12/21, the Fraud Defendants falsely relied on Stem's Massachusetts FTM project in order to misleadingly convince investors that it had a "very compelling product" for the FTM market:

[Interviewer:] (29:10) What would you say to a skeptical investor or a potential investor looking at the competition? What did they get wrong about your company?

[Carrington:] (29:22) You know, look, I mean, I think we've got a tremendous shareholder base. You can see who those names are. Obviously, the stock performance has been very good. I don't think people don't understand the company. *I think it's a question of can, can the company execute? Can they make this shift to front of the meter from behind the meter? Yes, you are the leader, yes, you have this huge market share. And I would say to that highlight, Massachusetts, which is one of the biggest front of the meter markets, we have 52% share.* I would also highlight the fact that we weren't there 18 months ago. *So we have a very compelling product that is winning in a variety of markets.* So, I don't, there's not been a silver bullet of, hey, here's a concern we see. And when your customers continue to buy from you, you grow at 4x, year over year, you continue to meet your financial metrics that you've committed to the street. That's pretty powerful and I intend to continue to do that. [Stmt. No. 56]

225. On 11/09/21, Stem held its 3Q 2021 earnings call, attended by Defendants Carrington, Johnson, Patel, and Bush. On the call the Fraud Defendants falsely represented the success of Stem's Massachusetts FTM project through the "automation" of Athena:

[Johnson:] Last month, we introduced new advanced applications for wholesale energy markets. Athena Supervisor, which provides customers and partners asset performance insights with real-time visibility into how Athena manages and monetizes energy assets to ensure the lowest total cost of ownership. And Athena Bidder, which incorporates an owner's asset strategy and continuously generates market bids to maximize wholesale market revenues. *We are fulfilling significant demand for these applications as we continue to expand our presence operating front-of-meter assets in wholesale energy markets*.

*Let's focus on our co-optimization capability for a couple of these FTM sites that went live in Massachusetts this year. For the first time, Athena Bidder automated day-ahead and real-time energy market participation along with capacity and frequency regulation services of hybrid solar plus storage assets in ISO-New England. Athena continuously forecast solar generation, the battery state of charge, energy and frequency regulation prices, market options and incentive goals*.

*With this information, Athena optimizes executing millions of scenarios per hour to determine the best operation for each site and then automatically generates bids for each market interval over the coming hours and days.  Athena continuously tracks real-time conditions and cleared bids to better inform this nonstop real-time trading activity*.  I'm pleased to report that our first system is already performing 16% better than the initial forecast.

Lastly, we aggressively deployed these systems to maximize returns for our customers.  This was no small feat and involved working with the ISO-New England to ensure these new hybrid systems were operating properly with the market.  Our deep domain expertise is differentiating, and we will continue to work with grid operators on maximizing the benefits of energy intelligence.  [Stmt. No. 57]

226.     On 01/06/22, Defendant Carrington spoke on behalf of Stem at the Goldman Sachs Global Energy and Clean Technology Conference.  In response to an analyst question, Defendant Carrington falsely contended that Stem was executing on its business model:

[Analyst:] And you mentioned the customer feedback.  So that's probably a good segue to talk a little bit about competition on the software side, where your value add really is.  So when we talk to investors, there does seem to be, at times, a lack of knowledge or appreciation of the differences in the software space for energy storage.  I know it's newer to the public markets, and that might be part of that why that's the case.  But the question we get a lot is how do battery software players like yourself differentiate from competitors from a tech perspective?  Why would a utility or C&I customer choose your platform versus another platform that might be out there?

[Carrington:] Sure.  Look, *I'd say we have the most complete solution for both behind the meter and front of the meter energy storage deployments*.  And why does that matter?  Well, we have significant experience in achieving compelling project economics.  So when a C&I customer thinks about the [say new] ratio, are we getting what's Tim told us we were going to say, the answer is yes.  That's a very tight community of energy buyers actually.  So they talk a lot about what other suppliers are doing, how they performed.  And our repeat customer purchases is exceptional.  Over 50% of our third quarter bookings were from repeat customers.  So they are they're seeing what we said we were going to do.  They're saving the money we said, and we're executing on the software solution we committed to.  We also help selecting the right hardware of a particular use case and importantly, the software to ensure the best outcome by optimizing the charge and discharge of the battery.  So when you look at a corporate customer, reducing their electricity bill or we're deciding when to help trade in and out of a wholesale market for utility scale development.  So all of that runtime hours and experience that we've accumulated, and there's 22 million run time hours.  That data really drives better outcomes through our machine AI platform.  And effectively, in the end, Brian, what we're doing is we could do more with a battery resource than any other competitor in our view, and that's the feedback we get from customers.  And again, I think when you have over half of your bookings coming from repeat customers, *that's a pretty loud voice saying that, a, we're differentiated.  We're executing on what we said we would do, and the software is either meeting or exceeding their expectations*.  [Stmt. No. 62]

227.    On Stem's 09/28/22 Investor and Analyst Day, with Defendants Carrington, Johnson, Ho, Patel, and Bush in attendance, Defendant Carrington falsely pointed to Stem's purported "great success" with its FTM business in New England:

> *And then finally, on the front-of-the-meter side, this is a market, as I mentioned, that we really continue to have great success on*.  I'd say that we have simplify the solution to help these customers achieve significant increases in their returns.  You see the IRR increases of 10% to 40%.  *We have the software platform that they need*.  We'll continue to grow this.  We are becoming the de facto company for the space.
>
> *And as I mentioned, really to go from 0 to leading market share in 18 months in New England ISO is very impressive.  And it says a lot about the software*.  It also says a lot about Athena that over 50% of our contracted volume last quarter was from repeat customers.  So, we are executing the say-do ratio is there, and they're continuing to come back and purchase from Stem.  [Stmt. No. 83]

228.    Defendant Carrington went on to describe the New England FTM project as a "real accomplishment" for Stem and it was all due to its "software platform," Athena:

> And people said, do you think you can really execute in front of the meter because you've done such a great job behind the meter.  *While we went from 0 to over 50% market share in 18 months in the New England ISO*.
>
> *So a real accomplishment that is very much attributable to our software platform because we could translate our behind-the-meter software deck to that front-of-the-meter need*.  And I think that – that was a big milestone for the business to make that transition.  [Stmt. No. 84]

229.    During the 09/28/22 Investor and Analyst Day, Johnson continued to emphasize the Massachusetts FTM project as a "winning" project for the Company based on the "*full suite of capabilities that automatically continuously co-optimize 7 different value streams*":

> [Johnson:] *So the question is, well, what does winning look like*?  With this extensive suite of capabilities, there's a lot of different characteristics that I think are important here.  The interesting thing that's going on with the passage of IRA is how to think about solar plus storage combination.  So we're going to focus a little bit on winning with the hybrid systems where you have both solar and storage, in particular, potentially retrofitting storage to that 40,000 installed base that you heard about with AlsoEnergy PowerTrack system.
>
> So *we'll start with one of the sites that has solar and storage in Massachusetts.  We've been operating this site, delivering a full suite of capabilities that automatically continuously co-optimize 7 different value streams*.  We're bidding hybrid solar and storage into the ISO-New England market.  PowerTrack is at the site providing a complete view of the asset, the solar asset and on-site weather conditions.  And this combination of economic optimization and asset management has resulted in revenues exceeding the project pro forma by over 46%.

*This demonstrates the differentiated capability to operate and monetize these different value streams in grid services and wholesale market opportunities in front-of-the-meter site, operating with the combined services of the Athena platform* and the AlsoEnergy PowerTrack application. [Stmt. No. 85]

230.    The Fraud Defendants, including Stem, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, and Russo, knowingly and/or with deliberate recklessness made materially false and misleading statements that the Company's Athena software was viable for the FTM market and touting the Stem's Massachusetts FTM project as an example of Athena's success in that market. Despite the fact that Stem's business model relied on it having a viable product for FTM projects, the Fraud Defendants failed to inform investors that Athena was not automated for FTM projects. Specifically, the Fraud Defendants' misstatements and omissions in ¶¶222-229 above and in Exhibit A(2) (Stmt. Nos. 54-57, 84-85) were materially false and misleading for the reasons detailed in ¶¶66-85, 99-101, 125-133 as well as, *inter alia*, because:

(a)    *Athena was not automated for the FTM market*: Contrary to the Fraud Defendants' statements highlighting the Massachusetts project as an example of Stem's success in the FTM market, as of the time CW1 left in February 2022, and as confirmed by CW2, who remained at Stem until after the Class Period, Stem did not have a working product for FTM projects because Athena was not fully automated. ¶¶67, 70, 72, 74, 77. CW3, who also remained at Stem until following the end of the Class Period, corroborated that Athena was still in development. ¶¶76, 81;

(b)    *Unbeknownst to investors a, Stem employee used an Excel spreadsheet to perform Athena's allegedly-automated functions*: As of the time CW1 left in February 2022, and as confirmed by CW2 who remained at Stem until after the Class Period, Athena was not automated; rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of Athena for the Massachusetts project. ¶¶67, 72-74. CW3 confirmed that when they arrived in March 2021, Athena was still not fully developed. ¶¶76, 81. These witness accounts are corroborated by Carrington's admission post-Class Period on 02/28/24 that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operation. ¶75;

1          (c)        ***Unbeknownst to investors, Athena was not viable for FTM projects,***

2  ***including in Massachusetts, but rather was still a prototype***: As of the time CW1 left, and as

3  confirmed by CW2, at the time of the Fraud Defendants' misstatements Athena was still in

4  development and unproven for FTM projects. ¶¶67-68, 70-74, 79-80.  CW1 further stated that Stem

5  did not have a working product for FTM projects since inception because Athena was unable to

6  provide core functionalities. ¶71.  CW1 reported that Athena only existed in Beta mode and would

7  repeatedly crash. ¶71.  After the issue that caused the crash was resolved, a new issue would arise

8  within five minutes, and Athena would crash again. ¶71.  Because Stem's business model rested

9  upon Athena being automated in order to be viable for FTM projects, Stem's strategy was to close

10  FTM deals and then worry about developing Athena for FTM projects later. ¶¶65-66, 69, 71-72.

11  CW2 confirmed that Stem's strategy was to eventually get enough FTM projects so that the

12  Company would have enough money to hire more personnel to develop Athena. ¶71.  Indeed, CW1

13  explained that despite requests they never received an example of a successful implementation of

14  Athena to show customers. ¶¶79-80.  CW3 further confirmed that despite numerous requests to the

15  product team, they could not recall ever seeing an example of a successful implementation of Athena

16  for FTM.  ¶¶79-81;

17          (d)        ***Despite Stem's representations to investors, Athena was not automated for***

18  ***FTM projects and Stem was losing FTM deals as a result***: Prior to CW1's departure in February

19  2022, CW1 asserted that Stem's customers described Athena as an empty suit because Athena was

20  not automated. ¶71.  CW1 also stated that Stem was having difficulties closing FTM deals because

21  Athena was not fully automated, resulting in Stem's poor closing rate, which was tracked in

22  Salesforce.  ¶¶70, 83, 89.  To that end, Carrington publicly reassured investors that he and other

23  Stem executives closely monitored the Company's performance, which necessarily would have

24  required a review of the Salesforce data reflecting lost deals. ¶¶379.  This inference is supported by

25  CW2's account of the $500 million FTM Available Power "deal" that Stem announced on 02/24/22

26  which was touted to investors as an example of Athena's viability for the FTM market.  ¶¶84-85,

27  258.  Unbeknownst to investors until January 2023, this purported deal in fact never closed.  ¶84;

28  and

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 88 -

1        (e)    ***Stem was unable to convert its business to a profitable high-margin software***

2    ***Company, as reflected by the magnitude of its miss***: Because Stem lacked a viable software product

3    for the FTM market, it had no product that could drive the high software margins and profits that the

4    Fraud Defendants promised would arise from Stem's software-based business model.  At the

5    beginning of the Class Period, the Fraud Defendants promised Stem would be profitable in two years

6    with gross margins more than doubling to 26% and earnings of $28 million for FY 2022 with the

7    Company's sale of Athena to the FTM market.  ¶¶62, 64, 99.  Reflecting the lack of a viable FTM

8    product, for FY 2022 Stem would report on 02/16/23 abysmal results – gross margins of only 13%

9    and rather than a profit, a loss of $124 million for FY 2022. ¶¶99. 125.  In addition, rather than the

10    promised gross margins of 32% and earnings of $113 million for FY 2023 on 12/04/20, Stem would

11    report gross margins of only 15% and a net loss of $140 million for FY 2023.  ¶¶101, 133.

12        231.    The market was unaware that Athena was, in fact, not viable for the FTM market and

13    that a human performed automated functions for the Massachusetts project.  Analysts had bought the

14    Fraud Defendants' message that Stem's Massachusetts project exemplified a successful use of

15    Athena in the FTM market.  For example, on 06/29/21, Credit Suisse analysts initiated coverage of

16    Stem tying expected growth in FTM market share to Stem's purportedly successful FTM

17    implementation of Athena for the Massachusetts' project:

18        **Growth from Utility, or Front-of-the-Meter (FTM), Projects**

19        Stem has a 30% share of the US BTM market and a <2% share of the US
       FTM market. ***Management expects to grow US FTM market share to >10-15% by***
20     ***2026, which is a steep slope***; however, we believe it will be driven by smaller utility-
       scale projects. ***Since Stem announced its first project in Massachusetts in 2017, it***
21     ***has captured a 20% market share of the non-residential projects in the state under***
       ***its SMART program***.  Internationally, the company expects to gain up to 5% of the
22     storage market share, driven by cross-country selling efforts to existing US
       customers.

23
        **D.    The Fraud Defendants' Materially False and Misleading**
24            **Statements Warned of Purported Risks that Had Already Come to**
              **Fruition**
25
        232.    In addition to the Fraud Defendants' false and misleading statements above, Stem
26
    filed documents with the SEC, including the Defective Prospectus and Forms 10-K and 10-Q, that
27

28

contained false and/or misleading statements that warned of risks that had already materialized because, unbeknownst to investors, Athena was not fully automated for FTM projects.

### 1. The Fraud Defendants Issued Materially False and Misleading Statements that Warned of Purported Risks Leading Up to Stem's IPO in Early 2021

233. Leading up to Stem's IPO, the Fraud Defendants made materially false and misleading statements in Stem's Defective Prospectus published on 03/30/21. In the section titled "Risk Factors," the Fraud Defendants falsely identified risks that Athena might not work or that Stem may not be able to develop Athena sufficiently to meet market needs.

234. First, the Fraud Defendants falsely warned in the 03/30/21 Defective Prospectus that Stem may be unable to "develop and maintain" its proprietary software, Athena, which would impact Stem's "competitive position":

**Risks Relating to Stem's Business and Industry**

\*    \*    \*

***If Stem is unsuccessful in developing and maintaining its proprietary technology, including the Athena platform, Stem's ability to attract and retain partners could be impaired, Stem's competitive position could be adversely affected and Stem's revenue could be reduced***. [Stmt. No. 38]

235. Second, in that same section, the Fraud Defendants went on to falsely warn that Stem's critical software Athena may have "***undetected defects***" or "***errors***" that could impact market adoption:

**Risks Relating to Stem's Business and Industry**

\*    \*    \*

***Stem's technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption, damage Stem's reputation with current or prospective customers and/or expose Stem to product liability and other claims that could materially and adversely affect Stem's business***. [Stmt. No. 39]

236. Third, the Fraud Defendants provided in the 03/30/21 Defective Prospectus false and misleading warnings regarding the perception that Stem's Athena technology was "***unproven***," which could impact market acceptance:

**Market Opportunity Risks**

1                              *      *      *

2          ***The distributed generation industry is an emerging market and our***
   ***distributed generation offerings may not receive widespread market acceptance***.
3
          The implementation and use of distributed generation at scale is still
4    relatively nascent, and we cannot be sure that potential customers will accept such
     solutions broadly, or our hardware and software-enabled services more specifically.
5    Enterprises may be unwilling to adopt our offerings over traditional or competing
     power sources for any number of reasons, ***including the perception that our***
6    ***technology is unproven***, lack of confidence in our business model, unavailability of
     back-up service providers to operate and maintain the energy storage systems, and
7    lack of awareness of our related hardware and software-enabled services. Because
     this is an emerging industry, ***broad acceptance of our hardware and software-***
8    ***enabled services is subject to a high level of uncertainty and risk***. If the market
     develops more slowly than we anticipate, our business may be adversely affected.
9    [Stmt. No. 40]

10         237.   The Fraud Defendants, including Stem, Star Peak, Bush, Carrington, Daley, Johnson,

11   Morgan, Patel, and Russo, knowingly and/or with deliberate recklessness misled investors when they

12   warned of risks to Stem's business that, unbeknownst to investors, had already materialized. For

13   instance, the risk that Stem may be unsuccessful in maintaining its proprietary technology had

14   already materialized because Athena was not actually viable for FTM projects which was already

15   adversely impacting Stem's ability to attract and retain customers. Likewise, the adverse risk to the

16   Company that Stem's Athena platform could have defects in its software had already materialized

17   because Athena was not automated for FTM projects. Further, the risk that customers' perception

18   that Stem's technology was unproven which would lead to a reduction in market adoption had

19   already materialized because Stem was unable to close deals due to Athena's lack of viability for the

20   FTM market. The Fraud Defendants' misstatements and omissions in ¶¶234-236 above and in

21   Exhibit A(2) (Stmt. Nos. 38-40) were materially false and misleading for the reasons detailed in

22   ¶¶63-83 as well as, *inter alia*, because:

23         (a)    ***The warned-of risks were already adversely impacting Stem because Athena***

24   ***was not automated for FTM projects***: The Fraud Defendants' warnings had already come to fruition

25   because according to CW1 (who was employed at Stem from prior to the Class Period until February

26   2022), and CW2 (who was employed at Stem from early 2020 until August 2023), Stem did not have

27   a working product for FTM projects because Athena was not fully automated. ¶¶67, 70, 72, 74, 77.

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                      - 91 -
4879-3770-3139.v1

1   CW3 also confirmed that when they arrived in March 2021, Athena was still in development for

2   FTM projects. ¶¶76, 81;

3           (b)    ***The warned-of risks had already materialized as evidenced by the fact that***

4   ***Athena was not automated for FTM projects and Stem was losing FTM deals as a result***: CW1

5   asserted that Stem's customers described Athena as an empty suit because Athena was not

6   automated. ¶71. CW1 further stated that Stem was having difficulties closing FTM deals because

7   Athena was not automated, resulting in Stem's poor closing rate, which was tracked in Salesforce.

8   ¶¶70, 83, 89. To that end, Carrington publicly reassured investors that he and other Stem executives

9   closely monitored the Company's performance, which would have required a review of the

10  Salesforce data reflecting lost deals. ¶379;

11          (c)    ***Unbeknownst to investors, a Stem employee used an Excel spreadsheet to***

12  ***perform Athena's allegedly-automated functions***: According to CW1 and CW2, Athena was not

13  automated; rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of

14  Athena. ¶¶67, 72, 74. CW3 confirmed that when they arrived in March 2021, Athena was still not

15  fully developed. ¶¶76, 81; and

16          (d)    ***Unbeknownst to investors, Athena was not viable for FTM projects but,***

17  ***rather still a prototype, evidencing that the warned-of risks had already materialized***: CW1 and

18  CW2 assert that at the time of the Fraud Defendants' misstatements, Athena was still in development

19  and unproven for FTM projects. ¶¶67-68, 70-74, 79-80. CW1 further stated that Stem did not have

20  a working product for FTM projects since inception because Athena was unable to provide core

21  functionalities. ¶71. For example, CW1 explained that Athena only existed in Beta mode and would

22  repeatedly crash. ¶71. After the issue that caused the crash was resolved, a new issue would arise

23  within five minutes, and Athena would crash again. ¶71. Because Stem's business model rested

24  upon Athena being automated to be viable for FTM projects, Stem's strategy was to close FTM deals

25  and worry about developing Athena for FTM projects later. ¶¶65-66, 69, 71-72. CW2 confirmed

26  that Stem's strategy was to eventually get enough FTM projects so that the Company would have

27  enough money to hire more personnel to develop Athena. ¶71. Indeed, CW1 explained that despite

28  requests they never received an example of a successful implementation of Athena to show

1   customers.  ¶¶79-80.  CW3 further confirmed that when they arrived in March 2021, despite

2   numerous requests to the product team, they could not recall ever seeing an example of a successful

3   implementation of Athena for FTM.  ¶¶79-81.

   **2.     The Fraud Defendants Continued to Issue Materially False
   and Misleading Statements Warning of Purported Risks After
   the IPO in 2021 and 2022**

6       238.    On 08/11/21 and 11/10/21, Stem filed Forms 10-Q with the SEC for 2Q 2021 and 3Q

7   2021 reporting on the financial results of the Company, signed by Defendant Bush.  Both the

8   08/11/21 and 11/10/21 Forms 10-Q incorporated by reference a 07/19/21 Form S-1 Registration

9   Statement filed with the SEC for a private placement sale (the "S-1 Registration Statement").

10      239.    In the Forms 10-Q for 2Q 2021 and 3Q 2021 incorporated from the S-1 Registration

11  Statement, the Fraud Defendants made the very same false and misleading risk statements and

12  omissions as the Defective Prospectus as set forth in ¶¶234-236 above by stating there were "***no***

13  ***material changes***" regarding the risks that: (i) Stem may be unable to "***develop and maintain***" its

14  proprietary software; (ii) the perception that Stem's critical software Athena may have "***undetected***

15  ***defects***" or "***errors***" could impact market adoption; and (iii) Stem's Athena technology was

16  "***unproven***."  [Stmt. Nos. 51-53, 59-61]

17      240.    By incorporating Stem's S-1 Registration Statement, the Fraud Defendants

18  misleadingly warned on 08/11/21 and 11/10/21, that Stem may be unable to "develop and maintain"

19  its proprietary software, Athena, which would impact Stem's "competitive position" when that risk

20  had already materialized:

21      **Risks Relating to Stem's Business and Industry**

22                                  *     *     *

23      ***If Stem is unsuccessful in developing and maintaining its proprietary technology,***
        ***including the Athena platform, Stem's ability to attract and retain partners could***
24      ***be impaired, Stem's competitive position could be adversely affected and Stem's***
        ***revenue could be reduced***.  [Stmt. Nos. 51, 59]

25

26      241.    The Fraud Defendants also misleadingly warned that Stem's critical software Athena

27  may have "***undetected defects***" or "***errors***" that could impact market adoption when that risk had

28  already materialized:

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 93 -
4879-3770-3139.v1

1  **Risks Relating to Stem's Business and Industry**

2            *      *      *

3  ***Stem's technology, including the Athena platform, could have undetected defects,***
4  ***errors or bugs in hardware or software which could reduce market adoption,***
   ***damage Stem's reputation with current or prospective customers and/or expose***
5  ***Stem to product liability and other claims that could materially and adversely affect***
   ***Stem's business***. [Stmt. Nos. 52, 60]

6      242.    Additionally, in the Forms 10-Q for 2Q 2021 and 3Q 2021, the Fraud Defendants

7  misleadingly claimed that Athena technology was "***unproven***," which could impact market

8  acceptance when that risk had already materialized:

9  **Market Opportunity Risks**

10            *      *      *

11      ***The distributed generation industry is an emerging market and our***
   ***distributed generation offerings may not receive widespread market acceptance.***
12

13      The implementation and use of distributed generation at scale is still
   relatively nascent, and we cannot be sure that potential customers will accept such
14  solutions broadly, or our hardware and software-enabled services more specifically.
   Enterprises may be unwilling to adopt our offerings over traditional or competing
15  power sources for any number of reasons, ***including the perception that our***
   ***technology is unproven***, lack of confidence in our business model, unavailability of
16  back-up service providers to operate and maintain the energy storage systems, and
   lack of awareness of our related hardware and software-enabled services. Because
17  this is an emerging industry, broad acceptance of our hardware and software-enabled
   services is subject to a high level of uncertainty and risk. If the market develops
18  more slowly than we anticipate, our business may be adversely affected. [Stmt. Nos.
   53, 61]

19      243.    The Fraud Defendants, including Stem, Bush, Carrington, Daley, Johnson, Morgan,

20  Patel, and Russo, misled investors when they warned of risks to Stem's business that, unbeknownst

21  to investors, had already materialized. For instance, the risk that Stem may be unsuccessful in

22  maintaining its proprietary technology had already materialized because Athena was not actually

23  viable for FTM projects which was already adversely impacting Stem's ability to attract and retain

24  customers. Likewise, the adverse risk to the Company that Stem's Athena platform could have

25  defects in its software had already materialized because Athena was not automated for FTM projects.

26  Further, the risk that customers' perception that Stem's technology was unproven which would lead

27  to a reduction in market adoption had already materialized because Stem was unable to close deals

28  due to Athena's lack of viability for the FTM market. The Fraud Defendants' misstatements and

1  omissions in the risk warnings in ¶¶239-242 above and in Exhibit A(2) [Stmt. Nos. 51-53, 59-61]

2  were materially false and misleading for the reasons detailed in ¶¶66-85, 99-101, 125-133 as well as,

3  *inter alia*, because:

4      (a)    ***The warned-of risks were already adversely impacting Stem because Athena***

5  ***was not automated for FTM projects***: The Fraud Defendants' warnings had already come to fruition

6  because as of the time CW1 left in February 2022, and as confirmed by CW2 who remained at Stem

7  until after the Class Period, Stem did not have a working product for FTM projects because Athena

8  was not fully automated.  ¶¶67, 70, 72, 74, 77.  CW3, who also remained at Stem until following the

9  end of the Class Period, confirmed that Athena was still in development throughout the Class Period.

10  ¶¶76, 81;

11      (b)    ***Unbeknownst to investors, a Stem employee used an Excel spreadsheet to***

12  ***perform Athena's allegedly-automated functions***: As of the time CW1 left in February 2022, and as

13  confirmed by CW2 who remained at Stem until after the Class Period, Athena was not automated;

14  rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of Athena.

15  ¶¶67, 72, 74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully

16  developed.  ¶¶76, 81.  These witness accounts are corroborated by Carrington's admission post-Class

17  Period on 02/28/24 that Stem's "program management team[ ] adds a 'human-in-the-loop'" to

18  Athena's operation.  ¶75;

19      (c)    ***Unbeknownst to investors, Athena was not viable for FTM projects but***

20  ***rather still a prototype, evidencing that the warned-of risks had already materialized***: As of the

21  time CW1 left in February 2022, and as confirmed by CW2, at the time of the Fraud Defendants'

22  misstatements Athena was still in development and unproven for FTM projects.  ¶¶67-68, 70-74, 79-

23  80.  CW1 further stated that Stem did not have a working product for FTM projects since inception

24  because Athena was unable to provide core functionalities.  ¶71.  CW1 reported that Athena only

25  existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was

26  resolved, a new issue would arise within five minutes, and Athena would crash again.  ¶71.  Because

27  Stem's business model rested upon Athena being automated to be viable for FTM projects, Stem's

28  strategy was to close FTM deals and worry about developing Athena for FTM projects later.  ¶¶65-

66, 69, 71-72. CW2 confirmed that Stem's strategy was to eventually get enough FTM projects so that the Company would have enough money to hire more personnel to develop Athena. ¶71. Indeed, CW1 explained that despite requests they never received an example of a successful implementation of Athena to show customers.  ¶¶79-80.  CW3 further confirmed that despite numerous requests to the product team, they could not recall ever seeing an example of a successful implementation of Athena for FTM. ¶¶79-81;

(d)    ***The warned-of risks had already materialized as evidenced by the fact that Athena was not automated for FTM projects and Stem was losing FTM deals as a result***: Prior to CW1's departure in February 2022, CW1 asserted that Stem's customers described Athena as an empty suit because Athena was not automated. ¶71.  CW1 also stated that Stem was having difficulties closing FTM deals because Athena was not fully automated, resulting in Stem's poor closing rate, which was tracked in Salesforce.  ¶¶70, 83, 89.  To that end, Carrington publicly reassured investors that he and other Stem executives closely monitored the Company's performance, which necessarily would have required a review of the Salesforce data reflecting lost deals. ¶379.  This inference is supported by CW2's account of the $500 million FTM Available Power "deal" that Stem announced on 02/24/22 which was touted to investors as an example of Athena's viability for the FTM market.  ¶¶84-85, 258.  Unbeknownst to investors until January 2023, this purported deal in fact never closed. ¶84; and

(e)    ***The warned-of risks had already materialized as evidenced by the fact that Stem was unable to convert its business to a profitable high-margin software company, as reflected by the magnitude of its miss***: Because Stem lacked a viable software product for the FTM market, it had no product that could drive the high software margins and profits that the Fraud Defendants promised would arise from Stem's software-based business model.  At the beginning of the Class Period, the Fraud Defendants promised Stem would be profitable in two years with gross margins more than doubling to 26% and earnings of $28 million for FY 2022 with the Company's sale of Athena to the FTM market.  ¶¶62, 64, 99.  Reflecting the lack of a viable FTM product, for FY 2022 Stem would report on 02/16/23 abysmal results – gross margins of only 13% and rather than a profit, a loss of $124 million for FY 2022. ¶¶99, 125.  In addition, rather than the promised

gross margins of 32% and earnings of $113 million for FY 2023 on 12/04/20, Stem would report gross margins of only 15% and a net loss of $140 million for FY 2023.  ¶¶101, 133.

244.    Later, on 02/28/22, Stem filed its FY 2021 Form 10-K signed by Defendant Bush.  In the Form 10-K, the Fraud Defendants continued to make similar false and misleading statements, warning of purported risks as it had in the Defective Prospectus and S-1 Registration Statement that had already come to fruition.

245.    For instance, in the FY 2021 Form 10-K, the Fraud Defendants continued to falsely warn that Stem may not be successful in "***developing and maintaining***" Athena for the market, which could impact the Company's growth when that risk had already materialized:

**Risks Related to Our Intellectual Property and Technology**

> ***If we are unsuccessful in developing and maintaining our proprietary technology, including our Athena platform, our ability to attract and retain partners could be impaired, our competitive position could be adversely affected and our revenue could be reduced***.  [Stmt. No. 70]

246.    And, again, in the FY 2021 Form 10-K, the Fraud Defendants falsely warned that Stem's critical software Athena may have "***undetected defects***" when that risk had already materialized:

**Risks Related to Our Intellectual Property and Technology**

                    *         *         *

> ***Our technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption, damage our  reputation with current or prospective customers and/or expose us to product liability and other claims that could materially and adversely affect our business***.  [Stmt. No. 71]

247.    Further, the Fraud Defendants in Stem's 2021 Form 10-K filed with the SEC on 02/28/22 warned that there was a risk that the market would perceive Athena's technology to be unproven when that risk had already materialized:

**Risks Related to Our Business and Industry**

                    *         *         *

> ***The distributed generation industry is emerging and our distributed generation offerings may not receive widespread market acceptance***.

1
2
3
4
5
6
7

The implementation and use of distributed generation at scale is still relatively nascent, and we cannot be sure that potential customers will accept such solutions broadly, or our hardware and software-enabled services more specifically. Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, *including the perception that our technology is unproven*, lack of confidence in our business model, unavailability of back-up service providers to operate and maintain the energy storage systems, and lack of awareness of our related hardware and software-enabled services. Because this is an emerging industry*, broad acceptance of our hardware and software-enabled services is subject to a high level of uncertainty and risk*. If the market develops more slowly than we anticipate, our business may be adversely affected. [Stmt. No. 72]

8
9
10
11
12
13
14
15

248.    Stem's Forms 10-Q during 2022, filed with the SEC on 05/06/22, 08/05/22, and 11/04/22, for Q1 2022, 2Q 2022 and 3Q 2022, and signed by Defendant Bush continued to affirm the same materially false and misleading statements by incorporating the FY 2021 Form 10-K by reference and stating quarter after quarter that there were "*no material changes*" to the relevant risk factors previously reported in the FY 2021 Form 10-K. This included statements regarding the risks that: (i) Stem may be unable to "*develop and maintain*" its proprietary software; (ii) Stem's critical software Athena may have "*undetected defects*" or "*errors*" that could impact market adoption; and (iii) Stem's Athena technology was "*unproven*." [Stmt. Nos. 74-76, 78-80, 86-88]

16
17

### 3.    The Fraud Defendants Continued to Issue Materially False and Misleading Statements Warning of Purported Risks After the IPO in 2023

18
19
20
21
22
23

249.    On 02/17/23, Stem filed its FY 2022 Form 10-K, signed by Defendant Bush. In the FY 2022 Form 10-K, again the Fraud Defendants issued the very same materially false and misleading risk warnings as set forth above in ¶¶245-247 in the FY 2021 Form 10-K regarding the risks that: (i) Stem may be unable to "*develop and maintain*" its proprietary software; (ii) Stem's critical software Athena may have "*undetected defects*" or "*errors*" that could impact market adoption; and (iii) Stem's Athena technology was "*unproven*." [Stmt. Nos. 92-94]

24
25
26
27
28

250.    The Fraud Defendants knowingly and/or with deliberate recklessness misled investors when they warned of risks to Stem's business that, unbeknownst to investors, had already materialized. For instance, the risk that Stem may be unsuccessful in maintaining its proprietary technology had already materialized because Athena was not actually viable for FTM projects which was already adversely impacting Stem's ability to attract and retain customers. Likewise, the

1    adverse risk to the Company that Stem's Athena platform could have defects in its software had

2    already materialized because Athena was not automated for FTM projects.  Further, the risk that

3    customers' perception that Stem's technology was unproven which would lead to a reduction in

4    market adoption had already materialized because Stem was unable to close deals due to Athena's

5    lack of viability for the FTM market.  The Fraud Defendants' misstatements and omissions in the

6    risk warnings at ¶249 above and in Exhibit A(2) (Stmt. Nos. 70-72, 74-76, 78-80, 86-88, 92-94)

7    were materially false and misleading for the reasons detailed in ¶¶66-83 as well as, *inter alia*,

8    because:

9            (a)    *The warned-of risks were already adversely impacting Stem because Athena*

10   *was not automated for FTM projects*: The Fraud Defendants' warnings had already come to fruition

11   because, as of the time CW1 left in February 2022, and as confirmed by CW2, who remained at

12   Stem until after the Class Period, Stem did not have a working product for FTM projects because

13   Athena was not fully automated.  ¶¶67, 70, 72, 74, 77.  CW3, who also remained at Stem until

14   following the end of the Class Period, confirmed that Athena was still in development throughout the

15   Class Period.  ¶¶76, 81;

16           (b)    *Unbeknownst to investors, a Stem employee used an Excel spreadsheet to*

17   *perform Athena's allegedly-automated functions*: As of the time CW1 left in February 2022, and as

18   confirmed by CW2 who remained at Stem until after the Class Period, Athena was not automated;

19   rather, a Stem employee used an Excel spreadsheet to perform "automated" functions of Athena.

20   ¶¶67, 72-74.  CW3 confirmed that when they arrived in March 2021, Athena was still not fully

21   developed.  ¶¶76, 81.  These witness accounts are corroborated by Carrington's admission post-Class

22   Period on 02/28/24 that Stem's "program management team[ ] adds a 'human-in-the-loop'" to

23   Athena's operation.  ¶75;

24           (c)    *Unbeknownst to investors, Athena was not viable for FTM projects but*

25   *rather still a prototype, evidencing that the warned-of risks had already materialized*: As of the

26   time CW1 left in February 2022, and as confirmed by CW2 at the time of the Fraud Defendants'

27   misstatement, Athena was still in development and unproven for FTM projects.  ¶¶67-68, 70-74, 79-

28   80.  CW1 further stated that Stem did not have a working product for FTM projects since inception

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 99 -

1   because Athena was unable to provide core functionalities.  ¶71.  CW1 reported that Athena only

2   existed in Beta mode and would repeatedly crash.  ¶71.  After the issue that caused the crash was

3   resolved, a new issue would arise within five minutes, and Athena would crash again. ¶71.  Because

4   Stem's business model rested upon Athena being automated to be viable for FTM projects, Stem's

5   strategy was to close FTM deals and worry about developing Athena for FTM projects later.  ¶¶65-

6   66, 69, 71-72.  CW2 confirmed that Stem's strategy was to eventually get enough FTM projects so

7   that the Company would have enough money to hire more personnel to develop Athena.  ¶71.

8   Indeed, CW1 explained that despite requests they never received an example of a successful

9   implementation of Athena to show customers.  ¶¶79-80.  CW3 further confirmed that despite

10  numerous requests to the product team, they could not recall ever seeing an example of a successful

11  implementation of Athena for FTM.  ¶¶79-81;

12          (d)    ***The warned-of risks had already materialized as evidenced by the fact that***

13  ***Athena was not automated for FTM projects and Stem was losing FTM deals as a result***: Prior to

14  CW1's departure in February 2022, CW1 asserted that Stem's customers described Athena as an

15  empty suit because Athena was not automated.  ¶71.  CW1 also stated that Stem was having

16  difficulties closing FTM deals because Athena was not fully automated, resulting in Stem's poor

17  closing rate, which was tracked in Salesforce.  ¶¶70, 83, 89.  To that end, Carrington publicly

18  reassured investors that he and other Stem executives closely monitored the Company's

19  performance, which necessarily would have required a review of the Salesforce data reflecting lost

20  deals.  ¶379. This inference is supported by CW2's account of the $500 million FTM Available

21  Power "deal" that Stem announced on 02/24/22 which was touted to investors as an example of

22  Athena's viability for the FTM market.  ¶¶84-85, 258.  Unbeknownst to investors until January

23  2023, this purported deal in fact never closed.  ¶84; and

24          (e)    ***The warned-of risks had already materialized as evidenced by the fact that***

25  ***Stem was unable to convert its business to a profitable high-margin software Company, as***

26  ***reflected by the magnitude of its miss***: Because Stem lacked a viable software product for the FTM

27  market, it had no product that could drive the high software margins and profits that the Fraud

28  Defendants promised would arise from Stem's software-based business model.  At the beginning of

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 100 -
4879-3770-3139.v1

1   the Class Period, the Fraud Defendants promised Stem would be profitable in two years with gross

2   margins more than doubling to 26% and earnings of $28 million for FY 2022 with the Company's

3   sale of Athena to the FTM market.  ¶¶62, 64, 99.  Reflecting the lack of a viable FTM product, for

4   FY 2022 Stem would report on 02/16/23 abysmal results – gross margins of only 13% and rather

5   than a profit, a loss of $124 million for FY 2022.  ¶¶99, 125.  In addition, rather than the promised

6   gross margins of 32% and earnings of $113 million for FY 2023 on 12/04/20, Stem would report

7   gross margins of only 15% and a net loss of $140 million for FY 2023.  ¶¶101, 133.

8           **E.   The Fraud Defendants' Scheme**

9           251.   The Fraud Defendants sold investors on a business model wherein Stem would

10  transform from an unprofitable Company that was considered a "going concern" – aka on the verge

11  of collapse – to achieving profitability and growth in FY 2022 based on its existing AI software

12  product, Athena.  The Fraud Defendants claimed that Stem's sale of its superior automated software

13  would result in high gross margins (*i.e.*, from 12% in FY 2020 to 26% in FY 2022) and require little

14  capital (*i.e.*, capital light).

15          252.   The principal problem with Stem's software story and the combined company's path

16  to profitability was that, contrary to the business model that was pitched to investors in connection

17  with Stem's IPO and throughout the Class Period, Athena did not operate as advertised when it came

18  to the lucrative FTM deals that Stem needed in order for Stem to transform into the profitable high-

19  margin software company it promised.  Indeed, at Stem's largest and most touted FTM project in

20  Massachusetts, optimization was done by an employee (*i.e.*, a human) using an Excel spreadsheet

21  and not Stem's purportedly automated Athena software.  ¶¶67, 72-74.  To that end, in furtherance of

22  their scheme, the Fraud Defendants touted Stem's pipeline and bookings and other metrics to make it

23  appear there was strong demand for Stem's Athena software when, in fact, the pipeline and booking

24  were entirely unrealistic and not representative of viable deals.  ¶¶82-85, 89, 277-279.  Similarly, in

25  furtherance of their scheme, the Fraud Defendants also touted an FTM deal with Available Power

26  that was non-existent and later, at the end of 2022, provided parent guarantees in order to unloaded

27  batteries that had been purchased in violation of Company policy on other "customers."  ¶¶82, 86,

28  350.  All of which were done to mask that Stem's business model was fatally flawed.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 101 -
4879-3770-3139.v1

253.    The Fraud Defendants scheme to defraud included not only the materially false and misleading statements alleged herein in *supra* ¶¶188-194, 196, 198-206, 208, 212-213, 215-219, 222-229, and set forth in Exhibit A(2) but also, *inter alia*: (i) the Fraud Defendants' acts to inflate the Company's value by creating and endorsing Stem's deceptive and unsound business model to artificially inflate the value of Star Peak and Stem, attract new investors, and take the Company public; (ii) their attempts to influence analysts and others to positively portray the combined company in order to artificially inflate the value of Stem's securities; (iii) their attempts to discredit or mitigate negative information regarding the combined company in order to artificially inflate the value of Stem's securities; (iv) their purchase of AlsoEnergy and comingling of financials which obscured Stem's poor results and prospects; (v) their violations of Company policy in purchasing hardware without a valid purchase order and subsequent parent guarantees to record deals where there was no reasonable basis to expect payment; (vi) their creation and use of financial metrics that masked Stem's lack of a viable FTM Athena software product and sales; and (vii) their preparation of false and misleading presentation materials used in presentations to Star Peak investors leading up to the IPO, during earnings calls, and for analyst days to prop up the value of Stem. The Fraud Defendants' deceptive acts and course of business were disseminated to the market and artificially inflated the prices of Stem's securities.

254.    ***The Plan to Take Stem Public by Touting a Non-Viable Business Model***: A scheme includes a plan. Here, the Fraud Defendants formed and/or participated in a plan to take Stem public *vis-à-vis* a SPAC with an unrealistic and non-viable business model, as described *supra* ¶¶50-112. Working together to complete the IPO at an inflated price, the Fraud Defendants promised rapid growth and profits as a result of Stem's pipeline, expansion into the FTM market, and resulting high-margin software sales. Indeed, during an 04/12/21 Fireside chat, Defendant Carrington explained "how we built the model" regarding Stem's growth forecast explaining that "it was a very collaborative effort by Star Peak." Star Peak was led by its CEO, Defendant Scheyer.

255.    To that end, as described *infra* ¶¶139-142, 151, 366-373, Defendants Carrington and Bush provided extensive due diligence regarding Stem's operations in connection with the IPO in

1   meetings with representatives from Star Peak, including Defendants Scheyer, Morgan, and Daley, in

2   order to secure the IPO based on a non-viable business model.

3       256.   ***AlsoEnergy***: On 12/16/21, Defendants announced in a release that Stem had entered

4   into an agreement to purchase AlsoEnergy for $695 million, with 75% in cash and 25% in common

5   stock.  By purchasing AlsoEnergy, which had its own high-margin software product(s), the Fraud

6   Defendants acted in furtherance of their scheme to defraud investors by masking Stem's issues with

7   Athena in the FTM market.  In other words, by combining the two companies, going forward Stem

8   was able to attribute part of Stem's "actual" success to Athena by muddling the financial results of

9   the two companies.  As described in ¶¶114-121, 126, 229, Stem intended to combine the financial

10   results of the two companies and not report them separately.  Post-Class Period, Stem would admit

11   that Stem overpaid for AlsoEnergy by writing off $547 million in goodwill – the entire amount of

12   goodwill Stem previously associated with AlsoEnergy only two and half years earlier.

13       257.   ***Available Power deal and Parent Guarantees***: On 02/24/22, the Fraud Defendants

14   filed with the SEC a Stem release on Form 8-K announcing Stem's 4Q 2021 and FY 2021 results in

15   which they reported a disappointing non-GAAP gross margin of 11% for the year (compared to

16   previous guidance of 16%).  The release further reported full-year 2021 revenues of $127.4 million

17   (compared to previous guidance of $147 million).

18       258.   To distract from the negative news, on the same day, 02/24/22, and in furtherance of

19   their scheme, the Fraud Defendants deliberately issued a release regarding a partnership with

20   Available Power in Texas that included Athena software.  The value of the award was "expected to

21   exceed $500 million across the project portfolio" pointing to Stem's exclusive rights to energy

22   storage systems at 100 FTM sites throughout Texas.  Later, during the earnings call on the same day,

23   Defendant Carrington clarified that the $500 million plus of the Available Power deal was for Stem

24   with bookings of ~$100 million assumed in 2022.  Defendant Carrington touted the $500 million

25   Available Power deal as "another example of our continued momentum in large-scale, front-of-

26   meter, or FTM, market."  Defendant Carrington also emphasized that "[t]he Available Power win

27   further demonstrates our commercial diversity, as our customers span multiple geographies,

28   customer types and use cases, continuing to underscore the reach of our Athena platform."

259.    To that end, during the 02/24/22 earnings call, the Fraud Defendants touted Stem's "bookings" and "Athena expansion" as signals of strong growth while reinforcing Stem's business-model messaging.  Defendant Bush sought to focus investors on record bookings and Stem's leading software: "Our sales team again set a **_new quarterly bookings record_**, which is 58% more than was reported in all of 2020, **_a testament to our leading software_** and hardware solution."

260.    During the 02/24/22 earnings call, Carrington also assured investors that, regarding the Available Power deal, "**_as we proceed and start to get more clarity on the planned tranches we'll obviously update you and everyone on how that's coming together_**."  In furtherance of their scheme, however, the Fraud Defendants would not update investors, regarding, *inter alia*, that: (i) Stem bought hardware for the Available Power deal in violation of Company policy; or (ii) that Available Power never issued purchase orders despite its agreement to do so.  ¶¶84-85.  Moreover, Available Power's deal with Stem required Stem to invest in the deal by providing cash to support it.

261.    The Fraud Defendants' deceptive efforts paid off as analysts continued to believe Stem's "software story" reporting on 02/25/22 as follows:

> [Wolfe:] – "Bookings and backlog growth the bright spot" with "**_Available Power deal the largest in STEM's history_**."

262.    The Fraud Defendants, however, deceived investors by not disclosing that it was, in fact, a phantom deal.  According to CW2, who worked directly with sales on FTM Projects, including opportunities with ERCOT in Texas, and utilized Salesforce data regarding bookings and purchase orders as part of their business responsibilities, the booking from Available Power was essentially a non-binding letter of intent in which Available Power was supposed to issue actual purchase orders to Stem within two months of the letter of intent date (*i.e.*, by 04/24/22).  ¶¶84-85.  However, Available Power never issued the purchase orders, which, according to CW2, was necessary to constitute a sale.  *Id.*

263.    Despite promising to update investors regarding the Available Power deal, on 11/03/22, Defendants held a Q3 2022 earnings call wherein the Fraud Defendants attempted to explain Stem's increased use of cash (without disclosing it included the purchase of hardware for the Available Power deal in violation of Company policy):

[Bush:] In the last few quarters, *we have strategically deployed some cash to secure storage hardware for our customers* and *drive greater adoption of high-margin recurring revenue*. This cash flow recycled back to the balance sheet when the systems are delivered, but the net effect has been the use of cash.

264.     In order to conceal the loss of the Available Power "deal" and Stem's use of cash to purchase hardware, the Fraud Defendants scrambled to unload the hardware on other customers. As described by CW2, Stem unloaded the batteries on two customers at the end of 2022 in order to report favorable results to investors. ¶¶86-88. In furtherance of the Fraud Defendants' scheme, unbeknownst to investors, Defendant Bush provided these customers with deal terms whereby the timing and amount of contract payment was ultimately contingent upon whether, when, and for how much these customers could eventually resell the Stem hardware to an end-user customer. The true contingent nature of these deals was hidden from investors and not disclosed in the Company's year-end 2022 financial statements filed with the SEC, as required by the SEC in accordance with Generally Accepted Accounting Principles ("GAAP"), including Financial Accounting Standards Board Accounting Standard Codification ("ASC") No. 606 – Revenue from Contracts with Customers. A year later, Stem belatedly began to describe the contours of these types of deals in its 2023 Form 10-K, as "Parent Company Guarantees" whereby if the customer: (i) was ultimately unable to resell the hardware, the product would be appraised and Stem "would be required to compensate the customer for any shortfall in fair value for the hardware from the initial contract price"; and (ii) if the customer resold the hardware for "less than the amount initially sold to the customer" Stem would bear responsibility for the shortfall. The Fraud Defendants did so in order to conceal the lost Available Power deal and incentivize these customers to enter in a "deal" with little risk to the customers.[21]

265.     The first of these customer "deals" was announced by Stem on 12/08/22 – a project in Texas with REX. The project represented the first of a $400 million equity commitment by REX. This announcement was in furtherance of the Fraud Defendants' scheme because it made Stem look like it had another plum deal when, in fact, it was trying to unload the hardware from its failed

---

[21]   On 05/03/24, Stem admitted in its Form 10-Q for Q1 2024, that as of July 2023 Stem no longer provided parent guarantees.

1    Available Power deal as described *supra* ¶¶86-87.  To that end, as of August 2023, when CW2 left

2    Stem, REX still had not found end users for Stem's battery system.  ¶86.

3        266.    The second of the Fraud Defendants' "deals" to FTM customers in 2022 was equally

4    problematic.  In what is described as "a last minute end-of-the year negotiation" in 2022, Stem

5    sought to offload the batteries it had purchased for the Available Power deal onto Lullwater.  ¶¶86-

6    88.  In connection with its sale of the batteries, Stem also provided Lullwater with a parent guaranty

7    to cover any shortfalls resulting from Lullwater's inability to sell the batteries to third parties at

8    certain prices.  ¶¶86-88.  According to the complaint filed by Lullwater against Stem, the Company

9    made several misrepresentations regarding the batteries it sold to Lullwater including the market for

10   them and their quality, and that "the last minute hard sell of Batteries in late 2022 may have been an

11   attempt to present year-end corporate disclosures in a more positive light."  ¶87.

12       267.    Ultimately, Lullwater filed suit, contending that the batteries sold by Stem were of

13   subpar quality and that Stem breached its contractual obligations in the sale.  ¶88.  In other words,

14   having failed to update investors, the Fraud Defendants sought to conceal the lost Available Power

15   deal and Stem's expenditure of cash in purchasing the batteries in violation of Company policy by

16   securing a purchase order from Lullwater on 12/30/22.  They did so knowing full well that the

17   batteries were subpar and that Stem would be responsible for any shortfalls relating to the batteries'

18   inability to be designated for a project or in a future resale.  ¶¶82-86.

19       268.    The Fraud Defendants' conduct in providing the parent guarantees to REX and

20   Lullwater was part of their scheme and resulted in Stem reporting materially false 2022 financial

21   results including revenue and earnings.  Stem's post-Class Period admissions regarding material

22   revenue reductions and accounts receivable write-offs evidence the Fraud Defendants' scheme.

23   Indeed, on 11/02/23, only seven months post-Class-Period, Stem announced material revenue

24   reduction adjustments of $37.4 million in its Q3 2023 Form 10-Q directly related to Class Period

25   "deals" with parent guaranty contracts and financial results from FY 2022 and the beginning of FY

26

27

28

1    2023.[22]  All told, Stem would report nearly $74 million in revenue reductions for its parent guaranty

2    contracts.

3          269.    Stem's post-Class Period admissions regarding revenue reductions and accounts

4    receivable write-offs evidence the Fraud Defendants' scheme.  Stem reported the adjustments merely

5    as "updated estimates" to "Variable Consideration" contracts.  However, in violation of GAAP and

6    ASC 606 Stem should never have recognized revenue on these parent-guarantee contracts because at

7    the time of the sale, collection of substantially all of the sales price was not probable as: (i) payment

8    was contingent upon factors outside Stem's influence, including the customer's ability to resell and

9    install the hardware; (ii) the contingent sales price factors were not expected to be resolved for a

10   considerable period of time; (iii) Stem's experience with collection of sales with similar types of

11   contract guarantees was limited or non-existent; and (iv) the risk of degradation of the hardware

12   (batteries) during the contingency period was considerable, and Stem would be on the hook for this

13   diminution in value.[23]  To the extent any of the revenue on these contracts was legitimate, ASC 606

14   required that revenue recognition be deferred until the significant contingencies described above

15   were resolved.  To make matters worse, Stem also did not establish any material reserves for

16   uncollectible sales related to its hardware parent guarantees at the time it booked revenue that was

17   subject to those guarantees.

18         270.    On 10/30/24, on the heels of the abrupt departure of Stem's CEO Defendant

19   Carrington and other executives as described in ¶¶395-398, Stem announced a massive accounts

20   receivable write-off of $104.1 million – a complete write-off of the Company's entire uncollected

21   balance of all previous hardware sales subject to the Company's parent guarantees.  ¶90.  This

22   material write-off included the contract sales on credit from FY 2022 and the beginning of FY 2023.

23   By way of example, in Stem's 2022 year-end Form 10-K it reported accounts receivable of $223

24   million – a figure that necessarily included both the REX and Lullwater "deals" that were subject to

---

25   [22]   Subsequently, Stem would report additional revenue reductions of $33.1 million and $5.6 million
26   for its parent guaranty contracts from FY 2022 and the beginning of FY 2023 in its Q2 2024 Form
     10-Q and Q3 2024 Form 10-Q, respectively.

27   [23]   Financial Accounting Standards Board Accounting Codification 606 *Revenue from Contracts*
28   *with Customers*, ¶¶606-10-25-1, 606-10-32-7, 11, 12, 606-10-55-3A.

1    the parent guarantees.  The Company's belated write-off constituted 46.6% and 34% of the entire

2    accounts receivable and hardware sales respectively for 2022.  In combination with the nearly $74

3    million in additional revenue reductions for the parent guaranty contracts discussed above, the

4    Company reduced revenue by a total of nearly $178 million.  By comparison, Stem only reported

5    $310 million in hardware revenue for the entire FY 2022.

6        271.    Importantly, REX and Lullwater[24] had no history of finding end users for Stem's

7    battery systems and the batteries making up a substantial portion of the hardware for these "deals"

8    were already degrading or becoming obsolete, and the parent guarantees would require Stem to make

9    up for any shortfalls in customer resale value associated with these deals.  ¶¶82, 86, 87.  As such,

10   revenue for these parent guaranty deals should never have been booked because the Company had no

11   reasonable expectation of payment.  The sheer magnitude of the revenue reductions and write-offs

12   related to the parent guaranty contracts reflects that there was no reasonable expectation of payment.

13   ¶¶90, 270.

14       272.    ***Meetings with Analysts and Others***: The Fraud Defendants, in furtherance of their

15   fraudulent scheme, met with analysts to try to influence their reports to investors.  For example,

16   Stem's management met with analysts at Wolfe the week of 03/14/22, after Stem had issued

17   disappointing results on 02/24/22 for FY 2021.  Following the meeting, Wolfe issued a report on

18   03/16/22 indicating that "[o]verall, we thought STEM was effective in addressing some of the key

19   concerns following the Q4 update last month" and giving the Company an outperform rating.

20       273.    According to the report, the Fraud Defendants also conveyed to Wolfe analysts the

21   false impression that Stem's software story was on track:

22           ***Shift toward FTM driving more software revenue***.  While the outlook reset
             for margins and pushed out timing for EBITDA profitability was a disappointment
23           last month, ***we think mgmt was effective in highlighting the big picture.  The
             dramatic shift toward FTM has compressed margins in the interim, but it also is
24           driving much larger absolute dollars of software revenue that will be recognized
             over time.  And in markets like ERCOT, continued success w/ large FTM storage-
25           only deals*** can lead to upside from market participation revenue immediately.

26

27   [24]   CW1 and CW2 reported that Stem focused on unsophisticated FTM customers (*i.e.*, developers)

28   adding to the inference that there was no reasonable expectation of payment from these customers.

274.    Wolfe continued to report what they learned from the Fraud Defendants, including their reinforcement of Stem's business model, using the Available Power deal as tangible evidence of the Company's success:

> Purposeful investments in OpEx; building a competitive moat. **Management spent a lot of time talking through the 2022 OpEx guidance** and even included a new slide in its deck to better illustrate the rationale for the increase vs 2021. A chunk of that is absorbing AlsoEnergy, **but STEM also went into detail on three different buckets, two of which will help build the company's competitive moat going forward.   First is to access large FTM opportunities to accelerate booking/revenue momentum, particularly for the software piece.  The Available Power deal is tangible evidence of this, which features $200M in total software value to STEM**.

275.    In furtherance of the Fraud Defendants scheme, Stem's management team also met with analysts at Guggenheim in May 2022, regarding Stem's business model and future. Guggenheim analysts reported on 05/24/22 that:

> **We hosted the management team from Stem for a series of meetings with investors last week**, and had an opportunity to drill down on the company's current operations, business model and plans for the future. **Stem is booking new business more rapidly than we had expected, and our revised financial model reflects a higher outlook for bookings and revenue**.  Guggenheim analysts further reported that "Stem reports that it continues to lead the market, as measured by the number of front-of-meter (FTM) systems that it operates."

276.    ***Use of Confusing Metrics to Obfuscate Stem's FTM Failures***: To obfuscate Stem's FTM failures, as indicated in ¶¶67-90, *supra*, in furtherance of their scheme, the Fraud Defendants used confusing "key" metrics to make it appear that Stem was on track to meet its performance objectives and turn a profit when, in fact, those metrics obfuscated Stem's failures in the FTM market.

277.    The Fraud Defendants misleadingly reported overinflated pipeline figures and did not provide investors with a reasonably accurate portrait of the Company's potential prospects.  CW1, who was, among other duties, involved in developing pipeline, indicated that engagements listed in the pipeline were not actual deals or even commitments on the part of the developer, rather, they represented just a chance with no guarantee of getting a platform deal signed.  CW1 explained that the pipeline included phantom deals; deals that there was no practical chance of winning; and that most of the prospective business in the pipeline was pie-in-the-sky because the pipeline was just a chance to send a proposal.  CW2, who worked to develop business opportunities for Stem,

1  corroborated that Stem's pipeline was inflated. According to CW2, some employees built

2  everything into the pipeline even though the opportunities were not meaningful pipeline and were

3  numbers without facts. At the end of the quarter, some of these deals would be shown as having a

4  high potential of closing even though the salespeople knew that was not the case, that prospective

5  deals were always kept in the pipeline even when those deals had no results after a couple of

6  quarters. According to CW2, this was apparent because of the low close rate of these deals.

7      278.    Following the IPO, Stem's pipeline of phantom deals ballooned with large FTM

8  projects when Stem did not have a viable product for those purported deals. For example, prior to its

9  consummation of the IPO, during a 04/12/21 Fireside Chat with IPO Edge, Defendant Carrington

10  confirmed that Stem's 12-month pipeline was currently valued at over $1 billion. And within weeks

11  of completing the IPO, in the 1Q 2021 earnings Release on 05/17/21, Stem announced a 12-month

12  pipeline of $1.43 billion. Just 13 months later, Defendant Carrington reported during Stem's Q1

13  2022 earnings call on 05/05/22 that its pipeline was valued **around $5.2 billion**, an increase of over

14  eight times, with the backlog consisting of "a little over 80% front of the meter" projects.

15      279.    However, as described in detail above in ¶¶67-90, Stem's software was not viable for

16  complicated FTM projects, thus Defendants had no reasonable basis to include FTM deals in Stem's

17  pipeline or bookings.

18      280.    In addition, the Fraud Defendants used the term "booking" – its plain meaning

19  implying an actual deal when there was no actual deal. Stem's FY 2021 Form 10-K filed on

20  02/28/22, reinforced that meaning: "We characterize **contracts that have been signed but not yet**

21  **installed as a booking** that becomes part of our backlog." The Fraud Defendants further stated that:

22      **[B]ookings are a key metric** that allows us to understand and evaluate the growth of
       our Company and our estimated future revenue related to customer contracts for our
23      energy optimization services and transfer of energy storage systems. Bookings
       represents the accumulated value at a point in time of **contracts that have been**
24      **executed** under both our host customer and partnership sales models.

25      281.    But then, for partnership sales like Available Power, Stem indicated that: (i) "[a]

26  signed customer contract is considered a booking as this indicates the customer has agreed to place a

27  purchase order in the foreseeable future"; and (ii) for accounting purposes they do not consider a

28  booking as a contract until "once a purchase order has been executed."

282.    This confusing terminology was part of the Fraud Defendants' scheme.  Stem's bookings were nothing more than letters of intent, not contracts.  And according to CW2, Stem's "bookings," particularly in the FTM sector, routinely did not convert to actual deals.  Yet, when the Fraud Defendants issued the announcement of the Available Power partnership in Stem's 02/24/22 release, there was no mention of Stem's unique interpretation of the meaning of "booking." Likewise, during Stem's earnings call held on the same day, Defendant Bush referred to the project as the "Available Power deal" and referred to "sign[ing] other large deals like the one [Available Power deal] we announced today."

283.    ***Efforts to Discredit Negative News***: The Fraud Defendants also took steps to negate potentially adverse news in order to keep Stem's stock artificially inflated.  For example, on 01/11/23 short-seller Blue Orca Capital ("Blue Orca") issued a report identifying a host of issues with Stem's business and business model, including that: "STEM continues to trade at a high valuation on its claim that its special AI enabled software platform has a growing pipeline of high-margin, long duration, and recurring software revenues.  ***This is nonsense***."  The report further provided that: "Ultimately, STEM is valued on the misconception that it provides AI enabled software with high margins, long-term contracts and recurring revenues.  The Company claims that as it sells new battery systems, software revenues will continue to be meaningful, will grow, and will remain sticky.  Yet this is false."  To that end, Blue Orca quoted industry experts regarding the fact that Stem was a non-player in the FTM space and described, *inter alia*, Stem's "key" pipeline metric as misleading.

284.    Immediately after Blue Orca issued its report, the Fraud Defendants, in furtherance of their scheme, engaged in damage control by issuing adamant denials of the truth of the contents of the Blue Orca report.  For example, Seeking Alpha wrote in an article on the same day, 01/11/23 that:

> ***Stem (STEM) responded to the short report in an email to Seeking Alpha***.
>
> "***The report contains numerous errors and unsupported speculation, and draws misleading and flawed conclusions***," Stem said in a statement. "Stem was not contacted during the development of the report nor given the opportunity to provide factual information that would have easily refuted the incorrect claims made

throughout the report.  Stem is preparing a response to the report, which it will release in the near future."

285.    On 01/12/23, the Fraud Defendants took the additional step of responding to the Blue Orca report in a published statement.  They did so in furtherance of their scheme to continue to mislead investors that Stem's software story and business model were, in fact, sound and that they should disregard the Blue Orca report.  Specifically, the Fraud Defendants told investors that "[t]he report, issued on January 11, 2023 which *Blue Orca itself describes as a 'short-biased opinion piece . . . not statements of fact,' contains factual inaccuracies, mischaracterizations and faulty assumptions.  While Stem will not rebut every inaccuracy in the report, we stand by our disclosures*" and then went on to respond to certain Blue Orca attacks.

286.    The Fraud Defendants also engaged in damage control by speaking with analysts to convince them that Stem's software story was on track.  Indeed, analysts at Guggenheim wrote on 01/01/23 that:

> We reiterate our Buy rating and $17 price target following some recent conversations with STEM's management team.

> - Reiterating Buy rating, and $17 price target.  *We spent some time catching up with the STEM management team following the company's updated outlook for 2022, and did some additional analysis following the release of a short seller report earlier this week. STEM needs to demonstrate that it can begin to show growth in the value-added segment of its business, which means services and software revenue for the energy storage and solar assets that STEM has under management.  The company has reasonable answers to our questions on this topic*, and based on our recent conversations and our own industry checks we think that STEM should in fact be able to show meaningful progress on software and services revenue during 2023.

287.    Analysts at Credit Suisse, however, noted on 01/13/23, that Stem's "[s]tock underperformed on 01/11/23 likely due to resurfaced concerns around mix of pure service+software revenues and legacy host customer arrangements in the reported service revenues."

## VII. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION

### A.    Loss Causation (All Claims)

288.    Leading up to Stem's IPO and throughout the remainder of the Class Period, the Defendants made materially false and misleading statements and omissions that caused the price of Stem's securities to be artificially inflated and/or maintained the artificial inflation in the price of

1   Stem's securities.  Said statements and omissions were materially false and/or misleading in that
2   they failed to disclose materially adverse information and/or misrepresented the truth that, *inter alia*,
3   Athena was not viable for FTM projects and that Stem's business model of profiting from high-
4   margin software sales while maintaining a capital light company was not feasible as a result.

5        289.    At all relevant times, the material misrepresentations and omissions particularized in
6   this Complaint directly or proximately caused, or were a substantial contributing cause, of the
7   damages sustained by Plaintiffs and the other members of the Class.  As described herein, during the
8   Class Period, the Defendants made or caused to be made, or failed to correct, a series of materially
9   false or misleading statements concerning Stem's business model, products, operations and
10  prospects.  Defendants' statements were materially and objectively misleading when made, as set
11  forth *supra*, and had the cause and effect of creating in the market an unrealistically positive
12  assessment of: (i) Stem's business model and its purported success in executing on that model; (ii)
13  the Company's ability to achieve growth and profits; and (iii) the success and viability of its Athena
14  software for the FTM market, thus causing Stem's securities to be overvalued and artificially inflated
15  at all relevant times.  The materially false or misleading statements made and/or endorsed by the
16  Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing
17  Stem's securities at artificially inflated prices, thus causing the damages complained of herein.

18       290.    As a result of their purchases of Stem's securities during the Class Period at
19  artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.*,
20  damages, under the federal securities laws.  The timing and magnitude of the price declines in
21  Stem's securities, the corrective events, and the market's reaction negate any inference that the loss
22  suffered by Plaintiffs and other Class members was caused by changed market conditions,
23  macroeconomic or industry factors, or facts specific to Stem that were unrelated to the alleged
24  misstatements.  This is supported by the stock charts in ¶¶197, 305, 317, 324 below, which
25  demonstrate the clear divergence in the performance of Stem's (STEM) common stock prices from
26  the S&P 500 index and its peers, Fluence Energy ("FLNC") and SolarEdge Technologies.

27
28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 113 -
4879-3770-3139.v1

291.    Defendants' Class Period misstatements were corrected through a series of partial disclosures.[25]  Though each of the disclosures was incomplete, each corrected at least part of Defendants' prior misstatements and omissions concerning Stem's business, leading to price declines that partially corrected Stem's stock price by reducing the extent to which it had been inflated by Defendants' misrepresentations, thereby injuring Plaintiffs and other members of the Class who had purchased Stem securities during the Class Period at prices that had been artificially inflated by the alleged false and misleading statements and omissions alleged herein.

### 1.    Partial Disclosures on February 24, 2022

292.    On 02/24/22, Defendants announced Stem's 4Q/FY 2021 financial results in a release issued after the market closed.  The 4Q/FY 2021 release was concurrently filed with the SEC on a Form 8-K.  Stem held an earnings call the same day after the market closed and issued a slide presentation titled "Q4 and FY2021 Financial Results," which was posted to Stem's website.  Stem's release, earnings call, and presentation conveyed disappointing FY 2021 results to the market. Indeed, the Company revealed misses including, *inter alia*, gross margins and adjusted EBITDA:

| ($$MM) | Guidance[26] | FY 2021A | Delta |
|---|---|---|---|
| Non-GAAP Gross Margins | 16% | 11% | (5)% |
| Adj. EBITDA | $(25) | $(30.3) | ~$(5.3) |

293.    Stem also reported disappointing FY 2022 guidance including, *inter alia*, gross margins of 15-20% and adjusted EBITDA of ($60)-($20) million.  By comparison, on 01/25/21, just over one year earlier, Stem led the market to believe that FY 2022 would result in gross margins of 26% and that the Company would be profitable with adjusted EBITDA of $28 million.

---

[25]   The list of corrective events identified herein is necessarily preliminary, and based upon Plaintiffs' analysis and investigation to date.  Upon further investigation and discovery and additional analysis Plaintiffs may alter or amend its theory of damages, including by identifying additional corrective events that caused or contributed to the damages claimed in this action.

[26]   Stem issued FY 2021 guidance in an investor presentations on 01/25/21 and reaffirmed that guidance on 03/22/21.  It also reaffirmed revenue and adjusted EBITDA guidance on 11/09/21.

294.     Stem's 02/24/22 4Q/FY 2021 release, earnings call and presentation reporting Stem's disappointing FY 2021 results and FY 2022 guidance, especially the disclosure that it was only able to achieve 11% margins for FY 2021, began to reveal to investors that Stem had not been generating revenues through high-margin FTM software sales, as Defendants previously represented.  Leading up to the IPO and during the Class Period, Defendants maintained that Stem's path to success and profits would be executed through expansion into the FTM market with high-margin FTM software sales.  Because Stem's Athena software was in fact not automated for the FTM market, however, the Company was unable to deliver on the business model it had been touting since the announcement of the Merger.  As a result, Stem's gross margins and profits suffered in FY 2021 and would continue to suffer in FY 2022.

295.     The disappointing FY 2021 financial results and FY 2022 guidance also began to reveal to investors the materialization of the risks posed by Stem's deficient business model – the risks of relying on FTM sales and market expansion without a viable high-margin software product for that market.

296.     Indeed, during Stem's 02/24/22 earnings call, an analyst at Goldman questioned the sharp drop in gross margins:

[Analyst:] Kudos on the nice bookings and revenue outlook here.  I wanted to ask a first question, I guess, on the margins here.  Maybe if you could give us a bit more bridge.  I think you said AlsoEnergy is doing 60% gross margin, overall.  So at the midpoint of guidance, it implies they're about half your gross profit dollars for 2022, *and that means core Stem is doing maybe about a 10% gross margin*.  *I think you guys originally had a target to do, like, mid-20s in 2022, and you were also 10% to 20% throughout all of '21, before 4Q.  Just I'm trying to reconcile the sharp drop-off here*, and I know you mentioned a number of different moving parts, but can you maybe help bridge a bit and maybe quantify, if you can, kind of where we were targeting before for core Stem and kind of where we're ending up here with, *if the math is right, an implied kind of 10% margin*?

*              *              *

[Bush:] Thanks, John.  Brian, appreciate the question.  So I think, as John said, I think in the future we won't be breaking out the 2 divisions of the company that way.  *But I mean, I think the basic math is pretty very correct*.

*I think the issue that we're focused on is the continued bookings of the company, and the focus there is making sure that the software is what's driving the long-term value of the company.  So it's possible that we'll see lower margins in the near term*, but ultimately – and that's why we rolled out the CARR metric.  I mean, that's the – I think we've said pretty consistently in the past that we think

1    backlog is a great short- to medium-term reflection of what the revenues will be.
2    Well, CARR is going to be a great reflection of what software is going to be as we
     mature.

3    297.    Upon Stem's disappointing news on 02/24/22, Stem's stock price plummeted from
4    $11.24 on 02/24/22 to $8.81 per share on 02/25/22 on unusually heavy trading volume, a decline of
5    $2.43 per share, or -21.62%, as depicted in the following:



298.    The market's reaction to the news indicated that it understood Stem's wide miss of its
gross-margin and earnings targets in FY 2021 and discouraging outlook for FY 2022 meant that
Stem was not generating the high-margin FTM software sales that Defendants had promised to
investors.  For example, on 02/25/22, analysts reported:

[Morningstar] – lowered Stem's price target $8, from $18 to $10 per share as a
"result of an increase in our discount rate *and a reduction in our long-term
profitability outlook*."; "*The miss is largely driven by weaker-than-expected gross
profit as the company appears to be selling hardware at near breakeven gross
margins, below its prior guidance of 10%-30% margins*"; and "[w]e would like to
see the company execute well against its 2022 targets *and demonstrate further
ability to generate software-only sales* prior to becoming more constructive on its
valuation upside."

[Credit Suisse] – "We reduce our TP by $8 to $28, due to *lower hardware gross
margins due to higher mix of low-margin FTM products* and higher opex for
expansion in new markets and products."

[SIG] – "margin below expectations" with "*non-GAAP gross margins came in
meaningfully below our forecast*."  Further, that "we are *assuming a slower gross
margin progression*."

[Wolfe] – "Stem's update was a disappointment" Noting "2021 misses; **margin outlook much weaker**" and that **"[d]riving the negative surprise was a materially weaker outlook for gross margins – guidance of 15-20% for 2022 vs our prior expectation of ~25%.**"  The price target was cut "largely on the lower margin outlook."

299.    Wolfe Research similarly noted that, while Stem's acquisition of AlsoEnergy was supposed to enhance Stem's margins, Stem's gross margin FY 2022 guidance was still far below expectations:

> **Wasn't the AE deal supposed to be margin accretive**?  That was our expectation heading into the print, but **AE's contribution is being masked by lower margins in STEM's battery segment.  STEM previously pointed to a 10-30% GM, but given the backlog's heavy tilt toward FTM projects, the blended margin looks to be at the 10% level.  With battery hardware still driving the majority of revenue in the coming years, this is driving materially lower margins/EBITDA in our forecast** (details on pg 3).

*       *       *

> **Gross margins inflect lower for now**.  STEM's 15-20% guide for gross margins in 2022 was well below our expectation of ~25%.  And our expectation was just for legacy STEM - **AlsoEnergy was supposed to be accretive to that given that it is a ~60% gross margin business.  However, AlsoEnergy's contribution is being masked by lower margins in STEM's battery segment.  STEM previously pointed to a 10-30% gross margin, but given the backlog's heavy tilt toward FTM projects (90%+), the blended margin looks to be at the 10% level at least over the near term**.

## 2.    Partial Disclosures on January 5, 2023

300.    On 01/05/23, before the market opened, Stem posted an Investor Presentation Deck for the Goldman Sachs Global Energy and Clean Technology Conference.  The presentation deck revealed that Stem's Q4 2022 revenue and FY 2022 gross margins were tracking at and below the low end of prior guidance, respectively, despite the Company reaffirming full-year and Q4 guidance not even two months prior as part of its 3Q 2022 results reported on 11/03/22.

301.    Specifically, the 01/05/23 presentation reported that Stem's FY 2022 non-GAAP gross margins were expected to be below the low end of prior guidance at 15%-20%, due to, among other reasons, lower storage software revenue.  Defendants' disclosures also revealed for the first time that Stem had "lost" one of its larger FTM projects, which would later be revealed to be Available Power.

302.    Indeed, the presentation further revealed that Stem's 2022 bookings backlog was lower due to "[a] **Stem-initiated contract cancellation** (~$130M) due to partner non-performance on

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                         - 117 -

[an] agreed timeline."[27]  Stem later admitted in a 01/12/23 publication that, "[a]s publicly disclosed in our January 5, 2023 investor webcast and presentation, we canceled a booking of approximately $135 million in the fourth quarter of 2022.  This cancellation was attributable solely to DevCo projects with Available Power."

303.    This news partially revealed to investors Stem's inability to bring large FTM projects to market, and its overall inability to transform the Company to a profitable high margin software-as-a-service company.

304.    This news also partially revealed to investors the continued materialization of the risks posed by Stem's deficient business model and its failure to have a viable automated Athena product for the FTM market, resulting in Stem now "losing" FTM customers.

305.    Following the Company's 01/05/23 partial disclosures, Stem's stock price declined from $8.54 per share on 01/04/23, to $7.79 per share on 01/05/23, a decline of $0.75 per share, or –8.78% on unusually heavy trading volume, as depicted in the following:



306.    The decline in the Company's stock price was the direct result of a correction of the Defendants' prior false statements and omissions being revealed to investors and the market.

307.    The market's reaction to the news indicated that it understood Stem's downward guidance to mean that Stem was not generating the high-margin FTM software sales, including

---

[27]  Notably, Stem did not disclose that the cancellation was that of the Available Power "deal" or that all of the Available Power's remaining $400 million in bookings had also been cancelled.

1    software only sales, that Defendants had promised to investors.   For example, on 01/09/23,

2    Morningstar lowered its fair value estimate for Stem to $10 per share from $12 "after reviewing an

3    updated slide deck the company released last week" based, in part, on Stem's lowered FY 2022

4    forecasts and inexperience with FTM projects.   Morningstar's lower estimate reflected Stem's

5    inability to generate software sales, reflecting a materialization of the risk that Athena did not work

6    for FTM deals.  As Morningstar reported, it was lowering its rating, in part, because:

7           ***Stem's software sales are largely derived from hardware sales today, and the
            company may be unsuccessful in generating stand-alone software sales***.

8           Competition from well-financed battery manufacturers that can integrate software
9           directly into hardware may prove difficult for Stem to compete with.

10          ***Stem is relatively inexperienced in the front-of-the-meter market***, which is a
            material contributor to long-term financial targets.

11                          *     *     *
12

13          Given the company does not undertake material value-added activities or
            manufacture proprietary hardware components, it is difficult to justify a moat for its
14          hardware sales.  Further, given margin stacking (Stem sells hardware at a 10%-30%
            gross margin), we think its hardware is at a relatively disadvantaged cost structure
15          versus competitors.

16          Stem's long-term strategic focus is around its Athena artificial intelligence
            software.  To date, the company's software has been sold attached to hardware sales
17          for a bundled solution.  We see this dynamic as favoring well capitalized battery
            hardware manufacturers that have increasingly looked to build out software
18          management systems (*i.e.*: Tesla's Autobidder).  ***We view the company's need to be
            involved in hardware as indicative that its software does not possess a competitive
19          moat on its own***.

20             **3.     Partial Disclosures on February 16, 2023**

21        308.    On 02/16/23, Stem announced 4Q/FY 2022 financial results in a release, issued after

22   market close.  The 4Q/FY 2022 release was concurrently filed with the SEC on a Form 8-K.  Also on

23   02/16/23, Stem published a slide presentation on its Investor Relations Webpage to inform

24   discussion during the 4Q/FY 2022 earnings call, which took place after market close on 02/16/23.

25        309.    On 02/16/23, Stem disclosed disappointing earnings and non-GAAP gross margins of

26   13%.  During the 4Q/FY 2022 earnings call, Defendant Bush revealed that Stem's gross margins

27   miss was "***driven by a higher mix of hardware than we expected***."

28

310.     In discussing Stem's disappointing results for FY 2022, Defendants acknowledged that Stem was having difficulty converting backlog to sales and, thus, only 10% of Stem's revenue came from higher margin software sales.[28] Stem further attributed the Company's disappointing FY 2022 non-GAAP gross margins of 13% to, among other things, "Storage Hardware Revenue mix weighted to FTM driving down consolidated Non-GAAP Gross Margin." Stem also reported adjusted EBITDA of negative $46 million for FY 2022.

311.     Stem also disclosed that it ended FY 2022 with $250 million in cash, cash equivalents and short-term investments explaining that "the primary uses of cash during the fourth quarter of 2022 related to purchases of hardware for customer projects, which are expected to convert to revenue in coming quarters." It had also built up $450 million in debt.

312.     Notably, Stem's 02/16/23 release also issued discouraging FY 2023 guidance, including anticipated FY 2023 revenues of $550 - $650 million, non-GAAP gross margins of 15 – 20%, and adjusted EBITDA of ($35) to ($5) million.

313.     When presented during the call with Stem's disappointing forecasts for FY 2023, analysts continued to be skeptical of Stem's ability to convert its $969 million FTM-heavy backlog into revenue and earnings. In response to that skepticism, Defendant Carrington confirmed that the backlog, which consisted heavily of FTM projects, was converting more slowly than expected:

> [Analyst:]  I just – first one on the guidance for revenue. I mean, given the backlog position here, I'm just kind of curious.  What's your assumption around backlog conversion?  *I would have thought you'd be in position to do higher than kind of the revenue guidance here of $600 million at the midpoint.  So are you seeing backlog converting more slowly?  Or is there something with respect to mix that's maybe not turning over as quickly as you would have thought* just given the overall headline number seem to be bigger and gave you more coverage than sort of the revenue guidance you're providing here?  And then I had a follow-up on the margins.

> [Carrington:]  Perfect. So yes.  And I think we – *in terms of the backlog, it is converting slower*.  *I think we've talked about this in the past, as we're taking on larger and larger projects, those tend to be – they tend to be FTM first*.  And then second, they tend to be multiyear installations.  And so we saw much quick – when the projects were slow – we're smaller, we saw a much quicker conversion, much like – say, at the end of '21, we had $400-plus million – $450 million in backlog.  We did $363 million in revenue this year.  So pretty quick conversion in general.

---

[28]  These hardware sales included sales to REX and Lullwater as a result of the collapse of the Available Power "deal."

But this year and into – I think going into the future years, we're just going to – we're going to need to build more pipeline because the projects are longer. And so from that standpoint, I would say extension, but still pretty significant growth on a year-over-year basis for revenue.

314.    Also, in response to analyst questioning during the 4Q/FY 2023 earnings call, Defendants acknowledged that, like in FY 2022, Stem's 60% gross margins revenues may not materialize in 2023, having an additional negative impact on forecasted margins:

[Analyst:] Okay. Fair enough. Yes, just on the margins. ***I know '22, it sounded like you obviously had some issue that impacted you on the gross margins. You're effectively starting '23 here with the same adjusted gross margin guidance is what you had going into '22. But it seems like some of the headwinds from last year have started to dissipate***.

So is there some conservatism baked in here? Or is there some level of margin leverage that you're not seeing that you would have expected? Because my understanding is you've got maybe a little bit more BTM coming back into the mix, supply chain is better. And I know – kudos on the operating leverage side of things. So just wondering what are some of the levers around gross margin leverage that we could look to here in '23? Because just based on the headline guidance, it doesn't seem like you're baking in a ton.

[Carrington:] Well, I think – so in terms of the margins, I think, one, is – I think we need to be somewhat conservative, because the solar part of our business has a lot of margin leverage into it. And though we are seeing some green shoots come out – I mean, you can see that in terms of we had 8% service growth in the fourth quarter sequentially. We've got really nice increase in backlog, 42% year-over-year. We want to make sure those numbers are actually there. And because of the – that's a 60% gross margin business in general. ***If that doesn't materialize, though we expect – much like in '22, that will have a negative impact on us for 2023***.

So probably is some conservatism. I think to some extent you can always increase the numbers, hard to take them down. And so I think what we'll be doing as we roll into 2023 is continue to monitor the solar part of our business very carefully. But I think the other thing to consider as well is that the hardware side of the storage part of the business continues to be under pressure. ***I mean that is definitely going to – as we move up in terms of project size, the margins on those hardware sales, which unfortunately comes before the software, is going to impact the overall gross margin***.

So we kind of went through and tried to appropriately forecast what the mix of those 2 things would be. And I think the ultimate answer is going to depend a lot on what the mix turns out to actually be.

315.    Stem's 02/16/23 partial disclosures, including the Company's gross-margins and earnings misses, as well as the discouraging FY 2023 guidance, partially revealed the negative impact of Defendants' materially false and misleading statements alleged herein. Rather than increasing revenue and margins from the "competitive moat" of its Athena software as promised,

1    Stem was continuing to focus on – and forced to spend its cash reserves on – its lower margin

2    hardware business.

3          316.    Similarly, this news partially revealed to investors that the materialization of the risks

4    posed by Stem's failure to have a viable automated software for the FTM market.  Stem's 02/16/23

5    disclosures of poor results, including the lack of the high software margins that underpinned its IPO

6    story, difficulty converting FTM projects into software revenue, and expected losses for FY 2023 all

7    reflected the risks that were already materializing.

8          317.    On 02/16/23, in response to Defendants' corrective disclosures, the price of Stem's

9    securities fell sharply, declining from $9.74 per share on 02/16/23 to $8.30 per share on 02/17/23, a

10   decline of $1.44 per share, or 14.78%, on unusually heavy trading volume as depicted in the

11   following:

12

13

14

15

16

17

18

19

20



21

22

23         318.    The extent of Stem's disclosures with respect to the Company's financial results and

24   outlook for 2023 surprised investors.  On 02/17/23, Morningstar analysts lowered Stem's target price

25   $2, from $10 to $8, as "a result of reducing our long-term gross margin forecast as we expect gross

26   margin improvement to be more gradual than our prior forecast" and noting that Stem's transition

27

28

from a hardware to a software company was going to take a lot longer than Defendants previously represented:

> With Stem previously indicating 2022 results were going to be weaker than expected, our focus was on the company's 2023 guidance.  Positives include expected booking growth of 40% year on year and reiteration of achieving breakeven adjusted EBITDA in the second half of 2023.  ***However, non-GAAP gross margin guidance of 15%-20% for the full year is in line with original 2022 guidance, showing limited improvement year on year***.
>
> ***Stem's long-term strategy remains around its Athena software, but we think its transition from a hardware-dominated business to one with sizable software revenue is going to be more gradual than our prior expectations.  As such, we now incorporate a more subdued gross margin improvement into our forecast.  We now assume the company does not meet its 15% adjusted EBITDA target until 2026, a year later than its analyst day projections.  We would like to see management execute against its 2023 guidance and further scale its software revenue prior to becoming more constructive on shares***.

319.    Similarly, other analysts expressed skepticism about Stem's ability to generate high-margin sales and turn a profit:

> [UBS 02/16/23] – "continued ***skepticism in the market about profit potential***"; and "STEM is not currently a profitable company and achieving our estimates profit levels will require commercial execution."
>
> [Morgan Stanley 02/17/23] – "***Weaker than expected 4Q revenue and gross margin***, offset by opex discipline."
>
> [BofA 02/17/23] – "***2023 guidance unfortunately comes with yet another negative reset vs expectations*** with revs guided to $550-650mm vs consensus at $680mm, gross margins again pointed to a 15-20% range on a non-GAAP basis (same as 2022 which missed this range at 13%) and relatively deep EBITDA drag of ($5)-($35mm)."

#### 4.    Partial Disclosures on March 29, 2023

320.    On 03/29/23, Stem announced it would be offering $175 million Convertible Senior Notes, due in 2030, in a private offering to institutional buyers.  Stem intended to use the proceeds of the notes to purchase and surrender for cancellation a portion of Stem's 2028 Convertible Senior Notes, to fund the cost of entering into the privately negotiated capped call transactions with the purchasers, and for general corporate purposes.

321.    On 03/30/23, Stem upped the amount of offering from the day before, from $175 million to $200 million.  Stem intended to use: (i) approximately $99.8 million of the net proceeds from the offering to purchase approximately $163.0 million in Stem's 0.50% Green Convertible

Senior Notes due 2028; (ii) approximately $23.2 million of the net proceeds of the offering to fund the cost of entering into capped call transactions; and (iii) the remainder of the net proceeds of the offering or ~$75 million for general corporate purposes.

322.    This news revealed to the market that Stem was not executing on its business model of a high-margin FTM software company that would alleviate the need for Stem to be a capital heavy company, and that Stem needed additional cash for corporate purposes. Those purposes included funding the development of a viable FTM product and covering shortfalls for parent guaranty contracts.

323.    Similarly, this news partially revealed to investors the materialization of the risks posed by Stem's deficient business model and its failure to have a viable automated Athena product for the FTM market. Stem's 03/29/23 disclosure that the Company would raise capital revealed that Stem was unable to support its operations with revenue generated from high-margin software sales, and thus the disclosure reflected that the risks were already materializing.

324.    Upon the news, Stem's stock price declined from $6.24 per share on 03/28/23 to $5.59 per share on 03/29/23, a decline of $0.65 per share, or – 10.42%, on unusually heavy trading volume. The stock fell another – 1.6%, or $0.09 the following day, to a close of $5.50 on 03/30/23 as Stem issued its second offering announcement and the market continued to absorb the news, as depicted in the following:



325.    Analysts were puzzled and surprised by the news.  On 03/29/23, a Credit Suisse analyst noted that "Stem's convert was not expected," and "[t]iming is also surprising given higher interest rates and spreads since their previous 2028 convert issued in mid-November 2021." Stating that its "Outperform" rating was based in part due to "Stem's capital-light business model," Credit Suisse now saw "risk to [the] Outperform rating and . . . Stem's ability to expand market share in [the] US FTM" market.

326.    A Guggenheim report issued on 03/30/23 reduced Stem's price target from $14 to $11 following the announcement of $175 million convertible debt financing, stating that "we think that STEM could have handled its recent communications more effectively.  The transaction is also poorly timed, in our view."  Moreover, "*the financing comes on the heels of management having assured investors repeatedly that no additional funding was needed*, and it also comes following a 64% decline in the stock price since September, not including the decline yesterday after the deal was announced."  Guggenheim found that "[t]he central question for STEM investors continues to be the ramp of storage-focused software and services revenue" and it was "*clearly proving more difficult than STEM expected to generate gross margin on its hardware resale business*."

327.    A Morningstar report on that same day reduced its fair value down from $8 per share to $6 per share following Stem's convertible note offering, finding that raising funds via a convertible note offering "raises questions."  Morningstar also doubted Stem's long-term business model strategy: "Stem's software sales are largely derived from hardware sales today, and the company may be unsuccessful in generating stand-alone software sales."

### 5.    Partial Disclosures on April 4, 2023

328.    Following Defendants' prior disclosures beginning on 02/24/22, analysts arrived on 04/04/23 at the inescapable conclusion that Stem's business was dependent on its lower margin hardware sales, and that the Company would not see the gross margins or profits that Defendants had repeatedly promised would result from Stem's high-margin automated software product and its expansion into the FTM market.  In other words, the market had little confidence in Stem management's ability to execute on the business model it sold investors on two years earlier when the Company went public.

329.    On 04/04/23, analysts at Bank of America issued a report titled, "Waning Confidence on Sharp Ramp: Downgrade to Underperform," stating their "confidence in estimates is increasingly strained." ***The analysts explained that they were diverting from the street consensus*** on hardware margins of 15% to 9-10% hardware margins, and explained their contrary rationale about Stem:

How do we look vs consensus?

> The primary differences between our updated estimates and consensus hinge on (1) ***lower attribution to a hardware business gross margin which we frankly think aligns more closely to reality*** and (2) a ***more reasonable take on opex trends against Stem's scaling plans. We emphasize that while we are lower than consensus on each, we are actually not dissimilar from Stem's long-term guidance on either, which leaves us confident in the prospect of further negative revisions. We lack confidence in Stem's ability to drive margin improvements in the increasingly supply constrained and competitive business of buying and selling batteries***. In 2022, still with the benefits of more BTM hardware delivery mix than what Stem expects long term, its hardware margin hovered in the high single digit range throughout the year. By contrast, consensus estimates provided via Visible Alpha imply that Stem drives its margin mix towards 15% by 2024 and off a 10% level in 2023 despite increasingly unfavorable mix trends and still limited available ESS focused cell supply that should continue to pressure "middle-man" margins. For our part, we assume that hardware margins trend in the high single digits (9-10%) over time. which is arguably still generous vs what we have already seen in 2022. Again, underling the peculiarities in consensus, ***Stem readily admits that the "Front of the Meter" (FTM) hardware margin it expects longer term is ~10% which more closely aligns to our view***. It flags increasing FTM exposure specifically as dragging its margin lower in 2022.

330.    The Bank of America analysts called out that Stem's business model was becoming more confusing to investors, especially given the convertible note offering:

> ***The notion of what Stem "is" at its core is now more confusing than it used to be given the shifting business mix contemplated within its dramatic top-line ramp from '22 into '25.*** While our recent launch contemplated a Neutral rating, ***a disappointing 4Q outlook call since and now uncertainty reflected from convertible issuance last week push us to be less generous on estimates*** – particularly given the risks reflected in standing up two new services businesses (Dev-serv to 'setup' the battery install initially and Pro-Serv to operate batteries on an ongoing basis) and implicitly keeping opex relatively stable.

*    *    *

> While we do see merits of an opportunistic convert refinancing last week – note Stem is not the first to execute this strategy, nor will it likely be the last – implicit messaging on cash is still less than ideal given at least some portion of proceeds will help bolster working capital needs. In the end, we still see Stem reaching positive EBITDA in 4Q22, albeit briefly, and purely as a function of back half loaded revenue recognition over ratable overhead spend. But it's not about simply realizing cash inflection – how much cash and how quickly it's growing matters, where even consensus suggests a hockey-stick-like cadence biasing realization to 2025. With a

deeper review of what could go wrong in consensus numbers as well as true ups for latest macro concerns, we downgrade to Underperform.

331.    Bank of America analysts also revealed to the market that, despite all the hype, Stem's software business is inherently dependent on its success as a low-margin hardware business, but the "middle-man margins" were not panning out. Stem's future plan to ultimately rely on software simply did not add up:

> For some time, this company has been pitched as a high margin, software-focused way to play energy storage given its Athena platform focus and vs peers in the space that reap a "typical" hardware margin in the 5-15% range. ***However, out of $550-650mm in revenue guided for FY23, ~$520mm is implied as hardware and we estimate just $45-50mm comes from Stem's recurring software business with the balance in a burgeoning services business.*** Note while Stem talks to a "Contracted Annual Recurring Revenue" metric to describe the software opportunity, the $45-50mm listed aligns to performance obligations in its 10-K that are expected to be realized in the next 12 months. ***The irony here is that while the company's pitch has been predicated for some time on front loaded hardware installs as an enabler of the long-term recurring software business, the latter cannot on its own drive the story to positive EBTIDA today and at a corporate level, the 2H23 inflection will rely on a business that Stem intends to divorce longer term***.

332.    The 04/04/23 disclosures, including: (i) the downgrade of Stem to underperform; (ii) the lowering of estimates based on Stem's gross margins aligned with a hardware company, not a software company; (iii) the Company's confusing business mix shift; and (iv) the uncertainty reflected in Stem's $200 million convertible issuance – all revealed the negative impact of Defendants' materially false and misleading statements alleged herein.

333.    Similarly, this news revealed to investors the materialization of the risks posed by Stem's deficient business model and its failure to have a viable automated Athena product for the FTM market. The downgrade of Stem to underperform and Bank of America's assessment that the Company's gross margins were aligned with that of a hardware company, not a high-margin software company, among other disclosures, was a materialization of these risks.

334.    Upon this news, Stem's stock price declined from $5.91 per share on 04/03/23, to $5.47 per share on 04/04/23, a decline of $0.44 or -7.45%. The stock fell another -10.60%, or $0.58 the following day, to a close of $4.89 on 04/05/23, as the market continued to absorb the news as depicted in the following chart:



335.    On 04/04/23, Seeking Alpha summarized Bank of America's report:

*Stem pitches itself as a software focused way to play energy storage, but "slow realization of revenues from this business means the company is ultimately dependent on lower margin hardware and service businesses to drive an EBITDA inflection*," BofA's [analyst] wrote.

While company management suggests a rapid scale up in services would bridge the drop in hardware sales, "the pivot towards standing up a novel services business to hit contemplated guide accentuates the uncertainty from the latest capital raise," according to [Bank of America's analyst].

Stem is trading near all-time lows despite rising revenues and margins.

336.    In a 04/06/23 Wolfe report titled, "STEM: Our view's been de-stemmed; downgrade to PP," analysts reported that "the investment case has not played out as hoped."  After taking a "*fundamental review*" of Stem's outlook, the report concluded that, "*[t]he thesis for STEM has drifted from targets established during the company's 2021 SPAC listing which were premised on 1) growing share in the front-of-the-meter (FTM) market and 2) Improving margins via increased deployments of Athena, STEM's software platform. Neither have played out as hoped.*"  The report also pointed out that while bookings are strong, the "backlog conversion remain[s] elongated," and that management may need to reconsider expectations again and the "sentiment [will likely stay] depressed until execution becomes apparent."

337. Wolfe was also surprised by the note offering; it had not anticipated Stem's "funding needs in 2023 which raises questions about STEM's anticipated cash generation outlook."

338. The Wolfe report also highlighted that Athena was not contributing meaningfully to gross margins:

> *Disaggregating the Services segment shows Athena not yet a meaningful contributor*. We estimate that in 2022, Athena contributed $5.9mn of gross margin relative to the company's $47.3mn consolidated GM. While Athena did grow by ~2x last year, *it would have to grow by more than 4x in FY23 in order to move the needle for consolidated margins* in our new model. Given the company's underwhelming 4Q results and FY23 outlook, *we don't view this as a probable outcome* in the NT.

> *Hard to justify premium multiples given recent disappointments*.

### 6. Post-Class Period Disclosures

339. Following the end of the Class Period, Stem would report additional news regarding the negative impact resulting from Stem's failure to have a viable automated software product for the FTM market including the Company's disclosure on 10/30/24 of millions in revenue reductions and a $104 million write-off of the Company's accounts receivable for parent guaranty contracts. Upon this news, the Company's stock price to decline from a close of $0.54 on 10/29/24 to a close of $0.38 on 10/31/24, a nearly 30% drop.

340. The market understood Stem had not, and was not, delivering on its high-margin software business model that the Defendants had touted throughout the Class Period and the Company now promised it was "focusing its efforts" on high-margin revenue sales (*i.e.* software) with analysts at Guggenheim reporting on 10/31/24 that:

> The question of whether STEM can make its new approach work remains unanswered, and the company did not offer enough detail on yesterday's call to give us clarity either way. *It is clear enough to us that the status quo does not work.* Even if STEM were able to convert all of its current $92 million in contracted recurring revenue to actual revenue, at a 50% gross margin, the company would still be looking at ~$45 million in annual gross margin against cash opex of more than $100 million, and that's *after* planned cost cuts. *We estimate that the resulting cash burn would leave STEM with less than 2 years of runway before running out of money.* When we spoke to management, we were told that there is more growth potential in high-margin revenue than we are currently seeing, now that the company is focusing its efforts. That is fair enough, but in the absence of clearer financial targets it is hard to evaluate the company's claims. *Much will depend* on whether STEM is able to execute the remainder of its existing backlog profitably, and *whether the strategy to drive better software+services growth is real*.

341.    Likewise, Morgan Stanley reported on how the Company's failure to achieve the high software gross margins promised by Defendants was negatively impacting Stem's ability to cover expenses: "[e]ven at an 80% gross margin, which would be representative of [Stem's] targeted software margin (this is a bullish assumption being that it is targeting a 30-50% gross margin on its energy services revenue), it would not cover its cash operating expense base."

### B.    Loss Causation (§10(b) Claims Only)

342.    In addition to the allegations above in ¶¶288-341, Plaintiffs allege that the Fraud Defendants' scheme and materially false and misleading statements caused the price of Stem's securities to be artificially inflated and/or maintained the artificial inflation in the price of Stem's securities.  They did so as part of the Fraud Defendants' scheme and by publicly issuing and endorsing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, in the light of the circumstances under which they were made as set forth herein, not materially false or misleading.

343.    The business conditions and risks concealed from investors by the Fraud Defendants' scheme and misrepresentations were corrected through the partial disclosures on 02/24/22, 01/05/23, 02/16/23, 03/29/23 and 04/04/23.  Though each of the disclosures was incomplete, each partially revealed the negative impact of the Fraud Defendants' scheme and their materially false and misleading statements and omissions.

### VIII.    ADDITIONAL ALLEGATIONS OF SCIENTER (§10(b) CLAIMS ONLY)

### A.    Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo's Massive Insider Trading Supports a Strong Inference of Scienter

344.    Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo (the "Selling Defendants") were motivated to engage in their fraudulent course of conduct to complete Stem's IPO and sell shares of their STEM common stock at inflated prices (depicted in the chart below), from which they and other Stem insiders collectively and personally profited by approximately $41 million during the Class Period.  The vast majority of Selling Defendants' insider trading took place *in a one-year time frame* from November 2021 to November 2022:

| Defendant | Date of Sale(s) | Number of Shares | Price | Proceeds |
|---|---|---:|---|---:|
| Bush | 11/16/21 | 12,456 | $24.55 | $305,794.80 |
| | 11/17/21 | 11,056 | $22.01 | $243,342.56 |
| | 11/17/21 | 1,400 | $22.69 | $31,766.56 |
| | 12/1/21 | 4,973 | $20.77 | $103,283.24 |
| | 12/1/21 | 5,027 | $21.49 | $108,054.36 |
| | 12/2/21 | 3,000 | $20.34 | $61,032.00 |
| | 5/10/22 | 2,080 | $7.32 | $15,225.60 |
| | 5/17/22 | 37,284 | $7.62 | $284,104.08 |
| | 8/15/22 | 60,220 | $16.24 | $977,972.80 |
| | 8/15/22 | 422 | $16.70 | $7,045.97 |
| | 8/16/22 | 21,200 | $15.93 | $337,800.80 |
| | 8/16/22 | 2,383 | $16.62 | $39,605.46 |
| | 11/15/22 | 30,000 | $14.67 | $440,100.00 |
| | 3/1/23 | 9,252 | $8.10 | $74,968.03 |
| | | **200,753** | | **$3,030,096.26** |
| | | | | |
| Carrington | 11/16/21 | 44,750 | $24.55 | $1,098,612.50 |
| | 11/17/21 | 39,750 | $22.01 | $874,980.98 |
| | 11/17/21 | 5,000 | $22.75 | $113,774.00 |
| | 12/1/21 | 11,163 | $20.77 | $231,907.98 |
| | 12/1/21 | 11,212 | $21.50 | $241,026.61 |
| | 12/2/21 | 6,401 | $20.36 | $130,309.64 |
| | 12/8/21 | 200 | $20.00 | $4,000.00 |
| | 12/9/21 | 19,621 | $20.11 | $394,578.31 |
| | 5/10/22 | 5,198 | $7.32 | $38,049.36 |
| | 5/19/22 | 28,580 | $7.73 | $220,923.40 |
| | 5/20/22 | 28,580 | $7.48 | $213,778.40 |
| | 6/8/22 | 28,570 | $9.34 | $266,843.80 |
| | 6/9/22 | 28,570 | $8.99 | $256,844.30 |
| | 7/20/22 | 28,570 | $8.92 | $254,844.40 |
| | 7/21/22 | 28,570 | $9.17 | $261,986.90 |
| | 8/16/22 | 26,560 | $15.94 | $423,292.03 |
| | 8/16/22 | 2,010 | $16.56 | $33,287.81 |
| | 8/17/22 | 27,870 | $15.09 | $420,477.48 |
| | 8/17/22 | 700 | $15.56 | $10,892.56 |
| | 9/13/22 | 7,899 | $15.81 | $124,867.39 |
| | 9/13/22 | 20,671 | $16.44 | $339,746.49 |
| | 9/14/22 | 10,231 | $16.38 | $167,628.80 |
| | 9/14/22 | 18,339 | $17.25 | $316,259.72 |
| | 10/5/22 | 26,670 | $13.46 | $359,031.54 |
| | 10/5/22 | 1,900 | $13.96 | $26,523.05 |
| | 10/6/22 | 25,913 | $13.67 | $354,114.10 |
| | 10/6/22 | 2,657 | $14.59 | $38,754.74 |
| | 11/16/22 | 28,570 | $13.82 | $394,837.40 |
| | 11/17/22 | 28,570 | $13.60 | $388,552.00 |
| | 3/20/23 | 13,216 | $6.33 | $83,657.28 |
| | | **556,511** | | **$8,084,382.95** |
| | | | | |
| Daley | 12/1/21 | 100,000 | $21.13 | $2,113,480.00 |

| Defendant | Date of Sale(s) | Number of Shares | Price | Proceeds |
|---|---|---|---|---|
| | 12/2/21 | 100,000 | $19.82 | $1,981,790.00 |
| | 8/10/22 | 75,000 | $14.79 | $1,109,250.00 |
| | 8/11/22 | 75,000 | $15.05 | $1,128,750.00 |
| | 11/17/22 | 75,000 | $13.63 | $1,022,220.00 |
| | 11/18/22 | 75,000 | $13.57 | $1,017,990.00 |
| | | **500,000** | | **$8,373,480.00** |
| | | | | |
| Johnson | 11/16/21 | 15,000 | $24.55 | $368,305.50 |
| | 5/10/22 | 1,269 | $7.32 | $9,289.08 |
| | 8/12/22 | 30,000 | $15.44 | $463,290.00 |
| | 8/15/22 | 20,000 | $16.38 | $327,640.00 |
| | 8/16/22 | 10,000 | $16.09 | $160,851.00 |
| | 11/14/22 | 12,500 | $13.46 | $168,250.00 |
| | 11/15/22 | 12,500 | $14.42 | $180,228.75 |
| | 3/1/23 | 6,877 | $8.10 | $55,723.64 |
| | | **108,146** | | **$1,733,577.97** |
| | | | | |
| Patel | 11/10/21 | 90,000 | $25.25 | $2,272,185.00 |
| | 11/11/21 | 25,000 | $25.26 | $631,522.50 |
| | 11/11/21 | 5,000 | $27.02 | $135,075.00 |
| | 5/10/22 | 1,269 | $7.32 | $9,289.08 |
| | 3/1/23 | 6,888 | $8.10 | $55,812.78 |
| | | **128,157** | | **$3,103,884.36** |
| | | | | |
| Russo | 11/2/21 | 8,500 | $25.01 | $212,570.55 |
| | 5/10/22 | 1,564 | $7.32 | $11,448.48 |
| | 8/9/22 | 46,641 | $14.70 | $685,622.70 |
| | 8/9/22 | 113,5569 | $14.70 | $1,669,464.30 |
| | 8/10/22 | 13,427 | $6.50 | $87,275.50 |
| | 3/1/23 | 6,022 | $8.10 | $48,795.66 |
| | | **189,723** | | **$2,715,177.19** |
| | | | | |
| Combined Total | | **1,683,290** | | **$27,040,598.73** |

345.    The Selling Defendants' sales of Stem common stock also culminated in the sale of significant portions of their personal holdings during the Class Period:[29]

| Defendant | 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|
| | Shares Sold | Shares Retained | % Sold | Shares Sold | Shares Retained | % Sold |
| Carrington | 138,097 | 428,127 | 24.4% | 405,198 | 97,843 | 80.5% |

[29]    The chart below does not take into account the Selling Defendants' additional stock sales in March 2023.

| Bush | 37,912 | 294,791 | 1.3% | 195,409 | 231,851 | 45.7% |
| Daley | 200,000 | 489,027 | 29% | 300,000 | 275,800 | 52.1% |
| Johnson | 15,000 | 192,456 | 7.2% | 86,269 | 107,456 | 44.5% |
| Patel | 120,000 | 53,231 | 69.3% | - | - | |
| Russo | 8,500 | 139,594 | 6.1% | 175,201 | 139,594 | 55.65% |

346.    The highly suspicious amounts and timing of the Selling Defendants' insider trading also supports a strong inference that they timed their respective trading with knowledge of the alleged fraud and intended to benefit from Stem's artificially inflated trading price before the market understood the truth about Stem's business model, including the negative impact of Athena's deficient software on the Company's growth and profits.

347.    Here, Stem's IPO included a lock-up agreement that prevented Stem's directors, officers, and substantial stockholders from selling stock until six months after the date upon which the Merger between Star Peak and Stem closed.  That lock-up agreement expired on or about 10/28/21.

348.    Shortly after the lock-up's expiration, the Selling Defendants began unloading their Stem stock for their own personal gain.  For instance, on 11/02/21, only five days after the lock-up's expiration, Defendant Russo made his first sale.  Defendant Patel's first sale followed, occurring on 11/10/21, a mere 13 days after the lock-up's expiration.  Defendants Bush, Carrington, and Johnson made their respective first sales on 11/16/21, only 19 days after the lock-up's expiration and days after Stem had reaffirmed FY 2021 guidance on 11/09/21 (*see* n.24, *supra*).  Defendant Daley's first sale would occur shortly thereafter on 12/01/21, 34 days after the lock-up's expiration.

349.    The Selling Defendants' 2021 sales also occurred weeks before the close of FY 2021 on 12/31/21 giving them considerable insight into the actual results for FY 2021, which Stem would be forced to report were far below expectations on 02/24/22 causing a nearly 22% drop in Stem's stock price as described in ¶¶297-298, 344-345, *supra*.

350.    The Selling Defendants' 2022 sales were also suspicious and made at a time when they knew of material adverse facts or recklessly disregarded such facts.  As described in ¶¶84-86, 207, 210, 220, 230, 243, 250, 257-263, *infra*, Stem announced its $500 million Available Power flagship FTM deal on 02/24/22 even though, according to CW2, the Company had only entered into

1  a letter of intent with Available Power and had not issued any purchase orders. Indeed, CW2

2  explained that Available Power had committed to issuing purchase orders within two months of the

3  letter of intent but that it never issued the purchase orders. Nevertheless, Defendants Bush and

4  Carrington authorized Stem to order hardware for the deal in violation of the Company's policy.

5  The Selling Defendants therefore knew that Available Power had not issued the purchase orders

6  within the timeframe contemplated in the letter of intent (*i.e.*, by 04/24/22) and as such, knew that

7  Stem had lost the Available Power deal and was saddled with hardware purchased in violation of

8  Company policy when the Selling Defendants sold additional shares in May 2022.

9    351.    Further, Stem's senior leadership knew that Stem had lost the Available Power deal

10 because they informed CW2's manager, who told CW2 in early 3Q 2022 that the hardware

11 purchased for Available Power needed to be sold. ¶¶85-87. Accordingly, when Defendants Bush,

12 Carrington, Daley, Johnson, and Russo sold Stem stock in 3Q 2022 (July through September), Stem

13 was desperately searching for buyers for the hardware that they had purchased for the Available

14 Power deal in violation of Company policy. *See* ¶¶84-86, 257-263, 344-345, s*upra.*

15   352.    Similarly, Defendants Bush, Carrington, Daley, and Johnson's sales in late 2022

16 occurred just a few months before Stem publicly disclosed, on 01/05/23, that the Company had lost a

17 $130 million contract (which was later revealed as the Available Power deal), was lowering 4Q 2022

18 revenue and gross margin guidance, and preannounced disappointing FY 2023 earnings guidance as

19 explained in ¶¶300-307, *supra.* The Selling Defendants' well-timed stock sales took advantage of

20 Stem's artificially inflated share price, which was then trading above $13 per share. Indeed, Stem's

21 stock price plummeted to below $8 per share following the Company's 01/05/23 disclosures.

22   353.    Likewise, Defendants Bush, Carrington, Johnson, Patel, and Russo's March 2023

23 stock sales were suspiciously timed as they occurred in the weeks leading up to Stem's 03/29/23

24 announcement of the Company's $175 million Convertible Senior Notes Offering, which was a

25 complete about-face to Stem's narrative that it had sufficient capital to fund its business model as

26 described in ¶¶320-327, *supra.* Again, Defendants Johnson, Patel, and Russo's well-timed stock

27 sales took advantage of Stem's artificially inflated value, allowing these defendants to sell their

28 shares for over $8 per share on 03/01/23, while Carrington unloaded his stock at $6.33 per share on

03/20/23.  Following Stem's 03/29/30 disclosures and analysts' subsequent 04/04/23 downgrade of the Company's stock, Stem's stock traded below $5 per share.

354.    Moreover, at the time of their aforementioned sales, the Selling Defendants knew adverse information regarding Athena's capabilities, Stem's ability to provide a viable automated software product for FTM projects and Stem's business model (*see* ¶¶66-96, *supra*), which, when ultimately revealed, caused the price of Stem's stock to decline.  Accordingly, the Selling Defendants' well-timed stock sales, capitalizing on Stem's inflated stock price, strongly support scienter.

355.    Ultimately, the Selling Defendants collectively sold almost 1.7 million shares of their Stem common stock at artificially inflated prices for proceeds of over $27 million dollars during the Class Period.  In total, Stem insiders offloaded over 2.7 million shares of Stem common stock during the Class Period for combined proceeds of over $41 million.

| Stem Insider | Total (Tax) | |
|---|---|---|
| | Shares | Proceeds |
| Defendant Bush | 200,753 | $3,030,096.26 |
| Director David Buzby | 203,121 | $2,625,620.21 |
| Defendant Carrington | 556,511 | $8,084,382.95 |
| Defendant Daley | 500,000 | $8,373,480.00 |
| Chief People Officer Kim Homenock | 54,690 | $651,939.76 |
| Defendant Johnson | 108,146 | $1,733,577.97 |
| Chief Legal Officer Saul Laureles | 25,181 | $296,962.90 |
| Defendant Patel | 128,157 | $3,103,884.36 |
| Defendant Russo | 189,723 | $2,715,177.19 |
| Chief Accounting Officer Shukla | 4,193 | $34,508.39 |
| Director Anil Tammineedi | 750,000 | $9,984,000.00 |
| Chief Operating Officer Mark Triplett | 40,000 | $767,464.16 |
| | | |
| Combined Total | 2,760,475 | $41,401,094.15 |

**B.    Defendant Carrington's Own Post-Class Period Admission Creates a Strong Inference of Scienter**

356.    Defendant Carrington admitted post-Class Period on 02/28/24 during the Company's Q4/FY 2023 earnings call that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's operation, thereby confirming Athena was never automated for FTM projects, contrary to the Fraud Defendants' Class Period statements.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 135 -
4879-3770-3139.v1

357.    Thus, the Fraud Defendants knew or recklessly disregarded during the Class Period that the lynchpin to Stem's software story and stated competitive differentiator – Athena – was neither automated nor viable for the FTM market.

**C.    Stem's Liquidity Issues and Capital Requirements Add to the
Strong Inference of Scienter**

358.    As explained in ¶¶91-93, *supra*, leading into Stem's IPO, the Company was facing a severe liquidity crisis that seriously jeopardized Stem's ability to continue operating unless the Company received a significant influx of funding.  Stem's auditors had issued a going concern letter, and the Company itself acknowledged in its registration statement that "***there is substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financial statements are available to be issued***."

359.    The Fraud Defendants were therefore desperate to complete Stem's IPO and secure cash to keep Stem afloat and to transform Stem into a successful software Company in the lucrative FTM market.  In turn, many of these defendants personally benefitted from propping up Stem's value including not only maintaining their positions but by selling millions in stock at artificially inflated prices as alleged herein.

360.    To that end, Defendant Carrington acknowledged, during a 04/12/21 Fireside Chat with IPO Edge, that the Company's dismal balance sheet hampered Stem's ability to secure new contracts, stating in relevant part:

> We have in fact seen instances where large renewable owners, asset owners, many private equity companies, where they say, "We want to use your solution.  We want to put Athena and your storage solution on our solar facilities." ***They'll spend time on our balance sheet pre this announcement, and we'll actually get cut back.  On multiple occasions where we had 100% win turn into 50, 40 or 30% because of that issue***.  So that's tabled.  We're seeing more and more large opportunities coming our way since the announcement.  So we feel like that bigger balance sheet will definitely open up the ability to participate in larger projects, and certainly the geographic expansion is big.

361.    During a 04/20/21 interview with TD Ameritrade Network, Defendant Carrington again repeated that the Company's balance sheet without the IPO cash was hampering Stem's ability to secure contracts because customers wanted to ensure they'd be around for 20 years, stating in relevant part:

In this industry, anything in energy, *a bigger balance sheet is viewed more positively*. Um, a lot of these customers that we have are large renewable portfolio developers of solar or wind as an example, and those are 20, 25 year deals. So they want to make sure their counterpart that is in is providing them the software to orchestrate and operate these facilities, in addition to the lithium ion batteries that we provide, *will be there for the duration of their project. So we certainly inoculate that concern with this deal*. And so it, it allows us to, to, I think just extend that lead allows us to expand much broader geographically as well.[30]

362.    Even after the IPO closed, Defendant Carrington continued to emphasize how Stem's dismal financial condition prior to the IPO constrained the Company's operations. For instance, on 06/21/21, Defendant Carrington participated in Cowen's Sustainability and Energy Transition Summit, wherein he emphasized that the funds received in Stem's IPO now alleviated customers' concerns about the Company's balance sheet, stating in relevant part:

[T]his transaction is transformational for the company. *We'll be able to go after larger customers. We would win projects. And our balance sheet did not give comfort previous to this, to have a 20-, 25-year PPA in place and making sure that this company would be here when we had 12 to 18 months of cash as a venture-backed company*. Now we have $500 million on the balance sheet with 0 debt.

363.    Similarly, on 08/21/21, Carrington participated in C3 Solution's Tech Voices Series wherein he explained that Stem's balance sheet hindered the Company's ability to secure contracts and further noted that the IPO funds alleviated that concern and provided the funding necessary to build out Athena's capabilities, stating in relevant part:

So early days, as we began to get more and more successful, *it became clear our balance sheet was a constraint*. So we, and that was constrained in a couple areas. When you look at large project owners, and there are a lot of those when you think about the Goldman Sachses, Blackstone, BlackRocks, you know, they have a big solar portfolio that they want to put storage on. *And when we have a, you know, 12 to 18 months runway as a venture backed company, it didn't exactly, uh, exude confidence for them.* So that was one of the big drivers. And also we wanted to do more geographic expansion. We knew our terms were asymmetrical because of our balance sheet with suppliers. That's all changing. *So yeah, I mean, you've hit on it. And again, look, you know, this now gives us a chance to look at some tuck-in acquisitions to accelerate our software roadmap as well*.

364.    As such, Stem's dire financial condition prior to the Merger and IPO motivated the Fraud Defendants to pitch an unrealistic business model based on the sale of a software product (*i.e.* Athena) to the lucrative FTM market, when, in fact, Athena was not viable for FTM projects. All

---

[30]    Schwab Network, *Stem CEO John Carrington on Company Growth & SPAC Deal*, April 20, 2021, https://schwabnetwork.com/video/ceo-of-stem-john-carrington-on-company-growth-spac-deal?redirect=true (last accessed Oct. 4, 2023).

while the Fraud Defendants claimed that Stem's software, with its 80% margins, would drive gross margins and profits, and that Stem's business model was capital light.

365. Indeed, the Fraud Defendants' efforts to secure needed funding in connection with the Merger paid off, as the Merger infused the Company with over $600 million of gross cash proceeds and zero debt, purportedly enabling Stem to execute on much larger projects and expand its addressable market.

**D.    Extensive Due Diligence as Part of the IPO Process Adds to the Strong Inference of Scienter**

366. Defendants Scheyer, Morgan, and Daley participated in an extensive due diligence in connection with the merger and Stem's IPO. The due diligence process involved numerous meetings between Star Peak and Stem's respective management and a thorough review of Stem's operations with documents supplied by Stem's management.

367. For instance, according to the Defective Prospectus, Defendants Scheyer, Morgan, and Daley attended presentations and participated in meetings with Stem management, including Defendant Carrington, to obtain information regarding Stem's operations. Those presentations and meetings included, *inter alia*, the following:

- On 08/28/20, Stem provided a management presentation to representatives of STPK, including Defendants Scheyer, Morgan, and Daley;

- On 08/31/20, Defendant Morgan spoke with Defendant Carrington and expressed STPK's initial interest in exploring a transaction with Stem and beginning due diligence;

- On 09/11/20, Defendant Morgan spoke with Defendant Carrington to outline STPK's intention to present a term sheet after completing initial due diligence;

- On 09/29/20, STPK commenced its confirmatory business due diligence concerning the following, *inter alia*, legal, financial, accounting, tax, information technology, insurance, benefits and industry trends. STPK management also participated in various discussions with representatives of Stem.

368. Moreover, throughout October and November 2020, Stem, STPK, and their respective advisors participated in a number of due diligence telephone calls and exchanged due diligence materials, including those relating to legal, financial, market, information technology, software, tax, insurance, employee benefits, and industry trends. This exchange of material included

1  Stem's contracted backlog through 2021, which Defendants Scheyer, Morgan, and Daley, and the

2  remaining members of Star Peak's board of directors expressly relied on in entering into the

3  Merger.

4  369.     Indeed, in the Defective Prospectus, Defendants Scheyer, Morgan, and Daley, and

5  the remaining members of Star Peak's board of directors represented to investors that they

6  considered, *inter alia*, Stem's purportedly strong growth prospects within the energy storage

7  industry, Stem's contracted backlog through 2021, Stem's robust long-term forecast, and Stem's

8  long-term market participation, historical financial results, outlook, financial plan, and debt

9  structure.

10  370.     Defendants Scheyer, Morgan, and Daley, and the remaining members of Star

11  Peak's board of directors also reviewed Stem's growth in certain key financial metrics, including

12  but not limited to certain customer and revenue metrics, Stem's prospects for growth if Stem

13  achieved its business plans, and Stem's various historical and current balance sheet items.

14  371.     According to the Defective Prospectus, Defendants Bush and Carrington prepared the

15  financial forecasts that were disclosed to investors in the Defective Prospectus/Proxy Statement as

16  part of the 14(a) Defendants' solicitation of shareholder investment and votes that included FTM

17  projects:

18      Stem's senior management prepared and provided to Stem's board of directors,
        Stem's financial advisors and STPK certain internal, unaudited prospective financial
19      information in connection with the evaluation of the merger.

20  372.     According to the Defective Prospectus, the forecast "reflects the best currently

21  available estimates and judgments, and presents, to the best of Stem senior management's

22  knowledge and belief, the expected course of action and the expected future financial performance of

23  Stem."

24  373.     Accordingly, given their extensive due diligence, Defendants Scheyer, Morgan, and

25  Daley knew or recklessly disregarded that Athena was not automated nor was it viable for the FTM

26  market.

27

28

**E.    The Individual Fraud Defendants' Participation in Meetings, Focus on Margins, and Access to Salesforce Adds to the Strong Inference of Scienter**

374.    Defendant Carrington and other members of Stem's C-suite and executive leadership team, including, *inter alia*, Defendants Bush, Johnson, Patel, and Russo, knew that the Available Power deal Stem was touting was not viable through their participation in regular meetings related to sales and marketing, and operations and had access to the pipeline deals reported in Stem's internal Salesforce system.  Indeed, during Stem's 11/09/21 Q3 2021 earnings call, Defendant Carrington, himself, admitted that Defendants closely monitored Stem's FTM projects through weekly operations calls where the Company's supply chain and deliverables were discussed and would have informed him that Athena was not viable for FTM projects.

375.    As to Defendant Russo, CW1 noted that Russo participated in weekly sales meetings throughout the Class Period, wherein updates were provided on the status of new deals.  CW1 stated that, during the weekly sales meetings, Defendant Russo asked questions about every deal and that Russo was a self-proclaimed Salesforce data czar.  CW1 also believed Mary Adam, the Director of Sales, would regularly meet with Defendant Russo and updated him on the status of deals following weekly meetings that CW1 participated in with Mary Adam.

376.    CW3 further confirmed that there were weekly sales meetings with Defendant Russo. CW3 explained that Defendant Russo was very involved in a lot of sales, especially for larger deals. Russo also knew the status of deals because he regularly reviewed sales data in Salesforce.  CW2 corroborated CW3's account, reporting that FTM deals were tracked in Salesforce and that Defendant Russo consistently reviewed Salesforce data.  To that end, CW2 confirmed that Defendant Russo signed the master purchase agreement on 09/30/22 with respect to the failed Lullwater deal as explained in ¶87.

377.    Based on CW1's experience developing sales proposals and regular attendance at weekly sales meetings with Defendants Carrington and Russo, CW1 said that the executives above Russo were 100% aware that the deals were not closing because Athena did not work.  CW1 had direct interactions with virtually every client as they were the person who would send the proposals to

1  these clients.  CW1 confirmed that Mary Adam and Russo were included in the group emails,

2  especially when a deal was in its final stages or if a deal was falling apart.

3      378.  CW2 corroborated CW1's account, stating Defendant Carrington would have been

4  briefed on the matters concerning the Available Power deal because Carrington participated in sales

5  and marketing meetings that were held on a weekly or bi-weekly basis during the Class Period, which

6  were predominantly to inform the C-suite of what sales and marketing organizations were doing.

7  According to CW2, Defendant Carrington would have cross-executed the purchase of the hardware

8  meant for Available Power.

9      379.  Defendant Carrington also assured investors its executives closely tracked and

10  monitored deals.  For example, during the 06/09/21 Cowen Sustainability & Energy Transition

11  Summit, Defendant Carrington stated "*we are looking at our supply chain weekly in our operations*

12  *call.  And it's obviously very important because we are going to only recognize revenue when the*

13  *hardware is delivered to our customer*."

14      380.  Similarly, during Stem's 11/09/21 Q3 2021 earnings call, Defendant Carrington

15  asserted that the Company was closely monitoring its FTM projects and discussing their status in

16  depth during the weekly calls, stating in relevant part:

17      [W]e've run a *very rigorous process of weekly discussions*, looking at each project
       aligned with each hardware supplier in that specific geography.  So it's a rigorous
18      literally weekly call with the operations team and e-staff members. So we're all over
       this.  I'd say, on the longer-term projects, *those front of the meter that tend to be a*
19      *little further out, we're also monitoring those on a regular basis*.

20      381.  Defendant Carrington, during Stem's Q4 2021 earnings call on 02/24/22, also

21  admitted that with respect to margins on hardware "*we have a pretty thorough process* . . . that we

22  go through on any large deals.  Our sales team has a threshold.  *If it goes below that, they've got to*

23  *come to me and Bill [Bush], and then we decide what we want to do*."  Further, Defendant

24  Carrington added that the margin review and approval process was not only "a very tight process"

25  but that it "goes on, on a weekly basis and as needed if it's more than weekly.  So we're all over

26  it . . . ."

27

28

382.    Likewise, as the person charged with business strategy, CSO Patel would have known that the sales team was not closing deals and was not delivering on the Company's stated business model to drive growth and profits.  ¶22.

383.    As to Defendant Bush, CW3 noted that Defendant Bush would sometimes join the weekly sales calls.  CW2 recalled that Defendant Bush would have signed for Stem's purchase of the hardware meant for Available Power, as explained in ¶85.  This is corroborated by the fact that Defendant Bush signed the Lullwater parent guaranty.  ¶87.  It is also reasonable to infer that as the CFO, Defendant Bush was well informed of large deals and particularly those where Stem had purchased tens of millions of dollars in hardware such as the Available Power deal. Given the importance and magnitude of the Available Power deal, it is reasonable to infer that senior management and senior executives knew that it had been lost.  Further, CW2 confirmed that by the time CW2 learned that the Available Power deal was lost in early 3Q 2022, Stem's senior management and executives would have also known because the information came down from senior leadership.  CW2's manager told CW2 the hardware purchased for Available Power needed to be sold.  CW2 received emails regarding the directive to sell the batteries from the failed Available Power deal, and it was clear the messaging came from Defendant Russo.

384.    As such, it is reasonable to infer that Defendants CFO Bush, CEO Carrington, Senior Director of Product Management Ho, CTO Johnson, CSO Patel, and CRO Russo were informed through their job positions and responsibilities as well as from Salesforce, sales meetings, Stem's supply chain, as well as from weekly monitoring of FTM projects and the approval process regarding margins, of the non-public adverse information alleged herein.

### F.    The Core Operations Inference Adds to the Strong Inference of Scienter

385.    The Fraud Defendants knew of the material adverse information alleged herein because Stem's business model was key to the Company's path to growth and profitability.

386.    Stem, a small company comprised of approximately 143 employees at the beginning of the Class Period, did not manufacture its own batteries.  Rather, it resold them.  As such, the key to Stem's success as purportedly a software company was its Athena product.  Indeed, 37 of the

1  Company's 143 employees at the time of the IPO were devoted to designing, developing, integrating,

2  and testing Athena.

3        387.    The Fraud Defendants consistently touted that "***the key to our growth and success is***

4  ***really this Athena software platform***."[31]  The Fraud Defendants similarly emphasized that Athena

5  was ***driving Stem's "continued momentum in growing share of the FTM market***" and "compelling

6  margins and long-term recurring software revenue."[32]

7        388.    For example, in Stem's 12/04/20 presentation, Defendant Carrington described Athena

8  as powering everything that Stem does:

9        **Nicole Petallides**

10       So, those are the logistics of how this is going to take place, right? It goes into the
         first quarter of 2021.  So, you are creating what would be the first public pure play
11       smart energy storage company.  What does that mean?

12       **John Carrington**

13       Yeah.  So, we provide clean energy battery solutions that allow our customers to
         reduce energy costs, reduce carbon emissions, and provide greater reliability for the
14       grid.  ***All of that is operated by our proprietary AI-driven software platform we call
         Athena.  So, it's really about the software, and we like to think of it as, the Athena***
15       ***software creates the superintelligence that drives these large lithium-ion batteries***.

16       **Nicole Petallides**

17       So, when you talk about what's going on here, this is a cleaner environment, you're
         telling me about solar.  This is to close in the first quarter of next year, ***Athena seems***
18       ***to be main, you know, project here***.  This goes forward, how do you expand? What
         are some of the projects on the horizon and goals going forward?[33]
19

20       389.    The market understood throughout and following the Class Period that Athena was

21  part of Stem's core operations, as reflected in the Wolfe Research analyst report issued on 11/01/24

22  stating "we have always understood STEM's strategy to be more software-focused ***with the Athena***

23  ***product long being held up as a core pillar of the investment thesis***."  Likewise, the Guggenheim

24  analyst report issued on 11/03/23 stated that "the core argument that supported our Buy argument for

25  STEM [was] that the growth in contracted hardware would eventually be followed by similar growth

26  in profitable recurring software revenue."  Despite the fact that Athena was the key to Stem's growth,

---

27  [31]  06/09/21, Stem Cowen's Sustainability and Energy Transition Summit Investor Call.
     [32]  08/11/21 Stem's Q2 2021 earnings call.
28  [33]  12/04/20, Investor Presentation.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 143 -
4879-3770-3139.v1

1   the Fraud Defendants also knew that Athena was not working in a way that could fuel that growth.

2   As such, they needed the IPO to secure cash to continue as a Company and develop its software to

3   work with FTM.  Without an influx of cash, the Company's ability to survive was in serious jeopardy.

4         390.    The Fraud Defendants also repeatedly represented that Athena had a "100% attach

5   rate," meaning that it was a service included in each prospective FTM project in the Company's

6   pipeline and in each booking.  For instance, during Stem's 02/24/22 Q4 2022 earnings call, Defendant

7   Bush emphasized that "long-term software revenue is the backbone of the backlog and represents

8   approximately 40% of the total booking. . . ."  Defendant Bush reiterated this point throughout the

9   Class Period, for instance on Stem's 02/16/23 Q4 2023 earnings call, Bush stated that "40% of the

10  total economic value of the system" related to software and that "software and services is definitely

11  going to be a bigger part of the business."

12        391.    Given the importance of Athena to Stem, a self-proclaimed "global leader in ***AI-driven***

13  ***clean energy solutions and services***," it is reasonable to infer that the Fraud Defendants knew of

14  adverse facts related to Athena's lack of automation for FTM projects.

15        **G.**    **That the Individual Fraud Defendants Spoke Knowingly on Topics**
16              **Adds to the Strong Inference of Scienter**

17        392.    Throughout the Class Period, during Stem's earnings calls, analysts also regularly

18  asked questions concerning Stem's FTM business, including the purported automated nature of

19  Stem's Athena software, during which Defendants Bush and Carrington repeatedly provided detailed

20  answers to these questions, indicating their personal knowledge on the subjects, and frequently

21  discussed their own knowledge and understanding of these issues.

22        393.    For example, Defendants Bush, Carrington, Ho, and Johnson all specifically had

23  numerous, detailed discussions with analysts and investors regarding the automated nature of Athena.

24  *See* Exhibit A(2), Statement Nos. 25, 44, 65, and 89.  Likewise, Defendant Carrington made similar

25  detailed statements concerning Stem's, software, and FTM sales during the 01/06/22 Goldman Sachs'

26  conference, which is probative of his knowledge regarding Athena's ability to thrive with complex

27  FTM projects.  Further, Defendants Carrington, Morgan, Russo, and Scheyer authorized the issuance

28  of the press releases they were quoted in and thus spoke on the automated nature of Athena as set

1  forth in those releases.  *See. e.g.*, Exhibit A(2), Statement Nos. 24, 27, 31, 42, 43, 63, 73, 77; *see also*
2  ¶¶16, 24, 28-29.

3       394.    By speaking on these topics and/or authorizing the issuance of press releases wherein
4  these topics were discussed, each of these Defendants is presumed to have been knowledgeable on the
5  topic, including the adverse information alleged herein.  Further, if the aforementioned Defendants
6  did not possess such knowledge, then they were deliberately reckless in speaking on those topics or
7  authorizing releases wherein the topics were discussed without first informing themselves about the
8  true nature of Stem's business model and Athena.

9       **H.    The Suspicious Departures of Multiple Stem Executives Adds to the
            Strong Inference of Scienter**
10
11       395.    Defendants Bush, Carrington, Johnson, Morgan, Patel, and Russo were part of Stem's
12  leadership since before the Merger.  However, following Stem's revelations that it was, in fact, not a
13  high margin software company, and its $37.4 million revenue reductions as revealed in the Form 10-
14  Q for Q3 2023 filed on 11/02/23, each of these of these Stem executives left the Company over the
15  course of only five months from May 2024 to October 2024.

16       396.    Defendant Johnson was the Company's CTO since January 2016 but abruptly
17  "retired" in May 2024 following Stem's announcement of its Q1 2024 financial results on 05/02/24.
18  ¶20.  Defendant Russo, Stem's CRO since 2019, departed two months later on 07/12/24.

19       397.    On 08/03/24, Stem filed a Form 10-Q for Q2 2024 and disclosed an additional
20  hardware-related revenue reduction of $33.1 million for deliveries that occurred in 2023 or earlier.
21  ¶90.  Shortly following this news, in a press release dated 08/06/24, Stem announced that it
22  conducted a "strategic review" of its entire business model, and that Defendant Bush was being
23  replaced as CFO by Doran Hole, effective 09/02/24.  Furthermore, Stem eliminated the CSO role,
24  removing Defendant Patel from the Company as well, effective immediately on 08/06/24.

25       398.    In the weeks that followed, Defendant Carrington, who led Stem as CEO since
26  December 2013, announced his departure on 09/16/24.  Defendant Morgan stepped down as a
27  director on 10/07/24.  On 10/30/24, the Company would announce a $104.1 million bad debt

28

1   expense reflecting Athena's lack of viability for the FTM market. ¶270.  These suspiciously timed

2   departures support a strong inference of scienter.

3       **I.      The Individual Fraud Defendants' Violations of Stem's Own
                Internal Policies and Controls Adds to a Strong Inference of
4               Scienter**

5       399.    Throughout the Class Period, the Individual Fraud Defendants violated Stem's own

6   internal corporate policies and guidelines by making the material misstatements and omissions

7   alleged herein concerning Stem's business model, the capabilities of Stem's Athena software and

8   Stem's ability to drive gross margins.  The Individual Fraud Defendants' violations of Stem's

9   internal Company policies support a strong inference of scienter.

10      400.    First, according to Stem's "Code of Conduct," which applies to "each director, officer

11  and employee" of the Company, all individuals are expected to "conduct themselves with the highest

12  degree of honesty and integrity at all times."  The "Company Disclosure Obligations" section of the

13  Code of Conduct required the Individual Fraud Defendants to provide complete and accurate public

14  disclosures to investors:

15          As a public company, we are committed to abiding by our disclosure obligations in a
            full, fair, accurate, timely, and understandable manner.  Only with reliable records
16          and clear disclosure procedures can we make informed and responsible business
            decisions.  When disclosing information to the public, it is our policy to provide
17          consistent and accurate information.

18      401.    Thus, the Individual Fraud Defendants violated Stem's internal policies by issuing

19  materially false and misleading statements, as detailed herein, that were both inaccurate and

20  incomplete.

21      402.    Second, the "Inside Information" section of the Code of Conduct strictly prohibits

22  insider trading based on material non-public information, providing that:

23          While at the Company, you may also come into contact with another form of
            information that requires special handling and discretion.  Inside information is
24          material, nonpublic information about the Company or another company that, if
            made public, would be reasonably expected to affect the price of a company's
25          securities or investment decisions regarding the purchase or sale of such securities.
            Employees must never use inside information to obtain any type of personal
26          advantage, and should not disclose inside information to any third parties without the
            prior approval of senior management.  For further discussion on our policy with
27          respect to inside information, please review our Insider Trading Policy and
            Guidelines for Public Disclosures and Communications with the Investment
28          Community, which are incorporated herein by reference.

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                              - 146 -
4879-3770-3139.v1

1

*     *     *

2    Directors, officers, and employees should avoid activities that create or give the
      appearance of a conflict of interest between their personal interests and the
3    Company's interests. A conflict of interest exists when a personal interest or activity
      of a director officer or employee could influence or interfere with that person's
4    performance of duties, responsibilities, or commitments to the Company. A conflict
      of interest also exists when a director, officer or employee (or member of his or her
5    family) receives an improper personal benefit as a result of his or her position at the
      Company.

6

7    403.    Yet in violation of this policy, Defendants Bush, Carrington, Daley, Johnson, Patel,

8    Russo, and other Stem insiders engaged in extensive insider trading while in possession of material

9    non-public information in which they collectively, personally profited to the tune of over

10   $41 million. *See* ¶¶344-345.

11   404.    The Individual Fraud Defendants' violations of the above financial reporting and

12   insider trading policies also constitute violations of Stem's policy for "Compliance with Laws, Rules

13   and Regulations," which provides:

14       Compliance with both the letter and spirit of all laws, rules and regulations applicable
         to the Company, including any securities exchange or other organization or body that
15       regulates the Company, is critical to our reputation and continued success. All
         employees, officers and directors must respect and obey the laws of the cities, states
16       and countries in which the Company operates and avoid even the appearance of
         impropriety.

17   405.    Moreover, "[a]ny director, officer or employee who obtains information about a Code

18   violation or illegal act has the responsibility to report the matter immediately" in the manner

19   specified in the Code of Conduct.[34] By perpetuating and allowing the alleged misconduct to occur

20   throughout the Class Period and failing to report it, the Individual Fraud Defendants also violated

21   Stem's policies concerning reporting requirements for known misconduct.

22   406.    Third, the Individual Fraud Defendants also violated their own Audit Committee

23   Charter, which lays out the policies and procedures relating to oversight of Stem's financial

24   statements and related disclosures. Defendant Morgan served on the Audit Committee in 2021.

25   Defendant Daley served on the Audit Committee in 2022 and 2023. The Audit Committee Charter

26   provides, in pertinent part:

27   ───────────────
     [34] Stem's Employee Code of Conduct, §II, https://s27.q4cdn.com/138752898/files/doc_downloads
28   /gov/Employee-Code-of-Conduct.pdf (May 26, 2021).

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                          - 147 -
4879-3770-3139.v1

The purpose of the Audit Committee, as stated in the charter, is to, "at minimum":

- represent and act on behalf of the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with ethical, legal and regulatory requirements; (c) the outside auditor's qualifications and independence; and (d) the performance of the Company's internal audit function and outside auditor; and

- oversee the preparation of the report of the Committee required by SEC Rules to be included in the Company's annual proxy statement.

407.    According to the Audit Committee Charter, management was required to report to members of the Committee, and the Committee must "review and discuss with management the adequacy of the Company's controls and procedures," as well as "earnings, press releases, financial information, and earnings guidance provided to analysts and ratings agencies."  The Audit Committee was required to meet at least quarterly, and annually "obtain and review a report by the outside auditor describing (1) the outside auditor's internal quality control procedures and (2) any material issues raised by the most recent internal quality control review . . . and any steps taken to deal with any such issues."

408.    The Individual Fraud Defendants violated the policies in the Audit Committee Charter by knowingly or recklessly failing to report Stem's material misstatements and omissions to the Audit Committee, and/or the Audit Committee members were complacent or ignored such violations in allowing Stem to issue the material misstatements and omissions alleged herein.

409.    Fourth, in violation of the Code of Conduct, Audit Committee Charter, and Stem's Governance Guidelines, the Individual Fraud Defendants conducted little, if any, oversight of the alleged scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Fraud Defendants' violations of law, including but not limited to violations of §10(b) of the Exchange Act.

410.    Finally, CW2 indicated that it was Stem's policy that a purchase order was necessary (*i.e.*, the trigger) for Stem to actually purchase hardware in relation to a particular project.  ¶84. Thus, the Fraud Defendants violated Stem's internal policies when the Company purchased

hardware for the Available Power deal without a purchase order, a practice that was not uncommon according to CW2.  ¶85.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR DOCTRINE AND BESPEAKS CAUTION DOCTRINE

411.    The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act's ("PSLRA") statutory safe harbor for forward-looking statements nor the bespeaks caution doctrine, because they are either: (a) not forward looking; (b) subject to exclusion; or (c) not identified as forward looking or accompanied by meaningful cautionary language.

412.    Under the PSLRA's statutory safe harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; *and* (b) accompanied by *meaningful* cautionary language.  15 U.S.C. §78u-5(c)(1)(A)(i).

413.    For oral statements, an oral forward-looking statement must be: (a) accompanied by a cautionary statement that it is forward looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document; (b) the oral statement must identify the written document, or portion thereof that contains such facts; and (c) the referenced written documents must contain meaningful cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

414.    The safe harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 USC §78u-5(b)(2)(A).

415.    The bespeaks doctrine requires a "stringent showing" that sufficient cautionary or risk disclosure is included in any forward-looking statement such "that reasonable minds could not disagree that the challenged statements were not misleading."  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (alteration and internal quotation marks omitted).

416.    Neither the safe harbor nor the bespeaks caution doctrine apply to Defendants' statements or omissions of current or historical fact.  Statements of historical fact, current condition,

or a mixture thereof are not "forward looking" and thus not protected by the safe harbor. Nor are Defendants' omissions of historical fact protected by the safe harbor. The false statements alleged herein are actionable and the safe harbor does not apply because they are statements of current or historical fact or omitted historical facts including, *inter alia*:

- (3/20/21) "Stem's technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption . . . ."

- (3/20/21) "Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, including the perception that our technology is unproven . . . ."

417. To the extent that the misrepresentations alleged are forward looking, they are still actionable. Defendants knew at the time they spoke or failed to speak fully that each of their forward-looking false and misleading statements was materially false and misleading. Defendants' false and misleading forward-looking statements were authorized or approved by a controlling person, who knew that the forward-looking statements were false when made. The forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading. And the safe harbor warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks. *See* 15 U.S.C. §78u-5(c)(1)(A)(i).

418. For example, no safe harbor applies to Defendants' statements contained in the Company's quarterly and annual filings, because those statements omitted then-existing facts and were knowingly false when issued. Legislative history on the safe harbor clearly specifies that "[a] cautionary statement that misstates historical facts[, however] is not covered by the Safe harbor" (H.R. Conf. Rep. No. 104-369, at 44 (1995), as reprinted in 1995 U.S.C.C.A.N. 730, 743).

419. Close examination of other purportedly cautionary language contained in the quarterly and annual filings (summarized below) shows that this language was inadequate because Defendants knew that these risks they warned of had already materialized, for example, in Stem's 2021 and 2022 Forms 10-K filed on 02/28/22 and 02/16/23:

(02/28/22 Form 10-K; 02/16/23 Form 10-K) If we are unsuccessful in developing and maintaining our proprietary technology, including our Athena platform, our

ability to attract and retain partners could be impaired, our competitive position could be adversely affected and our revenue could be reduced.

420.    Stem's purported cautionary language was inadequate to insulate Defendants' false statements under the statutory safe harbor because each of the disclosures was also vague and included boilerplate language that remained unchanged throughout the Class Period.  For example, the boilerplate warnings that Stem's technology "could have undetected defects, errors or bugs in hardware or software" could have applied to any of Stem's competitors.  Rather than meaningful, the risk warnings were misleading because the Company was already experiencing the failure to create real growth in the FTM market as a result of its nonviable Athena software.  None of Stem's purported risk disclosures were meaningful because they failed to warn investors of the known risks that materialized during the Class Period, including, *inter alia*, that its high margin Athena software was not viable for FTM deals.

## X.  APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

421.    The market for Stem securities was open, well-developed, and efficient at all relevant times.  As a result of the Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available market information relating to Stem.  Plaintiffs and Class members have been damaged thereby.

422.    During the Class Period, the artificial inflation of the value of Stem securities was caused by the material misrepresentations and omissions alleged in this Complaint,[35] thereby causing the damages sustained by Plaintiffs and other Class members.  As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove

---

[35]    And as to Count III, Defendants scheme.

1  down the value of the Company's securities, causing Plaintiffs and other Class members that had

2  purchased the securities at artificially inflated prices to be damaged as a result.

3      423.    At all relevant times, the market for Stem common stock was an efficient market for

4  the following reasons, among others:

5          (a)    Stem common stock met the requirements for listing, and was listed and

6              actively traded on the NYSE, a highly efficient, electronic stock market;

7          (b)    as a regulated issuer, Stem filed periodic public reports with the SEC and the

8              NYSE;

9          (c)    Stem regularly communicated with public investors via established market

10              communication mechanisms, including regular disseminations of press

11              releases on the national circuits of major newswire services and other wide-

12              ranging public disclosures, such as communications with the financial press

13              and other similar reporting services; and

14          (d)    Stem was followed by securities analysts employed by major brokerage firms

15              who wrote reports that were distributed to the sales force and certain

16              customers of their respective brokerage firms.  Each of these reports was

17              publicly available and entered the public marketplace.

18      424.    Based on the foregoing, during the Class Period, the market for Stem securities

19  promptly digested information regarding the Company from all publicly available sources and

20  impounded such information into the price of Stem securities.  Under these circumstances, the

21  market for Stem securities was efficient during the Class Period and, therefore, investors' purchases

22  of Stem securities at artificially inflated market prices give rise to a class-wide presumption of

23  reliance under the fraud-on-the-market doctrine.

24      425.    In the alternative, the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

25  (1972) presumption of reliance applies to the extent that Defendants' statements during the Class

26  Period involved omissions of material facts.  These omissions concealed, among other things, and as

27  alleged more fully above, that Stem's business model was deficient because its Athena software was

28  not viable for the FTM market.

# XI.    CLASS ACTION ALLEGATIONS

426.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of:

> (a)    the Section 10(b) Class: all purchasers of Stem securities during the Class Period and were damaged thereby (the "Section 10(b) Class"); and
>
> (b)    the Section 14(a) Class: all persons who were solicited to approve the merger of Stem and Star Peak and who exchanged publicly listed Star Peak shares for Stem Class A common stock rather than redeeming the same pursuant to the Defective Prospectus and were damaged thereby (the "Section 14(a) Class" and collectively with the Section 10(b) Class, "the Class").

Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

427.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Stem common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Stem and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

428.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

429.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel who are competent and experienced in class action securities litigation.

430.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the Exchange Act was violated by Defendants, as alleged herein;

      (b)    whether the statements made were materially false and misleading, or omitted material facts;

      (c)    as to the Section 10(b) Class, whether the Fraud Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

      (d)    whether the prices of Stem's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

      (e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

431.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violation of Section 14(a) of the Exchange Act of 1934 and SEC Rule 14a-9
Against the 14(a) Defendants**

432.    Plaintiffs restate and reallege ¶¶7-185, ¶¶288-341 and ¶¶411-431 as though fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is solely based on negligence.

433.    This Count is asserted pursuant to §14(a) of the Exchange Act, 15 U.S.C. §78n, and SEC Rule 14a-9 promulgated thereunder, against the 14(a) Defendants.

434.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

435.     Defendant Scheyer signed the cover letter for the Defective Prospectus.

436.     The Defective Prospectus was issued "By Order of the [Star Peak] Board of Directors" and signed by Defendant Morgan.  Star Peak also issued the Defective Prospectus "to its stockholders as part of the solicitation of proxies by the board of directors."  Moreover, the 14(a) Defendants permitted the use of their names by, among other things, allowing the Defective Prospectus to represent that they recommended the business combination (*see* ¶¶17, 28, and 30-34).

437.     The 14(a) Defendants also prepared, reviewed, and disseminated the Defective Prospectus and Defective Investor Materials, which as specified above, made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

438.     By virtue of their positions within the pre-Merger Company and their due diligence regarding Stem and the Merger, the 14(a) Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Prospectus and Defective Investor Materials.  The Defective Prospectus and Defective Investor Materials were prepared, reviewed, and/or disseminated by the 14(a) Defendants, named herein, and misrepresented and/or omitted material facts, as detailed above.  The 14(a) Defendants were at least negligent in filing the Defective Prospectus and Defective Investor Materials with these materially false and misleading statements.

439.    As a direct result of the 14(a) Defendants' negligent preparation, review, and dissemination of the Defective Prospectus and Defective Investor Materials, members of the Section 14(a) Class were induced to vote their shares and accept inadequate consideration in connection with the Merger.  The Defective Prospectus and Defective Investor Materials used to obtain shareholder approval of the Merger deprived Section 14(a) Class members of their right to a fully informed shareholder vote in connection therewith, and deprived them of their right to the information necessary to make an informed redemption decision.  At all times relevant to the dissemination of the Defective Prospectus and Defective Investor Materials, these Defendants were aware of and/or had access to the true facts concerning Stem.  Thus, as a direct and proximate result of the dissemination of the Defective Prospectus and Defective Investor Materials that the Section 14(a) Defendants used to obtain shareholder approval of and thereby consummate the Merger, the Section 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

440.    The omissions and false and misleading statements in the Defective Prospectus and Defective Investor Materials were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Defective Prospectus and Defective Investor Materials and in other information reasonably available to stockholders.

441.    As stated herein, the Defective Prospectus contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  It was an essential link in the consummation of the Merger and described itself as the sole source of information investors were to rely upon in making the Merger vote and redemption decisions.  The 14(a) Defendants failed to correct the Defective Prospectus and Defective Investor Materials prior to the Merger vote or redemption deadline, and the failure to update and correct false statements is also a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

442.    By reason of the foregoing, the 14(a) Defendants have violated §14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the 14(a) Individual Defendants**

443.    Plaintiffs restate and reallege ¶¶7-185, ¶¶288-341 and ¶¶411-431 as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely in negligence.

444.    As alleged above, the 14(a) Defendants violated §14(a) of the Exchange Act by their acts and omissions as alleged in this Complaint.

445.    The 14(a) Individual Defendants acted as controlling persons within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their high-level positions, participation in and or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the Defective Prospectus and Defective Investor Materials, the 14(a) Individual Defendants had the power to control the information in the Defective Prospectus and Defective Investor Materials.  By reason of such conduct, the 14(a) Individual Defendants are each liable pursuant to Section 20(a) of the Exchange Act.

446.    Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate cause of the untrue statements and omissions in the Defective Prospectus, and other solicitations described herein.  Plaintiffs and the other members of the Section 14(a) Class suffered damages as described in ¶¶10, 12-13, 183-185, 288-341, 421-425, a direct and proximate result of the 14(a) Defendants' negligent conduct

447.    By reason of such conduct, the 14(a) Defendants violated §20(a) of the Exchange Act.

**COUNT III**

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
**Against the Fraud Defendants**

448.    Plaintiffs repeat and reallege each and every allegation detailed above as if fully set forth herein.

449.    This Count is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b) and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against the Fraud Defendants.[36]

450.    During the Class Period, the Fraud Defendants named herein employed a scheme to defraud investors and disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

451.    The Fraud Defendants knowingly and with deliberate recklessness made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, thereby inflating the price of Stem securities during the Class Period.

452.    In addition, the Fraud Defendants: (a) employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Stem securities during the Class Period.

453.    Plaintiffs and the Section 10(b) Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Stem securities.  Plaintiffs and the Section 10(b) Class would not have purchased Stem securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Fraud Defendants' misleading statements and fraudulent scheme.

454.    As a direct and proximate result of the aforementioned Defendants' wrongful conduct, Plaintiffs and the other members of the Section 10(b) Class suffered damages in connection with their purchases of Stem securities during the Class Period.

---

[36]    With respect to Defendant Russo, for Count III, Plaintiffs only allege violations of Section 10(b) the Exchange Act and SEC Rules 10b-5 (a) and (c) promulgated thereunder.

1

**COUNT IV**

2

**For Violation of §20(a) of the Exchange Act
Against the Individual Fraud Defendants**

3

4

455.    Plaintiffs repeat and reallege each and every allegation detailed above as if fully set

forth herein.

5

6

456.    The Individual Fraud Defendants acted as controlling persons of Stem within the

meaning of §20(a) of the Exchange Act, 15 U.S.C. §78(t)(a).

7

8

457.    As alleged above, Defendants each violated §10(b) of the Exchange Act and SEC

Rule 10(b)(5) by their acts or omissions as alleged in this Complaint.

9

10

458.    By virtue of their high-level positions, participation in and/or awareness of the

Company's operations, direct involvement in the day-to-day operations of the Company, and/or

11

12

intimate knowledge of the Company's actual performance, and their power to control the materially

false and misleading public statements about Stem during the Class Period, the Individual Fraud

13

Defendants had the power and ability to control the actions of each other and the Company's

14

employees.  By reason of such conduct the Individual Fraud Defendants are each liable pursuant to

15

§20(a) of the Exchange Act.  The Individual Fraud Defendants had the power and authority to, and

16

did, because Stem to engage in the wrongful conduct alleged.

17

459.    As a direct and proximate result of the Individual Fraud Defendants' wrongful

18

conduct, Plaintiffs and the other members of the Section 10(b) Class suffered damages in connection

19

with their purchases of Stem common stock during the Class Period.

20

460.    By reason of such conduct, the Individual Fraud Defendants named herein are liable

21

pursuant to §20(a) of the Exchange Act.

22

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                               - 159 -
4879-3770-3139.v1

**COUNT V**

**For Violation of §20A of the Exchange Act Against
Defendants Bush, Carrington, Daley, Johnson, and Russo for Insider Selling**

461.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

462.    This Count is brought pursuant to §20A of the Exchange Act against Defendants Bush, Carrington, Daley, Johnson, and Russo.

463.    As set forth herein, Defendants Bush, Carrington, Daley, Johnson, and Russo violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by selling shares of Stem stock while in possession of material nonpublic information obtained by reason of their positions as Stem insiders to sell over $27 million in Stem stock during the Class Period.

464.    Defendant Bush made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Bush | 11/16/21 | 12,456 | $24.55 |
| Bush | 11/17/21 | 11,056 | $22.01 |
| Bush | 11/17/21 | 1,400 | $22.69 |
| Bush | 12/1/21 | 4,973 | $20.77 |
| Bush | 12/1/21 | 5,027 | $21.49 |
| Bush | 12/2/21 | 3,000 | $20.34 |
| Bush | 8/15/22 | 60,220 | $16.24 |
| Bush | 8/15/22 | 422 | $16.70 |
| Bush | 8/16/22 | 21,200 | $15.93 |
| Bush | 8/16/22 | 2,383 | $16.62 |

465.    Bush's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 11/17/21 | 100 | $23.80 |
| Lawale | 11/17/21 | 900 | $22.56 |
| Lawale | 11/19/21 | 1,000 | $21.86 |
| Lawale | 11/24/21 | 456 | $21.16 |
| Lawale | 12/3/21 | 1000 | $18.35 |
| Lawale | 12/3/21 | 1000 | $17.78 |
| Lawale | 12/3/21 | 1000 | $17.73 |

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Thakkar | 8/19/22 | 4,445 | $14.11 |
| Thakkar | 8/22/22 | 3,911 | $13.77 |
| Thakkar | 8/23/22 | 4,445 | $14.11 |

466.    Defendant Carrington made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Carrington | 11/16/21 | 44,750 | $24.55 |
| Carrington | 11/17/21 | 39,750 | $22.01 |
| Carrington | 11/17/21 | 5,000 | $22.75 |
| Carrington | 12/1/21 | 11,163 | $20.77 |
| Carrington | 12/1/21 | 11,212 | $21.50 |
| Carrington | 12/2/21 | 6,401 | $20.36 |
| Carrington | 6/8/22 | 28,570 | $9.34 |
| Carrington | 6/9/22 | 28,570 | $8.99 |
| Carrington | 8/16/22 | 26,560 | $15.94 |
| Carrington | 8/16/22 | 2,010 | $16.56 |
| Carrington | 8/17/22 | 27,870 | $15.09 |
| Carrington | 8/17/22 | 700 | $15.56 |

467.    Carrington's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Lawale | 11/17/21 | 100 | $23.80 |
| Lawale | 11/17/21 | 900 | $22.56 |
| Lawale | 11/19/21 | 1,000 | $21.86 |
| Lawale | 11/24/21 | 456 | $21.16 |
| Lawale | 12/3/21 | 1,000 | $18.35 |
| Lawale | 12/3/21 | 1,000 | $17.78 |
| Lawale | 12/3/21 | 1,000 | $17.73 |
| Lawale | 6/15/22 | 1,619 | $6.72 |
| Lawale | 6/15/22 | 1,623 | $6.72 |
| Lawale | 6/15/21 | 2,000 | $6.65 |
| Lawale | 6/15/21 | 2,000 | $6.59 |
| Thakkar | 8/19/22 | 4,445 | $14.11 |
| Thakkar | 8/22/22 | 3,911 | $13.77 |

468.    Defendant Daley made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                                    - 161 -

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Daley | 12/1/21 | 100,000 | $21.13 |
| Daley | 12/2/21 | 100,000 | $19.82 |

469.    Daley's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Lawale | 12/3/21 | 1,000 | $18.35 |
| Lawale | 12/3/21 | 1,000 | $17.78 |
| Lawale | 12/3/21 | 1,000 | $17.73 |

470.    Defendant Johnson made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Johnson | 11/16/21 | 15,000 | $24.55 |
| Johnson | 8/15/22 | 20,000 | $16.38 |
| Johnson | 8/16/22 | 10,000 | $16.09 |

471.    Johnson's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Lawale | 11/17/21 | 100 | $23.80 |
| Lawale | 11/17/21 | 900 | $22.56 |
| Lawale | 11/19/21 | 1,000 | $21.86 |
| Lawale | 11/24/21 | 456 | $21.16 |
| Thakkar | 8/19/22 | 4,445 | $14.11 |
| Thakkar | 8/22/22 | 3,911 | $13.77 |

472.    Defendant Russo made the following relevant sales:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Russo | 5/10/22 | 1,564 | $7.32 |

473.    Russo's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Lawale | 5/11/22 | 1,100 | $6.80 |
| Lawale | 5/11/22 | 5,000 | $6.83 |
| Lawale | 5/11/22 | 5,000 | $6.70 |

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Lawale | 5/11/22 | 5,000 | $6.73 |
| Lawale | 5/11/22 | 2,500 | $6.70 |
| Lawale | 5/11/22 | 3,000 | $6.65 |

474. Plaintiffs and members of the Class who purchased shares of Stem securities contemporaneously with sales by the foregoing Defendants suffered damages because: (a) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of the Exchange Act, as alleged herein; and (b) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the materially false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     determining that this action is a proper class action, having designated Plaintiffs as Lead Plaintiffs and Plaintiffs' counsel as Lead Counsel;

B.     awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     awarding such equitable/injunctive or other relief (including, but not limited to rescission), as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  November 8, 2024                ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                        SHAWN A. WILLIAMS
                                        WILLOW E. RADCLIFFE
                                        TAEVA C. SHEFLER
                                        ALAINA L. GILCHRIST


                                        _____
                                             s/ Willow E. Radcliffe
                                        WILLOW E. RADCLIFFE

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                           - 163 -
4879-3770-3139.v1

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
tshefler@rgrdlaw.com
agilchrist@rgrdlaw.com

DATED: November 8, 2024                LEVI & KORSINSKY, LLP
                                       SHANNON L HOPKINS (admitted *pro hac vice*)


                                          s/ Shannon L. Hopkins
                                       SHANNON L HOPKINS

                                       111 Summer Street, Suite 403
                                       Stamford, CT 06905
                                       Telephone: 203/992-4523
                                       212/363-7171 (fax)
                                       shopkins@zlk.com

                                       LEVI & KORSINSKY, LLP
                                       ADAM M. APTON
                                       445 South Figueroa Street, 31st Floor
                                       Los Angeles, CA 90071
                                       Telephone: 213/985-7290
                                       aapton@zlk.com

                                       Lead Counsel for Lead Plaintiffs

## CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)

I, Willow E. Radcliffe, am the ECF User whose identification and password are being used to file this document. Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of the document has been obtained from each of the other signatories.

Dated: November 8, 2024


                                          s/ Willow E. Radcliffe
                                       WILLOW E. RADCLIFFE

FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:23-cv-02329-MMC                         - 164 -
4879-3770-3139.v1