BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
JON FOUGNER, State Bar No. 314097
jon.fougner@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants Stem, Inc. f/k/a Star
Peak Energy Transition Corp., John Carrington,
William Bush, Michael C. Morgan, Adam E.
Daley, Larsh Johnson, Prakesh Patel, Alan Russo,
and Bryan Ho*

*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re STEM, INC. SECURITIES LITIGATION | Master File No.: 3:23-cv-02329-MMC |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT** |
| This Document Relates To:<br><br>ALL ACTIONS. | Date:      March 14, 2025<br>Time:      9:00 a.m.<br>Location:  Courtroom 7 – 19th Floor<br>Judge:     Hon. Maxine M. Chesney |

**TABLE OF CONTENTS**

Page

INTRODUCTION..................................................................................................................1

BACKGROUND...................................................................................................................2

    A. Stem Achieves Early Success in BTM...........................................................................2

    B. Stem Discloses Its Transition to FTM and Early Financial Success..................................2

    C. Plaintiffs Fail Yet Again to Plead Any Basis for this Lawsuit.........................................3

ARGUMENT........................................................................................................................4

    I. PLAINTIFFS FAIL AGAIN TO PLEAD A SECTION 10(b) CLAIM...............................4

        A. Plaintiffs Fail Again to Plead Any Materially False or Misleading Statements................4

            1. Plaintiffs' Complaint Remains Indecipherable Puzzle Pleading.............................5

            2. Plaintiffs Are Entirely Dependent on Non-Credible CW Testimony.........................6

            3. A Statement-by-Statement Analysis Again Shows No Falsity................................7

                a) Plaintiffs Again Do Not Contradict that Athena Automated Certain Functions.........7

                b) Plaintiffs Again Fail to Show Any False Statement About Stem's
                Transition to FTM...............................................................................10

        B. Plaintiffs Fail to Show that Any Statements Were Made with Scienter...........................14

            1. Speculation by Anonymous, Nontechnical, Ex-Employees..................................14

                a) The CWs Lack Reliability and Personal Knowledge.................................15

                b) The CWs' Allegations Do Not Indicate Fraudulent Intent.........................17

            2. Routine Stock Sales Again Do Not Support Scienter Inference..............................18

            3. "Core Operations" Still Cannot Make Up for Plaintiffs' Lack of Particularized
            Allegations of Scienter........................................................................19

            4. Plaintiffs' Other Recycled Theories Remain Unpersuasive.................................20

            5. Carrington's "Human-in-the-Loop" Statement in 2024 Is Irrelevant to His Knowledge
            Much Earlier, during the Class Period..................................................... 21

            6. Plaintiffs Fail to Plead that Executive Departures Were Suspicious.......................22

        C. Plaintiffs Fail to Plead Loss Causation Because Their "Corrective Disclosures" Do Not
        Match Any Alleged Misstatement........................................................................ 23

            1. The Five Cherrypicked Stock-Price Changes Fail Collectively............................. 23

            2. The Five Cherrypicked Stock-Price Changes Fail Individually............................. 23

    II. PLAINTIFFS FAIL AGAIN TO PLEAD A SCHEME...............................................26

        A. Plaintiffs Plead No Actions Constituting a Scheme..................................................26

        B. Plaintiffs Fail to Allege Individualized Participation in Any "Scheme".........................28

        C. Plaintiffs Fail to Allege Scienter.........................................................................28

    III. PLAINTIFFS FAIL AGAIN TO PLEAD A SECTION 14(a) CLAIM.............................28

        A. Plaintiffs' Allegations Sound Equally in Fraud after Small, Conclusory Changes............ 28

        B. Plaintiffs Still Plead No "Essential Link" to Harm...................................................29

        C. Plaintiffs Still Plead No Solicitation through Proxy References....................................30

CONCLUSION...................................................................................................................30

**TABLE OF AUTHORITIES**

**Case**                                                                                                     **Page**

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006)
    *aff'd sub nom. In re Adecco S.A. Sec. Litig.*,
    256 F. App'x 74 (9th Cir. 2007)……..…………………………..…...…….………… 26

*In re AnaptysBio, Inc. Sec. Litig.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ……………..………………………… 19

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012),
    *aff'd*, 561 Fed. App'x 598 (9th Cir. 2014) ……………….…….…….………...…… 15

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) ……………….………….……………..…………….…… 24

*Bailey v. Zendesk, Inc.*,
    2024 WL 1807943 (N.D. Cal. Apr. 24, 2024) ………..……………………….……….9

*Bajjuri v. Raytheon Techs., Corp.*,
    2023 WL 3650554 (D. Ariz. May 25, 2023) ………………………..…………………..6

*Bao v. SolarCity Corp.*,
    2016 WL 4192177 (N.D. Cal. Aug. 9, 2016) ………………………………………….17

*Bao v. Solarcity Corp.*,
    2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ……………….………..…….………… 16

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ……………….…………………………….8

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
    2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) …………………………………………25

*Borteanu v. Nikola Corp.*,
    2023 WL 1472852 (D. Ariz. Feb. 2, 2023) …………………………………21, 23,

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. Oct. 7, 2008) ………………………………………5

*Chang v. Accelerate Diagnostics, Inc.*,
    2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ………………………………………11

*Cheng Jiangchen v. Rentech, Inc.*,
    2017 WL 10363990 (C.D. Cal. Nov. 20, 2017). ……………………………….…….. 6

| Case | Page |
|---|---|

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) …………………………...……..…...…..……...… 12, 27

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) …………..……………..……….… 16, 22

*In re Cloudera, Inc. Sec. Litig.*,
2022 WL 14813896 (N.D. Cal. Oct. 25, 2022)
*aff'd*, 121 F.4th 1190 (9th Cir. 2024) ……….……………………….…..…….… 30

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) ………………………………………………… 28

*Cullen v. Ryvyl, Inc.*,
2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ………………………………………10, 14

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) …………………………………………………… 24

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ……………………..…………………………...…19

*In re DermTech, Inc. Sec. Litig.*,
2024 WL 4941026 (S.D. Cal. Dec. 2, 2024) …………………………………18, 21

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009) …………………………………..…15

*Dresner v. Silverback Therapeutics, Inc.*,
2022 WL 16716165 (W.D. Wash. Nov. 4, 2022) ………………………………….. 5

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ………………………………………………...……23

*In re Eargo, Inc. Sec. Litig.*,
2023 WL 1997918 (N.D. Cal. Feb. 14, 2023) …………………………………13

*In re Eargo, Inc. Sec. Litig.*,
2023 WL 5663154 (N.D. Cal. Aug. 31, 2023) …………………………………19

*In re Eargo, Inc. Sec. Litig.*,
656 F. Supp. 3d 928 (N.D. Cal. 2023) …………………………………………26

*Ezzes v. Vintage Wine Estates, Inc.*,
2024 WL 895018 (D. Nev. Mar. 1, 2024) ………………………………....…….… 16, 22

*Ferreira v. Funko*,
2021 WL 880400 (C.D. Cal. Feb. 25, 2021) …………………………………14, 16

| Case | Page |
|------|------|

*Foley v. Stem, Inc.*,
  No. 3:23-cv-03424-SK (N.D. Cal. July 10, 2023) …..……………………………….. 4

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ………..……………………………...13

*Garcia v. J2 Glob., Inc.*,
  2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) …………………………………….....12

*Golub v. Gigamon, Inc.*,
  372 F. Supp. 3d 1033 (N.D. Cal. 2019) ………………………………………….....12

*Greenberg v. Cooper Cos., Inc.*,
  2013 WL 100206 (N.D. Cal. Jan. 7, 2013) ………………………..………….……. 17

*Hampton v. Aqua Metals, Inc.*,
  2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) …………………..……………....…….. 8, 9

*Hefler v. Wells Fargo & Co.*,
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ………………..…..………………….. 4

*Hurst v. Enphase Energy, Inc.*,
  2021 WL 3633837 (N.D. Cal. Aug. 17, 2021) ……………………………………….27

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)…….................................................. 8

*In re Intel Corp. Sec. Litig.*,
  2023 WL 2767779 (N.D. Cal. Mar. 31, 2023)
  *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024)…………………………......….. 23

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
  2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) …………………………………….. 8

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
  998 F.3d 397 (9th Cir. 2021) …………………………………………………....... 24

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011) …………………………………………..…..………...…..…. 4

*Kampe v. Volta, Inc.*,
  2024 WL 308262 (N.D. Cal. Jan. 26, 2024) …………..…..……………………….. 9

*Kampe v. Volta Inc.*,
  2024 WL 4534732 (N.D. Cal. Oct. 21, 2024) ………………………………..…... 27

*Kang v. PayPal Holdings, Inc.*,
  2023 WL 3166159 (N.D. Cal. Apr. 27, 2023) …………………..………………....26

**Case**                                                                                      **Page**

*Kelley v. Rambus, Inc.*,
   2008 WL 5170598 (N.D. Cal. Dec. 9, 2008),
   *aff'd*, 384 F. App'x 570 (9th Cir. 2010) ……………………..………………………..….. 23

*Kim v. Advanced Micro Devices, Inc.*,
   2019 WL 2232545 (N.D. Cal. May 23, 2019) ……………………………………….….... 7

*Lamartina v. VMware, Inc.*,
   2021 WL 4133851 (N.D. Cal. Sept. 10, 2021) …………………………………………30

*Lamontagne v. Tesla, Inc.*,
   2024 WL 4353010 (N.D. Cal. Sept. 30, 2024) …………………………………………18

*Mauss v. NuVasive, Inc.*,
   2014 WL 4161431 (S.D. Cal. Aug. 19, 2014) …………………………………………17

*McGovney v. Aerohive Networks, Inc.*,
   2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ……………………………………..27

*Mehedi v. View, Inc.*,
   2023 WL 3592098 (N.D. Cal. May 22, 2023) ……………………………..…….……… 29, 30

*Mendoza v. HF Foods Grp. Inc.*,
   2021 WL 3772850 (C.D. Cal. Aug. 25, 2021) ………………………………………… 29

*In re Mercury Interactive Corp. Sec. Litig.*,
   2007 WL 2209278 (N.D. Cal. July 30, 2007) ……………………………….…..... 24, 25, 26

*In re Meta Materials Inc. Sec. Litig.*,
   2023 WL 6385563 (E.D.N.Y. Sept. 29, 2023) ………………………………………… 29

*In re Metawave Commc'ns Corp. Sec. Litig.*,
   298 F. Supp. 2d 1056 (W.D. Wash. 2003) …………………………………………… 26

*Metzler Inv. GMBH v. Corinthian Colls.*,
   540 F.3d 1049 (9th Cir. 2008) …………………………………..………………… 5, 14, 20, 24

*In re Mullen Auto Sec. Litig.*,
   2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ……………………………………...…6

*Mulquin v. Nektar Therapeutics*,
   510 F. Supp. 3d 854 (N.D. Cal. 2020)
   *aff'd sub nom. In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ……………………………………….…..…………….. 10

*N.Y. State Tchrs.' Ret. Sys. v. Fremont Gen. Corp.*,
   2010 WL 1473265 (C.D. Cal. Mar. 29, 2010) …………………….…………………… 6

**Case**                                               **Page**

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020) ……………………………..…….…… 19

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) …………………………………………………….. 10

*In re NVIDIA Corp. Sec. Litig.*,
2011 WL 4831192 (N.D. Cal. Oct. 12, 2011)
*aff'd*, *In re NVIDIA Corp. Sec. Litig.*
768 F.3d 1046 (9th Cir. 2014)……………………………..……………………..… 22

*In re Ocera Therapeutics Sec. Litig.*,
2018 WL 7019481 (N.D. Cal. Oct. 16, 2018) ............................................. 29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ……………………………………………………..…….. 12, 27

*Pirani v. Netflix, Inc.*,
710 F. Supp. 3d 756 (N.D. Cal. Jan. 5, 2024) ……………………..…………… 9

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) …..............………………..…….. 12, 13, 14

*Plumbers and Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
2024 WL 4251896 (N.D. Cal. Sept. 17, 2024) …………………………………24

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ……………………………………..……………… 20, 22

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) …………………………………………..……..… 20

*In re Rackable Sys., Inc. Sec. Litig.*,
2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ……………………………………24, 27

*Ramos v. Comerica Inc.*,
2024 WL 4744019 (C.D. Cal. Oct. 11, 2024) ……………………………..……….. 23

*In re Regulus Therapeutics Inc. Sec. Litig.*,
406 F. Supp. 3d 845 (S.D. Cal. 2019) ……………………………..……………… 22

*In re Rigel Pharms., Inc. Secs. Litig.*,
697 F.3d 869 (9th Cir. 2012) …………………………………..…………….. 9, 21, 29

*Robb v. Fitbit*,
216 F. Supp. 3d 1017 (N.D. Cal. 2016) ……………………………………...…… 18

*Sakkal v. Anaplan Inc.*,
557 F. Supp. 3d 988 ……………………………………………..…………..……17

**Case**                                                                                     **Page**

*Sakkal v. Anaplan Inc.*,
    557 F. Supp. 3d 988 ……………………………………..…….……………17

*Seaman v. Cal. Bus. Bank*,
    2013 WL 5890726 (N.D. Cal. Oct. 30, 2013) …………………..…………… 13

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
    2019 WL 4859099 (N.D. Cal. Oct. 2, 2019) ………………………………………21

*Sgarlata v. PayPal Holdings, Inc.*,
    409 F. Supp. 3d 846 (N.D. Cal. 2019) ……………………………………………16

*In re Siebel Sys., Inc. Sec. Litig.*,
    2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ……………………………………… 17

*Simpson v. AOL Time Warner Inc.*,
    452 F.3d 1040 (9th Cir. 2006) …………………………………..……………… 26

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ………………………..……...……………… 6

*Strezsak v. Ardelyx Inc.*,
    2024 WL 1160900 (N.D. Cal. Mar. 18, 2024) ………………………………………… 12

*Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*,
    2023 WL 3549506 (C.D. Cal. May 9, 2023) …………………………………...……15

*Union Asset Mgt. Holding AG v. Sandisk Corp.*,
    2016 WL 406283 (N.D. Cal. Jan. 22, 2016) ………………………………………… 13

*In re UTStarcom, Inc. Sec. Litig.*,
    2008 WL 11399451 (N.D. Cal. Mar. 14, 2008) …………………………………… 5

*Vanguard Specialized Funds v. VEREIT Inc.*,
    2016 WL 5858735 (D. Ariz. Oct. 3, 2016) …………………….…………………… 23

*In re Vantive Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ………………………………………………… 18

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) …………………………………………27

*In re Veritas Software Corp. Sec. Litig.*,
    2004 WL 7338912 (N.D. Cal. May 19, 2004) …………………..……,……………… 18, 25

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ………………………………..…………………… 4, 21

| Case | Page |
|---|---|

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) …….....………………………………………5

*World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.*,
  66 F. Supp. 3d 1233 (N.D. Cal. 2014) ……………………………………………28

*Wozniak v. Align Tech., Inc.*,
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ………………………………………...24

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ………………………..………………………… passim

**Statutes**

15 U.S.C. § 78n(a)(1) ………………………………………………………………30

15 U.S.C. § 78u-5(c)(1)(A) ………………………………………………………...13

15 U.S.C. § 78u-5(i)(1)(B) ………………………………………………………13

**Other Authorities**

17 C.F.R. § 240.10b-5 ……………………………………………………………28

17 C.F.R. § 270.20a-1(a) …………………………………………………………30

Fed. R. Civ. P. 8 ……………………………………………………………… 5, 6

Fed. R. Civ. P. 8(a) …………………………………………………...……… 1

Fed. R. Civ. P. 9(b) ……………………...……………………………......… 1, 4, 25

Fed. R. Civ. P. 11 …………………………………………………………………27

Fed. R. Civ. P. 12(b)(6) …………………………………………………………… 1

**TABLE OF ABBREVIATIONS**

| Abbreviation | Definition |
|---|---|
| Complaint or FACC | First Amended Consolidated Complaint, dated November 8, 2024 (ECF No. 127) |
| Consolidated Complaint or CC | Consolidated Complaint, dated October 17, 2023 (ECF No. 87) |
| CW(s) | Confidential witness(es) |
| 1st Mot. | Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint, dated November 28, 2023 (ECF No. 104) |
| Defendants | Stem, Inc, John Carrington, William Bush, Larsh Johnson, Prakesh Patel, Alan Russo, Bryan Ho, Star Peak Energy Transition Corp., Eric Scheyer, Michael C. Morgan, Adam E. Daley, and Alec Litowitz[i] |
| Ex. | Exhibit attached to Declaration of Jon Fougner in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Consolidated Complaint |
| MTD | Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' Consolidated Complaint (ECF No. 104) |
| MTD Order | Order Granting Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (ECF No. 123) |
| No. _ | Purported misstatement as listed in Plaintiffs' exhibits to the Complaint (ECF No. 127-1) |
| Plaintiffs | Lead Plaintiffs Vishal Lawale and Vishal P. Thakkar |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. 78u-4 *et seq.* |
| Star Peak or STPK | Star Peak Energy Transition Corp. |
| Stem or the Company | Stem, Inc. |

Emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

---

[i] Previous "14(a)" Defendants Michael D. Wilds, Desiree Rogers, and C. Park Shaper were dropped from the FACC.

DEFS.' MTD FIRST AMENDED COMPLAINT
CASE NO. 3:23-cv-02329-MMC

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that at the time and place noted above, Defendants will and hereby do move to dismiss Plaintiffs' First Amended Consolidated Complaint pursuant to Rules 12(b)(6), 8(a), and 9(b).

**INTRODUCTION**

Amended complaints tend to be better than the initial one. There usually is a refinement of claims, greater precision and richness to factual allegations, guided by the Court's instructions in its dismissal order. This is not the case here, however.

If anything, Plaintiffs' amended complaint has gotten worse. For each of the three elements of their fraud claim (falsity, scienter, and loss causation), Plaintiffs have either dropped factual allegations or added irrelevant detail. Knowing they fall well short of the standard for pleading fraud, Plaintiffs reprise their scheme and Section 14 claims, hoping to circumvent the rigorous pleading standard of the PSLRA. The reality is that the same course of conduct, no matter how characterized by Plaintiffs, is the common thread among all their claims—and that course of conduct is perfectly consistent with the securities law.

With respect to **falsity**, Plaintiffs challenge the same forward-looking and opinion statements as in their first complaint. They also fail, once again, to show why any statement by Defendants is contradicted by Plaintiffs' allegations. Plaintiffs themselves seem to have struggled with this task, having devised an exhibit list 400 pages long to explain the connection between the challenged statements and the amended complaint's allegations. Even after this monumental exercise, Plaintiffs fail to allege a single false statement.

With respect to Defendants' state of mind—**scienter**—Plaintiffs fare no better. Incredibly, they fail to heed the Court's instructions in its dismissal order and fail to add key details to their CW allegations. But if they had, the substance of those allegations does not once plead what exactly Defendants knew. Instead, the allegations are replete with speculation and guess work.

Finally, Plaintiffs fail to allege the **causal connection** between the revelation of the purported "truth" and any stock drop that caused them losses. The stock price bounced back after most stock

drops, and, more importantly, no market participant backs Plaintiffs' self-serving hypotheses about what caused the stock to drop.

It is telling that, after several amendments, this case remains in search of a viable claim. It should have never been brought in the first place, and no amount of patch up by amendment will salvage it. It should be dismissed, with prejudice this time.

## BACKGROUND

Stem's evolution as a business and its product offerings were described at length in the prior motion. 1st Mot. at 2–3. Defendants summarize those facts below, and note relevant updates.

### A.  Stem Achieves Early Success in BTM

Stem was founded in 2009, Ex. 1 at 4, pioneering its Athena software, which can automatically select the least expensive source of energy available to a company at a given time. Ex. 2 at 3–4, 5–6. Stem first entered the "behind-the-meter" or "BTM" segment of the energy services market, to help achieve savings for energy consumers. *Id.* at 4. For BTM customers, Athena can choose when to use in-house energy, *e.g.*, that generated by solar panels, or draw from the utility grid at the most cost-effective time. *Id.*

Stem's success in BTM has been universally acknowledged in this case. Defendants described in the prior motion, for example, how Stem achieved 75% market share for BTM in California. 1st Mot. at 2; Ex. 1 at 15. Plaintiffs have never disputed this success, and indeed begrudgingly concede that Athena was "functional for BTM deals." FACC ¶ 70.

### B.  Stem Discloses Its Transition to FTM and Early Financial Success

Stem next prepared to take on the front of the meter or "FTM" segment of the market. FTM customers are large utility networks, so their projects involve greater scale and complexity. Ex. 1 at 13. Stem was clear that it was confident in—but not certain of—Athena's success in transitioning to more complex FTM projects:

- "*As an early participant in the BTM market*, we developed operational focus and technical capabilities that *position us to have multiple product offerings and services in the evolving market for FTM* energy storage services." Nos. 15, 37, 69, 91.

- "I think it's a question of can, *can the company execute*? *Can they make this shift to front of the meter from behind the meter*? . . . And I would say to that highlight, *Massachusetts*, which is one of the biggest front of the meter markets, *we have 52% share*. I would also highlight the fact that *we weren't there 18 months ago*." No. 56.

Furthermore, Stem regularly disclosed the risk that it might *not* effectively complete this transition. *See* Nos. 18, 40, 53, 61, 72, 76, 80, 88, 94 ("The distributed generation industry is **emerging** and our distributed generation offerings **may not receive widespread market acceptance** . . . Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, **including the perception that our technology is unproven** . . . .").

Stem *did* achieve objective success with its first FTM project in Massachusetts, and won additional FTM business. Kearsarge Energy, L.P.'s announcement of an additional project with Stem in March 2021 speaks volumes about the success of that project. Ex. 3 at 1. Kearsarge's Managing Partner spoke positively on their experience: "Stem's strong knowledge and flexibility to navigate the ISO New England wholesale market makes them a preferred energy storage services provider for Kearsarge." *Id.* at 2. Stem more recently has announced FTM projects with Ameresco and other energy producers. Ex. 4. No Stem customer has *ever* announced dissatisfaction with Stem's FTM offerings, contrary to Plaintiffs' suggestions. *See infra* 11.

Stem achieved strong financial success alongside this customer satisfaction. After a de-SPAC merger on April 27, 2021, Ex. 5, it met or exceeded its revenue guidance for six quarters. *See* Exs. 6–11.

| Quarter | 22Q1 | 22Q2 | 22Q3 | 22Q4 | 23Q1 | 23Q2 |
|---------|------|------|------|------|------|------|
| Guidance | $26–32M | $53–64M | $70–95M | $145–220M | $55–65M | $83–98M |
| Actual | $41M | $67M | $100M | $156M | $67M | $93M |

But, as described in the prior motion, Stem was still affected by the economic headwinds faced by the entire clean energy sector from 2022 into 2023. 1st Mot. at 3. The impact on the industry is illustrated by the performance of Invesco WilderHill Clean Energy, an ETF with 77 clean energy stocks: as reported by Barron's, it *lost* 32% in 2023 against the S&P 500's *gain* of 14%. Ex. 12 at 1.

### C. Plaintiffs Fail Yet Again to Plead Any Basis for this Lawsuit

Amid these headwinds, an openly predatory and self-interested short-seller, "Blue Orca," published a report regarding Stem. Ex. 13 at 31 ("We are short sellers. We are biased. . . . Obviously, we will make money if the price of STEM stock declines."). The market did not care about this attack; Stem's stock price actually rose after it was published. Ex. 14 at 7. The report did, however,

captivate the imagination of a plaintiff and his counsel, who filed the first complaint in this case on

May 12, 2023. ECF No. 1. An almost-identical complaint was filed on July 10, 2023 and later

consolidated with this case. Complaint for Violation of the Federal Securities Laws, *Foley v. Stem,*

*Inc.*, No. 3:23-cv-03424-SK (N.D. Cal. July 10, 2023); ECF No. 83. Those complaints were too weak

even for the current lead plaintiffs. After boxing out all other comers in a PSLRA-mandated contest,

they filed a "Consolidated Complaint," on October 17, 2023 that jettisoned a defunct Section 11

claim and most references to Blue Orca. ECF No. 87.

      The Court dismissed that complaint, too, based on puzzle pleading, MTD Order at 6–8,

non-credible CWs, *id.* at 8–11, a Section 14(a) claim sounding in fraud, *id.* at 23–25, and other

grounds. After receiving leave to amend, Plaintiffs made only nominal changes to the FACC. But on

this fourth try, as set forth below, this remains a "lawsuit in search of a viable claim." 1st Mot. at 1.

## ARGUMENT

## I.   PLAINTIFFS FAIL AGAIN TO PLEAD A SECTION 10(b) CLAIM

      Plaintiffs fail to plead a "misrepresentation or omission," "scienter," and "loss causation"

with particularity, as required by the PSLRA and Rule 9(b). *Webb v. SolarCity Corp.*, 884 F.3d 844,

850–51 (9th Cir. 2018). The Court should again dismiss their Section 10(b) claim. MTD Order at 13.

### A.  Plaintiffs Fail Again to Plead Any Materially False or Misleading Statements

Plaintiffs fail to plead falsity[1] because:

- They repeat their impermissible puzzle pleading;
- The confidential witness allegations already deemed insufficient by the Court are the sole basis for alleging falsity; and
- None of the challenged statements is contradicted by Plaintiffs' allegations. In many cases, they are in fact protected forward-looking and opinion statements.

---

[1] Plaintiffs also still fail to allege that two Defendants "ma[de]" any statement. *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). The Court dismissed claims against Defendants Patel and Russo because they made no challenged statements and did not sign the challenged Prospectus. MTD Order at 16–17. In the FACC, Plaintiffs added only that Patel and Russo "participated" in certain investor calls, and that Russo was "quoted in" certain releases. FACC ¶¶ 22, 24. Ignoring the Court's order merits dismissal against Patel and Russo, since Plaintiffs still do not plead that they had any "ultimate authority" over any challenged statement. *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) (dismissing § 10(b) claims against officers because "control and authority" allegations were not "specific facts" showing "ultimate authority").

### 1. Plaintiffs' Complaint Remains Indecipherable Puzzle Pleading

The Court dismissed the CC for "fail[ing] to plead . . . fraud claims in compliance with Rule 8 and the PSLRA." MTD Order at 8. In response, Plaintiffs doubled down on the puzzle pleading that led to dismissal and still "merely throw[] the statements and the alleged 'true facts' together in an undifferentiated clump." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998) (Whyte, J.). The CC had set out challenged statements in six exhibits, each covering a "category" of statements. *See* CC, Exs. A–F. It then "g[ave]. . . an amalgam of 'reasons' why all statements in the corresponding exhibits [we]re false." MTD Order at 7. However, "the allegations . . . demonstrat[ing] the 'falsity' of each category of statements substantially overlap[ped][,]" and thus "d[id] not aid the Court in determining which facts . . . demonstrate[d] the falsity of which challenged statements." *Id.*

The FACC compounds these problems. It replaces six exhibits with a 402-page behemoth. *See generally* FACC Ex. A. This absurd length results from two additional columns still failing to provide the "specific facts" the PSLRA requires. *Metzler Inv. GMBH v. Corinthian Colls.*, 540 F.3d 1049, 1070 (9th Cir. 2008). The "Reasons Why Statements Were False and Misleading When Made" column retreads several pages of CW allegations over and again. For example, it repeats ***ninety-four times*** that Athena was in "Beta mode" and "crash[ed]"; this account supposedly falsifies ***every statement in the chart.*** Nos. 1–94. Judge Wilken dismissed similar allegations "recit[ing], almost verbatim, the same five-page description of [defendant's] problems." *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1199 (N.D. Cal. Oct. 7, 2008); *see also Dresner v. Silverback Therapeutics, Inc.*, 2022 WL 16716165, at *9 (W.D. Wash. Nov. 4, 2022) (dismissing complaint where "the reasons [statements were challenged were] copied and pasted verbatim" after each group of statements).

The new column purportedly describing why statements were made with negligence or scienter fails even more egregiously. It sets forth four lists of allegations, and then refers back to them roughly twenty entries at a time, accidentally skipping a few statements. *See* Nos. 2–17, 19–23 ("*See* Statement No. 1."); Nos. 25–41 (*"See* Statement No. 24."); Nos. 43–52, 54–72 ("*See* Statement No. 42."); Nos. 74–94 ("*See* Statement No. 73."). Courts in this district and others in the Ninth Circuit reject this sort of cross-referencing on puzzle pleading grounds. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 2008 WL 11399451, at *2 (N.D. Cal. Mar. 14, 2008) (Ware, J.) (dismissing 178-page

complaint that attached 124 pages of exhibits, which "frequently cross-referenc[ed] multiple paragraphs in other sections"); *Cheng Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at \*5–8 (C.D. Cal. Nov. 20, 2017) (dismissing complaint for "inconsistent use of emphasis, use of cross-references, and failure to delineate the reasons why statements were false and misleading").

After dismissal, Plaintiffs could have at least *attempted* a more tailored set of statements and facts. Failing to do so again, in the *fourth* complaint in this action, requires dismissal with prejudice. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1075 (N.D. Cal. 2001) (Brown Armstrong, J.) (dismissing second amended complaint with prejudice where "plaintiffs[] fail[ed] in three successive attempts to satisfy the pleading requirements of Rule 8 and the PSLRA"); *N.Y. State Tchrs.' Ret. Sys. v. Fremont Gen. Corp.*, 2010 WL 1473265, at \*3 (C.D. Cal. Mar. 29, 2010) (dismissing amended complaint with prejudice "that set[] forth virtually no new facts . . . and constitute[d] the puzzle pleading that made [two prior complaints] so difficult to decipher").

### 2. Plaintiffs Are Entirely Dependent on Non-Credible CW Testimony

The Court dismissed the last complaint, finding significant concerns with Plaintiffs' heavy reliance on CWs. The Court found those CWs "failed to show falsity" because Plaintiffs did not "plead[] facts sufficient to show such individuals' reliability and personal knowledge." MTD Order at 11. What remained were only "***two categories of statements*** that they argu[ed] [we]re contradicted by facts ***other than those*** contained in amalgamations or ***reported by a CW***." *Id.* at 12.

The latest complaint goes from ***two*** falsity allegations independent of a CW, to ***zero***, so the CWs are its sole, shaky foundation. Plaintiffs shed challenges to pipeline and margins, the ***"two categories"*** the Court viewed as potentially independent of CWs. MTD Order at 12. The FACC thus now relies on the CWs the Court already found non-credible. *See* Ex A. Nos. 1–94 (every purported "Reason[] Why Statements Were False and Misleading When Made" entry refers to CW statement); *In re Mullen Auto Sec. Litig.*, 2023 WL 8125447, at \*10 (C.D. Cal. Sept. 28, 2023) (dismissing portions of Section 10(b) complaint where "confidential witness statements form[ed] the sole basis for" alleging falsity, and were "hearsay" and "conclusory"). Those CWs are no more credible, *infra* 15–18, nor more able to show falsity, *infra* 7–12, than before amendment, requiring dismissal. *See Bajjuri v. Raytheon Techs., Corp.*, 2023 WL 3650554, at \*5 (D. Ariz. May 25, 2023) (dismissing

complaint based on "unchanged, uncorroborated, and unreliable confidential witness allegations" after amendment, with prejudice).

### 3. A Statement-by-Statement Analysis Again Shows No Falsity

Despite its length and indecipherability, the FACC challenges only (a) statements representing Athena's automation of certain power-related tasks and (b) statements representing the potential for Athena to drive Stem's success in FTM. Setting aside the puzzle pleading and CW credibility issues affecting *all* their allegations, Plaintiffs still fail to plead falsity as to any one such statement.

#### a) Plaintiffs Again Do Not Contradict that Athena Automated Certain Functions

The large majority of the statements challenged in the FACC concern tasks that Athena automates. Plaintiffs allege falsity only by setting forth a false all-or-nothing proposition: Defendants were 100% wrong, because their statements represented Athena as 100% automated. The *actual* statements, however, overwhelmingly represent that Athena automated only *certain functions* related to the use of power. Across the overbroad FACC and its unwieldy Exhibit A, these include:

- Athena automates "discharge" and "recharge" of available stored battery power or automatically "stores and release[s] energy" at the most cost-effective time. Nos. 2, 5, 12, 25, 28, 35, 62, 89.
- Athena "automatically switch[es] between battery power, onsite generation and grid power." Nos. 3–11, 19–20, 22–23, 26–34, 42–43, 45–47, 50, 58, 63, 73, 77.
- Athena "enables AI-automated system operations" and performs automated "data engineering." Nos. 1, 12, 24, 35, 64.
- Athena provides "automated dispatching" for grids and energy markets. Nos. 13, 36, 50, 81.
- Athena provides automated energy "market participation" and "bidding" and reacts to changing market "conditions." Nos. 5, 21, 24, 28, 44, 54, 57, 68.

Plaintiffs also challenge certain risk disclosures as false, by bootstrapping their assumption that Athena was unautomated: "Stem's technology, including the Athena platform, could have undetected defects, errors, or bugs in hardware or software which could reduce market adoption, damage Stem's reputation . . . and adversely affect Stem's business." Nos. 17, 39, 52, 60, 71, 75, 79, 87, 93. Nothing in that risk factor is false. Plaintiffs also attempt only to speak to whether Athena was automated, *not* whether it had "defects, errors, or bugs;" nothing they raise is even relevant to, let alone renders false, this risk factor. *See Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545, at *7 (N.D. Cal. May 23, 2019) (Davila, J.) (dismissing challenge to risk disclosure based on mismatch

between what company disclosed—risks from "[d]ata breaches and cyber-attacks" and "potential claims for damages resulting from loss of data from alleged vulnerabilities in the security of our processors"—and what plaintiffs alleged: the "existence of a vulnerability").

Plaintiffs fail to show a "direct contradict[ion]" with the statements regarding Athena's automation, as pleading falsity with particularity requires. *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 2018 WL 4181954, at *4 (N.D. Cal. Aug. 31, 2018). As was described in the prior motion, every CW allegation about Athena amounts to complaints "[v]aguely disparaging Stem's software capabilities." *See* 1st Mot. at 7. The FACC tries to show falsity through the CWs by reiterating the same flawed allegations:

- Making clearly secondhand references to the use of an "Excel spreadsheet" and performance of "manual tasks" by unnamed, non-CW employees, FACC ¶¶ 72–74;
- Alleging secondhand dissatisfaction of unnamed customers with Stem's product offerings, FACC ¶ 71; and
- Complaining that Stem did not provide materials to the marketing team. FACC ¶¶ 79–81.

These quibbles, even if credited, only show falsity if Defendants' *actual statements* represented Athena as an all-powerful artificial intelligence. *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 928 (N.D. Cal. 2017) (Tigar, J.) (dismissing complaint where "Plaintiff's allegation. . . d[id] not directly contradict any of Defendant's statements"). But the CWs *never* describe the functions that Defendants described as automated—*e.g.*, "discharges," and "switch[ing]" between energy sources[2]—as *un*automated. In *In re Intel Corp. Securities Litigation*, Judge Gonzalez Rogers dismissed a securities lawsuit that likewise did not contradict the *actual statements* defendants made about their products. 2019 WL 1427660, at *10 (N.D. Cal. Mar. 29, 2019) (holding that statement that a product was "vulnerability-resistant" did not suggest vulnerability-proof). Otherwise, Plaintiffs' allegations about Athena's automation amount to the "broad premise that [a] technology did not work," which Judge Gilliam held insufficient as a "foundation" for a securities claim. *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *7, 19 (N.D. Cal. Nov. 16, 2020) (dismissing complaint with prejudice).

---

[2] To that point, the allegations that "an Excel spreadsheet" performed Athena's functions do not add up. FACC ¶¶ 72–74. How could an Excel spreadsheet charge or discharge batteries, or switch between energy sources? Plaintiffs make no attempt to plead any resolution to this discrepancy.

The CWs are also too temporally vague to challenge Athena's automation under the PSLRA. Were it to wade through the FACC and its Exhibit A, the Court would find only two statements where Defendants made more general positive statements about Athena's automated capabilities. Nos. 65, 82. Plaintiffs fail to show these statements were "false or misleading at the time they were made." *In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012) (affirming dismissal). One of those statements, No. 82, was made on September 28, 2022. CW1 left the Company in February 2022, and thus could hardly speak about Athena as of September 2022. FACC ¶ 46; *see Kampe v. Volta, Inc.*, 2024 WL 308262, at *13 (N.D. Cal. Jan. 26, 2024) (Tigar, J.) (dismissing complaint as to allegations based on CW testimony, where one CW "left the company in early 2020" and the complaint "lack[ed] allegations" his observations would have affected the "challenged statements more than a year later").

CWs 1 and 2 also provide no time frame for their observations, so they are unable to show falsity, even for statements made when they were purportedly at Stem. *See* FACC ¶¶ 69–74, 78–80 (no reference by CWs to timing). These include, at least, the statements on February 24, 2022, No. 65, and September 28, 2022, No. 82. CW3's complaints about marketing materials, limited only to the vague period of "late 2021 or early 2022," are also unhelpful. FACC ¶ 81. This sort of "vagueness around timing, as well as around what was said and by whom" led Judge Tigar to find a "fail[ure] to state with particularity facts giving rise to a reasonable inference that the [challenged] statements . . . were false or misleading *when made*." *Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 770 (N.D. Cal. Jan. 5, 2024); *see also Bailey v. Zendesk, Inc.*, 2024 WL 1807943, at *4 (N.D. Cal. Apr. 24, 2024) (Pitts, J.) (dismissing Section 14(a) claim where plaintiffs failed to "present any ***contemporaneous*** evidence that directly contradict[ed]" defendants' statements regarding revenue).

Plaintiffs' fluffing of the CW allegations in the FACC also contributes nothing to pleading falsity. CW1 purportedly states, for the first time, that Athena was in a Beta version and crashed frequently. FACC ¶ 71. They also describe an apparent test process when Stem personnel tried to "break" Athena and the software failed before the test started. *Id.* These are just more examples of Plaintiffs "[v]aguely disparaging Stem's software capabilities," which the Court found unconvincing previously. 1st Mot. at 7; *see also Aqua Metals, Inc.*, 2020 WL 6710096, at *7 (dismissing "the broad

premise that the technology did not work as the foundation for [plaintiffs'] allegations"). They also do not contradict any description of the functions Athena was actually described as automating. *See supra* 7. Plaintiffs last selectively quote a statement from a defendant in **February 2024,** almost a full year after the end class period, to argue Athena was unautomated because it was then described as having sometimes added a "human in the loop." FACC ¶ 75. Mr. Carrington *actually* stated, though, that Athena produces "automated results," Ex. 15 at 6—which *affirms* Defendants' prior statements that Athena automated certain functions. *Supra* 7. Moreover, it is entirely possible that a "human in the loop" was added after the class period, without falsifying any of Defendants' statements in the Complaint. Indeed, this would be true even if, taken to the absurd, Athena was entirely *unautomated* as of February 2024.[3] The temporal and functional disconnects between Defendants' statements about Athena-automated tasks and the CWs' complaints remain far too wide to ever support falsity here, even after amendment.[4] Dismissal with prejudice should be the result. *See Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 866–70 (N.D. Cal. 2020) (Gilliam, J.) (dismissing with prejudice when additional allegations in amended complaint failed to establish falsity), *aff'd sub nom. In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022).

### b) Plaintiffs Again Fail to Show Any False Statement About Stem's Transition to FTM

Plaintiffs next challenge statements that refer to Athena's prospects in FTM and potentially resulting competitive and financial benefits to Stem. These include statements like the following:

- Expressions of confidence in Athena for FTM, based on Stem's success with Athena in BTM: "As an early participant in the BTM market, we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services. We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage." Nos. 15, 37, 69, 91; *see also* No. 66.

- Expressions of confidence based on Stem's successful experience providing Athena for the Massachusetts FTM project: "I think it's a question of can, can the company execute? Can they make this shift to front of the meter from behind the meter? Yes, you are the leader, yes, you have this huge market share. And I would say to that highlight, Massachusetts, which is

---

[3] Certainly, then, a statement that "[y]ou don't need a human operator to screen, you know, **chained to the desk 24/7** to [] make this work," is not shown false by these accounts. No. 89.

[4] Because Plaintiffs also attempt to show the falsity of risk disclosures only through these CW accounts, those attempts fail. *See Cullen v. Ryvyl, Inc.*, 2024 WL 898206, at *11 (S.D. Cal. Mar. 1, 2024) (plaintiffs failed to show risks had materialized where "confidential witness statements [we]re . . . unhelpful because it [wa]s not apparent that any of their information date[d]" to a relevant period).

one of the biggest front of the meter markets, we have 52% share. So we have a very compelling product that is winning in a variety of markets." No. 56; *see also* Nos. 57, 84, 87.

- General expressions of confidence in Athena for FTM: "These strong results demonstrate our speed to market and effectiveness of our Athena platform, underscoring our confidence and continued momentum in growing share of the FTM market." No. 55; *see also* Nos. 62, 83.

As with the automation statements, there is corresponding risk language Plaintiffs allege as false. *See* Nos. 18, 40, 53, 61, 72, 76, 80, 88, 94 ("The distributed generation industry is emerging and our distributed generation offerings may not receive widespread market acceptance . . . . Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, including the perception that our technology is unproven . . . ."). But all these statements are *accurate*, and in many cases protected as opinions and forward-looking statements.

**Most crucially, Plaintiffs never contradict these statements about FTM, because they never challenge Stem's *actual success* in FTM**. The CWs' conclusory criticisms of Athena FTM capabilities are very similar to their criticisms of Athena's automation:

- CW1 alleges Athena was "not well made for large FTM deals." FACC ¶ 70.
- CW3 alleges Athena "lacked functionality" with respect to FTM projects. FACC ¶ 76.
- CW2 alleges Athena was not "fully developed" for FTM. FACC ¶ 77.

As thinly sourced as these accounts are, *infra* 15–18, they also fail to falsify Stem's statements, which are less about Athena's specific FTM uses, and *more* about how Athena could enable Stem to succeed in FTM. *See* Nos. 15, 37, 69, 91 (Athena's BTM success "position[ed] [Stem] to have multiple product offerings and services in the evolving market for FTM energy storage"). That Stem *did* actually win new FTM customers and satisfy repeat FTM customers, *supra* 3, shows these statements were true. Further, the ample context surrounding many of the statements, describing both the transition from successful BTM projects, Nos. 15, 37, 69, 91, and success with the Massachusetts FTM project, No. 56, shows them to be true. *See Intel*, 2019 WL 1427660, at *11 ("the relevant context [of statements] undermine[d] plaintiff's allegations of falsity," when "viewed against the backdrop" of company's other statements and risk disclosures); *Chang v. Accelerate Diagnostics, Inc.*, 2016 WL 3640023, at *8 (D. Ariz. Jan. 28, 2016) (dismissing where "[a]ny confusion caused by reading [an assertion] in isolation [wa]s dispelled by reading Defendants' statements in context").

The minimal changes to CW allegations regarding FTM also fail to show falsity. CW1 supposedly states that "all of Stem's FTM clients CW1 worked with[5] described Athena as an empty suit when it came to the software for the FTM projects." FACC ¶ 71. This is only a slight change from just "FTM clients," in the CC, at ¶ 71. Changing the characterization of these uninformed opinions fails to contradict Stem's transition from BTM to FTM, or Stem's winning business in FTM. *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *13 (N.D. Cal. July 21, 2020) (Breyer, J.) (CW's "hearing th[at] customers did not want [a company's] new product" was "unreliable hearsay," "conclusory assertions," and "insufficient"); *see also Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *15 (C.D. Cal. Mar. 5, 2021) (dismissing complaint because "former employee's mere opinion" did not "substitute for particularized factual allegations regarding" a strategic decision).

**Many of the statements regarding Stem's transition to FTM are also protected opinions.** As before, Plaintiffs must allege with particularity that opinions are "both objectively and subjectively false or misleading." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 614 (9th Cir. 2017). Many FTM statements are obvious opinions:

- ***We believe*** that Athena's ability to optimize operations in both the BTM and FTM markets ***is unique*** in the industry and ***provides us with a competitive advantage***." Nos. 15, 37, 69, 91. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) ("We ***believe*** our conduct is lawful" is "an unadorned statement of opinion.").

- "These strong results demonstrate our speed to market and effectiveness of our Athena platform, ***underscoring our confidence*** and continued momentum in growing share of the FTM market." No. 55. *See Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *5–7 (N.D. Cal. Mar. 18, 2024) (Gilliam, J.) (statements "***expressing confidence***" in a new drug's "potential to transform the treatment landscape for patients" were protected opinions).

In the face of this opinion language, Plaintiffs fail entirely to plead either the objective or the subjective falsity the Ninth Circuit required in *Align*. The failure to show any contradiction of the FTM statements, *supra* 10–12, first makes showing ***objective*** falsity impossible. *See Golub v. Gigamon, Inc.*, 372 F. Supp. 3d 1033, 1051 (N.D. Cal. 2019) (Orrick, J.) (dismissing Section 14(a) complaint where the plaintiff "failed to show objective falsity with particularized facts that directly contradict[ed] or [we]re necessarily inconsistent with" opinion statements).

Plaintiffs' only attempt to show ***subjective*** falsity is again by citing the opinions of CWs, but even "legitimate difference[s] in opinion," which the CWs' are not, "[are] hardly sufficient to state a

---

[5] If anything, this narrows what CW1 could speak to even further, as another example of the CWs' admitted ignorance. *Infra* 16.

securities claim." *In re Eargo, Inc. Sec. Litig.*, 2023 WL 1997918, at *7, 11 (N.D. Cal. Feb. 14, 2023) (Breyer, J.) (granting motion to dismiss). Specifically, Plaintiffs still fail to show that management had the same beliefs as the CWs. *Infra* 17–18; *see Pivotal*, 2020 WL 4193384, at *14 (dismissing argument that defendants "must have known" about "trends" CWs observed or that trends were "generalizable across the company"). The speculative generalities added in the FACC—that CW1 "*believed* [his manager] would regularly meet with Defendant Russo and update[] him on the status of deals," FACC ¶ 83—are still only from CW1's narrative of the issues, and thus still fail to show any actual knowledge by Defendants. *Infra* 20. The vagueness of when the CWs were employed, and what periods they speak to, *supra* 9–10, also makes it impossible for Plaintiffs to show Defendants would have shared their skewed beliefs. *See Seaman v. Cal. Bus. Bank*, 2013 WL 5890726, at *4 (N.D. Cal. Oct. 30, 2013) (dismissing complaint in which it was "difficult to determine which facts were true and known to [a defendant] at the [relevant] time . . . and which events occurred later").

**Many statements regarding the transition to FTM are also protected forward-looking statements.** The PSLRA's safe harbor protects "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer" protected by the PSLRA's safe harbor. 15 U.S.C. § 78u-5(i)(1)(B). Though the forward-looking statements made by Defendants overlap considerably with the opinion statements covered previously, this is a distinct basis for their protection. These statements are definitionally forward-looking, as they clearly refer to management's plans and objectives for Athena in FTM:

- "We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and ***provides us with a competitive advantage.***" FACC Ex. A, Nos. 15, 37, 69, 91. *See Union Asset Mgt. Holding AG v. Sandisk Corp.*, 2016 WL 406283, at *2–3 (N.D. Cal. Jan. 22, 2016) (Chhabria, J.) (dismissing complaint because statement a product "***position[ed] [the company] well to accelerate its momentum*** in the fast-growing market for enterprise Flash" and similar statements were protected forward-looking statements).

- "These strong results demonstrate our speed to market and effectiveness of our Athena platform, underscoring our confidence and ***continued momentum in growing share of the FTM market.***" FACC Ex. A, No. 55. *See In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *13 (N.D. Cal. Feb. 12, 2015) (Koh, J.) (dismissing complaint where statements about "catpur[ing] market share" were protected forward-looking statements).

Given that these statements are forward-looking, they are protected by the PSLRA safe harbor as long as they are identified as such and "accompanied by meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A). Stem's statements *were* consistently designated as forward-looking in

Stem's public filings. *See, e.g.*, Ex. 2 at 3; Ex. 16 at 21–23. They were also consistently accompanied by cautionary language that "addressed the very subjects Plaintiffs challenge." *See Pivotal*, 2020 WL 4193384, at *16. Stem directly warned that it could flounder if Athena did not facilitate FTM projects. *E.g.*, No. 92 ("If we are ***unsuccessful in developing and maintaining*** our proprietary technology, ***including*** our ***Athena*** platform, ***our ability to attract and retain partners could be impaired***.").

      While Plaintiffs describe Stem's warnings as not meaningful, and as false in and of themselves, they do so only by assuming the truth of their CW allegations. The CWs are the *only* supposed sources of the information suggesting Athena was already unworkable or rejected by customers. *See* Nos. 18, 40, 53, 61, 72, 76, 80, 88, 94 ("reasons" column refers to CW statements falsifying these risk disclosures). The Court already deemed those accounts non-credible, and Plaintiffs' amendments made them no more credible.[6] *Infra* 15–18. The CW accounts alone thus cannot limit the protection of the safe harbor. *See, e.g.*, *Ferreira v. Funko*, 2021 WL 880400, at *21 (C.D. Cal. Feb. 25, 2021) (PSLRA safe harbor applied because "Plaintiffs' allegations fail[ed] to show Defendants shared [a] CW[]'s 'pessimism' or 'gloomy view'").

### B. Plaintiffs Fail to Show that Any Statements Were Made with Scienter

      Plaintiffs' Complaint should also be dismissed for failure to plead scienter. The Complaint must "raise a 'strong inference'" that "defendant[s] acted with an intent to deceive, manipulate or defraud." *Metzler*, 540 F.3d at 1061 (affirming dismissal). It must also "create an inference of scienter more cogent or compelling than an alternative innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009); *see id.* at 1007 (rejecting a "legion" of scienter allegations).

      Under *Metzler* and *Zucco*, the Court rejected the CC's allegations of scienter. MTD Order at 17–21. Incredibly, now, Plaintiffs allege *even less*. They abandon one of their CWs, many factual allegations, and several theories altogether. What little they have added cuts *against* scienter.

### 1. Speculation by Anonymous, Nontechnical, Ex-Employees

      The FACC, which still relies on CW allegations the Court found unpersuasive, does not cure

---

[6] Accordingly, as with risk disclosures related to automation, *supra* 7–8, Plaintiffs also fail to allege the risk disclosures relating to Athena's prospects in FTM were themselves false. *Ryvyl*, 2024 WL 898206, at *11 ("unhelpful" CW statements failed to show risks had materialized).

the deficiencies identified by this Court. *See* MTD Order at 8–11, 18. Plaintiffs again fail to (i) describe the CWs "with sufficient particularity to establish their reliability and personal knowledge" and (ii) demonstrate that the CW allegations are "themselves [] indicative of scienter." *See id.* at 8–9.

### a) The CWs Lack Reliability and Personal Knowledge

**CWs Still Lack Titles.** Plaintiffs ignore the Court's reasoning for discounting CWs 1, 2, and 4: they fail to add titles for CWs 1 and 2 and they remove all references to CW4. MTD Order at 9–10. The Ninth Circuit requires more. *E.g.*, *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012) (discrediting CWs where complaint provided titles *or* responsibilities, but not both), *aff'd*, 561 Fed. App'x 598 (9th Cir. 2014). The allegation that CW2 was a "Stem analyst" is too general, and the inclusion of the CWs' *managers'* names and titles (for CW1 and CW3) does not ameliorate Plaintiffs' deficient descriptions. FACC ¶¶ 46–49; *In re Downey Sec. Litig.*, 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (dismissing where complaint "merely state[d] each confidential witness's general job title and, on occasion, the name and title of the confidential witness's supervisor").

**CWs' Vague Job Responsibilities Cut *against* Personal Knowledge.** For CWs 1 and 2, the FACC adds only vague job responsibilities that undercut scienter. The PSLRA requires particularized allegations of "the responsibilities and duties of these individuals *such that they would possess information probative of scienter.*" *Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*, 2023 WL 3549506, at *12 (C.D. Cal. May 9, 2023) (dismissing complaint); *accord Applestein v. Medivation, Inc.*, 561 Fed. App'x 598, 600 (CWs' "responsibilities . . .and facts supporting an inference that they had personal knowledge" must be particularized). Vague allegations that CW1 "assist[ed] the FTM sales team with drafting [] initial proposals" and worked "across the entire sales cycle," FACC ¶ 46, or that CW2 "analyzed new markets and use cases for Stem's energy storage solutions" for "*Mexico, residential, power plants, and mini-co-ops,*" FACC ¶ 48, do not show that these CWs could know the technical aspects of Athena's functionality. *See supra* 6–10. Indeed, such allegations show that the CWs' responsibilities focused elsewhere.

**CWs Lack Personal Knowledge of Athena's Functionality.** Instead of facts based on personal knowledge, the CWs tout hearsay, speculation, and even their own ignorance:

- **Hearsay**: No CW worked directly with Athena or saw the purported "Excel spreadsheet." *See* FACC ¶¶ 67, 72, 73, 74. Plaintiffs thus still rely on "at least one level of hearsay." *Zucco*, 552 F.3d at 997; *e.g.*, FACC ¶¶ 67 ("they also learned"), 74 ("they had heard"), 79 ("someone would state"), 81 ("they were told"). This fails. *See Ezzes v. Vintage Wine Estates, Inc.*, 2024 WL 895018, at *5 (D. Nev. Mar. 1, 2024) (that CW "had only 'heard' or 'learned' . . . d[id] not clearly relate to having personal knowledge"). Worse still, their hearsay "includes no details specifying the nature of" the Excel functions. *Zucco*, 552 F.3d at 997 ("vague hearsay" not reliable). Plaintiffs also ignore the Court's concerns and attribute hearsay to an "unspecified member of a team of unspecified size." *Compare* MTD Order at 10, *with* FACC ¶ 81 (still specifying neither).

- **Speculation**: No CWs independently verified claims about Athena. Instead, they resort to similes, FACC ¶ 72 ("Athena could be likened to a vending machine"), and metaphors, FACC ¶ 77 ("the ship was taking off and being built at the same time").[7]

- **Ignorance**: These non-technical ex-employees complain that they suffered "confusion around Athena" and that it was "a big request from the sales force to get a video" demonstrating Athena. FACC ¶ 81. Their admitted ignorance of Athena discredits their complaints. *See Bao v. Solarcity Corp.*, 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016) ("CW['s] seeming lack of understanding of the concepts discussed . . .casts some doubt on his/her understanding").

At most, and at bottom, the CWs' allegations amount to "disagreement with [Stem's] management." *Funko*, 2021 WL 880400, at *21. That does not suffice. *Id.* at *31 (dismissing complaint).

**Malleable Allegations Are Not Credible.** Instead of bolstering their allegations, the CWs *contradict their own claims*. Plaintiffs previously alleged "CW2 explained that Stem's BTM line of business *began to flatline*" pre-IPO. CC ¶ 66. But now they allege "CW2 explained that . . . Stem's BTM line of business *had flatlined*" pre-IPO. FACC ¶ 65. Such inconsistency undercuts scienter. *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 857–58 (N.D. Cal. 2019) (dismissing where first complaint alleged CW "suspected or saw" but second alleged "they were informed").

**Temporally Irrelevant CW Allegations Do Not Show Scienter.** Two of the three CWs were not employed at Stem throughout the class period (December 4, 2020 to April 3, 2023).[8] But CW "accounts must be contemporaneous with the alleged misstatements." *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (CW statements "lack[ing] in particularity as to time" were not credible because the "statement or omission must be shown to have been false or misleading *when made*"). For instance, CW1 left Stem over a year before

---

[7] That "CW1 reported that *all* of Stem's FTM clients that CW1 worked with described Athena as an empty suit," is both inconsistent (*Compare* CC ¶ 71, *with* FACC ¶ 71) and implausible. *See Sgarlata*, 409 F. Supp. 3d at 857–58; *Zucco*, 552 F.3d at 998, n.4 (hearsay relied upon by CWs may not be "sufficiently reliable, plausible, or coherent to warrant further consideration").

[8] CW1 was employed at Stem from before the Class Period until February 2022, FACC ¶ 46, while CW3 joined Stem in March 2021, months after the start of the Class Period, FACC ¶ 49.

the end of the class period when "Stem had not yet finished . . . the Massachusetts FTM Project," so they cannot reliably opine on whether Athena "work[ed] as marketed." FACC ¶ 73; *see Bao v. SolarCity Corp.*, 2016 WL 4192177, at *5 (N.D. Cal. Aug. 9, 2016) (CWs who left company before purported false statements offered "little reliable insight into what occurred during the class period"). This problem is compounded by the FACC's reliance on nontemporal CW allegations. *Supra* 9–10; *see Mauss v. NuVasive, Inc.*, 2014 WL 4161431, at *8 (S.D. Cal. Aug. 19, 2014) (dismissing where, as here, complaint "rarely provide[d] any dates associated with [the CWs'] factual allegations").

### b)  The CWs' Allegations Do Not Indicate Fraudulent Intent

Plaintiffs cannot base scienter upon CW allegations that are not sufficiently "fact based to infer that specific information . . . was conveyed to the Defendants." *Greenberg v. Cooper Cos., Inc.*, 2013 WL 100206, at *8 (N.D. Cal. Jan. 7, 2013). The Court explained this. MTD Order at 8–9. But Plaintiffs still fail to allege that any CW interacted with the Individual Defendants such that the CW would have personal knowledge of the defendant's contemporaneous knowledge of falsity. Instead, Plaintiffs rehash CWs' speculation about what was in other people's heads. That fails.

**CWs Never Interacted with the Individual Defendants.** None of the CWs is alleged to have been "in a meeting with [the Individual Defendants] or personally overhead a conversation of any of the" Individual Defendants; this absence of "first hand knowledge of what the individual defendants allegedly knew" fails to "satisf[y] the PSLRA." *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *13 (N.D. Cal. Dec. 28, 2005) (dismissing with prejudice); *see also Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (dismissing where no CW had "any significant contact with [defendants] that could show what [they] actually knew"). Plaintiffs cannot overcome this failure with CWs' hearsay and speculation. *See* MTD Order at 10. Nonparty Mary Adam is an insufficient bridge from CW1 to Defendant Russo; CW1's "belie[fs]" (FACC ¶¶ 83, 375) about Adam's interactions with Russo are not particularized allegations. *See Greenberg*, 2013 WL 100206, at *8 (discrediting CW allegations not sufficiently "fact based to infer that specific information . . . was conveyed to the Defendants").

**CWs Allege No Personal Knowledge of Fraudulent Intent.** The CWs also lack any *other* basis of firsthand knowledge of scienter. CW2 assumes that the Individual Defendants shared his or

her pessimism that Stem had "no practical chance of winning" certain deals. FACC ¶ 277. *See Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *13–14 (N.D. Cal. Sept. 30, 2024) (discrediting CW's "conclusory assertions of scienter" alleging company "faced issues in its development of the technology"). CW2 further speculates that Carrington and Bush "would have signed" for Stem's hardware purchase for Available Power. FACC ¶ 85. Even that would fail to suggest that Carrington and Bush knew the deal was not viable. Instead, that Stem purchased hardware suggests the "plausible alternative inference" that Stem expected the order to be fulfilled. *See Robb v. Fitbit*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) (dismissing complaint where CW claims supported inference that executives were "simply unaware" of product's inaccuracy). Likewise, that CW2 "personally became aware" that the Available Power deal fell through in "early 3Q 2022," FACC ¶ 85, says nothing about Carrington's and Bush's prior knowledge of the deal's viability. *See In re Veritas Software Corp. Sec. Litig.*, 2004 WL 7338912, at *7 (N.D. Cal. May 19, 2004) (that accounting issues identified by CW were "ultimately determined" to be legitimate does not show that executives' prior accounting statements "were made with intent to defraud").

### 2. Routine Stock Sales Again Do Not Support Scienter Inference

Following Ninth Circuit precedent, this Court correctly held that the stock sales alleged in the CC do not support scienter. MTD Order at 18–20. All of the facts supporting that holding remain true: the same sales, representing the same percentage of holdings, the same 121-week class period,[9] the same purported nonpublic information, and the same failure to show deviation from prior trading history.[10] *Compare* CC ¶¶ 282–93, *with* FACC ¶¶ 344–55.

The Court rejected Plaintiffs' theory, even assuming these sales were discretionary. MTD Order at 19. Nearly all of Defendants' trades (and all of Carrington's and Patel's) were under Rule 10b5-1 trading plans or to cover tax obligations, and thus nondiscretionary.[11] Exs. 17–22; *see also* Ex.

---

[9] *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (63-week class period was "unusually long," and "allow[ed] the plaintiffs to sweep as many stock sales into their totals as possible"); *In re DermTech, Inc. Sec. Litig.*, 2024 WL 4941026, at *11 (S.D. Cal. Dec. 2, 2024).

[10] *See Zucco*, 552 F.3d at 1005 (plaintiff "not excused from pleading the relevant history," even where a "defendant's trading history is simply not available, for reasons beyond a plaintiff's control").

[11] Plaintiffs not only fail to plead that Defendants' trading activity constituted insider trading, but mischaracterize Defendants' trades themselves. Ex. 17 (showing that Russo sold 13,427 shares on August 10, *2023*, not August 10, 2022, as Plaintiffs allege).

23 at 33. This negates any inference of scienter. *See In re Eargo, Inc. Sec. Litig.*, 2023 WL 5663154, at *1 (N.D. Cal. Aug. 31, 2023) (no scienter for nondiscretionary trades); *In re Nektar Therapeutics*, 2020 WL 3962004, at *15–16 (N.D. Cal. July 13, 2020) (no scienter for sales of 87%, 75%, and 67% of holdings primarily under trading plans). Defendants did not "unload[] their Stem stock for . . . personal gain" after the lock-up period expired; those were *also* trading plan sales. FACC ¶ 348; Exs. 17–22. Accordingly, they were unsuspicious. *In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) ("sudden stock sales" after lock-up expired not suspicious). The same is true for all of Defendants' sales in late 2021, dispelling Plaintiffs' theory that the trades were influenced by 2021 results. FACC ¶ 349.[12]

### 3. "Core Operations" Still Cannot Make Up for Plaintiffs' Lack of Particularized Allegations of Scienter

As the Court explained, "Contrary to plaintiffs' argument, the Ninth Circuit has held 'general allegations of defendants' "hands-on" management style, their interaction with other officers and employees, their attendance at meetings, and the receipt of unspecified weekly or monthly reports are insufficient' to demonstrate scienter." MTD Order at 21 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005)). Thus, the Court correctly rejected Plaintiffs' "core operations" theory. *Id.*

But Plaintiffs' latest allegations are largely a copy-and-paste of the inadequate ones from the prior complaint. *Compare* CC ¶¶ 326–31, *with* FACC ¶¶ 385–91. The new allegations are even less relevant to scienter than the recycled ones. Plaintiffs now allege what the *market*—not the defendants—understood, and long after the class period ended. FACC ¶ 382. This ignores the Court's instruction to "show *defendants* had access to information demonstrating Athena's alleged lack of functionality for FTM" when they made the allegedly false statements. MTD Order at 21.

Plaintiffs' other allegations are of routine corporate management: taking meetings, reviewing databases, signing documents, and speaking publicly. Such allegations, "however, which reflect defendants' general oversight of company business and projects, do not suffice to show defendants had access to information demonstrating Athena's alleged lack of functionality for FTM projects."

---

[12] Plaintiffs have abandoned their other compensation-related theory of scienter: executive pay. *Compare* CC ¶¶ 294–300, *with* FACC at iii. For good reason: Stem's compensation *undercuts* scienter, because Stem's performance benchmark was changed *away from* the allegedly gameable metric, pipeline. CC ¶ 296.

MTD Order at 21 (citing CC ¶¶ 294, 299, 316–29). But Plaintiffs still rely on such allegations. FACC ¶¶ 368–84. They also add similar, equally conclusory "would have" allegations. *E.g.*, FACC ¶ 382 ("CSO Patel would have known that the sales team was not closing deals"); *see Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1112 (9th Cir. 2021) (rejecting "conclusory" allegation that defendant "would have been involved in creating" report).

**Meetings.** Plaintiffs claim that "during Stem's 11/09/21 Q3 2021 earnings call, Defendant Carrington, himself, admitted that . . . weekly operations calls . . . would have informed him that Athena was not viable for FTM projects." FACC ¶ 374. He said no such thing. Ex. 24 at 11 (instead stating that FTM projects were "further out" than BTM ones and dependent on "supply chain").

**Databases.** CW1 believes that Russo "was a self-proclaimed Salesforce data czar." FACC ¶ 375. Plaintiffs do not allege any knowledge basis for that belief; it is hearsay via nonparty Mary Adam. *Id.* Regardless—and whatever it means to be a "data czar"—there is no allegation that Russo saw that any data in Salesforce was false, much less that he later lied about it. FACC ¶¶ 83, 374–76

**Signing Contracts.** Citing no basis for personal knowledge, Plaintiffs allege that Russo signed the Lullwater contract on September 30, 2022. FACC ¶ 376. But Plaintiffs do not identify a single statement for which signing the Lullwater contract shows Russo's scienter. So, too, for Bush's allegedly signing the Lullwater parent guaranty. *See* FACC ¶¶ 87, 383.

**Speaking "Knowingly."** Plaintiffs gut their allegations that speaking knowledgeably shows scienter. *Compare* CC ¶¶ 332–36, *with* FACC ¶¶ 392–94. They are forced to do so because they have largely abandoned their falsity allegations, aside from the theory that Defendants lied about Athena's automation and viability for FTM. Thus, all that remains is that Defendants *discussed* Athena. That is insufficient. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062–64 (9th Cir. 2014) (affirming dismissal); *Metzler*, 540 F.3d at 1068 ("[G]eneral awareness of the day-to-day workings of [the defendant's] business does not establish scienter.").

### 4.  Plaintiffs' Other Recycled Theories Remain Unpersuasive

Plaintiffs continue to allege that corporate housekeeping—fundraising, due diligence, and self-scrutiny—shows scienter. The Ninth Circuit holds exactly the opposite.

**Desire to Raise Capital Is Immaterial to Scienter Inquiry.** Plaintiffs once again vilify

Defendants for endeavoring to improve Stem's financial position by raising money in the de-SPAC transaction. *Compare* CC ¶¶ 301–08, *with* FACC ¶¶ 358–65 (nearly verbatim). But the Ninth Circuit rejects such motive allegations based on "routine corporate objectives such as the desire to obtain good financing and expand." *SolarCity*, 884 F.3d at 856 (affirming dismissal). "To hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *Rigel*, 697 F.3d at 884; *accord DermTech*, 2024 WL 4941026, at *12 ("Company's . . . effort to raise capital" does not raise scienter inference).

**Conducting Due Diligence Is Not Indicative of Scienter.** Undertaking pre-merger diligence does not show scienter. *See Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *31 (D. Ariz. Feb. 2, 2023) (allegation that "prior to the merger, [the SPAC] conducted due diligence examinations" failed to support scienter). Plaintiffs leave "unclear what [STPK] even discovered" or whether "defendants were made aware of any specific issues" into Athena's viability as a result of the diligence. *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 4859099, at *5 (N.D. Cal. Oct. 2, 2019) (dismissing complaint). Missing, for instance, is the *content* of Stem's backlog that Scheyer, Daley, and Morgan purportedly received, FACC ¶ 368, and how that information renders any statements false. *See Intuitive Surgical*, 759 F.3d at 1063 ("Mere access to reports containing undisclosed sales data is insufficient to establish a strong inference of scienter."). Plaintiffs' sole new allegation is that "Stem's senior management prepared . . . certain internal, unaudited prospective financial information." FACC ¶ 371. But Plaintiffs fail to plead which documents were prepared, by whom, when, what made them inaccurate, and how Defendants should have known that.

**Plaintiffs' Reliance on Policies Is Circular.** Plaintiffs abandon their allegations that disclosing a weakness in internal controls shows scienter. *Compare* CC ¶¶ 337–41, *with* FACC ¶¶ 399–410. What remains is Plaintiffs' attempt to plead scienter by citing excerpts of Stem policies that Defendants purportedly violated. This argument is circular. The "violations," including insider trading and inaccurate disclosures, are exactly what Plaintiffs fail to allege. *See supra* 7–12, 18–19.

### 5. Carrington's "Human-in-the-Loop" Statement in 2024 Is Irrelevant to His Knowledge Much Earlier, during the Class Period

Plaintiffs try to manufacture scienter from a statement made long after the class period that Stem's "program management team[ ] adds a 'human-in-the-loop'" to Athena's automated

operations. FACC ¶ 356. This does not show falsity. *Supra* 10; Ex. 15 at 6. Moreover, it does not show anything about Carrington's knowledge when he made the alleged misstatements. *See Oracle*, 2019 WL 6877195, at *14 (no scienter from temporally irrelevant allegation).

### 6. Plaintiffs Fail to Plead that Executive Departures Were Suspicious

Finally, the FACC tries to plead fraudulent intent through management turnover well after the class period, but the Ninth Circuit rejects such a tenuous basis for scienter. "Employee resignations only support an inference of scienter when the 'resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances.'" *Vintage Wine Estates, Inc.*, 2024 WL 895018, at *14 (quoting *Zucco*, 552 F.3d at 1002). Here, Plaintiffs satisfy neither requirement.

First, Plaintiffs do not even try to show that the resignations at issue were uncharacteristic when compared to Stem's typical hiring and termination patterns. FACC ¶¶ 395–98.

Second, Plaintiffs do not point to suspicious circumstances accompanying any of the departures. As a threshold matter, Plaintiffs concede that *all* of the departures occurred more than a year after the class period. FACC ¶¶ 2, 395. Even when (unlike here) personnel changes occur "on the same day as the suspicious circumstances of the Company's restatement announcement," scienter is a "mere conclusory allegation" when (like here) the complaint fails to plead particularized facts connecting the changes to the purported bad news. *Vintage Wine Estates*, 2024 WL 895018, at *14–15; *see also In re Regulus Therapeutics Inc. Sec. Litig.*, 406 F. Supp. 3d 845, 861–62 (S.D. Cal. 2019) (CEO resignation within class period not indicative of scienter); *In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *10 (N.D. Cal. Oct. 12, 2011) (same; CFO, head of audit, and chief scientist), *aff'd*, 768 F.3d 1046 (9th Cir. 2014). Moreover, the defendant-specific allegations fare no better:

- **Bush**: Plaintiffs insinuate that Bush "was being replaced as CFO" because he did something nefarious. FACC ¶ 397. But Plaintiffs admit, as they must, that Bush moved to another role within Stem. FACC ¶ 18. His decision "to stay on . . . diminishes the inference of scienter." *Vintage Wine Estates*, 2024 WL 895018, at *14–15.

- **Johnson**: Plaintiffs concede that Johnson retired. FACC ¶ 396. This "bare fact of [the defendant's] retirement cannot support [the plaintiffs'] allegations of scienter." *Zucco*, 552 F.3d at 1002.

- **Patel**: Plaintiffs concede that Patel's role was eliminated amidst financial headwinds. FACC ¶ 397. Had Patel instead been fired for fraud, one would expect Stem to have invested in a replacement for him in the role.

Accordingly, even if the FACC had alleged terminations, "the inference that [the Individual Defendants] were terminated for performance failures [would be] more compelling than the inference of scienter." *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *24 (N.D. Cal. Mar. 31, 2023) (dismissing complaint), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024); *accord Vanguard Specialized Funds v. VEREIT Inc.*, 2016 WL 5858735, at *15 (D. Ariz. Oct. 3, 2016) ("[W]hen a company announces some trouble and the corresponding firing or resignation of certain employees, the most natural inference is that the employees were let go for their performance, rather than something more nefarious.").

The scienter allegations in the fourth complaint in this case are as deficient as those in the third. The Court should again dismiss—this time with prejudice.

### C. Plaintiffs Fail to Plead Loss Causation Because Their "Corrective Disclosures" Do Not Match Any Alleged Misstatement

#### 1. The Five Cherrypicked Stock-Price Changes Fail Collectively

Plaintiffs allege a mishmash of five stock drops spanning more than two years. "Plaintiffs' inability to settle on a corrective disclosure—and the inconsistency among the disclosures they allege—indicates the lack of a causal relationship between the alleged misstatements and omissions and any actual loss." *Kelley v. Rambus, Inc.*, 2008 WL 5170598, at *17 (N.D. Cal. Dec. 9, 2008), *aff'd*, 384 F. App'x 570 (9th Cir. 2010); *accord Nikola*, 2023 WL 1472852, at *10–11 (rejecting kitchen-sink corrective disclosures).

Confirming the lack of "causal relationship," Stem's stock price more-than-fully recovered just days or weeks after most of the drops. Ex. 14 at 5–7, 13. This precludes loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 339 (2005); *Ramos v. Comerica Inc.*, 2024 WL 4744019, at *6 (C.D. Cal. Oct. 11, 2024) (no loss causation where stock price recovered).

#### 2. The Five Cherrypicked Stock-Price Changes Fail Individually

Plaintiffs must plead a corrective disclosure matching an alleged misstatement. *Metzler*, 540 F.3d at 1063, 1072 (affirming dismissal). "[W]hen the match between the contents of the price-propping misrepresentation and the truth-revealing corrective disclosure is tenuous," the

"inference that the back-end price drop equals front-end inflation starts to break down." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80–81 (2d Cir. 2023). Plaintiffs must plead the match with particularity per Rule 9(b). *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 403–04, 403 n.3 (9th Cir. 2021) (affirming dismissal). But the FACC fails to match any of *five* disclosures with *any* prior misstatement. FACC ¶¶ 292–338.

**February 24, 2022 earnings call.** Plaintiffs contend that this earnings call revealed that Stem was missing out on high-margin FTM software sales. FACC ¶ 298. The analysts, by contrast, blamed "permitting and interconnection delay, similar to sentiment echoed by peers." Ex. 25 at 1. Such attribution to undisputedly innocent factors supports dismissal. *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012). Indeed, analysts confirmed that Stem *was* transitioning to FTM, Ex. 25 at 4; Ex. 26 at 1, with *100%* software attachment, Ex. 27 at 2. Confirming the *truth* of Stem's statement precludes loss causation. *See Plumbers and Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *11 (N.D. Cal. Sept. 17, 2024).

**January 5, 2023 Goldman Sachs presentation.** Those previously disclosed "delays in interconnection and permitting" still weighed on Stem's revenue on January 5. Ex. 28 at 9. Plaintiffs continue to omit that fact—which fails to match any alleged misstatement—from their selective citation to Stem's presentation. FACC ¶ 301. But the analyst report on which Plaintiffs themselves rely cites those very delays. Ex. 29 at 1. The only Athena-related information was one analyst's guess that risks "may" occur in the "long-term." FACC ¶ 307. Such speculation fails to match any prior alleged misstatement. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1225–26 (9th Cir. 2017) (insufficient even to "reveal[] a risk or potential for widespread fraudulent conduct").

The only meaningful change to the January 5 allegations confirms the lack of loss causation. Plaintiffs previously blamed the stock drop on a *hard*ware-margin miss. CC ¶ 242. Inconveniently for Plaintiffs, there was nothing untruthful about Stem's statements about hardware margins. MTD Order at 12. Undeterred, Plaintiffs now blame the margin outlook on "*among other reasons*, lower storage *soft*ware revenue." FACC ¶ 301. *Rambus* and *Nikola* held such scattershot pleading insufficient. Moreover, Plaintiffs' failure to allege what portion of the stock drop was due to software precludes loss causation. *In re Mercury Interactive Corp. Sec. Litig.*, 2007 WL 2209278, at

*7 (N.D. Cal. July 30, 2007); *see In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *12

(N.D. Cal. Aug. 27, 2010) (correlation between bad news and stock drop is not causation).

**February 16, 2023 earnings call.** Plaintiffs theorize two corrective disclosures on the

February 16 call but fail to match them to any alleged misstatements:

- **Athena**: Stem (Ex. 30 at 12; Ex. 31 at 18), analysts (FACC ¶ 318), and Plaintiffs themselves (FACC ¶ 309) agree: The gross margin announced on February 16 did not falsify any software-margin prediction or Athena's 100% attachment rate. Instead, it was due to a long-disclosed shift to FTM, which has (as Stem had long disclosed) lower margins from *hard*ware sales. Ex. 30 at 12. Indeed, the analysts saw Athena as succeeding ahead of schedule. Ex. 30 at 5–6, 12; *accord* Ex. 32 at 2 ("**Strong Athena performance in 2022**" (bold in original)); Ex. 33. at 3 "sharp *up*tick in Athena pricing").

- **FTM**: Plaintiffs allege the revelation of "Stem's failure to have a viable automated software for the FTM market." FACC ¶ 316. No CW, Stem employee, or market analyst said anything like that. FACC ¶¶ 313–14. After all, far from showing that terminating Available Power was a bellwether, the earnings release revealed that new bookings more than made up for that isolated cancellation. Ex. 9 at 3.

Plaintiffs' only meaningful changes to the February 16 allegations *undercut* loss causation.

Plaintiffs abandon allegations regarding CARR, software attachment rate, backlog, and pipeline.

*Compare* CC ¶¶ 254–58, *with* FACC ¶¶ 313–16. But Plaintiffs fail to allege what portion of the loss

is attributable to any such news (as opposed to the purported corrective disclosure). That failure

supports dismissal. *Mercury Interactive*, 2007 WL 2209278, at *7.

**March 29, 2023 convertible notes.** No one—no analyst, CW, or Stem employee —matched

the issuance of the notes to any alleged misstatement. FACC ¶¶ 320–27. In any event, Plaintiffs are

incorrect to assume that (1) "Stem needed additional cash for corporate purposes," FACC ¶ 322, and

(2) the need was Stem-specific, FACC ¶¶ 322–27. In fact, the deal was (1) "*deleveraging*," Ex. 34 at

1, and (2) part of a marketwide trend, FACC ¶ 330; Ex. 35 at 1.

**April 4, 2023 Bank of America report.** Finally, an analyst's fresh pessimism about stale

information, FACC ¶¶ 328–38, cannot shoulder loss causation. *See Bonanno v. Cellular Biomedicine*

*Grp., Inc.*, 2016 WL 4585753, at *1–2 (N.D. Cal. Sept. 2, 2016). Except Plaintiffs, FACC ¶ 333, no

one understood Athena news to have caused the price drop—much less matched the news to any

misstatement. FACC ¶¶ 328–38. The BofA report, moreover, was stuffed with unrelated information,

FACC ¶ 330, and Plaintiffs still fail to allege what portion of the loss is attributable to the purported

corrective disclosure. That merits dismissal. *Mercury Interactive*, 2007 WL 2209278, at *7.

## II.    PLAINTIFFS FAIL AGAIN TO PLEAD A SCHEME

The scheme claim should be dismissed because Plaintiffs fail to plead any of three required elements: (a) actions constituting a scheme, (b) individualized participation, and (c) scienter.

### A.    Plaintiffs Plead No Actions Constituting a Scheme

As the Court saw, the alleged "scheme" repackages Plaintiffs' failed misstatement claim. MTD Order at 22–23; *see Kang v. PayPal Holdings, Inc.*, 2023 WL 3166159, at *6 n.6 (N.D. Cal. Apr. 27, 2023) (dismissing with prejudice where scheme allegations were "at the center of Plaintiffs' [deficient] Rule 10b-5(b) claim"). Those few acts that might be deemed more than a statement were within Stem's "normal course of business" and thus not actionable. MTD Order at 23 (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006)). In the FACC, Plaintiffs largely recycle these failed allegations. *Compare* CC ¶¶ 200–28, *with* FACC ¶¶ 251–87.

Plaintiffs' new allegations, about accounting updates in the normal course of business, offer nothing more than 20/20 hindsight. Neither the applicable accounting standard nor Ninth Circuit caselaw supports the notion that such routine quarterly adjustments demonstrate a fraudulent scheme. To be clear, Plaintiffs allege no restatement, no auditor resignation, no SEC investigation—nothing of the sort. Instead, Plaintiffs cherrypick a small number of deals that struggled and ignore the many that succeeded. They fail to show any scheme.

**AlsoEnergy.** Plaintiffs concede that increasing high-margin software product sales was Stem's growth plan. *E.g.*, FACC ¶ 207(c). They also concede that, by acquiring AlsoEnergy, Stem obtained "high-margin software product(s)." FACC ¶ 256. Thus, buying AlsoEnergy was in the "normal course of business" and inactionable. *Simpson*, 452 F.3d at 1050. That Plaintiffs wish the asset had retained its intangible value is unavailing. *See Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 832–33 (S.D. Cal. 2006) ("[S]ubsequent write-offs . . . are not corroborative of anything. Plaintiff['s] reliance on those write-offs constitutes impermissible fraud by hindsight."), *aff'd sub nom. In re Adecco S.A. Sec. Litig.*, 256 F. App'x 74 (9th Cir. 2007). Indeed, "[t]emporal proximity [of three *weeks* was] inadequate evidence of scienter"—let alone the "two and half years" here. *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1081 (W.D. Wash. 2003); FACC ¶ 256.

**Parent-company guarantees.** "[G]enerally accepted accounting principles,' such as ASC 606, 'tolerate a range of reasonable treatments, leaving the choice among alternatives to management.'" *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 939–40 (N.D. Cal. 2023). "It is well established in this circuit that accounting judgments may constitute statements of opinion" under *Omnicare*. *Id.* at 940 (citing *Align*, 856 F.3d at 621); *see Rackable Sys.*, 2010 WL 3447857, at *7.

Plaintiffs fail to plead with particularity that Stem's opinion was unreasonable or insincere. Instead, they cite one subsection of a 150-page standard to manufacture impropriety. *Compare* FACC ¶ 269, *with* FASB ASU 2014-09 Topic 606, *Revenue from Contracts with Customers*. Simply listing factors to be "consider[ed]" under ASC 606 does not satisfy Plaintiffs' obligation to "plead[] facts that set out the why [Stem's revenue recognition] was improper." *Hurst v. Enphase Energy, Inc.*, 2021 WL 3633837, at *4 (N.D. Cal. Aug. 17, 2021) (dismissing where complaint failed to allege "how [defendants] ran afoul" of ASC 606). Plaintiffs are laypersons with a vested interest in criticizing Stem's management, and no auditor, regulator, or any other expert shares their quibbles. *See Kampe v. Volta Inc.*, 2024 WL 4534732, at *9 (N.D. Cal. Oct. 21, 2024) (dismissing where plaintiff failed to allege that CW "performed an accounting function" or "was in a position to have reliable information about Volta's accounting practices"). The Court may wish to ask Plaintiffs what efforts they undertook under Rule 11 to confirm that evidence supports their ASC 606 assertions.

Far from being a sign of fraud, Stem's updates to revenue estimates, FACC ¶ 268, are exactly what ASC 606 calls for: updating estimates after receiving additional information. *E.g.*, Ex. 2 at 13 ("[P]redicting our future revenue and appropriately budgeting for our expenses is difficult, and we have limited insight into trends that may emerge and affect our business."); *see McGovney v. Aerohive Networks, Inc.*, 2019 WL 8137143, at *17 (N.D. Cal. Aug. 7, 2019) (dismissing where company warned of variable revenue). Stem's revenue-recognition policy, moreover, was disclosed in detail in its public filings. *E.g.*, Ex. 2 at 47–49. Likewise, Stem had consistently disclosed how it calculates allowance for doubtful accounts. *E.g.*, *id.* at 70.

Nor do Plaintiffs cite any allegations or findings of ASC 606 violations in the Lullwater contract dispute. In any event, cribbing a commercial counterparty's untested, unsworn allegations in

its unrelated lawsuit does not show fraud. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812

(N.D. Cal. 2019) ("Plaintiffs may not rely on facts alleged in [a separate lawsuit] without providing

any independent corroboration. . . . Plaintiffs fail to acknowledge that . . . allegations [from a

separate action] (even if proven) do not automatically become basis for securities fraud[.]").

### B. Plaintiffs Fail to Allege Individualized Participation in Any "Scheme"

"To state a claim for scheme liability, plaintiffs must allege 'each defendant committed a

manipulative or deceptive act in furtherance of the scheme.' *See Cooper v. Pickett*, 137 F.3d 616,

624 (9th Cir. 1997)." MTD Order at 22. Nevertheless, the CC did not try to plead "any allegedly

deceptive course of conduct" by any individual defendant other than Carrington and Bush. MTD

Order at 23. As to those two, it pleaded only actions in the normal course of business. *Id.* Despite

these clear instructions from the Court, the FACC adds virtually no individualized allegations as to

any defendant. *Compare* CC ¶¶ 200–28, *with* FACC ¶¶ 251–87.

### C. Plaintiffs Fail to Allege Scienter

The Court cautioned Plaintiffs that they had "failed to adequately allege scienter for purposes

of pleading their section 10(b) claim, and such deficiency likewise is fatal to their scheme claim."

MTD Order at 23. But Plaintiffs' new scheme allegations add nothing to scienter; they are based on

hindsight from years later, not contemporaneous knowledge of deceptiveness. FACC ¶¶ 266–71.[13]

## III.   PLAINTIFFS FAIL AGAIN TO PLEAD A SECTION 14(a) CLAIM

Plaintiffs again tack on a Section 14(a) claim, but it is functionally the same as what the Court

already dismissed. MTD Order 23–27.

### A. Plaintiffs' Allegations Sound Equally in Fraud after Small, Conclusory Changes

The Section 14(a) claim fails for lack of particularity, as it did on the prior motion. The Court

held there that "formalistic differentiation" between Plaintiffs' 10(b) and 14(a) claims "d[id] not

mean that the 14(a) claims d[id] not sound in fraud." MTD Order at 25. In response, Plaintiffs

changed almost nothing. They repeated the language the Court already held insufficient, MTD Order

---

[13] There is a fourth reason, independently sufficient, why the scheme claim fails: Plaintiffs must show that the conduct was "in connection with the purchase or sale of [a] security." 17 C.F.R. § 240.10b-5. It is insufficient to "affect the price of a security in some attenuated way." *World Surveillance Grp. Inc. v. La Jolla Cove Invs., Inc.*, 66 F. Supp. 3d 1233, 1237–38 (N.D. Cal. 2014).

at 25, that the "14(a) Defendants were at least negligent in filing the Defective Prospectus and Defective Investor Materials." FACC ¶ 438. Plaintiffs continue to hedge with "at least negligent" language, which fails. *Mendoza v. HF Foods Grp. Inc.*, 2021 WL 3772850, at *11 (C.D. Cal. Aug. 25, 2021) (allegations that Defendants were "at least negligent" were not particularized).

The lack of daylight between the Section 10(b) and 14(a) claims also shows they should both be dismissed. The overlap among so-called "14(a)" and "fraud" defendants persists; in fact, they are even *more* similar now, with eight overlapping defendants. *See* FACC ¶¶ 33, 35 ("14(a)" and "Fraud" Defendants both contain Stem, Star Peak, Bush, Carrington, Daley, Morgan, Russo, and Scheyer). This undercuts the fiction that the 14(a) claim can be considered separately. *See In re Meta Materials Inc. Sec. Litig.*, 2023 WL 6385563, at *9–10 (E.D.N.Y. Sept. 29, 2023) (dismissing Section 14(a) claim sounding in fraud due to three defendants overlapping with Section 10(b) claim). Moreover, the two claims are allegedly shown false by the same facts. *See* Nos. 1–94 (all referring to Athena being in "Beta mode" and crashing); *Mehedi v. View, Inc.*, 2023 WL 3592098, at *14 (N.D. Cal. May 22, 2023) (Freeman, J.) (dismissing Section 14(a) claim that "sound[ed] in fraud" because "it [wa]s based on the same course of conduct as the Section 10(b) claim"). The FACC adds only additional mentions of so-called "negligent preparation" of false statements. FACC ¶¶ 138, 154. No details of what form this "preparation" took, by whom or through what means, appear in the Complaint.[14]

The previous complaint's "nominal efforts to disclaim allegations of fraud with respect to its negligence claims are unconvincing." MTD Order at 25. So too, here, where "the gravamen of the complaint is fraud and no effort [was] made to show any other basis for the claims." *Rigel*, 697 F.3d at 885 (dismissing Section 11 claim sounding in fraud).

**B. Plaintiffs Still Plead No "Essential Link" to Harm**

As before, no actual connection is alleged between the proxy and any harm Plaintiffs allege occurred. If the harm encountered by Plaintiffs was being influenced to vote for the de-SPAC and receive inadequate Stem shares, FACC ¶ 183(b–c), then the fact that there are no allegations Plaintiffs actually voted makes it unclear they experienced any harm at all. Even if they had voted for the

---

[14] This is also dismissable "group negligence" pleading. *In re Ocera Therapeutics Sec. Litig.*, 2018 WL 7019481, at *10–11 (N.D. Cal. Oct. 16, 2018) (Seeborg, J.) (dismissing "[c]omplaint contain[ing] only conclusory averments of Defendants' negligence as a group").

de-SPAC, moreover, Plaintiffs could have redeemed their shares for cash, FACC ¶ 183(a), such that there was no necessary connection between the vote decision and the redemption decision.

### C.  Plaintiffs Still Plead No Solicitation through Proxy References

Plaintiffs make only a very limited attempt[15] to overcome the Court's holding that their solicitation allegations were insufficient. MTD Order at 25–27. A Section 14(a) claim requires allegations that a defendant "solicit[ed] or permitt[ed] the use of [their] name to solicit" votes. 17 C.F.R. § 270.20a-1(a); *see also* 15 U.S.C. § 78n(a)(1). The FACC's additions on this are only references to other descriptions of Defendants in the proxy. *See* FACC ¶¶ 97–100, 135–55. This sort of "solicitation by reference" theory has no basis. Plaintiffs must, but failed to, "allege a substantial connection between the use of defendant's name and the solicitation effort." *View*, 2023 WL 3592098, at *15.

### CONCLUSION

For the foregoing reasons, the First Amended Consolidated Complaint should be dismissed with prejudice.[16] *See In re Cloudera, Inc. Sec. Litig.*, 2022 WL 14813896, at *17 (N.D. Cal. Oct. 25, 2022) (Chesney, J.) (dismissing with prejudice where plaintiffs "fail[ed] to cure the deficiencies identified in [the prior] Order and in Defendants' motions to dismiss"), *aff'd*, 121 F.4th 1190 (9th Cir. 2024).

---

[15] So limited, in fact, that Plaintiffs dropped three 14(a) defendants, Michael D. Wilds, Desiree Rogers, and C. Park Shaper, from the Complaint entirely. *Compare* CC ¶¶ 29, 33–34 (Wilds, Rogers, and Shaper as Defendants), *with* FACC (Wilds, Rogers, and Shaper absent from Complaint). To be clear, Plaintiffs' decision to drop all claims against these Defendants, and remove them from the case completely, adds nothing to their attempt to plead the Section 14(a) claim.

[16] Because Plaintiffs' Sections 10(b) and 14(a) claims fail, so do the Section 20A and two Section 20(a) claims. *E.g.*, *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *16 (N.D. Cal. Sept. 10, 2021) (dismissing §§ 20(a) and 20A claims where predicate § 10(b) claim was dismissed).

1  Dated: December 20, 2024                    FRESHFIELDS US LLP

2
                                              By: */s/ Boris Feldman*_____
3                                                  Boris Feldman

4                                              *Attorneys for Defendants Stem, Inc. f/k/a Star*
                                              *Peak Energy Transition Corp., John Carrington,*
5                                              *William Bush, Michael C. Morgan, Adam E.*
                                              *Daley, Larsh Johnson, Prakesh Patel, Alan*
6                                              *Russo, and Bryan Ho*

7
   Dated: December 20, 2024                    KIRKLAND & ELLIS LLP
8
                                              By: */s/ Stefan Atkinson*_____
9                                                  Stefan Atkinson

10                                             *Attorneys for Star Peak Energy Transition Corp.,*
                                              *Eric Scheyer, and Alec Litowitz*
11

12

13

14

15

16

17

18

19

20

21                    **CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)**

22         I, Boris Feldman, am the ECF user whose identification and password are being used to file

23  this document. Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of the

24  document has been obtained from each of the other signatories.

25  Dated: December 20, 2024

26                                             */s/ Boris Feldman*_____
                                               Boris Feldman
27

28