ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
TAEVA C. SHEFLER (291637)
ALAINA L. GILCHRIST (335807)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
tshefler@rgrdlaw.com
agilchrist@rgrdlaw.com

LEVI & KORSINSKY, LLP
DAVID C. JAYNES (SBN 338917)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Telephone: 213/985-7290
djaynes@zlk.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re STEM, INC. SECURITIES LITIGATION | Master File No. 3:23-cv-02329-MMC |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT |
| ALL ACTIONS. | |
| | DATE: March 14, 2025<br>TIME: 9:00 a.m.<br>CTRM: 7, 19th Floor<br>JUDGE: Honorable Maxine M. Chesney |

4930-2999-9891.v1

1
2

# TABLE OF CONTENTS

**Page**

I.     Introduction ................................................................................................1

II.    Background and Overview of Falsity ..........................................................2

III.   The Complaint Provides Proper Notice of the Claims................................4

IV.    The Complaint Adequately Alleges Materially False and Misleading Statements ...........5

    A.     The Confidential Witnesses Are Sufficiently Alleged............................5

    B.     The FAC Adequately Alleges the Misrepresentations Were Materially False or Misleading........................9

        1.     Misstatements Regarding Athena Automation ............................9

        2.     Misstatements Regarding Business Model and Success in the FTM Market........................11

        3.     The Purported Risk Factors Are Actionable Because They Had Already Materialized ........................13

        4.     Defendants Patel and Russo Made Actionable Statements........................14

        5.     Defendants Cannot Escape Liability by Invoking the Safe Harbor ..........15

V.     The FAC Sufficiently Pleads Scheme Liability................................16

VI.    The FAC Alleges a Strong Inference of Scienter for the §10(b) Claims..........19

VII.   The Complaint Adequately Alleges §14(a) Claims ................................23

    A.     Plaintiffs' 14(a) Claims Do Not Sound in Fraud ..................................23

    B.     Plaintiffs Adequately Allege Each Defendant's Participation in the Solicitation of Shareholder Votes Pursuant to the Defective Proxy.....................24

    C.     Plaintiffs Plead the Misstatements Were an Essential Link................27

VIII.  The Complaint Sufficiently Alleges Loss Causation................................27

IX.    Conclusion ................................................................................................30

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

**CASES**

5

*Abdo v. Fitzsimmons*,
6
    2021 WL 616324 (N.D. Cal. Feb. 17, 2021) ........................................................................18

7

*Azar v. Blount Int'l.*,
    2017 WL 1055966 (D. Or. Mar. 20, 2017)..............................................................24, 26, 27

8

*Azar v. Yelp, Inc.*,
9
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ......................................................................22

10

*Bailey v. Zendesk, Inc.*,
11
    731 F. Supp. 3d 1109 (N.D. Cal. 2024) ................................................................................8

12

*Baron v. Hyrecar Inc.*,
    2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) ......................................................................22

13

*Berson v. Applied Signal Tech.*,
14
    527 F.3d 982 (9th Cir. 2008) ..........................................................................10, 11, 14, 19

15

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ......................................................................13

16

*Butala v. Owlet, Inc.*,
17
    2024 WL 3648141 (C.D. Cal. Aug. 5, 2024)........................................................................23

18

*Buttonwood Tree Value Partners, LP v. Sweeney*,
19
    2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) ....................................................................23

20

*Crews v. Rivian Auto., Inc.*,
    2023 WL 4361098 (C.D. Cal. July 3, 2023)......................................................................8, 16

21

*Cullen v. Ryvyl, Inc.*,
22
    2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ..........................................................................14

23

*Cutler v. Kirchner*,
24
    696 F. App'x 809 (9th Cir. 2017) ........................................................................................12

25

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).............................................................................................................27

26

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
27
    81 F.4th 918 (9th Cir. 2023) ..............................................................................................5, 7

28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..................................................................................................30

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................19

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)......................................................................................29

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ................................................................................ *passim*

*Hampton v. Aqua Metals, Inc.*,
    2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ..........................................................10

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ......................................................................19

*Homyk v. ChemoCentryx, Inc.*,
    2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) .......................................................5, 16

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ..................................................................................23

*In re Adaptive Broadband Sec. Litig.*,
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................................................22

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ...........................................................................9, 14, 16

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4. 2014)...........................................................20

*In re Amylin Pharms., Inc. Sec. Litig.*,
    2003 WL 21500525 (S.D. Cal. May 1, 2003)............................................................15

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .........................................................9, 20

*In re Avista Corp. Sec. Litig.*,
    2006 WL 8429610 (E.D. Wash. June 2, 2006)..........................................................29

*In re BioMarin Pharms. Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ...............................................................22

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) .............................................................................27, 30

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ................................................................7, 21, 27, 28

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
    2005 WL 2206693 (N.D. Cal. Sept. 12, 2005) ..........................................................24

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018).............................................................20

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023), *Cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, _ U.S. _, 144 S. Ct. 2629 (2024), *and cert. dismissed as improvidently granted sub nom. Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024)....................................8, 14, 27

*In re Firstenergy Corp. Sec. Litig.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022)................................................................19

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ................................................................16, 18, 19

*In re Genius Brands Int'l Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ...................................................................................30

*In re Hot Topic, Inc. Sec. Litig.*,
    2014 WL 7499375 (C.D. Cal. May 2, 2014) ..............................................................24

*In re Intuitive Surgical Sec. Litig.*,
    2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ...........................................................13

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ..........................................................................5

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    2006 WL 538756 (D. Or. Jan. 3, 2006) ....................................................................21

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................................5

*In re Obalon Therapeutics, Inc.*,
    2019 WL 4729461 (S.D. Cal. Sept. 25, 2019).............................................................29

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020)...............................................................8

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .............................................................7, 15, 16, 21

*In re Questcor Inc. Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).................................................................22

*In re Rocket Fuel, Inc. Sec. Litig.*,
   2015 WL 9311921 (N.D. Cal. Dec. 23, 2015)................................................................15

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ......................................................................22

*In re SupportSoft, Inc. Sec. Litig.*,
   2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ............................................................11

*In re Thoratec Corp. Sec. Litig.*,
   2006 WL 1305226 (N.D. Cal. May 11, 2006)..............................................................29

*In re UTStarcom, Inc. Sec. Litig.*,
   2008 WL 2949264 (N.D. Cal. July 24, 2008)................................................................4

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................................23

*In re Vaxart, Inc. Sec. Litig.*,
   2023 WL 3637093 (N.D. Cal. May 25, 2023)..............................................................19

*In re Vaxart, Inc. Sec. Litig.*,
   576 F. Supp. 3d 663 (N.D. Cal. 2021) ........................................................................21

*In re Venator Materials PLC Sec. Litig.*,
   547 F. Supp. 3d 624 (S.D. Tex. 2021) ........................................................................19

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)....................................................7, 10

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007) ..................................................................26, 27

*Kampe v. Volta, Inc.*,
   2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ................................................................8

*Karinski v. Stamps.com, Inc.*,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ..............................................................28

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................................9, 29

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ..............................................................................24

*Lamartina v. VMware, Inc.*,
   2021 WL 4133851 (N.D. Cal. Sept. 10, 2021) ..........................................................23

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) .................................................................................................15, 16, 17

*Lorenzo v. SEC*,
    872 F.3d 578 (D.C. Cir. 2017), *aff'd*, 587 U.S. 71 (2019) ......................................14

*Luna v. Marvell Tech. Grp.*,
    2017 WL 2171273 (N.D. Cal. May 17, 2017) ..........................................................23

*Luna v. Marvell Tech. Grp., Ltd.*,
    2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ..........................................................30

*Mandalevy v. Bofi Holding, Inc.*,
    2021 WL 794275 (S.D. Cal. Mar. 2, 2021) .............................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ....................................................................................................9

*Mehedi v. View, Inc.*,
    2023 WL 3592098 (N.D. Cal. May 22, 2023) ..........................................................26

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ..................................................................................................27

*Mineworks' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...................................................................................28

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ....................................................................20

*Nguyen v. Radient Pharms. Corp.*,
    2011 WL 13141630 (C.D. Cal. Oct. 26, 2011) ........................................................23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) .................................................................................29

*Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*,
    2024 WL 5182634 (9th Cir. Dec. 20, 2024) .........................................................7, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .............................................................................................12, 13

*Patel v. Axesstel, Inc.*,
    2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ...........................................................22

*Plumbers Union Loc. No. 12 Pension Fund v. Ambassador's Grp.*,
    717 F. Supp. 2d 1170 (E.D. Wash. 2010) ...............................................................19

*Prodanova v. H.C. Wainwright & Co., LLC,*
   993 F.3d 1097 (9th Cir. 2021) ...................................................................................21

*Provenz v. Miller,*
   102 F.3d 1478 (9th Cir. 1996) ...................................................................................22

*Roberts v. Zuora, Inc.,*
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ............................................................8

*S. Ferry LP, No. 2 v. Killinger,*
   542 F.3d 776 (9th Cir. 2008) .....................................................................................20

*SEC v. Fiore,*
   416 F. Supp. 3d 306 (S.D.N.Y. 2019).......................................................................18

*SEC v. Richman,*
   2021 WL 5113168 (N.D. Cal. Nov. 3, 2021) ...........................................................17

*SEC v. SeeThruEquity, LLC,*
   2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019)...........................................................17

*Shueneman v. Arena Pharms., Inc.,*
   840 F.3d 698 (9th Cir. 2016) .....................................................................................19

*Simpson v. AOL Time Warner Inc.,*
   452 F.3d 1040 (9th Cir. 2006),
   *vacated by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008)..........18

*Smilovits v. First Solar, Inc.,*
   2012 WL 6574410 (D. Ariz. Dec. 17, 2012) ............................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
   551 U.S. 308 (2007)..............................................................................................19, 20

*Turocy v. El Pollo Loco Holdings, Inc.,*
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)............................................................22

*Vess v. Ciba-Geigy Corp. USA,*
   317 F.3d 1097 (9th Cir. 2003) ...................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009)........................................8

1

**STATUTES, RULES, AND REGULATIONS**

2

15 U.S.C.
 §78t(a) ............................................................................................................2
 §78t-1 ............................................................................................................2
 §78u-4(b)(1) ...................................................................................................9
 §78u-5(c)(1)(A)(i) .........................................................................................15

17 C.F.R.
 Rule 10b-5 ....................................................................................................22
 Rules 10b-5(a) and (c) .................................................................................16
 Rule 10b5-1 ..................................................................................................22

Federal Rules of Civil Procedure
 Rule 8(a) .......................................................................................................24
 Rule 9(b) .......................................................................................................24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## GLOSSARY OF DEFINED TERMS

The following short forms and citations are used herein:

| TERM | DEFINITION |
|---|---|
| "14(a) Defendants" | Defendants Stem, Star Peak, Bush, Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer. |
| "14(a) Individual Defendants" | Defendants Bush, Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer. |
| "AI" | Artificial intelligence |
| "AlsoEnergy" | AlsoEnergy Holdings, Inc. |
| "Available Power" | Available Power, LLC |
| "BTM" | Behind-the-meter |
| "Bush" | William Bush |
| "Carrington" | John Carrington |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "Class" | The Section 14(a) Class and the Section 10(b) Class. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. |
| "Class Period" | The time period between and including 12/04/20 and 04/03/23. |
| "CRO" | Chief Revenue Officer |
| "CSO" | Chief Strategy Officer |
| "CTO" | Chief Technology Officer |
| "CW" | Confidential witness |
| "Daley" | Adam E. Daley |
| "Defective Investor Materials" | Numerous investor materials that were incorporated by reference into the Defective Prospectus, including press releases, PowerPoint slide decks, and presentation transcripts, that were filed with the SEC on 12/04/20, 01/05/21, 01/13/21, 01/25/21, 02/11/21, 02/18/21, 03/02/21, 03/19/21, 03/30/21, 04/06/21, |

| TERM | DEFINITION |
|---|---|
| | 04/12/21, 04/14/21, and 04/21/21. |
| "Defective Prospectus/ Proxy Statement" or "Defective Proxy" | The defective prospectus includes the defective registration statement and preliminary proxy statement/consent solicitation statement/prospectus on Form S-4 in connection with the merger and that was thereafter amended on Forms S-4/A on 01/22/21, 02/12/21, 03/15/21, 03/25/21, and 03/26/21, and the body of which was incorporated into the final proxy statement/consent solicitation statement/prospectus on Form 424(b)(3) filed on 03/30/2021. |
| "Defendants" | Collectively refers to Defendants Stem, Inc., John Carrington, William Bush, Larsh Johnson, Prakesh Patel, Alan Russo, Bryan Ho, Star Peak Energy Transition Corp., Eric Scheyer, Michael C. Morgan, Adam E. Daley, and Alec Litowitz. |
| "EBITDA" | Earnings before interest, taxes, depreciation, and amortization. |
| "ERCOT" | Electric Reliability Council of Texas |
| "Fraud Defendants" | Defendants Stem, Star Peak, Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, Russo, and Scheyer. |
| "FTM" | Front-of-the-meter |
| "Ho" | Bryan Ho |
| "Individual Fraud Defendants" | Defendants Bush, Carrington, Daley, Ho, Johnson, Morgan, Patel, Russo, and Scheyer. |
| "IPO" | Initial public offering |
| "Johnson" | Larsh Johnson |
| "Litowitz" | Alec Litowitz |
| "Merger" | Merger of Stem, Inc. and Star Peak Energy Corp. |
| "Morgan" | Michael C. Morgan |
| "Patel" | Prakesh Patel |
| "Plaintiffs" | Vishal Lawale and Vishal P. Thakkar |
| "PSLRA" | Private Securities Litigation Reform Act of 1995 |
| "Russo" | Alan Russo |

| TERM | DEFINITION |
|------|-----------|
| "Scheyer" | Eric Scheyer |
| "SEC" | U.S. Securities and Exchange Commission |
| "Selling Defendants" | Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo. |
| "Star Peak" or "STPK" | Star Peak Energy Transition Corp. |
| "Stem" or the "Company" | Stem, Inc. f/k/a Star Peak Energy Transition Corp. |

1    **I.    Introduction**

2        This case arises from material misstatements and omissions made by Stem, Inc. ("Stem" or

3    the "Company"), its predecessor, Star Peak, and their executives and directors between 12/04/20 and

4    04/03/23 (the "Class Period") regarding Stem's purportedly fully AI automated Athena software for

5    large lucrative front-of-the-meter ("FTM") projects.  Historically, Stem was a reseller of batteries to

6    behind-the-meter ("BTM") customers – a company in the red and with low profit margins.  To

7    induce investment in Stem's IPO and raise $600 million, Defendants pitched Stem's software,

8    Athena, as "the key to [Stem's] growth and success" and, in turn, the lynchpin to the Company's

9    business model.  Unbeknownst to investors, Athena was never a viable product for the FTM market

10   prior to or during the Class Period.  To the contrary, rather than a fully automated AI software,

11   Athena's core functionalities for FTM projects required human intervention.

12       The First Amended Consolidated Complaint for Violations of the Federal Securities Laws

13   ("FAC" or "Complaint") (ECF 127)[1] adds allegations, including an admission from Stem's former

14   CEO, Carrington, that contrary to prior statements (which Defendants deliberately ignore) that

15   Athena was "fully automated" in the FTM market with "no humans involved in this loop," in fact,

16   there were humans in the "loop" because Athena lacked core functionalities and, thus, it was not

17   fully automated for FTM.  It also adds information to correct the deficiencies this Court previously

18   found demonstrating the Confidential Witnesses ("CWs") were in a position to know that the

19   Company's key product was neither fully automated nor viable for the FTM market.  These

20   allegations are consistent with one another and cover the entire Class Period.  Thus, all of the

21   misrepresentations at issue are actionable because they omitted the same critical information –

22   Athena was not fully automated for FTM projects but rather lacked core functionalities.

23

24

25   [1]    All "¶" and "¶¶" references are to the Complaint. All "No." and "Nos." references are to
     Defendants' materially false and misleading statements as identified in Exhibit A to the Complaint.
26   All references to "Exhibit" or "Ex." (excluding Exhibit A to the Complaint) refer to Defendants'
     exhibits attached to Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' First Amended
27   Consolidated Complaint ("DB") (ECF 128) for which they improperly seek the Court to consider.
     Unless otherwise noted, capitalized terms have the same meanings as in the Complaint, all emphasis
28   is added, and all internal quotations and citations are omitted unless otherwise noted.

1    Defendants' contention that this adverse material information does not contradict with their

2    misrepresentations is not credible given the picture they painted for investors that Athena was fully

3    automated for FTM.  In addition to the CW accounts and Carrington's admission that belie any such

4    notion, Stem's massive misses in gross margins and profits bolster the fact that Athena was not

5    viable for, or successful in, the FTM market.  Defendants' other challenges to the FAC should be

6    likewise rejected.  For the §14(a) claims, Plaintiffs have satisfied the requirement that Defendants

7    solicited a proxy statement containing misstatements that was an essential link in causing Plaintiffs'

8    injuries.  For the §10(b) claims, scienter allegations abound, including, *inter alia*: (i) Carrington's

9    post-Class Period admission; (ii) their speaking knowledgeably on the topic at issue; (iii) their

10   participation in sales meetings and access to Salesforce; (iv) their monitoring of key metrics

11   informing them Athena was not viable for FTM projects; (v) the core operations inference given the

12   importance of Athena to the success of Stem's business model; (vi) suspicious resignations; and (vii)

13   motive including the survival of the Company and $27 million in suspicious insider trading profits.

14   Likewise, loss causation is sufficiently alleged through multiple partial disclosures correcting

15   Defendants' prior misstatements regarding Stem's business and causing Plaintiffs' losses.  Indeed,

16   rather than the picture painted by the Defendants of a high-margin software company capturing

17   lucrative FTM market share as a result of Stem's "automated" Athena product, the market learned

18   Stem did not have such a product through, *inter alia*, disappointing margins and profits, lost sales,

19   the need for additional capital, and the market's loss of confidence in Stem's business model. In

20   total, Stem's stock lost 81.92% of its value by the end of the Class Period.

21   Because Plaintiffs' §14(a) and §10(b) claims are actionable, so too are Plaintiffs' §20(a)

22   control person claims and §20A contemporaneous insider trading claims.

23   **II.    Background and Overview of Falsity**

24   Stem's business initially focused on selling batteries bundled with its Athena software as an

25   AI-driven "solution" to BTM customers in the clean energy market.  ¶¶56-58, 94-96.  Prior to the

26   IPO, however, growth in Stem's BTM business had flatlined as the BTM market was saturated and

27   re-selling batteries was a low-margin business.  ¶¶57-58, 65, 94-96.  As a result, Stem incurred tens

28   of millions in net losses and low gross margins.  ¶¶65, 91-95.  Stem's prospects for growth in its

1    historical business model were not bright; and Stem's external auditors questioned the Company's

2    ability to survive. ¶¶91-101.  Faced with a severe liquidity crisis, in late 2020, leading up to the IPO,

3    Stem sought to enter the larger, more lucrative FTM market.  ¶¶65-66, 96.

4           With this background, Stem sought to merge with Star Peak, a blank check acquisition

5    company, to secure over $600 million to fund its flailing operations.  ¶¶1, 27, 50-55, 61-64, 91-111.

6    To garner interest in the IPO, Stem portrayed its business as a high-margin software company that

7    would see astronomical growth and profits while requiring little capital because its purportedly

8    "fully automated" software, Athena, would drive growth in the FTM market (ten times that of the

9    BTM market).  ¶¶60-66, 97-98, 112; *see* ¶171 (No. 15) ("Athena's ability to optimize operations in

10   both the BTM and FTM markets is unique . . . and provides us with a competitive advantage").

11          Defendants reinforced Stem's Athena software-centric profit model throughout the Class

12   Period by, *inter alia*, claiming: Athena (i) offered a "differentiated value . . . without human

13   intervention" (¶205 (No. 82)); (ii) "is a fully automated process lights out.  There's no humans

14   involved in this loop.  Once we set it up, it just keeps running" (*id.*); and (iii) provides "a significant

15   competitive mode for the company" (¶216 (No. 49)).  The market, thus, understood Athena to be

16   essential to Stem's growth, operations and profitability as reflected by analyst commentary.  For

17   example, on 05/05/22, one analyst reported that "[t]he cornerstone of the company is its Athena

18   software platform."  ¶122.  Likewise, on 09/29/22, another reported "technological differentiation

19   . . . is driving [Stem's] profitable and predictable growth"; and that "STEM expects to be EBITDA

20   positive in 2H 2023; with them having a capex-light business model."  *Id.*

21          Defendant Carrington has now admitted that the premise upon which Defendants sold Stem

22   to investors was not true – rather than automated, Stem's "program management team[ ] adds a

23   'human-in-the-loop'" to Athena's operations and thus the software was not fully automated. ¶75.  In

24   addition, the CWs corroborate that the Defendants' misrepresentations regarding the automated

25   nature of Athena were misleading.  CW1, who was there prior to the Class Period until February

26   2022 and "had direct interactions with virtually every one of Stem's FTM clients" as part of CW1's

27   role managing FTM deals "across the entire sales cycle," described in detail that Stem had a low

28   FTM deal close rate of 15%-20% because Athena was not fully automated, as evidenced by, for

1  example: (i) feedback from potential FTM clients describing Athena as "an empty suit"; (ii) the

2  existence of only a prototype consisting of an Excel spreadsheet; (iii) that there was only a beta

3  version of the software that would repeatedly crash; and (iv) the fact a Stem employee had to

4  manually perform Athena's functions for Stem's Massachusetts project.  ¶¶46, 67, 70-77, 79, 89.

5      Athena's inability to "provide core functionalities" for FTM projects is corroborated with

6  consistent accounts by other witnesses.  ¶71.  CW2, who was with Stem prior to and throughout the

7  Class Period (¶48) and worked with sales on FTM projects, including those in Texas, confirmed that

8  Athena was not fully developed, indicating that "the ship was taking off and being built at the same

9  time."  ¶77.  CW1 and CW2 heard that a Stem employee manually used "an Excel spreadsheet to

10  handle functions on the Massachusetts FTM project that were supposed to be handled by Athena."

11  ¶74.  Likewise, CW3, who was at Stem from March 2021 through the end of the Class Period as

12  Director of Technical Sales Training (¶49) and worked closely with the product team that oversaw

13  development of the Athena software, "corroborated reports that Athena lacked functionality with

14  respect to FTM projects."  ¶76.  According to CW3, they along with the FTM sales team, frequently

15  requested examples of Athena's successful implementation into an FTM project but never received

16  one.  ¶¶79-80.  CW1 confirmed that Stem's difficulties closing FTM deals was reflected in Stem's

17  Salesforce database through failed FTM bookings and a low deal close rate.  ¶¶48, 70, 83, 89.

18      Thus, as substantiated by Carrington's post-Class Period admission and the CW accounts, all

19  of the misstatements at issue were materially false and misleading for the same reason – Athena was

20  neither fully automated nor viable for the FTM market but, in fact, lacked core functionalities.

21  **III.    The Complaint Provides Proper Notice of the Claims**

22      The FAC – only the second (not the fourth) complaint this Court has reviewed – corrects the

23  prior deficiencies in pleading identified by the Court; it no longer "cross-references to multiple

24  sections of factual allegations" nor is "devoid of citations to prior paragraphs in the [complaint]."

25  Order Granting Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint (ECF 123)

26  ("Order") at 7-8; *see also In re UTStarcom, Inc. Sec. Litig.*, 2008 WL 2949264, at *3 (N.D. Cal. July

27  24, 2008) (overruling defendants' challenges to a 150-page complaint because it complied with the

28  court's prior directive and set forth the statements at issue by date and author, the reasons why the

1  statements were false, and the factual basis for scienter).  Defendants' authority is inapposite because

2  the plaintiffs there failed to identify which statements are false for which reasons.  DB at 5.

3  Conversely, "Plaintiff[s] here ha[ve] precisely detailed each problematic statement, alleged that each

4  statement is false and misleading, and alleged the reasons as to why" in both the FAC and its

5  accompanying chart.  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014);

6  *see also Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *6 (N.D. Cal. Feb. 23, 2023) (no

7  puzzle pleading where "the alleged misstatements are . . . grouped according to the alleged omitted

8  facts in each misstatement").  Plaintiffs also "set out in chart form," their allegations under the

9  headings the Court provided "on a numbered, statement-by-statement basis."  Order at 27; Ex. A.

10       Defendants quibble that the reasons why their statements were materially misleading

11  "substantially overlap" and complain that the chart is too long.  DB at 5.  But Plaintiffs have

12  provided separate allegations as to why Defendants' similar statements were materially false and

13  misleading over time.  *Compare, e.g.*, ¶195 (pre-IPO reasons why statements that Athena was

14  automated were misleading), *with* ¶197 (post-IPO throughout 2021 reasons), *with* ¶207 (2022

15  reasons), *and* ¶210 (2023 reasons).  Nor is length determinative particularly where, as here, Plaintiffs

16  were ordered to comply with a certain format.  DB at 5; *see also, e.g.*, *In re New Century*, 588 F.

17  Supp. 2d 1206, 1218 (C.D. Cal. 2008) (dismissal for puzzle pleading not warranted of a nearly 375-

18  page complaint with 200 additional pages of charts).  There is also ample justification for "overlap"

19  – the statements are all misleading for the same reason, as explained in §IV.  Defendants' efforts to

20  dismiss on puzzle pleading alone are not supported by the cases they cite and should be denied.

21  **IV.    The Complaint Adequately Alleges Materially False and Misleading Statements**

22

23       The FAC sufficiently alleges that each of the Defendants' misrepresentations were materially

24  false and misleading for the same reason – unbeknownst to investors, Stem's Athena software was

25  not fully automated nor viable for the FTM market but a prototype in beta stage.

26      **A.    The Confidential Witnesses Are Sufficiently Alleged**

27       CWs need only be described "with sufficient particularity to establish their reliability and

28  personal knowledge." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 938 (9th Cir.

2023). While CW descriptions must be pled with particularity, the CW allegations are subject to the *Twombly* plausibility standard. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 767 (9th Cir. 2023) (In determining whether the CWs are adequately pled, "the court considers **the level of detail** provided by the confidential witnesses, **the plausibility of the allegations**, the number of sources, the reliability of the sources, **corroborating facts**, and similar indicia of reliability.").

The Court already found CW3 was described with sufficient particularity but found CWs 1 and 2 were insufficiently described. Order at 9-10. The FAC addresses these deficiencies by adding allegations as to why these witnesses were in a position to know the detailed information they provide, and by adding corroborating details such as Carrington's post-Class Period admission.

**CW1**: CW1 was a sales cycle expert reporting to Mary Adam, Director of Sales responsible for FTM. ¶46. In this sales role, CW1 communicated directly with virtually every one of Stem's FTM clients to answer questions about Stem's FTM product, assisted the sales team in drafting initial proposals for FTM customers and managed deal flow, pricing, shipping, payment, and other logistics for FTM sales. *Id.* CW1, thus, was in a position to know, among other things, Athena was not fully automated for FTM (¶70), Stem used an Excel spreadsheet to manually perform functions Athena was supposed to do for their larger FTM customer in Massachusetts (¶67), and that Stem would sign new clients before it had a working FTM product hoping to eventually build out the software (¶71). Because CW1 received feedback directly from Stem's FTM clients, CW1 was also in a position to know that Stem had difficulty closing FTM deals, with a closing rate of just 15% to 20% (¶89); that clients described Athena as akin to "an empty suit" (¶71); and that clients did not use Athena for FTM because it could not provide core functionalities (¶83).

**CW2**: CW2 was a Stem analyst and a member of the Market Enablement Group that included 20 individuals from the Business and Product Development departments, reporting to manager, Randy Parole. ¶48. In this role, CW2 worked directly with Stem's sales department on new customer proposals for FTM projects such as ERCOT, and used Salesforce, which tracked new bookings. *Id.* Thus, in CW2's sales role, CW2 was in a position to know Athena was not fully developed for FTM (¶77), details concerning parent guarantees that were part of customer proposals

1  (¶82), and details about the Available Power deal and efforts to find new buyers for the equipment

2  ordered prematurely against Company policy.  ¶¶84-86.

3       Defendants' contention that CW2 contradicted their prior statements (DB at 16) is incorrect.

4  Both "began to flatline" and "had flatlined" say the same thing – by the time the Class Period began,

5  BTM sales had fizzled out.  CW2's accounts cannot be faulted for providing clarification in response

6  to the Court's Order.  This is not akin to situations on which Defendants rely where a witness

7  changed the basis for their knowledge or where Plaintiffs provide no description of a witness's job

8  duties.  DB at 16.  Rather, the bases for the witnesses' knowledge is sufficiently particular under

9  Ninth Circuit law.  *See Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *2

10  (9th Cir. Dec. 20, 2024) (two CWs described as "an account strategist in Snap's gaming advertising

11  group" and "a data scientist tasked with revenue forecasting" sufficiently described); *In re Daou*

12  *Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (allegations of each CW's job description and

13  responsibilities, without specific title, sufficient).  The CWs' allegations are further bolstered by

14  their corroboration.  *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *5 (W.D. Wash. Apr.

15  19, 2019) (CWs credited where averments "consistent and interlocking").  For instance, CW1, CW2,

16  and CW3 all confirmed that Athena was not viable for FTM projects, and that Stem did not have a

17  working prototype for FTM projects.  *See, e.g.*, ¶¶69-81.  Nor do the witnesses' allegations stand

18  alone – defendant Carrington has admitted that there is a "human in the loop," and Stem's actual

19  performance, as well as loss of the Available Power deal, reflect abysmal FTM sales.  ¶¶75, 257-

20  264.

21       Defendants' attempt to discredit the CW accounts on temporal grounds falls flat.  DB at 16-

22  17.  Not only do the witnesses provide consistent accounts that cover the entire Class Period, the

23  Ninth Circuit holds that inferences about a company's condition and operations or a defendant's

24  practices during a class period can be drawn from allegations regarding a time prior to a class period.

25  *See NVIDIA*, 81 F.4th at 939 ("FE 2's statements about [d]efendant Huang's practices in the period

26  immediately preceding the Class Period – in particular, his micromanaging and attention to detail –

27  are relevant and probative" to scienter during the Class Period.); *see also In re Quality Sys., Inc. Sec.*

28  *Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (accepting statements by CW not employed during class

1   period but having personal knowledge of defendants' real-time access to reports); *Roberts v. Zuora,*

2   *Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (employment during entirety of class

3   period not required); *cf. Kampe v. Volta, Inc.*, 2024 WL 308262, at *13 (N.D. Cal. Jan. 26, 2024)

4   (one CW who left the company over a year before class period began); *Bailey v. Zendesk, Inc.*,731 F.

5   Supp. 3d 1109, 1116 (N.D. Cal. 2024) (no "contemporaneous evidence" of falsity).

6          Further, when viewed in a light most favorable to the Plaintiffs, all three CW allegations

7   coupled with other corroborating allegations are particular and show why it is plausible to conclude

8   that Athena did not work for FTM projects prior to and ***throughout the entire Class Period***.

9   Defendants' efforts to require technical detail as to why Athena did not work for FTM projects is a

10  red herring – one does not need technical details of why a product was not fully automated or why

11  Stem was unable to provide a working example to its employees to infer that it did not work as

12  advertised. *Compare* DB at 16, *with* ¶¶46-49, 66-83. And unlike *In re Pivotal Sec. Litig.*, 2020 WL

13  4193384 (N.D. Cal. July 21, 2020) and *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996

14  (9th Cir. 2009), *as amended* (Feb. 10, 2009), these detailed CW accounts come from personal

15  knowledge, and are not conclusory because they directly address the "precise means through which"

16  Defendants omitted that Athena was neither automated nor viable for the FTM market. *Zucco*, 552

17  F.3d at 996. CW1 and CW2 were involved in sales and interacted directly with FTM customers who

18  told them Athena did not work. Likewise, Defendants' efforts to require CW allegations to directly

19  contradict Defendants' misrepresentations (DB at 10-11) ignores that the omission of material

20  adverse information is sufficient. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir.

21  2023)[2] (material omissions when "misconduct was far from 'transmitted to the public with a degree

22  of intensity and credibility sufficient to effectively counterbalance any misleading impression'");

23  *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *10-*11 (C.D. Cal. July 3, 2023) (while

24  "technically accurate," the alleged false statement still "misled investors by misidentifying and

---

[2]   *Cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, _ U.S. _, 144 S. Ct. 2629 (2024), *and cert. dismissed as improvidently granted sub nom. Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024).

obscuring the key facts").  Defendants' other attacks on the CWs (DB at 16) are properly raised on cross-examination at trial, not at the pleading stage.

### B. The FAC Adequately Alleges the Misrepresentations Were Materially False or Misleading

Falsity is alleged because the FAC "'specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . with particularity all facts on which that belief is formed.'"  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (quoting 15 U.S.C. §78u-4(b)(1)).  A statement may also be misleading if it omits material information.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018).  An omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

#### 1. Misstatements Regarding Athena Automation

Defendants misleadingly claimed that Stem had a "proprietary software platform, called Athena™, which enables AI-automated system operations." ¶¶158, 188 (Nos. 1, 24).  They also told investors, *inter alia*, that Athena: (i) "automates everything," ¶200 (No. 65); (ii) is "a *fully automated* process lights out" with "*no humans involved in this loop*.  Once we set it up, it just keeps running." ¶205 (No. 82); (iii) is "*fully automated*" in the Massachusetts FTM market, ¶222 (No. 54); (iv) "automates system discharges across multiple different utility territories," ¶¶159, 189 (Nos. 2, 25); and (v) "automatically switch[es] between battery power, onsite generation and grid power," ¶¶161, 163, 165, 190-191, 196 (Nos. 3-11, 19-20, 22-23, 26-34, 42-43, 45-47, 50, 58).  Defendants also relied on Athena's supposed "power of automation" to claim that Stem was well positioned to be profitable and grow.  ¶206 (No. 89), *see generally* ¶¶187-210.  Plaintiffs adequately plead these statements were misleading because Athena was neither fully automated nor viable for the FTM market but was a mere prototype and required human intervention, as confirmed by the three CWs and an admission by Carrington that Stem's "program management team[ ] adds a 'human-in-the-loop'" (¶75).  *See* ¶¶66-83; *see also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at

1   *10 (N.D. Cal. Nov. 4, 2020) (relying on post-Class Period admission "suggest[ing] that [defendant]

2   had ["contrary"] information" at time of false statement).  Contrary to Defendants' authority (DB at

3   8), Plaintiffs do show "direct contradict[ion]" with their statements and undisclosed adverse

4   information.

5        The allegations here are not "[v]aguely disparaging" of Athena (DB at 8); rather, they go to

6   its inability to provide core functions.  *Cf. Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *7,

7   *19 (N.D. Cal. Nov. 16, 2020) (company disclosed that a new technology was unproven and the

8   technology was not the basis for the company's commercial viability).  Defendants' attempt to limit

9   Plaintiffs' allegations to only "certain functions" of Athena (DB at 7) deliberately ignores their

10  actual misstatements that Athena was "fully automated" with "no human in the loop" and that, in

11  context, this is the message conveyed by all of their statements.  *See generally* ¶¶187-210.

12  Moreover, the CWs assert that the "functions" Defendants point to were core functionalities that did

13  not work for FTM.  Thus, the only reasonable inference from the picture Defendants paint regarding

14  Athena for the FTM market was that it was viable and fully automated.[3]  Further, Defendants'

15  suggestion that Stem only added a "human in the loop" post-Class Period (DB at 10) when they

16  claimed Athena was fully automated during the Class Period is implausible and should be rejected.

17  *See Berson v. Applied Signal Tech.*, 527 F.3d 982, 986-87 (9th Cir. 2008) (rejecting defendant's

18  "conceivable interpretation" where it was "hardly the only – or even the most plausible – one").

19  Defendants specifically disavowed that humans were required as part of Athena's "fully automated

20  process" (¶205 (No. 82)) during the Class Period and Carrington's admission that there is a "human

21  in the loop" undercuts that Athena was ever able to provide core automated functions.  ¶75.

22       Moreover, the three CW accounts and Carrington's admission – viewed collectively –

23  demonstrate Athena was ***never*** viable for the FTM market, leading up to or during the Class Period.

24  *See* §II; *see also Zillow*, 2019 WL 1755293, at *5 (CWs credited where averments "consistent and

25  interlocking").  In addition, Stem's massive miss of its earnings and margin targets – which hinged

26

---

27  [3]   Defendants' query regarding how a spreadsheet could charge batteries (DB at 8 n.2) ignores that
    Athena lacked the core functionalities touted by Defendants and rather had a Stem employee
28  performing these functions instead.  ¶73.

on the viability of Athena for the FTM market – further evidence Athena's alleged automation was not working for FTM. *See* ¶¶90, 99-101, 268, 292-293, 300-301, 309-312. The FAC is factually inapposite from Defendants' authority (DB at 7-10) because, unlike here, the plaintiffs in those cases did not provide sufficient detail evidencing falsity or included witness accounts that were mere disagreements with statistical methodology.

## 2. Misstatements Regarding Business Model and Success in the FTM Market

Defendants sold investors on a business model that relied primarily on software sales in the FTM market by falsely stating Stem's "operational focus and technical capabilities . . . position[ed them] to have multiple product offerings and services in the evolving market for FTM energy." ¶¶171, 212, 218-219 (Nos. 15, 37, 68, 91). Defendants also falsely portrayed Stem as having success in the FTM market as a result of Athena. For example, they told investors that: (i) "Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers," ¶¶169, 201, 213 (Nos. 14, 41, 67); (ii) Stem's business was a "software story" and "the differentiating component of Stem is the Athena platform," ¶217 (No. 66); (iii) "the software is either meeting or exceeding their expectations," ¶226 (No. 62); (iv) "the front-of-the-meter side [was] a market . . . that [Stem] really continue[s] to have great success on," ¶227 (No. 83); and (v) Athena was a "real accomplishment that is very much attributable to [Stem's] software platform [that it] could translate [its] behind-the-meter software deck to that front-of-the-meter need." ¶228 (No. 84). *See also, generally* ¶¶211-231. To boot, Defendants falsely highlighted that the one large FTM project it did have in Massachusetts proved that it could be successful in the FTM market. ¶¶222-229 (Nos. 54-57, 62, 83-85).

Because Stem's business model was premised on a product that was not viable, Defendants' misrepresentations created an "impression of a state of affairs that differs in a material way from the one that ***actually exists***." *Berson*, 527 F.3d at 985; *see also In re SupportSoft, Inc. Sec. Litig.*, 2005 WL 3113082, at *3, *6 (N.D. Cal. Nov. 21, 2005) (statements actionable where company failed to disclose that "the software [was] problematic and incapable of performing functions promised"). Any reasonable investor would understand their statements to contain the embedded fact that the key

1  product offering on which Stem's business model relied – Athena – was viable for the FTM market,

2  when it was not.  *E.g.*, ¶¶211-231; *see Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017)

3  (reasonable investors would view statement that technology is "working" in the context of other

4  statements "made over a long period of time, describing what [the technology] did and what

5  practical aims it was supposed to achieve"); *Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *2-

6  *4 (D. Ariz. Dec. 17, 2012) (underreporting scope of solar panels' defects misleading).

7         Defendants' contention that Stem had, "in context," success with Athena is preposterous.

8  DB at 11.  First, Stem's success in the BTM market is irrelevant because FTM projects are

9  "significantly more complex."  ¶69.  Second, the release Defendants cite for the proposition that

10  Stem had success in the FTM market because the product was automated or viable says no such

11  thing.  DB at 11, Ex. 3.  Rather, the release related to Stem's Massachusetts project, for which

12  Plaintiffs allege Stem used human intervention to perform Athena's core functionalities.  *Compare*

13  DB at 11, Ex. 3, *with* ¶¶66-83, 221-231.  Third, Stem's actual results belie any such notion that the

14  Company had any widespread "success" in the FTM market.  For example, for FY 2022, rather than

15  gross margins of 26% and a positive adjusted EBITDA of $28 million as promised by Defendants,

16  Stem reported gross margins of 13% and a negative adjusted EBITDA of $46 million.  ¶¶101, 309-

17  311.  The plausible inference is that the astronomical 50% gross-margin and nearly 300% earnings

18  misses were because, *inter alia*, "Athena [was] an empty suit when it came to the software for the

19  FTM projects because Stem simply did not have the software it said it had" and "many [FTM] deals

20  did not close because customers . . . realized Athena did not work for FTM projects," resulting in a

21  meager 15%-20% FTM project close rate.  ¶¶71, 89.  The failed Available Power and Lullwater

22  deals stack on to this inference.  ¶¶84-88, 257-271.  Indeed, Stem could not even provide its own

23  employees with a working prototype to demonstrate that the product worked.  ¶72.  Contrary to the

24  cases Defendants cite (DB at 8) where the defendants disclosed the ongoing problem and/or the

25  allegations were conclusory, here, Plaintiffs' allegations are particular and corroborate each other.

26         Further, couching statements with terms such as "I think" or "we believe," including those

27  regarding Athena's purported automation and viability for FTM projects (¶¶171, 212, 218-219 (Nos.

28  15, 37, 69, 91)) do not transform factual assertions into inactionable opinions.  *Omnicare, Inc. v.*

1   *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-85, 192-93 (2015).  Even if

2   Defendants' statements were considered opinions, they are still actionable because Defendants

3   "lacked the basis for making those statements that a reasonable investor would expect," "contain

4   embedded statements of fact," or the statement or the opinion did not "fairly align[] with the

5   information in [their] possession."  *Omnicare*, 575 U.S. at 185-89, 196; *see also Glazer*, 63 F.4th at

6   764 (similar).  Here, that Stem "developed operational focus and technical capabilities that position

7   us to have multiple product offerings and services in the evolving market for FTM energy storage

8   services" and Athena's "ability to optimize operations in both BTM and FTM markets" are clear

9   statements of embedded fact; Stem had not developed the "technical capabilities" and was not able

10  to "optimize operations" in the FTM market because it lacked a viable automated FTM software

11  product.  *See* §II; *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal.

12  Aug. 7, 2020) (opinions actionable when plaintiff pleads facts that "call into question the issuer's

13  basis for offering the opinion").  Defendants' representations that they believe Athena "provides

14  [Stem] with a competitive advantage" (¶¶171, 212, 218-219 (Nos. 15, 37, 69, 91)) is actionable

15  because it did not fairly align with the facts in Defendants' possession at the time.  Athena could not

16  provide a competitive advantage when it was not automated or viable for the FTM market.  *See*

17  *Glazer*, 63 F.4th at 764 ("When defendants 'tout positive information to the market,' they must 'do

18  so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts

19  against the positive information.'").  Finally, Athena's lack of viability would be material to the

20  reasonable investor because Athena was "key to [the Company's] growth and success."  ¶387; *see*

21  *also In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017).

22          **3.      The Purported Risk Factors Are Actionable Because They Had
                      Already Materialized**

23

24          Beginning on 03/30/21, Defendants purported to warn of the risks that Stem may be unable

25  to "develop and maintain" its proprietary software, Athena (¶248 (No. 86)), which would impact

26  Stem's "competitive position" (¶¶174, 234 (Nos. 16, 38)); that Stem's Athena software may have

27  "***undetected defects***," "***bugs***" or "***errors***" that could impact market adoption (¶¶176, 235 (Nos. 17,

28  39)); and that "the perception that [Athena] technology is ***unproven***" could impact "widespread

1    market acceptance" (¶¶178, 236 (Nos. 18, 40)).  On 08/11/21 and 11/10/21, Stem incorporated by

2    reference a registration statement with the same false and misleading warnings, ¶239 (Nos. 51-53,

3    59-61), and then again in its 02/28/22 FY 2021 Form 10-K, ¶¶245-247 (Nos. 70-72), FY 2022 Forms

4    10-Q filed on 05/06/22, 08/05/22, and 11/04/22, for 1Q 2022, 2Q 2022 and 3Q 2022, ¶248 (Nos. 74-

5    76, 78-80, 86-88), and its 02/17/23 FY 2022 Form 10-K, ¶249 (Nos. 92-94).

6            Contrary to these statements, "these risks [had] already . . . come to fruition" because Stem

7    did not have the technology that it claimed it had because Athena was "defective" – it was neither

8    fully automated nor viable for FTM projects.  *See Glazer*, 63 F.4th at 781; *see also Alphabet*, 1 F.4th

9    at 703 (risk disclosure statements actionable when warned-of risks had already come to fruition); *cf.*

10   *Cullen v. Ryvyl, Inc.*, 2024 WL 898206, at *11 (S.D. Cal. Mar. 1, 2024) (plaintiffs failed to show that

11   risks had materialized).  At the time of Defendants' misstatements, Stem had been "unsuccessful in

12   developing and maintaining its proprietary technology" but the Defendants failed to inform investors

13   that these risks had already come to fruition.  ¶234; *see Facebook,* 87 F.4th at 950 (a company may

14   make a misleading statement when it "'speaks entirely of as-yet-unrealized risks'" when the risks

15   have "'already come to fruition.'") (quoting *Berson*, 527 F.3d at 987).  Ninth Circuit "case law does

16   ***not require harm to have materialized*** for a statement to be materially misleading"; only the ***risk*** of

17   harm needs to have materialized.  *Id.* at 949.  Reference to hypothetical unfounded concerns about [a

18   company's] security practices "ripened into actual harm when the [security bug] was detected and

19   ***created the new risk*** that this discovery would become public." *Alphabet*, 1 F. 4th at 703.  Nor does

20   a defendant need to "know" the extent of likely harm.  *Facebook*, 87 F4th at 948-50.

21           Defendants contend that Athena's lack of core functionalities preventing it from being fully

22   automated or viable for FTM does not qualify as "undetected defects, errors or bugs in hardware or

23   software."  ¶¶176, 235, 239, 246, 248-249 (Nos. 17, 39, 52, 60, 71, 75, 79, 87, 93); DB at 7.  A

24   product's inability to be used as stated or intended is, indisputably, a defect.

25           **4.      Defendants Patel and Russo Made Actionable Statements**

26           Contrary to the Defendants' insinuation (DB at 4 n.1), it is not proper to dismiss defendants

27   Russo and Patel when they were involved in preparing investor materials and were required to

28   correct false statements made by other officers and did not.  *See Lorenzo v. SEC*, 872 F.3d 578, 590-

91 (D.C. Cir. 2017), *aff'd*, 587 U.S. 71 (2019) (key factor is the defendant's active involvement in the fraudulent scheme and direct communication with investors); *see Mandalevy v. Bofi Holding, Inc.*, 2021 WL 794275, at *7 (S.D. Cal. Mar. 2, 2021) ("high-level officers . . . play a part in ensuring the accuracy of [Defendants'] public statements"). Further, Patel participated in earnings calls and other investor conferences where misrepresentations were made. ¶¶22, 126, 195, 197, 204, 216, 222-223, 225, 227; *see In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (defendant's "power and authority to control the contents of the Company's press releases [and] investor and media presentations" sufficient) (alteration in original). They are also liable for their conduct under scheme liability. ¶¶251-287; *see Lorenzo v. SEC,* 587 U.S. 71, 78 (2019).

### 5.    Defendants Cannot Escape Liability by Invoking the Safe Harbor

A forward-looking statement is protected under the safe harbor if it is: (a) identified as such; *and* (b) accompanied by *meaningful* cautionary language. 15 U.S.C. §78u-5(c)(1)(A)(i); *see also Glazer*, 63 F.4th at 767. The safe harbor does not protect a defendant from liability for misstatements of present fact, as alleged here. *See, e.g.*, *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *6 (S.D. Cal. May 1, 2003) ("[a]ssertions of present or historical fact" are not forward-looking). Moreover, even where there are "mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *See Quality Sys.*, 865 F.3d at 1142.

The misrepresentations at issue here are not forward-looking or, at minimum, are mixed statements. For example, unlike the factually inapposite cases that Defendants cite (DB at 13-14), their representation that Athena's "ability to optimize operations in both the BTM and FTM markets . . . provides [Stem] with a competitive advantage," are current statements of fact regarding both Athena's abilities and Stem's competitive advantage. ¶¶212, 218, 219 (Nos. 37, 69, 91). So too are Defendants' statements regarding Stem's "*continued* momentum" based on the "effectiveness of our Athena platform," which inherently speaks to an *existing* momentum underlying this alleged misstatement. ¶223 (No. 55).

1    Regardless, even if forward-looking, the statements are still actionable because Defendants

2 "concealed adverse facts that gave investors a misleading impression of . . . the prospective market

3 for" Defendants' product and the risks had materialized. *Homyk*, 2023 WL 3579440, at *18.

4 Because Defendants knew of then-existing adverse facts, including that Stem did not have a viable

5 software product for the FTM market, the safe harbor does not insulate their statements. *Quality*

6 *Sys.*, 865 F.3d at 1141 (statements fall outside of the PSLRA's safe harbor when the speakers had

7 "actual knowledge" that the statement was false or misleading); *see also* §VI (detailing knowledge);

8 *Alphabet*, 1 F.4th at 703 ("Risk disclosures that 'speak[] entirely of as-yet-unrealized risks and

9 contingencies' and do not 'alert[] the reader that some of these risks may already have come to

10 fruition' can mislead reasonable investors.") (alterations in original).

11    Further, the allegedly forward-looking statements are actionable because Stem's risk

12 disclosures do not constitute "meaningful" cautionary language.   The risk disclosures were

13 themselves materially misleading because they omitted existing material adverse information.

14 *Rivian*, 2023 WL 4361098, at *9 (no safe harbor where there are material omissions).

15 **V.    The FAC Sufficiently Pleads Scheme Liability**

16    For scheme liability, under Rules 10b-5(a) and (c), it is unlawful to employ any device,

17 scheme, or artifice to defraud or engage in any act, practice, or course of business that operates as a

18 fraud or deceit. *Lorenzo*, 587 U.S. at 77.  A plaintiff need not plead scheme liability "to the same

19 degree of specificity as a plain misrepresentation claim." *In re Galena Biopharma, Inc. Sec. Litig.*,

20 117 F. Supp. 3d 1145, 1193 (D. Or. 2015).

21    Here, the Fraud Defendants engaged in a scheme to concoct a business model that hinged on

22 software that did not work so that they could consummate the merger of the financially-distressed

23 Stem with Star Peak and raise $600 million to keep Stem afloat long enough to try to develop

24 software for FTM customers (¶¶71, 98, 251-257, 358-365) and allow certain Defendants to sell stock

25 at artificially inflated prices.   ¶¶344-355.   In furtherance of the scheme, the Fraud Defendants,

26 working together, executed a plan (¶254) to convince investors that Stem already possessed the

27 automated software that was needed to transition Stem from a "hardware-dominated business"

28 (¶126) serving a relatively small market (¶60) to a "capital light" software business (¶63) serving the

1   FTM market which was ten times larger (¶¶60, 97).  Investors typically assign higher valuations to

2   software businesses because they can scale up rapidly and serve massive markets at low cost, unlike

3   a business tethered to hardware sales, *i.e.*, battery sales.

4       As part of their scheme, the Fraud Defendants' acts of creating and disseminating[4] false

5   statements, including those about Stem's business model, was a fraud and deceit upon the market

6   and is, alone, sufficient to plead a scheme.  *See Lorenzo*, 587 U.S. at 80; *SEC v. Richman*, 2021 WL

7   5113168, at *8 (N.D. Cal. Nov. 3, 2021) ("misleading [. . .] investors about the strength and

8   sustainability of the company's business model" was sufficient for scheme); *see also SEC v.

9   SeeThruEquity, LLC*, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (deceptive business model

10  was sufficient for scheme).

11      In addition, the FAC pleads other acts in furtherance of the scheme (¶¶252-253) which

12  served to mislead the market that Stem had automated software capable of serving the FTM market

13  (¶389).  These acts include: (i) purchasing another software company, AlsoEnergy, to obfuscate

14  what earnings were attributable to Athena's purported success in Stem's reported financial results

15  (¶¶114-121, 256); (ii) touting Stem's pipeline and bookings and other metrics to make it appear there

16  was strong demand for Stem's Athena software when, in fact, the pipeline and bookings were

17  entirely unrealistic and not representative of viable FTM deals (¶¶82-85, 89, 259, 277-279); (iii)

18  touting a $500 million purported FTM "deal" with Available Power the same day Stem announced

19  disappointing earnings to distract investors from the negative news, even though, unbeknownst to

20  investors, the "deal" was not a viable sale (¶¶84-89, 257-263); and (iv) concealing the loss of the

21  Available Power "deal" by providing parent guarantees to unload onto other "customers" the

22  inventory that had been purchased in violation of Company policy and to be able to announce yet

23  more "deals," despite their undisclosed, highly contingent nature that in fact led to revenue

24  reductions (¶¶82, 86, 264-271).  Fraud Defendants complain some of the alleged scheme conduct

25  "cherrypick[s] a small number of deals that struggled[,]" (DB at 26) but publicizing such weak,

---

26  [4]   These acts of creation and dissemination included the preparation of materials used in
27  presentations to Star Peak investors leading up to the IPO, during earnings calls, and for analyst
    days, attempts to influence analysts, and attempts to discredit or distract from negative information
28  about the merger, all intended to artificially inflate the price of Stem's securities.  ¶253.

1    highly-contingent, and nonexistent "deals" and concealing failures are all acts in furtherance of the

2    scheme. *SEC v. Fiore*, 416 F. Supp. 3d 306, 321 (S.D.N.Y. 2019) (efforts to convince public of

3    more market interest than existed was sufficient for scheme). And the Available Power "deal" was

4    not small but Stem's purportedly largest FTM deal. ¶261.

5        Fraud Defendants rely on *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir.

6    2006), *vacated by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008) to argue the

7    alleged other acts were in the ordinary course of business and, thus, not a scheme. DB at 26. But

8    *Simpson* has no precedential authority as it was vacated. Regardless, if anything, *Simpson* supports

9    the scheme claims because Plaintiffs plead Fraud Defendants portrayed to the market through their

10   false statements and other acts that Stem had a viable software-model for FTM through Athena,

11   which gave Stem a purported "competitive advantage," for the purpose of consummating a merger

12   and selling stock at artificially inflated prices. *Simpson*, 452 F.3d at 1050 (transaction whose

13   purpose is to create a false appearance or inflated financial image is not within the normal course of

14   business);[5] *see also Abdo v. Fitzsimmons*, 2021 WL 616324, at *11-*13 (N.D. Cal. Feb. 17, 2021)

15   (directors participated in scheme by disregarding a risk that signing documents would contribute to a

16   fraud where they knew materials may have contained misstatements).

17       Importantly, the FAC adequately pleads all Fraud Defendants acted deceptively in

18   furtherance of the scheme. *See Galena*, 117 F. Supp. 3d at 1193 (alleging defendant's "role" in

19   scheme is sufficient to allege participation); ¶253 (all Fraud Defendants alleged to have "creat[ed]

20   and endors[ed]" the fraudulent business model to artificially inflate valuation). The Fraud

21   Defendants' individual roles in the scheme are set forth in the "Parties" section of the FAC. ¶¶14-15

22   (Stem); ¶¶16-17 (CEO Carrington); ¶¶18-19 (CFO Bush); ¶¶20-21 (CTO Johnson); ¶¶24-25 (CRO

23   Russo); ¶26 (Senior Director of Product Management Ho); ¶¶22-23 (CSO Patel); ¶27 (Star Peak);

24   ¶¶27-28 (CEO/Director Scheyer); ¶29 (Chairman Morgan); ¶31 (Director Daley); *see Galena*, 117 F.

25   Supp. 3d at 1193 ((collecting cases) (describing actionable conduct for purposes of a scheme

26   _____

27   [5]    Defendants' cases (DB at 26-28) are inapposite or distinguishable because those cases included
     facts such as plaintiffs failing to plead falsity or scienter, inadequate witness allegations, alleging
     fraud by hindsight, challenging permissible accounting judgments, and non-fraudulent conduct
28   accompanied by adequate warnings.

1   including reviewing and approving misleading documents)); *In re Firstenergy Corp. Sec. Litig.*,

2   2022 WL 681320, at *15-*16 (S.D. Ohio Mar. 7, 2022) (signing SEC filings and making statements

3   during investor calls constituted participation in scheme).

4           Each of the officers and directors were participants in the solicitation of the proxies for the

5   Merger and IPO and thus the deceitful "plan." ¶¶136-137, 143-154, 198, 254-255. As officers and

6   directors of public companies, each of the Fraud Defendants had a duty to disseminate truthful

7   information and possessed the power to control and correct SEC filings, press releases, and earnings

8   calls. ¶¶37-41. *See In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 665 (S.D. Tex.

9   2021) (allowing joint presenter to speak falsely during earnings call actionable); *Freudenberg v.*

10  *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) (same); *Plumbers Union Loc. No. 12*

11  *Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010) (same).

12  Further, Fraud Defendants Bush, Carrington, Daley, Johnson, Patel, and Russo sold stock at inflated

13  prices as part of "their fraudulent course of conduct." *Compare* ¶¶344-355, *with In re Vaxart, Inc.*

14  *Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. May 25, 2023) (stock sales part of a scheme);

15  *Galena*, 117 F. Supp. 3d at 1194 (same).

16  **VI.    The FAC Alleges a Strong Inference of Scienter for the §10(b) Claims**

17          Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but

18  also 'deliberate recklessness.'" *Shueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir.

19  2016). A defendant is deliberately reckless if they "had reasonable grounds to believe material facts

20  existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts

21  although [they] could have done so without extraordinary effort." *Hatamian v. Advanced Micro*

22  *Devices, Inc.*, 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). Nor is direct evidence required –

23  "'particular allegations which ***strongly imply*** Defendants' *contemporaneous* knowledge that the

24  statement was false when made'" are sufficient. *Id.* at 1161-62 (quoting *Berson*, 527 F.3d at 989)

25  (some emphasis in original). Fraud Defendants attempt to parse the scienter allegations and pick

26  them off one by one, but scienter is to be considered "holistically." *Tellabs, Inc. v. Makor Issues &*

27  *Rts., Ltd.*, 551 U.S. 308, 326 (2007). The scienter inference here, that Fraud Defendants were aware

28  Athena was not viable for FTM projects, is "strong" and is "at least as likely" as the opposing

1  inference, that Defendants were oblivious that Stem's "key" to success did not work as promised.

2  *Id.* at 324, 328-29 (no smoking gun required); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026-

3  30 (N.D. Cal. 2020) (totality of allegations support scienter).  Even if Defendants' contentions were

4  plausible, a "tie goes to the Plaintiff."  *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D.

5  Cal. Aug. 4. 2014); *Tellabs*, 551 U.S. at 326 (court must find for plaintiff if "the inference of scienter

6  at least as strong as any opposing inference").  Plaintiffs' allegations, taken holistically, support a

7  strong inference of scienter.

8       **Post-Class Period Admission**: During Stem's 02/28/24 earnings call, defendant Carrington

9  admitted that, contrary to prior statements that Athena was fully automated with "no humans

10  involved in this loop," in fact, Stem's "program management team[ ] adds a 'human-in-the-loop'" to

11  Athena's operations.  ¶75.  *See also Apple*, 2020 WL 6482014, at *10 (post-Class Period admission

12  supported scienter).

13       **Core Business Operations**: Plaintiffs meet the "absurdity test" as they allege Athena's

14  viability for FTM projects was integral to Stem's stated business model, its successful IPO and to

15  Stem's long-term survival.  *Snap*, 2024 WL 5182634, at *3 ("The TAC also meets the 'absurdity'

16  test . . . 'where the nature of the relevant fact is of such prominence that it would be "absurd" to

17  suggest that management was without knowledge of the matter.'"); *see S. Ferry LP, No. 2 v.

18  Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008); *see also, e.g.*, ¶387 (Athena is "key to our growth

19  and success"); ¶278 (two-thirds to 80% of Stem's $5 billion pipeline consisted of these FTM

20  projects); ¶¶387-388 (Carrington admitted Athena powered everything Stem does).

21       **Fraud Defendants' Access to Information Contradicting Their Public Statements**:

22  While CWs need not have personally interacted with Defendants (DB at 170; *Glazer*, 63 F.4th at 771

23  (knowledge of corporate-level activities not necessary for statements to "combine to tell a plausible

24  story")), Plaintiffs allege CW1 and CW3 attended weekly sales meetings ***with*** defendants Russo,

25  Carrington (and sometimes Bush) during which Russo asked questions about every deal in the

26  pipeline.  ¶¶83, 375-378, 383; *see also In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129,

27  at *28 (N.D. Cal. Mar. 21, 2018) (scienter inferred by attendance at a global sales meeting).  CWs 1,

28  2 and 3 all confirmed that Stem used Salesforce to record bookings and purchase orders (¶¶374-376),

1    CW1 learned from the weekly meetings (not from Mary Adam, as Defendants suggest, DB at 20)

2    that Russo was a self-proclaimed Salesforce data czar, and CWs 1, 2 and 3 confirmed Russo

3    personally accessed and reviewed the Salesforce data, which would have showed that throughout the

4    Class Period, FTM deals were closing at a modest rate of only about 15%-20% (which included

5    contingent "deals" that were not deals at all).  ¶¶83, 89, 375-376.

6        On an 11/09/21 earnings call, Carrington admitted that Stem "run[s] a very rigorous process

7    of weekly discussions, looking at each project aligned . . . with the operations team and e-staff

8    members.  So we're all over this. . . .  [W]e're also monitoring those [FTM projects] on a regular

9    basis." ¶380.  The Fraud Defendants' attendance at meetings, access and review of Salesforce data

10   and "monitoring" and weekly "rigorous process" informed them that Athena was not automated nor

11   viable for FTM projects.  *Daou Sys.*, 411 F.3d at 1022 (admissions of monitoring support scienter);

12   *see Quality Sys.*, 865 F.3d at 1145 (scienter where "'reports' and sales forecasts" through Salesforce

13   software showed trends "available to executives"); *In re Lattice Semiconductor Corp. Sec. Litig.*,

14   2006 WL 538756, at *15 (D. Or. Jan. 3, 2006) ("access to information about the company's business

15   success and to information about the company's financial data," adds to scienter); *cf.*, *Prodanova v.*

16   *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1112 (9th Cir. 2021) (no particular allegations that

17   any executive had access to adverse information).

18       **Fraud Defendants' Participation in IPO Due Diligence**: Scheyer, Morgan, Daley,

19   Carrington and Bush's participation in the extensive pre-IPO due diligence of Stem adds to the

20   inference that they knew Athena did not work for FTM projects and would not drive growth.  ¶¶366-

21   373 (detailing due diligence, which would have showed, for example, that the forecasts included in

22   the Defective Proxy were inflated with non-viable FTM deals); *In re Vaxart, Inc. Sec. Litig.*, 576 F.

23   Supp. 3d 663, 673 (N.D. Cal. 2021).  Contrary to the Fraud Defendants' contention, Plaintiffs allege

24   which documents were prepared (*e.g.*, Defective Proxy, financial forecasts, Salesforce data), by

25   whom (Bush, Carrington, Daley, Litowitz, Morgan, Russo, and Scheyer), when (pre-IPO), why

26   inaccurate (included non-viable FTM deals and misrepresented Athena's functionalities for FTM)

27   and how the Fraud Defendants knew (meetings, Salesforce).  ¶¶366-373.

28

1      **Fraud Defendants' Violations of Stem's Internal Policies**: The Fraud Defendants'

2   issuance of false statements, failure to report violations, and purchasing hardware for the Available

3   Power deal without a purchase order all also add to the inference of scienter.  ¶¶84-85, 399-410;

4   *Patel v. Axesstel, Inc.*, 2015 WL 631525, at *12 (S.D. Cal. Feb. 13, 2015) (violation of policy

5   supported inference of scienter); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *17

6   (N.D. Cal. Apr. 2, 2002) (scheme to inflate revenue against internal policy supported scienter).

7      **Insider Trading**: During a ***one-year period*** of November 2021 to November 2022 (not a

8   121-week class period, DB at 18), the Selling Defendants collectively reaped over $27 million in

9   proceeds ($41 million with other insiders) from the sale of their personal holdings of Stem stock

10  with Carrington selling 51% of holdings for proceeds of over $8 million; Daley selling 40% for over

11  $8.3 million; Russo selling 40% for over $2.7 million; Bush selling 31% for over $3 million;

12  Johnson selling 25% for over $1.7 million; and Patel selling 69% of holdings in 2021 for over $3.1

13  million. ¶¶344-355; *see In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D.

14  Cal. 2003) (sale of 7.6% of holdings supported scienter); *Provenz v. Miller*, 102 F.3d 1478, 1491

15  (9th Cir. 1996) (sale of 20% of stock supported scienter).  They also sold at suspicious times with

16  trades occurring immediately after the lock-up expired and prior to negative news concerning Stem's

17  earnings, failed Available Power deal, and desperate need for financing.  *See, e.g.*, ¶¶346-354;

18  *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *18 (C.D. Cal. Aug. 4, 2017) (scienter

19  pled where "[d]efendants sold at the earliest possible moment, while aware of negative

20  information"); *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) (selling

21  17%-45% of shares within three months of corrective disclosure supports scienter).

22      Fraud Defendants' contention that some of their trades were "nondiscretionary" (DB at 18-

23  19) should be disregarded as any sales made to cover taxes are discretionary, and the presence of a

24  Rule 10b-5 trading plan does not negate scienter and is otherwise an issue of fact not properly

25  decided on a motion to dismiss.  *See In re Questcor Inc. Sec. Litig.*, 2013 WL 5486762, at *16 (C.D.

26  Cal. Oct. 1, 2013).  Where a defendant "conceal[ed] the negative information before the sale," as

27  they did here, they are not insulated by a Rule 10b5-1 trading plan.  *In re BioMarin Pharms. Inc.*

28  *Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022); *Azar v. Yelp, Inc.*, 2018 WL 6182756,

1    at *18-*20 (N.D. Cal. Nov. 27, 2018); *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL

2    13026910, at *2 (C.D. Cal. Dec. 10, 2012) (declining to consider SEC Forms 4 for truth of the

3    content and inferences drawn therefrom).

4    **Need to Raise Capital**: Prior to the IPO, Stem's auditor expressed that the Company was a

5    going concern – *e.g.*, on the verge of financial collapse.  ¶¶92, 358.  Stem needed to raise capital

6    because its survival depended on it and this motivated the Fraud Defendants to overstate Stem's

7    unrealistic business model.  ¶¶358-365; *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064, n.8 (9th

8    Cir. 2000) (motive based on need to "raise financing"); *Butala v. Owlet, Inc.*, 2024 WL 3648141, at

9    *6-*7, (C.D. Cal. Aug. 5, 2024) (motive to raise financing combined with "red flags" concerning a

10   company's financial condition sufficient for scienter); *Nguyen v. Radient Pharms. Corp.*, 2011 WL

11   13141630, at *8 (C.D. Cal. Oct. 26, 2011) (misrepresentations made to secure financing).

12   Defendants' cases (DB at 21) do not concern a company in financial dire straits.

13   **Suspicious Departure of Multiple Stem Executives**: That five long-time executive

14   defendants and a director defendant all departed in rapid succession between May and October 2024,

15   immediately prior to Stem announcing $104.1 million of bad debt expense that was connected to

16   Athena's lack of viability in the FTM market, adds to scienter.  ¶¶395-398; *see Luna v. Marvell

17   Tech. Grp.*, 2017 WL 2171273, at *5 (N.D. Cal. May 17, 2017) (finding scienter as "'house-cleaning

18   and reforms' like terminating certain employees [. . .] 'do not follow innocent mistakes'"); *In re

19   UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("proximity of Defendants'

20   departures to the financial restatements and investigations adds" to scienter); *Lamartina v. VMware,

21   Inc.*, 2021 WL 4133851, at *14 (N.D. Cal. Sept. 10, 2021) (even if a resignation alone is not enough

22   for scienter, "'it add[s] [a] piece to the scienter puzzle'") (alterations in original).  Defendants' cited

23   cases (DB at 22-23) lack the details of tenure, proximity in time, connection to misstatements, and

24   volume of departures that add to scienter in this case.

25   **VII.    The Complaint Adequately Alleges §14(a) Claims**

26       **A.    Plaintiffs' 14(a) Claims Do Not Sound in Fraud**

27   To state a §14(a) claim, a plaintiff must show that "'(1) a proxy statement contained a

28   material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy

1   solicitation . . . was an essential link in the accomplishment of the transaction.'" *In re Hot Topic,*

2   *Inc. Sec. Litig.*, 2014 WL 7499375, at *4 (C.D. Cal. May 2, 2014); *Knollenberg v. Harmonic, Inc.*,

3   152 F. App'x 674, 682 (9th Cir. 2005).  Section 14(a) only requires that Plaintiffs allege a defendant

4   acted negligently and scienter is not required.  *Hot Topic*, 2014 WL 7499375, at *4.

5          Allegations of "non-fraudulent conduct need satisfy only the ordinary notice pleading

6   standards of Rule 8(a)."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-05 (9th Cir. 2003).

7   Unless the plaintiff alleges a "unified course of fraudulent conduct," such that the entire claim is

8   "grounded in fraud," only the allegations of fraud must be pled with particularity.  *Id.* at 1103-04.

9   The FAC cures the earlier pleading defect found by the Court (Order at 25) by pleading non-

10  fraudulent conduct, including detailing negligent conduct separately (¶¶134-155), not incorporating

11  fraud (¶¶432-442) and setting the §14(a) claims apart from the fraud claims.  *See In re Exodus*

12  *Commc'ns, Inc. Sec. Litig.*, 2005 WL 2206693, at *1 (N.D. Cal. Sept. 12, 2005) (negligence based

13  claims not subject to Rule 9(b) where claims do not incorporate or make a "wholesale adoption" of

14  fraud allegations).  Even if the Court finds Rule 9(b) applies, the FAC also satisfies that standard.

15      **B.    Plaintiffs Adequately Allege Each Defendant's Participation in the**
        **Solicitation of Shareholder Votes Pursuant to the Defective Proxy**

16

17          The FAC specifies each statement alleged to be false in the Defective Proxy, who made the

18  statement and why the statements were false.  ¶¶156-182; Ex. A(1).  As detailed in the chart below,

19  Plaintiffs also adequately allege solicitation as to each of the 14(a) Defendants as they "'plead the

20  nature of [the] [d]efendants' involvement in preparing or reviewing the Proxy,' combined with the

21  '[d]efendants' management roles in the company.'"  Order at 25-26 (quoting *Azar v. Blount Int'l.*,

22  2017 WL 1055966, at *10 (D. Or. Mar. 20, 2017)).  Such allegations "suffice to plead negligence

23  under the PSLRA" (*id.*):

| 14(a) Defendant | IPO False Statement(s) | Solicitation | Negligent Preparation |
|---|---|---|---|
| Carrington (Stem CEO) | • Spoke falsely at 12/04/20 Investor Conference. ¶¶16, 104, 150-153, 159.<br>• Speaker of numerous Company-issued releases. ¶150, Nos. 1, 3-4, 6-10, | • 12/04/20 and 03/30/21 releases deemed "executive officers" a "participant[] in the solicitation." ¶¶137, 152<br>• Participated in Road shows. ¶142.<br>• Had  discussions  and | • "Prepared, reviewed, and disseminated Defective Prospectus and Defective Investor Materials." ¶¶437-438.<br>• Participated  in  the negligent  preparation  of |

| 14(a)<br>Defendant | IPO False<br>Statement(s) | Solicitation | Negligent Preparation |
|---|---|---|---|
| | 19-20, 22-23. | negotiations with the Stem and STPK Boards and management concerning the Merger terms. ¶¶137, 140-141, 153, 437-438. | Stem's financial forecasts in the Defective Proxy. ¶¶144, 147-149. |
| Bush<br>(Stem CFO) | • Participated in 12/04/20 Investor Conference. ¶¶18, 150, 153.<br>• Speaker of numerous Company-issued releases. ¶¶18, 150, 153, Nos. 1, 3-4, 6-10, 19-20, 22-23. | • 12/04/20 and 03/30/21 releases deemed "executive officers" a "participant[] in the solicitation." ¶¶137, 152<br>• Part of "Stem management" keeping Board updated on Merger discussions and diligence. ¶¶140-141.<br>• Point person to answer questions regarding the consent solicitation for the Merger. ¶146. | • "Prepared, reviewed, and disseminated Defective Prospectus and Defective Investor Materials." ¶¶437-438.<br>• Participated in negligent preparation of Stem's financial forecasts included in the Defective Proxy. ¶¶147-149. |
| Scheyer<br>(STPK CEO, Director and Controlling Shareholder) | • Signed Defective Proxy. ¶28.<br>• Spoke at 12/04/20 Investor Conference. ¶¶150, 153.<br>• Signed 12/04/20 8-K attaching press release with false statements. ¶¶150, 153.<br>• Speaker of Company-issued releases. ¶150, Nos. 1, 3-4, 6-10, 19-20, 22-23. | • Recommended Merger approval in 12/04/20 release. ¶¶150-151.<br>• Primary negotiator of the Merger participating in meetings with Stem management and Stem and STPK's Boards to discuss and negotiate Merger terms. ¶¶139, 141, 143-145. | • "Prepared, reviewed, and disseminated Defective Prospectus and Defective Investor Materials." ¶¶437-438.<br>• STPK agreed "*to prepare*" the Defective Proxy "for the purpose of *soliciting proxies*." ¶144. |
| Morgan<br>(STPK Chairman and Controlling Shareholder) | • Authorized Scheyer to sign the Defective Proxy on his behalf as attorney-in-fact. ¶29.<br>• Participated in 12/04/20 Investor Conference and 04/12/21 IPO Edge Fireside Chat. ¶29.<br>• Quoted in releases issued on 12/04/20 and 04/12/21 containing false statements. ¶188.<br>• Speaker of numerous | • Recommended approval of the Merger in the 12/04/20 release. ¶151.<br>• Primary negotiator of the Merger participating in meetings with Stem management and Stem's and STPK's Boards to discuss and negotiate terms of a business transaction. ¶¶139-141, 143-145. | • "Prepared, reviewed, and disseminated Defective Prospectus and Defective Investor Materials." ¶¶437-438.<br>• STPK agreed "*to prepare*" the Defective Proxy "for the purpose of *soliciting proxies*." ¶144. |

| 14(a) Defendant | IPO False Statement(s) | Solicitation | Negligent Preparation |
|---|---|---|---|
| | Company-issued releases. ¶¶150, 153, Nos. 1, 3-4, 6-10, 19-20, 22-23. | | |
| Russo (Stem CRO) | • Quoted in Stem's misleading releases filed by Star Peak with the SEC pursuant to Rule 425 on 03/02/21 and 04/06/21 issued to solicit votes for the Merger. ¶24. | • As part of Stem management, kept the Board informed about the Merger negotiations. ¶¶143-145. | • "Prepared, reviewed, and disseminated Defective Prospectus and Defective Investor Materials." ¶¶437-438.<br>• Participated in the negligent preparation of Stem's financial forecasts in the Defective Proxy. ¶¶144, 147-149. |
| Daley and Litowitz (STPK Directors) | • Authorized Scheyer to sign the Defective Proxy on their behalf as attorney-in-fact. ¶¶30-31. | • Recommended approval of the Merger. ¶151.<br>• Daley was a primary negotiator of the Merger participating in meetings with Stem management and Stem and STPK's Boards to discuss and negotiate terms of a business transaction. ¶¶139-140, 143-145. | • "Prepared, reviewed, and disseminated Defective Prospectus and Defective Investor Materials." ¶¶437-438.<br>• STPK agreed "*to prepare*" the Defective Proxy "for the purpose of *soliciting proxies*." ¶144. |

Plaintiffs have addressed the Court's concerns requiring "more" to demonstrate each of the 14(a) Defendants' participation in the solicitation.  Order at 26-27; *see also Blount*, 2017 WL 1055966, at *10 (collecting cases) (CEO and CFO's positions and participation of the defective proxy, including the misleading financial forecasts, sufficient to allege solicitation).  Plaintiffs further allege the 14(a) Defendants were responsible for correcting any misleading information in the Proxy.  ¶145; *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015-16 (N.D. Cal. 2007) (that defendants "were charged with ensuring . . . proxy statements were correct" sufficient).

Defendants fault Plaintiffs for making "references to other descriptions of Defendants in the proxy" (DB at 30), but Plaintiffs' reliance on publicly available facts to show the 14(a) Defendants' solicitation is entirely proper.  *Blount*, 2017 WL 1055966, at *10.  Defendants' lone case, *Mehedi v. View, Inc.*, 2023 WL 3592098 (N.D. Cal. May 22, 2023), is distinguishable because there, plaintiff only alleged "certain fees were payable [to the defendants] on summation of the Business Transaction (which was achieved via the Proxy)."  *Id.* at *15.

1

         **C.**      **Plaintiffs Plead the Misstatements Were an Essential Link**

2

        The FAC adequately alleges that the Defective Proxy "***was an essential link in the***

3

***consummation of the Merger*** and described itself as the sole source of information investors were to

4

rely upon in making the Merger vote and redemption decisions." ¶¶183-185, 441; *see Blount*, 2017

5

WL 1055966, at *11 ("Plaintiffs adequately plead proximate causation when they allege that the

6

Proxy 'was an essential link in the accomplishment of the transaction.'").

7

        Citing no authority, the 14(a) Defendants recycle their prior arguments that Plaintiffs failed

8

to allege an essential link because the FAC contains no allegations that any Plaintiff voted (DB at

9

29) and Plaintiffs could have redeemed their shares for cash so there is no connection between the

10

voting and redemption decisions.  DB at 30.  Not so.  The Defective Proxy prevented Class members

11

from making an informed decision about the value of their shares and whether to redeem or

12

exchange them, ***resulting*** in investor losses.  *E.g.*, ¶¶369-372, 388; *see Zoran*, 511 F. Supp. 2d at

13

1016 (proximate causation adequately pled where there are allegations that "'the Proxy solicitation

14

itself . . . was an essential link in the accomplishment of the transaction'") (quoting *Mills v. Elec.*

15

*Auto-Lite Co.*, 396 U.S. 375, 385 (1970)); *Blount*, 2017 WL 1055966, at *4 (same).

16

**VIII.**   **The Complaint Sufficiently Alleges Loss Causation**

17

        To allege loss causation, Plaintiffs need only "plausibly plead 'a causal relationship[,]'"

18

*Facebook*, 87 F.4th at 956, "between the defendant's fraudulent conduct and [their] economic loss,"

19

*In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020), that "provide[s] a defendant

20

with some indication of the loss and the causal connection that the plaintiff has in mind" and is "not

21

meant to impose a great burden upon a plaintiff."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347

22

(2005).  There is no perfect "match" requirement between the corrective disclosures and the alleged

23

misstatements.  *Compare* DB at 23-25, *with BofI Holding*, 977 F.3d at 790 (corrective disclosure

24

"need not precisely mirror the earlier misrepresentation") (citing cases).  Nor are Plaintiffs required

25

to allege what "portion" of the loss is attributable to the misstatements at the pleading stage, prior to

26

expert discovery.  DB at 25.  Rather, Plaintiffs need only show the misstatement was one substantial

27

cause of the loss.  *Daou Sys.*, 411 F.3d at 1025.

28

1    Here, Stem's disappointing gross margins and earnings disclosed on the first three alleged

2    disclosures were causally connected to Defendants' misrepresentations regarding Athena being fully

3    automated and viable for the FTM market, and as a result, a high-margin software company.

4    Following Stem's 02/24/22 disclosure of massive gross margin and earnings misses for FY 2021

5    (¶¶292-293), analyst commentary confirms that the market understood that Stem was struggling with

6    FTM sales.  *Id.*  On 02/25/22, Morningstar reported Stem needed to demonstrate an "ability to

7    generate software-only sales prior to [Morningstar] becoming more constructive on its valuation

8    upside."  ¶¶292-293, 298.  Following Stem's disclosure on 01/05/23 that FY 2022 gross margins

9    were tracking well below prior guidance (¶¶300-301), analyst commentary confirms that the market

10   questioned Stem's ability to deliver on its software-centric business model.  On 01/09/23,

11   Morningstar cautioned Stem "may be unsuccessful in generating stand-alone software sales" and

12   Stem's "software does not possess a competitive moat on its own."  ¶307.  Following, Stem's

13   disclosure on 02/16/23, of disappointing gross margins for FY 2022 and guidance for FY 2023

14   (¶¶309-311), analyst commentary again linked the poor results and guidance to Stem's status as

15   purportedly a high-margin software company.  *See* ¶¶318-319.

16   Each of the disclosures corrected Defendants' prior misstatements regarding Stem's status as

17   a high-margin software-centric company *vis a vis* its fully automated Athena software for FTM

18   projects (*e.g.*, ¶¶157, 200 (Nos. 1, 65)) and led to significant stock price drops of 21.62%, 8.78%,

19   and 10.42%, respectively, (¶¶297, 305, 317).  *See, e.g.*, *Karinski v. Stamps.com, Inc.*, 2020 WL

20   281716, at *17 (C.D. Cal. Jan. 17, 2020) (loss causation pled despite "neither announcement

21   disclos[ing] the conduct that Plaintiff contends is fraudulent" because "Plaintiff argues that both

22   earnings reduction[s] were . . . related to the . . . fraudulent conduct"); *Mineworks' Pension Scheme*

23   *v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("A plaintiff may also prove loss causation by

24   showing that the stock price fell upon the revelation of an earnings miss, even if the market was

25   unaware at the time that fraud had concealed the miss.").  Plaintiffs also establish loss causation for

26   these three disclosures by alleging Defendants' misrepresentations concealed the risks posed by

27   Stem's lack of a viable high-margin software product for the FTM market and that the risks

28   materialized through subsequent revelations, causing economic loss.  ¶¶295, 304, 306, 316, 323,

1    333; *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120-23

2    (9th Cir. 2013).

3        Plaintiffs also allege loss causation for additional corrective disclosures, including: (i) a $200

4    million offering on 03/29/23 (¶¶320-327); and (ii) a BofA report published on 04/04/23

5    downgrading Stem to "Underperform" because it lacked confidence in Stem's ability to "to drive

6    margin improvements" (¶¶328-338). These disclosures caused stock price drops of 10.42% and

7    18.05%, respectively (¶¶324, 334) and revealed that Stem needed cash because it did could not

8    deliver on its high margin "light capital" business model, resulting in a BofA downgrade due to

9    Stem's inability "to drive margin improvements" and deliver on its business model. ¶329. These

10    disclosures were causally connected to Stem's failure to have the automated Athena product

11    Defendants claimed Stem had. *See In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *10 (S.D.

12    Cal. Sept. 25, 2019) (stock offering, with other disclosures, sufficient to show loss causation); *In re*

13    *Avista Corp. Sec. Litig.*, 2006 WL 8429610 (E.D. Wash. June 2, 2006) (analyst downgrade, with

14    other factors, sufficient to plead loss causation).

15        Defendants' truth-on-the-market defense that it was "long disclosed" Stem's shift to FTM

16    would result in lower margins (DB at 25) is unsupported and wrong. The 02/16/23 corrective

17    disclosure revealed that Stem was nowhere close to becoming a "software-only" Company and still

18    heavily reliant on hardware sales, causing analysts to question Athena's viability for FTM. *Compare*

19    ¶215 (No. 48) ("[W]e've . . . ***created this AI machine*** that . . . ***really creates a higher competitive***

20    ***moat for the company***), *with* ¶307 (Morningstar: "Stem's software sales are largely derived from

21    hardware sales today. . . . We view the company's need to be involved in hardware as indicative that

22    its software does not possess a competitive moat on its own."). *See also In re Thoratec Corp. Sec.*

23    *Litig.*, 2006 WL 1305226, at *10 (N.D. Cal. May 11, 2006) (citing *Ganino v. Citizens Utils. Co.*, 228

24    F.3d 154, 167 (2d Cir. 2000) (rejecting truth-on-the-market defense on motion to dismiss)).

25        Defendants' injection of extraneous evidence for the truth of what purportedly caused

26    Plaintiffs' losses ignores allegations and may not be considered on a motion to dismiss to create

27    factual disputes. *Khoja*, 899 F.3d at 998. Either way, Exhibits' 25-27, 30 and 32 do not demonstrate

28    Stem was successfully transitioning to FTM. DB at 24-25. They show Stem was ***unable*** to

1    transition to a software-only model and, thus, experienced lower margins. *See* Plaintiffs' Opposition

2    to Defendants' Request for Judicial Notice ("RJN Opp.") at 13-16.

3          As to the 03/29/23 announced offering, calling it a "marketwide trend," DB at 25, does not

4    negate loss causation at the pleading stage because, unlike the rest of the market, Stem was a going

5    concern in desperate need of cash that it was not generating because of its failed business model (*i.e.*

6    lack of a viable FTM software product).   ¶¶320-323.   Further, the very report Defendants cite as

7    disclosing a "deleveraging" (DB at 25) actually states "we did not anticipate funding needs in 2023

8    **which raises questions about STEM's anticipated cash generation outlook**." *See* Ex. 34; *see also*

9    RJN Opp. at 14-16.  Likewise, the 04/04/23 BofA report was not "stale" (DB at 25) – it downgraded

10   Stem to underperform and reported a lack in confidence in Stem's ability to execute on its software-

11   only model.   ¶¶328-333; *BofI Holding*, 977 F.3d at 795 ("The underlying information, although

12   publicly available, 'had little to no probative value in its native state'; someone needed to put the

13   pieces together before the market could appreciate its import."); *see also In re Genius Brands Int'l*

14   *Inc. Sec. Litig.*, 97 F.4th 1171, 1186 (9th Cir. 2024) ("'A disclosure based on publicly available

15   information can, in certain circumstances, constitute a corrective disclosure.'").   Nor do Defendants

16   point to any other reason such as "'changed economic circumstances, changed investor expectations,

17   new industry-specific or firm-specific facts, conditions, or other events'" that caused Stem's 18%

18   stock drop. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).

19         Defendants' unsupported contention that Stem's stock price temporarily rebounded after

20   some disclosures (DB at 23) does not negate loss causation. *Luna v. Marvell Tech. Grp., Ltd.*, 2017

21   WL 4865559, at *3 (N.D. Cal. Oct. 27, 2017) ("Later market gains unrelated to the fraud do not

22   wipe out losses that resulted from the fraud.").   None of Defendants' cases (DB at 23-25) support

23   dismissal.   Rather, they are inapposite because they either involve statements from third parties of

24   irrelevant facts, did not decide loss causation, had no allegations of the market's understanding of the

25   corrective disclosures and/or alleged no link between the false statement and the negative news.

26   **IX.    Conclusion**

27         For the reasons set forth above, Defendants' motion should be denied.

28

1   DATED:  February 3, 2025                    Respectfully submitted,

2                                               ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
3                                               SHAWN A. WILLIAMS
                                                WILLOW E. RADCLIFFE
4                                               TAEVA C. SHEFLER
                                                ALAINA L. GILCHRIST
5

6
                                                        s/ Willow E. Radcliffe
7                                                    WILLOW E. RADCLIFFE

8                                               Post Montgomery Center
                                                One Montgomery Street, Suite 1800
9                                               San Francisco, CA  94104
                                                Telephone:  415/288-4545
10                                              415/288-4534 (fax)
                                                shawnw@rgrdlaw.com
11                                              willowr@rgrdlaw.com
                                                tshefler@rgrdlaw.com
12                                              agilchrist@rgrdlaw.com

13  DATED:  February 3, 2025                    LEVI & KORSINSKY, LLP
                                                SHANNON L HOPKINS (admitted *pro hac vice*)
14

15
                                                        s/ Shannon L. Hopkins
16                                                   SHANNON L. HOPKINS

17                                              1111 Summer Street, Suite 403
                                                Stamford, CT  06905
18                                              Telephone:  203/992-4523
                                                212/363-7171 (fax)
19                                              shopkins@zlk.com

20                                              LEVI & KORSINSKY, LLP
                                                DAVID C. JAYNES (SBN 338917)
21                                              1160 Battery Street East, Suite 100
                                                San Francisco, CA 94111
22                                              Telephone: 415/373-1671
                                                415/484-1294 (fax)
23                                              djaynes@zlk.com

24                                              Lead Counsel for Lead Plaintiffs

25

26

27

28

1

**CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)**

2   I, Willow E. Radcliffe, am the ECF User whose identification and password are being used to

3 file this document. Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in the filing of the

4 document has been obtained from each of the other signatories.

5

Dated:  February 3, 2025

6                s/ Willow E. Radcliffe
                 WILLOW E. RADCLIFFE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28